# *EXHIBIT C*



P.O. Box 443                                                    Pacific Palisades, CA 90272

March 28, 2016

Division of Dockets Management
Food and Drug Administration
Department of Health and Human Services
5630 Fishers Lane Room 1061
Rockville, MD 20852

**Re: Amendment to Docket FDA-2014-P-0814,** *Citizen Petition Asking the U.S. Food and Drug Administration to Increase Protection of Human Subjects in Clinical Drug Trials*

To Whom It May Concern:

The Center for Responsible Science (CRS) hereby submits this amendment to the above-referenced docket.

Clinical trials that test drugs in humans are vital to drug development but they present risks because the current drug development paradigm relies on preclinical data that don't always predict human response. FDA requires preclinical animal tests for new drugs and devices, based on a presumption of human relevance and predictability, rather than robust scientific evidence.[1]  Because risk exists that cannot be eliminated under the current drug development paradigm, and simply discontinuing all new drug applications until more predictive human-relevant testing methods are available is not a realistic option, FDA regulations must mandate that prospective clinical trial participants receive adequate warning of the true extent of the risks posed, as part of informed consent.

As *Archibald et al* point out: "On the question of human in vivo testing, it is widely held to be unethical to use humans as experimental subjects in the assessment of new medicine safety and efficacy. However, we must recognize that we are in fact doing exactly that. It is established that in excess of 90% of potential medicines that have successfully passed the preclinical testing process, fail, on the basis of safety and/or efficacy, when evaluated in human subjects. It is clear that human subjects, be they healthy volunteers or patients, are currently the most powerful contributors in the identification of clinical suitability. The obvious failure of animal-based

---

[1] Bailey, J., Thew, M.,  Balls, M. , *Predicting Human Drug Toxicity and Safety via Animal Tests: Can Any One Species Predict Drug Toxicity in Any Other, and Do Monkeys Help?,* ATLA 43, 393–403 (2015). (Ex. 1)

preclinical testing to 'weed out' the unsuitable leaves the eventual human recipient as the real arbiter on this issue. If we cannot do any better than this, then we must acknowledge the key role that human subjects play in the process, and consider how best to minimize the possibility of harm to them."[2]

In a recent study, "a data set on an unprecedented scale, of published adverse events in multiple species, induced by well over 2,000 pharmaceuticals, was used to apply the evidential weight provided by animal tests to the probability that a new drug may be toxic (or not toxic) to humans." [3], [4] The study states:

> "These studies revealed two main points: first, that toxicity in animals may be likely to also be present in humans, though this cannot be considered particularly consistent or reliable, due to considerable variability and lack of any clear pattern in types of toxic effects; and secondly, perhaps more crucially, that the absence of toxicity in animals provides essentially no insight into the likelihood of toxicity or absence of toxicity in humans."[5]

Recent events underscore the need for human participants in clinical trials to be adequately warned of the risks of adverse events. In the past few months numerous clinical trials in the United States and abroad have been shut down because of severe adverse reactions in healthy and patient volunteers, including death and permanent disability.  The regulations must be updated to ensure that every prospective trial participant receives the information necessary to evaluate the risks posed and to provide true informed consent. It is in the best interests of investigators, drug manufacturers, and especially human trial subjects that 21 C.F.R. 50.25 be modified as requested in the above-referenced petition.

## BIA 10-2474 Clinical Trial in France

On January 17, 2016, a previously healthy man participating in a clinical trial in France died and five men were hospitalized due to severe adverse reactions to the drug being tested.  French authorities say that four of the five volunteers who were hospitalized face brain damage.[6]

---

[2] K. Archibald, T. Drake, R. Coleman, *Barriers to the Uptake of Human-based Test Methods, and How to Overcome Them,* ATLA 43, 301–308 (2015) (Ex. 2)

[3] Bailey, J., Thew, M., Balls, M.,  *An analysis of the use of dogs in predicting human toxicology and drug safety.* ATLA 41, 335–350.(2013) (Ex. 3)

[4] Bailey, J., Thew, M., Balls, M*., An analysis of the use of animal models in predicting human toxicology and drug safety.* ATLA 42, 181–199 (2014). (Ex. 4)

[5] Bailey, J., Thew, M.,  Balls, M. , *Predicting Human Drug Toxicity and Safety via Animal Tests: Can Any One Species Predict Drug Toxicity in Any Other, and Do Monkeys Help?,* ATLA 43, 393–403 (2015) (at Ex. 1)

[6] Nano News, Nothing to justify stopping clinical trials, says French health minister, 1/25/16 http://nanonews.org/nothing-to-justify-stopping-clinical-trials-says-french/  (Ex. 5) and PharmExec.com. French Bial Trial Death: Regulators Release Timeline of Events. Feb 01, 2016 http://www.pharmexec.com/french-bial-trial-death-regulators-release-timeline-events

French prosecutors have opened a manslaughter investigation. A preliminary report found that the laboratory failed to suspend the trial when one volunteer was hospitalized, and continued to inject other volunteers a day later.[7]  This, however, does not explain the underlying cause of the initial serious adverse reaction to the drug, and it cannot be known if the remaining five volunteers would have suffered the debilitating adverse reactions without the second dose. What is known is that the first dose killed one healthy volunteer. This incident underscores the risks to human participants in clinical trials.

It was reported on March 7, 2016 that experts conducting the investigation have concluded that BIA 10-2474 had caused an "astonishing and unprecedented" reaction in the brain, "unlike anything seen before".[8] The investigators ruled out any manufacturing problem, and said there was no shared genetic weakness among the victims, who suffered similar damage to the same part of the brain.[9]

The investigators have inquired about the reasons why so much animal testing preceded the human trials. They said it was surprising to see that rats, mice, dogs and monkeys were all used – raising the question whether the lab had suspicions about toxicity.[10]  Despite the volume of animal testing, **no adverse effects were noted in the animals, despite doses 400 times stronger than those given to the human volunteers**.[11]

This incident and others underscore the risks to human participants in clinical trials when traditional tests, don't predict severe adverse reactions.    The clinical research group conducting the BIA 10-2474 trial insists that the trial was conducted in "full compliance with worldwide regulations,"[12] which further underscores the urgency for implementation of new regulations regarding informed consent.

Additionally, because other significant adverse events may well have occurred in other human trials which are not required to be reported in public databases, it is clear that participants in human clinical trials must be warned of insufficiencies in preclinical testing to obtain true informed consent.

**BIA 10-2474 underwent preclinical animal tests[13] before first-in-human tests.  The animal tests did not predict the adverse event.**

---

[7] Business Insider, *Authorities are wrapping up their investigation of a deadly drug trial that left one dead and several others in hospital.* February 5, 2016 **http://www.businessinsider.com/french-laboratory-at-fault-in-deadly-clinical-trial-2016-1** (Ex. 6)

[8] The Guardian**,** *Man who died in French drug trial had 'unprecedented' reaction, say experts*, May 7, 2016. https://www.theguardian.com/science/2016/mar/07/french-drug-trial-man-dead-expert-report-unpredicted-reaction (Ex. 7)

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] Nano News, *supra.* (at Ex. 5)

[13] Mice, rats, dogs, and monkeys. Clinical Study Protocol N° BIA-102474-101 (Ex. 8)

From the clinical study protocol:

>This is the first study of single and multiple doses of BIA 10-2474 in human subjects. The current study is designed to assess the safety and tolerability of single and repeated oral doses of BIA 10-2474 in healthy subjects. The study also includes pharmacokinetic (PK)/pharmacodynamic (PD) characterization, to allow an estimate of the efficacious dose range to be studied in further clinical trials. The study further includes a preliminary assessment of the potential interaction of BIA 10-2474 with food in healthy young subjects.[14]

>Animal toxicology studies of repeated daily dosing of BIA10-2474 for up to 13 weeks in mice, dogs and monkeys and up to 26 weeks in rats have been conducted. **Treatment with BIA 10-2474 produced no signs of toxicity in mice, rats, dogs and monkeys up to the no observed adverse effect level (NOAEL)**.[15]  *[emphasis added]*

The French National Agency for Medicines and Health Products (ANSM) established a Temporary Specialist Scientific Committee (TSSC) to investigate the BIA 10-2474 incident.  The ANSM's investigations are running alongside those being carried out by the French judiciary, the General Inspectorate of Social Affairs and the Ministry for Health[16]. With regard to preclinical animal studies on BIA 10-2474, the TSSC concluded:[17]

*   BIA 10-2474 toxicology studies were carried out properly in accordance with current standards (those of the ICH especially),
*   No toxicity, especially neurological (central or peripheral) comparable to that observed in the accident in Rennes, appears to have been demonstrated in animals, despite the use of 4 different species and high doses administered over long periods.

The preclinical tests identified in the study protocol did not predict the fatal and disabling adverse events in these healthy volunteers. As noted further herein, recent study results for

---

[14] Clinical Study Protocol N° BIA-102474-101
https://dkmedia.s3.amazonaws.com/AA/AE/gertschgroup/downloads/300052/protocole_BIAL_102474_101-22012016131259.pdf  (Ex. 8)

[15] *Id.*

[16] *The*pharmaletter, ANSM continues investigations into Bial clinical trial death, March 3, 2016 http://www.thepharmaletter.com/article/ansm-continues-investigations-into-bial-clinical-trial-death (Ex. 9)

[17] Minutes of the Temporary Specialist Scientific Committee (TSSC) meeting on "FAAH (Fatty Acid Amide Hydrolase) Inhibitors" of 15 February 2016.
http://ansm.sante.fr/var/ansm_site/storage/original/application/5a8a7343ad970487b473274c67ab2db1.pdf (Ex. 10)

non-human primates, dogs, mice, rabbits, and rats, have major implications for the value of animal tests in predicting human toxicity.[18]

Studies have shown that clinical trial participants take comfort in learning that an external safety board may monitor trials.[19]  An analysis of multiple qualitative studies in the United Kingdom found that **participant cooperation with medical research is contingent on participants' belief that investigators will not expose them to harm or exploitation; moreover, participants relied on regulation to enforce this.[20]** As stated in CRS' Citizen Petition, the therapeutic misconception that clinical trial subjects experience reflects an obvious deficiency in the informed consent process.  To balance subjects' belief that clinical trials are safe and likely to benefit them, informed consent requires that subjects receive an explicit warning that animal tests may not predict human response to a drug.  Disclosure of this information is essential to justify exposing human research subjects to unproven compounds.

The European Medicines Agency (EMA) is reviewing the BIA10-2474 incident to determine what steps are necessary to provide protection to human clinical trial participants. EMA spokeswoman Rebecca Harding stated:  "EU authorities will look carefully at the findings to determine if further measures are needed to protect health of clinical trial participants.**"[21]** FDA officials have conferred with EMA and are in the process of collecting and reviewing safety data pertinent to FAAH inhibitors. [22]  FDA stated they will work with sponsors to ensure the safety of participants in clinical trials and take regulatory action as appropriate.[23] **It is imperative that FDA does so expeditiously.**

## TeGenero TGN1412 Trial in the UK

In 2006, six healthy British men suffered permanent organ damage, and the loss of fingers, from unanticipated severe immune reactions during testing of an arthritis and cancer drug candidate called TGN1412.  After very first infusion of a dose 500 times smaller than that found safe in animal studies, all six human volunteers faced life-threatening conditions involving multi-organ failure for which they were moved to intensive care unit.[24]  The Secretary of State

---

[18] Bailey, J., Thew, M.,  Balls, M. , *Predicting Human Drug Toxicity and Safety via Animal Tests: Can Any One Species Predict Drug Toxicity in Any Other, and Do Monkeys Help?,* ATLA 43, 393–403 (2015) (at Ex. 1)

[19] K.E.Flynn, et al., Participants' Perspectives on Safety Monitoring in Clinical Trials, in 10 CLINICAL TRIALS 552, 557 (2013).

[20] *Id* at 553.

[21] EMA Will Assess ANSM Review of Botched Clinical Trial in France, January 19, 2016 http://www.raps.org/Regulatory-Focus/News/2016/01/19/23925/EMA-Will-Assess-ANSM-Review-of-Botched-Clinical-Trial-in-France/ (Ex. 11)

[22] *Learning About French Trial Death*, JAMA March 1, 2016, Volume 315, Number 9

[23] *Id.*

**[24]** H. Attarwala, *TGN1412: From Discovery to Disaster*, J Young Pharm. 2010 Jul-Sep; 2(3): 332–336. http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2964774/ (Ex. 12)

for Health established the formation of an Expert Scientific Group (ESG) following the tragic events in the TeGenero TGN1412 trial.[25]

From the November 30, 2006 Expert Scientific Group on Phase I Clinical Trials:

> On March 13, 2006, six healthy male volunteers received TeGenero's TGN1412 drug and two received a placebo in a phase one, first-in-man, clinical trial run by Parexel, a contract research organization.  The Parexel unit was in rented space on the Northwick Park Hospital site in London.   TGN1412 is a monoclonal antibody that was being developed as a new medicine for the treatment of B cell leukemia and autoimmune diseases.  Within hours of receiving TGN1412, all six volunteers were admitted to the intensive care unit at Northwick Park Hospital with a very severe systemic inflammatory reaction that progressed to multi-organ failure.
>
> **Based on the proposed TGN1412 mode-of-action and on its demonstrated preclinical safety in non-human primates, the company considered that an analysis of its immunological safety and pharmacodynamic effects in immunocompetent humans justified the selection of healthy subjects as the target population for a TGN1412 first-in-man trial.**[26] [*emphasis added*]

Recent studies, however, analyzed data from non-human primates, which are considered the species most likely to have the most human relevance, found that when no toxicity was found in the animal tests, these tests contributed very little to no evidential weight to the probability of lack of toxicity in humans. [27]

The ESG reported that TGN1412 had undergone preclinical testing according to current regulatory requirements, but the preclinical studies had failed to predict a safe starting dose for the first trial in humans.

The volunteers receiving TGN1412 experienced a catastrophic inflammatory reaction called a cytokine storm, a particular problem for new biological therapies, which use biological material such as antibodies. Many blockbuster drugs such as the cancer drugs Herceptin and Avastin are biologics, as are around a third of medicines in the pharmaceutical pipeline. Because these

---

[25] Expert Scientific Group on Phase I Clinical Trials, Final Report, 11/20/06, http://webarchive.nationalarchives.gov.uk/20130107105354/http://www.dh.gov.uk/prod_consum_dh/groups/dh_digitalassets/@dh/@en/documents/digitalasset/dh_073165.pdf (Ex. 13)
[26] *Id.*
[27] Bailey, J., Thew, M.,  Balls, M. , *Predicting Human Drug Toxicity and Safety via Animal Tests: Can Any One Species Predict Drug Toxicity in Any Other, and Do Monkeys Help?,* ATLA 43, 393–403 (2015) (at Ex. 1)

medicines are specific to humans, they can cause severe reactions that don't materialize in animal studies, so tests on human cells are essential.[28]

Dose calculation from the ESG Report

"Since the specificity of TGN1412 was apparently restricted to CD28 expressed on T cells from humans and non-human primates, safety and toxicology studies in non-human primates (cynomolgus and rhesus monkeys) were considered as the most relevant studies to assess a potential toxicity of TGN1412 administration to humans.  To determine potential adverse effects related to TGN1412 mode-of-action as well as unintended toxicity, a number of safety and efficacy studies with TGN1412 in non-human primates were conducted using single dose and multiple-dose regimens. The results of these studies showed that TGN1412 was well tolerated at doses up to 50 mg·kg-1·week-1 for at least 4 consecutive weeks."[29]

**Calculation of the phase I trial starting dose was primarily based on the NOAEL in the repeated dose toxicity study in cynomolgus monkeys and the procedure described in the draft USA Food and Drug Administration (FDA) guideline "Estimating the Safe Starting Dose in Clinical Trials for Therapeutics in Adult Healthy Volunteers."[30]** The NOAEL was considered 50 mg·kg-1.[31]

Using the FDA guidance, an allometric correction factor of 3.1 was applied for the cynomolgus monkey NOAEL in order to calculate the "human equivalent dose" (HED) of 16 mg·kg-1. When the default safety factor of 10 was then applied, the maximum recommended starting dose (MRSD) was estimated to be 1.6 mg·kg-1. The company then applied an additional safety margin and proposed a starting dose of 0.1 mg·kg-1. The dose range in the proposed phase I trial was considered to ensure both maximum patient safety due to the conservative safety factors of 160 and also to enable investigation of basic PD/PK characteristics of TGN1412, relevant for future clinical trials to be conducted in patient populations.[32]

It's important to note that while biological therapies are increasingly important for the treatment of human disease, because these medicines are human specific, they require the use of human tissue-based bioassays for measures of efficacy and safety. The assessment of biological drugs which cause cytokine release or possible cytokine storm is of particular concern. Cytokine storm is a potentially fatal immune reaction associated with the clinical symptoms of

---

[28] Science 20, Blood Test Predicts Cytokine Storm Drug Reaction in Humans, March 9, 2015 http://www.science20.com/news_articles/blood_test_predicts_cytokine_storm_drug_reaction_in_humans-153875 (Ex. 14)

[29] *Id.*

[30] Estimating the Safe Starting Dose in Clinical Trials for Therapeutics in Adult Healthy Volunteers. U.S. Department of Health and Human Services Food and Drug Administration, Center for Drug Evaluation and Research (CDER), Center for Biologics Evaluation and Research (CBER), December 2002

[31] Expert Scientific Group on Phase I Clinical Trials, *supra.* (at Ex. 13)

[32] *Id.*

severe inflammation and highly elevated levels of various pro-inflammatory cytokine.[33] Unfortunately, the safe dose calculation for TGN 1412 was focused on non-human primate studies, assuming that non-human primates were the most relevant studies to predict human toxicity.

It has been well established that drugs showing safety and efficacy in preclinical animal models may show very different pharmacological properties when administered to humans.[34] Development of preclinical models which can efficiently predict drug behavior in humans is essential prior to testing a drug in a human subject.[35]  The TeGenero incident was an alarming wake-up call for researchers, and also for the trial approving regulatory authorities, on toxicity-related unpredictability of new drugs in human subjects, especially for a biological with a novel mechanism of action like TGN1412.[36]

Several of the laboratory tests that were performed in the preclinical development phase of TGN1412 were repeated by the National Institute for Biological Standards and Control (NIBSC), and similar results were obtained, highlighting the problem of translation of preclinical animal tests to the clinic.  **It is important to note, however, that further tests performed at NIBSC showed that it was possible to create conditions in vitro that resulted in TGN1412-induced release of cytokines and T cell proliferation in human blood cells.[37]**  These results from experiments performed at NIBSC suggest that different and informative approaches can be taken in in vitro studies that might be more predictive of in vivo responses.[38] **Unlike the non-human primate tests, in vitro testing <u>could</u> have predicted the danger posed by TGN1412 to human trial volunteers.**

The ESG report states:

> **"Species-specificity of an agent does not imply that there is always an increased risk in first-in-man trials, but it makes preclinical evaluation of the risk in animal experiments much more difficult, and sometimes perhaps impossible. Therefore, a highly cautious approach is needed."[39]**

Surprisingly, even after the disastrous clinical trial of TGN1412, the drug is now being tested in humans as an arthritis therapy[40].  This is possible because of a human cell based in vitro test that can predict the severe adverse reactions that occurred in TGN1412 and facilitate

---

[33] D.M. Reed et al.  *An autologous endothelial cell:PBMC assay that detects cytokine storm responses to biologics*. FASEB Journal, 2015. doi:10.1096/fj.14-268144 (Ex. 15)
[34] H. Attarwala, *supra* (at Ex. 12)
[35] *Id.*
[36] *Id.*
[37] Expert Scientific Group on Phase I Clinical Trials, *supra* (at Ex. 13)
[38] *Id.*
[39] *Id.*
[40] O. Dyer, Experimental drug that injured UK volunteers resumes in human trials. BMJ 2015;350:h1831, April 2, 2015 (Ex. 16)

determination of a safe starting dose.  Use of a combination of human cells can predict severe immune reaction in humans.[41]

Researchers isolated stem cells from the blood of a volunteer, and used them to grow endothelial cells in vitro.  They took white blood cells which they added to the donor's own endothelial cells to recreate unique conditions found in their blood vessels.  When TGN1412 was added, the mixture of cells released a cytokine storm, as would happen in the body.[42]

According to Professor Jane Mitchell, from the National Heart and Lung Institute at Imperial College London**:**

> **"As biological therapies become more mainstream, it's more likely that drugs being tested on humans for the first time will have unexpected and potentially catastrophic effects.  We've used adult stem cell technology to develop a laboratory test that could prevent another disaster like the TGN 1412 trial."[43]**

Use of appropriate models employing human cells could have prevented the TGN1412 disaster.

## Zydelig – idelalisib in the United States and other locations

On March 15, 2016, six clinical trials were halted after reports of serious side effects—including multiple deaths--among participants in several of the studies.[44]  Zydelig, which is approved for use in the United States, was undergoing clinical trials in combination with other cancer drugs in multiple locations.

## Zafgen – beloranib Trial in the United States

In early December 2015, a clinical trial participant died from bilateral pulmonary emboli, two months after FDA temporarily halted part of the clinical trial to investigate circumstances surrounding the previous death of a 23 year-old clinical trial volunteer due to pulmonary emboli.  After the second death, FDA put a complete hold on the clinical trial for the obesity drug, beloranib, and investigation into the drugs' safety is ongoing.[45]

---

[41] Science 20, *supra.* (at Ex. 14)

[42] D.M. Reed et al., *supra.* (at Ex. 15)

[43] *Id.*

[44] FDA Alerts Healthcare Professionals About Clinical Trials with Zydelig (idelalisib) in Combination with other Cancer Medicines, FDA website, March 15, 2016
http://www.fda.gov/Drugs/DrugSafety/ucm490618.htm?source=govdelivery&utm_medium=email&utm_source=govdelivery

[45] Zafgen Says a Second Patient Died in Beloranib Study, The Wall Street Journal, December 2, 2015.
http://www.wsj.com/articles/zafgen-says-another-patient-dies-in-beloranib-study-1449059965 (Ex. 17)

Seven out of about 400 patients dosed with the drug have had serious blood clots (including the patients who died), compared to none out of 150 on placebo, according to Zafgen.

**Pacritinib, Phase III Trial in the United States**

In February 2016, FDA shut down a Phase III clinical trial of a blood cancer drug (pacritinib**)** after patients died from "intracranial hemorrhage, cardiac failure and cardiac arrest."[46]The number of deaths has not been revealed, and no study results have been posted on clinicaltrials.gov.

**BMS-986094 Trial in the United States**

In August of 2012, Bristol-Myers Squibb halted development of a potential hepatitis C drug after nine participants in a phase II clinical trial of the therapy were hospitalized and one died.[47] As part of a retrospective review of the phase II study that included the death, researchers report that 14 of 34 patients treated with BMS-986094 had some evidence of cardiac dysfunction.[48]

## Transparency in Clinical Trials

The tragedies in France, the UK and the United States underscore concerns about the safety of early-stage human testing and the lack of a comprehensive public database that tracks the outcomes of such clinical trials. Unfortunately, the results of Phase 1 trials are not required to be publicly released to data repositories in Europe or the United States[49]. Under Section 801 of the Food and Drug Administration Amendments Act, Phase I trials do not have to be registered nor results published in the ClinicalTrials.gov website.  This prevents the public and researchers from knowing just how often serious adverse events occur in these trials.  If problems in trials go unreported, scientists working with similar drugs could unknowingly proceed with potentially hazardous studies, unnecessarily putting human volunteers at risk.  Additionally, due to the lack of reporting, we have no idea how many serious adverse events have occurred in the United States.

Deaths are variably reported in ClincalTrials.gov records.  A reliable total number of deaths per trial arm cannot always be determined with certainty or can be discounted with numbers reported in corresponding trial publications.  Unambiguous and complete reporting of the

---

[46] FDA Halts trial of Cancer drug by Seattle's CTI BioPharma after patient dies. February 11, 2016 http://www.seattletimes.com/business/fda-halts-cti-biopharma-drug-trial-for-detrimental-effect-on-survival/ (Ex. 18)

[47]Hepatitis C Drug trial halted after patient death, Nature.com News Blog August 24,2012  http://blogs.nature.com/news/2012/08/hepatitis-c-drug-trial-halted-after-patient-death.html (Ex. 19)

[48] After Patient's Death, Study Shows HCV Drug Cardiotoxic in 14 of 34 Treated Patients, Michael O'Riordan, September 24, 2014 http://www.medscape.com/viewarticle/832251 (Exhibit 20)

[49] Food and Drug Administration Amendments Act (FDAA) 801

number of deaths in trial registries and publications does not currently exist.[50]

**The lack of reporting requirements and enforcement of existing reporting requirements makes the requested regulatory updates even more important to inform and protect human clinical trial participants.  The phase II and phase III deaths in the United States (identified above) have not been reported on ClinicalTrials.gov.**

Under 21 CFR 50.25(c) an element of informed consent is to inform participants that the trial will be listed on ClinicalTrials.gov.  The following statement is included on informed consent forms:

> "A description of this clinical trial will be available on *http://www.ClinicalTrials.gov,* as required by U.S. Law.  This Web site will not include information that can identify you. At most, the Web site will include a summary of the results. You can search this Web site at any time."[51]

Unfortunately, most research institutions, including leading universities and hospitals in addition to drug companies that are required to register and report clinical trial outcomes under FDAA 801, routinely break the law by failing to report the results of human studies of new treatments to the federal government's ClinicalTrials.gov database.[52]

## Conclusion

Informed consent is an ethical and legal doctrine that has evolved to protect persons participating in clinical research trials.  In light of evolving ethical standards, our increased scientific knowledge, and recent undeniable failures in adequately warning and protecting human clinical trial participants, it is clear that the current informed consent regulations are deficient in the context of drug development, as they do not mandate provision of complete information regarding the risks that human subjects accept when participating in a clinical trial.

Relying on animal models in preclinical development may result in unexpected outcomes since preclinical animal data are often not predictive of human responses. Participation in clinical trials creates a foreseeable risk of harm to humans because subjects are knowingly given investigational products with an incomplete, and possibly incorrect, safety profile derived from animal studies.

---

[50] Earley A, Lau J, Uhlig, K. Haphazard reporting of deaths in clinical trials: a review of cases of ClinicalTrials.gov records and matched publications–a cross-sectional study. BMJ Open 2013;3:e001963. doi:10.1136/bmjopen-2012- 001963 http://bmopen.bmj.com/content/3/1/e001963.full.pdf+html (Ex. 21)

[51] 21 CFR 50.25 (c) https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/CFRSearch.cfm?fr=50.25

[52] Failure to Report, a STAT Investigation, Law Ignored, Patients at Risk, 12/13/15 http://www.statnews.com/2015/12/13/clinical-trials-investigation/ (Ex. 22)

Trial subjects must receive all information that a reasonable human subject participating in a clinical drug trial would find material.[53]   Accordingly, the regulations must be updated to ensure that every prospective trial participant receives the information necessary to evaluate the real risks posed and to provide true informed consent. It is in the best interests of investigators, drug manufacturers, and especially human trial subjects that 21 C.F.R. 50.25 be modified as requested in this petition.

Respectfully submitted,


_____
Dr. Neil L. Wilcox
for Center for Responsible Science

---

[53] Protecting Participants in First-In-Humans Trials, in IRB Advisor (May 2011)

Exhibit 1

ATLA **43**, 393–403, 2015                                                                 393

# Predicting Human Drug Toxicity and Safety via Animal Tests: Can *Any* One Species Predict Drug Toxicity in Any Other, and Do Monkeys Help?

**Jarrod Bailey,[1] Michelle Thew[1] and Michael Balls[2]**

[1]*Cruelty Free International, London, UK;* [2]*c/o Fund for the Replacement of Animals in Medical Experiments (FRAME), Nottingham, UK*

**Summary** — Animals are still widely used in drug development and safety tests, despite evidence for their lack of predictive value. In this regard, we recently showed, by producing Likelihood Ratios (LRs) for an extensive data set of over 3,000 drugs with both animal and human data, that the absence of toxicity in animals provides little or virtually no evidential weight that adverse drug reactions will also be absent in humans. While our analyses suggest that the presence of toxicity in one species may sometimes add evidential weight for risk of toxicity in another, the LRs are extremely inconsistent, varying substantially for different classes of drugs. Here, we present further data from analyses of other species pairs, including non-human primates (NHPs), which support our previous conclusions, and also show in particular that test results inferring an absence of toxicity in one species provide no evidential weight with regard to toxicity in any other species, even when data from NHPs and humans are compared. Our results for species including humans, NHPs, dogs, mice, rabbits, and rats, have major implications for the value of animal tests in predicting human toxicity, and demand that human-focused alternative methods are adopted in their place as a matter of urgency.

**Key words**: *animal tests, dog, drug development, monkey, mouse, non-human primate, preclinical testing, rabbit, rat, toxicology.*

**Address for correspondence**: *Jarrod Bailey, Cruelty Free International (formerly BUAV), 16a Crane Grove, London N7 8NN, UK.*
E-mail: *jarrod.bailey@crueltyfreeinternational.org*

## Introduction

Preclinical trials or 'animal tests' on new drugs are required by regulatory agencies worldwide (e.g. 1, 2), based on a presumption of human relevance and predictability, rather than robust scientific evidence (3). This requirement continues, even in the face of record levels of drug failure and drug attrition (4–7), as well as evidence that reveals the animal tests to be unfit for purpose. This evidence includes our two recent analyses, in which a data set on an unprecedented scale, of published adverse events in multiple species, induced by well over 2,000 pharmaceuticals, was used to apply the evidential weight provided by animal tests to the probability that a new drug may be toxic (or not toxic) to humans (8, 9). These studies revealed two main points: first, that toxicity in animals may be likely to also be present in humans, though this cannot be considered particularly consistent or reliable, due to considerable variability and lack of any clear pattern in types of toxic effects; and secondly, perhaps more crucially, that the absence of toxicity in animals provides essentially no insight into the likelihood of toxicity or absence of toxicity in humans.

To augment these studies, which examined the contribution of tests on dogs, rats, mice and rabbits to predicting human risk, we have now analysed further data from non-human primates (NHPs) — arguably the most likely non-human species to have significant human relevance — asking the same question. In addition, we have examined the relationships of data from other pairs of these five non-human species, to assess how reliably tests in one species can indicate the toxicological susceptibility of any other species to new drugs. Our hypothesis is that this is not possible, since major interspecies differences mean that the interspecies extrapolation of toxicity risk is inevitably poor, whatever the species, including humans.

Once again, we have used the most apposite statistical metrics in our approach — Likelihood Ratios (LRs) — which, unlike 'concordance' metrics, such as the True Positive Rate (sensitivity) or Positive Predictive Value (PPV), directly address the salient issue of the contribution of evidential weight by a test in one species for or against the toxicity of a given compound in another species.

## Methods

A detailed consideration and description of the diagnostic metrics used in this analysis can be

found in our first two reports (8, 9). Briefly, the data analysed were obtained from Instem Scientific Limited (Harston, Cambridge, UK; http://www.instem-lss.com; Safety Intelligence Programme). All the data were collated by Instem from publicly available sources, including: PubMed (http://www.ncbi.nlm.nih.gov/pubmed), the FDA Adverse Event Reporting System (FAERS), DrugBank (http://www.drugbank.ca), and the National Toxicology Program (http://ntp.niehs.nih.gov), for a total of 3,028 'single active ingredients' (excluding combination drugs) in humans and preclinical species. The effects of each compound were classified by Instem according to their target tissues (e.g. bradycardia and arrhythmic disorder would both be considered to be effects on heart tissues), based on five levels of specificity classified by their MedDRA (Medical Dictionary for Regulatory Activities; http://www.meddramsso.com) counterparts, ranging from any of the (more than 70,000) very specific Low Level Terms (LLT, e.g. 'feeling queasy') up to very generic System Organ Class (SOC), such as 'gastrointestinal disorders'. These classifications help to eliminate false positives that may arise from species-specific observations, as well as in the identification of concordant observations that might otherwise have been missed, by their 'rolling up' into more-generic terms. Where it was not possible for such MedDRA mapping to be achieved, the preferred term of Instem's own Safety Intelligence Programme (SIP) knowledge base (e.g. 'musculoskeletal toxicity') was used instead.

For each compound, the presence or absence of toxicity was logged for each species of each 'species pair' being examined. These results were recorded in a standard 2 × 2 matrix of results (see Table 1), allowing various diagnostic metrics to be derived. The rationale for our use of LRs, as opposed to positive concordance rate or PPV, has been described previously (8, 9); in short, LRs — both positive (PLR) and inverse negative (iNLR) — are the only approaches that include both sensitivity and specificity, i.e. that are sufficient to measure the evidential weight provided by each test in question. Sensitivity alone is insufficient: if, for instance, an animal test always indicates toxicity present in

humans, it has a *sensitivity* of 100%. However, if that test, in addition, always indicates toxicity, even when it is absent in humans, every drug tested may as well be dismissed as toxic to humans at the outset, so knowledge of that test's *specificity* is also necessary. Further, PPV is conditional and depends on the prevalence of toxicity in the compounds, and so is inappropriate (e.g. 10, 11).

With reference to the 2 × 2 results matrix (Table 1), PLR is given by: sensitivity/(1 − specificity) = (a / a + c)/(b / b + d), while iNLR = specificity/(1 − sensitivity) = (d / b + d)/(c / a + c). All the values were calculated by using the above formulae, in Microsoft Excel® worksheets containing the data. PLR and iNLR capture the ability of one animal species to add evidential weight to the belief that a specific compound is toxic/non-toxic in another, respectively. As McGee (12) has emphasised, "LRs may range from 0 to infinity. Findings with LRs greater than 1 argue for the diagnosis of interest; the bigger the number, the more convincing [the finding]. Findings whose LRs lie between 0 and 1 argue against the diagnosis of interest; the closer the LR is to 0, the less likely [the finding]. Findings whose LRs equal 1 lack diagnostic value". Note that, where McGee states, "argue [for/against] the diagnosis of interest" (as he is discussing the role of LRs in evaluating the performance of a diagnostic test clinically), we can replace this phrase with 'support the evidential value of the animal test'.

Any animal species that gives a PLR/iNLR that is statistically significantly higher than 1.0, can therefore be regarded as contributing some degree of evidential weight to the probability that the compound under test will be toxic/non-toxic in the other species. Crucially, these definitions imply that, if any particular animal species is 'good' at predicting toxicity in another, it is not necessarily also good for predicting an absence of toxicity. That is, a high PLR does not guarantee a high iNLR. The full set of Instem Scientific data on which this analysis is based, including 95% Confidence Intervals, are available on request from the author for correspondence.

A discussion of potential bias in the LR estimates is provided in the previous papers (8, 9),

## Table 1:   A 2 × 2 matrix of results

|  | Compound toxic in humans | Compound not toxic in humans |
|---|---|---|
| **Compound toxic in animal model** | a: true positives (TPs) | b: false positives (FPs) |
| **Compound not toxic in animal model** | c: false negatives (FNs) | d: true negatives (TNs) |

which should be consulted for a fuller explanation. Briefly, the data set is probably affected by selection bias/effect, given that drugs that appear highly toxic in rodent tests are unlikely to advance to tests in dogs, NHPs and humans. This means that these types of drugs will be under-represented in the data set, so the LRs will not exactly represent the population of drugs as a whole. This will be true of all data sets, however, as this precautionary principle is an inherent aspect of the testing protocol. In these circumstances, anybody conducting an analysis such as this will be faced with an identical situation, and this is acknowledged (see 8, 9). Gauging the actual contribution of animal data to human toxicology is therefore virtually impossible. All one can do is to take steps to minimise the effects of bias. We have taken such steps. The data set was limited to drugs in the FAERS database, and so all the compounds had proceeded to market, and animal and human data were available for them. The only way in which publication bias can be addressed is for the industry, as the holders of significant amounts of unpublished data, to either conduct its own investigations, and/or to facilitate such investigations by third parties. The latter could be achieved by making anonymised data available for analysis, in accordance with the promotion of transparency cited in *Directive 2010/63/EU* (13).

## Results

The total number of classifications of effects for each species pair examined, and therefore the numbers of LRs calculated initially for each species pair, are shown in Table 2a. It should be noted that a large proportion of the data reflected adverse events that are rare, potentially compromising the reliability of any analysis of it. A more-detailed consideration of this point is provided in our previous paper (8). To take account of this, rare events were removed from consideration, and the LRs were recalculated. This was done for rare events at various thresholds, namely, less than 2, 5, 10 and 20 events. The number of classifications used in our analysis for each of these thresholds is shown in Table 2b.

Median PLRs and iNLRs, involving the entire data set for each species pair (i.e. with no classifications containing rare observations removed), in each direction (i.e. 'mouse for rat' and 'rat for mouse'), are shown in Table 3a. Almost all the values show the evidential weight provided by an animal test in one species for toxicity/lack of toxicity in another species to be zero (the exceptions being the rat–mouse pairs). These conclusions, however, must be affected by the predominance of rare observations in the data set, as mentioned above. For example, 97% of the classifications were dis-

counted for the NHP–human species pair, when accounting for rare observations (< 2; see Table 2), due to the extremely low numbers of observations in one or more species. The recalculated LRs, at four different thresholds with classifications containing rare events removed, are depicted graphically in Figure 1. The PLR and iNLR values for the '< 5' threshold, at which any classifications in the data set that contained observations of toxicity in either species that numbered fewer than five were discounted, are listed in Table 3b. This threshold was chosen, as it has served as a basis for removing the potential bias caused by the inclusion of rare observations in previous analyses, and is the cut-off point used by the data provider, Instem. The range of LRs (both PLRs and iNLRs) for each species pair, also with rare LRs (< 5 observations) removed from the data set, is shown in Figure 2.

All the PLRs were generally quite high (though not dramatically so, bearing in mind that LRs may have values up to infinity), particularly for the rat–mouse pairs, suggesting that compounds showing toxicity in one species are also likely to be toxic in the other. This includes the NHP–human species pair. Notably, however, these are significantly lower than median PLRs for the dog, mouse, rabbit and rat with respect to humans, reported in our previous analyses (8, 9). However, in common with these previous reports, high ranges, with no obvious pattern of toxicity, suggest the reliability of this aspect cannot be generalised or regarded with confidence. Crucially, median iNLRs were substantially lower than PLRs, and were barely greater than unity, supporting the view that, when toxicity appears to be absent in one species, this result provides essentially no evidential weight to the likelihood of lack of toxicity in any other species. As for PLRs, this includes the NHP–humans species pair.

It has been put to us that it may be difficult to appreciate the significance of our results, given that LRs can extend to infinity. In other words, what, for instance, do PLRs of approximately 10, 20 or 50 actually mean? We have tried to provide a rough, though relevant, 'yardstick' by taking data from the comparison of the two most-commonly used preclinical species (rat and dog), and comparing the rat with itself, and the dog with itself. Clearly, the LRs from these 'control' comparisons were always going to have infinite values, as a data set must show absolute identity with itself. We therefore factored in a small percentage of FP and FN values (0.1% of the total sample size for each observation, in the dog–rat data set with rare events [< 5] removed, to derive a value for a hypothetical inter-species 'self' comparison that is not perfect, but which shows a high level of identity. The PLR for the hypothetical rat–rat pair was 898, and for the dog–dog 845. The iNLRs were 17.3 and 6.6, respectively. While these values are artificial,

**Table 2:   The number of classifications of adverse effects for each species pair, as used in this analysis**

a) The total number of classifications

| Species pair | PLR | | | | iNLR | | | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Tissue-level effects | Biomedical observations (BMOs) | Total classifications used | Classifications eliminated | Tissue-level effects | Biomedical observations (BMOs) | Total classifications used | Classifications eliminated | |
| **NHP–human** | 44 | 483 | 527 | 16,230 | 86 | 16,563 | 16,649 | 194 | 16,757 |
| NHP–dog | 56 | 394 | 450 | 1791 | 63 | 1814 | 1877 | 364 | 2241 |
| Dog–NHP | 58 | 405 | 463 | 1778 | 58 | 724 | 782 | 1459 | 2241 |
| NHP–rat | 55 | 495 | 550 | 7965 | 86 | 8428 | 8514 | 1 | 8515 |
| Rat–NHP | 50 | 626 | 676 | 7839 | 51 | 619 | 670 | 7845 | 8515 |
| NHP–mouse | 57 | 493 | 550 | 4022 | 82 | 4250 | 4332 | 240 | 4572 |
| Mouse–NHP | 57 | 530 | 587 | 3985 | 57 | 722 | 779 | 3793 | 4572 |
| Dog–rat | 59 | 1119 | 1178 | 7772 | 86 | 8263 | 8349 | 601 | 8950 |
| Rat–dog | 65 | 1238 | 1303 | 7647 | 59 | 1675 | 1734 | 7216 | 8950 |
| Dog–mouse | 64 | 829 | 893 | 4402 | 83 | 4227 | 4310 | 985 | 5295 |
| Mouse–dog | 65 | 854 | 919 | 4376 | 64 | 1781 | 1845 | 3450 | 5295 |
| Rat–mouse | 83 | 2779 | 2862 | 6842 | 83 | 3875 | 3958 | 5746 | 9704 |
| Mouse–rat | 83 | 2565 | 2648 | 7056 | 86 | 8137 | 8223 | 1481 | 9704 |

The number of classifications of effects for each species pair, and therefore the numbers of LRs calculated for each species pair, are shown: the total number of classifications the data provided (column 9), as well as those data able to be used to calculate both PLR (columns 1–4), and iNLR (columns 5–8). Note that each pair is shown bi-directionally (e.g. dog–rat and rat–dog), for reasons described in the text; briefly, the test hypothesis was: 'Does species 2 predict/add value to species 1', so each pair had to be done in both directions. The exception was the 'NHP–human' pair, as we are not interested in to what degree humans predict/add value to NHP toxicity (Row 1 of results).

The total number of classifications used in the analysis is shown in columns 3 and 7 (Total classifications used; PLR and iNLR respectively), which comprise the sum of column 1 (PLR) or 5 (iNLR) (tissue-level effects) and column 2 (PLR) or 6 (iNLR) (BMOs). The number of BMO classifications for which there were no effects observed in the 'test' species of interest, and which were therefore eliminated from consideration in our analysis, are shown in columns 4 (PLR) and 8 (iNLR) (Classifications eliminated), out of the total number of classifications for which there were data. In total, data were available for 3,028 active pharmaceutical ingredients'.

**Table 2:   continued**

b) The number of classifications of adverse effects for each species pair, as used in this analysis, *with rare events (fewer than two, five, ten, or twenty in either or both species) removed from the data set*

| Species pair | Number of classifications used in analysis when 'Rare Observations' discounted | | | | Total |
|---|---|---|---|---|---|
| | < 2 | < 5 | < 10 | < 20 | |
| **NHP–human** | 159 | 37 | 9 | 3 | 16,757 |
| | | | | | |
| NHP–dog | 214 | 86 | 43 | 19 | 2241 |
| NHP–rat | 237 | 64 | 25 | 3 | 8515 |
| NHP–mouse | 247 | 89 | 46 | 16 | 4572 |
| Dog–rat | 638 | 312 | 166 | 76 | 8950 |
| Dog–mouse | 471 | 223 | 108 | 54 | 5295 |
| Rat–mouse | 1500 | 688 | 304 | 131 | 9704 |

*The number of observations for which data were discounted is shown at the head of the columns. As the numbers were identical for each species pair, regardless of the 'direction.' (see Table 2a legend), only one pair is shown, which may be assumed to be 'bi-directional'. The most stringent approach (< 10 and < 20) can be considered illustrative only; for practical purposes, < 5 has been used previously, and is used by Instem (the data provider) as a cut-off point. The relatively low numbers of 'non-rare' observations for species pairs involving NHPs (and indeed the absolute low numbers of observations when, for example, less than 20 observations are discounted) is evidence of the difficulty in accessing NHP toxicology data, of which little is publicly-available.*

J. Bailey *et al.*

**Figure 1:  PLRs and iNLRs for all species pairs, for all four thresholds below which rare events were removed from the data set**



*Graphs a and b show the median PLR and iNLR values, respectively. For each species pair, the first point on each line (i.e. < 2) shows the median PLR or iNLR for the data set with rare events below the first threshold removed (fewer than two observations; see* Results *section); the second point (i.e. < 5) shows the median PLR or iNLR for the data set with rare events below the second threshold removed (fewer than five observations; see* Results *section); and so on. Removing rare events progressively from < 2 to < 20 has little effect on most of the LR values. The exceptions are for the PLRs of the rat–mouse pairs, which roughly halve in value; and rat–mouse and rat–dog pairs for the iNLR values, most of which increase only marginally. Notably, the NHP–human values, which indicate the degree of evidential weight NHP tests provide for human toxicity, are one of the lowest for PLRs, and the lowest for iNLR.*

**Figure 1:  continued**



b) Median iNLR values

*Graphs a and b show the median PLR and iNLR values, respectively. For each species pair, the first point on each line (i.e. < 2) shows the median PLR or iNLR for the data set with rare events below the first threshold removed (fewer than two observations; see* Results *section); the second point (i.e. < 5) shows the median PLR or iNLR for the data set with rare events below the second threshold removed (fewer than five observations; see* Results *section); and so on. Removing rare events progressively from < 2 to < 20 has little effect on most of the LR values. The exceptions are for the PLRs of the rat–mouse pairs, which roughly halve in value; and rat–mouse and rat–dog pairs for the iNLR values, most of which increase only marginally. Notably, the NHP–human values, which indicate the degree of evidential weight NHP tests provide for human toxicity, are one of the lowest for PLRs, and the lowest for iNLR.*

**Table 3: Median LRs and ranges for each species pair**

| Species pair | PLR (median) | iNLR (median) | PLR range | iNLR range |
|---|---|---|---|---|
| **a)  Values for the complete data set** | | | | |
| NHP–human | 0 | 1.00 | 605 | 2.00 |
| NHP–dog | 0 | 1.00 | 3027 | 1.01 |
| Dog–NHP | 0 | 1.00 | 3027 | 9.73 |
| NHP–rat | 0 | 1.00 | 1513 | 1.00 |
| Rat–NHP | 1.18 | 1.00 | 3027 | 20.93 |
| NHP–mouse | 0 | 1.00 | 1009 | 3.00 |
| Mouse–NHP | 0 | 1.00 | 3027 | 4.89 |
| Dog–rat | 0 | 1.00 | 3027 | 1.68 |
| Rat–dog | 0 | 1.00 | 3027 | 6.63 |
| Dog–mouse | 0 | 1.00 | 3027 | 3.97 |
| Mouse–dog | 0 | 1.00 | 3027 | 2.04 |
| Rat–mouse | 14.70 | 1.00 | 3027 | 27.86 |
| Mouse–rat | 11.47 | 1.00 | 3027 | 10.98 |
| **b)  Values calculated with rare events (< 5) removed from the data set** | | | | |
| NHP–human | 9.39 | 1.02 | 605 | 0.09 |
| NHP–dog | 11.97 | 1.06 | 3027 | 0.39 |
| Dog–NHP | 8.81 | 1.17 | 96 | 1.98 |
| NHP–rat | 13.40 | 1.04 | 60 | 0.19 |
| Rat–NHP | 6.28 | 1.94 | 56 | 5.55 |
| NHP–mouse | 13.81 | 1.07 | 173 | 0.40 |
| Mouse–NHP | 11.11 | 1.35 | 173 | 2.31 |
| Dog–rat | 15.90 | 1.10 | 173 | 1.21 |
| Rat–dog | 11.83 | 1.32 | 173 | 6.56 |
| Dog–mouse | 11.64 | 1.11 | 129 | 3.57 |
| Mouse–dog | 11.23 | 1.13 | 146 | 1.60 |
| Rat–mouse | 39.43 | 1.66 | 480 | 8.28 |
| Mouse–rat | 50.30 | 1.27 | 472 | 7.92 |

*a) While of interest, as almost all the values show the evidential weight provided by an animal test for toxicity in another species are also likely to be zero (the exceptions being the rat–mouse pairs), the conclusions must be affected by the preponderance of rare observations in the data set. For example, 97% of the classifications were discounted for the NHP–human species pair (see Table 2), due to extremely low numbers of observations in one or more species. For this reason, and to minimise any associated bias, rare events were removed from consideration, and LRs recalculated (see Table 3b, and graphs in Figure 1).*

*b) The PLRs were generally quite high, particularly for the rat–mouse pairs, suggesting that compounds showing toxicity in one species are also likely to be toxic in another. This includes the NHP–human species pair. Notably, however, these are significantly lower than median PLRs for the dog, mouse, rabbit and rat with respect to humans, reported in our previous analyses. However, in common with these previous reports, high ranges, with no obvious pattern of toxicity, suggest the reliability of this aspect cannot be generalised or regarded with confidence. Crucially, median iNLRs were substantially lower, supporting the view that, when toxicity appears to be absent in one species, this result provides essentially no evidential weight to the likelihood of lack of toxicity in any other species. As for the PLRs, this includes NHPs and humans.*

they may go some way toward suggesting what might be expected from interspecies comparisons that would suggest a high degree of evidential weight provided by one species for another.

## Discussion and Conclusions

This analysis of animal toxicology in preclinical drug development, complements our other two recently-published evaluations of toxicity tests in rats, mice, rabbits and dogs, and their relevance to humans (8, 9). All were sorely needed, and inspired by the lack of scientific evidence to support such animal testing of new human drugs, and were intended to augment previous studies suggesting there is, in fact, evidence to the contrary (see 8, 9).

Our previous analyses have applied the apposite statistical metrics of LRs, to data sets of unprecedented scale (though comprising, necessarily, only publicly-available data), to determine the evidential weight for or against the toxicity of a given compound in humans, contributed by data from animal tests. Critically, they found that, when no toxicity was found in the animal tests, these tests contributed very little to no evidential weight to the probability of lack of toxicity in humans. This was the case for tests in dogs, rabbits and rats, and this current study found that the same applies to tests in NHPs, meaning that the five species commonly used in preclinical testing — including dogs and monkeys — fail to contribute evidential weight in this scenario. Though the data set used in the analysis reported in this paper, and therefore as the basis of the NHP–human species pair analysis, was different from that used in our previous two studies, this common theme is summarised in Table 4, which condenses all of our analyses involving human risk of toxicity throughout the three papers. Tests in all five preclinical species, dogs, mice, NHPs, rabbits and rats, provide little to no evidential weight. Indeed, the iNLR value for NHPs is the lowest of all, though the use of a different data set may account for this.

These conclusions are underpinned and bolstered by the other aspect of this paper, which illustrates a similar lack of evidential weight provided by *any* species for lack of toxicity in any other. In other words, these data, and our analyses, suggest strongly that a lack of toxicity in any species cannot be reliably used to imply a probable lack of toxicity in any other species. This is absolutely crucial, because the critical observation for deciding whether a candidate drug can proceed to testing in humans is the *absence* of toxicity in tests on animals, yet our analyses show that this contributes no additional confidence in the eventual human outcome, but at considerable cost in terms of animal welfare and money.

If no one species can add evidential weight in this regard to any other species, then how can any

**Figure 2:  Box plots showing ranges of PLRs and iNLRs for all seven species pairs, with values for rare observations (< 5) removed**





*The results summarised in Table 3b are shown in their entirety in these box plots, to aid visualisation and comprehension. For each species pair, the distribution of Likelihood Ratios — a) PLRs, b) iNLRs — is illustrated via 'box and whisker' plots. Standard quantile box plots are shown with a logarithmic scale ($\log_{10}$) to incorporate higher values, with each individual LR value plotted alongside, and 'jittered' for ease of visualisation. The box on each plot is bounded by the lower (25%) and upper (75%) quartiles, and therefore represents the interquartile range, i.e. the 50% of LRs that lie either side of the median value, which itself is shown by the dashed line bisecting the box. The mean value is indicated by the dotted line bisecting the box. The maximum and minimum LRs are shown by the whiskers at the top and bottom of the plots, respectively. Outliers are shown as dots beyond the upper whisker, which are greater than 1.5× the interquartile range above the upper (75%) quartile. These box plots illustrate that, for most of the species pairs, there is a high range of LR values, but that there are high-value outliers, and that most LR values lie toward the lower end of the range.*

**Table 4: Median iNLRs and ranges for all five preclinical species with regard to humans**

|       | iNLR (median) | iNLR range |
|-------|---------------|------------|
| Rat    | 1.82 | 1.02–100.0 |
| Mouse  | 1.39 | 1.03–50.0 |
| Rabbit | 1.12 | 1.01–2.33 |
| Dog    | 1.10 | 1.01–1.92 |
| NHP    | 1.02 | 1.00–1.08 |

The median iNLRs were extremely low for all the preclinical species, supporting the view that animals provide very little or essentially no evidential weight to this aspect of toxicity testing. Though it may appear interesting that the value for NHPs is the lowest (and therefore most inferior) of all five preclinical species, it was derived from a different total data set to the other four, which may partly account for this.

non-human species be expected to add evidential weight to what is likely to happen in humans? At present, the main rationale given by those who use, for example, non-rodents such as dogs and NHPs, is that they are not rodents — rodent data are not trusted, so further data are sought from other, non-rodent, species. But our analyses and other data strongly suggest that additional data from other species do not solve the problem of interspecies extrapolation, and in particular, extrapolation to humans.

While the presence of toxicity in one species may sometimes add evidential weight for risk of toxicity in another, the LRs are extremely inconsistent, varying substantially for different classes of drugs and their effects. As we have previously commented, this suggests that this aspect of animal toxicity tests cannot be considered robust and reliable for any specific new drug, particularly when one considers the prior evidence to the contrary, suggesting that animal toxicity tests are poorly predictive of human risk (see our previous related papers [8, 9] for references). At the very least, the fact that there is conflicting evidence in this respect, and that our analyses are, necessarily, based on the relatively limited publicly-available data, demands that further analyses of proprietary data, conducted and/or overseen by industry, are conducted in a transparent, and preferably independent, manner.

As we have argued previously, all of this must have practical and urgent implications for the future use of animals in toxicity testing, especially in the pharmaceutical industry, because poor iNLRs mean that toxic compounds are progressing to testing in humans, only to fail in clinical trials or soon after approval for marketing. This is not

conjecture — it is widely acknowledged, and evidenced by adverse drug reactions and new drug failures at record levels, after an inexorable rise over the past two decades (4, 5, 14–20). Further, this is not something that can be 'fixed' by improving the rigour of the animal tests. There is a scientific basis for this level of failure, namely, major interspecies differences in the cytochrome P450 enzymes (CYP), which are involved in the metabolism of more than 90% of drugs (21). This is discussed in our recent papers, but briefly, increasing (and long overdue) comparative analyses of CYPs across species, including dogs and monkeys, are revealing important differences (which are often minor in nature, but significant functionally), with important consequences for the extrapolation of animal data to humans. Indeed, such differences also seem prevalent *within* species, and are a basis for human variability in susceptibility to adverse drug reactions. So, even if, for the sake of argument, any one or a combination of non-human species *could* reliably predict effects in humans — which 'humans' would they be, given the vast scale of human polymorphism?

It is increasingly clear that the animal testing of human drugs is not fit-for-purpose, and this is especially true in the light of the astounding array of directly human-relevant methods now available to science for testing new drugs (see, for example, 22, 23). In combination with an unprecedented level of public concern over the use of animals in science (24), and the high ethical costs of doing so, we conclude that the preclinical testing of pharmaceuticals in animals cannot currently be justified, ethically or scientifically. At the very least, it is incumbent on the pharmaceutical industry and its regulators to take on board the concerns highlighted by our work, and to augment it via their own studies, using proprietary data that are not publicly-available, as a matter of urgency.

## Acknowledgements

The authors are grateful to the Cruelty Free International Trust for funding. They thank Instem Scientific Limited for scientific consultancy, and for the provision of data relating to adverse events in humans and in various animal species.

## References

1.  Anon. (2004). *Directive 2004/27/EC* of the European Parliament and of the Council of 31 March 2004 amending *Directive 2001/83/EC* on the Community code relating to medicinal products for human use. *Official Journal of the European Union* **L136**, 30.04.2004, 34–79.
2.  Anon. (2009). *The 1938 Food, Drug and Cosmetics*

*Act*. Silver Spring, MD, USA: US Food and Drug Administration. Available at: http://www.fda.gov/AboutFDA/WhatWeDo/History/ProductRegulation/ucm132818.htm (Accessed 29.10.15).

3. Aithal, G.P. (2010). Mind the gap. *ATLA* **38**, Suppl. 1, 1–4.

4. Duyk, G. (2003). Attrition and translation. *Science, New York* **302**, 603–605.

5. Kola, I. & Landis, J. (2004). Can the pharmaceutical industry reduce attrition rates? *Nature Reviews Drug Discovery* **3**, 711–715.

6. Wehling, M. (2011). Drug development in the light of translational science: Shine or shade? *Drug Discovery Today* **16**, 1076–1083.

7. DiMasi, J.A. (2014). Pharmaceutical R&D performance by firm size: Approval success rates and economic returns. *American Journal of Therapeutics* **21**, 26–34.

8. Bailey, J., Thew, M. & Balls, M. (2013). An analysis of the use of dogs in predicting human toxicology and drug safety. *ATLA* **41**, 335–350.

9. Bailey, J., Thew, M. & Balls, M. (2014). An analysis of the use of animal models in predicting human toxicology and drug safety. *ATLA* **42**, 181–199.

10. Altman, D.G. & Bland, J.M. (1994). Diagnostic tests 2: Predictive values. *British Medical Journal* **309**, 102.

11. Grimes, D.A. & Schulz, K.F. (2005). Refining clinical diagnosis with likelihood ratios. *Lancet* **365**, 1500–1505.

12. McGee, S. (2002). Simplifying likelihood ratios. *Journal of General Internal Medicine* **17**, 646–549.

13. Anon. (2010). *Directive 2010/63/EU of the European Parliament and of the Council of 22 September 2010 on the protection of animals used for scientific purposes. Official Journal of the European Union* **L276**, 20.10.2010, 33–79.

14. Anon. (2010). *Innovation or Stagnation: Challenge and Opportunity on the Critical Path to New Medical Products — March 2004*. Silver Spring, MD, USA: US Food and Drug Administration. Available at: http://www.fda.gov/ScienceResearch/SpecialTopics/CriticalPathInitiative/CriticalPathOpportunitiesReports/ucm077262.htm (Accessed 29.10.15).

15. Issa, A.M., Phillips, K.A., Van Bebber, S., Nidamarthy, H.G., Lasser, K.E., Haas, J.S., Alldredge, B.K., Wachter, R.M. & Bates, D.W. (2007). Drug withdrawals in the United States: A systematic review of the evidence and analysis of trends. *Current Drug Safety* **2**, 177–185.

16. Bennani, Y.L. (2011). Drug discovery in the next decade: Innovation needed ASAP. *Drug Discovery Today* **16**, 779–792.

17. Eichler, H.G., Aronsson, B., Abadie, E. & Salmonson, T. (2010). New drug approval success rate in Europe in 2009. *Nature Reviews Drug Discovery* **9**, 355–356.

18. Hughes, B. (2008). 2007 FDA drug approvals: A year of flux. *Nature Reviews Drug Discovery* **7**, 107–109.

19. Hartung, T. (2009). Toxicology for the twenty-first century. *Nature, London* **460**, 208–212.

20. Aurup, P. (2012). *Er Danmark et Attraktivt Land for Klinisk Forskning?* [Is Denmark an Attractive Country for Clinical Research?; Presentation]. Available at: http://di.dk/SiteCollectionDocuments/Opinion/Sundhed/Høring/Præsentation%20-%20Peter%20Aurup,%20Merck.pdf (Accessed 29.10.15).

21. Martinez, M.N., Antonovic, L., Court, M., Dacasto, M., Fink-Gremmels, J., Kukanich, B., Locuson, C., Mealey, K., Myers, M.J. & Trepanier, L. (2013). Challenges in exploring the cytochrome P450 system as a source of variation in canine drug pharmacokinetics. *Drug Metabolism Reviews* **45**, 218–230.

22. Anon. (2007). *Petition to the US Food and Drug Administration for Mandatory Use of Non-Animal Methods in the Development and Approval of Drugs and Devices*, 6pp. Available at: http://www.alternatives-petition.org/docs/MAP-Executive-Summary.pdf (Accessed 29.10.15).

23. Anon. (2012). T*he AXLR8 Consortium: Alternative Testing Strategies, Progress Report 2012*, 288pp. Berlin, Germany: AXLR8 Administration. Available at: http://www.axlr8.eu/assets/axlr8-progress-report-2012.pdf (Accessed 29.10.15).

24. Anon. (2010). *Eurobarometer Survey Shows Public Concern on Animal Testing*. London, UK: European Coalition to End Animal Experiments. Available at: http://www.eceae.org/no/category/watching-brief/76/eurobarometer-survey-shows-public-concern-on-animal-testing (Accessed 29.10.15).

Exhibit 2

ATLA 43, 301–308, 2015
301

# Barriers to the Uptake of Human-based Test Methods, and How to Overcome Them[a]

**Kathy Archibald,[1] Tamara Drake[2] and Robert Coleman[1,2]**

[1]Safer Medicines Trust, Kingsbridge, UK; [2]Center for Responsible Science, Pacific Palisades, CA, USA

**Summary** — Although there is growing concern as to the questionable value of animal-based methods for determining the safety and efficacy of new medicines, which has in turn led to many groups developing innovative human-based methods, there are many barriers to their adoption for regulatory submissions. The reasons for this are various, and include a lack of confidence that the available human-based methods, be they *in vivo*, *in silico* or *in vitro*, can be sufficiently predictive of clinical outcomes. However, this is not the only problem: the issue of validation presents a serious impediment to progress, a particularly frustrating situation, in view of the fact that the existing animal-based methods have never themselves been formally validated. Superimposed upon this is the issue of regulatory requirements, where, although regulators may be willing to accept non-animal approaches in place of particular animal tests, nowhere is this explicitly stated in their guidelines. Such problems are far from trivial, and represent major hurdles to be overcome. In addition, there are a range of other barriers, real or self-imposed, that are hindering a more-predictive approach to establishing a new drug's clinical safety and efficacy profiles. Some of these barriers are identified, and ways forward are suggested.

**Key words:** animal alternative, barriers, humanising, in silico, in vitro, in vivo, predictive, replacement, safety, validation.

**Address for correspondence:** Kathy Archibald, Safer Medicines Trust, Kingsbridge, UK.
E-mail: Kathy@SaferMedicines.org

## Introduction

It is widely accepted that current test methods for predicting safety issues with medicines and other chemicals in human subjects/consumers are inadequate, and increasing efforts are now being directed toward identifying more-reliable replacements. With a growing realisation that a significant contributor to the poor performance of existing methods is the use of non-human species as the basis of most current tests (1–6), much effort has been directed toward human-based approaches, whether *in vivo*, *in silico* or *in vitro* (7–9). Despite this growing recognition of the shortcomings of current methods, the process of introducing new, potentially more-reliable tests based on human biology, is fraught with difficulty, and researchers face an uphill struggle to get such methods recognised and incorporated into preclinical test regimens (10). This is a worrying situation, and it is important to understand the reasons for it, in order to be able to make necessary progress in improving patient and consumer safety.

## The Challenge of Humanising the Process

The transition from any established technology to an alternative one is a difficult process, and any new technology has a hard time in breaking through (11). This is true in any technological area, not least in pharmaceutical research and development. On the question of human *in vivo* testing, it is widely held to be unethical to use humans as experimental subjects in the assessment of new medicine safety and efficacy. However, we must recognise that we are in fact doing exactly that. It is established that in excess of 90% of potential medicines that have successfully passed the preclinical testing process, fail, on the basis of safety and/or efficacy, when evaluated in human subjects. It is clear that human subjects, be they healthy volunteers or patients, are currently the most powerful contributors in the identification of clinical suitability. The obvious failure of animal-based preclinical testing to 'weed out' the unsuitable, leaves the eventual human recipient as the real arbiter on this issue. If we really cannot do any better than this, then we should acknowledge the key role that human subjects play in the process, and consider how best to minimise the possibility of harm to them (12). For example, the use of microdosing, associated with highly sensitive mass spectrometry, has enormous potential to elucidate clinical ADME (Absorption, Distribution, Metabolism and Excretion) issues, and early concerns about extrapolating from sub-therapeutic to

[a]None of the authors of this paper are affiliated or directly associated with the Lush Prize.

therapeutic doses have proven to be largely unfounded (13). Another approach that has been generating immense interest in recent years, is the identification of specific biomarkers, the use of which in human subjects could represent a more sensitive way of detecting potential safety/toxicity issues than waiting for the appearance of overt toxicity (14).

*In silico* methods will undoubtedly contribute increasingly to drug testing paradigms, as significant efforts are being made to develop improved methods, both to predict drug effects in various organs of the human body (15), and, excitingly, also to model the organs themselves (16). However, since these can only be based on what we know, their ultimate value will depend heavily on the availability of the clinical data on which models can be built. Fortunately, the increased awareness of the value of such data has prompted many, but by no means all, pharmaceutical companies to agree to share safety data. We can only hope that, in the not too distant future, the remaining companies currently resisting this forward-looking approach will be persuaded of its value, and will agree to contribute.

*In vitro* technologies are often criticised on the basis of the seemingly impossible task of modelling the functioning of the whole body through a focus on individual parts. While this concern is clearly not without foundation, it ignores two important facts: a) species differences mean that *in vivo* methods based on non-human biology are inherently unreliable for the purpose of predicting human responses; and b) significant progress has been and is continually being made in the development of more-complex and physiologically more-relevant human-based models, such as human cell systems with high-content output (17–19), which has been given a significant boost by the explosive development of stem cell technologies (20). While it is unlikely that any single *in vitro* approach alone will ever fully mirror an intact human, there is good reason to believe that a suitable combination of such tests, alongside low-risk *in vivo* tests in human volunteers, will ultimately succeed in replacing *in vivo* testing in non-human species.

Paradoxically, one issue that delays the transition from methods based on animal biology to those based on human biology, is the concept of the Three Rs (i.e. *Replacement*, *Reduction* and *Refinement*; 21, 22). While the Three Rs concept has been, and remains, a laudable means of minimising animal suffering, it also somewhat obscures the issue of increasing human relevance. Industry and regulators are inherently conservative, so will naturally opt for the least challenging of the Three Rs — *Reduction* and *Refinement* — at the expense of the considerably more challenging, but infinitely more valuable, *Replacement*. The two more conservative Rs may be ethically desirable,

but they do not address the issue of species relevance (23, 24).

## Validation

Validation is the process used to demonstrate that a particular test is reliable and relevant for its intended use (25). Clearly, it is essential to ensure that any required test meets these criteria. However, one considerable barrier to the adoption of novel methods is the hugely resource-intensive burden of formal validation, and to date, only a few human-based tests have achieved this status. To make things more complicated, validation does not guarantee regulatory acceptance, nor does regulatory acceptance necessarily require formal validation (26, 27). While the latter is theoretically true, it must be said that few non-animal tests without formal validation have achieved regulatory approval.

Validation itself has two primary components: technical and functional (28). The technical aspect relates to the practicality, robustness, reproducibility and transferability of the method, each of which is crucial if a method is going to have practical application. The functional aspect relates to its ability to do the job, i.e. to identify potential clinical toxicities; it is here that problems arise. How can we establish whether a particular test can identify a toxicity that will occur in human subjects, if we do not know whether any such toxicity will arise? It is a classical circular problem: we need to know the likelihood of the clinical toxicity, so that we can predict the clinical toxicity. There are ways of getting round this problem — for example, by evaluating a new test method with test substances for which human toxicity profiles are already available. Success in predicting the known could be regarded as strong evidence of the utility of the method. Of course, just because a test is successful in predicting known toxicities, does not guarantee that it will be as successful for predicting unknowns, but a strong track record should increase confidence.

The alternative approach, and one that is widely used for formal validation studies, is comparison against an existing 'gold standard' — which, in most cases, is a non-human animal-based method (28). However, in the knowledge that non-human animal-based methods are unreliable, it is hard to see their value as 'gold standard' methods, and this process often results in more questions than answers (29, 30). To fail to validate a test on such a basis is illogical, and thus potentially wastes both time and resources, adding inappropriate delay to the process of humanising safety testing.

Nobody would dispute that validation is essential, but, as acknowledged by ICCVAM (Interagency Coordinating Committee on the Validation of Alternative Methods; 31), it often serves to prevent, rather than promote, the introduction of

improved methods. It must also be noted that the currently-required animal-based testing regime has never been subjected to validation. Conversely, novel methods are expected to demonstrate a level of performance that is neither expected, nor indeed feasible, from animal-based methods. An obvious solution to this conundrum is that validation needs to become relative, rather than absolute. If a new test, or tests, can be shown to outperform what is currently required, that alone should suffice to ensure the continual and incremental replacement of underperforming tests with better ones, even if they are not yet perfect themselves. Unless this system of gradual improvement (which operates in almost every other sphere of endeavour) is adopted, the perfect will remain forever the enemy of the good.

## Regulation

Another barrier to the adoption of non-animal methods relates to perceived regulatory requirements. There is a widespread perception among manufacturers that regulatory authorities require animal data, whereas, in fact, what they actually require is a degree of assurance that a particular substance will not cause harm. They do not necessarily mandate by what means that assurance is provided, only that it is logical and has some practical basis (32). There is a pressing need for a clearer understanding of actual regulatory requirements in the relevant industries. Consultation with the regulatory authorities before embarking on a regulatory submission, rather than presenting them with a *fait accompli*, is strongly advised, in order to avoid conducting animal tests that were simply not required. However, many companies do not do this, relying instead on advice from regulatory consultants, who tend to be more conservative than the regulators themselves, and often recommend a 'belt and braces' approach, believing that this will increase the likelihood of approval (H. Stemplewski [MHRA], personal communication).

It must be mentioned that the regulators are not entirely without fault, often by virtue of excessive conservatism in their response to non-animal approaches (33), and they can also be guilty of giving out ambiguous messages. In statements on the issue, they may actively encourage the increased use of non-animal tests (34), but this is not necessarily supported by their written guidance. For example, the FDA's Investigational New Drug (IND) and Investigational Device Exemption (IDE) regulations give the FDA the flexibility to accept non-animal test methods (NATMs), such as *in vitro* studies or prior experience with the drug or biological product in humans, when appropriate (35, 36). However, despite this stated willingness to accept NATMs when they are at least as valid as other methods, the FDA has not modified the text of its regulations. The current regulations clearly suggest a requirement for animal testing. For example:

— New Drug Application (NDA) Records and Reports: "To acquire necessary data for determining the safety and effectiveness of long-term use of such drugs, *extensive animal and clinical tests are required as a condition of approval*" (37).

— IND Investigator's Brochure: "A summary of the pharmacological and toxicological effects of the drug in animals and, to the extent known, in humans" (38).

— Application Technical Sections: "A description and analysis of each clinical pharmacology study of the drug, including a brief *comparison of the results of the human studies with the animal pharmacology and toxicology data*" (39).

The fact that companies perceive the full repertoire of animal tests as being required by the regulators, even if this is not always the case, discourages their adoption of NATMs, which are viewed as an additional and inessential expense: "Increasing the use of alternative methods is advised by the law, but it is not mandatory and nobody wastes time on anything that is not essential" (40). Dr Derek Knight, Senior Scientific Advisor to the European Chemicals Agency, made an impassioned plea at the EPAA (European Partnership for Alternative Approaches to Animal Testing) Conference in November 2014: "Regulators, please, please communicate your regulatory R&D requirements to the regulated community" (41).

Unfortunately, the regulatory acceptance of a human-based approach by one regulatory authority does not guarantee similar acceptance by others, and as the pharmaceutical industry is global in nature, even companies enlightened with regard to the inclusion of human-based data in their regulatory submissions, may feel obliged to include animal data, in order to gain access to the widest market. Despite the fact that harmonisation between authorities in different territories is of the greatest importance, and industry's admitted efforts to expedite the process, achieving harmonisation is both a lengthy and difficult process (23, 27, 42, 43). However, through the efforts of the International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use (ICH), some progress is being made (44).

## Other Barriers

Even validation and regulatory acceptance do not guarantee success. There are further self-imposed

**Table 1:  Examples of self-imposed barriers to the adoption of non-animal methods**

| Type of barrier | Example statement |
| --- | --- |
| Entrenched views | "…this is the way I've always done it, and I see no reason to change now." |
| Vested interest | "Animal studies are advantageous for us and we would not risk abandoning any of them." |
| Complacency | "I don't know anything about alternatives, I'll just carry on doing things the way I always have." |
| Scepticism | "I really don't believe that *in vitro* and *in silico* alternatives will ever be able to replace *in vivo* animal tests." |
| Lack of 'courage' | "I'm concerned that use of alternatives may result in expensive delay in getting my drug on the market, and may lay me open to possible litigation if things go wrong." |

*Source: MacLachlan (45).*

barriers to adoption, some of which are rather more insidious (see Table 1). Such reactionary positions as these, are, of course, encountered in all walks of life, but they are highly frustrating. Unless real regulatory action is taken, they can only be overcome by clear demonstrations of the advantages to be gained from NATMs, including reduced costs and increased accuracy, reliability and speed.

A clear example of the above problems is the continued unnecessary and inappropriate use of the unreliable and highly contentious Draize tests for detecting potential ocular and skin irritancy. The Draize tests are acute toxicity tests that were originally devised in 1944, in order to test cosmetics for irritancy (46), but subsequently became widely used to determine the possible eye and skin irritancy of chemicals in general and topically-applied drugs. As early as 2005, the FDA stated publicly that Draize testing was no longer required for skin and ocular irritancy in preclinical test packages for regulatory applications. While stopping short of issuing formal guidance to industry, the FDA has published posters, made public presentations, and communicated with sponsors during Pre-IND meetings, that Draize tests are not required. However, of the 137 drugs approved by the FDA between the years 2011–2014, 24% were tested for skin and eye irritancy, and of these, the Draize test was used in 94% of all skin irritation and 60% of all eye irritation tests (see Table 2). And what is worse, of these drugs for which Draize testing was conducted, 76% were for systemic, not topical, administration — i.e. no irritancy testing of any kind was necessary. Thus, despite the legal requirement to consider non-animal methods before embarking on animal tests, and the FDA's pronouncement that they no longer require Draize testing, the toxicologists concerned carried on regardless, and they even used the test for drugs where there was no obvious skin or eye irritancy issue. The lack of negative consequences for companies who continue to perform unnecessary tests that are not recommended, provides no incentive for change. If tests are no longer required, their use should be challenged by regulators, not passively tolerated.

Various attempts have been made to illustrate, and in some cases to quantify, the inappropriate use of animal-based test methods. Carvalho and colleagues performed a study based on citation analysis to investigate the contribution that animal-based test methods have made in advancing clinical studies of ADHD (47). Systematic analysis showed that, despite a considerable number of animal-based studies of ADHD, they have made, at most, a minimal impact on research into the clinical condition. Similarly, citation analyses have reached very much the same conclusions for many other disease areas, including anorexia and bulimia (48), and stroke and head injury (49). A citation analysis of more than 1,000 animal studies, reported over a 12-year period at three German universities, showed that none of them led to any new therapies or had any clinical impact (50). Furthermore, citations of these studies declined to zero after 17 years, illustrating their lack of long-term impact (51). Citation analysis of 749 studies in chimpanzees showed that half were never cited at all, and of the 27 that went on to clinical application, none made an essential contribution, or in most cases, any contribution at all, toward the development of the described human treatment (52). Another study revealed that even the most highly cited animal studies published in the leading scientific journals, only translated to human clinical application in 10% of the cases, leading the authors to caution patients and physicians about extrapolating the findings of even highly-cited animal research to the treatment of human disease (53).

**Table 2: The use of the Draize Tests for skin and eye irritancy testing for new molecular entities submitted for NDA and BLA review between 2011–2014**

|                    | 2011 | 2012 | 2013 | 2014 | 2011–2014 |
|--------------------|------|------|------|------|-----------|
| Total NMEs         | 30   | 39   | 27   | 41   | 137       |
| SIT performed      | 5    | 8    | 7    | 13   | 33        |
| Draize used for SIT| 5    | 8    | 6    | 12   | 31        |
| SIT (% Draize)     | 100% | 100% | 86%  | 92%  | 94%       |
| SIT (% total NMEs) | 17%  | 21%  | 27%  | 32%  | 24%       |
| EIT performed      | 4    | 8    | 8    | 10   | 30        |
| Draize used for EIT| 2    | 5    | 4    | 7    | 18        |
| EIT (% Draize)     | 50%  | 63%  | 50%  | 70%  | 60%       |
| EIT (% total NMEs) | 13%  | 21%  | 30%  | 24%  | 22%       |

*EIT = eye irritancy testing; NME = new molecular entities; SIT = skin irritancy testing.*

Undue emphasis by funding review boards on animal-based studies over more-relevant human-based studies has been noted by many researchers (22, 45, 54, 55). This is not helped by the fact that researchers are far more expert in the areas of their work than regulators, and can thus have an advantage in expressing the perceived advantages of their particular animal-based technology; a phenomenon known as 'informational asymmetry' (56). A pioneer of evidence-based medicine, Dr David Sackett, firmly believed that 'experts' were an impediment to progress and change (57). As long ago as 1911, a Nobel Laureate, Maurice Maeterlinck, observed that: "At every crossroads on the path that leads to the future, tradition has placed ten thousand men to guard the past".

The phenomenon of 'technological lock-in' (where the superior long-term path is not necessarily the path chosen) applies strongly to the continued default use of animal testing, even where NATMs would be advantageous. There is also a strong case that animal testing is subject to institutional, psychological and behavioural lock-in, as explained by Frank (58). An important message of this paper is that, when an inferior technology has become locked-in, there is no reason to expect the path to self-correct. Therefore, intervention is necessary to 'de-lock' or change paths, in order to overcome the many factors contributing to entrenchment against change.

Perhaps the greatest barrier to the replacement of animal tests is the legal protection that they afford to pharmaceutical companies in litigation regarding adverse drug reactions (ADRs). It is therefore imperative to increase awareness of the fallacy of such protection: unpredictive tests do not protect patients, and should no longer protect companies who continue to use them, when more-predictive methods not reliant on interspecies extrapolation are available.

## Stimulating Change

To break down the barriers to change, it must first be more widely acknowledged that current methods are unsatisfactory in terms of predictive value, time and expense. The issues of excessive time and expense associated with current animal-based methods in drug development are now reasonably well acknowledged, but their poor predictive performance less so. There are many sources of evidence for this, including:

— the high rate of failure of drugs in clinical testing and therapeutic use (59);

— the lack of association between clinical toxicities and correlates in preclinical animal tests, to the extent that, in one study, animal tests missed 81% of the serious side-effects of 43 drugs that went on to harm patients (60); and

— the lack of contribution of research based on animal models to clinical research (47, 55, 61–64).

As Professor John Ioannidis has observed: "It is nearly impossible to rely on most animal data to predict whether or not an intervention will have a favourable clinical benefit–risk ratio in human subjects" (65).

The consequences of continued reliance on inadequate tests include the exposure of patients and research volunteers to unacceptable risks and frequent harm. Many clinical trials are now conducted in India, where hundreds die each year in trials for Western medicines (2,644 between the years 2005–2012; 66). ADRs kill 197,000 people in the EU each year, costing €79 billion (67). In the USA, in 2011, prescription drugs were associated with serious or disabling injuries in two to four million people, including 128,000 deaths (68). Of course, animal tests are not the sole cause of ADRs, but it cannot be denied that more-predictive

tests would prevent many toxic medicines from reaching patients. The scale of the problem necessitates urgent action to improve the performance of preclinical safety testing.

In our view, the most important contribution that can be made is to ensure that human biology is given absolute priority throughout drug development and testing. Although the pharmaceutical industry is making moves in this direction, the absence of regulatory pressure for change is allowing progress to occur at a glacial pace. There are precedents that show that deadlines create tremendous impetus for change, such as the EU Cosmetic and REACH regulations. Mandatory targets and time limits are called for, if we are serious about reducing the ever-increasing burden of death and disability caused by ADRs. In order to realise the potential of a human-based approach, we must continue to research and refine human-based tests, improve and accelerate validation, educate researchers, regulators and insurers about the limitations of extrapolating between species and the advantages of a human-focused approach, clarify, pro-actively communicate and enforce official guidelines, and, most importantly, set time-lines for action. Many organisations and individuals have called for all of these things for many years, but without clear milestones and firm deadlines, the "paradigm shift from the use of experimental animals... toward the use of more efficient *in vitro* tests and computational techniques", as called for in the seminal 2007 report *Toxicity Testing in the 21st Century* (69), will continue to be postponed indefinitely.

# References

1. Varga, O.E., Hansen, A.K., Sandøe, P. & Olsson, I.A. (2010). Validating animal models for preclinical research: A scientific and ethical discussion. *ATLA* **38**, 245–248.
2. Bailey, J., Thew, M. & Balls, M. (2013). An analysis of the use of dogs in predicting human toxicology and drug safety. *ATLA* **41**, 335–350.
3. Bailey, J., Thew, M. & Balls, M. (2014). An analysis of the use of animal models in predicting human toxicology and drug safety. *ATLA* **42**, 181–199.
4. Wall, R. & Shani, M. (2008). Are animal models as good as we think? *Theriogenology* **69**, 2–9.
5. Hartung, T. (2013). Food for thought... Look back in anger — What clinical studies tell us about preclinical work. *ALTEX* **30**, 275–291.
6. Geerts, H. (2009). Of mice and men: Bridging the translational disconnect in CNS drug discovery. *CNS Drugs* **23**, 915–926.
7. Ashton, R., De Wever, B., Fuchs, H.W., Gaça, M., Hill, E., Krul, C., Poth, A. & Roggen, E.L. (2014). State of the art on alternative methods to animal testing from an industrial point of view: Ready for regulation? *ALTEX* **31**, 357–363.
8. Holmes, A., Bonner, F., & Jones, D. (2015). Assessing drug safety in human tissues — what are the barriers? *Nature Reviews Drug Discovery* **14**, 585–587.
9. Hartung, T. (2010). Lessons learned from alternative methods and their validation for a new toxicology in the 21st century. *Journal of Toxicology & Environmental Health B Critical Reviews* **13**, 277–290.
10. Kooijman, M. (2013). Why animal studies are still being used in drug development. *ATLA* **41**, P79–P81.
11. Geels, F.W. (2002). Technological transitions as evolutionary configuration processes: A multi-level perspective and a case study. *Research Policy* **31**, 1257–1274.
12. Kimmelman, J. & London, A.J. (2011). Predicting harms and benefits in translational trials: Ethics, evidence, and uncertainty. *PLoS Medicine* **8**, e1001010.
13. Rowland, M. (2012). Microdosing: A critical assessment of human data. *Journal of Pharmaceutical Science* **101**, 4067–4074.
14. Patru, M-M. (2012). Biomarkers of toxicity panel in clinical trials. *Clinical Insight* **4**, 6–12.
15. Myatt, G.J. & Cross, K.P. (2014). *In silico* solutions for predicting efficacy and toxicity. In *Human-based Systems for Translational Research* (ed. R. Coleman), Chapter 9, pp. 194–218. Cambridge, UK: Royal Society of Chemistry.
16. Rodriguez, B. (2014). *In silico* organ modelling in predicting efficacy and safety of new medicines. In *Human-based Systems for Translational Research* (ed. R. Coleman), Chapter 10, pp. 219–240. Cambridge, UK: Royal Society of Chemistry.
17. Berg, E.L. & O'Mahoney, A. (2014). Complex primary human cell systems for drug discovery. In *Human-based Systems for Translational Research* (ed. R. Coleman), Chapter 5, pp. 88–109. Cambridge, UK: Royal Society of Chemistry.
18. Esch, E.W., Bahinski, A. & Huh, D. (2015). Organs-on-chips at the frontiers of drug discovery. *Nature Reviews Drug Discovery* **14**, 248–260.
19. Smith, A.S.T., Long, C.J., McAleer, C., Guo, X., Esch, M., Prot, J.M., Shuler, M.L. & Hickman, J.J. (2014). 'Body-on-a-chip' technology and supporting microfluidics. In *Human-based Systems for Translational Research* (ed. R. Coleman), Chapter 7, pp. 132–161. Cambridge, UK: Royal Society of Chemistry.
20. Chintawar, S., Graf, M. & Cader, Z. (2014). Utility of human stem cells for drug discovery. In *Human-based Systems for Translational Research* (ed. R. Coleman), Chapter 8, pp. 162–193. Cambridge, UK: Royal Society of Chemistry.
21. Russell, W.M.S. & Burch, R.L. (1959). *The Principles of Humane Experimental Technique*, 238pp. London, UK: Methuen.
22. Schiffelers, M.J., Blaauboer, B.J., Bakker, W.E., Beken, S., Hendriksen, C.F., Koëter, H.B. & Krul, C. (2014). Regulatory acceptance and use of 3R models for pharmaceuticals and chemicals: Expert opinions on the state of affairs and the way forward. *Regulatory Toxicology & Pharmacology* **69**, 41–48.
23. Garthoff, B. (2005). Alternatives to animal experimentation: The regulatory background. *Toxicology & Applied Pharmacology* **207**, 388–392.
24. Coleman, R.A. (2014). Human-based systems in drug and chemical safety testing — toward replacement, the single 'R'. *ATLA* **42**, 357–366.
25. AltTox (2008). *Validation*. Available at: http://alttox.org/mapp/validation-2/ (Accessed 08.09.15).

26. Wilcox, N. & Goldberg, A. (2011). Food for thought... On validation. A puzzle or a mystery: An approach founded on new science. *ALTEX* **28**, 3–8.

27. Schiffelers, M.J., Blaauboer, B.J., Hendriksen, C.F. & Bakker, W.E. (2012). Regulatory acceptance and use of 3R models: A multilevel perspective. *ALTEX* **29**, 287–300.

28. Leist, M., Hasiwa, N., Rovida, C., Daneshian, M., Basketter, D., Kimber, I., Clewell, H., Gocht, T., Goldberg, A., Busquet, F., Rossi, A.M., Schwarz, M., Stephens, M., Taalman, R., Knudsen, T.B., McKim, J., Harris, G., Pamies, D. & Hartung, T. (2014). Consensus report on the future of animal-free systemic toxicity testing. *ALTEX* **31**, 341–356.

29. Metz, B., Hendriksen, C.F., Jiskoot, W. & Kersten, G.F. (2002). Reduction of animal use in human vaccine quality control: Opportunities and problems. *Vaccine* **20**, 2411–2430.

30. Paparella, M., Daneshian, M., Hornek-Gausterer, R., Kinzl, M., Mauritz, I. & Mühlegger, S. (2013). Uncertainty of testing methods — what do we (want to) know? *ALTEX* **30**, 131–144.

31. Anon. (2015). *ICCVAM Public Forum: May 27 2015.* Available at: http://ntp.niehs.nih.gov/go/iccvamforum-2015 (Accessed 08.09.15). Research Triangle Park, NC, USA: ICCVAM.

32. MHRA (2008). *Medicines & Medical Devices Regulations: What You Need to Know,* 20pp. London, UK: MHRA.

33. Taylor, K., Stengel, W., Casalegno, C. & Andrew, D. (2014). Experiences of the REACH testing proposals system to reduce animal testing. *ALTEX* **31**, 107–128.

34. MHRA (undated). *Animal Work for the Licensing of Medicines — the Facts,* 1pp. London, UK: MHRA.

35. Anon. (2015). *Code of Federal Regulations: 21, 812.20(b) and 812.27(a).* Washington, DC, USA: US Publishing Office. Available at: http://www.ecfr.gov/cgi-bin/text-idx?SID=1924bdde4f98ebc1f828ac891640d972&mc=true&tpl=/ecfrbrowse/Title21/21cfr812_main_02.tpl (Accessed 09.09.15).

36. Anon. (2010). *Information Advisory: FDA to Issue Response to Citizen Petition on Non-Animal Test Methods,* 18 May 2010.

37. Anon. (2010). *21 CFR 310.303: Continuation of Long-term Studies, Records, and Reports on Certain Drugs for which New Drug Applications Have Been Approved.* Washington, DC, USA: US Publishing Office. Available at: http://www.gpo.gov/fdsys/granule/CFR-2010-title21-vol5/CFR-2010-title21-vol5-sec310-303 (Accessed 09.09.15).

38. Anon. (2015). *Code of Federal Regulations: 21, 312.23(a)(5)(ii).* Washington, DC, USA: US Publishing Office. Available at: http://www.ecfr.gov/cgi-bin/text-idx?SID=1924bdde4f98ebc1f828ac891640d972&mc=true&node=se21.5.312_123&rgn=div8 (Accessed 09.09.15).

39. Anon. (2015). *Code of Federal Regulations: 21, 314.50(d)(5)(i).* Washington, DC, USA: US Publishing Office. Available at: http://www.ecfr.gov/cgi-bin/text-idx?SID=dc4410d0795c777d29a2f0879f6e8a7e&mc=true&tpl=/ecfrbrowse/Title21/21cfr314_main_02.tpl (Accessed 09.09.15).

40. Rovida, C. (2010). Food for thought... Why no new *in vitro* tests will be done for REACH by registrants. *ALTEX* **27**, 175–183.

41. Knight, D.J. (2014). *ECHA Perspective on the Use of New Approaches to Satisfy REACH Regulatory Requirements* [Presentation at 10th EPAA Annual Conference, Brussels, Belgium, 19 November 2014]. Available at: https://circabc.europa.eu/sd/a/b15d04a0-01ac-454a-a753-6d9bb1f87fae/02-knight.pdf (Accessed 09.09.15).

42. Majone, G. (2010). Foundations of risk regulation: Science, decision-making, policy and institutional reform. *European Journal of Risk Regulation* **1**, 5–19.

43. Weisfeld, V. & Lustig, T.A. (ed.) (2013). *International Regulatory Harmonization Amid Globalization of Drug Development: Workshop Summary,* 128pp. Washington, DC, USA: The National Academies Press.

44. ICH (2010). *The Value and Benefits of ICH to Drug Regulatory Authorities — Advancing Harmonization for Better Health,* 31pp. Geneva, Switzerland: ICH.

45. MacLachlan, A. (1994). The chemical industry: Risk management in today's product liability environment. In *Product Liability and Innovation: Managing Risk in an Uncertain Environment* (ed. J.R. Hunziker & T.O. Jones), pp. 47–53. Washington DC, USA: The National Academies Press.

46. Draize, J.H., Woodard, G. & Calvery, H.O. (1944). Methods for the study of irritation and toxicity of substances applied topically to the skin and mucous membranes. *Journal of Pharmacology & Experimental Therapeutics* **82**, 377–390.

47. Carvalho, C. (2015). *ADHD: What Have we Learned from Clinical Research and Animal Studies?* [Proceedings of II International Conference of Alternatives to Animal Experimentation, Lisbon, Portugal].

48. Shapiro, K.J. (1998). *Animal Models of Human Psychology: Critique of Science, Ethics and Policy,* 344pp. Göttingen, Germany: Hogrefe.

49. Knight, A. (2008). Systematic reviews of animal experiments demonstrate poor contributions toward human healthcare. *Reviews on Recent Clinical Trials* **3**, 89–96.

50. Lindl, T., Völkel, M. & Kolar, R. (2006). Animal experiments in biomedical research. An evaluation of the clinical relevance of approved animal experimental projects: No evident implementation in human medicine within more than 10 years. [Lecture]. *ALTEX* **23**, 111.

51. Lindl, T. & Völkel, M. (2011). No clinical relevance of approved animal experiments after seventeen years. *ALTEX* **28**, 242–243.

52. Bailey, J., Balcombe, J. & Capaldo, T. (2007). *Chimpanzee Research: An Examination of its Contribution to Biomedical Knowledge and Efficacy in Combating Human Diseases,* 47pp. Boston, MA, USA: New England Anti-Vivisection Society (Project R&R). Available at: http://www.releasechimps.org/flawed-science/dangerous-and-unnecessary/the-case-to-end-chimpanzee-research/ (Accessed 09.09.15).

53. Hackam, D.G. & Redelmeier, D.A. (2006). Translation of research evidence from animals to humans. *Journal of the American Medical Association* **296**, 1731–1732.

54. Rice, M.J. (2011). The institutional review board is an impediment to human research: The result is more animal-based research. *Philosophy, Ethics & Humanitarian Medicine* **6**, 12–22.

55. Ayres-de-Campos, D. (2015). *Defining the Clinical Research Question: Unnecessary Repetition of Animal Studies: The Case of Fetal Monitoring.* [Pro-

ceedings of II International Conference of Alternatives to Animal Experimentation, Lisbon, Portugal].

56. Heritier, A. (2001). *Regulator–Regulatee Interaction in the Liberalized Utilities: Access and Contract Compliance in the Rail Sector*, 26pp. Bonn, Germany: Max Planck Institute for Research on Collective Goods. Available at: http://www.coll.mpg.de/pdf_dat/2001_12online.pdf (Accessed 09.09.15).

57. Picard, A. (2015). *David Sackett: The father of evidence-based medicine.* Toronto, ON, Canada: The Globe and Mail. Available at: http://www.theglobeandmail.com/life/health-and-fitness/health/david-sackett-the-father-of-evidence-based-medicine/article24607930/ (Accessed 09.09.15).

58. Frank, J. (2004). Technological lock-in, positive institutional feedback, and research on laboratory animals. *Structural Change Economic Dynamics* **16**, 557–575.

59. Arrowsmith, J.A. (2012). Decade of change. *Nature Reviews Drug Discovery* **11**, 17–18.

60. van Meer, P.J.K., Kooijman, M., Gispen-de Wied, C.C., Moors, E.H. & Schellekens, H. (2012). The ability of animal studies to detect serious post marketing adverse events is limited. *Regulatory Toxicology & Pharmacology* **64**, 345–349.

61. Kaste, M. (2005). Use of animal models has not contributed to development of acute stroke therapies: Pro. *Stroke* **36**, 2323–2324.

62. Seok, J., Warren, H.S., Cuenca, A.G., Mindrinos, M.N., Baker, H.V., Xu, W., Richards, D.R., McDonald-Smith, G.P., Gao, H., Hennessy, L., Finnerty, C.C., López, C.M., Honari, S., Moore, E.E., Minei, J.P., Cuschieri, J., Bankey, P.E., Johnson, J.L., Sperry, J., Nathens, A.B., Billiar, T.R., West, M.A., Jeschke, M.G., Klein, M.B., Gamelli, R.L., Gibran, N.S., Brownstein, B.H., Miller-Graziano, C., Calvano, S.E., Mason, P.H., Cobb, J.P., Rahme, L.G., Lowry, S.F., Maier, R.V., Moldawer, L.L., Herndon, D.N., Davis, R.W., Xiao, W. & Tompkins, R.G. (2013). Inflammation and host response to injury, large scale Collaborative Research Program. Genomic responses in mouse models poorly mimic human inflammatory diseases. *Proceedings of the National Academy of Sciences of the USA* **110**, 3507–3512.

63. Mak, I.W.Y., Evaniew, N. & Gher, M. (2014). Lost in translation: Animal models and clinical trials in cancer treatment. *American Journal of Translational Research* **6**, 114–118.

64. Safer Medicines (undated). *Quotes from doctors & researchers*. Available at: http://www.safermedicines.org/page/quotes_misc (Accessed 09.09.15).

65. Ionnidis, J.P. (2012). Extrapolating from animals to humans. *Science Translational Medicine* **4**, 1–3.

66. Buncombe, A. (2013). *A heaven for clinical trials, a hell for India*. London, UK: The Independent. Available at: http://www.independent.co.uk/news/world/asia/a-heaven-for-clinical-trials-a-hell-for-india-court-orders-government-to-regulate-drugs-testing-by-international-pharmaceutical-companies-8849461.html (Accessed 09.09.15).

67. Anon. (2008). *Strengthening Pharmacovigilance to Reduce Adverse Effects of Medicines*. Brussels, Belgium: European Commission. Available at: http://europa.eu/rapid/press-release_MEMO-08-782_en.htm?locale=en (Accessed 09.09.15).

68. ISMP (2012). *QuarterWatch: Monitoring FDA MedWatch Reports*, 25pp. Horsham, PA, USA: Institute for Safe Medication Practices. Available at: http://www.ismp.org/quarterwatch/pdfs/2011Q4.pdf (Accessed 09.09.15).

69. US National Research Council (2007). *Toxicity Testing in the 21st Century: A Vision and a Strategy*, 216pp. Washington, DC, USA: National Academies Press.

Exhibit 3

ATLA 41, 335–350, 2013                                                                                        335

# An Analysis of the Use of Dogs in Predicting Human Toxicology and Drug Safety

**Jarrod Bailey,[1] Michelle Thew[1] and Michael Balls[2]**

[1]*British Union for the Abolition of Vivisection (BUAV), London, UK;* [2]*c/o Fund for the Replacement of Animals in Medical Experiments (FRAME), Nottingham, UK*

**Summary** — Dogs remain the main non-rodent species in preclinical drug development. Despite the current dearth of new drug approvals and meagre pipelines, this continues, with little supportive evidence of its value or necessity. To estimate the evidential weight provided by canine data to the probability that a new drug may be toxic to humans, we have calculated Likelihood Ratios (LRs) for an extensive dataset of 2,366 drugs with both animal and human data, including tissue-level effects and Medical Dictionary for Regulatory Activities (MedDRA) Level 1–4 biomedical observations. The resulting LRs show that the absence of toxicity in dogs provides virtually no evidence that adverse drug reactions (ADRs) will also be absent in humans. While the LRs suggest that the presence of toxic effects in dogs can provide considerable evidential weight for a risk of potential ADRs in humans, this is highly inconsistent, varying by over two orders of magnitude for different classes of compounds and their effects. Our results therefore have important implications for the value of the dog in predicting human toxicity, and suggest that alternative methods are urgently required.

**Key words:** *canine, dog, drug development, preclinical testing, toxicology.*

**Address for correspondence:** *Jarrod Bailey, British Union for the Abolition of Vivisection (BUAV), 16a Crane Grove, London N7 8NN, UK.*
E-mail: *jarrod.bailey@mac.com*

## Introduction

It is generally assumed that testing new pharmaceuticals on animals helps to ensure human safety and efficacy. Regulatory agencies worldwide require preclinical trials (e.g. 1, 2), which involve at least two species — typically one rodent and one non-rodent species — to determine toxicity and pharmacokinetics. The expectation is that additional data from the non-rodent will detect adverse effects not detected by rodent tests. Despite the current dearth of new drug approvals and meagre pipelines (e.g. 3, 4), this practice continues, with little supportive evidence of its value or necessity (5).

Dogs are used in significant numbers in science — approximately 90,000 are used per annum across the EU and the USA, according to the latest available figures (6–8). About 80% of this use is as the non-rodent species in the evaluation of pharmaceutical safety and efficacy (6). However, only limited evaluations of the reliability of the canine model for this purpose have been conducted, chiefly due to the difficulty of accessing relevant data, most of which are unpublished and proprietary to pharmaceutical companies. Those evaluations that have been conducted have usually employed 'concordance' metrics (e.g. 9), which various authors have interpreted as the true positive rate ('sensitivity') or the Positive Predictive Value (PPV). While these metrics are appropriate for assessing the reliability of a diagnostic test for a specific disorder (e.g. HIV infection), the insights they provide depend critically on the question being asked of the diagnostic test. However, they are not appropriate for assessing the salient question at issue with animal models, which is *whether or not they contribute significant weight to the evidence for or against the toxicity of a given compound in humans*. Overcoming this key problem — almost entirely overlooked by previous authors — requires a precise specification of the various terms used (see *Methods*). Briefly, the appropriate metrics are Likelihood Ratios (LRs; 10): the Positive Likelihood Ratio (PLR) and the inverse Negative Likelihood Ratio (iNLR). Therefore, there is clearly a need for the kind of statistically-appropriate critical analysis that we provide here. The dataset we have used is unique, in that it is large and allows the conditional probabilities required for the LRs (PLR/iNLR) to be calculated.

## Methods

Animal models are widely used to assess the risk that a given compound will prove toxic in humans. As with any diagnostic test, their reliability can only be assessed by performing tests in which the same compound is given to both animals and humans, and the presence or absence of toxicity recorded. This leads to a 2 × 2 matrix of results, as shown in Figure 1 (11).

**Figure 1:  A 2 × 2 matrix of results**

|  | Compound toxic in humans | Compound not toxic in humans |
|---|---|---|
| **Compound toxic in animal model** | a: true positives (TPs) | b: false positives (FPs) |
| **Compound not toxic in animal model** | c: false negatives (FNs) | d: true negatives (TNs) |

The basis of this matrix is that the human data are correct, and the dog data are true/false, if they do/do not match them. The various cells in this matrix allow a variety of diagnostic metrics to be deduced, of which the most familiar and widely used are the true positive rate for the test (or 'sensitivity' = a/[a + c]), and the true negative rate (or 'specificity' = d/[d + b]). In previous research into the reliability of animal models as predictors of toxicity in humans, some authors (e.g. 9) have focused on the sensitivity, expressed as the 'true positive concordance rate', or the so-called Positive Predictive Value (PPV), given by a/(a+b), which reflects the probability that human toxicity was correctly identified by the animal model, given that toxicity was observed in the animal model (e.g. 12). However, neither of these metrics is suitable for the role of assessing the evidential weight provided by any toxicity test. In the case of animal models, the sensitivity addresses only the ability of such models to detect toxicity that will subsequently manifest itself in humans. This is a necessary, but not sufficient, measure of evidential weight. Suppose, for example, that the animal model always indicates toxicity found in humans; it would then have a sensitivity of 100%. However, if, in addition, the model always indicates toxicity, even in humans, its evidential value is no better than simply dismissing *every* compound as toxic from the outset. Thus, a useful toxicity test must also be able to give insight into when toxicity seen in the animal model is not observed in humans, which requires knowledge of the *specificity* of the test.

There is, of course, an obvious reason for the focus on sensitivity in animal model evaluation: if a compound is found to be positive in an animal model, it is unlikely to go into human evaluation. Nevertheless, the fact remains that sensitivity alone cannot be an adequate guide to the value of animal models.

The case of the PPV is more subtle. This metric is a measure of the probability that human toxicity will be correctly identified, given that the animal model detected toxicity. As such, PPVs are conditional probabilities, the condition being the pre-existence of a positive animal test result. This makes PPVs dependent on the prevalence of toxicity in compounds, and thus an inappropriate measure of the reliability of the test with any specific compound (e.g. 10, 13).

Thus, any appropriate metric of the evidential value of animal models requires knowledge of *both* the sensitivity *and* the specificity of the model. This, in turn, implies that the appropriate metrics for the evidential weight provided by an animal model are LRs (e.g. 13). In general, these are ratios of functions of the sensitivity and specificity, which can be extracted from the 2 × 2 matrix given above. In the specific case of animal models in general, two LRs are relevant. The first is the so-called PLR, which is given by:

$$PLR = \text{sensitivity}/(1 - \text{specificity})$$
$$= (a / a + c)/(b/ b + d)$$

This LR captures the ability of an animal model to add evidential weight to the belief that a specific compound is toxic. Any animal model that gives a PLR that is statistically significantly higher than 1.0, can be regarded as contributing evidential weight to the probability that the compound under test will be toxic in humans.

The other relevant LR is the so-called iNLR, given by:

$$iNLR = \text{specificity}/(1 - \text{sensitivity})$$
$$= (d / b + d)/(c / a + c)$$

This LR captures the ability of an animal model to add evidential weight to the belief that a specific compound is not toxic: any animal model that gives an iNLR that is statistically significantly higher than 1.0, can be regarded as contributing evidential weight to the probability that the compound under test will not be toxic in humans.

It is worth noting at this point that the above definitions imply that a good animal model for detecting human toxicity is not necessarily also good for detecting an absence of toxicity. That is, a high PLR does not guarantee a high iNLR; this will emerge as a key issue in this study.

The above definitions also underscore the need for data on the human toxicity of compounds that

fail initial animal tests. Again, a key feature of the current study is that this issue has been overcome via data mining methods. Data were obtained from a leading pharmaceutical safety consultancy, Instem Scientific Limited (Harston, Cambridge, UK; http://www.instem-lss.com 'Safety Intelligence Programme'), with funding provided by FRAME. All the information stemmed from publicly accessible sources, including: PubMed (http://www.ncbi.nlm.nih.gov/pubmed), the FDA Adverse Event Reporting System (FAERS), DrugBank (http://www.drugbank.ca), and the National Toxicology Program (http://ntp.niehs.nih.gov). Data were available for more than 2,300 drug compounds in humans and preclinical species.

Inference of the good quality of the data used in this evaluation is outlined in the *Discussion*. Compounds were selected that feature in the FAERS, FDA New Drug Applications (FDA NDAs) and DrugBank. Thus, the drugs selected for this analysis are in clinical use, and have undergone preclinical testing: human and animal data are therefore available for them. A non-redundant list of parent moieties was created, for example, by normalising therapeutic products to their generic names (e.g. Lipitor to Atorvastatin). This yielded 2,366 compounds.

A signature of the effects of each compound was created, focusing on tissue-level effects (e.g. bradycardia and arrhythmic disorder would both be considered to be effects on heart tissues), as well as the individual observations, which were mapped to their MedDRA (Medical Dictionary for Regulatory Activities; http://www.meddramsso.com) counterparts. MedDRA observations are classified into four levels, Level 1 being the most specific and Level 4 providing a more generic 'System Organ Class'. These classifications help to eliminate false positives that may arise from species-specific observations, and help the identification of concordant observations that might otherwise have been missed, by their 'rolling up' into more-generic terms.

LRs were derived for broad tissue-level effects ($n$ = 52), and more-specific biomedical observations (BMOs; $n$ = 384), mapped to MedDRA classifications (Levels 1 [most specific] to Level 4 [more generic 'organ class']). Fourteen BMO classifications not involving dogs were eliminated from the study. A total of 3,275 comparisons were made between the human and the dog, for 2,366 compounds, involving 436 (52 + 384) classifications of effects. The Instem Scientific data on which our analysis was based are shown in the Appendix, and the full set of data, including 95% Confidence Intervals, are available on the FRAME website (www.frame.org.uk).

With regard to potential bias: FNs are more common than FPs, since there is a bias resulting from a 'precautionary principle' not to progress positives to human administration. This has been mitigated by limiting the dataset to compounds reported in the FAERS database. Therefore, all the compounds are certain to have proceeded to market, and animal preclinical data are available for these compounds. Specific details of how the FPs that were identified arose were not sought, because they were not pertinent to this analysis, and this was not feasible, given the nature of the dataset. It must be assumed that the dog data were correlated with the human data retrospectively, and/or the human data arose from post-marketing studies, and/or clinical trials were applied for and approved, since the adverse effect(s) in dogs were minor and/or mitigated by other data.

## Results

The inappropriate nature of PPVs is demonstrated in Figure 2, which shows a scatter plot of 'ranked' PPVs against equivalent ranked PLRs. Each PPV and PLR was ranked according to its value for each of the 436 classifications of effects, and these ranks were plotted against each other. The disparity is evidenced by the scatter of points, few of which lie close to the $y = x$ line that shows an ideal correlation. The misclassifications and misplaced assumptions of the accuracy of canine data for the prediction of human adverse drug reactions (ADRs) are clear. For example, MedDRA 'Level 4, Vascular Disorder' was ranked 20/436 with regard to the most favourable classifications for human predictivity based on PPV, but its cognate PLR ranked 404/436 — one of the least predictive. Conversely, MedDRA classification 'Level 2, Ventricular Conduction' ranked 30/436 by PLR, but 406/436 by PPV.

Dog PLRs were generally high (median ~28), implying that compounds that are toxic in dogs are likely also to be toxic in humans. However, because the PLRs vary considerably (range 4.7–548.7), with no obvious pattern regarding the form of toxicity, the reliability of this aspect of canine models cannot be generalised or regarded with confidence.

In contrast, the calculated inverse negative LRs (iNLRs) are substantially more consistent, but their median value of 1.11 (range 1.01–1.92) supports the view that dogs provide essentially no evidential weight to this aspect of toxicity testing. Specifically, the fact that a compound shows no toxic effects in dogs provides essentially no insight into whether the compound will also show no toxic effects in humans.

This lack of evidential weight has important implications for the role of dogs in toxicity testing, especially for the pharmaceutical industry. The critical observation for deciding whether a candidate drug can proceed to testing in humans is the absence of toxicity in tests on animals. However,

J. Bailey *et al.*

**Figure 2:  Scatter plot illustrating the lack of correlation of PPVs and PLRs of biomedical observations (BMOs) and tissue effects in humans and dogs**



*PPVs and PLRs for all 436 results were ordered according to their value, with the highest ranking first and the lowest last. For each BMO and tissue effect, the corresponding PPV and PLR rank were plotted against each other. If a perfect correlation exists, all points should lie on the line, where, for example, the 10th, 50th, and 100th highest PPV value would also be the 10th, 50th, and 100th highest PLR values. However, the significant scatter of the data points demonstrates that little correlation exists between PPV and PLR. For example: the 20th highest PPV ranks only 404/436 for PLR, whereas the 30th highest PLR ranks only 406/436 for PPV.*

our findings show that the predictive value of the animal test in this regard is barely greater than that that would be obtained by chance (see below).

## Discussion

The analysis presented here is urgently required, to support informed debate about the worth of animal models in preclinical testing. It is acknowledged among some stakeholders (if not universally among all stakeholders) that assessment of the scientific value of animal data in drug development is necessary, has been scarce, and has been thwarted for decades by the unavailability of relevant data for analysis (e.g. 14). Nevertheless, primarily due to concerns over privacy and commercial interests, data sharing and making data available continue to be resisted, in spite of assurances to the contrary from industry (14).

Those few analyses that have been done, tend to reflect unfavourably on animal models, including

the dog. In 2012, a study that expressly set out to minimise bias, showed that 63% of serious ADRs had no counterparts in animals, and less than 20% of serious ADRs had a true positive corollary in animal studies (15). Other similar examples exist for testing generally (e.g. 16–18) and more-specifically, for example, in teratology (e.g. 19, 20) and drug-induced liver injury (e.g. 5, 21). One notable study claimed a good concordance for dog and human toxicology (10), though neither the predictive nature of the animal data for humans, nor the evidential weight provided by those data, were addressed (22).

We have, for the first time, addressed the salient question of *contribution of evidential weight for or against the toxicity of a given compound in humans* by data from dog tests, by using the appropriate metrics of LRs. Furthermore, we have applied the apposite LRs to a dataset of unprecedented scale, to critically question the value of the use of the dog as a preclinical species in the testing of new pharmaceuticals.

Substantiation of data quality is evidenced by: the methods used to source the data and the assured quality of the databases supplying them (listed above); the ways in which the data had been used recently as a basis for scientific publications and presentations (e.g. 23–26); and the international corporate and academic clients that have used the consultancy and its data (e.g. AstraZeneca; see 23–26). In addition, the impact of 'missing data' (i.e. unpublished data held by pharmaceutical companies) was mitigated by strictly limiting the dataset to drugs "with the greatest chance of having been evaluated in all the species included in the study" (here, dogs and humans). In other words, "…lack of evidence for an association between a compound and a specific BMO demonstrates a real absence of effect, and is not due to missing data" (Instem Scientific Ltd. Analysis Report, unpublished).

Naturally, there must be caveats. Our analysis was limited to data that are published and publicly available. It is widely acknowledged that many animal experimental results/preclinical data remain unpublished and/or proprietary, for a variety of reasons (e.g. 15, 27–30). Such publication bias is a major problem (e.g. 31–34), and, compounded by other factors such as size and quality of the animal studies, variability in the requirements for reporting animal studies, 'optimism bias', and lack of randomisation and blinding (28, 35), it means that gauging the true contribution of animal data to human toxicology is impossible — at least for third parties without access to pharmaceutical company files. All datasets are imperfect to varying degrees. However, it is only possible to use data which are available, and to ensure that, as far as feasible, those data are of good quality and as free from biases as possible, and that their analysis and derived conclusions are as objective as possible.

It must be made abundantly clear that we, the authors of this report, did not make decisions regarding the toxicity/non-toxicity of drugs, or decide upon or apply any criteria to such decisions. The mining of the data, and the decisions on toxicity of the drugs, were independent of the authors of this paper, and were made by one or both of the authors of the drug/toxicity papers and/or database submissions used, and the data-mining consultancy/curators of the Safety Intelligence Programme, Instem Scientific Limited. Therefore, if any pharmaceutical industry stakeholders have issues or concerns with our conclusions, we would encourage them to conduct further analyses by using their own proprietary data, and/or to facilitate such investigations by making available anonymised data, in accordance with the promotion of transparency encouraged by EU *Directive 2010/63/EU* (36), as well as to engage fully in constructive discussion and debate with us and our colleagues in animal protection organisations.

Our findings have practical implications for the use of animal models for toxicity testing, especially in the pharmaceutical industry. Reliance on flawed models of toxicity testing leads to two types of failure. If the models have poor PLRs, then there is a risk that many potentially useful compounds will be wrongly discarded, because of 'false positives' produced by the toxicity model. On the other hand, if the models have poor iNLRs, then many toxic compounds will wrongly find their way into human tests, and will fail in clinical trials. The relatively high PLRs found in this study show that animal models may not be leading to the loss of many potentially valuable candidate drugs through false positives. However, our results do imply that many toxic drugs are not being detected by animal models, leading to the risk of unnecessary harm to humans.

In this regard, our findings are entirely consistent with the acknowledged failure of animal models in general to provide guidance on likely toxicity ahead of the entry of compounds into human trials. Drug attrition has increased significantly over the past two decades (e.g. 3, 4, 37–42): 92–94% of all drugs that pass preclinical tests fail in clinical trials, mostly due to unforeseen toxicities (43–45), and half of those that succeed may be subsequently withdrawn or re-labelled due to ADRs not detected in animal tests (46). ADRs are a major cause of premature death in developed countries (47). A major contributing factor is the inadequacy of preclinical animal tests: one recent study showed that 63% of ADRs had no counterpart in animals, and less than 20% had a positive corollary in animal studies (15).

With specific regard to the dog, the most extensive study prior to the report we present here, concluded that 92% of dog toxicity studies did not provide relevant information in addition to that provided by the rat, and that the other 8% did not result in the immediate withdrawal of drugs from development, indicating that dog studies are not required for the prediction of safe doses for humans (17). There is a scientific basis for this: among several notable species differences which confound the extrapolation of data from dogs to humans, significant differences between humans and dogs in their cytochrome P450 enzymes (CYPs) — the major enzymes involved in drug metabolism — have been acknowledged for some time, compelling the conclusion that, "…it is readily seen that the dog is frequently not a good metabolic model for man and is poorly comparable to the rat and mouse" (for references, see 46). The lack of knowledge of canine CYPs has been highlighted, which is surprising, considering the extent of the use of dogs in preclinical testing. This problem is likely to be amplified by intra-species differences, as well as by inter-species differences (49). It may therefore be argued that, if many differ-

ences exist between different breeds or strains of the same species, then extrapolating pharmacokinetic data from that highly variable species to humans must not only be difficult, but must also be patently unreliable.

## Conclusions

This analysis of the most comprehensive quantitative database of publicly-available animal toxicity studies yet compiled, suggests that dogs are highly inconsistent predictors of toxic responses in humans, and that the predictions they can provide are little better than those that could be obtained by chance — or tossing a coin — when considering whether or not a compound should proceed to testing in humans. In other words: "…for any putative source of evidential weight to be deemed useful, its specificity and sensitivity must be such that LR+ [PLR] >1. Tossing a coin contributes no evidential weight to a given hypothesis, as the sensitivity and specificity are the same — 50% — and thus the LR+ [PLR] is equal to 1" (22).

Dog PLRs were generally high, showing that a drug which is toxic in the dog is likely to be toxic in humans. However, they were extremely variable and with no obvious pattern, suggesting this aspect of dog tests cannot be considered particularly reliable or helpful. Further, though not within the scope of this analysis, it is of great interest whether the dog revealed any significant toxicities, that were also present in humans, that other species such as the rat did not. In other words, did the dog 'catch' any true human toxicities not caught by the rat? It has been previously argued that such toxicities are relatively low in number (e.g. the development of just 11% of new compounds was terminated due to effects uniquely seen in dogs, though the human significance of these could not be determined), which would further diminish any value the canine model may have in this respect (50).

More importantly, while iNLRs were much more consistent, they revealed that dogs provide essentially no evidential weight to this aspect of toxicity testing. Specifically, if a compound shows no toxic effects in dogs, this provides essentially no insight into whether the compound will also show no toxic effects in humans. This is crucial: the critical observation for deciding whether a candidate drug can proceed to testing in humans is the absence of toxicity in tests on animals, and our findings show that the predictive value of the dog test in this regard is barely greater than by chance.

A quantitative example illustrates this. Suppose researchers wish to investigate a candidate compound belonging to a family which prior experience indicates has a 70% probability of freedom from ADRs in humans. Before conducting tests in humans, the drug is tested in dogs. By using the median iNLR figure found by our study, if the compound shows no sign of toxicity in the dog, the probability that the compound will also show no toxic effects in humans will have been increased by the animal testing from 70% to 72%. The testing thus contributes essentially no additional confidence in the outcome, but at considerable extra cost, both in monetary terms and in terms of animal welfare. This also has obvious practical relevance to the issue of high attrition rates in clinical trials on new drug candidates.

It is argued that a comprehensive suite of more reliable alternative methods is now available (14, 51, 52). Combined with considerable public concern over the use of dogs in science (53), the high ethical costs of doing so, given the sensitive nature of dogs (e.g. 15, 54), and the expressed desire for the use of dogs as a second species in drug testing to have a scientific, rather than a habitual, basis (14), we conclude that the preclinical testing of pharmaceuticals in dogs cannot currently be justified on scientific or ethical grounds.

## Acknowledgements

The authors are grateful to the British Union for the Abolition of Vivisection (BUAV), the Fund for the Replacement of Animals in Medical Experiments (FRAME), and The Kennel Club (via FRAME), for funding. They thank Robert Matthews for advice on inferential issues, Bob Coleman for his help and encouragement during the inception of this undertaking, and Instem Scientific (previously BioWisdom; Harston, Cambridge, UK) for scientific consultancy and for data analysis on integrated data relating to adverse events in model animal species. The research described in this article is based on the analysis and conclusions of the authors: it has not been subjected to each agency's peer review and policy review; therefore, it does not necessarily reflect the views of the organisations, and no official endorsement should be inferred.

*Received 23.05.13; received in final form 11.09.13; accepted for publication 19.09.13.*

## References

1.  Anon. (2004). *Directive 2004/27/EEC* of the European Parliament and the Council of 31 March 2004, amending *Directive 2001/83/EC* on the Community code relating to medicinal products for human use. *Official Journal of the European Union* **L136**, 30.04.2004, 34–57.
2.  Anon. (2010). *Federal Food, Drug and Cosmetics Act.* Silver Spring, MD, USA: US Food and Drug Administration. Available at: http://www.fda.gov/RegulatoryInformation/Legislation/FederalFoodDrugandCosmeticActFDCAct/default.htm (Acc-

essed 11.10.13).

3. Duyk, G. (2003). Attrition and translation. *Science, New York* **302**, 603–605.

4. Kola, I. & Landis, J. (2004). Can the pharmaceutical industry reduce attrition rates? *Nature Reviews Drug Discovery* **3**, 711–715.

5. Aithal, G.P. (2010). Mind the gap. *ATLA* **38**, Suppl. 1, 1–4.

6. UK Home Office (2013). *Statistics of Scientific Procedures on Living Animals — Great Britain 2012.* HC 549, 60pp. London, UK: The Stationery Office.

7. USDA (2011). *Annual Report. Animal Usage by Fiscal Year — Fiscal Year 2010,* 2pp. Riverdale, MD, USA: United States Department of Agriculture (USDA), Animal and Plant Health Inspection Service (APHIS). Available at: http://www. aphis. usda.gov/animal_welfare/efoia/downloads/2010_ Animals_Used_In_Research.pdf (Accessed 05.09. 13).

8. Anon. (2010). *Sixth Report on the Statistics on the Number of Animals Used for Experimental and Other Scientific Purposes in the Member States of the European Union. SEC(2010) 1107,* 14pp. Brussels, Belgium: European Commission. Available at: http://eurlex.europa.eu/LexUriServ/LexUriServ.do? uri=COM:2010:0511:REV1:EN:PDF (Accessed 10. 10.13).

9. Olson, H., Betton, G., Robinson, D., Thomas, K., Monro, A., Kolaja, G., Lilly, P., Sanders, J., Sipes, G., Bracken, W., Dorato, M., Van Deun, K., Smith, P., Berger, B. & Heller, A. (2000). Concordance of the toxicity of pharmaceuticals in humans and in animals. *Regulatory Toxicology & Pharmacology* **32**, 56–67.

10. Altman, D.G. & Bland, J.M. (1994). Diagnostic tests 5: Predictive values. *British Medical Journal* **309**, 102.

11. Anon. (2012). *Likelihood Ratios.* Oxford, UK: Centre for Evidence Based Medicine (CEBM). Available at: http://www.cebm.net/index.aspx?o= 1043 (Accessed 10.10.13).

12. Greek, R. & Menache, A. (2013). Systematic reviews of animal models: Methodology *versus* epistemology. *International Journal of Medical Sciences* **10**, 206–221.

13. Grimes, D.A. & Schulz, K.F. (2005). Refining clinical diagnosis with likelihood ratios. *Lancet* **365**, 1500–1505.

14. Hasiwa, N., Bailey, J., Clausing, P., Daneshian, M., Eileraas, M., Farkas, S., Gyertyan, I., Hubrecht, R., Kobel, W., Krummenacher, G., Leist, M., Lohi, H., Miklosi, A., Ohl, F., Olejniczak, K., Schmitt, G., Sinnett-Smith, P., Smith, D., Wagner, K., Yager, J.D., Zurlo, J. & Hartung, T. (2011). Critical evaluation of the use of dogs in biomedical research and testing in Europe. *ALTEX* **28**, 326–340.

15. van Meer, P.J., Kooijman, M., Gispen-de Wied, C.C., Moors, E.H. & Schellekens, H. (2012). The ability of animal studies to detect serious post marketing adverse events is limited. *Regulatory Toxicology & Pharmacology* **64**, 345–349.

16. Igarashi, T., Nakane, S. & Kitagawa, T. (1995). Predictability of clinical adverse reactions of drugs by general pharmacology studies. *Journal of Toxicological Sciences* **20**, 77–92.

17. Broadhead, C.L., Jennings, M. & Combes, R. (1999). *A Critical Evaluation of the Use of Dogs in the Regulatory Toxicity Testing of Pharmaceuticals,* 106pp. Nottingham, UK: Fund for the Replacement of Animals in Medical Experiments (FRAME).

18. Litchfield, J.T.J. (1962). Symposium on clinical drug evaluation and human pharmacology. XVI. Evaluation of the safety of new drugs by means of tests in animals. *Clinical Pharmacology & Therapeutics* **3**, 665–672.

19. Bailey, J. (2008). Developmental toxicity testing: Protecting future generations? *ATLA* **36**, 718–721.

20. Schardein, J. (2000). *Chemically Induced Birth Defects,* 3rd edn, 1019pp. Boca Raton, FL, USA: CRC Press.

21. Spanhaak, S., Cook, D., Barnes, J. & Reynolds, J. (2008). *Species Concordance for Liver Injury,* 6pp. Cambridge, UK: Biowisdom Ltd. Available at: http://www.biowisdom.com/files/SIP_Board_Species _Concordance.pdf (Accessed 10.10.13).

22. Matthews, R.A. (2008). Medical progress depends on animal models — doesn't it? *Journal of the Royal Society of Medicine* **101**, 95–98.

23. Barnes, J.C., Matis, S., Kenna, G., Swinton, J., Bradley, P.M., Day, N.C., Reed, J.Z., Reynolds, J. & Cook, D. (2008). *The Safety Intelligence Program: An Intelligence Network for Drug-induced Liver Injury,* 2pp. Cambridge, UK: Biowisdom Ltd. Available at: http://bioblog.instem.com/downloads/ Carboxylic_acids_A4.pdf (Accessed 10.10.13).

24. Sidaway, J.R.M., Roberts, S., Huby, R., Nicholson, A., Pemberton, J., South, M., Noeske, T., Engkvist, O., Bradley, P. & Reed, J. (2012). *Drug Toxicities Associated With Pharmacological Activity: Using Harmonised Data to Make the 'Known' Visible,* 2pp. Macclesfield, UK: Safety Assessment, AstraZeneca. Available at: http://bioblog.instem.com/wp-content/ uploads/downloads/2012/03/SOT2012_make-the-known-visible_poster.pdf (Accessed 10.10.13).

25. Fourches, D., Barnes, J.C., Day, N.C., Bradley, P., Reed, J.Z. & Tropsha, A. (2010). Cheminformatics analysis of assertions mined from literature that describe drug-induced liver injury in different species. *Chemical Research in Toxicology* **23**, 171–183.

26. Greco, I., Day, N., Riddoch-Contreras, J., Reed, J., Soininen, H., Kloszewska, I., Tsolaki, M., Vellas, B., Spenger, C., Mecocci, P., Wahlund, L.O., Simmons, A., Barnes, J. & Lovestone, S. (2012). Alzheimer's disease biomarker discovery using *in silico* literature mining and clinical validation. *Journal of Translational Medicine* **10**, 217.

27. Wandall, B., Hansson, S.O. & Ruden, C. (2007). Bias in toxicology. *Archives of Toxicology* **81**, 605–617.

28. Hackam, D.G. (2007). Translating animal research into clinical benefit. *British Medical Journal* **334**, 163–164.

29. ter Riet, G., Korevaar, D.A., Leenaars, M., Sterk, P.J., Van Noorden, C.J., Bouter, L.M., Lutter, R., Elferink, R.P. & Hooft, L. (2012). Publication bias in laboratory animal research: A survey on magnitude, drivers, consequences and potential solutions. *PLoS One* **7**, e43404.

30. Briel, M., Muller, K.F., Meerpohl, J.J., von Elm, E., Lang, B., Motschall, E., Gloy, V., Lamontagne, F., Schwarzer, G. & Bassler, D. (2013). Publication bias in animal research: A systematic review protocol. *Systematic Reviews* **2**, 23.

31. van der Worp, H.B., Howells, D.W., Sena, E.S., Porritt, M.J., Rewell, S., O'Collins, V. & Macleod, M.R. (2010). Can animal models of disease reliably inform human studies? *PLoS Medicine* **7**, e1000245.

32. Sena, E.S., van der Worp, H.B., Bath, P.M., Howells, D.W. & Macleod, M.R. (2010). Publication bias in reports of animal stroke studies leads to major overstatement of efficacy. *PLoS Biology* **8**, e1000344.

33. Perel, P., Roberts, I., Sena, E., Wheble, P., Briscoe, C., Sandercock, P., Macleod, M., Mignini, L.E., Jayaram, P. & Khan, K.S. (2007). Comparison of treatment effects between animal experiments and clinical trials: Systematic review. *British Medical Journal* **334**, 197.

34. Schott, G., Pachl, H., Limbach, U., Gundert-Remy, U., Ludwig, W.D. & Lieb, K. (2010). The financing of drug trials by pharmaceutical companies and its consequences. Part 1: A qualitative, systematic review of the literature on possible influences on the findings, protocols, and quality of drug trials. *Deutsches Arzteblatt International* **107**, 279–285.

35. Kilkenny, C., Parsons, N., Kadyszewski, E., Festing, M.F., Cuthill, I.C., Fry, D., Hutton, J. & Altman, D.G. (2009). Survey of the quality of experimental design, statistical analysis and reporting of research using animals. *PLoS One* **4**, e7824.

36. Anon. (2010). *Directive 2010/63/EU* of the European Parliament and of the Council of 22 September 2010 on the protection of animals used for scientific purposes. *Official Journal of the European Union* **L276**, 20.10.2010, 33–79.

37. US FDA (2004). *Innovation or Stagnation: Challenge and Opportunity on the Critical Path to New Medical Products*, 12pp. Silver Spring, MD, USA: US Department of Health and Human Services, Food and Drug Administration. Available at: http://www.fda.gov/ScienceResearch/Special Topics/CriticalPath Initiative/CriticalPathOpportunitiesReports/ucm077 262.htm (Accessed 10.10.13).

38. Issa, A.M., Phillips, K.A., Van Bebber, S., Nidamarthy, H.G., Lasser, K.E., Haas, J.S., Alldredge, B.K., Wachter, R.M. & Bates, D.W. (2007). Drug withdrawals in the United States: A systematic review of the evidence and analysis of trends. *Current Drug Safety* **2**, 177–185.

39. Bennani, Y.L. (2011). Drug discovery in the next decade: Innovation needed ASAP. *Drug Discovery Today* **16**, 779–792.

40. Eichler, H.G., Aronsson, B., Abadie, E. & Salmonson, T. (2010). New drug approval success rate in Europe in 2009. *Nature Reviews Drug Discovery* **9**, 355–356.

41. Hughes, B. (2008). 2007 FDA drug approvals: A year of flux. *Nature Reviews Drug Discovery* **7**, 107–109.

42. Hartung, T. (2009). Toxicology for the twenty-first century. *Nature, London* **460**, 208–212.

43. Harding, A. (2004). More compounds failing phase I. FDA chief warns that high drug attrition rate is pushing up the cost of drug development. *The Scientist*, 6 August 2004. Available at: http://www.the-scientist.com/?articles.view/articleNo/

23003/title/More-compounds-failing-Phase-I/ (Accessed 10.10.13).

44. Okie, S. (2006). Access before approval — a right to take experimental drugs? *New England Journal of Medicine* **355**, 437–440.

45. Aurup, P. (2012). *Er Danmark et Attraktivt Land for Klinisk Forskning?* (*Is Denmark an Attractive Country for Clinical research?*), 23pp. Ballerup, Denmark: MSD Laboratories. Available at: http://di.dk/SiteCollectionDocuments/Opinion/Sundhed/Høring/Præsentation%20-%20Peter%20Aurup, %20Merck.pdf (Accessed 10.10.13).

46. Anon. (1990). *FDA Drug Review: Post Approval Risks 1976–1985*. GAO/PEMD-90-15, 132pp. Washington, DC, USA: US General Accounting Office. Available at: http://161.203.16.4/d24t8/141456.pdf (Accessed 10.10.13).

47. Lazarou, J., Pomeranz, B.H. & Corey, P.N. (1998). Incidence of adverse drug reactions in hospitalized patients: A meta-analysis of prospective studies. *Journal of the American Medical Association* **279**, 1200–1205.

48. Gad, S.C. (2006). *Animal Models in Toxicology*, 952pp. Boca Raton, FL, USA: CRC Press.

49. Martinez, M.N., Antonovic, L., Court, M., Dacasto, M., Fink-Gremmels, J., Kukanich, B., Locuson, C., Mealey, K., Myers, M.J. & Trepanier, L. (2013). Challenges in exploring the cytochrome P450 system as a source of variation in canine drug pharmacokinetics. *Drug Metabolism Reviews* **45**, 218–230.

50. Broadhead, C.L., Betton, G., Combes, R., Damment, S., Everett, D., Garner, C., Godsafe, Z., Healing, G., Heywood, R., Jennings, M., Lumley, C., Oliver, G., Smith, D., Straughan, D., Topham, J., Wallis, R., Wilson, S. & Buckley, P. (2000). Prospects for reducing and refining the use of dogs in the regulatory toxicity testing of pharmaceuticals. *Human & Experimental Toxicology* **19**, 440–447.

51. Spielmann, H., Kral, V., Schäfer-Korting, M., Seidle, T., McIvor, E., Rowan, A. & Schoeters, G. (2011). *The AXLR8 Consortium. Alternative Testing Strategies, Progress Report 2011*, 364pp. Berlin, Germany: Institute of Pharmacy, Free University of Berlin. Available at: http://scrtox.eu/~scrtox/images/stories/AXLR8-2011.pdf (Accessed 10.10.13).

52. Anon. (2007). *Toxicity Testing for the 21st Century: A Vision and a Strategy*, 216pp. Washington, DC, USA: National Academies Press.

53. Anon. (2009). *Public Opinion*. London, UK: European Coalition to End Animal Experiments. Available at: http://www.eceae.org/en/what-we-do/campaigns/12-million-reasons/public-opinion (Accessed 10.10.13).

54. Hare, B., Brown, M., Williamson, C. & Tomasello, M. (2002). The domestication of social cognition in dogs. *Science, New York* **298**, 1634–1636.

# Appendix

### Table A1: Raw data from Instem Scientific's 'Safety Intelligence Programme', showing the number of drugs associated with ADRs in humans and dogs

| | Parameters | Number of drugs | | | | | |
|---|---|---|---|---|---|---|---|
| | Adverse effect: tissue-level or BMO (MedDRA Level 1–4) | Human/Dog a (TP) | Dog b (FP) | Human c (FN) | Neither d (TN) | Dog total | Human total |
| 1 | Level 1 — qrs prolongation | 10 | 0 | 22 | 2334 | 10 | 32 |
| 2 | Level 2 — glomerulonephritis and nephrotic syndrome | 13 | 0 | 104 | 2249 | 13 | 117 |
| 3 | Level 2 — kidney neoplastic disorder | 8 | 0 | 57 | 2301 | 8 | 65 |
| 4 | Level 1 — ocular hypertension | 6 | 0 | 17 | 2343 | 6 | 23 |
| 5 | Level 3 — glaucoma and ocular hypertension | 6 | 0 | 19 | 2341 | 6 | 25 |
| 6 | Level 2 — glaucomas (excluding congenital) | 6 | 0 | 19 | 2341 | 6 | 25 |
| 7 | Level 1 — nephrotic syndrome | 8 | 0 | 68 | 2290 | 8 | 76 |
| 8 | Level 2 — renal neoplasms (malignant) | 7 | 0 | 49 | 2310 | 7 | 56 |
| 9 | Level 3 — renal and urinary tract neoplasms (malignant and unspecified) | 7 | 0 | 50 | 2309 | 7 | 57 |
| 10 | Level 2 — urinary tract neoplasms (unspecified malignancy not elsewhere classified; nec) | 6 | 0 | 27 | 2333 | 6 | 33 |
| 11 | Level 1 — kidney neoplastic disorder | 6 | 0 | 27 | 2333 | 6 | 33 |
| 12 | Level 1 — orthostatic hypotension | 10 | 0 | 170 | 2186 | 10 | 180 |
| 13 | Level 2 — hepatic peroxisome proliferation | 5 | 0 | 16 | 2345 | 5 | 21 |
| 14 | Level 1 — cholestatic jaundice | 7 | 0 | 131 | 2228 | 7 | 138 |
| 15 | Brain | 78 | 1 | 854 | 1433 | 79 | 932 |
| 16 | Level 2 — renal failure and impairment | 62 | 2 | 510 | 1792 | 64 | 572 |
| 17 | Bodily fluid | 474 | 18 | 980 | 894 | 492 | 1454 |
| 18 | Skin | 154 | 7 | 1066 | 1139 | 161 | 1220 |
| 19 | Large intestine | 44 | 2 | 810 | 1510 | 46 | 854 |
| 20 | Kidney | 214 | 11 | 696 | 1445 | 225 | 910 |
| 21 | Heart | 509 | 27 | 727 | 1103 | 536 | 1236 |
| 22 | Liver | 515 | 31 | 853 | 967 | 546 | 1368 |
| 23 | Vasculature | 465 | 28 | 842 | 1031 | 493 | 1307 |
| 24 | Nervous system | 165 | 10 | 1001 | 1190 | 175 | 1166 |
| 25 | Level 2 — cholestasis and jaundice | 47 | 3 | 418 | 1898 | 50 | 465 |
| 26 | Nerve | 43 | 3 | 459 | 1861 | 46 | 502 |
| 27 | Level 4 — cardiac disorder | 480 | 34 | 698 | 1154 | 514 | 1178 |
| 28 | Muscle | 168 | 12 | 829 | 1357 | 180 | 997 |
| 29 | Level 4 — blood and lymphatic system disorders | 28 | 2 | 465 | 1871 | 30 | 493 |
| 30 | Level 4 — hepatobiliary disorder | 472 | 34 | 787 | 1073 | 506 | 1259 |
| 31 | Level 3 — hepatic and hepatobiliary disorders | 338 | 26 | 764 | 1238 | 364 | 1102 |
| 32 | Level 3 — renal disorder | 75 | 6 | 394 | 1891 | 81 | 469 |
| 33 | Ear | 12 | 1 | 444 | 1909 | 13 | 456 |
| 34 | Level 4 — vascular disorder | 415 | 35 | 835 | 1081 | 450 | 1250 |
| 35 | Bodily fluid liver | 304 | 26 | 848 | 1188 | 330 | 1152 |
| 36 | Level 3 — renal disorders (excluding nephropathies) | 113 | 10 | 591 | 1652 | 123 | 704 |
| 37 | Level 4 — skin and subcutaneous tissue disease | 195 | 18 | 619 | 1534 | 213 | 814 |
| 38 | Level 2 — hepatic lipid peroxidation | 32 | 3 | 129 | 2202 | 35 | 161 |
| 39 | Level 4 — investigation | 339 | 32 | 723 | 1272 | 371 | 1062 |
| 40 | Level 1 — kidney failure | 21 | 2 | 292 | 2051 | 23 | 313 |

All entries are numbered for identification only (column 1). The second column (**parameters**) indicates the specific biomedical observation (BMO) in question (e.g. 'bradycardia' or 'arrhythmic disorder'), or tissue-level effects (e.g. 'heart', which would encompass these two BMOs). The BMOs were mapped to their MedDRA (Medical Dictionary for Regulatory Activities) counterpart, which are classified into four levels, level 1 being the most specific and level 4 providing a more generic 'System Organ Class'. The number of drugs for which ADRs were observed in each species is shown in columns 3–8. **Human/Dog** represents drugs for which an ADR was reported in both humans and dogs: these are True Positives (TPs), and correspond to cell 'a' in the 2 × 2 matrix (see Methods, Figure 1). **Dog** represents drugs for which an ADR was reported in dogs, but not in humans: these are False Positives (FPs), and correspond to cell 'b' in the 2 × 2 matrix. **Human** represents drugs for which an ADR was reported in humans, but not in dogs: these are False Negatives (FNs), and correspond to cell 'c' in the 2 × 2 matrix. **Neither** represents drugs for which an absence of ADRs was evident in both humans and dogs: these are True Negatives (TNs), and correspond to cell 'd' in the 2 × 2 matrix. Notably, lack of an association between a compound and a specific BMO was assumed (by the data provider) to demonstrate a real absence of effect, and not be due to missing data. To minimise the impact of missing data, the group of compounds in the dataset were chosen with the greatest chance of having been evaluated in all the species included in the study (see Methods). The total number of drugs exhibiting ADRs in each species, regardless of the presence or absence of ADRs in the other species, is given in the final two columns: **Dog** = a + b (TP + FP); **Human** = a + c (TP + FN).

nec = not elsewhere classified.

J. Bailey *et al.*

| | Parameters | Number of drugs | | | | | |
|---|---|---|---|---|---|---|---|
| | Adverse effect: tissue-level or BMO (MedDRA Level 1–4) | Human/Dog a (TP) | Dog b (FP) | Human c (FN) | Neither d (TN) | Dog total | Human total |
| 41 | Level 4 — injury, poisoning and procedural complications | 276 | 27 | 670 | 1393 | 303 | 946 |
| 42 | Level 4 — renal and urinary disorders | 222 | 22 | 630 | 1492 | 244 | 852 |
| 43 | Breast | 20 | 2 | 434 | 1910 | 22 | 454 |
| 44 | Adrenal gland | 10 | 1 | 224 | 2131 | 11 | 234 |
| 45 | Pancreas | 19 | 2 | 421 | 1924 | 21 | 440 |
| 46 | Level 3 — cardiac and vascular investigations (excluding enzyme tests) | 320 | 34 | 647 | 1365 | 354 | 967 |
| 47 | Level 3 — arrhythmic disorder | 294 | 32 | 577 | 1463 | 326 | 871 |
| 48 | Level 3 — skin vascular abnormalities | 182 | 20 | 482 | 1682 | 202 | 664 |
| 49 | Level 2 — trophic disorders | 9 | 1 | 110 | 2246 | 10 | 119 |
| 50 | Level 4 — musculoskeletal disorder | 105 | 12 | 706 | 1543 | 117 | 811 |
| 51 | Neuromuscular tissue | 104 | 12 | 712 | 1538 | 116 | 816 |
| 52 | Level 4 — neurological disorder | 85 | 10 | 627 | 1644 | 95 | 712 |
| 53 | Haemolymphoid tissue | 68 | 8 | 748 | 1542 | 76 | 816 |
| 54 | Joint | 17 | 2 | 420 | 1927 | 19 | 437 |
| 55 | Level 1 — cardiac hypertrophy | 25 | 3 | 106 | 2232 | 28 | 131 |
| 56 | Level 2 — hepatic microsomal lipid peroxidation | 8 | 1 | 26 | 2331 | 9 | 34 |
| 57 | Level 1 — interstitial nephritis | 8 | 1 | 108 | 2249 | 9 | 116 |
| 58 | Respiratory tissue | 70 | 9 | 653 | 1634 | 79 | 723 |
| 59 | Level 2 — haemolysis | 15 | 2 | 330 | 2019 | 17 | 345 |
| 60 | Level 4 — respiratory, thoracic and mediastinal disorders | 112 | 15 | 717 | 1522 | 127 | 829 |
| 61 | Level 1 — muscle twitching | 29 | 4 | 162 | 2171 | 33 | 191 |
| 62 | Level 2 — non-site specific vascular disorders nec | 137 | 19 | 382 | 1828 | 156 | 519 |
| 63 | Level 3 — vascular disorder | 150 | 21 | 525 | 1670 | 171 | 675 |
| 64 | Level 2 — skin vasomotor conditions | 171 | 24 | 331 | 1840 | 195 | 502 |
| 65 | Level 1 — vasodilation | 113 | 16 | 246 | 1991 | 129 | 359 |
| 66 | Level 2 — nephropathies and tubular disorders nec | 56 | 8 | 313 | 1989 | 64 | 369 |
| 67 | Level 1 — congestive heart failure | 7 | 1 | 158 | 2200 | 8 | 165 |
| 68 | Prostate gland | 7 | 1 | 234 | 2124 | 8 | 241 |
| 69 | Level 3 — chemical injury and poisoning | 168 | 25 | 544 | 1629 | 193 | 712 |
| 70 | Level 2 — poisoning and toxicity | 168 | 25 | 544 | 1629 | 193 | 712 |
| 71 | Level 2 — vascular test | 193 | 29 | 580 | 1564 | 222 | 773 |
| 72 | Stomach | 86 | 13 | 863 | 1404 | 99 | 949 |
| 73 | Level 2 — electrocardiogram observation | 59 | 9 | 306 | 1992 | 68 | 365 |
| 74 | Level 2 — rate and rhythm disorders nec | 208 | 32 | 530 | 1596 | 240 | 738 |
| 75 | Level 3 — muscular disorder | 78 | 12 | 632 | 1644 | 90 | 710 |
| 76 | Level 3 — epidermal and dermal conditions | 13 | 2 | 354 | 1997 | 15 | 367 |
| 77 | Urogenital tissue | 70 | 11 | 695 | 1590 | 81 | 765 |
| 78 | Level 3 — decreased and non-specific blood pressure disorders and shock | 153 | 25 | 498 | 1690 | 178 | 651 |
| 79 | Bodily fluid kidney | 61 | 10 | 479 | 1816 | 71 | 540 |
| 80 | Level 3 — general system disorders nec | 30 | 5 | 502 | 1829 | 35 | 532 |
| 81 | Level 3 — central nervous system vascular disorders | 18 | 3 | 266 | 2079 | 21 | 284 |
| 82 | Level 1 — jaundice | 12 | 2 | 327 | 2025 | 14 | 339 |
| 83 | Level 2 — dermal and epidermal conditions nec | 12 | 2 | 329 | 2023 | 14 | 341 |
| 84 | Level 1 — hypertrophy | 6 | 1 | 68 | 2291 | 7 | 74 |
| 85 | Level 3 — respiratory and mediastinal neoplasms (malignant and unspecified) | 6 | 1 | 72 | 2287 | 7 | 78 |
| 86 | Level 2 — lower respiratory tract neoplasms | 6 | 1 | 79 | 2280 | 7 | 85 |
| 87 | Level 3 — respiratory tract neoplastic disorder | 6 | 1 | 79 | 2280 | 7 | 85 |
| 88 | Level 2 — hepatocellular damage and hepatitis nec | 215 | 36 | 582 | 1533 | 251 | 797 |
| 89 | Level 2 — heart rate and pulse investigations | 203 | 34 | 529 | 1600 | 237 | 732 |
| 90 | Level 3 — arteriosclerosis, stenosis, vascular insufficiency and necrosis | 171 | 29 | 564 | 1602 | 200 | 735 |
| 91 | Level 1 — acute kidney failure | 34 | 6 | 289 | 2037 | 40 | 323 |
| 92 | Lung | 96 | 17 | 733 | 1520 | 113 | 829 |
| 93 | Level 1 — myocardial disorder | 73 | 13 | 198 | 2082 | 86 | 271 |
| 94 | Level 2 — vascular hypotensive disorders | 145 | 26 | 470 | 1725 | 171 | 615 |
| 95 | Level 3 — myocardial disorder | 100 | 18 | 321 | 1927 | 118 | 421 |
| 96 | Level 2 — muscle observation | 50 | 9 | 336 | 1971 | 59 | 386 |
| 97 | Bodily fluid cardiovascular | 105 | 19 | 608 | 1634 | 124 | 713 |
| 98 | Level 4 — immunological disorder | 44 | 8 | 527 | 1787 | 52 | 571 |
| 99 | Level 2 — cerebrovascular and spinal necrosis and vascular insufficiency | 11 | 2 | 138 | 2215 | 13 | 149 |
| 100 | Level 2 — inflammatory kidney disease | 11 | 2 | 155 | 2198 | 13 | 166 |

| | Parameters | Number of drugs | | | | | |
|---|---|---|---|---|---|---|---|
| | Adverse effect: tissue-level or BMO (MedDRA Level 1–4) | Human/Dog a (TP) | Dog b (FP) | Human c (FN) | Neither d (TN) | Dog total | Human total |
| 101 | Uterus | 11 | 2 | 201 | 2152 | 13 | 212 |
| 102 | Bladder | 11 | 2 | 293 | 2060 | 13 | 304 |
| 103 | Level 3 — cardiac disorder signs and symptoms | 65 | 12 | 509 | 1780 | 77 | 574 |
| 104 | Level 3 — hypertension | 96 | 18 | 520 | 1732 | 114 | 616 |
| 105 | Pituitary gland | 16 | 3 | 221 | 2126 | 19 | 237 |
| 106 | Level 2 — hepatic failure and associated disorders | 16 | 3 | 274 | 2073 | 19 | 290 |
| 107 | Level 1 — hypotension | 140 | 27 | 442 | 1757 | 167 | 582 |
| 108 | Level 2 — bronchospasm and obstruction | 31 | 6 | 376 | 1953 | 37 | 407 |
| 109 | Level 3 — bronchial disorders (excluding neoplasms) | 31 | 6 | 376 | 1953 | 37 | 407 |
| 110 | Eye | 77 | 15 | 762 | 1512 | 92 | 839 |
| 111 | Level 3 — injury | 120 | 24 | 511 | 1711 | 144 | 631 |
| 112 | Level 1 — hepatic apoptosis | 15 | 3 | 111 | 2237 | 18 | 126 |
| 113 | Level 2 — central nervous system vascular disorders | 10 | 2 | 90 | 2264 | 12 | 100 |
| 114 | Level 3 — haemolyses and related conditions | 15 | 3 | 339 | 2009 | 18 | 354 |
| 115 | Level 2 — hepatic collagen synthesis | 5 | 1 | 23 | 2337 | 6 | 28 |
| 116 | Level 1 — atrial flutter | 5 | 1 | 26 | 2334 | 6 | 31 |
| 117 | Level 1 — glutathione depletion | 5 | 1 | 29 | 2331 | 6 | 34 |
| 118 | Level 2 — haematological analyses nec | 5 | 1 | 29 | 2331 | 6 | 34 |
| 119 | Level 1 — liver failure | 10 | 2 | 221 | 2133 | 12 | 231 |
| 120 | Level 1 — cardiomyocyte apoptosis | 5 | 1 | 32 | 2328 | 6 | 37 |
| 121 | Level 2 — cardioprotection | 5 | 1 | 35 | 2325 | 6 | 40 |
| 122 | Level 3 — haematology investigations (including blood groups) | 5 | 1 | 40 | 2320 | 6 | 45 |
| 123 | Level 1 — lung neoplastic disorder | 5 | 1 | 49 | 2311 | 6 | 54 |
| 124 | Level 2 — encephalopathies (toxic and metabolic) | 5 | 1 | 49 | 2311 | 6 | 54 |
| 125 | Level 2 — respiratory tract and pleural neoplasms (malignancy unspecified nec) | 5 | 1 | 50 | 2310 | 6 | 55 |
| 126 | Level 2 — diabetic complications (renal) | 5 | 1 | 52 | 2308 | 6 | 57 |
| 127 | Level 1 — abnormal liver function | 10 | 2 | 323 | 2031 | 12 | 333 |
| 128 | Level 2 — hepatic enzymes and function abnormalities | 10 | 2 | 323 | 2031 | 12 | 333 |
| 129 | Level 1 — toxic hepatitis | 5 | 1 | 94 | 2266 | 6 | 99 |
| 130 | Level 3 — cardiac physiological observation | 229 | 46 | 322 | 1769 | 275 | 551 |
| 131 | Level 2 — cardiac disorder | 64 | 13 | 378 | 1911 | 77 | 442 |
| 132 | Digestive tissue | 49 | 10 | 731 | 1576 | 59 | 780 |
| 133 | Level 4 — general disorders and administration site conditions | 58 | 12 | 599 | 1697 | 70 | 657 |
| 134 | Level 2 — ventricular arrhythmias and cardiac arrest | 118 | 25 | 390 | 1833 | 143 | 508 |
| 135 | Level 2 — peripheral vasoconstriction, necrosis and vascular insufficiency | 101 | 22 | 209 | 2034 | 123 | 310 |
| 136 | Salivary gland | 9 | 2 | 440 | 1915 | 11 | 449 |
| 137 | Level 1 — vasoconstriction | 100 | 23 | 185 | 2058 | 123 | 285 |
| 138 | Level 1 — cardiotoxicity | 26 | 6 | 142 | 2192 | 32 | 168 |
| 139 | Level 1 — thrombosis | 13 | 3 | 186 | 2164 | 16 | 199 |
| 140 | Mouth | 13 | 3 | 297 | 2053 | 16 | 310 |
| 141 | Level 2 — ischaemic coronary artery disease | 89 | 21 | 413 | 1843 | 110 | 502 |
| 142 | Level 1 — tachycardia | 112 | 27 | 402 | 1825 | 139 | 514 |
| 143 | Level 3 — hepatic physiological phenomenon | 267 | 65 | 519 | 1515 | 332 | 786 |
| 144 | Level 2 — hypertension | 73 | 18 | 480 | 1795 | 91 | 553 |
| 145 | Level 3 — coronary arterial disease | 93 | 23 | 413 | 1837 | 116 | 506 |
| 146 | Level 1 — nephrotoxicity | 36 | 9 | 212 | 2109 | 45 | 248 |
| 147 | Level 1 — injury | 20 | 5 | 150 | 2191 | 25 | 170 |
| 148 | Level 1 — left ventricular hypertrophy | 8 | 2 | 62 | 2294 | 10 | 70 |
| 149 | Level 1 — asthma | 12 | 3 | 218 | 2133 | 15 | 230 |
| 150 | Level 1 — kidney papillary necrosis | 4 | 1 | 27 | 2334 | 5 | 31 |
| 151 | Level 2 — atrial natriuretic factor secretion | 4 | 1 | 28 | 2333 | 5 | 32 |
| 152 | Level 2 — renal disorders (congenital) | 4 | 1 | 32 | 2329 | 5 | 36 |
| 153 | Level 3 — renal and urinary tract disorders (congenital) | 4 | 1 | 37 | 2324 | 5 | 41 |
| 154 | Level 1 — acute lung injury | 4 | 1 | 39 | 2322 | 5 | 43 |
| 155 | Level 1 — pulmonary toxicity | 4 | 1 | 46 | 2315 | 5 | 50 |
| 156 | Level 2 — herg current | 4 | 1 | 77 | 2284 | 5 | 81 |
| 157 | Level 2 — inflammation | 4 | 1 | 109 | 2252 | 5 | 113 |
| 158 | Level 2 — non-site specific gastrointestinal haemorrhages | 4 | 1 | 125 | 2236 | 5 | 129 |
| 159 | Level 2 — hepatic and hepatobiliary disorders | 138 | 36 | 524 | 1668 | 174 | 662 |
| 160 | Level 1 — torsade de pointes | 19 | 5 | 163 | 2179 | 24 | 182 |

| Parameters | Number of drugs | | | | | |
|---|---|---|---|---|---|---|
| Adverse effect: tissue-level or BMO (MedDRA Level 1–4) | Human/Dog a (TP) | Dog b (FP) | Human c (FN) | Neither d (TN) | Dog total | Human total |
| 161 Level 1 — arrhythmic disorder | 79 | 21 | 383 | 1883 | 100 | 462 |
| 162 Level 2 — heart failure | 30 | 8 | 326 | 2002 | 38 | 356 |
| 163 Level 1 — hypertension | 71 | 19 | 477 | 1799 | 90 | 548 |
| 164 Level 2 — renal and urinary tract injuries nec | 26 | 7 | 185 | 2148 | 33 | 211 |
| 165 Level 1 — renal injury | 26 | 7 | 185 | 2148 | 33 | 211 |
| 166 Level 2 — renal structural abnormalities and trauma | 26 | 7 | 189 | 2144 | 33 | 215 |
| 167 Level 2 — allergic conditions | 26 | 7 | 374 | 1959 | 33 | 400 |
| 168 Level 3 — allergic conditions | 26 | 7 | 377 | 1956 | 33 | 403 |
| 169 Level 2 — coronary necrosis and vascular insufficiency | 62 | 17 | 409 | 1878 | 79 | 471 |
| 170 Level 2 — left ventricular failure | 21 | 6 | 165 | 2174 | 27 | 186 |
| 171 Level 4 — congenital, familial and genetic disorders | 21 | 6 | 294 | 2045 | 27 | 315 |
| 172 Level 2 — central nervous system haemorrhages and cerebrovascular accidents | 7 | 2 | 209 | 2148 | 9 | 216 |
| 173 Level 3 — lower respiratory tract disorders (excluding obstruction and infection) | 38 | 11 | 368 | 1949 | 49 | 406 |
| 174 Bone | 31 | 9 | 398 | 1928 | 40 | 429 |
| 175 Level 2 — signs and symptoms | 24 | 7 | 439 | 1896 | 31 | 463 |
| 176 Level 2 — non-site specific embolism and thrombosis | 17 | 5 | 230 | 2114 | 22 | 247 |
| 177 Level 2 — non-site specific injuries nec | 20 | 6 | 158 | 2182 | 26 | 178 |
| 178 Level 1 — ventricular tachyarrhythmia | 10 | 3 | 32 | 2321 | 13 | 42 |
| 179 Cardiovascular tissue | 73 | 22 | 445 | 1826 | 95 | 518 |
| 180 Level 1 — long qt interval | 23 | 7 | 186 | 2150 | 30 | 209 |
| 181 Level 1 — cardiac arrest | 23 | 7 | 211 | 2125 | 30 | 234 |
| 182 Level 2 — renal disorder | 19 | 6 | 185 | 2156 | 25 | 204 |
| 183 Level 2 — cardiac conduction abnormality | 44 | 14 | 278 | 2030 | 58 | 322 |
| 184 Level 1 — bradycardia | 78 | 25 | 271 | 1992 | 103 | 349 |
| 185 Level 4 — metabolism and nutrition disorders | 62 | 20 | 368 | 1916 | 82 | 430 |
| 186 Level 3 — tissue disease | 24 | 8 | 218 | 2116 | 32 | 242 |
| 187 Level 1 — pulmonary oedema | 18 | 6 | 145 | 2197 | 24 | 163 |
| 188 Level 4 — eye disorder | 9 | 3 | 88 | 2266 | 12 | 97 |
| 189 Level 2 — muscular disorder | 15 | 5 | 286 | 2060 | 20 | 301 |
| 190 Level 3 — immunological disorder | 12 | 4 | 258 | 2092 | 16 | 270 |
| 191 Level 3 — cardiac and vascular disorders congenital | 9 | 3 | 173 | 2181 | 12 | 182 |
| 192 Level 2 — renal observation | 6 | 2 | 85 | 2273 | 8 | 91 |
| 193 Oesophagus | 9 | 3 | 258 | 2096 | 12 | 267 |
| 194 Level 3 — gastrointestinal haemorrhage | 6 | 2 | 159 | 2199 | 8 | 165 |
| 195 Level 2 — gastrointestinal haemorrhage | 6 | 2 | 177 | 2181 | 8 | 183 |
| 196 Level 1 — hepatic injury | 61 | 21 | 341 | 1943 | 82 | 402 |
| 197 Level 2 — abdominal injury | 61 | 21 | 343 | 1941 | 82 | 404 |
| 198 Level 1 — hepatotoxicity | 92 | 32 | 386 | 1856 | 124 | 478 |
| 199 Musculoskeletal tissue | 23 | 8 | 525 | 1810 | 31 | 548 |
| 200 Level 2 — pulmonary oedema | 20 | 7 | 197 | 2142 | 27 | 217 |
| 201 Level 1 — liver disorder | 17 | 6 | 211 | 2132 | 23 | 228 |
| 202 Level 1 — muscular disorder | 8 | 3 | 113 | 2242 | 11 | 121 |
| 203 Level 1 — liver cirrhosis | 8 | 3 | 139 | 2216 | 11 | 147 |
| 204 Nose | 8 | 3 | 401 | 1954 | 11 | 409 |
| 205 Level 1 — hypoxia | 13 | 5 | 150 | 2198 | 18 | 163 |
| 206 Level 2 — conditions associated with abnormal gas exchange | 13 | 5 | 151 | 2197 | 18 | 164 |
| 207 Level 2 — muscle tone abnormalities | 13 | 5 | 232 | 2116 | 18 | 245 |
| 208 Level 1 — ventricular arrhythmia | 41 | 16 | 159 | 2150 | 57 | 200 |
| 209 Level 3 — neuromuscular disorder | 23 | 9 | 351 | 1983 | 32 | 374 |
| 210 Level 3 — heart failure | 53 | 21 | 388 | 1904 | 74 | 441 |
| 211 Bodily fluid cardiac | 53 | 21 | 443 | 1849 | 74 | 496 |
| 212 Level 4 — endocrine disorder | 10 | 4 | 125 | 2227 | 14 | 135 |
| 213 Level 2 — hepatic monooxygenase system | 5 | 2 | 15 | 2344 | 7 | 20 |
| 214 Level 1 — sudden cardiac death | 5 | 2 | 48 | 2311 | 7 | 53 |
| 215 Level 3 — encephalopathy | 5 | 2 | 52 | 2307 | 7 | 57 |
| 216 Thyroid gland | 10 | 4 | 266 | 2086 | 14 | 276 |
| 217 Level 3 — diabetes-related disorder | 5 | 2 | 63 | 2296 | 7 | 68 |
| 218 Level 2 — vascular smooth muscle cell proliferation | 5 | 2 | 69 | 2290 | 7 | 74 |
| 219 Level 1 — acute liver failure | 5 | 2 | 76 | 2283 | 7 | 81 |
| 220 Level 1 — muscle rigidity | 5 | 2 | 134 | 2225 | 7 | 139 |

| | Parameters | Number of drugs | | | | | |
|---|---|---|---|---|---|---|---|
| | Adverse effect: tissue-level or BMO (MedDRA Level 1–4) | Human/Dog a (TP) | Dog b (FP) | Human c (FN) | Neither d (TN) | Dog total | Human total |
| 221 | Level 1 — vascular disorder | 5 | 2 | 144 | 2215 | 7 | 149 |
| 222 | Level 2 — vascular anomalies congenital nec | 5 | 2 | 147 | 2212 | 7 | 152 |
| 223 | Level 2 — purpuras (excluding thrombocytopenic) | 5 | 2 | 198 | 2161 | 7 | 203 |
| 224 | Level 3 — coagulopathies and bleeding diatheses (excluding thrombocytopenic) | 5 | 2 | 220 | 2139 | 7 | 225 |
| 225 | Level 3 — infections (pathogen unspecified) | 5 | 2 | 270 | 2089 | 7 | 275 |
| 226 | Level 2 — cardiomyopathy | 32 | 13 | 227 | 2094 | 45 | 259 |
| 227 | Level 4 — neoplasms benign, malignant and unspecified (including cysts and polyps) | 66 | 27 | 359 | 1914 | 93 | 425 |
| 228 | Level 2 — parenchymal lung disease | 12 | 5 | 182 | 2167 | 17 | 194 |
| 229 | Level 2 — myocardial contraction | 81 | 34 | 130 | 2121 | 115 | 211 |
| 230 | Level 2 — pulmonary vascular resistance | 28 | 12 | 61 | 2265 | 40 | 89 |
| 231 | Level 2 — musculoskeletal and connective tissue signs and symptoms nec | 28 | 12 | 115 | 2211 | 40 | 143 |
| 232 | Level 3 — musculoskeletal disorder | 28 | 12 | 117 | 2209 | 40 | 145 |
| 233 | Level 1 — endothelial dysfunction | 7 | 3 | 77 | 2279 | 10 | 84 |
| 234 | Level 2 — vascular malformations and acquired anomalies | 7 | 3 | 175 | 2181 | 10 | 182 |
| 235 | Level 1 — cardiac disorder | 7 | 3 | 240 | 2116 | 10 | 247 |
| 236 | Level 4 — gastrointestinal disorder | 7 | 3 | 280 | 2076 | 10 | 287 |
| 237 | Level 3 — heart valve disorder | 16 | 7 | 128 | 2215 | 23 | 144 |
| 238 | Level 3 — vascular physiological observation | 91 | 40 | 201 | 2034 | 131 | 292 |
| 239 | Level 2 — non-site specific necrosis and vascular insufficiency nec | 52 | 23 | 285 | 2006 | 75 | 337 |
| 240 | Level 1 — cardiac lesion | 9 | 4 | 56 | 2297 | 13 | 65 |
| 241 | Level 2 — cell metabolism disorders nec | 9 | 4 | 117 | 2236 | 13 | 126 |
| 242 | Level 1 — pulmonary fibrosis | 9 | 4 | 121 | 2232 | 13 | 130 |
| 243 | Level 2 — neuromuscular disorder | 9 | 4 | 216 | 2137 | 13 | 225 |
| 244 | Bodily fluid vascular | 22 | 10 | 301 | 2033 | 32 | 323 |
| 245 | Level 1 — hepatitis | 22 | 10 | 367 | 1967 | 32 | 389 |
| 246 | Level 3 — metabolic disorder | 11 | 5 | 133 | 2217 | 16 | 144 |
| 247 | Level 3 — vasculitis | 11 | 5 | 298 | 2052 | 16 | 309 |
| 248 | Level 2 — pulmonary vascular disorder | 24 | 11 | 206 | 2125 | 35 | 230 |
| 249 | Level 1 — bronchial spasm | 13 | 6 | 246 | 2101 | 19 | 259 |
| 250 | Level 3 — respiration disorder | 15 | 7 | 277 | 2067 | 22 | 292 |
| 251 | Level 2 — supraventricular arrhythmia | 34 | 16 | 238 | 2078 | 50 | 272 |
| 252 | Level 1 — cholestasis | 19 | 9 | 181 | 2157 | 28 | 200 |
| 253 | Level 1 — contracture | 27 | 13 | 91 | 2235 | 40 | 118 |
| 254 | Level 1 — aortic valve insufficiency | 8 | 4 | 60 | 2294 | 12 | 68 |
| 255 | Level 2 — diseases of aortic valve | 8 | 4 | 79 | 2275 | 12 | 87 |
| 256 | Level 3 — fatal outcomes | 6 | 3 | 50 | 2307 | 9 | 56 |
| 257 | Level 2 — death and sudden death | 6 | 3 | 50 | 2307 | 9 | 56 |
| 258 | Gallbladder | 10 | 5 | 201 | 2150 | 15 | 211 |
| 259 | Level 3 — miscellaneous and site unspecified neoplasms (malignant and unspecified) | 8 | 4 | 171 | 2183 | 12 | 179 |
| 260 | Cartilage | 4 | 2 | 39 | 2321 | 6 | 43 |
| 261 | Level 2 — biliary excretion | 4 | 2 | 41 | 2319 | 6 | 45 |
| 262 | Level 1 — arterial thrombosis | 4 | 2 | 46 | 2314 | 6 | 50 |
| 263 | Level 1 — fibrosis | 6 | 3 | 132 | 2225 | 9 | 138 |
| 264 | Level 2 — fibrosis | 6 | 3 | 132 | 2225 | 9 | 138 |
| 265 | Level 2 — vasculitides | 8 | 4 | 228 | 2126 | 12 | 236 |
| 266 | Level 1 — acute hepatitis | 6 | 3 | 151 | 2206 | 9 | 157 |
| 267 | Level 2 — muscle weakness | 6 | 3 | 188 | 2169 | 9 | 194 |
| 268 | Level 1 — myoclonus | 4 | 2 | 113 | 2247 | 6 | 117 |
| 269 | Level 2 — neurological signs and symptoms nec | 4 | 2 | 119 | 2241 | 6 | 123 |
| 270 | Integumentary tissue | 6 | 3 | 428 | 1929 | 9 | 434 |
| 271 | Level 3 — renal physiological observation | 72 | 37 | 225 | 2032 | 109 | 297 |
| 272 | Level 3 — embolism and thrombosis | 23 | 12 | 392 | 1939 | 35 | 415 |
| 273 | Level 1 — cardiomyopathy | 9 | 5 | 104 | 2248 | 14 | 113 |
| 274 | Level 1 — hepatocyte damage | 9 | 5 | 117 | 2235 | 14 | 126 |
| 275 | Level 3 — biliary tract neoplasm | 48 | 27 | 188 | 2103 | 75 | 236 |
| 276 | Level 3 — haemorrhage | 28 | 16 | 502 | 1820 | 44 | 530 |
| 277 | Level 1 — vasospasm | 7 | 4 | 65 | 2290 | 11 | 72 |
| 278 | Endocrine tissue | 7 | 4 | 299 | 2056 | 11 | 306 |
| 279 | Bodily fluid muscle | 40 | 23 | 405 | 1898 | 63 | 445 |
| 280 | Level 1 — liver neoplastic disorder | 24 | 14 | 96 | 2232 | 38 | 120 |

J. Bailey *et al.*

| | Parameters | | Number of drugs | | | | |
|---|---|---|---|---|---|---|---|
| | Adverse effect: tissue-level or BMO (MedDRA Level 1–4) | Human/Dog a (TP) | Dog b (FP) | Human c (FN) | Neither d (TN) | Dog total | Human total |
|---|---|---|---|---|---|---|---|
| 281 | Level 2 — biliary tract neoplasm | 24 | 14 | 99 | 2229 | 38 | 123 |
| 282 | Level 2 — hepatobiliary neoplasms (malignancy unspecified) | 24 | 14 | 99 | 2229 | 38 | 123 |
| 283 | Level 1 — renal disorder | 12 | 7 | 148 | 2199 | 19 | 160 |
| 284 | Level 1 — ventricular tachycardia | 27 | 16 | 147 | 2176 | 43 | 174 |
| 285 | Level 2 — l-type calcium current | 10 | 6 | 90 | 2260 | 16 | 100 |
| 286 | Level 1 — haemorrhage | 15 | 9 | 269 | 2073 | 24 | 284 |
| 287 | Level 1 — cerebral vasospasm | 5 | 3 | 27 | 2331 | 8 | 32 |
| 288 | Level 3 — ancillary infectious topics | 5 | 3 | 86 | 2272 | 8 | 91 |
| 289 | Level 2 — inflammatory disorders following infection | 5 | 3 | 86 | 2272 | 8 | 91 |
| 290 | Level 2 — lower respiratory tract inflammatory and immunologic conditions | 5 | 3 | 163 | 2195 | 8 | 168 |
| 291 | Level 1 — muscle spasm | 8 | 5 | 98 | 2255 | 13 | 106 |
| 292 | Level 1 — myocardial disorder | 22 | 14 | 60 | 2270 | 36 | 82 |
| 293 | Level 2 — cardiac afterload | 11 | 7 | 40 | 2308 | 18 | 51 |
| 294 | Level 2 — liver cirrhosis | 14 | 9 | 239 | 2104 | 23 | 253 |
| 295 | Level 1 — ischaemic disease | 20 | 13 | 141 | 2192 | 33 | 161 |
| 296 | Level 1 — ischaemic cardiomyopathy | 20 | 13 | 156 | 2177 | 33 | 176 |
| 297 | Level 1 — ventricular fibrillation | 27 | 18 | 127 | 2194 | 45 | 154 |
| 298 | Level 3 — hepatobiliary neoplasms (malignant and unspecified) | 24 | 16 | 116 | 2210 | 40 | 140 |
| 299 | Level 1 — st-segment elevation | 9 | 6 | 30 | 2321 | 15 | 39 |
| 300 | Level 1 — necrosis | 9 | 6 | 59 | 2292 | 15 | 68 |
| 301 | Level 2 — necrosis | 9 | 6 | 60 | 2291 | 15 | 69 |
| 302 | Level 2 — hemorrhage | 18 | 12 | 372 | 1964 | 30 | 390 |
| 303 | Level 1 — apoptosis | 6 | 4 | 92 | 2264 | 10 | 98 |
| 304 | Level 2 — arterial and aortic injuries | 3 | 2 | 12 | 2349 | 5 | 15 |
| 305 | Level 1 — neoplastic disorder | 6 | 4 | 118 | 2238 | 10 | 124 |
| 306 | Level 2 — neoplasms unspecified (malignancy and site unspecified nec) | 6 | 4 | 122 | 2234 | 10 | 128 |
| 307 | Level 2 — hepatic lipid level | 3 | 2 | 20 | 2341 | 5 | 23 |
| 308 | Level 1 — renal fibrosis | 3 | 2 | 22 | 2339 | 5 | 25 |
| 309 | Level 1 — right ventricular hypertrophy | 3 | 2 | 22 | 2339 | 5 | 25 |
| 310 | Level 1 — hepatic mitochondrial swelling | 3 | 2 | 36 | 2325 | 5 | 39 |
| 311 | Level 1 — glomerular sclerosis | 3 | 2 | 39 | 2322 | 5 | 42 |
| 312 | Level 2 — pericardium disorder | 3 | 2 | 47 | 2314 | 5 | 50 |
| 313 | Small intestine | 6 | 4 | 233 | 2123 | 10 | 239 |
| 314 | Level 1 — hypersensitive vasculitis | 3 | 2 | 85 | 2276 | 5 | 88 |
| 315 | Level 1 — inflammation | 3 | 2 | 96 | 2265 | 5 | 99 |
| 316 | Level 2 — cutaneous vasculitis | 3 | 2 | 102 | 2259 | 5 | 105 |
| 317 | Level 2 — peripheral vascular disorder | 3 | 2 | 143 | 2218 | 5 | 146 |
| 318 | Connective tissue | 3 | 2 | 204 | 2157 | 5 | 207 |
| 319 | Level 2 — muscle tone abnormal | 10 | 7 | 208 | 2141 | 17 | 218 |
| 320 | Level 1 — pulmonary hypertension | 17 | 12 | 94 | 2243 | 29 | 111 |
| 321 | Level 2 — systemic vascular resistance | 24 | 17 | 79 | 2246 | 41 | 103 |
| 322 | Level 2 — hepatic cytochrome p450 level | 7 | 5 | 50 | 2304 | 12 | 57 |
| 323 | Level 1 — renal impairment | 7 | 5 | 276 | 2078 | 12 | 283 |
| 324 | Level 2 — hepatic protein biosynthesis | 11 | 8 | 61 | 2286 | 19 | 72 |
| 325 | Bone-marrow | 15 | 11 | 302 | 2038 | 26 | 317 |
| 326 | Level 3 — lipid metabolism disorder | 19 | 14 | 137 | 2196 | 33 | 156 |
| 327 | Level 2 — lipid metabolism and deposit disorders nec | 19 | 14 | 137 | 2196 | 33 | 156 |
| 328 | Level 1 — hepatic necrosis | 46 | 34 | 177 | 2109 | 80 | 223 |
| 329 | Level 1 — premature cardiac complex | 4 | 3 | 51 | 2308 | 7 | 55 |
| 330 | Level 3 — pericardium disorder | 4 | 3 | 72 | 2287 | 7 | 76 |
| 331 | Level 1 — muscle weakness | 4 | 3 | 174 | 2185 | 7 | 178 |
| 332 | Level 1 — myocardial infarction | 21 | 16 | 296 | 2033 | 37 | 317 |
| 333 | Level 2 — pulmonary hypertension | 17 | 13 | 108 | 2228 | 30 | 125 |
| 334 | Level 3 — electrolyte and fluid balance conditions | 9 | 7 | 107 | 2243 | 16 | 116 |
| 335 | Level 4 — infections and infestations | 9 | 7 | 381 | 1969 | 16 | 390 |
| 336 | Level 1 — hepatomegaly | 16 | 13 | 116 | 2221 | 29 | 132 |
| 337 | Ovary | 11 | 9 | 327 | 2019 | 20 | 338 |
| 338 | Level 1 — hepatic steatosis | 18 | 15 | 135 | 2198 | 33 | 153 |
| 339 | Level 1 — cardiogenic shock | 6 | 5 | 83 | 2272 | 11 | 89 |
| 340 | Testis | 19 | 16 | 260 | 2071 | 35 | 279 |

| | Parameters | Number of drugs | | | | | |
|---|---|---|---|---|---|---|---|
| | Adverse effect: tissue-level or BMO (MedDRA Level 1–4) | Human/Dog a (TP) | Dog b (FP) | Human c (FN) | Neither d (TN) | Dog total | Human total |
| 341 | Level 1 — heart failure | 13 | 11 | 208 | 2134 | 24 | 221 |
| 342 | Level 1 — centrilobular hepatic necrosis | 7 | 6 | 27 | 2326 | 13 | 34 |
| 343 | Level 3 — acid-base disorders | 7 | 6 | 50 | 2303 | 13 | 57 |
| 344 | Level 2 — action potential duration | 38 | 35 | 91 | 2202 | 73 | 129 |
| 345 | Level 3 — procedural related injuries and complications nec | 13 | 12 | 193 | 2148 | 25 | 206 |
| 346 | Level 2 — cardiovascular injuries | 15 | 14 | 107 | 2230 | 29 | 122 |
| 347 | Level 1 — atrial fibrillation | 16 | 15 | 162 | 2173 | 31 | 178 |
| 348 | Level 2 — action potential | 28 | 27 | 101 | 2210 | 55 | 129 |
| 349 | Level 1 — hyperaemia | 7 | 7 | 34 | 2318 | 14 | 41 |
| 350 | Level 2 — hepatic glutathione level | 7 | 7 | 37 | 2315 | 14 | 44 |
| 351 | Level 2 — cardiac function diagnostic procedures | 13 | 13 | 180 | 2160 | 26 | 193 |
| 352 | Level 2 — liver respiration | 5 | 5 | 32 | 2324 | 10 | 37 |
| 353 | Level 1 — coronary artery vasospasm | 5 | 5 | 38 | 2318 | 10 | 43 |
| 354 | Level 2 — hepatic RNA synthesis | 4 | 4 | 18 | 2340 | 8 | 22 |
| 355 | Level 2 — renal vascular and ischaemic conditions | 6 | 6 | 65 | 2289 | 12 | 71 |
| 356 | Level 1 — ECG abnormality | 9 | 9 | 161 | 2187 | 18 | 170 |
| 357 | Level 2 — circulatory collapse and shock | 8 | 8 | 135 | 2215 | 16 | 143 |
| 358 | Level 1 — complete atrioventricular block | 5 | 5 | 52 | 2304 | 10 | 57 |
| 359 | Level 2 — effective renal plasma flow | 4 | 4 | 29 | 2329 | 8 | 33 |
| 360 | Level 1 — hepatic fibrosis | 7 | 7 | 116 | 2236 | 14 | 123 |
| 361 | Level 1 — oedema | 5 | 5 | 64 | 2292 | 10 | 69 |
| 362 | Level 2 — total fluid volume increased | 5 | 5 | 72 | 2284 | 10 | 77 |
| 363 | Level 2 — metabolic acidoses (excluding diabetic acidoses) | 4 | 4 | 41 | 2317 | 8 | 45 |
| 364 | Level 2 — oedema | 5 | 5 | 73 | 2283 | 10 | 78 |
| 365 | Level 2 — bile acid biosynthesis | 3 | 3 | 40 | 2320 | 6 | 43 |
| 366 | Level 3 — increased intracranial pressure and hydrocephalus | 4 | 4 | 92 | 2266 | 8 | 96 |
| 367 | Level 2 — increased intracranial pressure disorders | 4 | 4 | 92 | 2266 | 8 | 96 |
| 368 | Level 3 — neurological disorder | 5 | 5 | 153 | 2203 | 10 | 158 |
| 369 | Thymus gland | 5 | 5 | 164 | 2192 | 10 | 169 |
| 370 | Level 2 — cerebrospinal fluid tests (excluding microbiology) | 3 | 3 | 69 | 2291 | 6 | 72 |
| 371 | Level 1 — intracranial hypertension | 3 | 3 | 69 | 2291 | 6 | 72 |
| 372 | Level 3 — neurological, special senses and psychiatric investigations | 3 | 3 | 70 | 2290 | 6 | 73 |
| 373 | Level 2 — vascular tissue neoplasm | 3 | 3 | 71 | 2289 | 6 | 74 |
| 374 | Level 2 — nervous system haemorrhagic disorders | 3 | 3 | 105 | 2255 | 6 | 108 |
| 375 | Level 2 — coronary blood flow | 40 | 41 | 41 | 2244 | 81 | 81 |
| 376 | Level 2 — bile flow | 14 | 15 | 59 | 2278 | 29 | 73 |
| 377 | Level 2 — cardiac and vascular procedural complications | 11 | 12 | 183 | 2160 | 23 | 194 |
| 378 | Level 1 — infarct size | 20 | 22 | 95 | 2229 | 42 | 115 |
| 379 | Level 2 — coronary arterial disease | 7 | 8 | 64 | 2287 | 15 | 71 |
| 380 | Level 3 — bile duct disorder | 7 | 8 | 192 | 2159 | 15 | 199 |
| 381 | Level 2 — hepatic portal blood flow | 6 | 7 | 26 | 2327 | 13 | 32 |
| 382 | Level 2 — heart weight | 6 | 7 | 36 | 2317 | 13 | 42 |
| 383 | Level 2 — hepatic glycogen level | 5 | 6 | 18 | 2337 | 11 | 23 |
| 384 | Level 2 — hepatocyte proliferation | 5 | 6 | 39 | 2316 | 11 | 44 |
| 385 | Level 2 — liver weight | 53 | 66 | 156 | 2091 | 119 | 209 |
| 386 | Level 2 — hepatic glucose release | 4 | 5 | 10 | 2347 | 9 | 14 |
| 387 | Level 1 — left ventricular dysfunction | 4 | 5 | 49 | 2308 | 9 | 53 |
| 388 | Level 2 — atrioventricular conduction | 9 | 12 | 32 | 2313 | 21 | 41 |
| 389 | Level 1 — myocardial infarct size | 9 | 12 | 42 | 2303 | 21 | 51 |
| 390 | Level 2 — hepatic drug metabolism | 6 | 8 | 54 | 2298 | 14 | 60 |
| 391 | Level 1 — muscle hypotonia | 3 | 4 | 43 | 2316 | 7 | 46 |
| 392 | Level 2 — left ventricular mass | 3 | 4 | 45 | 2314 | 7 | 48 |
| 393 | Level 2 — hepatic blood flow | 8 | 11 | 64 | 2283 | 19 | 72 |
| 394 | Level 1 — myocardial fibrosis | 5 | 7 | 37 | 2317 | 12 | 42 |
| 395 | Level 2 — renal blood flow | 28 | 40 | 63 | 2235 | 68 | 91 |
| 396 | Level 1 — atrioventricular block | 7 | 10 | 94 | 2255 | 17 | 101 |
| 397 | Level 2 — hepatobiliary signs and symptoms | 17 | 25 | 142 | 2182 | 42 | 159 |
| 398 | Level 1 — coronary artery thrombosis | 4 | 6 | 9 | 2347 | 10 | 13 |
| 399 | Level 2 — site specific embolism and thrombosis nec | 4 | 6 | 12 | 2344 | 10 | 16 |
| 400 | Level 2 — renal function | 6 | 9 | 104 | 2247 | 15 | 110 |
| 401 | Level 2 — ventricular refractory period | 2 | 3 | 6 | 2355 | 5 | 8 |
| 402 | Level 2 — hepatic cytochrome p450 function | 4 | 6 | 76 | 2280 | 10 | 80 |
| 403 | Level 1 — high cardiac output | 2 | 3 | 17 | 2344 | 5 | 19 |
| 404 | Level 1 — chronic hepatitis | 2 | 3 | 22 | 2339 | 5 | 24 |
| 405 | Level 1 — myocarditis | 2 | 3 | 46 | 2315 | 5 | 48 |

| | Parameters | Number of drugs | | | | | |
|---|---|---|---|---|---|---|---|
| | Adverse effect: tissue-level or BMO (MedDRA Level 1–4) | Human/Dog a (TP) | Dog b (FP) | Human c (FN) | Neither d (TN) | Dog total | Human total |
| 406 | Level 2 — non-infectious myocarditis | 2 | 3 | 50 | 2311 | 5 | 52 |
| 407 | Level 4 — pregnancy, puerperium and perinatal conditions | 2 | 3 | 65 | 2296 | 5 | 67 |
| 408 | Level 1 — st-segment depression | 2 | 3 | 67 | 2294 | 5 | 69 |
| 409 | Level 1 — inflammatory kidney disease | 2 | 3 | 68 | 2293 | 5 | 70 |
| 410 | Level 2 — cardiac conduction | 5 | 8 | 28 | 2325 | 13 | 33 |
| 411 | Level 1 — infarction | 5 | 8 | 74 | 2279 | 13 | 79 |
| 412 | Level 1 — hepatocyte hypertrophy | 15 | 25 | 40 | 2286 | 40 | 55 |
| 413 | Level 2 — site-specific vascular disorders nec | 3 | 5 | 29 | 2329 | 8 | 32 |
| 414 | Level 2 — bile duct infections and inflammations | 3 | 5 | 42 | 2316 | 8 | 45 |
| 415 | Level 2 — liver vascular disorder | 4 | 7 | 78 | 2277 | 11 | 82 |
| 416 | Level 2 — renal vascular resistance | 9 | 16 | 48 | 2293 | 25 | 57 |
| 417 | Level 3 — hepatobiliary investigations | 6 | 11 | 241 | 2108 | 17 | 247 |
| 418 | Level 2 — hepatic function test | 6 | 11 | 241 | 2108 | 17 | 247 |
| 419 | Level 2 — cardiac function | 8 | 15 | 88 | 2255 | 23 | 96 |
| 420 | Level 1 — centrilobular hypertrophy | 9 | 18 | 22 | 2317 | 27 | 31 |
| 421 | Level 1 — ventricular premature complex | 8 | 16 | 117 | 2225 | 24 | 125 |
| 422 | Level 3 — vascular injury | 5 | 10 | 59 | 2292 | 15 | 64 |
| 423 | Level 2 — ventricular conduction | 2 | 4 | 6 | 2354 | 6 | 8 |
| 424 | Level 2 — mixed acid-base disorders | 2 | 4 | 17 | 2343 | 6 | 19 |
| 425 | Level 1 — acidosis | 2 | 4 | 17 | 2343 | 6 | 19 |
| 426 | Level 1 — tachyarrhythmia | 2 | 4 | 33 | 2327 | 6 | 35 |
| 427 | Level 1 — hepatic enzyme level | 3 | 6 | 104 | 2253 | 9 | 107 |
| 428 | Level 2 — coronary vascular resistance | 13 | 28 | 25 | 2300 | 41 | 38 |
| 429 | Level 3 — hepatic and biliary neoplasms (benign) | 15 | 33 | 106 | 2212 | 48 | 121 |
| 430 | Level 1 — ischaemia-reperfusion injury | 5 | 11 | 67 | 2283 | 16 | 72 |
| 431 | Level 2 — biliary secretion | 4 | 9 | 36 | 2317 | 13 | 40 |
| 432 | Level 2 — left ventricular pressure | 7 | 17 | 33 | 2309 | 24 | 40 |
| 433 | Level 1 — altered hepatic foci | 2 | 5 | 14 | 2345 | 7 | 16 |
| 434 | Level 1 — cholangitis | 2 | 5 | 24 | 2335 | 7 | 26 |
| 435 | Level 2 — hepatic enzyme function | 2 | 5 | 28 | 2331 | 7 | 30 |
| 436 | Level 1 — arteriosclerosis | 2 | 5 | 37 | 2322 | 7 | 39 |
| 437 | Level 2 — hepatobiliary neoplasms benign | 13 | 33 | 105 | 2215 | 46 | 118 |
| 438 | Level 2 — renal plasma flow | 3 | 8 | 30 | 2325 | 11 | 33 |
| 439 | Level 2 — left ventricular function | 3 | 8 | 31 | 2324 | 11 | 34 |
| 440 | Level 2 — myocardial blood flow | 7 | 19 | 24 | 2316 | 26 | 31 |
| 441 | Level 1 — hepatocellular adenoma | 12 | 33 | 97 | 2224 | 45 | 109 |
| 442 | Level 2 — hepatic vacuolation | 2 | 6 | 9 | 2349 | 8 | 11 |
| 443 | Level 2 — cerebral blood flow | 5 | 16 | 79 | 2266 | 21 | 84 |
| 444 | Level 3 — neurological physiological observation | 5 | 16 | 83 | 2262 | 21 | 88 |
| 445 | Level 2 — peripheral vascular resistance | 7 | 24 | 53 | 2282 | 31 | 60 |
| 446 | Level 2 — ventricular repolarisation | 2 | 7 | 17 | 2340 | 9 | 19 |
| 447 | Level 2 — left ventricular systolic blood pressure | 5 | 19 | 24 | 2318 | 24 | 29 |
| 448 | Level 2 — hepatocyte vacuolation | 5 | 26 | 22 | 2313 | 31 | 27 |
| 449 | Level 1 — hepatocyte degeneration | 2 | 12 | 16 | 2336 | 14 | 18 |
| 450 | Level 2 — left ventricular contraction | 2 | 12 | 16 | 2336 | 14 | 18 |

Exhibit 4

ATLA 42, 181–199, 2014

# An Analysis of the Use of Animal Models in Predicting Human Toxicology and Drug Safety

Jarrod Bailey,[1] Michelle Thew[1] and Michael Balls[2]

[1]British Union for the Abolition of Vivisection (BUAV), London, UK; [2]c/o Fund for the Replacement of Animals in Medical Experiments (FRAME), Nottingham, UK

**Summary** — Animal use continues to be central to preclinical drug development, in spite of a lack of its demonstrable validity. The current nadir of new drug approvals and the drying-up of pipelines may be a direct consequence of this. To estimate the evidential weight given by animal data to the probability that a new drug may be toxic to humans, we have calculated Likelihood Ratios (LRs) for an extensive data set of 2,366 drugs, for which both animal and human data are available, including tissue-level effects and MedDRA Level 1–4 biomedical observations. This was done for three preclinical species (rat, mouse and rabbit), to augment our previously-published analysis of canine data. In common with our dog analysis, the resulting LRs show: a) that the absence of toxicity in the animal provides little or virtually no evidential weight that adverse drug reactions (ADRs) will also be absent in humans; and b) that, while the presence of toxicity in these species can add considerable evidential weight for human risk, the LRs are extremely inconsistent, varying by over two orders of magnitude for different classes of compounds and their effects. Therefore, our results for these additional preclinical species have important implications for their use in predicting human toxicity, and suggest that alternative methods are urgently required.

**Key words:** animals, dog, drug development, mouse, preclinical testing, rabbit, rat, toxicology.

**Address for correspondence:** Jarrod Bailey, British Union for the Abolition of Vivisection (BUAV), 16a Crane Grove, London N7 8NN, UK.
E-mail: jarrod.bailey@mac.com

## Introduction

There exists a general assumption that animal testing helps to ensure human safety and the efficacy of new pharmaceuticals. Such preclinical testing is required by regulatory agencies worldwide (e.g. 1, 2), and involves at least two species — typically one rodent and one non-rodent species — ostensibly to aid the prediction of toxicity and pharmacokinetics. However, while there is little supportive evidence for the value or necessity of this practice (3), it continues, with apparent disregard for the dearth of new drug approvals and the drying-up of pipelines over the past decade (e.g. 4–7) that may be a consequence of the way in which the preclinical testing is currently performed.

Animals are used in significant numbers for these purposes. In the UK alone, in 2012, drug testing involved the use of more than 277,000 animals (8). The human relevance and predictive nature of these animal models have been investigated relatively rarely and then only superficially. Such a lack of evaluation (see *Discussion*) could be considered surprising, given the central role of the models in drug development (9–11), but it is chiefly due to the difficulty in accessing relevant data, most of which are unpublished and proprietary to pharmaceutical companies. Almost invariably, the human relevance of preclinical animal tests has been measured via 'concordance' metrics (e.g. 12), which have been interpreted by various authors as the true-positive rate (sensitivity) or the Positive Predictive Value (PPV). While these metrics are appropriate for assessing the reliability of a diagnostic test for a specific disorder (e.g. HIV infection), the insights they provide depend critically on the question being asked of the diagnostic test. However, they are not appropriate for assessing the salient question at issue with animal models, which is *whether or not they contribute significant weight to the evidence for or against the likely toxicity of a given compound in humans*.

Overcoming this key problem — almost entirely overlooked by previous authors — requires a precise specification of the various terms used (see *Methods*). Briefly, the appropriate metrics are Likelihood Ratios (LRs; 13): the Positive Likelihood Ratio (PLR) and the inverse Negative Likelihood Ratio (iNLR). Therefore, there is clearly a need for the kind of statistically appropriate critical analysis that we provide here. The data set we have used is unique, in that it is large and allows the conditional probabilities required for the LRs (PLR/iNLR) to be calculated.

The analysis presented here comprises data sets for the rat, mouse and rabbit. This complements our recently published analysis of dog preclinical

data (14), which contains more-complete details of the statistical methods. A précis of these methods is provided below.

## Methods

Animal models are widely used to assess the likelihood that a given compound will prove toxic or non-toxic in humans. As with any diagnostic test, their reliability can only be assessed by performing tests in which the same compound is given to both animals and humans, and the presence or absence of toxicity is recorded. This leads to a $2 \times 2$ matrix of results, as shown in Table 1 (15).

The basis of this matrix is that the human data are correct, and the animal data are true/false, if they do/do not match them. The various cells in this matrix allow a variety of diagnostic metrics to be deduced, of which the most familiar and widely used are the true-positive rate for the test (or 'sensitivity' = a/[a + c]), and the true-negative rate (or 'specificity' = d/[d + b]). In previous research into the reliability of animal models as predictors of toxicity in humans, some authors (e.g. 12) have focused on the sensitivity, expressed as the 'true-positive concordance rate', or the so-called Positive Predictive Value (PPV), given by a/(a + b), which reflects the probability that human toxicity was correctly identified by the animal model, given that toxicity was observed in the animal model (e.g. 16). However, neither of these metrics is suitable for the role of assessing the evidential weight provided by any toxicity test. In the case of animal models, the sensitivity addresses only the ability of such models to detect toxicity that will subsequently manifest itself in humans. This is a necessary, but not sufficient, measure of evidential weight. Suppose, for example, that the animal model always indicates toxicity found in humans; it would then have a sensitivity of 100%. However, if, in addition, the model always indicated toxicity, even when such toxicity was not subsequently seen in humans, its evidential value would be no better than simply dismissing *every* compound as toxic from the outset. Thus, a useful toxicity test must also be able to give insight into when toxicity seen in the animal model is *not* observed in humans, which requires knowledge of the *specificity* of the test.

There is, of course, an obvious reason for the focus on sensitivity in animal model evaluation: if a compound is found to be positive for toxicity in an animal model, it is unlikely to go forward into human evaluation. Nevertheless, the fact remains that sensitivity alone cannot be an adequate guide to the value of animal models.

The case of the PPV is more subtle. This metric is a measure of the probability that human toxicity will be correctly identified, given that the animal model detected toxicity. As such, PPVs are conditional probabilities, the condition being the pre-existence of a positive animal test result. This makes PPVs dependent on the prevalence of toxicity in compounds, so it is an inappropriate measure of the reliability of the test with any specific compound (e.g. 13, 17).

Thus, any appropriate metric of the evidential value of animal models requires knowledge of *both* the sensitivity *and* the specificity of the model. This, in turn, implies that the appropriate metrics for the evidential weight provided by an animal model are LRs (e.g. 17). In general, these are ratios of functions of the sensitivity and specificity, which can be extracted from the $2 \times 2$ matrix given in Table 1. In the case of animal models, in general, two LRs are relevant. The first is the so-called PLR, which is given by:

$$PLR = sensitivity/(1 - specificity)$$
$$= (a/[a + c])/(b/[b + d])$$

It should be noted that, in a relatively small number of cases (see Table 2), this equation results in an undefined value when there are no observations in the animal (i.e. b = 0 in the $2 \times 2$ matrix). These cases were eliminated from consideration. This LR captures the ability of an animal model to add evidential weight to the belief that a specific compound is toxic. Any animal model that gives a PLR that is statistically significantly higher than 1.0, can be regarded as contributing evidential weight to the probability that the compound under test will be toxic in humans.

**Table 1:   A 2 × 2 matrix of results**

|  | Compound toxic in humans | Compound not toxic in humans |
|---|---|---|
| **Compound toxic in animal model** | a: true positives (TPs) | b: false positives (FPs) |
| **Compound not toxic in animal model** | c: false negatives (FNs) | d: true negatives (TNs) |

**Table 2:   The number of classifications of adverse effects for each species, as used in this analysis**

| Species | Tissue-level effects | Biomedical observations (BMOs) | Total classifications used | Classifications eliminated |
|---|---|---|---|---|
| Rat | 62 | 548 | 610 | 271/881 |
| Mouse | 62 | 342 | 404 | 266/670 |
| Rabbit | 54 | 221 | 275 | 141/416 |
| Dog | 52 | 384 | 436 | 14/450 |

*The numbers of classifications of effects for each species, and therefore the numbers of LRs calculated for each species, are shown. The total number of classifications used in the analysis is shown in column 3 (Total classifications used), which comprises the sum of column 1 (Tissue-level effects) and column 2 (BMOs). The number of BMO classifications for which there were no effects observed in the preclinical species of interest, and which were therefore eliminated from consideration in our analysis, are shown in column 4 (Classifications eliminated), out of the total number of classifications for which there were data. In total, 3,275 comparisons were made for each human–animal pair (human–rat, human–mouse, human–rabbit), for 2,366 compounds.*

The other relevant LR is the so-called iNLR, given by:

$$iNLR = \text{specificity}/(1 - \text{sensitivity})$$
$$= (d/[b + d])/(c/[a + c])$$

This LR captures the ability of an animal model to add evidential weight to the belief that a specific compound is not toxic: any animal model that gives an iNLR that is statistically significantly higher than 1.0 can be regarded as contributing evidential weight to the probability that the compound under test will not be toxic in humans.

At this point, it is worth noting that the above definitions imply that a good animal model for detecting human toxicity is not necessarily also good for detecting an absence of toxicity. That is, a high PLR does not guarantee a high iNLR; this will emerge as a key issue in this study.

The above definitions also underscore the need for data on the human toxicity of compounds that fail initial animal tests. Again, a key feature of the current study is that this issue has been substantively overcome — at least, as much as it could ever be overcome — via data mining methods. Data were obtained from a leading pharmaceutical safety consultancy, Instem Scientific Limited (Harston, Cambridge, UK; www.instem-lss.com; 'Safety Intelligence Programme'), with funding provided by FRAME. All the information stemmed from publicly accessible sources, including: PubMed (www.ncbi.nlm.nih.gov/pubmed), the FDA Adverse Event Reporting System (FAERS), DrugBank (www.drugbank.ca), and the National Toxicology Program (ntp.niehs.nih.gov). Human and preclinical species data were available for more than 2,300 drug compounds. Inference of the good quality of the data used in this evaluation is outlined in the *Discussion*. Compounds were selected that feature in the FAERS, FDA New Drug Applications (FDA NDAs) and DrugBank. Thus, the drugs selected for this analysis had undergone preclinical testing and are (or have been) in clinical use: human and animal data are therefore available for them. Prior to our analysis, the data provided to us by Instem had been processed — thus, a non-redundant list of parent moieties was created, for example, by normalising therapeutic products to their generic names (e.g. Lipitor to Atorvastatin). This yielded 2,366 compounds. A signature of the effects of each compound was then created, focusing on tissue-level effects (e.g. bradycardia and arrhythmic disorder would both be considered to be effects on heart tissues), as well as the individual observations, which were mapped to their MedDRA (Medical Dictionary for Regulatory Activities; www.meddramsso.com) counterparts. MedDRA observations are classified into four levels, Level 1 being the most specific, and Level 4 providing a more generic 'system organ class'. These classifications help to eliminate FPs that may arise from species-specific observations, and help the identification of concordant observations that might otherwise have been missed by their 'rolling up' into more generic terms. A threshold of a minimum of five observations in both humans and the preclinical species had been applied, presumably to avoid the inclusion of effects considered to be 'rare'.

LRs were derived for both broad and tissue-level effects, as well as more specific biomedical observations (BMOs) mapped to MedDRA classifications (Level 1 [most specific] to Level 4 [more generic 'system organ class']). The numbers of classifications of effects for each species, and therefore the numbers of LRs calculated for each species, are shown in Table 2. Also shown are the numbers of BMO classifications not involving the species of interest, which were eliminated from further consideration. In total, 3,275 comparisons were made

for each human–animal pair (human–rat, human–mouse, human–rabbit), for 2,366 compounds. The Instem Scientific data on which our analysis was based are shown in our complementary paper (14), and the full set of data, including 95% Confidence Intervals, will be available on the *ATLA* website (www.atla.org.uk).

With regard to potential bias: FNs are more common than FPs, since there is a bias resulting from a 'precautionary principle' not to progress positives to human administration. This has been mitigated by limiting the data set to compounds reported in the FAERS database. Therefore, all the compounds are certain to have proceeded to market, and animal preclinical data are available for these compounds. Specific details of how the FPs that were identified arose were not sought, because they were not pertinent to this analysis and it was not feasible, given the nature of the data set. It must be assumed that the animal data were correlated with the human data retrospectively, and/or the human data arose from post-marketing studies, and/or clinical trials were applied for and approved, since the adverse effect(s) in animals were minor and/or mitigated by other data.

## Results

Median LRs and ranges are shown in Table 3. All the PLRs were generally high: median values were 101 (rabbit), 203 (mouse) and 253 (rat), which compare favourably to the median PLR of 28 for the dog (14). In common with the canine data, these values suggest that compounds showing toxicity in these animal species are also likely to be toxic in humans. However, the range of PLRs for each of these species varies enormously. The PLR ranges were: 13–1,348 (rabbit); 23–2,361 (mouse); and 24–2,360 (rat). These ranges are considerably greater than those seen for the dog, i.e. 5–549 (14), meaning that, with no obvious pattern regarding the form of toxicity, the reliability of this aspect of animal models cannot be generalised or regarded with confidence.

In contrast, the median iNLRs are substantially lower: 1.12 (rabbit); 1.39 (mouse); and 1.82 (rat). While the ranges of iNLRs, if not for the rabbit (1.01–2.33) but certainly for the mouse (1.03–50) and the rat (1.02–100), were much greater than the range for the dog iNLR values (1.01–1.92), the medians compare only slightly favourably to the median iNLR of 1.10 for the dog (14).

One major caveat regarding these data, and the associated ranges of LR values, is that they incorporate a significant number of adverse effects and events that are rarely caused and/or reported. In those specific cases, the ability to reliably estimate the sensitivity and specificity of the dog tests may be compromised. The frequency of rare events is depicted for each species in Figure 1, in which histograms show that, for the preclinical species, an average of one third (33%) of ADR classes have sample sizes of ≤ 10, and more than half (55%) have sample sizes of ≤ 20. For humans — for which the threshold for rare events was set higher on account of greater sample sizes — 64% and 78% of ADR classes have sample sizes of ≤ 100 and ≤ 200, respectively. The range of sample sizes for each species is also depicted in Figure 2, via 'box and whisker' plots. For each species, a grouped histogram representing those in Figure 1 is shown for reference, alongside the associated quantile and outlier box plots. These show clearly how, while the range of sample sizes for the ADR classifications is broad (as indicated by the maximum and minimum whiskers), the majority of the sample sizes are toward the lower end of the range, shown by the box that represents the middle 50% of the distribution.

In order to assess the impact of including the rare events/low sample sizes in our analysis, we recalculated the PLRs and iNLRs for each species comparison, with the rare events in each preclinical species removed (Figures 3a and 3b), and with the rare events in both the preclinical species and humans removed (Figures 3c and 3d). Notably, removing rare events significantly reduces the PLR for each species, particularly for the rat and the mouse. With regard to iNLR values for each species, the removal

## Table 3: Median LRs and ranges for the rat, mouse and rabbit

| Species | PLR (median) | iNLR (median) | PLR range | iNLR range |
|---------|--------------|---------------|-----------|------------|
| Rat | 253 | 1.82 | 24–2360 | 1.02–100 |
| Mouse | 203 | 1.39 | 23–2361 | 1.03–50 |
| Rabbit | 101 | 1.12 | 13–1348 | 1.01–2.33 |
| Dog | 28 | 1.10 | 5–549 | 1.01–1.92 |

*All the PLRs were generally high, and compared favourably to those for the dog, suggesting that compounds showing toxicity in those animals are also likely to be toxic in humans. However, high ranges, with no obvious pattern of toxicity, suggest the reliability of this aspect cannot be generalised or regarded with confidence. Median iNLRs were substantially lower, and compared only slightly favourably to those for the dog, supporting the view that animals provide very little or essentially no evidential weight to this aspect of toxicity testing.*

**Figure 1: Sample sizes for each ADR class**





*For each species (including humans), the sample size (number of compounds for which a specific ADR was observed) is shown for each ADR class. Markers indicate two thresholds of rare events: for each preclinical species, sample sizes of ≤ 10 and ≤ 20, and for humans (given the much greater sample sizes), ≤ 100 and ≤ 200. The columns to the right of each marker represent ADR classes for which there are ≤ the indicated sample sizes. Many ADR classes have small sample sizes for each species. For the preclinical species, an average of one third (33%) of ADR classes have sample sizes of ≤ 10, and more than half (55%) have sample sizes of ≤ 20. For humans, 64% and 78% of ADR classes have sample sizes of ≤ 100 and ≤ 200, respectively.*

**Figure 1: continued**





*For each species (including humans), the sample size (number of compounds for which a specific ADR was observed) is shown for each ADR class. Markers indicate two thresholds of rare events: for each preclinical species, sample sizes of ≤ 10 and ≤ 20, and for humans (given the much greater sample sizes), ≤ 100 and ≤ 200. The columns to the right of each marker represent ADR classes for which there are ≤ the indicated sample sizes. Many ADR classes have small sample sizes for each species. For the preclinical species, an average of one third (33%) of ADR classes have sample sizes of ≤ 10, and more than half (55%) have sample sizes of ≤ 20. For humans, 64% and 78% of ADR classes have sample sizes of ≤ 100 and ≤ 200, respectively.*

**Figure 1: continued**



*For each species (including humans), the sample size (number of compounds for which a specific ADR was observed) is shown for each ADR class. Markers indicate two thresholds of rare events: for each preclinical species, sample sizes of ≤ 10 and ≤ 20, and for humans (given the much greater sample sizes), ≤ 100 and ≤ 200. The columns to the right of each marker represent ADR classes for which there are ≤ the indicated sample sizes. Many ADR classes have small sample sizes for each species. For the preclinical species, an average of one third (33%) of ADR classes have sample sizes of ≤ 10, and more than half (55%) have sample sizes of ≤ 20. For humans, 64% and 78% of ADR classes have sample sizes of ≤ 100 and ≤ 200, respectively.*

of rare events in the preclinical species results in a marginal increase in iNLR in each case, though, when rare events in humans are also removed, the iNLRs for the rat and the mouse decrease further. These observations are further supported by the scatter plots shown in Figure 4. These plots show that observed PLRs with higher values tend to have lower sample sizes, both in the preclinical animal and in humans, and that more-robust PLRs with higher sample sizes tend to have lower values. Conversely, observed iNLRs with higher values tend to have higher sample sizes, both in the preclinical animal and in humans, and more-robust iNLRs with higher sample sizes also tend to have higher values, though the increase in iNLR with sample size is slight. In summary, taking account of rare events, to illustrate their impact on our results and how making our results more statistically robust affects them, augments our conclusions. The evidential weight provided by animal tests given a positive toxicology result, is significantly decreased, most conspicuously for the rat and the mouse. The evidential weight provided by animal tests given a negative toxicology result, is also decreased for the rat and the mouse; while it is marginally increased for the rabbit and the dog, the values remain extremely low.

Therefore, in common with the canine data, our analysis of data from these other species supports the view that animals provide very little or essentially no evidential weight to this aspect of toxicity testing. Specifically, the fact that a compound shows no toxic effects in animals provides essentially no insight into whether the compound will also show no toxic effects in humans. This lack of evidential weight has important implications for the role of animals in toxicity testing, especially for the pharmaceutical industry. The critical observation for deciding whether a candidate drug can proceed to testing in humans, is the absence of toxicity in tests on animals. However, our findings show that the predictive value of the animal test in this regard is barely greater than that which would result merely by chance (see below).

## Discussion

The analysis presented here complements and augments our recently published similar analysis of canine toxicity data (14). These analyses are

**Figure 2: Box plots to illustrate sample-size distribution**



*For each species (including humans), the distribution of sample sizes (number of compounds for which a specific ADR was observed) is illustrated via 'box and whisker' plots. In each case, column 1 depicts a condensed 'grouped' sample size histogram, using the same data that generated the histograms in Figure 1, for ease of comparison. Column 2 shows a standard quantile box plot, and column 3 an outlier box plot. The 'box' is bounded by the lower (25%) and upper (75%) quartiles, and therefore represents the interquartile range, i.e. the 50% of sample sizes that lie either side of the median value, which itself is shown by the horizontal line bisecting the box. The mean value is indicated by the diamond. The maximum and minimum sample sizes are shown by the whiskers at the top and bottom of the plots, respectively. For the outlier plot in column 3, outlier values are shown as dots, which are greater than 1.5× the interquartile range above the upper (75%) quartile.*

*The precise values for each marker are provided in the accompanying box (Quantiles and Summary Statistics) beside the plots. These box plots demonstrate that many ADR classes have small sample sizes, for each species. For the preclinical species, an average of one third (33%) of ADR classes have sample sizes of ≤ 10, and more than half (55%) have sample sizes of ≤ 20. For humans, 64% and 78% of ADR classes have sample sizes of ≤ 100 and ≤ 200, respectively.*

**Figure 2: continued**



**Mouse**

| Quantiles | | |
|---|---|---|
| 100.0% | Maximum | 785 |
| 99.5% | | 653.12 |
| 97.5% | | 350.8 |
| 90.0% | | 148.3 |
| 75.0% | Quartile | 57.25 |
| 50.0% | Median | 17.5 |
| 25.0% | Quartile | 9 |
| 10.0% | | 6 |
| 2.5% | | 5 |
| 0.5% | | 5 |
| 0.0% | Minimum | 5 |

| Summary Statistics | |
|---|---|
| Mean | 55.435821 |
| Standard deviation | 95.36241 |
| Standard error mean | 3.6841713 |
| Upper 95% mean | 62.669751 |
| Lower 95% mean | 48.201891 |
| N | 670 |

**Rabbit**

| Quantiles | | |
|---|---|---|
| 100.0% | Maximum | 449 |
| 99.5% | | 427.94 |
| 97.5% | | 222.6 |
| 90.0% | | 106.3 |
| 75.0% | Quartile | 32.75 |
| 50.0% | Median | 15 |
| 25.0% | Quartile | 7 |
| 10.0% | | 5 |
| 2.5% | | 5 |
| 0.5% | | 5 |
| 0.0% | Minimum | 5 |

| Summary Statistics | |
|---|---|
| Mean | 38.663462 |
| Standard deviation | 64.711945 |
| Standard error mean | 3.1727642 |
| Upper 95% mean | 44.900154 |
| Lower 95% mean | 32.426769 |
| N | 416 |

*For each species (including humans), the distribution of sample sizes (number of compounds for which a specific ADR was observed) is illustrated via 'box and whisker' plots. In each case, column 1 depicts a condensed 'grouped' sample size histogram, using the same data that generated the histograms in Figure 1, for ease of comparison. Column 2 shows a standard quantile box plot, and column 3 an outlier box plot. The 'box' is bounded by the lower (25%) and upper (75%) quartiles, and therefore represents the interquartile range, i.e. the 50% of sample sizes that lie either side of the median value, which itself is shown by the horizontal line bisecting the box. The mean value is indicated by the diamond. The maximum and minimum sample sizes are shown by the whiskers at the top and bottom of the plots, respectively. For the outlier plot in column 3, outlier values are shown as dots, which are greater than 1.5× the interquartile range above the upper (75%) quartile.*

*The precise values for each marker are provided in the accompanying box (Quantiles and Summary Statistics) beside the plots. These box plots demonstrate that many ADR classes have small sample sizes, for each species. For the preclinical species, an average of one third (33%) of ADR classes have sample sizes of ≤ 10, and more than half (55%) have sample sizes of ≤ 20. For humans, 64% and 78% of ADR classes have sample sizes of ≤ 100 and ≤ 200, respectively.*

Substantiation of data quality is evidenced by: a) the methods used to source the data and the assured quality of the supplying databases (listed earlier); b) the ways in which the data had been used recently as a basis for scientific publications and presentations (e.g. 29–32); and c) the international corporate and academic clients that have used the consultancy and its data (e.g. Astra-Zeneca; see 29–32). In addition, the impact of 'missing data' (i.e. unpublished data held by pharmaceutical companies) was mitigated by strictly limiting the data set to drugs "with the greatest chance of having been evaluated in all the species included in the study". In other words, "…lack of evidence for an association between a compound and a specific BMO demonstrates a real absence of effect, and is not due to missing data" (direct quotes from the Instem Scientific Ltd Analysis Report, unpublished).

Naturally, there must be caveats. Our analysis was limited to data that are published and publicly available. It is widely acknowledged that many animal experimental results/preclinical data remain unpublished and/or proprietary, for a variety of reasons (e.g. 21, 33–36). Such publication bias is a major problem (e.g. 37–40), and, compounded by

## Figure 3: Impact of rare ADRs on LRs



● = Rat; ○ = mouse; ■ = rabbit; □ = dog.

*Median PLRs and iNLRs were recalculated for each preclinical species–human data set, with rare events removed for illustrative purposes. Graphs a and b show the median PLR and iNLR values, respectively, with rare events removed from the animal data only; graphs c and d show the median PLR and iNLR values, respectively, with rare events removed from both the animal data set and the human data set. For each animal species–human pair, the first point on each line shows the median PLR or iNLR for the entire data set; the second point (data minus rares 1) shows the median PLR or iNLR for the data set with rare events below the first threshold removed (see the Results section); and the third point (data minus rares 2) shows the median PLR or iNLR for the data set with rare events below the second threshold removed (see the Results section). Removing rare events significantly reduces the PLR for each species, particularly for the rat and the mouse. It results in a marginal increase in iNLR in each case, although, when rare events in humans are also removed, the iNLRs for the rat and the mouse decrease further.*

**Figure 3: continued**



● = *Rat and human;* ○ = *mouse and human;* ■ = *dog and human;* □ = *rabbit and human.*

*Median PLRs and iNLRs were recalculated for each preclinical species–human data set, with rare events removed for illustrative purposes. Graphs a and b show the median PLR and iNLR values, respectively, with rare events removed from the animal data only; graphs c and d show the median PLR and iNLR values, respectively, with rare events removed from both the animal data set and the human data set. For each animal species–human pair, the first point on each line shows the median PLR or iNLR for the entire data set; the second point (data minus rares 1) shows the median PLR or iNLR for the data set with rare events below the first threshold removed (see the* Results *section); and the third point (data minus rares 2) shows the median PLR or iNLR for the data set with rare events below the second threshold removed (see the* Results *section). Removing rare events significantly reduces the PLR for each species, particularly for the rat and the mouse. It results in a marginal increase in iNLR in each case, although, when rare events in humans are also removed, the iNLRs for the rat and the mouse decrease further.*

other factors, such as size and quality of the animal studies, variability in the requirements for reporting animal studies, 'optimism bias', and lack of randomisation and blinding (34, 41), it means that gauging the true contribution of animal data to human toxicology is virtually impossible — at least for third parties without access to pharmaceutical company files. It would be an interesting exercise to speculate on how such biases affect analyses such as ours. Such speculation is acknowledged to be difficult, however, due to a lack of empirical studies of toxicological bias, and the absence of knowledge of its prevalence and impact (33).

All data sets are imperfect to varying degrees. However, it is only possible to use data which are available, and to ensure, as far as is feasible, that those data are of good quality and as free from bias as possible, and that their analysis and derived conclusions are as objective as possible. It must be made abundantly clear that we, the authors of this report, did not make decisions regarding the toxicity/non-toxicity of the drugs, or decide upon or apply any criteria to such decisions. The mining of the data, and the decisions on toxicity of the drugs, were independent of the authors of this paper, and were made by one or more of the authors of the

**Figure 4: Scatter plots to illustrate the dependence of PLR and iNLR values on sample size**

Dog PLR



n(Dog) = (a + b) = number of compounds for which an adverse effect
has been reported in the dogs data

● = 0.9–1.4 log10(nHuman); ◕ = 1.4–1.9 log10(nHuman); ◑ = 1.9–2.4 log10(nHuman); ◔ = 2.4–2.9 log10(nHuman); ○ = 2.9–3.4 log10(nHuman).

*Each plot shows a sample of 200 LR values for the dog, for reasons of clarity, and shows PLR (a) and iNLR (b) against animal (x axis) and human (dot intensity) sample sizes. Observed PLRs with higher values tend to have lower sample sizes, both in the preclinical animal and in humans, and more robust PLRs (with higher sample sizes) tend to have lower values. Conversely, observed iNLRs with higher values tend to have higher sample sizes, both in the preclinical animal and in humans, and more robust iNLRs (with higher sample sizes) also tend to have higher values, though the increase in iNLR with sample size is slight. The evidential weight provided by animal tests given a positive toxicology result is significantly decreased by the omission of rare events from the data set, most conspicuously for the rat and the mouse. The evidential weight provided by animal tests given a negative toxicology result is also decreased for the rat and the mouse, when rare events are excluded; while it is marginally increased for the rabbit and dog, the values remain extremely low.*

**Figure 4: continued**



● = 0.9–1.4 log10(nHuman); ◕ = 1.4–1.9 log10(nHuman); ◑ = 1.9–2.4 log10(nHuman); ◔ = 2.4–2.9 log10(nHuman);
○ = 2.9–3.4 log10(nHuman).

*Each plot shows a sample of 200 LR values for the dog, for reasons of clarity, and shows PLR (a) and iNLR (b) against animal (x axis) and human (dot intensity) sample sizes. Observed PLRs with higher values tend to have lower sample sizes, both in the preclinical animal and in humans, and more robust PLRs (with higher sample sizes) tend to have lower values. Conversely, observed iNLRs with higher values tend to have higher sample sizes, both in the preclinical animal and in humans, and more robust iNLRs (with higher sample sizes) also tend to have higher values, though the increase in iNLR with sample size is slight. The evidential weight provided by animal tests given a positive toxicology result is significantly decreased by the omission of rare events from the data set, most conspicuously for the rat and the mouse. The evidential weight provided by animal tests given a negative toxicology result is also decreased for the rat and the mouse, when rare events are excluded; while it is marginally increased for the rabbit and dog, the values remain extremely low.*

**Figure 2: continued**

Human



| | Quantiles | |
|---|---|---|
| 100.0% | Maximum | 1454 |
| 99.5% | | 1255.31 |
| 97.5% | | 838.5 |
| 90.0% | | 429.8 |
| 75.0% | Quartile | 174 |
| 50.0% | Median | 50 |
| 25.0% | Quartile | 20 |
| 10.0% | | 11 |
| 2.5% | | 6 |
| 0.5% | | 5 |
| 0.0% | Minimum | 5 |

| Summary Statistics | |
|---|---|
| Mean | 148.76731 |
| Standard deviation | 226.61868 |
| Standard error mean | 7.6349773 |
| Upper 95% mean | 163.7522 |
| Lower 95% mean | 133.78242 |
| N | 881 |

*For each species (including humans), the distribution of sample sizes (number of compounds for which a specific ADR was observed) is illustrated via 'box and whisker' plots. In each case, column 1 depicts a condensed 'grouped' sample size histogram, using the same data that generated the histograms in Figure 1, for ease of comparison. Column 2 shows a standard quantile box plot, and column 3 an outlier box plot. The 'box' is bounded by the lower (25%) and upper (75%) quartiles, and therefore represents the interquartile range, i.e. the 50% of sample sizes that lie either side of the median value, which itself is shown by the horizontal line bisecting the box. The mean value is indicated by the diamond. The maximum and minimum sample sizes are shown by the whiskers at the top and bottom of the plots, respectively. For the outlier plot in column 3, outlier values are shown as dots, which are greater than 1.5× the interquartile range above the upper (75%) quartile.*

*The precise values for each marker are provided in the accompanying box (Quantiles and Summary Statistics) beside the plots. These box plots demonstrate that many ADR classes have small sample sizes, for each species. For the preclinical species, an average of one third (33%) of ADR classes have sample sizes of ≤ 10, and more than half (55%) have sample sizes of ≤ 20. For humans, 64% and 78% of ADR classes have sample sizes of ≤ 100 and ≤ 200, respectively.*

urgently required, to support informed debate about the value of animal models in preclinical testing. It is acknowledged among some stakeholders (if not universally among all stakeholders) that assessment of the scientific value of animal data in drug development is necessary, has been scarce, and has been thwarted for decades by the lack of availability of relevant data for analysis (e.g. 18–20). Nevertheless, primarily due to concerns over privacy and commercial interests, data sharing and making data available continue to be resisted, in spite of assurances to the contrary from the industry (18).

Those few analyses that have been done, tend to reflect unfavourably on animal models. In 2012, a study that expressly set out to minimise bias, showed that 63% of serious ADRs had no counterparts in animals, and less than 20% of serious ADRs had an actual positive corollary in animal studies (21). Other similar examples exist for testing generally (e.g. 22–24), and more-specifically, for example, in teratology (e.g. 25, 26) and drug-induced liver injury (e.g. 3, 27). One notable study claimed a good concordance between animal and human toxicology (12), though neither the predictive nature of the animal data for humans, nor the evidential weight provided by those data, were addressed (28).

We have, for the first time, addressed the salient question of the *contribution of evidential weight for or against the toxicity of a given compound in humans* by data from animal tests, by using the appropriate metrics of LRs. Furthermore, we have applied the apposite LRs to a data set of an unprecedented scale, to critically question the value of the use of the main preclinical animal species in the testing of new human pharmaceuticals.

drug/toxicity papers and/or database submissions used, and the data-mining consultancy/curators of the Safety Intelligence Programme, Instem Scientific Limited. Therefore, if any pharmaceutical industry stakeholder disagrees with our conclusions, it is incumbent on them, as the holders of significant amounts of unpublished data, to either conduct an investigation into the worth of the animal models they use routinely, or to facilitate such an investigation by a third party. The latter course of action could be facilitated by making their anonymised data available for analysis, in accordance with the promotion of transparency cited in EU *Directive 2010/63/EU* (42).

Our findings have practical implications for the use of animal models for toxicity testing, especially in the pharmaceutical industry. Reliance on flawed models of toxicity testing leads to two types of failure. If the models have poor PLRs, then there is a risk that many potentially useful compounds will be wrongly discarded, because of FPs produced by the toxicity model. On the other hand, if the models have poor iNLRs, then many toxic compounds will wrongly find their way into human tests, and will fail in clinical trials. The relatively high PLRs found in this study show that animal models may not be leading to the loss of many potentially valuable candidate drugs through the generation of FPs. However, our results do imply that many toxic drugs are not being detected by animal models, leading to the risk of unnecessary harm to humans. Notably, the removal of rarely caused/reported adverse events from our data, which to some degree dominate the data set, in order to make our analysis more statistically robust, further substantiated and validated our conclusions.

In this regard, our findings are entirely consistent with the acknowledged failure of animal models in general to provide guidance on likely toxicity ahead of the entry of compounds into human trials. Drug attrition has increased significantly over the past two decades (e.g. 4, 5, 43–48): 92–94% of all the drugs that pass preclinical tests fail in clinical trials, mostly due to unforeseen toxicities (49–51), and half of those that succeed may be subsequently withdrawn or re-labelled due to ADRs not detected in the animal tests (52). ADRs are a major cause of premature death in developed countries (53). A major contributing factor is the inadequacy of preclinical animal tests: one recent study showed that 63% of ADRs had no counterpart in animals, and less than 20% had a positive corollary in animal studies (21).

There is a scientific basis for the inadequacy of preclinical animal tests. Foremost, are differences in the main enzymes responsible for the metabolism of drugs — the cytochrome P450 (CYP) enzymes (54), which are believed to be involved in the metabolism of more than 90% of drugs (55). While members of the CYP superfamily of enzymes (consisting of 18 families and 43 subfamilies) are highly conserved (typically 75–80% amino-acid sequence identity), it is noted that minor changes in their amino-acid sequences — even one single, conservative substitution — may result in significant differences in activity and/or substrate specificity (56, 57). With regard to differences between species, there is an acknowledged paucity of available comparable data (54). However, reports of important species differences do exist, and suggest that this is a widespread phenomenon that may have significant consequences for the extrapolation of animal data to humans (e.g. 58–62). Important differences with consequences for human extrapolation exist, not just in rodents, but also in the non-rodent species used in drug testing, such as monkeys (58) and dogs (55, 63).

These differences comprise not only differences in amino-acid sequence and catalytic activity, but also in the cellular levels of specific P450 enzymes, which, as in the case of P450 1A2, can show a 25-fold difference between certain species, or be entirely absent in other species (57, 64). Indeed, there is significant variation in the complement of P450 isoforms between humans and other species: for example, humans actually have fewer functional P450 genes than mice, which exhibit substrate specificities and regulatory patterns that can differ markedly from the P450s in other species (65). For example, CYP2B is well conserved between rodents and rabbits, though it is poorly expressed in human liver; CYP3A is the major component of human hepatic P450, but is generally at a low level in other animals, notably in experimental species (64). Four subfamilies of enzymes have been lost in humans compared to rodents, while some genes present in humans are absent in mice: species differences in the seven main CYP gene clusters "pose serious problems in interpretation, when extrapolating from the mouse to human" (66). The 2A subfamily differ markedly in catalytic specificity, despite their sequence similarity (57), and levels of several subfamily forms are relatively low in humans, meaning that comparisons of their activities across species "may be problematic" (67). In the 2C subfamily, "...similarity of one catalytic activity among animal species may have little predictive value for the other reactions catalyzed by the enzymes", and several genetic polymorphisms have been noted in humans, but not in other animals (57). Extrapolation from animal P450 activities to humans must be done with "some caution" for subfamilies 1A1, 1A2, 17A, 1B1 and 4A, "more caution" for subfamilies 2D and 3A, and "major problems" are noted for subfamilies 2A, 2B and 2C (57).

There are marked species differences in the nuclear receptors involved in the activation of CYP pathways, which "make the prediction of cyto-

chrome P450 (CYP) induction in humans from data derived from animal models problematic" (68, 69). Non-genotoxic inducers of CYPs 2B and 4A cause liver tumours in rats and mice, for example, but not in humans (69). There are also notable differences, not only between rats and mice, but also between strains of the same species, which may be further confounded by differences resulting from dietary and other environmental factors (64). It is believed that human polymorphic drug metabolism, underpinned by intra-species variability in P450 enzymes, is a leading cause of adverse drug reactions (70).

## Conclusions

This analysis of the most comprehensive quantitative database of publicly-available animal toxicity studies yet compiled, suggests that results from tests on animals (specifically rat, mouse and rabbit models) are highly inconsistent predictors of toxic responses in humans, and are little better than what would result merely by chance — or tossing a coin — in their most important role of providing a basis for deciding whether a compound should proceed to testing in humans. In other words: "…for any putative source of evidential weight to be deemed useful, its specificity and sensitivity must be such that $LR_+$ *[i.e. PLR]* > 1. Tossing a coin contributes no evidential weight to a given hypothesis, as the sensitivity and specificity are the same — 50% — and thus the $LR_+$ *[i.e. PLR]* is equal to 1" (28).

This analysis complements, and to a large degree is in accordance with, our recent findings for predictions from dog studies (14), as follows: PLRs were generally high, showing that a drug that is toxic in these species is likely to be toxic in humans. The rat was the species with the highest median PLR, followed by the mouse, then the rabbit. All three were higher than the one for the dog. However, the PLRs for each species were extremely variable — even more so than for the dog — and with no obvious pattern, suggesting that this aspect of animal tests cannot be considered particularly reliable or helpful for any specific new drug. Notably, removing rare events from the data set in order to strengthen the analysis resulted in a marked decrease in PLR values, particularly for the rat and the mouse. More importantly, while iNLRs were much more consistent than PLRs for each species, the range of values was relatively high for the rat and mouse, in contrast to the ones for the rabbit and dog. While the removal of rare events from the data set resulted in a slight increase in iNLR values in two out of eight cases, the values remained very low, indicating the provision of little evidential weight. The median values were better than the median for the dog and, though the order of species from 'best' to 'worst' was the same, all medians were very low, showing that these species provide very little, or essentially no, evidential weight concerning this aspect of toxicity testing. Specifically, if a compound shows no toxic effects in rats, mice, rabbits or dogs, this provides essentially no insight into whether the compound will also show no toxic effects in humans. This is crucial: a critical observation for deciding whether a candidate drug can proceed to testing in humans is the absence of toxicity in tests on animals, and our findings show that the predictive value of the animal tests in this regard is barely greater than that by chance.

This can be illustrated quantitatively. Suppose researchers wish to investigate a candidate compound belonging to a family which prior experience indicates has a 70% probability of absence of ADRs in humans. Before conducting tests in humans, the drug is tested in animals. By using the median iNLR figures found by our study, if the compound shows no sign of toxicity in the rabbit, the probability that the compound will also show no toxic effects in humans will have been increased by the animal testing from 70% to 72%: this is identical to the increase from the performance of tests in dogs (14). These results suggest that testing in the dog or the rabbit contribute essentially no additional confidence in the outcome, but at considerable extra cost, both in monetary terms and in terms of animal welfare. This also has obvious practical relevance to the issue of high attrition rates in clinical trials on new drug candidates. The mouse and rat studies performed marginally better in this respect: lack of toxicity in the mouse increased the probability of no toxic effects in humans from 70% to 76%, and lack of toxicity in the rat increased the probability from 70% to 81%.

A mean increase in the probability that a new drug will not be toxic to humans of just 5% in these four species, suggests that these tests are not fit for purpose (i.e. to validate the progression of testing from animals to humans), and that they are not worth the cost in terms of monetary expense, man-hours, and animal suffering and lives. It is argued that a comprehensive suite of more reliable alternative methods is available (18, 71, 72), and it is difficult to conceive that they would add less evidential weight than the animal tests. Combined with considerable public concern over the use of animals in science (73), and the high ethical costs of doing so, we conclude that preclinical testing of pharmaceuticals in animals cannot currently be justified on scientific or ethical grounds.

## Acknowledgements

The authors are grateful to the British Union for the Abolition of Vivisection (BUAV), the Fund for the

Replacement of Animals in Medical Experiments (FRAME), and The Kennel Club (via FRAME), for funding. They thank Robert Matthews for advice on inferential issues, Bob Coleman for his help and encouragement during the inception of this undertaking, and Instem Scientific (previously BioWisdom; Harston, Cambridge, UK) for scientific consultancy and for data analysis on integrated data relating to adverse events in model animal species. The research described in this article is based on the analysis and conclusions of the authors: it has not been subjected to each agency's peer review and policy review; therefore, it does not necessarily reflect the views of the organisations, and no official endorsement should be inferred.

*Received 30.01.14; received in final form 15.05.14; accepted for publication 23.05.14.*

## References

1. Anon. (2004). *Directive 2004/27/EEC* of the European Parliament and the Council of 31 March 2004, amending *Directive 2001/83/EC* on the Community code relating to medicinal products for human use. *Official Journal of the European Union* **L136**, 30.04.2004, 34–57.
2. Anon. (1938). *Federal Food, Drug and Cosmetics Act*. Silver Spring, MD, USA: US Food and Drug Administration. Available at: http://www.fda.gov/RegulatoryInformation/Legislation/FederalFoodDrugandCosmeticActFDCAct/default.htm (Accessed 28.05.14).
3. Aithal, G.P. (2010). Mind the gap. *ATLA* **38**, Suppl. 1, 1–4.
4. Duyk, G. (2003). Attrition and translation. *Science, New York* **302**, 603–605.
5. Kola, I. & Landis, J. (2004). Can the pharmaceutical industry reduce attrition rates? *Nature Reviews Drug Discovery* **3**, 711–715.
6. Wehling, M. (2011). Drug development in the light of translational science: Shine or shade? *Drug Discovery Today* **16**, 1076–1083.
7. DiMasi, J.A. (2014). Pharmaceutical R&D performance by firm size: Approval success rates and economic returns. *American Journal of Therapeutics* **21**, 26–34.
8. UK Home Office (2013). *Statistics of Scientific Procedures on Living Animals — Great Britain 2012.* HC 549, 60pp. London, UK: The Stationery Office.
9. Greaves, P., Williams, A. & Eve, M. (2004). First dose of potential new medicines to humans: How animals help. *Nature Reviews Drug Discovery* **3**, 226–236.
10. Heywood, R. (1981). Target organ toxicity. *Toxicology Letters* **8**, 349–358.
11. Schein, P.S., Davis, R.D., Carter, S., Newman, J., Schein, D.R. & Rall, D.P. (1970). The evaluation of anticancer drugs in dogs and monkeys for the prediction of qualitative toxicities in man. *Clinical Pharmacology & Therapeutics* **11**, 3–40.
12. Olson, H., Betton, G., Robinson, D., Thomas, K., Monro, A., Kolaja, G., Lilly, P., Sanders, J., Sipes, G., Bracken, W., Dorato, M., Van Deun, K., Smith, P., Berger, B. & Heller, A. (2000). Concordance of the toxicity of pharmaceuticals in humans and in animals. *Regulatory Toxicology & Pharmacology* **32**, 56–67.
13. Altman, D.G. & Bland, J.M. (1994). Diagnostic tests 2: Predictive values. *BMJ* **309**, 102.
14. Bailey, J., Thew, M. & Balls, M. (2013). An analysis of the use of dogs in predicting human toxicology and drug safety. *ATLA* **41**, 335–350.
15. Anon. (2012). *Likelihood Ratios*. Oxford, UK: Centre for Evidence Based Medicine (CEBM). Available at: http://www.cebm.net/index.aspx?o=1043 (Accessed 28.05.13).
16. Greek, R. & Menache, A. (2013). Systematic reviews of animal models: Methodology *versus* epistemology. *International Journal of Medical Sciences* **10**, 206–221.
17. Grimes, D.A. & Schulz, K.F. (2005). Refining clinical diagnosis with likelihood ratios. *Lancet* **365**, 1500–1505.
18. Hasiwa, N., Bailey, J., Clausing, P., Daneshian, M., Eileraas, M., Farkas, S., Gyertyan, I., Hubrecht, R., Kobel, W., Krummenacher, G., Leist, M., Lohi, H., Miklosi, A., Ohl, F., Olejniczak, K., Schmitt, G., Sinnett-Smith, P., Smith, D., Wagner, K., Yager, J.D., Zurlo, J. & Hartung, T. (2011). Critical evaluation of the use of dogs in biomedical research and testing in Europe. *ALTEX* **28**, 326–340.
19. CAAT–Europe (2011). Critical evaluation of the use of dogs in biomedical research and testing in Europe. *Centre for Alternatives to Animal Testing–Europe Workshop, 21–23 June 2011.* Konstanz, Germany: *Centre for Alternatives to Animal Testing–Europe.*
20. CAAT (2011). Critical evaluation of the use of dogs in biomedical research and testing. *Centre for Alternatives to Animal Testing Workshop, 21–23 January 2011.* Baltimore, MA, USA: Johns Hopkins Bloomberg School of Public Health.
21. van Meer, P.J., Kooijman, M., Gispen-de Wied, C.C., Moors, E.H. & Schellekens, H. (2012). The ability of animal studies to detect serious post marketing adverse events is limited. *Regulatory Toxicology & Pharmacology* **64**, 345–349.
22. Igarashi, T., Nakane, S. & Kitagawa, T. (1995). Predictability of clinical adverse reactions of drugs by general pharmacology studies. *Journal of Toxicological Sciences* **20**, 77–92.
23. Broadhead, C.L., Jennings, M. & Combes, R. (1999). *A Critical Evaluation of the Use of Dogs in the Regulatory Toxicity Testing of Pharmaceuticals,* 106pp. Nottingham, UK: Fund for the Replacement of Animals in Medical Experiments (FRAME).
24. Litchfield, J.T.J. (1962). Symposium on clinical drug evaluation and human pharmacology. XVI. Evaluation of the safety of new drugs by means of tests in animals. *Clinical Pharmacology & Therapeutics* **3**, 665–672.
25. Bailey, J. (2008). Developmental toxicity testing: Protecting future generations? *ATLA* **36**, 718–721.
26. Schardein, J. (2000). *Chemically Induced Birth Defects,* 3rd edn, 1019pp. Boca Raton, FL, USA: CRC Press.
27. Spanhaak, S., Cook, D., Barnes, J. & Reynolds, J. (2008). *Species Concordance for Liver Injury,* 6pp. Cambridge, UK: Biowisdom Ltd. Available at: http://www.biowisdom.com/files/SIP_Board_Species_Concordance.pdf (Accessed 28.05.14).

28. Matthews, R.A. (2008). Medical progress depends on animal models — doesn't it? *Journal of the Royal Society of Medicine* **101**, 95–98.

29. Barnes, J.C., Matis, S., Kenna, G., Swinton, J., Bradley, P.M., Day, N.C., Reed, J.Z., Reynolds, J. & Cook, D. (2008). *The Safety Intelligence Program: An Intelligence Network for Drug-induced Liver Injury*, 2pp. Cambridge, UK: Biowisdom Ltd. Available at: http://bioblog.instem.com/downloads/Carboxylic_acids_A4.pdf (Accessed 28.05.14).

30. Sidaway, J.R.M., Roberts, S., Huby, R., Nicholson, A., Pemberton, J., South, M., Noeske, T., Engkvist, O., Bradley, P. & Reed, J. (2012). *Drug Toxicities Associated With Pharmacological Activity: Using Harmonised Data to Make the 'Known' Visible*, 2pp. Macclesfield, UK: Safety Assessment, AstraZeneca.

31. Fourches, D., Barnes, J.C., Day, N.C., Bradley, P., Reed, J.Z. & Tropsha, A. (2010). Cheminformatics analysis of assertions mined from literature that describe drug-induced liver injury in different species. *Chemical Research in Toxicology* **23**, 171–183.

32. Greco, I., Day, N., Riddoch-Contreras, J., Reed, J., Soininen, H., Kloszewska, I., Tsolaki, M., Vellas, B., Spenger, C., Mecocci, P., Wahlund, L.O., Simmons, A., Barnes, J. & Lovestone, S. (2012). Alzheimer's disease biomarker discovery using *in silico* literature mining and clinical validation. *Journal of Translational Medicine* **10**, 217.

33. Wandall, B., Hansson, S.O. & Rudén, C. (2007). Bias in toxicology. *Archives of Toxicology* **81**, 605–617.

34. Hackam, D.G. (2007). Translating animal research into clinical benefit. *BMJ* **334**, 163–164.

35. ter Riet, G., Korevaar, D.A., Leenaars, M., Sterk, P.J., Van Noorden, C.J., Bouter, L.M., Lutter, R., Elferink, R.P. & Hooft, L. (2012). Publication bias in laboratory animal research: A survey on magnitude, drivers, consequences and potential solutions. *PLoS One* **7**, e43404.

36. Briel, M., Muller, K.F., Meerpohl, J.J., von Elm, E., Lang, B., Motschall, E., Gloy, V., Lamontagne, F., Schwarzer, G. & Bassler, D. (2013). Publication bias in animal research: A systematic review protocol. *Systematic Reviews* **2**, 23.

37. van der Worp, H.B., Howells, D.W., Sena, E.S., Porritt, M.J., Rewell, S., O'Collins, V. & Macleod, M.R. (2010). Can animal models of disease reliably inform human studies? *PLoS Medicine* **7**, e1000245.

38. Sena, E.S., van der Worp, H.B., Bath, P.M., Howells, D.W. & Macleod, M.R. (2010). Publication bias in reports of animal stroke studies leads to major overstatement of efficacy. *PLoS Biology* **8**, e1000344.

39. Perel, P., Roberts, I., Sena, E., Wheble, P., Briscoe, C., Sandercock, P., Macleod, M., Mignini, L.E., Jayaram, P. & Khan, K.S. (2007). Comparison of treatment effects between animal experiments and clinical trials: Systematic review. *BMJ* **334**, 197.

40. Schott, G., Pachl, H., Limbach, U., Gundert-Remy, U., Ludwig, W.D. & Lieb, K. (2010). The financing of drug trials by pharmaceutical companies and its consequences. Part 1: A qualitative, systematic review of the literature on possible influences on the findings, protocols, and quality of drug trials. *Deutsches Arzteblatt International* **107**, 279–285.

41. Kilkenny, C., Parsons, N., Kadyszewski, E., Festing, M.F., Cuthill, I.C., Fry, D., Hutton, J. & Altman, D.G. (2009). Survey of the quality of exper-imental design, statistical analysis and reporting of research using animals. *PLoS One* **4**, e7824.

42. Anon. (2010). *Directive 2010/63/EU* of the European Parliament and of the Council of 22 September 2010 on the protection of animals used for scientific purposes. *Official Journal of the European Union* **L276**, 20.10.2010, 33–79.

43. US FDA (2004). *Innovation or Stagnation: Challenge and Opportunity on the Critical Path to New Medical Products*, 31pp. Silver Spring, MD, USA: US Department of Health and Human Services, Food and Drug Administration.

44. Issa, A.M., Phillips, K.A., Van Bebber, S., Nidamarthy, H.G., Lasser, K.E., Haas, J.S., Alldredge, B.K., Wachter, R.M. & Bates, D.W. (2007). Drug withdrawals in the United States: A systematic review of the evidence and analysis of trends. *Current Drug Safety* **2**, 177–185.

45. Bennani, Y.L. (2011). Drug discovery in the next decade: Innovation needed ASAP. *Drug Discovery Today* **16**, 779–792.

46. Eichler, H.G., Aronsson, B., Abadie, E. & Salmonson, T. (2010). New drug approval success rate in Europe in 2009. *Nature Reviews Drug Discovery* **9**, 355–356.

47. Hughes, B. (2008). 2007 FDA drug approvals: A year of flux. *Nature Reviews Drug Discovery* **7**, 107–109.

48. Hartung, T. (2009). Toxicology for the twenty-first century. *Nature, London* **460**, 208–212.

49. Harding, A. (2004). *More compounds failing phase I*. [*The Scientist*, 06.08.04]. Available at: www.the-scientist.com/?articles.view/articleNo/23003/title/More-compounds-failing-Phase-I/ (Accessed 28.05.14).

50. Okie, S. (2006). Access before approval — a right to take experimental drugs? *New England Journal of Medicine* **355**, 437–440.

51. Aurup, P. (2012). *Er Danmark et Attraktivt Land for Klinisk Forskning? (Is Denmark an Attractive Country for Clinical Research?)*, 23pp. Ballerup, Denmark: MSD Laboratories. Available at: http://di.dk/SiteCollectionDocuments/Opinion/Sundhed/Høring/Præsentation%20-%20Peter%20Aurup,%20Merck.pdf (Accessed 28.05.14).

52. Anon. (1990). *FDA Drug Review: Post Approval Risks 1976–1985*. GAO/PEMD-90-15, 132pp. Washington, DC, USA: US General Accounting Office.

53. Lazarou, J., Pomeranz, B.H. & Corey, P.N. (1998). Incidence of adverse drug reactions in hospitalized patients: A meta-analysis of prospective studies. *JAMA* **279**, 1200–1205.

54. Nishimuta, H., Nakagawa, T., Nomura, N. & Yabuki, M. (2013). Species differences in hepatic and intestinal metabolic activities for 43 human cytochrome P450 substrates between humans and rats or dogs. *Xenobiotica* **43**, 948–955.

55. Martinez, M.N., Antonovic, L., Court, M., Dacasto, M., Fink-Gremmels, J., Kukanich, B., Locuson, C., Mealey, K., Myers, M.J. & Trepanier, L. (2013). Challenges in exploring the cytochrome P450 system as a source of variation in canine drug pharmacokinetics. *Drug Metabolism Reviews* **45**, 218–230.

56. Zhou, S.F., Liu, J.P. & Chowbay, B. (2009). Polymorphism of human cytochrome P450 enzymes and its clinical impact. *Drug Metabolism Reviews* **41**, 89–295.

57. Guengerich, F.P. (1997). Comparisons of catalytic

selectivity of cytochrome P450 subfamily enzymes from different species. *Chemico-Biological Interactions* **106**, 161–182.

58. Nishimuta, H., Sato, K., Mizuki, Y., Yabuki, M. & Komuro, S. (2011). Species differences in intestinal metabolic activities of cytochrome P450 isoforms between cynomolgus monkeys and humans. *Drug Metabolism & Pharmacokinetics* **26**, 300–306.

59. Komura, H. & Iwaki, M. (2011). *In vitro* and *in vivo* small intestinal metabolism of CYP3A and UGT substrates in preclinical animals species and humans: Species differences. *Drug Metabolism Reviews* **43**, 476–498.

60. Shimada, T., Mimura, M., Inoue, K., Nakamura, S., Oda, H., Ohmori, S. & Yamazaki, H. (1997). Cytochrome P450-dependent drug oxidation activities in liver microsomes of various animal species including rats, guinea pigs, dogs, monkeys, and humans. *Archives of Toxicology* **71**, 401–408.

61. Turpeinen, M., Ghiciuc, C., Opritoui, M., Tursas, L., Pelkonen, O. & Pasanen, M. (2007). Predictive value of animal models for human cytochrome P450 (CYP)-mediated metabolism: A comparative study *in vitro*. *Xenobiotica* **37**, 1367–1377.

62. Antonovic, L. & Martinez, M. (2011). Role of the cytochrome P450 enzyme system in veterinary pharmacokinetics: Where are we now? Where are we going? *Future Medicinal Chemistry* **3**, 855–879.

63. Gad, S.C. (2006). *Animal Models in Toxicology*, 952pp. Boca Raton, FL, USA: CRC Press.

64. Lewis, D.F., Ioannides, C. & Parke, D.V. (1998). Cytochromes P450 and species differences in xenobiotic metabolism and activation of carcinogen. *Environmental Health Perspectives* **106**, 633–641.

65. Gonzalez, F.J. (2004). Cytochrome P450 humanised mice. *Human Genomics* **1**, 300–306.

66. Nelson, D.R., Zeldin, D.C., Hoffman, S.M., Maltais, L.J., Wain, H.M. & Nebert, D.W. (2004). Comparison of cytochrome P450 (CYP) genes from the mouse and human genomes, including nomenclature recommendations for genes, pseudogenes and alternative-splice variants. *Pharmacogenetics* **14**, 1–18.

67. Honkakoski, P. & Negishi, M. (1997). The structure, function, and regulation of cytochrome P450 2A enzymes. *Drug Metabolism Reviews* **29**, 977–996.

68. Hewitt, N.J., Lecluyse, E.L. & Ferguson, S.S. (2007). Induction of hepatic cytochrome P450 enzymes: Methods, mechanisms, recommendations, and *in vitro–in vivo* correlations. *Xenobiotica* **37**, 1196–1224.

69. Graham, M.J. & Lake, B.G. (2008). Induction of drug metabolism: Species differences and toxicological relevance. *Toxicology* **254**, 184–191.

70. Zhang, W., Roederer, M.W., Chen, W.Q., Fan, L. & Zhou, H.H. (2012). Pharmacogenetics of drugs withdrawn from the market. *Pharmacogenomics* **13**, 223–231.

71. Spielmann, H., Kral, V., Schafer-Korting, M., Seidle, T., McIvor, E., Rowan, A. & Schoeters, G. (2011). *The AXLR8 Consortium. Alternative Testing Strategies, Progress Report 2011*, 364pp. Berlin, Germany: Institute of Pharmacy, Free University of Berlin. Available at: http://scrtox.eu/~scrtox/images/stories/AXLR8-2011.pdf (Accessed 28.05.14).

72. Committee on Toxicity Testing and Assessment of Environmental Agents, National Research Council (2007). *Toxicity Testing in the 21st Century: A Vision and a Strategy,* 216pp. Washington, DC, USA: National Academies Press.

73. YouGov plc. (2009). *Public Opinion*. London, UK: European Coalition to End Animal Experiments. Available at: http://www.eceae.org/en (Accessed 28.05.14).

Exhibit 5

≡

Home

About

Join us

Our team

Privacy Policy

Terms and Conditions

Contact us

# NANONEWS
nano in the large world news

Nano World News

Nano Entertainment

Nano Business

Nano Sports

More

HEADLINES       ENTERTAINMENT NEWS   The New Ghostbusters Trailer Is Here      NANO WORLD NEWS   South Africa

Home » Nano Health & Medical News » Nothing to justify stopping clinical trials, says French health minister

# Nothing to justify stopping clinical trials, says French health minister



📅 Jan 25, 2016 by  Ronald Becker

**0**
SHARES          0          0          0          0

The Portuguese company said that the clinical trial had been running in a Phase 1 clinical trial unit in France since June 2015, with a BIAL experimental compound. The focus is finding whether the drug is safe and what the best dose may be for patients.

# Healthcare IT Solutions

## Find Healthcare-Specific Technology Solutions from IT Experts at CDW.

○     ○



The trials were stopped after six people became seriously ill.

The molecule was being developed to treat mood disorders and anxiety and movement disorders related to neurodegenerative diseases, and contrary to previous reports, the drug contains no cannabis, and is not a derivative of cannabis. It said another five will had medical exams closer to their homes, but didn't say whether the others were being monitored or tested.

He was among six male volunteers between 28 and 49 hospitalized last week after volunteering to take the drug.

French clinical research group Biotrial insists that it carried out the trial, which is now suspended, "in full compliance with worldwide regulations", but The National Agency of Drug Safety has now launched its own investigation into the incident.

Francois Peaucelle, the head of Biotrial, the company that conducted the trials for Bial, said it was not yet known what caused the tragedy.

Four of the five others who were injured were in stable condition with neurological disorders, the hospital said.

Since news of the fatality emerged, it has been revealed that the drug has been administered to around 90 test subjects, with approximately another 30 receiving a placebo, since the trial started in early January. French health authorities have said three of the hospitalized volunteers face possible brain damage.

The company has admitted that the man who has lost his life and five others hospitalized were part of its drug test. The company will work with health authorities to understand what caused this ill-fated situation during the trial, it said.

Rollover to find out how we can
help your clinical trial succeed

:inc
Research



**PharmExec**.com

▶ WHERE BUSINESS MEETS POLICY ◀

Enter your Keyword or Phrase   Search

○ This Site    ○ Include Affiliate Sites

Magazine   Topics   Events   Resources   Subscribe   Advertise   Contact Us

Europe   From the Editor   Global   New & Noteworthy   R&D   Sales & Marketing   Strategy

**SUBSCRIBE** 

- Most Read
- Current Issue
- Top Features
- New &
  Noteworthy
- Washington
  Report
- Webcasts



Print/Digital Products    Podcasts
LinkedIn    Webcasts
Twitter    RSS Feed

Share

# French Bial Trial Death: Regulators Release Timeline of Events

Feb 01, 2016   By Applied Clinical Trials Editorial Staff
Applied Clinical Trials

The French national drug safety agency (ANSM), released the timeline of events (downloadable in English) for the Phase I clinical trial of BIA 10-2474, and it confirms what had been speculated, that the eight healthy volunteers received the fifth of the highest dose escalation (50 mg) of the investigational drug at the same time. This goes against EMA recommendations released in 2007, to address failures of a 2006 Phase I trial conducted in the UK, that specifically stated that trials be designed with "sequence and interval between dosing of subjects within the same cohort," among other ways to help mitigate risk.

The Phase I trial contracted by Portuguese pharma company Bial to CRO Biotrial was conducted in Rennes, France. The ANSM document outlines that after the eight received their doses, one was hospitalized that evening. The remaining seven then received the sixth dose the next morning. The eighth man succumbed to a coma that day. Biotrial and Bial then discontinued the trial and notified ANSM, three days later. In the interim, five additional participants were hospitalized and now MRIs are indicating brain injuries to four of them.

On January 22, the FDA announced it would work with the EMA and ASNM to learn more about the safety issues around BIA 10-2474, a fatty acid amide hydrolase (FAAH) enzyme inhibitor. Additionally, the regulatory authority is in the process of collecting and reviewing safety information pertinent to FAAH inhibitors under investigation in the United States.

Read more on this trial from Medscape as well as a report  Clinical Trials from January 19.

Add new comment

Email, digital



Healthcare Businesswomen's Association
Woman of the Year event
May 12, 2016 | New York
Join us. Early registration rates until April 5

Jennifer Cook
head of region Europe
for Roche Pharmaceuticals

JOIN OTHERS
IN YOUR
PROFESSION
Subscribe Now

Pharmaceutical
Executive

jobs-ohio.com




ZS
New Report:
Get the latest data on pharma sales force
Learn what Ohio can do for business

DIA Knowledge Center

Therapeutic Innovation & Regulatory Science: An Increasingly Global Approach

What Lies Ahead 2016

Exhibit 6

French laboratory at fault in deadly clinical trial - Business Insider

# Business Insider

# Authorities are wrapping up their investigation of a deadly drug trial that left one dead and several others in hospital

 TANYA LEWIS
FEB. 5, 2016, 11:13 AM

The company in charge of the trial of an experimental drug that left one person dead and others possibly brain damaged has been found to be at fault, the French Health Ministry said.

A preliminary report found that the laboratory Biotrial failed to suspend the trial on Jan. 10 when one volunteer was hospitalized, and continued to inject other volunteers a day later. Four of those others were later hospitalized with brain disorders, Dow Jones Business News reports.

Biotrial will still be allowed to carry out drug trials, however, the health ministry said.

A total of 90 people were involved in the trial of the drug, which was designed to treat mood and movement disorders, French health minister Marisol Touraine said in a news conference, according to Reuters.


*Getty Images/Christopher Furlong*

One of the volunteers later died, the company reported on its website. Five others were hospitalized after taking the drug.

The six volunteers who became ill were all healthy men aged 28 to 49. They began taking the drug on Jan. 7, and by Jan. 10, the first volunteer was hospitalized with a headache and blurry vision. The following day, five more volunteers were given the same dosage of the drug. An hour later, the hospitalized patient's condition worsened, and by the end of the day, he had been declared brain dead, and the trial was suspended on Jan. 11. On Jan. 13, the other volunteers were hospitalized.

The cause of the death is still unknown, and a full report will not be published until late March, Dow Jones Business News reports. The other volunteers are now home and their health is improving, but it's too soon to

know if they will recover fully, the French health minister said.

According to BioWorld, the drug, known as Bial, was intended to act on the brain's cannabinoid receptors, which are involved in a variety of mental functions, including pain relief. A copy of documents sent to the French media by a prospective volunteer describes the drug as a "product in development for the treatment of different medical conditions from anxiety to Parkinson's disease, but also for the treatment of chronic pain of sclerosis, cancer, hypertension, or the treatment of obesity."

The trial participants were reportedly paid €1,900 ($2,080).

## Clinical trials

Clinical trials are typically conducted in three phases. Phase 1 trials focus primarily on the drug's safety and side effects, while Phases 2 and 3 are larger trials that focus on its efficacy, though safety is still important.

The trial was conducted by French-based company Biotrial, a licensed private institution that conducts trials of drug safety, tolerability, and pharmacology in healthy volunteers.

Such adverse events during a Phase I clinical trial are rare.

The European Union has very strict standards for performing clinical trials, Jayne Lawrence, chief scientist at the Royal Pharmaceutical Society, said in a statement. "Those in charge of the trial would have had to have shown they had done everything they could to protect patient safety before the trial was allowed to go ahead," she added.

Because Phase I trials are used to determine a drug's toxic effects, they "are inherently risky, as unexpected events can — and do — occur," Carl Heneghan, a professor of evidence-based medicine at the University of Oxford, said in a statement. "Phase 1 trials, therefore, pose significant practical and ethical issues."

The New York Times reported a similar event in March 2006, when six previously healthy young men in England were seriously sickened after being injected with an immune-system stimulant known as TGN1412 in a Phase 1 trial.

Exhibit 7



# Man who died in French drug trial had 'unprecedented' reaction, say experts

Experts investigating the French drug trial that left one man dead and five hospitalised have published a report laying blame on the substance tested

**AFP in Paris**

Monday 7 March 2016 18.10 EST

Experts investigating the death of a man in a drug trial in France have concluded that the compound being tested had caused an "astonishing and unprecedented" reaction in the brain.

Six people were hospitalised and one died in January after taking part in a Phase I trial for a new pain and mood disorder medication at the Biotrial research institute, in western France, on behalf of Portuguese pharmaceutical company Bial.

In a report published on Monday, a group of experts put together by the National Agency for Drug Safety said the problem clearly lay with the substance being tested – BIA 10-2474.

They underlined "the astonishing and unprecedented nature" of the accident, which caused a reaction in the brain "unlike anything seen before".

The team ruled out any manufacturing problem, and said there was no shared genetic weakness among the victims, who suffered similar damage to the same part of the brain.

However, it was noted that the drug test volunteers were relatively old (aged up to 49) and some presented various risk factors "vis-a-vis certain adverse drug reactions".

Pharma company Bial told AFP that "the results obtained in these pre-clinical didn't raise any issue regarding the toxicity/dangerousness of the molecule".

BIA 10-2474 is part of a family of FAAH-enzyme inhibitors that can have an impact on pain and anxiety by boosting the endocannabinoid system involved in appetite control, pain sensation, mood and memory.

"It is clearly the molecule that is the cause. The common element between the victims is indeed that molecule," said Dominique Martin, director general of the drug safety agency, following the publication of the report.

The experts wrote that "BIA 10-2474 was administered to the volunteers at a dose 10 times greater than that needed to completely inhibit the FAAH enzyme."

But they added that "the stimulation, even massive, of the endocannabinoid system … is not known to cause very serious toxic effects in itself."

A total of 108 volunteers took part in the study. Ninety received the drug at varying doses, and the rest were given a placebo. Those hospitalised had received the highest dose.

One question the experts want answered is why so much animal testing had preceded the human trials. They said it was surprising to see that rats, mice, dogs and monkeys were all used – raising the question whether the lab had suspicions about toxicity.

The pain relief effects observed in the animals, added the team, appeared "much too superficial" to warrant human testing. No ill-effects were noted in the animals, despite doses 400 times stronger than those given to the human volunteers.

But other laboratories had already abandoned efforts to develop this family of molecules "due to ineffectiveness", the experts said.

The hospitalised volunteers received cumulative doses of between 250 and 300 milligrammes. The report criticised the large daily dose of 50mg they were given – a major leap from the previous maximum of 20 mg per day.

It was not clear why three of the six victims had a more serious reaction, including the one death, while two experienced less severe problems and one none at all.

There was no evidence of drug or alcohol use among the group.

The experts will formally present their conclusions on 24 March.

Exhibit 8

# BIAL – Portela & Cª, S.A.

Avenida da Siderurgia Nacional
4745-457 Coronado (S. Romão e S. Mamede)
Portugal

EudraCT N°: 2015-001799-24

## Clinical Study Protocol N° BIA-102474-101

Biotrial Code: **1BIAL35**

> *A double-blind, randomised, placebo-controlled, combined single and multiple ascending dose study including food interaction, to investigate the safety, tolerability, pharmacokinetic and pharmacodynamic profile of BIA 10-2474, in healthy volunteers*

| | |
|---|---|
| Investigational Medicinal Product Code: | BIA 10-2474 |
| Development Phase: | I |

**Principal Investigator:**                    **Sponsor:**

Biotrial

7-9 rue Jean-Louis Bertrand, CS 34246
35042 Rennes Cedex
France

BIAL – Portela & Cª, S.A.
R&D Department

Avenida da Siderurgia Nacional
4745-457 Coronado (S. Romão e S.
Mamede)
Portugal

Version 1.2                    Date: 01 July 2015

This information may not be used, published or otherwise disclosed without prior written authorisation from the sponsor

## Protocol Approval Form

The protocol entitled "*A double-blind, randomised, placebo-controlled, combined single and multiple ascending dose study including food interaction, to investigate the safety, tolerability, pharmacokinetic and pharmacodynamic profile of BIA 10-2474, in healthy volunteers*", version 1.2 dated 01 July 2015 has been approved for submission to the French Ethics Committee and regulatory authorities (CPP and ANSM) by:

**Sponsor's Representatives:**

Head of Clinical Research                                              01.07.2015
                                                              Date

R&D Director                      PhD                  , MD,    02-07-2015
                                                              Date

**Biotrial Medical Director:**

                                                              03 July 2015
                                                              Date

## Principal/ Coordinating Investigators' Approval

I, the undersigned, have examined this protocol and agree to conduct this trial according to this protocol, to comply with its requirements, subject to ethical and safety considerations, as set out in this protocol, the Declaration of Helsinki 1964 (latest revision Fortaleza 2013) and all other laws and regulations on the use of investigational medicinal products.

Date:   03 JUL 2015

**Principal Investigator**

## 1.   SYNOPSIS

| | |
|---|---|
| **Name of Company:**<br>BIAL-Portela & Cª, S.A.<br>À Avenida da Siderurgia Nacional, 4745-457 Coronado (S. Romão e S. Mamede) PORTUGAL | |
| **Name of Finished Product:**<br>NA | |
| **Name of active ingredient:**<br>BIA 10-2474 | |
| **Title of Study:**<br>A double-blind, randomised, placebo-controlled, combined single and multiple ascending dose study including food interaction, to investigate the safety, tolerability, pharmacokinetic and pharmacodynamic profile of BIA 10-2474, in healthy volunteers | |
| **Principal Investigator:** | |
| **Study centre:**<br>Biotrial, 7-9 rue Jean-Louis Bertrand, CS 34246, 35042 Rennes Cedex, France | |
| **Publication (reference):**<br>NA | |
| **Clinical Phase:**<br>Phase I | |
| **Rationale:**<br>This is the first study of single and multiple doses of BIA 10-2474 in human subjects. The current study is designed to assess the safety and tolerability of single and repeated oral doses of BIA 10-2474 in healthy subjects. The study also includes pharmacokinetic (PK)/pharmacodynamic (PD) characterization, to allow an estimate of the efficacious dose range to be studied in further clinical trials. The study further includes a preliminary assessment of the potential interaction of BIA 10-2474 with food in healthy young subjects.<br>The tolerability, PK and PD data from this study will determine whether it is appropriate to continue development of BIA 10-2474. | |
| **Objectives:**<br>Primary:<br>• To assess the safety and tolerability of BIA 10-2474 after single and multiple oral doses<br>• To investigate the effect of food on the PK and PD of BIA 10-2474<br>Secondary:<br>• To characterize the PK profile of BIA 10-2474 (and its metabolites) after single and multiple oral doses<br>• To characterize its PD profile [mainly fatty acid amide hydrolase (FAAH) activity inhibition but also concentrations of N-arachidonoyl-ethanolamine (anandamide, AEA) and related fatty acid amides (FAAs) such as PEA (N-palmitoylethanolamide), OEA (N-oleoylethanolamide) and LEA (N-lineleoyl ethanolamide)]<br>• To assess several potential PD effects | |
| **Design:**<br>A double blind, randomised, placebo-controlled combined single ascending dose (SAD) and multiple ascending dose (MAD) study, including an additional food interaction (FI) part (which is an open label design), and a PD part. | |

**Design (continued):**

The SAD part consists of 8 groups of 8 healthy young male and female subjects, gender balanced to the extent possible, each receiving a single oral dose of BIA 10-2474 or placebo (6 verum and 2 placebo). In the first group, 2 subjects (1 verum and 1 placebo) are to be dosed 24 h before the remaining 6 subjects, and if the safety and tolerability results are acceptable, the remaining 6 subjects (5 verum and 1 placebo) will be dosed. If the maximum tolerated dose (MTD) is not reached after completing the planned sequential groups, additional groups can be included up to a maximum of 12 sequential groups in total.

The FI part consists of 12 healthy young male and female subjects, gender balanced to the extent possible, each receiving either a single or multiple dose of BIA 10-2474 in the fed or fasting state (to be decided after analysis of PK data available at this time) in an open-label, two-way crossover design. Treatment periods will be separated by at least 14 days (between the last administration of Period 1 and the first administration of Period 2).

The MAD part consists of 4 groups of 8 healthy young male and female subjects, gender balanced to the extent possible, each receiving an oral dose of BIA 10-2474 or placebo (6 verum and 2 placebo) once daily for 10 days. If the MTD is not reached after completing the planned sequential groups, additional groups can be included up to a maximum of 8 sequential groups in total.

The PD part consists of 1 group of 20 male subjects performing a double-blind, placebo-controlled, two-way cross-over design to assess PD effects of BIA 10-2474 on various PD models (pain, antitussive and anti-emetic), on intraocular pressure (IOP), on cognition and on mood. Treatment periods will be separated by at least 14 days (between the last administration of Period 1 and the first administration of Period 2). If necessary, the wash-out period can be extended according to the PK/PD data obtained in SAD/MAD parts.

**Number of subjects:**

One hundred and twenty-eight (128) healthy young subjects (64 in the SAD part, 12 in the FI part, 32 in the MAD part and 20 in the PD part). If the MTD is not reached after completing the planned SAD and MAD sequential groups, additional groups can be included in the SAD and MAD parts up to a maximum of 96 and 64 subjects, respectively.

**Number of study centres:**

1

**Duration of participation:**

Subjects will participate in the study for a maximum of 13 weeks.

**Study products, dose and mode of administration:**

| Name | Formulation | Doses | Mode of administration |
| --- | --- | --- | --- |
| BIA 10-2474 | Capsules, hard | 0.25, 2.5 and 10 mg | Oral |
| Placebo | Capsules, hard | NA | Oral |

SAD

Group S1:   A single dose of 0.25 mg BIA 10-2474 (n=6) or matching placebo (n=2) on D1
Group S2:   A single dose of 1.25 mg BIA 10-2474 (n=6) or matching placebo (n=2) on D1
Group S3:   A single dose of 2.5 mg BIA 10-2474 (n=6) or matching placebo (n=2) on D1
Group S4:   A single dose of 5 mg BIA 10-2474 (n=6) or matching placebo (n=2) on D1
Group S5:   A single dose of 10 mg BIA 10-2474 (n=6) or matching placebo (n=2) on D1
Group S6:   A single dose of 20 mg BIA 10-2474 (n=6) or matching placebo (n=2) on D1
Group S7:   A single dose of 40 mg BIA 10-2474 (n=6) or matching placebo (n=2) on D1
Group S8:   A single dose of 100 mg BIA 10-2474 (n=6) or matching placebo (n=2) on D1

Study Protocol BIA-102474-101          -CONFIDENTIAL-                                    Page 5
1BIAL35 / Version 1.2 / 01 July 2015

**Study products, dose and mode of administration (continued):**

SAD (continued)

Escalation to the next higher dose and any dose adjustments of the next dose levels will be based on safety and tolerability results of the previously administered dose and available PK data of previous dose groups. There will be a 5-fold increase from the first dose level (0.25 mg) to the second dose level. The dose levels of the following groups will be increased by approximately 2-fold from the previous dose level, until the dose exceeds 100 mg, which is the human equivalent dose (HED) corresponding to the no observable adverse effect level (NOAEL) in the rat. Thereafter, there will be a 50% increase up to the last dose (if applicable). PK data of Group S1 through H72 after (last) dosing will be reviewed before the start of Group S2. Further PK data through H72 after (last) dosing [except if available PK data allow the review through H24 or H48 after (last) dosing] will be available with a lag time of 1 dose (i.e., PK results of Group S2 will be reviewed before the start of Group S4, etc.). The available PK results may change the planned dose levels.

If the MTD is not reached after completing the planned sequential groups, additional groups can be included up to a maximum of 12 groups.

FI

Group FI: The dose design of the food interaction will be decided during the SAD part (and the MAD part if available). The BIA 10-2474 dose and the use of single or multiple dose(s) will be decided based on previous PK data (nevertheless the daily dose will not exceed 33 % of the MTD or the maximum dose given in the SAD part). BIA 10-2474 will be administered in one period under fasting conditions and after a high-fat breakfast in the other period.

MAD

Groups M1 to M4: Multiple doses of BIA 10-2474 or matching placebo once daily from D1 to D10. The dose levels of Groups M1 to M4 will be determined after evaluation of the safety, tolerability and available PK results of previous SAD and MAD (when applicable) dose groups. The MAD part may start during the SAD part, but only when enough PK and safety data are available.

If the MTD is not reached after completing the planned sequential groups, additional groups can be included up to a maximum of 8 groups.

PD

Group PD: Repeated dosing from D1 to at least D10 with placebo and a well-tolerated BIA 10-2474 dose, chosen after analysis of previous SAD/MAD cohorts. These will be administered in a randomized order according to a cross-over design. The duration of each repeated dose is to be decided according to previous SAD and MAD PK results.

Product batches used will be identified in the Clinical Study Report (CSR).

**Main eligibility criteria:**

**Inclusion:**

Subjects must satisfy all of the following inclusion criteria before being allowed to participate/continue in the study:

1. Male or female subjects (only male subjects for the PD part) aged 18 to 55 years, inclusive;
2. Body mass index (BMI) between 19 and 30 $kg/m^2$ inclusive;
3. Healthy as determined by pre-study medical history, physical examination, vital signs, complete neurological examination and 12-lead electrocardiogram (ECG);
4. Negative tests for Hepatitis B surface antigen (HBsAg), hepatitis C virus antibody (anti-HCV) and human immunodeficiency virus (HIV)-1 and HIV-2 antibody at screening;
5. Clinical laboratory test results clinically acceptable at screening and admission;
6. Negative screen for alcohol and drugs of abuse at screening and admission;
7. Non-smokers or ex-smokers (must have ceased smoking >3 months prior screening visit);

**Main eligibility criteria (continued):**
**Inclusion (continued):**
If female:
8.  Woman with no childbearing potential by reason of surgery or at least 1 year post-menopause (i.e., 12 months post last menstrual period), or menopause confirmed by follicle-stimulating hormone (FSH) testing;
9.  If of childbearing potential, using an effective nonhormonal method of contraception (intrauterine device or intrauterine system; condom or occlusive cap [diaphragm or cervical or vault caps] with spermicidal foam or gel or film or cream or suppository; true abstinence; or vasectomized male partner, provided that he is the sole partner of that subject) for all the duration of the study and up to one month after the last investigational medicinal product (IMP) administration;
10. Negative serum pregnancy test at screening and negative urine pregnancy test on admission of each treatment period (women of childbearing potential only);
If male:
11. Using an effective method of contraception (condom or occlusive cap [diaphragm or cervical or vault caps] with spermicidal foam or gel or film or cream or suppository; true abstinence; or vasectomy) throughout the study and up to one month after the last IMP administration.

For the PD part only:
12. Normal forced expiratory volume in one second (FEV1) at screening (80-120% predicted for the best FEV1 of 3 measures with a difference between the two best measures < or equal to 0.150 L);
13. Responsive (within acceptable ranges) to the cough provocation agent (capsaicin);
14. Normal basal intraocular pressure (IOP) (between 10-20 mmHg inclusive);
15. At screening, a cold pressor tolerance $\geq$15 seconds and $\leq$120 seconds on three measurements, after one training trial, with a deviation $\leq$20 seconds between the three measurements.

**Exclusion:**
If any of the following exclusion criteria apply, the subject must not enter/continue in the study:
1.  Subjects who have a clinically relevant history or presence of respiratory, gastrointestinal, renal, hepatic, haematological, lymphatic, neurological, cardiovascular, psychiatric, musculoskeletal, genitourinary, immunological, dermatological, endocrine, connective tissue diseases or disorders;
2.  Have a clinically relevant surgical history;
3.  Have a history of hyperemesis;
4.  Have a history of relevant atopy or drug hypersensitivity;
5.  Have a history of alcoholism or drug abuse;
6.  Consume more than 14 units of alcohol a week [1 glass (25 cl) of beer with 3° of alcohol = 7.5 g, or 1 glass (25 cl) of beer with 6° of alcohol = 15 g, or 1 glass (12.5 cl) of wine with 10° of alcohol = 12 g, or 1 glass (4cl) of aperitif with 42° of alcohol = 17 g];
7.  Have a significant infection or known inflammatory process on screening or admission;
8.  Have acute gastrointestinal symptoms (e.g., nausea, vomiting, diarrhea, heartburn) at the time of screening or admission;
9.  Have used medicines within 2 weeks of admission that may affect the safety or other study assessments, in the investigator's opinion;
10. Have used any investigational drug or participated in any clinical trial within 90 days prior to screening;
11. Have participated in more than 2 clinical trials within the 12 months prior to screening;
12. Have donated or received any blood or blood products within the 3 months prior to screening;
13. Are vegetarians, vegans or have medical dietary restrictions;
14. Cannot communicate reliably with the investigator;
15. Are unlikely to co-operate with the requirements of the study;
16. Are unwilling or unable to give written informed consent.

**Main eligibility criteria (continued):**
**Exclusion (continued):**
If female:
17. Pregnancy or breast-feeding;
18. Woman of childbearing potential not using an accepted effective contraceptive method or using oral contraceptives;
If male:
19. Not using an accepted effective method of contraception.

---

**Concomitant medications and study restrictions:**

The use of medicines that, in the investigator's opinion, may affect the safety or other study assessments is prohibited within 2 weeks of admission.

The use of any investigational drug is prohibited within 90 days prior to screening.

Tobacco use is prohibited.

Subjects will be requested to abstain from strenuous physical activity, consumption of grapefruit or grapefruit-containing products, alcohol and stimulating beverages containing xanthine derivatives (i.e., no coffee, tea, chocolate or cola like drinks) for 48 hours prior to admission and until the follow up visit.

---

**Procedures:**

Screening:

Subjects will be screened for eligibility between D-28 and D-3 (D-2 for PD part) before the first study drug administration. Written informed consent will be obtained before any study procedure is performed. The screening will consist of: medical history; physical examination (including height and body weight); vital signs (supine and standing systolic and diastolic blood pressure (BP), pulse rate and tympanic body temperature); complete neurological examination; 12-lead ECG; haematology, coagulation, plasma biochemistry and urinalysis tests; HIV-1 and HIV-2, HBsAg and HCV serology; drugs of abuse and alcohol screen; and review of the eligibility criteria. Post-menopausal female subjects will be tested for FSH levels (if less than 12 months post last menstrual period) and female subjects of childbearing potential will be tested for pregnancy (serum test). For the subjects screened for the PD part, spirometry will be carried out to assess $FEV1$ and the basal IOP will be measured by an ophthalmologist using a contact tonometer. A cold pressor test and a cough challenge will also be performed in order to verify that the subjects are responsive (in predefined ranges) to pain and the cough provocation agent, respectively.

The results of screening must be known to the investigator prior to the subject's admission.

Admission:

Subjects will be admitted to the clinical unit one or two days prior to dosing (D-2 in the SAD, FI and MAD parts, D-1 in the PD part ) to undergo medical history update; physical examination update; vital signs [supine and standing systolic BP (SBP) and diastolic BP (DBP), pulse rate (supine and standing SBP, DBP and pulse rate in triplicate on D-1) and tympanic body temperature]; 12-lead ECG (in triplicate on D-1); haematology, coagulation, plasma biochemistry (note that clinical laboratory assessments will be done on D-1 for all study parts), and urinalysis tests; drugs of abuse and alcohol screen; and verification of the eligibility criteria (at each study period if applicable). Female subjects of childbearing potential will be tested for pregnancy (urine test).

In the PD Part, psychometric tests and scales will be performed at $t_{max}$ (if possible) on D-1. In SAD part and in PD part, familiarisation/training sessions will be done on D-1 for all psychometric tests and scales.

Study Protocol BIA-102474-101          -CONFIDENTIAL-                              Page 8
1BIAL35 / Version 1.2 / 01 July 2015

**Procedures (continued):**

Hospitalisation period:

- *SAD:* One (1) period in clinic from 36 h before drug administration to 72 h after drug administration on D1.

- *FI:* Two (2) periods in clinic (for each period from 36 h before drug administration to 72 h after drug administration) with a wash-out of at least 14 days (between the last administration of Period 1 and the first administration of Period 2).

- *MAD:* One (1) period in clinic from 36 h before the first drug administration to 72 h after the last drug administration on D10.

- *PD:* 2 periods in clinic from 24 h before the first drug administration to 48 h after the last drug administration (at least D10), with a wash-out of at least 14 days (between the last administration of Period 1 and the first administration of Period 2).

Follow-up:

A follow-up (FU) visit will occur between 14 and 21 days after discharge or early discontinuation for: medical history and physical examination updates; vital signs (supine and standing systolic and diastolic blood pressure, pulse rate and tympanic body temperature); 12-lead ECG; haematology, coagulation, plasma biochemistry and urinalysis tests. Female subjects of childbearing potential will be tested for pregnancy (serum test).

**Criteria for evaluation:**

Safety Assessments while on treatment:

- *SAD:* Adverse events (AEs): throughout the study; physical examination: throughout the study on medical indication at the discretion of the Medical Investigator; Supine and standing vital signs: on D-1 (in triplicate), on D1 at pre-dose and 1, 2, 3, 4, 6, 8, 10, 12, 24, 48 and 72 h post-dose; tympanic body temperature: at D4/discharge; ECG on D-1 (in triplicate), on D1 at pre-dose, 1, 2, 3, 4, 6, 8, 10, 12, 24, 48 and 72 h post-dose; clinical laboratory evaluation: at discharge; telemetry: from pre-dose to 24 h post-dose.

- *FI:* AEs: throughout the study; physical examination: throughout the study on medical indication at the discretion of the Medical Investigator; Supine and standing vital signs: on D-1 (in triplicate), on D1 at pre-dose, 1, 2, 3, 4, 8, 12, 24, 48 and 72 h post-single or last dose; tympanic body temperature: at D4/discharge; ECG on D-1 (in triplicate), on D1 at pre-dose and 1, 2, 3, 4, 24 and 72 h post-single or last dose; clinical laboratory evaluation: at discharge.

- *MAD:* AEs: throughout the study; physical examination: throughout the study on medical indication at the discretion of the Medical Investigator; Supine and standing vital signs: on D-1 (in triplicate), on D1 at pre-dose and 1, 2, 3, 4, 6, 8, 10, 12 and 24 h post-dose; on D10 at pre-dose and 1, 2, 3, 4, 6, 8, 10, 12, 24, 48 and 72 h post-dose; tympanic body temperature: on D13/discharge; ECG on D-1 (in triplicate), on D1 at pre-dose and 1, 2, 3, 4, 6, 8, 10, 12 and 24 h post-dose and on D10 at pre-dose, 1, 2, 3, 4, 6, 8, 10, 12, 24, 48 and 72 h post-dose; clinical laboratory evaluation: on D5 and at discharge; telemetry: from pre-dose to 24 h post-dose on D1 and D10.

- *PD:* AEs: throughout the study; physical examination: throughout the study on medical indication at the discretion of the Medical Investigator; Supine and standing vital signs: On D-1 (in triplicate), on D1 at pre-dose and 1, 2, 3, 4, 6, 8, 10, 12 and 24 h post dose; on D9 at pre-dose and 1, 2, 3, 4, 6, 8, 10, 12, 24, 48 and 72 h post-dose; tympanic body temperature: on D12/discharge. ECG on D-1 (in triplicate), on D1 at pre-dose and 1, 2, 3, 4, 6, 8, 10, 12 and 24 h post dose and on D9 at pre-dose, 1, 2, 3, 4, 6, 8, 10, 12, 24, 48 and 72 h post-dose; clinical laboratory evaluation: at discharge.

**Criteria for evaluation (continued):**

Pharmacokinetic Assessments in blood

- _SAD_: Blood sampling for PK of BIA 10-2474 and metabolites: pre-dose and 0.5, 1, 2, 3, 4, 6, 8, 12, 24, 48 and 72 h post-dose.

Maximum observed plasma concentration ($C_{max}$), time of occurrence of $C_{max}$ ($t_{max}$), apparent terminal elimination rate constant ($\lambda_z$), terminal half-life ($t_{1/2}$), area under the plasma concentration-time curve from hour 0 to last sample with measurable plasma concentrations ($AUC_{last}$), area under plasma concentration-time curve from hour 0 to infinity ($AUC_{inf}$), apparent volume of distribution ($V_z/F$), total body clearance (CL/F), time to last measurable plasma concentration ($t_{last}$), last measurable plasma concentration ($C_{last}$); additional parameters could be calculated if deemed necessary.

- _FI_: Blood sampling for PK of BIA 10-2474 [and/or metabolites, depending on the previous SAD PK data and decided in accordance with bioavailability/bioequivalence (BABE) guidelines]: pre-dose and 0.5, 1, 2, 3, 4, 6, 8, 12, 24, 48 and 72 h post-single or last dose.

$C_{max}$, $t_{max}$, $\lambda_z$, $t_{1/2}$, $AUC_{last}$, $AUC_{inf}$, $V_z/F$, CL/F, $t_{last}$, $C_{last}$; additional parameters could be calculated if deemed necessary.

- _MAD_: Blood sampling for PK of BIA 10-2474 and metabolites: pre-dose, 0.5, 1, 2, 3, 4, 6, 8, 12 and 24 h post-dose on D1; pre-dose, 0.5, 1, 2, 3, 4, 6, 8, 12, 24, 48, 60 and 72 h post-dose on D10; pre-dose on D4, D6 and D8.

D1: $C_{max}$, $C_{last}$, $t_{max}$, $t_{last}$, $AUC_{last}$, area under the plasma concentration-time curve over one dosing interval ($AUC_{0-\tau}$);

D10: $C_{max}$, $C_{last}$, $t_{max}$, $t_{last}$, $AUC_{0-\tau}$, $\lambda_z$, $t_{1/2}$, $V_z/F$, CL/F, $AUC_{inf}$, $AUC_{last}$, minimum observed plasma concentration ($C_{min}$), average plasma concentration at steady state ($C_{average}$), accumulation ratio of $C_{max}$ ($R_{acc}C_{max}$), accumulation ratio of $AUC_{0-\tau}$ ($R_{acc}$ $AUC_{0-\tau}$), concentration at the end of a dosing interval before the next dose administration ($C_{trough}$), peak-trough fluctuation (PTF%); additional parameters could be calculated if deemed necessary.

Pharmacokinetic Assessments in Urine

- _SAD_: Urine sampling for PK of BIA 10-2474 and metabolites: pre-dose and 0-4, 4-8, 8-12, 12-24, 24-36, 36-48, 48-60 and 60-72 h post-dose intervals.

Total amount excreted in urine (Ae), percent of drug recovered in urine (Ae %dose) and renal clearance ($CL_r$); additional parameters could be calculated if deemed necessary.

- _MAD_: Urine sampling for PK of BIA 10-2474 and metabolites: pre-dose and 0-4, 4-8, 8-12 and 12-24 h post-dose intervals on D1; pre-dose and 0-4, 4-8, 8-12, 12-24, 24-36, 36-48, 48-60 and 60-72 h post-dose intervals on D10.

Ae, Ae %dose and $CL_r$; additional parameters could be calculated if deemed necessary.

Pharmacodynamic Assessments

- _SAD:_ Blood sampling for FAAH activity: 24, 23.5, 23, 22, 21, 20, 18, 16, 12 h before dosing on D1 (corresponding to the time points on D1) and pre-dose, 0.5, 1, 2, 3, 4, 6, 8, 12, 24, 48 and 72 h post-dose.

Blood sampling for analysis of AEA and related FAAs: pre-dose and 0.5, 1, 2, 3, 4, 6, 8, 12, 24, 48 and 72 h post-dose.

- _FI_: Blood sampling for FAAH activity: 24, 23.5, 23, 22, 21, 20, 18, 16 and 12 h before dosing on D1 (corresponding to the time points on D1); pre-dose, 0.5, 1, 2, 3, 4, 6, 8, 12, 24, 48 and 72 h post-single or last dose.

Pharmacodynamic Assessments (continued)

- *MAD:* Blood sampling for FAAH activity: 24, 23.5, 23, 22, 21, 20, 18, 16 and 12 h before dosing on D1 (corresponding to the time points on D1); pre-dose, 0.5, 1, 2, 3, 4, 6, 8, 12 and 24 h post-dose on D1; pre-dose, 0.5, 1, 2, 3, 4, 6, 8, 12, 24, 48 and 72h post-dose on D10; pre-dose on D4, D6 and D8.

Blood sampling for analysis of AEA and related FAAs: pre-dose, 0.5, 1, 2, 3, 4, 6, 8, 12 and 24 h post-dose on D1; pre-dose, 0.5, 1, 2, 3, 4, 6, 8, 12, 24, 48, 60 and 72 h post-dose on D10; pre-dose on D4, D6 and D8.

- *SAD, MAD and FI parts:* Maximum observed effect on FAAH activity ($E_{max}$), time to occurrence of $E_{max}$ ($t_{Emax}$), area under the effect-time curve (AUEC).

Anandamide (AEA) and related FAAs like PEA (N-palmitoylethanolamide), OEA (N-oleoylethanolamide) and LEA (N-lineleoyl ethanolamide) will also be analysed.

- *Psychometric tests and scales*
- *SAD:* Marijuana scale score assessed on D-1 (familiarisation); pre-dose and 3 h post-dose on D1.

- *PD:* Number of correct answers in Choice Reaction Time (CRT) and Digit Vigilance (DV), number of correctly detected targets in Rapid Information Processing Test (RVIP), mean response time in CRT, DV and RVIP, number of missed targets and number of false answers for DV and RVIP, number of words correctly recalled in immediate recall 1, mean number of words correctly recalled in all immediate recalls and number of words recalled in delayed recall in Learning Memory Test (LMT), sleepiness score for Stanford Sleepiness Scale (SSS) and tension-anxiety, depression-dejection, anger-hostility, vigour-activity, fatigue-inertia and confusion-bewilderment scores in Profile of Mood States (POMS). These tests will be performed on D-1 (familiarisation); at $t_{max}$ on D1, D5 and D9 (POMS, DV, CRT, RVIP and SSS) and at $t_{max}$ (if possible) on D-1 and D9 (LMT).

- *Cold pressor test*
- *PD:* Time endured with hand submerged in cold water (cold pressor tolerance-$CP_{tol}$), maximum value observed (Pain $VAS_{max}$), total of values observed until the withdrawal from the bath (Pain $VAS_{total}$), analogue scale with replacement of missing values between time of withdrawal and 120 seconds by the maximum value (100) (Pain $AUC_{0-120s}$). This test will be performed at screening and at $t_{max}$ on D6.
- *Cough challenge*
- *PD:* C2, C5, number of coughs during the first 15s after administration for each capsaicin concentration, number of coughs from 15s after to 1 minute after administration for each capsaicin concentration.This test will be performed at screening and at $t_{max}$ on D7.

- *IOP measurement*
- *PD:* IOP in mmHg. This test will be performed at screening and at $t_{max}$ on D8.

- *Apomorphine challenge*

*PD:* Maximum degree of nausea ($NS_{max}$), time of the maximum degree of nausea ($NS\ t_{max}$), area under the degree of nausea versus time curve ($NS\ AUC_{0-90min}$). This test will be performed at $t_{max}$ on D10.

**Statistical methods:**

Data entry and statistical analysis of clinical parameters will be performed under the responsibility of Biotrial.

The statistical package SAS® (SAS Institute Inc. Cary NC USA) will be used in statistical analysis.

Safety parameters:
All laboratory results, vital signs measurements, and safety ECG results will be summarised using appropriate descriptive statistics. The incidence of all AEs and treatment-emergent AEs will be described by MedDRA® preferred term and system organ class.

**Statistical methods (continued):**

PK parameters:
Single and multiple-dose PK parameters will be derived from the plasma concentration time and urinary excretion data.

A compartmental or non-compartmental PK method, as appropriate, will be used to analyse the plasma and urine concentrations of BIA 10-2474 and its metabolites.

Descriptive statistics and graphs will be performed for plasma and urine concentrations and PK parameters.

For the SAD and MAD parts, the dose-proportionality of PK plasma parameters $C_{max}$ and AUC will be evaluated using the Power model.

For the MAD part, the steady-state of plasma concentration will be also studied using a one-way analysis of variance (ANOVA) on factor Day after logarithmic transformation of plasma concentrations.

For the FI part, an analysis of variance model appropriate for a 2-period, cross-over design with fixed terms for sequence, period, and treatment and a random term for subject within sequence will be used to investigate the food interaction. Following log-transformation of the data, the 90% confidence intervals (90%CI) for the geometric mean ratio (GMR) between the food conditions will be calculated. Moreover, $t_{max}$ will be compared between the food conditions using a Wilcoxon signed ranks test.

PD parameters:
All parameters will be summarised using appropriate descriptive statistics. The differences between treatment group and placebo group will be investigated using appropriate statistical tests.

Study Protocol BIA-102474-101          -CONFIDENTIAL-                    Page 12
1BIAL35 / Version 1.2 / 01 July 2015

## Flow chart 1: SAD part

| PROCEDURES | Screening (D-28 to D-3) | Admission (D-2 evening) | D-1 | Day 1 | Day 2 | Day 3 | Day 4/Discharge | Follow-up (between D18 & D25) |
|---|---|---|---|---|---|---|---|---|
| Written informed consent | X | | | | | | | |
| Medical history | X | | | | | | | |
| Medical history update | | X | | | | | | X |
| Physical examination[1] | X | | | | | | | |
| Physical exam update | | X | | | | | | X |
| Vital signs[2] | X | X | X | X | X | X | X | X |
| Complete neurological examination | X | | | | | | | |
| 12-lead ECG[3] | X | X | X | X | X | X | X | X |
| Viral serology | X | | | | | | | |
| Alcohol and drugs of abuse screen | X | X | | | | | | |
| Haematology | X | | X | | | | X | X |
| Coagulation | X | | X | | | | X | X |
| Plasma biochemistry | X | | X | | | | X | X |
| Urinalysis | X | X | | | | | X | X |
| Serum pregnancy test[4] | X | | | | | | | X |
| Hormone Panel (FSH testing)[5] | X | | | | | | | |
| Urine pregnancy test[4] | | X | | | | | | |
| Eligibility criteria review | X | X | | X[6] | | | | |
| Randomisation | | | | X | | | | |
| Pharmacokinetic sampling: blood[7] | | | | X | X | X | X | |
| Pharmacokinetic sampling: urine[8] | | | | X | X | X | X | |
| Pharmacodynamic sampling: blood[9] | | | X | X | X | X | X | |
| Marijuana scale score[10] | | | X | X | | | | |
| Telemetry[11] | | | | X | X | | | |
| Study drug administration | | | | X | | | | |
| Adverse events monitoring | ← | | | | | | → | |

[1] Physical examination at screening; from D-2 to D4 on medical indication at the discretion of the Medical Investigator.

[2] Blood pressure, pulse rate, body temperature. *Supine and standing vital signs*: at screening, D-2 (admission), D-1 (in triplicate), and follow-up; on D1 at pre-dose and 1, 2, 3, 4, 6, 8, 10, 12, 24, 48 and 72 h post-dose; *Body temperature* will be measured at screening, D-2, D4 (discharge) and follow-up visit only.

[3] ECG at screening, D-2, D-1 (in triplicate), and at follow-up; on D1 at pre-dose and 1, 2, 3, 4, 6, 8, 10, 12, 24, 48 and 72 h post-dose.

[4] Female subjects of childbearing potential only.

[5] Post-menopausal female subjects only if less than12 months post last menstrual period.

[6] Before randomization.

[7] Blood sampling for PK of BIA 10-2474 and metabolites: pre-dose and 0.5, 1, 2, 3, 4, 6, 8, 12, 24, 48 and 72 h post-dose. Blood sampling for analysis of AEA and related FAAs: pre-dose and 0.5, 1, 2, 3, 4, 6, 8, 12, 24, 48 and 72 h post-dose.

[8] Urine sampling for PK of BIA 10-2474 and metabolites: pre-dose and 0-4, 4-8, 8-12, 12-24, 24-36, 36-48, 48-60 and 60-72 h post-dose intervals.

[9] Blood sampling for FAAH activity: 24, 23.5, 23, 22, 21, 20, 18, 16, 12 h before dosing on D1 (same time points as on D1) and pre-dose, 0.5, 1, 2, 3, 4, 6, 8, 12, 24, 48 and 72 h post-dose

[10] Psychometric scale: M Scale (marijuana) at D-1 (familiarization), at predose and at 3 h post-dose.

[11] Telemetry: from pre-dose to 24 h post-dose.

## Flow chart 2: FI part

| PROCEDURES | Screening (D-28 to D-3) | Admission (D-2 evening) | D-1 | Day 1 | Day 2 | Day 3 | Day 4/Discharge | Follow-up (between D18 & D25) |
|---|---|---|---|---|---|---|---|---|
| | | Assessment Period 1 and Period 2 (wash-out: 14 days) | | | | | | |
| Written informed consent | X | | | | | | | |
| Medical history | X | | | | | | | |
| Medical history update | | X | | | | | | X |
| Physical examination[1] | X | | | | | | | |
| Physical exam update | | | | | | | | X |
| Vital signs[2] | X | X | X | X | X | | X | X |
| Complete neurological examination | X | | | | | | | |
| 12-lead ECG[3] | X | X | X | X | X | | X | X |
| Viral serology | X | | | | | | | |
| Alcohol and drugs of abuse screen | X | X | | | | | | |
| Haematology | X | | X | | | | X | X |
| Coagulation | X | | X | | | | X | X |
| Plasma biochemistry | X | | X | | | | X | X |
| Urinalysis | X | X | | | | | X | X |
| Serum pregnancy test[4] | X | | | | | | | X |
| Hormone Panel (FSH testing)[5] | X | | | | | | | |
| Urine pregnancy test[4] | | X | | | | | | |
| Eligibility criteria review | X | X | | X[6] | | | | |
| Randomisation | | | | X | | | | |
| Pharmacokinetic sampling: blood[7] | | | | X | X | X | X | |
| Pharmacodynamic sampling: blood[8] | | | X | X | X | X | X | |
| Study drug administration[9] | | | | X | | | | |
| Adverse events monitoring | ←———————————————————————————→ | | | | | | | |

[1] Physical examination at screening; from D-2 to D4 on medical indication at the discretion of the Medical Investigator.

[2] Blood pressure, pulse rate, body temperature. *Supine and standing vital signs*: at screening, D-2 (admission), D-1 (in triplicate), and follow-up; on D1 at pre-dose and 1, 2, 3, 4, 8, 12, 24, 48 and 72 h post-single or last dose; *Body temperature* will be measured at screening, D-2, D4 and follow-up visit only.

[3] ECG at screening, D-2, D-1 (in triplicate), and follow-up; on D1 at pre-dose and 1, 2, 3, 4, 24 and 72 h post-single or last dose.

[4] Female subjects of childbearing potential only.

[5] Post-menopausal female subjects only if less than 12 months post last menstrual period.

[6] Before randomization.

[7] Blood sampling for PK of BIA 10-2474 and metabolites: pre-dose and 0.5, 1, 2, 3, 4, 6, 8, 12, 24, 48 and 72 h post-single or last dose.

[8] Blood sampling for FAAH activity: 24, 23.5, 23, 22, 21, 20, 18, 16 and 12 h before dosing on D1 (same time points as on D1); pre-dose, 0.5, 1, 2, 3, 4, 6, 8, 12, 24, 48 and 72 h post-single or last dose.

[9] Study drug will be administered after an overnight fast in one period and after consumption of a high fat breakfast in the other period.

## Flow chart 3: MAD part

| PROCEDURES | Screening (D-28 to D-3) | Admission (Day -2 evening) | D-1 | Day 1 | Day 2 | Day 3 | Day 4 | Day 5 | Day 6 | Day 7 | Day 8 | Day 9 | Day 10 | Day 11 | Day 12 | Day 13 /Discharge | Follow up (between D27 & D34) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Written informed consent | X | | | | | | | | | | | | | | | | |
| Medical history | X | | | | | | | | | | | | | | | | |
| Medical history update | | X | | | | | | | | | | | | | | | X |
| Physical examination[1] | X | | | | | | | | | | | | | | | | |
| Physical exam update | | X | | | | | | | | | | | | | | | X |
| Vital signs[2] | X | X | X | X | X | | | | | | | | X | X | X | X | X |
| Complete neurological examination | X | | | | | | | | | | | | | | | | |
| 12-lead ECG[3] | X | X | X | X | X | | | | | | | | X | X | X | X | X |
| Viral serology | X | | | | | | | | | | | | | | | | |
| Alcohol and drugs of abuse screen | X | X | | | | | | | | | | | | | | | |
| Haematology | X | | X | | | | | X[4] | | | | | | | | X | X |
| Coagulation | X | | X | | | | | X[4] | | | | | | | | X | X |
| Plasma biochemistry | X | | X | | | | | X[4] | | | | | | | | X | X |
| Urinalysis | X | X | | | | | | X[4] | | | | | | | | X | X |
| Serum pregnancy test[5] | X | | | | | | | | | | | | | | | | X |
| Hormone Panel (FSH testing)[6] | X | | | | | | | | | | | | | | | | |
| Urine pregnancy test[5] | | X | | | | | | | | | | | | | | | |
| Eligibility criteria review | X | X | X[7] | | | | | | | | | | | | | | |
| Randomisation | | | X | | | | | | | | | | | | | | |
| Pharmacokinetic sampling: blood[8] | | | | X | X | | X | | X | | X | | X | X | X | X | |
| Pharmacokinetic sampling: urine[9] | | | | X | X | | | | | | | | X | X | X | X | |
| Pharmacodynamic sampling: blood[10] | | | X | X | X | | X | | X | | X | | X | X | X | X | |
| Telemetry[11] | | | | X | X | | | | | | | | X | X | | | |
| Study drug administration | | | | X | X | X | X | X | X | X | X | X | X | | | | |
| AE monitoring | ← | | | | | | | | | | | | | | | | → |

[1] Physical examination at screening; from D-2 (admission), to D13 (discharge) on medical indication at the discretion of the Medical Investigator.

[2] Blood pressure, pulse rate, body temperature. *Supine and standing vital signs*: at screening, D-2 (admission), D-1 (in triplicate), and follow-up; on D1 at pre-dose and 1, 2, 3, 4, 6, 8, 10, 12 and 24 h post-dose; on D10 at pre-dose and 1, 2, 3, 4, 6, 8, 10, 12, 24, 48 and 72 h post-dose; *Body temperature* will be measured at screening, D-2, D13 and follow-up visit only.

[3] ECG at screening, D-2, D-1 (in triplicate), and follow-up; on D1 at pre-dose and 1, 2, 3, 4, 6, 8, 10, 12 and 24 h post-dose and on D10 at pre-dose, 1, 2, 3, 4, 6, 8, 10, 12, 24, 48 and 72 h post-dose.

[4] Clinical laboratory: on D5 it will be performed at pre-dose.

[5] Female subjects of childbearing potential only.

[6] Post-menopausal female subjects only if less than 12 months post last menstrual period.

[7] Before randomisation.

[8] Blood sampling for PK of BIA 10-2474 and metabolites: pre-dose, 0.5, 1, 2, 3, 4, 6, 8, 12 and 24 h post-dose on D1; pre-dose, 0.5, 1, 2, 3, 4, 6, 8, 12, 24, 48, 60 and 72 h post-dose on D10; pre-dose on D4, D6 and D8.
Blood sampling for analysis of AEA and related FAAs: pre-dose and 0.5, 1, 2, 3, 4, 6, 8, 12, 24, 48 and 72 h post-dose.

[9] Urine sampling for PK of BIA 10-2474 and metabolites: pre-dose, 0-4, 4-8, 8-12 and 12-24 h post-dose intervals on D1; pre-dose, 0-4, 4-8, 8-12, 12-24, 24-36, 36-48, 48-60 and 60-72 h post-dose intervals on D10.

[10] Blood sampling for FAAH activity: 24, 23.5, 23, 22, 21, 20, 18, 16 and 12 h before dosing on D1 (same time points as on D1); pre-dose, 0.5, 1, 2, 3, 4, 6, 8, 12 and 24 h post-dose on D1; pre-dose, 0.5, 1, 2, 3, 4, 6, 8, 12, 24, 48 and 72 h post-dose on D10; pre-dose on D4, D6 and D8.

[11] Telemetry: from pre-dose to 24 h post-dose on D1 and D10.

## Flow chart 4: PD part

| PROCEDURES | Screening (D-28 to D-2) | Admission (Day -1) | Day 1 | Day 2 | Day 3 | Day 4 | Day 5 | Day 6 | Day 7 | Day 8 | Day 9 | Day 10 | Day 11 | Day 12 Discharge | Follow-up (between D26 & D33) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Assessment Period 1 and Period 2 (wash–out: 14 days) | | | | | | | | | | | | |
| Written informed consent | X | | | | | | | | | | | | | | |
| Medical history | X | | | | | | | | | | | | | | |
| Medical history update | | X | | | | | | | | | | | | | X |
| Physical examination[1] | X | | | | | | | | | | | | | X | |
| Physical exam update | | X | | | | | | | | | | | | | X |
| Vital signs[2] | X | X | X | X | | | | | | | X | X | X | X | X |
| Complete neurological examination | X | | | | | | | | | | | | | | |
| 12-lead ECG[3] | X | X | X | X | | | | | | | X | X | X | X | X |
| Viral serology | X | | | | | | | | | | | | | | |
| Alcohol and drugs of abuse screen | X | X | | | | | | | | | | | | | |
| Haematology | X | X | | | | | | | | | | | | X | X |
| Coagulation | X | X | | | | | | | | | | | | X | X |
| Plasma biochemistry | X | X | | | | | | | | | | | | X | X |
| Urinalysis | X | X | | | | | | | | | | | | X | X |
| Spirometry | X | | | | | | | | | | | | | | |
| Eligibility criteria review | X | X | X[4] | | | | | | | | | | | | |
| Cold pressor test | X | | | | | | X | | | | | | | | |
| Cough challenge | X | | | | | | | | X | | | | | | |
| IOP measurement | X | | | | | | | | | | | X | | | |
| Randomisation | | X | | | | | | | | | | | | | |
| Psychometric tests[5] | | X | X | | | | X | | | | X | | | | |
| Apomorphine challenge | | | | | | | | | | | | | X | | |
| Study drug administration | | | X | X | X | X | X | X | X | X | X | X | | | |
| Adverse events monitoring | | | ←——————————————————————————————→ | | | | | | | | | | | | |

[1] Physical examination at screening and follow-up; from D-1 (admission), to D12 (discharge) on medical indication at the discretion of the Medical Investigator.

[2] Blood pressure, pulse rate, body temperature. *Supine and standing vital signs*: at screening, D-1 (admission) (in triplicate) and follow-up; on D1 at pre-dose and 1, 2, 3, 4, 6, 8, 10, 12 and 24 h post-dose; on D9 at pre-dose and 1, 2, 3, 4, 6, 8, 10, 12, 24 h and 48 h post-dose, and on D12 before discharge; *Body temperature* will be measured at screening, D-1, D12 and follow-up visit only.

[3] ECG at screening, D-1 (in triplicate) and follow-up; on D1 at pre-dose and 1, 2, 3, 4, 6, 8, 10, 12 and 24 h post-dose and on D9 at pre-dose, 1, 2, 3, 4, 6, 8, 10, 12, 24 and 48 h post-dose, and on D12 before discharge.

[4] Before randomization.

[5] Psychometric tests and scales will be performed at $t_{max}$ on D1, D5 and D9 (POMS, DV, CRT, RVIP and SSS) and at $t_{max}$ (if possible) on D-1 and D9 (LMT). Familiarisation/training sessions will be done on D-1 for all psychometric tests and scales.

Study Protocol BIA-102474-101          -CONFIDENTIAL-                    Page 16
1BIAL35 / Version 1.2 / 01 July 2015

# TABLE OF CONTENTS

1.   SYNOPSIS ................................................................................................................................... 3

     Flow chart 1: SAD part ............................................................................................................. 12

     Flow chart 2: FI part ................................................................................................................ 13

     Flow chart 3: MAD part ........................................................................................................... 14

     Flow chart 4: PD part ............................................................................................................... 15

     TABLE OF CONTENTS ............................................................................................................. 16

     LIST OF ABBREVIATIONS ...................................................................................................... 22

2.   BACKGROUND AND RATIONALE ...................................................................................... 26

2.1.    Background .................................................................................................................... 26
        2.1.1.     The endocannabinoid system ................................................................................. 26
        2.1.2.     BIA 10-2474 .......................................................................................................... 26
        2.1.2.1. Non-clinical data ...................................................................................................... 26
        2.1.2.2. Pharmacokinetics and metabolism .......................................................................... 28
        2.1.2.3. Effects in humans .................................................................................................... 28
        2.1.3.     Study rationale ....................................................................................................... 28
        2.1.3.1. Regulatory background ............................................................................................ 28
        2.1.3.2. Subject population .................................................................................................... 28
        2.1.3.3. Study design ............................................................................................................. 30
        2.1.3.4. Dose selection .......................................................................................................... 30

3.   OBJECTIVES ............................................................................................................................ 32

3.1.    Primary Objectives ...................................................................................................... 32

3.2.    Secondary Objectives ................................................................................................... 32

4.   STUDY DESIGN ....................................................................................................................... 33

4.1.    Description ..................................................................................................................... 33

4.2.    Number of Subjects ...................................................................................................... 33

4.3.    Number of Study Centres ............................................................................................ 33

4.4.    Duration of Participation ............................................................................................ 33

4.5.    Study endpoints ............................................................................................................ 34
        4.5.1.     Safety endpoints .................................................................................................... 34
        4.5.2.     Pharmacokinetic endpoints ................................................................................... 34
        4.5.3.     Pharmacodynamic endpoints ................................................................................ 35

4.6.    Discussion of the Design .............................................................................................. 36

4.7.    Identification of Source Data ...................................................................................... 38

5.     STUDY POPULATION ........................................................................................ 39

5.1.      Inclusion criteria ........................................................................................ 39

5.2.      Exclusion criteria ....................................................................................... 40

5.3.      Withdrawal criteria and related procedures ........................................... 40
5.3.1.       Withdrawal criteria ............................................................................. 40
5.3.2.       Withdrawn subject data collection ...................................................... 41
5.3.3.       Replacement of subjects ..................................................................... 41


6.     STUDY DRUGS .................................................................................................. 42

6.1.      Description of treatment ............................................................................ 42
6.1.1.       BIA 10-2474 ....................................................................................... 42
6.1.2.       Placebo ............................................................................................... 42
6.1.3.       Provocation agents ............................................................................. 42
6.1.3.1.       Capsaicin solution ......................................................................... 42
6.1.3.2.       Apomorphine ................................................................................. 43

6.2.      Dose administration ................................................................................... 43

6.3.      Supply, packaging and labelling of the investigational products .......... 44

6.4.      Storage of the investigational products .................................................... 45

6.5.      Accountability, reconciliation and return of the investigational products ....................... 45

6.6.      Treatment compliance ............................................................................... 46


7.     PRIOR TREATMENTS ...................................................................................... 46


8.     CONCOMITANT TREATMENTS ..................................................................... 46


9.     PROCEDURES .................................................................................................... 47

9.1.      Investigational schedule ............................................................................ 47
9.1.1.       Screening Visit (between D-28 and D-3; between D-28 and D-2 in PD part) ............................. 47
9.1.2.       Admission Visit (D-2, two days prior to dosing; D-1, one day prior to dosing in PD part) .......... 48
9.1.3.       SAD part ............................................................................................. 48
9.1.3.1.       Day before dosing (D-1) ................................................................ 48
9.1.3.2.       Dosing Day (D1) ........................................................................... 48
9.1.3.3.       Day 2 (D2) ..................................................................................... 49
9.1.3.4.       Day 3 (D3) ..................................................................................... 50
9.1.3.5.       Day 4 (D4): 72 h PK and PD samples and Discharge Visit ............ 50
9.1.4.       FI part ................................................................................................. 50
9.1.4.1.       Day before dosing (D-1) ................................................................ 50
9.1.4.2.       Dosing Day (D1) ........................................................................... 50
9.1.4.3.       Day 2 (D2) ..................................................................................... 51
9.1.4.4.       Day 3 (D3) ..................................................................................... 51
9.1.4.5.       Day 4 (D4): 72 h PK and PD samples and Discharge Visit ............ 52
9.1.5.       MAD part ........................................................................................... 52
9.1.5.1.       Day before dosing (D-1) ................................................................ 52
9.1.5.2.       Dosing Day (D1) ........................................................................... 52
9.1.5.3.       Day 2 (D2) ..................................................................................... 53
9.1.5.4.       Day 3 (D3) and Day 4 (D4) ............................................................ 53

    9.1.5.5. Day 5 (D5) ................................................................................................. 53
    9.1.5.6. Day 6 (D6) to Day 9 (D9) ............................................................................ 54
    9.1.5.7. Day 10 (D10) ............................................................................................... 54
    9.1.5.8. Day 11 (D11) ............................................................................................... 54
    9.1.5.9. Day 12 (D12) ............................................................................................... 54
    9.1.5.10. Day 13 (D13): 72 h (D10) PK and PD samples and Discharge Visit .......... 55
   9.1.6.     PD part ........................................................................................................ 55
    9.1.6.1. Dosing Day (D1) ......................................................................................... 55
    9.1.6.2. Day 2 (D2) .................................................................................................. 55
    9.1.6.3. Day 3 (D3) and Day 4 (D4) ....................................................................... 56
    9.1.6.4. Day 5 (D5) .................................................................................................. 56
    9.1.6.5. Day 6 (D6) .................................................................................................. 56
    9.1.6.6. Day 7 (D7) .................................................................................................. 56
    9.1.6.7. Day 8 (D8) .................................................................................................. 56
    9.1.6.8. Day 9 (D9) .................................................................................................. 56
    9.1.6.9. Day 10 (D10) ............................................................................................. 56
    9.1.6.10. Day 11 (D11) ............................................................................................ 57
    9.1.6.11. Day 12 (D12): Discharge Visit ................................................................. 57
   9.1.7.     Follow-Up / End of Study Visit (for all study parts) .................................... 57

9.2.     Dose escalation and stopping rules ............................................................... 58

9.3.     Total volume of blood collected ..................................................................... 59

9.4.     Prohibitions and restrictions applying to subjects ...................................... 62

10.     MEASURES TO MINIMIZE BIAS ............................................................... 63

10.1.     Randomisation procedure ............................................................................... 63

10.2.     Blinding .............................................................................................................. 63

10.3.     Emergency code-break procedure ................................................................. 64

11.     PHARMACOKINETIC EVALUATION ...................................................... 64

11.1.     Pharmacokinetic Criteria ............................................................................... 64

11.2.     Pharmacokinetic Assessment Methods and Timing .................................... 65

11.3.     Sample handling and labelling ........................................................................ 66

11.4.     Sample shipment and storage ......................................................................... 67

11.5.     Bioanalytical methods ...................................................................................... 67

12.     PHARMACODYNAMIC ASSESSMENT ................................................... 67

12.1.     Pharmacodynamic criteria ............................................................................. 67

12.2.     Pharmacodynamic Assessment Methods and Timing ................................. 69
   12.2.1.     FAAH activity ............................................................................................. 69
    12.2.1.1. Sample handling and labelling .................................................................. 69
    12.2.1.2. Sample shipment and storage ................................................................... 69
    12.2.1.3. Bioanalytical methods ............................................................................... 69
   12.2.2.     AEA and related FAAs .............................................................................. 70
    12.2.2.1. Sample handling and labelling .................................................................. 70

12.2.1.2. Sample shipment and storage ......................................................... 70
12.2.1.3. Bioanalytical methods ................................................................. 70
12.2.3.    Cognitive testing ...................................................................... 71
12.2.2.1. M-scale .................................................................................. 71
12.2.2.2. Choice reaction time (CRT) ......................................................... 71
12.2.2.3. Digit vigilance (DV) ................................................................. 71
12.2.2.4. Rapid visual information processing (RVIP) .................................... 72
12.2.2.5. Learning memory task (LMT) ...................................................... 72
12.2.2.6. Stanford Sleepiness Scale (SSS) .................................................. 72
12.2.2.7. Profile of Mood States (POMS) ................................................... 72
12.2.4.    Pain model: Cold Pressor Test ...................................................... 73
12.2.5.    Antitussive model: Cough challenge (capsaicin) ................................ 73
12.2.6.    Intraocular pressure measurement ................................................ 74
12.2.7.    Apomorphine challenge ............................................................. 74

13.    SAFETY ASSESSMENT ...................................................................... 75

13.1.    Physical Examination ....................................................................... 75

13.2.    Neurological Examination ................................................................. 75

13.3.    Vital Signs .................................................................................... 75
13.3.1.    Parameters ............................................................................. 75
13.3.2.    Method of assessment ............................................................... 76

13.4.    Standard 12-lead ECG ...................................................................... 76
13.4.1.    Parameters ............................................................................. 76
13.4.2.    Method of assessment ............................................................... 77

13.5.    Telemetry ..................................................................................... 77
13.5.1.    Parameters ............................................................................. 77
13.5.2.    Method of assessment ............................................................... 77

13.6.    Laboratory safety parameters ............................................................ 78
13.6.1.    Serology, Drug Screen, Pregnancy Tests, Hormonology, and Risk Factors.... 78
13.6.2.    Laboratory Safety .................................................................... 78
13.6.2.1. Blood safety analysis ................................................................. 78
13.6.2.2. Urinalysis parameters ................................................................ 78
13.6.2.3. Method of assessment ................................................................ 78
13.6.2.4. Laboratory safety determinations .................................................. 79

13.7.    Adverse Events and Treatment Emergence ............................................ 79
13.7.1.    Definitions ............................................................................. 79
13.7.2.    Serious adverse events or Serious Adverse Drug Reactions ................... 80
13.7.3.    Severity ................................................................................. 81
13.7.4.    Causal relationship with trial medication ........................................ 81
13.7.5.    Documentation and Treatment of Adverse Events by the Investigator........ 82
13.7.6.    Reporting of Serious Adverse Events .............................................. 83
13.7.7.    Pregnancy .............................................................................. 83

14.    DATA MANAGEMENT AND STATISTICS ............................................... 84

14.1.    Data entry and management .............................................................. 84
14.1.1.    Data collection ........................................................................ 84
14.1.2.    Data coding: ........................................................................... 84
14.1.3.    Data transfer .......................................................................... 84

14.2.    Statistical considerations .................................................................. 84

14.2.1.    Sample size ...................................................................................... 84
14.2.2.    Statistical methods ............................................................................ 84
14.2.3.    Description of data sets ..................................................................... 85
    14.2.3.1. Definition of data sets ................................................................... 85
    14.2.3.2. Description of the sets ................................................................... 85
14.2.4.    Demographic and baseline characteristics ....................................... 85
14.2.5.    Protocol deviations ........................................................................... 86
14.2.6.    Pharmacokinetic analysis ................................................................. 86
14.2.7.    Pharmacodynamic analysis .............................................................. 87
    14.2.7.1. Criteria ......................................................................................... 87
    14.2.7.2. Statistical methodology ................................................................ 87
14.2.8.    Safety analysis .................................................................................. 89
    14.2.8.1. Criteria ......................................................................................... 89
    14.2.8.2. Statistical methodology ................................................................ 89

15.     RIGHT OF ACCESS TO DATA AND SOURCE DOCUMENTS ........................ 90

15.1.   Monitoring ...................................................................................................... 90

15.2.   Audit- Inspection ........................................................................................... 90

16.     QUALITY CONTROL ................................................................................. 91

17.     STUDY SUSPENSION, TERMINATION, AND COMPLETION ....................... 91

18.     ETHICS AND REGULATORY ASPECTS ..................................................... 92

18.1.   Current texts .................................................................................................. 92

18.2.   Subject Information and Consent ................................................................. 92

18.3.   Submission to the authorities ....................................................................... 93
    18.3.1.    Ethics Committee opinion .............................................................. 93
    18.3.2.    ANSM authorisation ...................................................................... 93
    18.3.3.    Protocol Amendments .................................................................... 93

18.4.   Regulatory requirements .............................................................................. 94

19.     DATA PROCESSING AND ARCHIVING OF DOCUMENTS AND DATA
        RELATIVE TO THE RESARCH ................................................................... 94

20.     CONFIDENTIALITY AND AGREEMENTS .................................................. 94

20.1.   Confidentiality ............................................................................................... 94

20.2.   Obligations of the Sponsor and contracting to CRO ................................... 94

21.     REPORT AND PUBLICATION ................................................................... 95

21.1.   Report: ........................................................................................................... 95

21.2.   Publication: .................................................................................................... 95

**22.      REFERENCES**................................................................................................**96**

**List of Tables**

Table 1: Composition of capsaicin solution..................................................................43
Table 2: Composition of apomorphine .......................................................................43
Table 3: SAD part: Blood Volume and Collection Schedule .................................................59
Table 4: FI part: Blood Volume and Collection Schedule ..................................................60
Table 5: MAD part: Blood Volume and Collection Schedule................................................61
Table 6: PD part: Blood Volume and Collection Schedule ..................................................62
Table 7: Randomisation .............................................................................................63

# LIST OF ABBREVIATIONS

| | |
|---|---|
| AE | Adverse Event |
| $A_e$ | Total amount excreted in urine |
| $A_{e\%dose}$ | Percent of drug recovered in urine |
| AEA | Anandamide or N-arachinoylethanolamine |
| ALT | Alanine Aminotransferase |
| ANOVA | Analysis of Variance |
| ANSM | Agence Nationale de Sécurité du Médicament et des produits de santé |
| APPT | Activated Partial Thromboplastin Time |
| ARCI | Addiction Research Center Inventory |
| AST | Aspartate Amino Transferase |
| AUC | Area Under the plasma concentration-time Curve |
| $AUC_{0-t}$ | Area under the plasma concentration-time curve from time 0 to the time of last quantifiable concentration |
| $AUC_{0-120}$ | Pain Analogue scale between time of withdrawal and 120s by maximum value |
| AUEC | Area Under the Effect-time Curve |
| $AUC_{inf}$ | Area Under the plasma concentration-time Curve from hour 0 to infinity |
| $AUC_{last}$ | Area Under the plasma concentration-time Curve from hour 0 to last sample with measurable plasma concentrations |
| BABE | Bioavailability/Bioequivalence |
| BMI | Body Mass Index |
| BP | Blood Pressure |
| CI | Confidence Interval |
| cm | centimetre |
| $C_{average}$ | Average plasma concentration at steady state |
| $C_{max}$ | Maximum observed plasma concentration |
| $C_{min}$ | Minimum observed plasma concentration |
| $C_{last}$ | Last measurable plasma concentration |
| $CL_{-r}$ | Apparent Renal Clearance |
| CL/F | Apparent total body Clearance |
| CPK | Creatinine Phosphokinase |
| CPP | Comité de Protection des Personnes (Independent Ethics Committee) |
| $CP_{tol}$ | Cold pressor tolerance |
| CRO | Contract Research Organisation |
| CRF | Case Report Form |
| CRT | Choice Reaction Time |

| | |
|---|---|
| CSR | Clinical Study Report |
| $C_{trough}$ | Concentration at the end of a dosing interval before the next dose administration |
| CTD | Common Technical Document |
| CV | Coefficient of Variation |
| C2 | Concentrations of capsaicin causing 2 coughs |
| C5 | Concentrations of capsaicin causing 5 coughs |
| D | Day |
| DBP | Diastolic Blood Pressure |
| DMSO | Dimethylsulphoxide |
| DV | Digit Vigilance |
| EA-d4 | Deuterated ethanolamide |
| $E_{max}$ | Maximum observed effect on FAAH activity |
| ECG | Electrocardiogram |
| ERS | European Respiratory Society |
| EudraCT | European Clinical Trials Database |
| FAAH | Fatty Acid Amide Hydrolase |
| FEV1 | Forced Expiratory Volume in 1 second |
| FI | Food Interaction |
| FSH | Follicle-stimulating hormone |
| FU | Follow up |
| GGT | Gamma Glutamyl Transferase |
| GCP | Good Clinical Practice |
| GLP | Good Laboratory Practice |
| GMP | Good Manufacturing Practice |
| GMR | Geometric mean ratio |
| Hb | Haemoglobin |
| HBsAg | Hepatitis B surface Antigen |
| HCV | Hepatitis C Virus |
| HDPE | High-Density PolyEthylene |
| HED | Human Equivalent Dose |
| HIV | Human Immunodeficiency Virus |
| HR | Heart Rate |
| IB | Investigator's Brochure |
| ICF | Informed Consent Form |
| ICH | International Conference on Harmonisation |
| IEC | Independent Ethics Committee |
| IMP | Investigational Medicinal Product |
| IMPD | Investigational Medicinal Product Dossier |

| IND | Investigational New Drug application |
|-----|--------------------------------------|
| IRB | Institutional Review Board |
| INR | International Normalized Ratio |
| IOP | Intra ocular Pressure |
| kg | kilogram |
| $\lambda_z$ | Apparent terminal elimination rate constant |
| LEA | N-lineleoyl ethanolamide |
| LDH | Lactate Dehydrogenase |
| LMT | Learning Memory Test |
| min | minute |
| mL | millilitre |
| mmHg | Millimetre of mercury |
| msec | millisecond |
| M | Marijuana |
| MAD | Multiple Ascending Dose |
| MedDRA | Medical Dictionary for Regulatory Activities |
| MTD | Maximum Tolerated Dose |
| NOAEL | No Observed Adverse Effect Level |
| NOEL | No Observed Effect Level |
| NS | Nausea |
| $NS_{max}$ | Maximum Degree of Nausea |
| $NS_{tmax}$ | Time of maximum degree of nausea |
| $NS\ AUC_{0-90min}$ | Area under the degree of nausea versus time curve |
| OEA | N-oleoylethanolamide |
| PEA | N-palmitoylethanolamide |
| PBS | Phosphate-buffered saline |
| PD | Pharmacodynamic |
| PK | Pharmacokinetics |
| pmol | picomole |
| p. o. | *per os* |
| POMS | Profile of Mood States |
| PR | Pulse Rate |
| QRS | QRS complex duration (ECG) |
| QT | QT interval (ECG) |
| QTc | QT interval corrected for heart rate |
| QTcB | QT interval corrected for heart rate using Bazett's correction |
| QTcF | QT interval corrected for heart rate using Fridericia's correction |
| $R_{ac}$ | Accumulation ratio of $C_{max}$ |
| RVIP | Rapid Vigilance Information Processing |

| | |
|---|---|
| SAE | Serious Adverse Event |
| SAD | Single Ascending Dose |
| SAP | Statistical Analysis Plan |
| SBP | Systolic Blood Pressure |
| SD | Standard Deviation |
| SEM | Standard Error of Mean |
| SOP | Standard Operating Procedure |
| SSS | Stanford Sleepiness Scale |
| SUSARs | Suspected Unexpected Serious Adverse Reactions |
| $\tau$ | Dosing interval |
| $t_{1/2}$ | Apparent terminal elimination half-life |
| $t_{Emax}$ | Time to occurrence of $E_{max}$ |
| $t_{last}$ | Time to last measurable plasma concentration |
| $t_{max}$ | Time to reach $C_{max}$ (time at peak plasma level) |
| TEAE | Treatment Emergent Adverse Event |
| ULN | Upper Limit of Normal |
| VAS | Visual Analogue Scale |
| $VAS_{max}$ | Maximum value observed |
| $VAS_{total}$ | Total of values observed until the withdrawal from the bath |
| $V_z/F$ | Apparent volume of distribution |
| WHO-DD | World Health Organisation Drug Dictionary |
| 2-AG | 2-arachidonoylglycerol |
| % | percent |

## 2.   BACKGROUND AND RATIONALE

### 2.1.   Background

#### 2.1.1.   The endocannabinoid system

The endocannabinoid system has been implicated in a growing number of physiological functions, both in the central and peripheral nervous systems, and in peripheral organs. More importantly, modulating the activity of the endocannabinoid system has turned out to hold therapeutic promise in a wide range of disparate diseases and pathological conditions, ranging from mood and anxiety disorders, movement disorders such as Parkinson's and Huntington's diseases, neuropathic pain, multiple sclerosis and spinal cord injury, to cancer, atherosclerosis, myocardial infarction, stroke, hypertension, glaucoma, obesity/metabolic syndrome, and osteoporosis. The endogenous analogues of cannabinoids, the "endocannabinoids", include anandamide (N-arachidonoylethanolamine, AEA), 2-arachidonoylglycerol (2-AG), and other amides, esters and ethers of long chain polyunsaturated fatty acids. Fatty acid amide hydrolase (FAAH), the enzyme responsible for the degradation of AEA *in vivo*, has emerged as a promising target for modulating endocannabinoid signalling, with therapeutic potential in several medical conditions.

#### 2.1.2.   BIA 10-2474

BIA 10-2474 (3-(1-(cyclohexyl(methyl)carbamoyl)-1H-imidazol-4-yl)pyridine 1-oxide) is currently being developed by Bial - Portela & Cᵃ, S.A. (BIAL) for the treatment of medical conditions in which there is an advantage in enhancing the levels of endogenous AEA and tonically increasing the drive of the endocannabinoid system. BIA 10-2474 is a reversible FAAH inhibitor that increases AEA levels in the central nervous system and in peripheral tissues. It is designed to act as a long-acting and reversible inhibitor of brain and peripheral FAAH, endowed with sustained inhibition of the enzyme.

##### 2.1.2.1.   Non-clinical data

BIA 10-2474 inhibited FAAH activity in mouse brain and liver in a time- and dose-dependent manner. Decreases in FAAH activity after BIA 10-2474 administration were accompanied by increases in brain AEA levels, in a time- and dose-dependent manner. BIA 10-2474 was tested in models of predictive efficacy in pain conditions. When given alone BIA 10-2474 produced analgesic/anti-inflammatory activity in the mouse Formalin-Paw and Tail-Flick tests in a time-and dose-dependent manner. BIA 10-2474 also markedly potentiated the antinociceptive effects of exogenous AEA in the mouse Formalin-Paw and Tail-Flick tests.

Safety pharmacology evaluation revealed that BIA 10-2474 up to 300 mg/kg (p.o.) had no significant effects on the gross behavioural state, gastrointestinal transit and renal function in the rat. BIA 10-2474 was found not to affect HERG mediated currents up to 10 μM, which corresponds to 3 μg/mL. BIA 10-2474 (1.5, 4.5 and 15 μg/mL) had no effects on the action potential parameters in the dog Purkinje fiber. In dogs, BIA 10-2474 had no major effects on arterial blood pressure (BP), heart rate, and on the PR, the QRS, the QT and the QTc (Fridericia's and van de Water's formulae) intervals. No arrhythmia or other changes in the morphology of the electrocardiogram which could be attributed to BIA 10-2474 were observed.

Animal toxicology studies of repeated daily dosing of BIA 10-2474 for up to 13 weeks in
mice, dogs and monkeys and up to 26 weeks in rats have been conducted. Treatment with
BIA 10-2474 produced no signs of toxicity in mice, rats, dogs and monkeys up to the no
observed adverse effect level (NOAEL) indicated in the table below. Administration of
BIA 10-2474 was associated with dose-dependent increases in plasma level. The table below
indicates the extent of exposure ($AUC_{0-t}$ [ng•h/mL]) of BIA 10-2474 associated with the
corresponding NOAEL at the end of treatment.

| Study | Study code | NOAEL (mg/kg/day) | $AUC_{0-t}$ (ng•h/mL) | |
|---|---|---|---|---|
| | | | Males | Females |
| Four week oral repeat administration in the mouse | C74568 | 100 | 160,000 | 149,000 |
| Three month oral repeat administration in the mouse | C75042 | 25 | 30,700 | 24,900 |
| Four week oral repeat administration in the rat | C74570 | 30 | 41,300 | 64,900 |
| Three month oral repeat administration in the rat | C75031 | 10 | 18,900 | 23,100 |
| Six month oral repeat administration in the rat | D35972 | 10 | 16,751 | 20,109 |
| Four week oral repeat administration in the dog | S30940 | 50 | 65,000 | 38,600 |
| Three month oral repeat administration in the dog | S31208 | 20 | 24,100 | 66,200 |
| Four week oral repeat administration in the monkey | S38498 | 100 | 179,416 | 168,772 |
| Three month oral repeat administration in the monkey | S47972 | 75 | 138,325 | 130,702 |

The genotoxic profile of BIA 10-2474 was examined in two types of tests. BIA 10-2474 was
not mutagenic in the Ames test, when tested in dimethylsulphoxide (DMSO) up to the limit
of its solubility, suggesting that there is no indication of a genotoxic risk to humans. The *in
vivo* genotoxic potential of BIA 10-2474 was evaluated for its potential to cause chromosome
or cell division apparatus damage, or cell cycle interference, leading to micronucleus
formation in polychromatic erythrocytes in the bone marrow of mice; it was concluded that
BIA 10-2474 did not induce micronuclei in bone marrow cells when tested to the maximum
tolerated dose of 1800 mg/kg/day in male CD-1 mice and 1400 mg/kg/day in female CD-1
mice using a 0 h and 24 h oral dosing and 48 h sampling regimen.

Reproductive and development toxicology studies were performed in rats and rabbits and the
no effect level (NOEL) for each particular study segment is indicated in the table below.

| Study | Code | NOEL (mg/kg/day) |
|---|---|---|
| Rat fertility and early embryonic development (Segment I) | C75086 | 50 |
| Rat developmental toxicity study (Segment II) | C75108 | Maternal = 25 Fetal = 7.5 |
| Pre- and post-natal developmental toxicity study in the rat (Segment III) | C75110 | F1 generation = 6 |
| Rabbit study for effects on embryo-fetal development (Segment II main test) | | Maternal = 25 Fetal = 25 |

In human hepatic microsomes, BIA 10-2474 (up to 30 µg/mL) produced minor inhibition in
CYP2D6 and CYP3A4 (testosterone) and is not an inhibitor of CY1A2, CYP2A6, CYP2B6,
CYP2C8, CYP2C9, CYP2C19, CYP2E1 and CYP3A4 (midazolam) activities *in vitro*.
BIA 10-2474 (up to 30 µg/mL) is not considered to be an inducer of CYP2B and CYP3A,
although further investigation with CYP1A2 may be warranted due to the effect observed in
one of the donors used in this study. It has been predicted that the maximum plasma
concentration of BIA 10-2474 achieved in humans is not likely to be >2 µg/mL and,
therefore, it is unlikely that these inhibitions will be of clinical significance.

### 2.1.2.2. Pharmacokinetics and metabolism

Administration of BIA 10-2474 was associated with dose-dependent increases in plasma level. In both rats and dogs, [$^{14}$C]-BIA 10-2474 was detectable up to 24 h post-dose. The apparent terminal half-life ($t_{1/2}$) of total radioactivity was 45 h and 104 h and 4 h and 52 h following oral and intravenous administration, respectively. In both rats and dogs, the urinary excretion was the primary route of excretion of total radioactivity, accounting for 65.2 and 68.7 %, and 50.8 and 61.2% of the administered dose, following both oral and intravenous administration of [$^{14}$C]-BIA 10-2474. Faecal excretion was the secondary route of excretion, accounting for 23.5 and 18.3%, and 23.8 and 22.2% of the administered dose, following both oral and intravenous administration of [$^{14}$C]-BIA 10-2474. Excretion of total radioactivity following both oral and intravenous administration of [$^{14}$C]-BIA 10-2474 occurred principally in the first 24 to 48 h after dose administration and was essentially complete by 72 h post-dose. In the mouse, rat, dog and monkey, BIA 10-2474 undergoes extensive metabolism.

### 2.1.2.3. Effects in humans

Up to the date of this document, there is no experience with BIA 10-2474 in human subjects.

Subjects should be instructed to take BIA 10-2474 only as recommended. Since BIA 10-2474 increases exposure to anandamide, endocannabinoid effects, such as catalepsy, hypothermia and hyperphagia, may be potentiated. Subjects should be informed about the possible occurrence of such effects and cautioned against rising rapidly after sitting or lying down. Subjects should be advised not to drive or operate dangerous machinery. Because of potential additive sedative effects, caution should be used when taking other CNS depressants.

For more detailed information, please refer to the Investigator's Brochure (IB) [1].

### 2.1.3.  Study rationale

### 2.1.3.1. Regulatory background

This is the first study of single and multiple doses of BIA 10-2474 in human subjects. The current study is designed to assess the safety and tolerability of single and repeated oral doses of BIA 10-2474 in healthy subjects. The study also includes pharmacokinetic (PK)/pharmacodynamic (PD) modelling, to allow an estimate of the efficacious dose range to be studied in further clinical trials. The assessment of the potential interaction of BIA 10-2474 with food in healthy young subjects is also to be investigated.

The tolerability, PK and PD data from this study will determine whether it is appropriate to continue development of BIA 10-2474.

### 2.1.3.2. Subject population

As is usual in first-in-man studies, the population to be included is healthy young males and females between 18 and 55 years old (inclusive) at screening. The selection of healthy subjects is justified on the basis that PK, safety, and tolerability, can be investigated accurately in this population.

In healthy subjects, the study can be performed under standardized conditions, reducing the influence of confounding factors.

According to international guidelines, as soon as the pre-clinical studies allow the inclusion of women, female subjects should be included in Phase I studies in order to appreciate safety, PK and PD in each gender. There are known sex differences in how women and men absorb, metabolize and excrete certain therapeutic products (for example some antidepressants, antipsychotics or antibiotics). It is theorized that these pharmacokinetic differences stem from variations between the sexes due to factors such as body weight, plasma volume, gastric emptying time, plasma protein levels, metabolizing enzymes, drug transporter function and clearance activity. Sex differences in pharmacodynamics have been observed in drugs acting on the central nervous system, immune system, cardiovascular system and on energy metabolism.

For this reason, it has been decided to include female subjects in this Phase I study nevertheless, in the PD part, as the objectives of this specific part are very specific, the choice to include only men was done considering the gender effect in some PD models as deleterious in the ability to conclude by increasing variability.

In this PD part, the number of subjects was estimated according to the data of the literature and was driven by the less sensitive test of all the tests planned in this cohort. This less sensitive test was the cough test which requires around 20 subjects to be interpreted.
For this particular model, it is well known that healthy women have a more sensitive cough reflex than healthy men. The reasons for this significant gender difference remain to be elucidated, but may involve a heightened sensitivity, in women, of the sensory receptors within the respiratory tract that mediate cough [2; 3].

In addition, in the apomorphine-induced emesis test, even if 100 % of subjects present emesis after apomorphine injection, the intensity and the number of vomiting episodes could be influenced by the gender (as described in the rotation-induced emesis model which showed gender differences in the unconditioned nausea response to rotation and in the hormonal and the immunological response patterns [4].

Considering these driving factors, and in order to limit the number of subjects exposed in this specific PD exploratory part, only male subjects will be included in the PD exploratory cohort.
This study will be conducted in healthy subjects; therefore, no medical benefit for the subjects can be expected beyond the thorough medical check-up, which each subject will receive prior to treatment and at the end of the study. The potential risks associated with BIA 10-2474 are not known as this product has not yet been tested in humans. As BIA 10-2474 increases exposure to anandamide, endocannabinoid effects, such as catalepsy, hypothermia and hyperphagia, may be potentiated.

Provided the protocol is adhered to, careful observation and medical management will minimize any associated risk in this study.

The participation of healthy subjects in this study is justified with regard to the expected benefit for the target population that will receive this therapy after registration of the compound.

Study Protocol BIA-102474-101          -CONFIDENTIAL-                              Page 30
1BIAL35 / Version 1.2 / 01 July 2015

### 2.1.3.3. Study design

The study will be performed in four parts: the single ascending dose (SAD) part, the food interaction (FI) part, the multiple ascending dose (MAD) part, and a specific PD part.

For discussion of the design of the four parts of this study, please see Section 4.6.

### 2.1.3.4. Dose selection

No target organ was identified during toxicology studies and few adverse clinical findings were observed at the highest dose tested.

The selection of the single doses to be administered in this study is based on the extrapolation of *in vivo* data from preclinical pharmacologic models, and safety data from the toxicology studies using safety margins derived from the NOAEL.

For the SAD part, a starting dose of 0.25 mg was judged to be safe for a first-in-human administration. Escalation to the next higher dose and any dose adjustments of the next dose levels will be based on safety and tolerability results of the previously administered dose and available PK data of previous dose groups. There will be a 5-fold increase from the first dose level (0.25 mg) to the second dose level. The dose levels of the following groups will be increased by approximately 2-fold from the previous dose level, until the dose exceeds 100 mg, which is the human equivalent dose (HED) corresponding to the NOAEL in the rat. Thereafter, there will be a 50% increase up to the last dose (if applicable). The PK data of SAD Group 1 (Group S1) will be reviewed before the start of Group S2. Further PK data will be available with a lag time of 1 dose (i.e., the PK results of Group S2 will be reviewed before the start of Group S4, etc.). The available PK results may change the planned dose levels. If the maximum tolerated dose (MTD) is not reached after completing the planned sequential groups, additional groups can be included to a maximum of 12 groups.

The dose escalation steps are supported by the preliminary preclinical studies. Depending on the tolerance, this range of doses may be modified during the first-in-man study, and intermediate doses may be added.

For the FI part, the dose will be decided during the SAD part (and the MAD part if available). The BIA 10-2474 dose and the use of a single or multiple dose(s) will be decided based on previous PK data (nevertheless the daily dose will not exceed 33 % of the MTD or the maximum dose given in the SAD part). BIA 10-2474 will be administered in one period under fasting conditions and after a high fat breakfast in the other period.

For the MAD part, dosing is expected to be once daily in the morning, but will depend on the outcome of the previous parts. If necessary, the dosing may be more than once daily and the daily dose will be divided according to the new schedule.

The dose levels for MAD Groups 1 to 4 (Groups M1 to M4) will be determined after evaluation of the safety, tolerability and available PK results of previous SAD and MAD (when applicable) dose groups. The MAD part may start during the SAD part, but only when enough PK and safety data are available. If the MTD is not reached after completing the planned sequential groups, additional groups can be included to a maximum of 8 groups.

The dose escalation may also be decreased based on food effects or anticipated accumulation.

The dosing in the MAD part is expected to be under fasting conditions; however, this should be confirmed by the FI part. If PK data suggest there is a positive effect of food (increase of exposure), the subjects may receive the drug in fed conditions.

If there are drug safety concerns, the subjects' dosing will be staggered (a maximum of 4 subjects dosed on the same day and 24 hours of follow-up necessary before dosing the remaining subjects).

If there is no major safety issue based on new preclinical/clinical data, only the first SAD group will be staggered (in the first dose, 2 subjects (1 verum, 1 placebo) will be dosed 24h before the remaining 6 subjects, and if the safety and tolerability results are acceptable, the 6 remaining subjects (5 verum and 1 placebo) will be dosed. Nevertheless, an interval of 10 minutes between each subject will be respected.

An increase in dose will only occur if the previous dose is demonstrated to be generally safe and tolerable. Safety and tolerability will be evaluated continuously through on-going assessments of Adverse Events (AEs), blood and urine safety labs, ECGs, vital signs and physical examinations.

## 3.   OBJECTIVES

### 3.1.   Primary Objectives

The primary objectives are:
- To assess the safety and tolerability of BIA 10-2474 after single and multiple oral doses
- To investigate the effect of food on the PK and PD of BIA 10-2474

### 3.2.   Secondary Objectives

The secondary objectives are:

- To characterize the PK profile of BIA 10-2474 (and its metabolites) after single and multiple oral doses
- To characterize its PD profile [mainly FAAH activity inhibition but also concentrations of N-arachidonoyl-ethanolamine (anandamide, AEA), and related fatty acid amides (FAAs) concentrations such as PEA (N-palmitoylethanolamide), OEA (N-oleoylethanolamide) and LEA (N-lineleoyl ethanolamide)]
- To assess several potential PD effects.

## 4.  STUDY DESIGN

### 4.1.  Description

This is a double blind, randomised, placebo-controlled combined SAD and MAD study, including an additional FI part (which is an open label study), and a PD part.

### 4.2.  Number of Subjects

One hundred and twenty-eight (128) healthy young subjects (64 in the SAD part, 12 in the FI part, 32 in the MAD part and 20 in the PD part), who volunteer for study participation are planned to be enrolled. If the MTD is not reached after completing the planned SAD and MAD sequential groups, additional groups can be included in the SAD and MAD parts up to a maximum of 96 and 64 subjects, respectively.

Due to the exploratory nature of this investigation, there is no formal statistical hypothesis testing. The sample size is based on empirical considerations and on the literature [5; 6].

### 4.3.  Number of Study Centres

The study will be performed at one investigational site in France: Biotrial Rennes.

### 4.4.  Duration of Participation

The total duration for a single subject in each part is:

SAD: Each subject will participate in the study for approximately 8 weeks. Participation will include a screening evaluation between 3 and 28 days before the first administration, 1 check-in period of approximately 5 days. A follow-up visit will be performed 14 to 21 days after discharge or early discontinuation.

FI: Each subject will participate in the study for approximately 11 weeks. Participation will include a screening evaluation between 3 and 28 days before the first administration, 2 check-in periods of approximately 5 days each, with a wash-out period of at least 14 days between administrations. A follow-up visit will be performed 14 to 21 days after discharge from the last treatment period (Period 2) or early discontinuation.

MAD: Each subject will participate in the study for approximately 9 weeks. Participation will include a screening evaluation between 3 and 28 days before the first administration, 1 check-in period of approximately 14 days. A follow-up visit will be performed 14 to 21 days after discharge or early discontinuation.

PD: Each subject will participate in the study for approximately 13 weeks. Participation will include a screening evaluation between 2 and 28 days before the first administration, 2 check-in periods of approximately 12 days each, with a wash-out period of at least 14 days between administrations. A follow-up visit will be performed 14 to 21 days after discharge from the last treatment period (Period 2) or early discontinuation.

## 4.5.    Study endpoints

### 4.5.1.  Safety endpoints

The safety and tolerability parameters evaluated during this study are:

- Clinical safety (adverse event information, prior and concomitant medications assessment, physical examination (including body weight), vital signs, digital standard 12-lead ECGs).
- Laboratory safety assessments (standard haematology, plasma biochemistry analyses, coagulation, urinalysis, serology, alcohol breath test, urine drug screen).

### 4.5.2.  Pharmacokinetic endpoints

The following parameters for BIAL 10-2474 will be derived, where appropriate:

Plasma:

- Maximum observed plasma concentration ($C_{max}$),
- Time of occurrence of $C_{max}$ ($t_{max}$),
- Terminal elimination rate constant ($\lambda_z$),
- Terminal half-life ($t_{1/2}$),
- Area under plasma concentration-time curve from hour 0 to last sample with measurable plasma concentrations ($AUC_{last}$),
- Area under plasma concentration-time curve from hour 0 to infinity $AUC_{inf}$,
- Apparent volume of distribution (Vz/F),
- Total body clearance (CL/F),
- Last measurable plasma concentration ($C_{last}$),
- Time to reach last measurable plasma concentration ($t_{last}$),
- Area under the plasma concentration-time curve over one dosing interval ($AUC_{0-\tau}$),
- Average plasma concentrations at steady state ($C_{average}$),
- Minimum observed plasma concentration ($C_{min}$),
- Accumulation ratio of $C_{max}$ ($R_{acc}$ $C_{max}$),
- Accumulation ratio of $AUC_{0-\tau}$ ($R_{acc}$ $AUC_{0-\tau}$),
- Concentration at the end of a dosing interval before the next dose administration ($C_{trough}$),
- Peak-trough fluctuation (PTF%).

Urine:

- Renal clearance ($CL_r$),
- Total amount excreted in urine ($A_e$),
- Percent of drug recovered in urine ($A_{e\ \%dose}$).

Additional parameters could be calculated if deemed necessary.

### 4.5.3.  Pharmacodynamic endpoints

The following parameters will be calculated, where appropriate, for FAAH activity [expressed as the amount of deuterated ethanolamide (EA-d4) formed by the action of the FAAH in isolated leukocytes samples, on an anandamide substrate]:

-   Maximum observed effect on FAAH activity ($E_{max}$),
-   Time to occurrence of $E_{max}$ ($t_{Emax}$),
-   Area under the effect-time curve (AUEC).

Additionally, plasma levels of AEA and related FAAs like PEA, OEA and LEA will also be analysed.

Additional parameters could be calculated if deemed necessary.

The following parameters will be calculated for psychometric tests and scales:

-   M-(marijuana) score,
-   Number of correct answers in Choice Reaction Time (CRT) and Digit Vigilance (DV),
-   Mean response time in CRT, DV and Rapid Visual Information Processing (RVIP),
-   Number of correctly detected targets in RVIP,
-   Number of missed targets and number of false answers for DV and RVIP,
-   Number of words correctly recalled in immediate recall 1, mean number of words correctly recalled in all immediate recalls and number of words recalled in delayed recall in Learning Memory test (LMT),
-   Sleepiness score for Stanford Sleepiness Score (SSS) and,
-   Tension-anxiety, depression-dejection, anger-hostility, vigour-activity, fatigue-inertia and confusion-bewilderment scores in Profile of Mood States (POMS).

Additional parameters could be calculated if deemed necessary.

The following parameters will be calculated for cold pressor test:

-   Time endured with hand submerged in cold water (cold pressor tolerance-$CP_{tol}$),
-   Maximum value observed on pain Visual Analogue Scale (VAS) (pain $VAS_{max}$),
-   Total of values observed until the withdrawal from the bath (pain $VAS_{total}$),
-   Analogue scale with replacement of missing values between time of withdrawal and 120 seconds by maximum value (100) (pain $AUC_{0-120s}$)

Additional parameters could be calculated if deemed necessary.

The following parameters will be calculated for cough challenge:

-   Concentrations of capsaicin causing five coughs (C5),
-   Concentrations of capsaicin causing two coughs (C2),
-   Number of coughs during the first 15s after administration for each capsaicin concentration,

-   Number of coughs from 15s after to 1 minute after administration for each capsaicin
    concentration.

Additional parameters could be calculated if deemed necessary.

The following parameter will be measured for intraocular pressure (IOP) measurement:

-   IOP (in mmHg).

Additional parameters could be calculated if deemed necessary.

The following parameters will be calculated for apomorphine challenge:

-   Maximum degree of nausea (NS) ($NS_{max}$),
-   Time of the maximum degree of nausea (NS $t_{max}$),
-   Area under the degree of nausea versus time curve [NS $AUC_{(0-90\ mins)}$].

Additional parameters could be calculated if deemed necessary.

### 4.6.    Discussion of the Design

The selected designs for the four parts of this study are as follows:

-   The SAD part consists of 8 groups of 8 healthy young male and female subjects, gender
    balanced to the extent possible, each receiving a single oral dose of BIA 10-2474 or
    placebo (6 verum and 2 placebos). In the first group, 2 subjects (1 verum and 1 placebo)
    are to be dosed 24 h before the remaining 6 subjects, and if the safety and tolerability
    results are acceptable, the remaining 6 subjects (5 verum and 1 placebo) will be dosed. If
    the MTD is not reached after completing the planned sequential groups, additional groups
    can be included up to a maximum of 12 sequential groups in total.

-   The FI part consists of 12 healthy young male and female subjects, gender balanced to the
    extent possible, each receiving either a single dose or multiple doses of BIA 10-2474 in
    either the fed or fasting state in an open-label, two-way crossover design. Treatment
    periods will be separated by at least 14 days (between the last administration of Period 1
    and the first administration of Period 2).

-   The MAD part consists of 4 groups of 8 healthy young male and female subjects, gender
    balanced to the extent possible, each receiving an oral dose of BIA 10-2474 or placebo
    (6 verum and 2 placebos) once daily for 10 days. If the MTD is not reached after
    completing the planned sequential groups, additional groups can be included up to a
    maximum of 8 sequential groups in total.

-   The PD part consists of 1 group of 20 male subjects performing a double-blind,
    placebo-controlled, two-way cross-over design to assess the effects of BIA 10-2474 on
    various PD models (pain, antitussive, anti-emetic) and on psychometric tests and IOP
    measurement. Treatment periods will be separated by at least 14 days (between the last
    administration of Period 1 and the first administration of Period 2).

These designs are well-established for first-in-man studies and appropriate to assess the
preliminary safety and tolerability of small molecules such as BIA 10-2474.

For the SAD part, the sample size of 8 subjects per dose level (6 verum and 2 placebos) is
deemed adequate for this type of study [5].

For the FI part, there will be 12 healthy young subjects. This number is deemed adequate for an initial evaluation of food effect. The wash-out period the and follow-up observation period after Period 2 is anticipated to be 14 days, but the actual duration will take into account the results for PK parameters in the SAD part.

For the MAD part, there will be 8 healthy young subjects per dose level (6 verum and 2 placebos). This number is deemed adequate for the objectives of this study part.

For the PD part, 20 subjects will be enrolled. The review of the literature showed that the recommended sample size for the cough challenge is 20 subjects. The sample sizes used in the other PD models (apomorphine challenge and cold pressor test) are generally smaller than 20 subjects, thus this number is deemed adequate for the objectives of this study part.

For the cough challenge model, it is well known that healthy women have a more sensitive cough reflex than healthy men. The reasons for this significant gender difference remain to be elucidated, but may involve a heightened sensitivity in women of the sensory receptors within the respiratory tract that mediate coughing [2; 3].

In addition, in the apomorphine-induced emesis test, even if 100 % of subjects present emesis after apomorphine injection, the intensity and the number of vomiting episodes could be influenced by the gender (as described in the rotation-induced emesis model, which showed gender differences in the unconditioned nausea response to rotation and in the hormonal and the immunological response patterns [4]).

Considering these factors, and in order to limit the number of subjects exposed in this specific exploratory PD part, only male subjects will be included in the exploratory PD cohort.

During this study, safety parameters will be closely followed by regular measurements, to enable a detection of any changes as early as possible and to be able to stop dosing before any subject sustains major harm. The follow-up observation for the end of study visit will take into account the results of previously available PK parameters (especially for the potential occurrence of AEs) and could be changed if necessary for safety reasons.

The use of placebo as a control is necessary to provide reliable scientific evidence of safety and tolerability and to ensure a reliable evaluation of the pharmacological activity of the tested drug.

A double-blind design is used in conjunction with a placebo control to prevent the evaluation being biased by the expected effects of the test article.

The sequential ascending dose design will be used for a safe determination of the MTD and the establishment of a sufficient safety margin over the expected therapeutic doses in humans.

Evaluation of BIA 10-2474 administered in the fasting and fed states will provide a preliminary assessment of the effect of food on the bioavailability and/or on certain safety and tolerability parameters of BIA 10-2474.

This study design is in line with current regulatory guidance and appropriate to reach the objectives of the study.

## 4.7.    Identification of Source Data

The source data will not be directly collected in the Case Report Form (CRF) but will be captured in supportive documentation (study source documents): laboratory parameters and clinical interpretation of the values on the analytical laboratory print outs, ECG records and clinical significance of observations (when applicable) on the ECG print-outs. The psychometric tests and scales will be computer-assisted assessments; thus the source data will be electronically saved. The other investigated parameters are collected in the Investigator's source data book.

The data collected in the CRF are copied from this source data documentation.

## 5.  STUDY POPULATION

Subjects must give written informed consent for participation in the study before any study-specific screening tests or evaluations.

Nevertheless, if necessary and after documented agreement with the sponsor, any measures identical to those planned in the protocol for the subjects' screening and already performed within the timelines given by the protocol for the screening exams (and after a Biotrial generic written informed consent) could be used for the protocol in order to minimize the constraints on the subjects.

### 5.1.  Inclusion criteria

Subjects must satisfy all of the following inclusion criteria before being allowed to participate/continue in the study:

1. Male or female subjects (only male subjects for the PD part) aged 18 to 55 years, inclusive;
2. Body mass index (BMI) between 19 and 30 kg/m$^2$ inclusive;
3. Healthy as determined by pre-study medical history, physical examination, vital signs, complete neurological examination and 12-lead ECG;
4. Negative tests for Hepatitis B surface antigen (HBsAg), hepatitis C virus antibody (anti-HCV) and human immunodeficiency virus (HIV)-1 and HIV-2 antibody at screening;
5. Clinical laboratory test results clinically acceptable at screening and admission;
6. Negative screen for alcohol and drugs of abuse at screening and admission;
7. Non-smokers or ex-smokers (must have ceased smoking >3 months prior screening visit);
   If female:
8. Woman with no childbearing potential by reason of surgery or at least 1 year post-menopause (i.e., 12 months post last menstrual period), or menopause confirmed by follicle-stimulating hormone (FSH) testing;
9. If of childbearing potential, using an effective nonhormonal method of contraception (intrauterine device or intrauterine system; condom or occlusive cap [diaphragm or cervical or vault caps] with spermicidal foam or gel or film or cream or suppository; true abstinence; or vasectomized male partner, provided that he is the sole partner of that subject) for all the duration of the study and up to one month after the last investigational medicinal product (IMP) administration;
10. Negative serum pregnancy test at screening and negative urine pregnancy test on admission of each treatment period (women of childbearing potential only);
    If male:
11. Using an effective method of contraception (condom or occlusive cap [diaphragm or cervical or vault caps] with spermicidal foam or gel or film or cream or suppository; true abstinence; or vasectomy) throughout the study and up to one month after the last IMP administration.

For the PD part only:

12. Normal forced expiratory volume in one second (FEV1) at screening (80-120% predicted for the best FEV1 of 3 measures with a difference between the two best measures < or equal to 0.150 L);
13. Responsive (within acceptable ranges) to the cough provocation agent (capsaicin);
14. Normal basal IOP (between 10-20 mmHg inclusive);
15. At screening, a cold pressor tolerance ≥15 seconds and ≤120 seconds on three measurements, after one training trial, with a deviation ≤20 seconds between the three measurements

## 5.2.   Exclusion criteria

If any of the following exclusion criteria apply, the subject must not enter/continue in the study:

1. Subjects who have a clinically relevant history or presence of respiratory, gastrointestinal, renal, hepatic, haematological, lymphatic, neurological, cardiovascular, psychiatric, musculoskeletal, genitourinary, immunological, dermatological, endocrine, connective tissue diseases or disorders;
2. Have a clinically relevant surgical history;
3. Have a history of hyperemesis;
4. Have a history of relevant atopy or drug hypersensitivity;
5. Have a history of alcoholism or drug abuse;
6. Consume more than 14 units of alcohol a week [1 glass (25 cl) of beer with 3° of alcohol = 7.5 g, or 1 glass (25 cl) of beer with 6° of alcohol = 15 g, or 1 glass (12.5 cl) of wine with 10° of alcohol = 12 g, or 1 glass (4cl) of aperitif with 42° of alcohol = 17 g];
7. Have a significant infection or known inflammatory process on screening or admission;
8. Have acute gastrointestinal symptoms (e.g., nausea, vomiting, diarrhea, heartburn) at the time of screening or admission;
9. Have used medicines within 2 weeks of admission that may affect the safety or other study assessments, in the investigator's opinion;
10. Have used any investigational drug or participated in any clinical trial within 90 days prior to screening;
11. Have participated in more than 2 clinical trials within the 12 months prior to screening;
12. Have donated or received any blood or blood products within the 3 months prior to screening;
13. Are vegetarians, vegans or have medical dietary restrictions;
14. Cannot communicate reliably with the investigator;
15. Are unlikely to co-operate with the requirements of the study;
16. Are unwilling or unable to give written informed consent.
If female:
17. Pregnancy or breast-feeding;
18. Woman of childbearing potential not using an accepted effective contraceptive method or using oral contraceptives;
If male:
19. Not using an accepted effective method of contraception.

## 5.3.   Withdrawal criteria and related procedures

### 5.3.1.   Withdrawal criteria

Any subject may be withdrawn from the study at the discretion of the Investigator. The subject is also free to terminate his participation at any time. However, if the subject has been dosed with study medication, it is recommended to ask the subject to remain in contact with the centre and the investigational site should make every effort to convince the subject to return for a safety follow-up visit. The safety follow-up visit will then be organised.

The Investigator also undertakes to obtain more detailed information about any subject lost to follow-up.

Subjects withdrawn from the study must not be re-included.

### 5.3.2.  Withdrawn subject data collection

The Principal Investigator and/or another Investigator involved in the study will document on the termination page of the CRF and in the subject's medical records the primary reason for the subject's withdrawal as follows:

- Lost to follow-up: subjects who leave the clinic during the hospitalisation period or do not attend the following visit. Intensive efforts should be made to locate and recall them if possible and to determine their health status at a minimum.

- AE: an AE form must be completed.

- Deviation from protocol.

- Withdrawal of consent: in this case, it should be clarified with the subject if the underlying reason for withdrawal is an AE or not. This clarification should be documented.

- Other: if none of the above-mentioned reasons are applicable, then the reason will be specified.

All withdrawals will be reported to the Sponsor.

For all drop-outs, the safety follow-up visit will be arranged 10 to 14 days after the drop-out day, and will document the progress of their condition. In every case, the CRF must be filled in up to the last visit performed.

### 5.3.3.  Replacement of subjects

Subjects who withdraw or drop out may be replaced. The replacement subject will be assigned to the same treatment or treatment sequence as the replaced subject.

If a subject is withdrawn from the study due to an AE, the Investigator should follow the procedures documented in Section 13 to assess the safety of the IMP.

# 6.   STUDY DRUGS

## 6.1.    Description of treatment

### 6.1.1.   BIA 10-2474

A detailed description of BIA 10-2474 can be found in the IMP dossier (IMPD), Drug Substance module.

- **Description of the dosage form:**

BIA 10-2474 will be supplied as 0.25, 2.5 and 10 mg light blue hard gelatine capsules. Subject doses will be composed of a single strength or combinations of different strengths.

- **Composition:**

The capsules are composed of the respective amount of active ingredient. The drug-in-capsule approach is used to prepare the study medication.

### 6.1.2.   Placebo

- **Description of the dosage form:**

Placebo will be supplied as hard gelatine capsules matching the appearance and other visual and organoleptic characteristics of BIA 10-2474 capsules.

### 6.1.3.   Provocation agents

#### 6.1.3.1. Capsaicin solution

- **Description of the dosage form:**

Capsaicin will be supplied by Baccinex and released by LC2 as unidoses of sterile 3.33mg/ml capsaicin solution.

Fresh dilutions will be made from this stock solution in 0.9% saline solution on a daily basis in order to obtain serial doubling concentrations ranging from 0.9765 to 500 µmol/L, with the knowledge that, in the literature, induction of cough is rare at the lowest concentration.

To increase challenge blindness, inhalation of 0.9% saline solution will be randomly interspersed.

For each step of concentration, an adequate volume of diluted capsaicin solution or 0.9% saline solution will be placed in a breath-activated nebuliser with a dosimeter which will deliver 20µL of solution per puff.

Each volunteer participating to this cough challenge assessment will test until 10 concentrations of capsaicin to determine the concentration causing two and five coughs at screening (=baseline) and on Day 7 of each period.

All instructions for the reconstitution will be available in the corresponding Pharmacy Manual.

- **Composition:**

The components of capsaicin are shown in Table 1.

**Table 1: Composition of capsaicin solution**

| Ingredients | Function | Unit formula per vial 250µL) | Reference to Standards |
|---|---|---|---|
| Capsaicin + Dihydrocapsaicin | Net Drug Substance | 0.833 mg | USP |
| Tween 80 | Solvent | 18.75 mg | Ph.Eur. |
| Sodium chloride | Diluent | 2.25 mg | Ph. Eur |
| Sodium chloride injection 0.9% (saline) | Diluent | Qs. 250 µL | Ph.Eur. |

### 6.1.3.2. Apomorphine

- **Description of the dosage form:**

Apomorphine will be supplied by Biotrial as a marketed injectable dosage form of apomorphine 5 mg/mL (Apokinon®).

A volume of apomorphine 5 mg/mL will be transferred in a sterile syringe to obtain a quantity of 50 µg/kg for each subject.

All instructions for the reconstitution will be available in the corresponding Pharmacy Manual.

- **Composition:**

The components of apomorphine are shown in Table 2.

**Table 2: Composition of apomorphine**

| Active ingredient | Apomorphine chlorhydrate 50 mg/vial |
|---|---|
| Excipients | Sodium metabisulfite (E223), concentrated hydrochloric acid for pH adjustment, water for injectable preparations |

### 6.2.    Dose administration

All treatments will be administered orally.

SAD

Group S1:   A single dose of 0.25 mg BIA 10-2474 (n=6) or matching placebo (n=2) on D1

Group S2:   A single dose of 1.25 mg BIA 10-2474 (n=6) or matching placebo (n=2) on D1

Group S3:   A single dose of 2.5 mg BIA 10-2474 (n=6) or matching placebo (n=2) on D1

Group S4:   A single dose of 5 mg BIA 10-2474 (n=6) or matching placebo (n=2) on D1

Group S5:   A single dose of 10 mg BIA 10-2474 (n=6) or matching placebo (n=2) on D1

Group S6:   A single dose of 20 mg BIA 10-2474 (n=6) or matching placebo (n=2) on D1

Group S7:   A single dose of 40 mg BIA 10-2474 (n=6) or matching placebo (n=2) on D1

Group S8:   A single dose of 100 mg BIA 10-2474 (n=6) or matching placebo (n=2) on D1

If the MTD is not reached after completing the planned sequential groups, additional groups can be included to a maximum of 12 groups.

FOOD INTERACTION

Group FI: The dose design of the food interaction will be decided during the SAD part (and MAD part if available). The BIA 10-2474 dose and the use of a single or multiple dose(s) will be decided based on the previous PK data (nevertheless the daily dose will not exceed 33% of the MTD or the maximum dose given in the SAD part). BIA 10-2474 will be administered in one period under fasting conditions and after a high fat breakfast in the other period. These will be administered in a randomized order according to a cross-over design.

MAD

Groups M1 to M4: Multiple doses of BIA 10-2474 or matching placebo once daily from D1 to D10. The dose levels of Groups M1 to M4 will be determined after evaluation of the safety, tolerability and available PK results of previous SAD and MAD (when applicable) dose groups. The MAD part may start during the SAD part but only when enough PK and safety data are available.

If the MTD is not reached after completing the planned sequential groups, additional groups can be included to a maximum of 8 groups.

PD

Group PD: Repeated dosing from D1 to at least D10 with placebo and a well-tolerated BIA 10-2474 dose, chosen after analysis of previous SAD/MAD cohorts. These will be administered in a randomized order according to a cross-over design. The duration of each repeated dose is to be decided according to previous SAD and MAD PK results.

Product batches used will be identified in the final Clinical Study Report (CSR).

IMPs will be given orally with 240 mL of water early in the morning after an 8-hour overnight fast in each period. Note: As the 100 mg SAD dose implies to take 10 capsules of 10 mg, the volume of water can be increased to 270 mL if 240 mL is not sufficient.

Detailed dose escalation and stopping rule procedures are set out in Section 9.2.

6.3.    Supply, packaging and labelling of the investigational products

The IMPs (BIA 10-2474 and placebo capsules) will be bulk supplied by BIAL in high-density polyethylene (HDPE) containers and delivered to the investigational site.

A sufficient quantity of the IMPs will be supplied to Biotrial to perform the study, and Biotrial will complete an acknowledgement of receipt form to be returned to the Sponsor. The Sponsor's representative will provide a certificate of analysis and a QP batch release for those batches of IMP to be used in the study.

The IMPs and the challenge agents (capsaicin and apomorphine) will be packed and labelled per subject at Biotrial according to the European Union-Good Manufacturing Practice (EU-GMP), including its annex 13, and all local regulations.

The investigational products will bear at least the following information on the labels:

-    Sponsor's name, address and telephone number

-    Study code

-    Study drug description and content

- Route of administration
- Identification of subject
- Dosage form
- Randomisation number, Visit number
- Investigator's name
- Batch and/or code number
- Expiry date or Retest date
- Storage conditions
- Instructions for use
- Phrase "For biomedical research only"

The Investigator, or his designee, will only dispense IMPs to subjects included in this study. Each subject will only be given the IMP carrying his number. The dispensing for each subject will be documented in the subject's CRF.

## 6.4.    Storage of the investigational products

IMPs and apomorphine vials will be stored at ambient temperature (do not freeze, store below 25°C).

Capsaicin vials will be stored in a cold room (store between 2 and 8°C).

All IMPs and challenge agents will be stored in a secure and locked storage area with limited access, with temperature control and monitoring.

The pharmacist at Biotrial will be responsible for the correct storage and handling of the IMPs and challenges agents.

Any deviations from the storage requirements, including actions taken, must be documented and communicated to the Sponsor in advance of any eventual actions.

## 6.5.    Accountability, reconciliation and return of the investigational products

The Investigator must maintain a complete and current dispensing and inventory record. The Investigator is accountable for all test articles supplied by the Sponsor. The dispenser will use this information to maintain an accurate and complete dispensing and inventory record. The designated copies of the completed dispensing and inventory record will be returned to the Sponsor.

Regulatory agencies require accounting for the disposition of all investigational drugs received by each clinical site. Information on drug disposition required by law consists of the date received, date administered, quantity administered, and the subject to whom the drug was administered.

All unused IMPs must be returned in the original containers. Non-used, returned study drug and empty IMP containers may be destroyed after the Pharmacist and the monitor have performed accountability and the Sponsor has confirmed in writing that destruction can occur.

Supplies are shipped to the investigational site as needed. Drug accounting will be reviewed by the site monitor during routine monitoring visits. Each time a dose is dispensed to a subject, the following information should be recorded: the subject's study number, the total dose dispensed, the number of capsules used, the batch number, and the initials of the person dispensing the dose.

At the completion or termination of the study, a final drug accountability review and reconciliation must be completed, and any discrepancies must be investigated and their resolution documented.

## 6.6.    Treatment compliance

All IMP doses will be administered in the clinical unit under the direct supervision of the Investigator or his designee.

After administration of IMP, a hand check and a mouth check will be performed to verify that the subject has swallowed the dose.

Drug administration information will be recorded in the CRF and in the drug accountability form.

## 7.    PRIOR TREATMENTS

Reasonable efforts will be made to determine all relevant treatments received by the subject within 2 weeks before IMP administration. All relevant information must be recorded on the subject's CRF.

## 8.    CONCOMITANT TREATMENTS

As a general rule, no concomitant medication will be permitted, with the exception of medications to treat AEs, unless the rationale for the exception is discussed and clearly documented between the Investigator and the Sponsor.

## 9.   PROCEDURES

### 9.1.   Investigational schedule

Flow chart 1 summarises the schedule of assessments in the SAD part; Flow chart 2 summarises the schedule of assessments in the FI part; Flow chart 3 summarises the schedule of assessments in the MAD part; Flow chart 4 summarises the schedule of assessments in the PD part.

Before dosing and in order to have enough time for breakfast and/or PD predose assessments, when several procedures are scheduled at the same time, the 12-lead ECG will be obtained first within 60 minutes of the scheduled time, then vital signs will be measured, then the PK blood samples will be collected at the scheduled time within the windows noted in Section 9.3.

After dosing, when several procedures are scheduled at the same time, the 12-lead ECG will be obtained first within 15 minutes of the scheduled time, then vital signs will be measured, then the PK blood samples will be collected at the scheduled time within the windows noted in Section 9.3.

#### 9.1.1.   Screening Visit (between D-28 and D-3; between D-28 and D-2 in PD part)

The eligibility criteria will be documented on the CRF. The subject will be provided with all information regarding the study objectives and procedures from the Investigator. The subject will be assigned a screening number after signing the informed consent form (ICF).

Adverse events will be monitored throughout the study.

The screening visit will include the following:

-   Signature and date of an ICF before any study specific screening procedures are performed,
-   Verification of the eligibility criteria,
-   Medical history,
-   Physical examination including weight (kg) and height (cm). BMI will be calculated to ensure eligibility,
-   Complete neurological examination,
-   Vital signs measurement (including tympanic body temperature),
-   12-lead ECG,
-   Laboratory evaluation (haematology, plasma biochemistry, coagulation and urinalysis), viral serology testing (includes HBsAg, anti-HCV antibodies, anti-HIV-1 antibodies and anti-HIV-2 antibodies), and a urine drug of abuse screening,
-   Alcohol breath test,
-   Hormone panel [FSH testing] (if necessary),
-   Serum pregnancy test (only for female subjects of childbearing potential),
-   Cold pressor test (only in PD part),
-   Cough challenge (only in PD part),

- IOP measurement (only in PD part),
- Spirometry (only in PD part).

### 9.1.2.  Admission Visit (D-2, two days prior to dosing; D-1, one day prior to dosing in PD part)

Subjects will be admitted to the unit two days prior to dosing or one day prior to dosing (in the PD part) for each study part (and for each of the two study periods when applicable), and will undergo the following investigations:

- Verification of the eligibility criteria,
- Medical history update,
- Physical examination update,
- Vital signs measurement (including tympanic body temperature),
- 12-lead ECG,
- Laboratory evaluation (haematology, plasma biochemistry, coagulation) only in PD part,
- Urinalysis,
- Urine drug screen,
- Alcohol breath test,
- AE monitoring,
- Urine pregnancy test (only for female subjects of childbearing potential),
- Psychometric scales and tests (only in PD part).

Subjects will be offered a meal, and will be fasting until the following day for a required duration of at least 8 hours in SAD part, PD part and FI part fasting period. The dosing during the MAD part is expected to be also under fasting conditions; however this should be confirmed by the FI part.

### 9.1.3.  SAD part

#### 9.1.3.1. Day before dosing (D-1)

The following procedures will be performed:

- Laboratory evaluation (haematology, plasma biochemistry, coagulation),
- Vital signs in triplicate (without body temperature),
- 12-lead ECG in triplicate,
- PD blood sampling,
- Psychometric scale (M Scale – Marijuana),
- AE monitoring.

#### 9.1.3.2. Dosing Day (D1)

The subjects will be randomised to the group treatment allocated on D1 morning.

The study drug will be administered after an overnight fast of at least 8 hours.

The intake hour (H0) on D1 will be the reference time for implementing the following investigational procedures consistently.

Subjects will have the following procedures performed at pre-dose:

- Verification of the eligibility criteria,
- Vital signs (without body temperature),
- 12-lead ECG,
- PK blood sampling,
- PK urine sampling,
- PD blood sampling,
- M-scale,
- Telemetry,
- AE monitoring.

After drug administration, the following examinations will be performed at several time-points (see Flow chart 1):

- Vital signs (without body temperature),
- 12-lead ECG,
- PK blood sampling,
- PK urine sampling,
- PD blood sampling,
- M-scale,
- Telemetry,
- AE monitoring.

Meals will be served around H4 post-dose for lunch and around H12 post-dose for dinner, after the completion of all examinations.

### 9.1.3.3. Day 2 (D2)

The following procedures will be performed at several time-points (see Flow chart 1):

- Vital signs (without body temperature),
- 12-lead ECG,
- PK blood sampling,
- PK urine sampling,
- PD blood sampling,
- Telemetry,
- AE monitoring.

A breakfast will be offered after the H24 post-dose sampling has been drawn.

#### 9.1.3.4. Day 3 (D3)

The following procedures will be performed:

- Vital signs (without body temperature),
- 12-lead ECG,
- PK blood sampling,
- PK urine sampling,
- PD blood sampling,
- AE monitoring.

#### 9.1.3.5. Day 4 (D4): 72 h PK and PD samples and Discharge Visit

The following procedures will be performed:

- Vital signs (including tympanic body temperature),
- 12-lead ECG,
- PK blood sampling,
- PK urine sampling,
- PD blood sampling,
- Laboratory evaluation (haematology, plasma biochemistry, coagulation, and urinalysis),
- AE monitoring.

After medical authorization, the subject will be discharged.

The subject will be asked to return for a follow-up visit, scheduled between 14 and 21 days after Day 4 or early discontinuation.

#### 9.1.4.  FI part

#### 9.1.4.1. Day before dosing (D-1)

The following procedures will be performed at several time-points (see Flow chart 2):

- Vital signs in triplicate (without body temperature),
- 12-lead ECG in triplicate,
- Laboratory evaluation (haematology, plasma biochemistry, coagulation),
- PD blood sampling,
- AE monitoring.

#### 9.1.4.2. Dosing Day (D1)

The subjects will be randomised to the group treatment allocated on D1 morning of the first period.

The study drug will be administered after an overnight fast of at least 8 hours in the fasting period and 30 minutes after the beginning of a standardized high-fat breakfast in the fed period.

The intake hour (H0) on D1 will be the reference time for implementing the following investigational procedures consistently.

Subjects will have the following procedures performed on D1 of each of the two study periods at pre-dose:

- Verification of the eligibility criteria,

- Vital signs (without body temperature),

- 12-lead ECG,

- PK blood sampling,

- PD blood sampling.

After drug administration, the following examinations will be performed at several time points (see Flow chart 2):

- Vital signs (without body temperature),

- 12-lead ECG,

- PK blood sampling,

- PD blood sampling,

- AE monitoring.

In the fed period, a standard breakfast will be offered after the H24 post-dose sampling has been drawn. In the fasting period, subjects will remain fasted for at least 4 hours after dosing.

Meals will be served around H4 post-dose for lunch and around H12 post-dose for dinner, after the completion of all examinations.

### 9.1.4.3. Day 2 (D2)

The following procedures will be performed:

- Vital signs (without body temperature),

- 12-lead ECG,

- PK blood sampling,

- PD blood sampling,

- AE monitoring.

A standard breakfast will be offered after the H24 post-dose sampling has been drawn.

### 9.1.4.4. Day 3 (D3)

The following procedures will be performed:
- 12-lead ECG,

- PK blood sampling,

- PD blood sampling,

- AE monitoring.

A standard breakfast will be offered after the H48 post-dose sampling has been drawn.

### 9.1.4.5. Day 4 (D4): 72 h PK and PD samples and Discharge Visit

The following procedures will be performed:

- Vital signs (including tympanic body temperature),
- 12-lead ECG,
- PK blood sampling,
- PD blood sampling,
- Laboratory evaluation (haematology, plasma biochemistry, coagulation, and urinalysis),
- AE monitoring.

A standard breakfast will be offered after the H72 post-dose sampling has been drawn.

After medical authorization, the subject will be discharged and be asked to return for Period 2 after a wash-out period of at least 14 days beginning from the IMP administration.

Following the second treatment period, the subject will be asked to return for a follow-up visit, scheduled between 14 and 21 days after Day 4 or early discontinuation.

### 9.1.5.  MAD part

### 9.1.5.1. Day before dosing (D-1)

The following procedures will be performed at several time-points (see Flow chart 3):

- Vital signs in triplicate (without body temperature),
- 12-lead ECG in triplicate,
- Laboratory evaluation (haematology, plasma biochemistry, coagulation),
- PD blood sampling,
- AE monitoring.

### 9.1.5.2. Dosing Day (D1)

The subjects will be randomised to the group treatment allocated on D1 morning.

The intake hour (H0) on D1 will be the reference time for implementing the following investigational procedures consistently.

Subjects will have the following procedures performed at pre-dose:

- Verification of the eligibility criteria,
- Vital signs (without body temperature),
- 12-lead ECG,
- PK blood sampling,
- PK urine sampling,

- PD blood sampling,
- Telemetry,
- AE monitoring.

After drug administration, the following examinations will be performed at several time points (see Flow chart 3):

- Vital signs (without body temperature),
- 12-lead ECG,
- PK blood sampling,
- PK urine sampling,
- PD blood sampling,
- Telemetry,
- AE monitoring.

### 9.1.5.3. Day 2 (D2)

Before drug administration, the following procedures will be performed

- Telemetry (until T24h post first dose),
- Vital signs (without body temperature),
- 12-lead ECG,
- PK blood sampling,
- PK urine sampling,
- PD blood sampling.

After drug administration, the following examinations will be performed:

- AE monitoring.

A breakfast will be offered after the H24 post-dose sampling has been drawn.

### 9.1.5.4. Day 3 (D3) and Day 4 (D4)

The following procedures will be performed:
- Drug administration,
- PK blood sampling on D4 only,
- PD blood sampling on D4 only,
- AE monitoring.

### 9.1.5.5. Day 5 (D5)

Before drug administration, the following examinations will be performed:

- Laboratory evaluation (haematology, plasma biochemistry, coagulation, and urinalysis).

After drug administration, the following examinations will be performed:

- AE monitoring.

### 9.1.5.6. Day 6 (D6) to Day 9 (D9)

The following procedures will be performed:
- Drug administration,
- PK blood sampling on D6 and D8 only,
- PD blood sampling on D6 and D8 only,
- AE monitoring.

### 9.1.5.7. Day 10 (D10)

After the last drug administration, the following examinations will be performed at several
time-points (see Flow chart 3):
- Vital signs (without body temperature),
- 12-lead ECG,
- PK blood sampling,
- PK urine sampling,
- PD blood sampling,
- Telemetry (from D10 pre-dose),
- AE monitoring.

### 9.1.5.8. Day 11 (D11)

The following examinations will be performed:
- Vital signs (without body temperature),
- 12-lead ECG,
- PK blood sampling,
- PK urine sampling,
- PD blood sampling
- Telemetry (until T24h post D10 dose),
- AE monitoring.

### 9.1.5.9. Day 12 (D12)

The following examinations will be performed at several time-points (see Flow chart 3):
- Vital signs (without body temperature),
- 12-lead ECG,
- PK blood sampling,
- PK urine sampling,
- PD blood sampling,
- AE monitoring.

**9.1.5.10. Day 13 (D13): 72 h (D10) PK and PD samples and Discharge Visit**

The following procedures will be performed:

- Vital signs (including tympanic body temperature),
- 12-lead ECG,
- PK blood sampling,
- PK urine sampling,
- PD blood sampling,
- Laboratory evaluation (haematology, plasma biochemistry, coagulation, and urinalysis),
- AE monitoring.

After medical authorization, the subject will be discharged.

The subject will be asked to return for a follow-up visit, scheduled between 14 and 21 days after discharge or early discontinuation.

**9.1.6. PD part**

D-1 procedures are described in Section 9.1.2 (admission visit).

Vital signs (without body temperature) and 12-lead ECG will be performed in triplicate.

**9.1.6.1. Dosing Day (D1)**

The subjects will be randomised to the group treatment allocated on D1 morning of the first period.

The study drug will be administered after an overnight fast of at least 8 hours.

The intake hour (H0) on D1 will be the reference time for implementing the following investigational procedures consistently.

Subjects will have the following procedures performed at pre-dose:

- Verification of the eligibility criteria,
- Vital signs (without body temperature),
- 12-lead ECG,
- Psychometric tests and scales.

After drug administration, the following examinations will be performed:

- Vital signs (without body temperature),
- 12-lead ECG,
- Psychometric tests and scales,
- AE monitoring.

**9.1.6.2. Day 2 (D2)**

After randomization and drug administration, the following examinations will be performed:

- Vital signs (without body temperature),

- 12-lead ECG,
- AE monitoring.

A breakfast will be offered after the H24 post-dose sampling has been drawn.

### 9.1.6.3. Day 3 (D3) and Day 4 (D4)

The following procedures will be performed:

- Drug administration,
- AE monitoring.

### 9.1.6.4. Day 5 (D5)

After drug administration, the following examinations will be performed:

- Psychometric tests and scales (at $t_{max}$),
- AE monitoring.

### 9.1.6.5. Day 6 (D6)

After drug administration, the following examinations will be performed:

- Cold pressor test (at $t_{max}$),
- AE monitoring.

### 9.1.6.6. Day 7 (D7)

After drug administration, the following examinations will be performed:

- Cough challenge (at $t_{max}$),
- AE monitoring.

### 9.1.6.7. Day 8 (D8)

After drug administration, the following examinations will be performed:

- IOP measurement (at $t_{max}$),
- AE monitoring.

### 9.1.6.8. Day 9 (D9)

After drug administration, the following examinations will be performed:

- Vital signs (without body temperature),
- 12-lead ECG,
- Psychometric tests and scales (at $t_{max}$),
- AE monitoring.

### 9.1.6.9. Day 10 (D10)

After the last drug administration, the following examinations will be performed:

- Vital signs (without body temperature),
- 12-lead ECG,
- Apomorphine challenge (at $t_{max}$),
- AE monitoring.

### 9.1.6.10. Day 11 (D11)

The following examinations will be performed:

- Vital signs (without body temperature),
- 12-lead ECG,
- AE monitoring.

### 9.1.6.11. Day 12 (D12): Discharge Visit

The following procedures will be performed:

- Physical examination,
- Complete neurological examination,
- Vital signs (including tympanic body temperature),
- 12-lead ECG,
- Laboratory evaluation (haematology, plasma biochemistry, coagulation, and urinalysis),
- AE monitoring.

After medical authorization, the subject will be discharged.

The subject will be asked to return for a follow-up visit, scheduled between 14 and 21 days after Day 12 or early discontinuation.

### 9.1.7. Follow-Up / End of Study Visit (for all study parts)

- Vital signs measurement,
- Physical examination update,
- Medical history update,
- 12-lead ECG,
- Laboratory evaluation (haematology, plasma biochemistry, coagulation, and urinalysis),
- Serum pregnancy test (only for female subjects of childbearing potential),
- AE monitoring.

## 9.2.    Dose escalation and stopping rules

The starting dose will be 0.25 mg BIA 10-2474 in Group S1 (SAD part). The dose levels of the following groups will be increased by approximately 2-fold from the previous dose level (except for a 5-fold increase from 0.25 mg to the second dose), until the dose exceeds 100 mg BIA 10-2474, being the HED, corresponding to the NOAEL in the rat. Thereafter, there will be a 50% increase up to the last dose (if applicable). If the MTD is not reached after completing the planned sequential groups, additional groups can be included to a maximum of 12 groups.

The decision to progress to the next higher dose will be made after the safety and tolerability data (treatment emergent adverse events (TEAEs), vital signs, ECG and routine lab tests) are reviewed for each dose group, for 6 out of 8 subjects in the cohort through H48 after (last) dosing. This decision will be made jointly by the Investigator, medical director or representative, and medical monitor or representative of the Sponsor. PK data of Group S1through H 72 after (last) dosing will be reviewed before the start of Group S2. Further PK data through H 72 after (last) dosing (except if available PK data allow the review through H24 or H48 after (last) dosing) will be available with a lag time of 1 dose (i.e., PK results of Group S2 will be reviewed before the start of Group S4, etc.). The available PK results may change the planned dose levels.

The dose should not be escalated further if one of the circumstances listed below occurs in subjects within the same cohort, unless it is obvious that the occurrence is not related to the administration of the treatment:

- Drug related severe AEs of the same character in 4 or more subjects;
- Clinically significant drug-related laboratory abnormalities of the same character in 6 or more subjects [e.g., alanine aminotransferase (ALT) > 3 times the upper limit of normal (3 ULN)].
- Clinically significant drug-related changes in vital signs of the same character in 6 or more subjects [e.g., systolic BP consistently greater than 160 mmHg associated with an increase from baseline greater than 20 mmHg].
- Clinically significant drug-related changes in ECGs of the same character in 6 or more subjects: QT interval corrected for heart rate according to Fridericia (QTcF) greater than 500 msec (confirmed by a repeat test) with an increase from baseline greater than 60 msec, or other abnormalities.

It should be made clear that these are guidelines only, and the Investigator, together with the Sponsor's medical monitor and clinical pharmacologist can make an exception, if justified. However, when such an exception is made, the reasons for it should be clearly documented.
Although these are the minimum criteria, dose escalation may be suspended on the basis of other safety information considered to pose a risk to subjects.
Planned dose escalation may be modified to include the repetition of a dose based on the results of the safety and tolerability review, or if further characterization of the safety profile at that dose is required. Intermediate dose levels or a lower increment can also be done.

### 9.3.    Total volume of blood collected

Blood samples will be obtained according to the following schedule (see Table 3 for SAD, Table 4 for FI, Table 5 for MAD, and Table 6 for PD):

**Table 3: SAD part: Blood Volume and Collection Schedule**

| | |
|---|---|
| *Screening Visit (D-28 to D-3)* | |
| Biochemistry*, Haematology, Coagulation, Serology*, Serum Pregnancy* (if applicable), FSH (if applicable) | $3.5+3+2+3.5^{\#}$ mL |
| | *Total =12 mL* |
| *Admission Visits (D-2 & D-1)* | |
| Biochemistry, Haematology, Coagulation, PD samples | 3.5+3+2+(9 samples x 4) mL |
| | *Total = 44.5 mL* |
| *Dosing Visit (D1)* | |
| PK samples, PD samples | (9 samples x 3)+(9  samples x 6)+(9 samples x 4) mL |
| | *Total = 117 mL* |
| *D2* | |
| PK samples, PD samples | 3+6+4 mL |
| | *Total =13 mL* |
| *D3* | |
| PK samples, PD samples | 3+6+4 mL |
| | *Total = 13 mL* |
| *D4 Discharge* | |
| Biochemistry, Haematology, Coagulation, PK sample, PD sample | 3.5+3+2+3+6+4 mL |
| | *Total = 21.5mL* |
| *Follow up visit* | |
| Biochemistry*, Haematology, Coagulation, Serum Pregnancy* (if applicable) | 3.5+3+2 mL |
| | *Total = 8.5 mL* |
| **Overall duration of the study** | **Total = 229.5 mL** |

*Biochemistry, serology and serum pregnancy assessments are performed on the same blood sample.*
#*FSH levels measured in post-menopausal female subjects only if less than12 months post last menstrual period.*

**Table 4: FI part: Blood Volume and Collection Schedule**

| | |
|---|---|
| *Screening Visit (D–28 to D–3)* | |
| Biochemistry*, Haematology, Coagulation, Serology*, Serum Pregnancy* (if applicable), FSH (if applicable) | 3.5+3+2 + 3.5# mL |
| *These are performed on the same blood sample | *Total =12 mL* |
| *Admission Visit (D-1)* | |
| Biochemistry, Haematology, Coagulation, PD samples | 3.5+3+2+ (9 samples x 4) mL per period |
| | *Total = 44.5 mL x 2=89 mL* |
| *Dosing Visit (D1)* | |
| PK samples, PD samples | (9 samples x 3)+(9 samples x 4) mL per period |
| | *Total = 63 mL x 2= 126 mL* |
| *D2* | |
| PK samples, PD samples | 3+4 mL/sample per period |
| | *Total =7 mL x 2= 14 mL* |
| *D3* | |
| PK samples, PD samples | 3+4 mL/sample per period |
| | *Total =7 mL x 2= 14 mL* |
| *D4 Discharge* | |
| Biochemistry, Haematology, Coagulation, PK samples, PD samples | 3.5+3+2+3+4 mL/sample per period |
| | *Total =15.5 mL x 2= 31 mL* |
| *Follow up visit* | |
| Biochemistry*, Haematology, Coagulation, Serum Pregnancy* (if applicable) | 3.5+3+2 mL |
| | *Total = 8.5 mL* |
| **Overall duration of the study** | **Total = 294.5 mL** |

*Biochemistry, serology and serum pregnancy assessments are performed on the same blood sample.
#FSH levels measured in post-menopausal female subjects only if less than12 months post last menstrual period.

Study Protocol BIA-102474-101          -CONFIDENTIAL-                                    Page 61
1B1AL35 / Version 1.2 / 01 July 2015

**Table 5: MAD part: Blood Volume and Collection Schedule**

| | |
|---|---|
| *Screening Visit (D-28 to D-3)*<br>Biochemistry*, Haematology, Coagulation, Serology*, Serum Pregnancy* (if applicable), FSH (if applicable) | 3.5+3+2 + 3.5# mL for FSH<br>*Total =12 mL* |
| *Admission Visit (D-1)*<br>Biochemistry, Haematology, Coagulation, PD samples | 3.5+3+2+(9 samples x4) mL<br>*Total = 44.5 mL* |
| *Dosing Visit (D1)*<br><br>PK samples, PD samples | (9 samples x 3) + (9 samples x 6) + (9 samples x 4) mL<br>*Total = 117 mL* |
| *Dosing visit (D2)*<br>PK samples, PD samples | 3+6+4 mL<br>*Total =13 mL* |
| *Dosing visit (D4)*<br>PK samples, PD samples | 3+6+4 mL<br>*Total =13 mL* |
| *Dosing visit (D5)*<br>Biochemistry, Haematology, Coagulation | 3.5+3+2mL/sample<br>*Total = 8.5 mL* |
| *Dosing visit (D6)*<br>PK samples, PD samples | 3+6+4 mL<br>*Total =13 mL* |
| *Dosing visit (D8)*<br>PK samples, PD samples | 3+6+4 mL<br>*Total =13 mL* |
| *Dosing visit (D10)*<br><br>PK samples, PD samples | (9 samples x 3) + (9 samples x 6) + (9 samples x 4) mL<br>*Total = 117 mL* |
| *D11*<br>PK samples, PD samples | 3+6+4 mL<br>*Total =13 mL* |
| *D12*<br>PK samples, PD samples | (2 samples x 3) + (2 samples x 6) + 4 mL<br>*Total =22 mL* |
| *D13 Discharge*<br>Biochemistry, Haematology, Coagulation, PK samples, PD samples | 3.5+3+2+3+6+4 mL<br>*Total = 21.5 mL* |
| *Follow up visit*<br>Biochemistry*, Haematology, Coagulation, Serum Pregnancy (if applicable)* | 3.5+3+2 mL<br>*Total = 8.5 mL* |
| **Overall duration of the study** | **Total = 416 mL** |

*Biochemistry, serology and serum pregnancy assessments are performed on the same blood sample.*
#*FSH levels measured in post-menopausal female subjects only if less than12 months post last menstrual period.*

**Table 6: PD part: Blood Volume and Collection Schedule**

| | |
|---|---|
| *Screening Visit (D-28 to D-2)* | |
| Biochemistry, Haematology, Coagulation, Serology | 3.5+3+2 mL |
| | *Total =8.5 mL* |
| *Admission Visit (D-1)* | |
| Biochemistry, Haematology, Coagulation | 3.5+3+2 mL per period |
| | *Total = 8.5 mL x 2=17 mL* |
| *D12 Discharge* | |
| Biochemistry, Haematology, Coagulation | 3.5+3+2 mL per period |
| | *Total = 8.5 mL x 2=17 mL* |
| *Follow up visit* | |
| Biochemistry, Haematology, Coagulation | 3.5+3+2 mL |
| | *Total = 8.5 mL* |
| **Overall duration of the study** | Total = 51 mL |

Blood samples for PK and PD analyses should be collected at the requested times; however, a window of ± 10%, but no more than 15 minutes, for sample collection will be allowed. The exact actual time of collection should be noted in the CRFs and used for the PK calculations.

Less than 500 mL of blood (which corresponds approximatively to a blood donation) will be collected during the whole study.

**9.4.    Prohibitions and restrictions applying to subjects**

Tobacco use is prohibited.

Subjects will be requested to abstain from strenuous physical activity, consumption of grapefruit or grapefruit-containing products, alcohol and stimulating beverages containing xanthine derivatives (i.e., no coffee, tea, chocolate or cola like drinks) for 48 hours prior to admission and until the follow up visit.

Meals will be provided during the subjects' stay in the clinic. Drinking of water will be allowed *ad libitum* except for 1 h before and 1 h after dosing.

SAD and PD:
An overnight fast will be imposed so that no food is taken within at least 8 hours before IMP administration. Subjects will remain fasted for at least 4 hours after dosing.

MAD:

The dosing of MAD is expected to be under fasting conditions; however this should be confirmed by the FI part.

FI:

*Fasting period*: An overnight fast will be imposed so that no food is taken within at least 8 hours before IMP administration. Subjects will remain fasted for at least 4 hours after dosing.

*Fed period*: On PK days, IMP will be administered 30 minutes after start of intake of a standardized high-fat breakfast. Composition of the standardized high-fat breakfast is 2 eggs fried in butter, 80 g of bacon, 40 g of toast, 25 g of butter, 120 g of potatoes and 240 mL of whole milk (i.e., 180 protein, 220 carbohydrate and 600 fat calories).

## 10.  MEASURES TO MINIMIZE BIAS

### 10.1.  Randomisation procedure

The randomization schedule for each part and three sets of individual sealed codebreak envelopes (for the SAD, MAD and PD parts) will be generated by a Biotrial Statistician, who will be different from the study statistician, using SAS software.

One copy of the randomization list will be provided to the unblinded pharmacist for preparation of the treatment for the SAD, FI, MAD and PD parts.

One set of the sealed codebreak envelopes will be provided to the investigational site, one sent to the Sponsor and one sent to the pharmacovigilance (PV) contact for the trial.

No set of sealed codebreak envelopes will be prepared for the FI part as this part will be open-label.

Subjects withdrawn from the study retain their randomization number, if already given. New subjects must always be allotted a new randomization number/treatment number (replacement treatment number): once assigned, randomization numbers are never re-used within the study site. Note that subjects will be identified by their randomization numbers, throughout the entire course of the study.

Subjects who withdraw or drop out could be replaced. The replacement subject will be assigned to the same treatment or treatment sequence as the replaced subject.

**Table 7: Randomisation**

| Group | Randomization number | Replacement randomization number | Randomization ratio Verum:Placebo |
|---|---|---|---|
| S1 | 1101 to 1102 | 5101 to 5102 | 1:1 |
| | 1103 to 1108 | 5103 to 5108 | 5:1 |
| S2 | 1201 to 1208 | 5201 to 5208 | 6:2 |
| S3 | 1301 to 1308 | 5301 to 5308 | 6:2 |
| S4 | 1401 to 1408 | 5401 to 5408 | 6:2 |
| S5 | 1501 to 1508 | 5501 to 5508 | 6:2 |
| S6 | 1601 to 1608 | 5601 to 5608 | 6:2 |
| S7 | 1701 to 1708 | 5701 to 5708 | 6:2 |
| S8 | 1801 to 1808 | 5801 to 5808 | 6:2 |
| M1 | 2101 to 2108 | 6101 to 6108 | 6:2 |
| M2 | 2201 to 2208 | 6201 to 6208 | 6:2 |
| M3 | 2301 to 2308 | 6301 to 6308 | 6:2 |
| M4 | 2401 to 2408 | 6401 to 6408 | 6:2 |
| FI | 3101 to 3112 | 7101 to 7112 | NA |
| PD | 4101 to 4120 | 8101 to 8120 | NA |

### 10.2.  Blinding

This study is double-blind for the SAD, MAD and PD parts. The FI part is open label.

The unblinded pharmacist and his/her attendant will be the only personnel to have access to the randomisation list.

**10.3.  Emergency code-break procedure**

In case of an emergency, when knowledge of the investigational product assignment is required for the medical management of an individual subject, the treatment for that subject may be unblinded. The investigator must notify the sponsor within 24 hours after determining that it is necessary to unblind the treatment assignment.

This documentation must include the name of the individual breaking the blind, the date on which the blind was broken, and a description of the event that led to the unblinding. The investigator must also indicate in source documents and in the CRF that the blind was broken and provide the date, time, and reason for breaking the blind. Any AE or serious AE (SAE) associated with breaking the blind must be recorded and reported as specified in this protocol.

Monitors will routinely check the integrity of the envelopes that are stored at the site. The envelopes will be collected from the site prior to study close-out and sent to the Sponsor to ensure that they were all intact.


**11.  PHARMACOKINETIC EVALUATION**

**11.1.  Pharmacokinetic Criteria**

The investigated pharmacokinetic criteria include:

**In the SAD part:**
*PK Plasma parameters*
The investigated plasma pharmacokinetic criteria include: the maximum observed plasma concentration ($C_{max}$), the time of occurrence of $C_{max}$ ($t_{max}$), the terminal elimination rate constant ($\lambda z$), the apparent terminal half-life ($t_{1/2}$), the area under plasma concentration-time curve from hour 0 to last sample with measurable plasma concentrations ($AUC_{last}$), the area under plasma concentration-time curve from hour 0 to infinity ($AUC_{inf}$), the apparent volume of distribution ($Vz/F$), the apparent total body clearance ($CL/F$), the last measurable plasma concentration ($C_{last}$) and the time to reach last measurable plasma concentration ($t_{last}$).

Additional parameters could be calculated if deemed necessary.


*PK urine parameters*
The investigated urine pharmacokinetic criteria include: the total amount excreted in urine ($A_e$), the percent of drug recovered in urine ($A_{e\ \%dose}$) and the apparent renal clearance ($CL_r$). Additional parameters could be calculated if deemed necessary.


**In the MAD part:**
*PK Plasma parameters*
-    On D1: The investigated plasma pharmacokinetic criteria include: the maximum observed plasma concentration ($C_{max}$), the time of occurrence of $C_{max}$ ($t_{max}$), the area under the plasma concentration-time curve over one dosing interval ($AUC_{0-\tau}$), the area under plasma concentration-time curve from hour 0 to last sample with measurable plasma concentrations ($AUC_{last}$), the last measurable plasma concentration ($C_{last}$) and the time to reach last measurable plasma concentration ($t_{last}$).

- On D10: The investigated plasma pharmacokinetic criteria include: the maximum observed plasma concentration ($C_{max}$), the time of occurrence of $C_{max}$ ($t_{max}$), the area under the plasma concentration-time curve over one dosing interval ($AUC_{0-\tau}$), the area under plasma concentration-time curve from hour 0 to last sample with measurable plasma concentrations ($AUC_{last}$), the area under plasma concentration-time curve from hour 0 to infinity ($AUC_{inf}$), the elimination rate constant ($\lambda z$), the apparent terminal half-life ($t_{1/2}$), the apparent volume of distribution ($Vz/F$), the apparent total body clearance ($CL/F$), the minimum observed plasma concentration ($C_{min}$), the average plasma concentration at steady state ($C_{average}$) calculated as $C_{average} = AUC_{0-\tau}/\tau$, the concentration at the end of a dosing interval before the next dose administration ($C_{trough}$), the peak-trough fluctuation (PTF%) calculated as PTF% = 100 x $[(C_{max}-C_{min})/C_{average}]$; the last measurable plasma concentration ($C_{last}$), the time to reach last measurable plasma concentration ($t_{last}$) and the accumulation ratio of $C_{max}$ and $AUC_{0-\tau}$ ($R_{acc}\ C_{max}$ and $R_{acc}\ AUC_{0-\tau}$) calculated as:

- $R_{acc}\ C_{max} = C_{max,\ Day\ 10} / C_{max,\ Day\ 1}$
- $R_{acc}\ AUC_{0-\tau} = AUC_{0-\tau,\ Day\ 10} / AUC_{0-\tau,\ Day\ 1}$

Additional parameters could be calculated if deemed necessary.

- *PK urine parameters*

The investigated urine pharmacokinetic criteria include: the total amount excreted in urine ($A_e$), the percent of drug recovered in urine ($A_{e\ \%\ dose}$) and the apparent renal clearance ($CL_r$).

Additional parameters could be calculated if deemed necessary.

**In the FI part:**

*PK Plasma parameters*

The investigated plasma pharmacokinetic criteria include: the maximum observed plasma concentration ($C_{max}$), the time of occurrence of $C_{max}$ ($t_{max}$), the elimination rate constant ($\lambda z$), the apparent terminal half-life ($t_{1/2}$), the area under plasma concentration-time curve from hour 0 to last sample with measurable plasma concentrations ($AUC_{last}$), the area under plasma concentration-time curve from hour 0 to infinity ($AUC_{inf}$), the apparent volume of distribution ($Vz/F$), the apparent total body clearance ($CL/F$), the last measurable plasma concentration ($C_{last}$) and the time to reach last measurable plasma concentration ($t_{last}$).

Additional parameters could be calculated if deemed necessary.

**11.2.   Pharmacokinetic Assessment Methods and Timing**

**Plasma**

Venous blood samples (3 mL) for the determination of plasma concentrations of BIA 10-2474 and metabolites will be drawn by direct venipuncture or via an intravenous catheter into K3-EDTA tubes during the SAD, MAD and FI parts of the study.

It is important to avoid haemolysis during blood collection.

After collection, the blood samples will be immediately (no longer than 30 min) centrifuged, at approximately 1500 g for 10 minutes at 4°C. The resulting plasma will be separated into 2 equal aliquots of at least 250 µL each (series A & B) and transferred to polypropylene tubes, which will be labelled, frozen and stored at –80 ºC until required for analysis. These plasma aliquots will be used for the determination of BIA 10-2474 and its metabolites.

The blood samples will be drawn at the time-points indicated in Flow chart 1 for the SAD part, Flow chart 2 for the FI part, Flow chart 3 for the MAD part, and Flow chart 4 for the PD part. When a sampling time is close to a meal time, the sample will be collected before the meal.

## Urine

Urine will be collected in glass containers (adapted to the collected urine volume) at the designated time points in the SAD and MAD parts of the study (see Flow chart 1 for the SAD part, and Flow chart 3 for the MAD part), their volume will be recorded in the CRF.

Aliquots of 10 ml of the resulting urine will be transferred into 15 mL polypropylene tubes, and 30 µL of Tween 80 will be immediately added to the sample. It is important to rigorously vortex the sample and ensure that it is sufficiently homogeneous, and they will be frozen and stored at -80°C until required for analysis.

## 11.3.   Sample handling and labelling

Sample tubes will be labelled with self-adhesive pre-printed labels able to withstand freezing temperatures.

All samples will be frozen in an upright position; they will be retained in the clinical freezers at a temperature of < -70°C nominal or on dry ice until transferred to the laboratory to be stored frozen at a temperature of -80°C nominal until assayed.

Each aliquot of plasma will be identified as follows:

-   Line 1: Study 1BIAL35 / BIA-102474-101 (SAD, MAD or FI),

-   Line 2: randomisation number,

-   Line 3: theoretical day and time after drug administration (e.g., D1H24); for the FI part, the period will also be identified (e.g., P1D1H24),

-   Line 4: PK assay (plasma),

-   Line 5: time point number (e.g., 101 for plasma D1 pre-dose, 102 for plasma D1H0.5),

-   Aliquot number.

Each aliquot of urine will be identified as follows:

-   Line 1: 1BIAL35 / BIA-102474-101 (SAD or MAD),

-   Line 2: randomisation number,

-   Line 3: theoretical day interval of time after drug administration (e.g., D1[H24-H36]),

-   Line 4: PK assay (urine),

-   Line 5: time point number (e.g., 201 for urine D1 pre-dose, 202 for urine D1[H0-H4]),

-   Aliquot number.

**11.4.   Sample shipment and storage**

The samples will be shipped in a container filled with enough dry ice to ensure that the samples are kept frozen.

Study samples for PK assays will be shipped to: SWISSBIO ANALYTICS AG, Sternenfeldstr. 14, CH-4127 Birsfelden, Switzerland.

**11.5.   Bioanalytical methods**

Determination of plasma concentrations will be carried out in compliance with Good Laboratory Practices (GLP) utilising validated methods. Details of the methodologies used and the results obtained will be given in the bioanalytical reports.

## 12.   PHARMACODYNAMIC ASSESSMENT

**12.1.   Pharmacodynamic criteria**

Detailed descriptions of the PD parameters and of their calculation are provided below.

**SAD, MAD and FI parts**
*FAAH activity*
The investigated criteria include the maximum observed effect on FAAH activity ($E_{max}$); time to occurrence of $E_{max}$ ($t_{Emax}$); area under the effect-time curve (AUEC), calculated by the trapezoidal rule.

FAAH activity will be expressed as the amount of deuterated ethanolamide (EA-d4) formed by the action of the FAAH in isolated leukocyte samples, on an anandamide substrate, in pmol per hour, per mL of blood (pmol/H/mL blood).

Besides, AEA and related FAAs like PEA, OEA and LEA will also be analysed.
Additional parameters could be calculated if deemed necessary.

The blood samples will be drawn at the time-points indicated in Flow chart 1 for the SAD part, Flow chart 2 for the FI part, Flow chart 3 for the MAD part, and Flow chart 4 for the PD part. When a sampling time is close to a meal time, the sample will be collected before the meal.

**SAD part**
*Psychometric testing*
The investigated criterion is the M-(marijuana) score.

## PD part

### *Psychometric tests and scales*

The investigated criteria include speed (expressed as the mean reaction time) for CRT, DV and for RVIP, accuracy for CRT (expressed as the number of correct answers), DV (expressed as the number of correct answers) and RVIP (expressed as the number of correctly detected targets), number of missed targets and number of false answers for DV and RVIP, immediate and delayed recall efficiencies for LMT (expressed as the number of words correctly recalled in immediate recall 1, mean number of words correctly recalled in all immediate recalls and number of words recalled in delayed recall), sleepiness score for SSS and tension-anxiety, depression-dejection, anger-hostility, vigour-activity, fatigue-inertia and confusion-bewilderment scores for POMS.

Additional parameters could be calculated if deemed necessary.

### *Pain model (cold pressor test)*

The investigated criteria include pain and parameters derived from the pain VAS: the time endured with hand submerged in cold water (cold pressor tolerance-$CP_{tol}$), the maximum value observed (pain $VAS_{max}$), the total of values observed until the withdrawal from the bath (pain $VAS_{total}$), and the analog scale with replacement of missing values between time of withdrawal and 120 seconds by maximum value (100) (pain $AUC_{0-120s}$).

Additional parameters could be calculated if deemed necessary.

### *Cough challenge (capsaicin)*

The investigated criteria include the concentrations of capsaicin causing five (C5) and two coughs (C2), the number of coughs during the first 15s after administration for each capsaicin concentration, the number of coughs from 15s after to 1 minute after administration for each capsaicin concentration.

Additional parameters could be calculated if deemed necessary.

### *IOP measurement*

The investigated criterion is intraocular pressure (in mmHg).

Additional parameters could be calculated if deemed necessary.

### *Apomorphine challenge*

The investigated criteria include emesis and parameters derived from the nausea VAS: the maximum degree of nausea ($NS_{max}$), the time of the maximum degree of nausea ($NS\ t_{max}$), the area under the degree of nausea versus time curve [NS $AUC_{(0-90\ mins)}$].

Additional parameters could be calculated if deemed necessary.

## 12.2.  Pharmacodynamic Assessment Methods and Timing

### 12.2.1. FAAH activity

Venous blood samples (4 mL) for the determination of FAAH activity will be drawn by direct venipuncture or via an intravenous catheter into Li-Heparin tubes.

It is important to avoid haemolysis during blood collection.

When a sampling time is close to a meal time, the sample will be collected before the meal.

### 12.2.1.1. Sample handling and labelling

Sample tubes will be labelled with self-adhesive pre-printed labels able to withstand freezing temperatures.

Precisely 2.00 mL aliquots of human blood will be diluted in approximately 36.8 mL of cold (4°C) red cell lysis buffer. After 10 minutes of rock mixture at room temperature, samples will be centrifuged at 4°C for 10 minutes at 300 g. The supernatant will be carefully discarded and the pellet resuspended in 2.5 mL cold Phosphate-buffered saline (PBS) followed by centrifugation for 10 minutes at 800 g at 4°C. Again, the supernatant will be carefully discarded and the pellet immediately frozen and kept on dry ice until storage. Each aliquot will be stored at -80°C until required for analysis.

Each aliquot of leukocytes will be identified as follows:

- Line 1: 1BIAL35 / BIA-102474-101 (SAD, MAD or FI),
- Line 2: randomisation number,
- Line 3: theoretical day and time or interval of time after drug administration,
- Line 4: FAAH assay,
- Line 5: time point number (e.g., 301 for FAAH D1 predose, 302 for FAAH D1H0.5); for the FI part, the period will also be identified (e.g., P1D1H24),
- Aliquot number.

### 12.2.1.2. Sample shipment and storage

The samples will be shipped in a container filled with enough dry ice to ensure that the samples are kept frozen.

Study samples for FAAH activity assays will be shipped to: SWISSBIO ANALYTICS AG, Sternenfeldstr. 14, CH-4127 Birsfelden, Switzerland.

### 12.2.1.3. Bioanalytical methods

FAAH assays will be carried out in compliance with GLP utilising validated methods. Details of the methodologies used and the results obtained will be given in the bioanalytical reports.

## 12.2.2. AEA and related FAAs

Venous blood samples (6 mL) for the determination of AEA and FAAs will be drawn by direct venipuncture or via an intravenous catheter into K3-EDTA tubes during the SAD, MAD and FI parts of the study.

It is important to avoid haemolysis during blood collection.

After collection, the blood samples will be immediately (no longer than 30 min) centrifuged, at approximately 1500 g for 10 minutes at 4°C. The resulting plasma will be separated into 2 equal aliquots of at least 1.5 mL each (series A & B) and transferred to polypropylene tubes, which will be labelled, frozen and stored at −80 °C until required for analysis. These plasma aliquots will be used for the determination of AEA and related FAAs.

### 12.2.2.1. Sample handling and labelling

Sample tubes will be labelled with self-adhesive pre-printed labels able to withstand freezing temperatures.

All samples will be frozen in an upright position; they will be retained in the clinical freezers at a temperature of < -70°C nominal or on dry ice until transferred to the laboratory to be stored frozen at a temperature of -80°C nominal until assayed.

Each aliquot of plasma will be identified as follows:

- – Line 1: Study 1BIAL35 / BIA- 10-2474-101,
- – Line 2: randomisation number,
- – Line 3: theoretical day and time after drug administration (e.g., D1H24),
- – Line 4: AEA & FAAs assay (plasma),
- – Line 5: time point number (e.g., 101 for plasma D1 pre-dose, 102 for plasma D1H0.5),
- – Aliquot number.

### 12.2.1.2. Sample shipment and storage

The samples will be shipped in a container filled with enough dry ice to ensure that the samples are kept frozen.
Study samples for AEA and related FAAs will be shipped to: NUVISAN GmbH, Wegenerstrasse 13, 89231 Neu-Ulm, Germany.

### 12.2.1.3. Bioanalytical methods

AEA and FAAs assays will be carried out in compliance with GLP utilising validated methods. Details of the methodologies used and the results obtained will be given in the bioanalytical reports.

### 12.2.3. Cognitive testing

<u>In the SAD part:</u>

M-scale will be used at T0 before dosing and at 3h post dose. A familiarization session will be done on D-1.

<u>In the PD part:</u>

Several psychometric tests and scales will be used, including CRT, DV, RVIP, LMT, SSS, and POMS.

The baseline will be established prior to dosing on D-1. The tests will then be administered at the predicted $t_{max}$ on D1, D5 and D9.

As performance on CRT, DV, RVIP tests shows a learning component, a training session will be organised on D-1 morning so that volunteers can reach their maximal performance prior to the study. These tests will therefore be done at least 4 times.

The tests without learning effect (LMT and subjective evaluations) will be done only once to familiarise the subjects with the procedure.

All psychometric tests and scales will be computerized; this computer-assisted testing takes approximately 30 minutes and allows rapid electronic transfer into the study database.

#### 12.2.2.1. M-scale

The marijuana (M) scale is a self-reporting instrument specifically designed to measure cannabis intoxication. It is a subscale (12 true-false statements) of the Addiction Research Center Inventory (ARCI) which was developed by Chait et al. (1985) and has been demonstrated to be sensitive to the effects of smoked marijuana [7].

#### 12.2.2.2. Choice reaction time (CRT)

This test evaluates the speed at which a subject is able to respond to a complex visual stimulus. The complex stimulus consists of the words YES or NO, which will appear randomly at the centre of the computer screen. The subject is asked to press the green button (! button) of the keyboard as quickly as possible if the word YES appears on the screen, or to press the red button (W button) as quickly as possible if the word NO appears on the screen. Fifty (50) targets (25 YES and 25 NO) will be presented to the subject. This test takes approximately 3 minutes. Performance is assessed by the speed, expressed as the mean reaction time in msec, and the accuracy, expressed as the number of correct answers.

#### 12.2.2.3. Digit vigilance (DV)

This test assesses sustained attention. A target digit is randomly selected and constantly displayed to the right of the screen. A series of 500 digits is then presented in the centre of the screen at the rate of 150 per minute and the subject is required to press the space bar of the keyboard as quickly as possible every time the digit in the series matches the target digit. There are 50 targets in the series. The test takes approximately 4 minutes. The performance is the speed, expressed as the mean reaction time in msec, and the accuracy, expressed as the number of correct answers. In addition, missed targets and false answers are recorded.

#### 12.2.2.4. Rapid visual information processing (RVIP)

This test assesses the effects of drugs on sustained attention and working memory. A series of 1000 digits is presented in the centre of a computer screen at a rate of 100 digits every 70 sec. The subject is instructed to press the space bar of the keyboard as quickly as possible when they detect sequences of three consecutive odd or three consecutive even digits. On average, 80 of these sequences (40 odd sequences and 40 even sequences) are presented over 10 minutes. Any two sequences are separated by a minimum of 5 and a maximum of 30 digits. After the appearance of the third digit of an experimental target, 1500 msec are allowed for a correct response to be made. Responses obtained at any other time are counted as errors. The performance is the speed, expressed as the mean reaction time in msec, and the accuracy, expressed as the number of correctly detected targets. In addition, missed targets and false answers are recorded.

#### 12.2.2.5. Learning memory task (LMT)

This test involves learning a list of 15 words which are presented to the subject on a computer screen at a rate of one word every 900 msec. It assesses short- and long-term memory. After the presentation of the 15 words, the subject is asked to recall freely as many words as possible in any order in 60 seconds. This process will then be repeated until 4 trials have elapsed, with the 15 words presented in a different order at each trial. Delayed free recall is recorded about 30 minutes later, when the subject is then given 60 seconds to recall freely as many words as he can remember. Equivalent lists are constructed using commonly used words of 2 syllables, selected according to their degree of concreteness, imagery and meaningfulness. At each time and day, as requested in the protocol, a different list of words (equivalent) will be presented to the subject. The scores are the number of words recalled after the first immediate recall (immediate free recall 1), and the mean number of words correctly recalled in all immediate recalls (mean immediate free recall) and in the delayed free recall.

#### 12.2.2.6. Stanford Sleepiness Scale (SSS)

The Stanford Sleepiness Scale is used to provide a subjective assessment of the subject's general level of daytime sleepiness. The SSS consists of a seven-point scale of equal intervals varying from 1 ("feeling active and vital; alert; wide awake ") to 7 ("almost in reverie; sleep onset soon, lost in struggle to remain awake"). The score is expressed between 1 and 7.
It must be taken into account that most people have two peak times of alertness daily, at about 9 a.m. and 9 p.m. Alertness wanes to its lowest point at around 3 p.m.; after that it begins to build again.

#### 12.2.2.7. Profile of Mood States (POMS)

The Profile Mood Scale consists of 65 adjectives describing various mood feelings. A computerized version of this paper-pencil questionnaire will be used in this study. Each adjective will appear one by one on the screen and the subject is asked to describe how these adjectives reflect his mood at the time he is completing the questionnaire, rating each description on a 5 point scale of increasing agreement: from "not at all" to "extremely". Six scores are classically derived from the questionnaire: tension – anxiety (TA), depression – dejection (DD), anger – hostility (AH), vigor – activity (VA), fatigue – inertia (FI), confusion – bewilderment (CB).

### 12.2.4. Pain model: Cold Pressor Test

In the PD part, the cold pressor test will be used in order to induce pain and to verify a potential antalgic effect of BIA 10-2474. This test will be done during the screening visit in order to verify that the study subjects are all responsive to the predefined cold pressor tolerance test. This test will then be used as a pain model on Day 6 at $t_{max}$.

The cold pressor test will be performed by having the subjects submerge their dominant hand and wrist in circulating cold water and hold it there as long as they are able, up to 120 seconds. Endurance time (time to remove hand) will be recorded. The refrigerated circulator is connected to a container with a water temperature of 3.0°C and flow rate of 22 L/min; Subjects will rate their pain intensity every 10 seconds until the hand is withdrawn from the bath on a pain VAS. This latter is a 100 mm VAS ranging from "no pain at all" to "the maximum pain that you can imagine" and will be used at all-time points.

Cold pressor tolerance ($CP_{tol}$) is assessed by the time endured with the hand submerged in cold water and is considered as the main outcome.
In addition to $CP_{tol}$, the pain intensity will be analysed as the maximum value observed ($VAS_{max}$), the total of values observed until withdrawal from the bath ($VAS_{total}$), and $AUC_{0-120s}$ , which is the analogue scale with replacement of missing values between time of withdrawal and 120 seconds by the maximum value (100).

### 12.2.5. Antitussive model: Cough challenge (capsaicin)

In the PD part, capsaicin will be used in order to experimentally induce cough and to assess a potential antitussive effect of BIA 10-2474. This test will be done during the screening visit in order to verify that the study subjects are all responsive to the cough provocation agent (capsaicin) at the concentration tested at screening. This cough challenge will then be used as an antitussive model on Day 7 at $t_{max}$.

According to the European Respiratory Society (ERS) guidelines [8], the methodology for the performance of inhalation cough challenge is standardized in order to facilitate universal interpretation and comparison of data.
For this reason, the cough challenge test will use the single-breath concentration–response method using a flow-limited dosimeter, and both C2 and C5 will be recorded [i.e., the concentrations of capsaicin causing two (C2) and five coughs (C5)].
Capsaicin, the non-acid tussive agent most commonly used to experimentally induce cough in humans, was first described in 1984 and is well known to induce cough in a dose-dependent and reproducible manner.
Studies in healthy volunteers are almost invariably performed using cough challenge methodologies. Subject selection includes a screening visit, during which the challenge is performed. There is a strong argument for excluding subjects who show cough responses only at high challenge concentrations. In these subjects, it is difficult to demonstrate cough suppression because they are already approaching the maximum tolerable dose, and nonspecific effects, such as a burning sensation from capsaicin, mask any active effect.

Materials:
In order to control inspiratory flow rate, the device used will be a compressed air-driven nebulizer controlled by a dosimeter, modified by the addition of an inspiratory flow regulator valve.

The valve limits inspiratory flow rate to 0.5 L/sec regardless of excessive inspiratory force, thereby guaranteeing a consistent and reproducible inspiratory effort with each breath. Thus, with appropriate instructions to inhale with sufficient force, all subjects achieve an identical inspiratory flow rate during each inhalation of aerosol.

Using these devices, the exact output (in mL/min) of the nebulizer is determined and the modulation of the duration of aerosol delivery permits the determination of aerosol output per inhalation. For example, a nebuliser with an output of 1.007 mL/min, programmed to deliver aerosol for 1.2 s, provides 0.02 mL/breath.

Measurements:
Capsaicin cough challenge will be performed by inhalation of incrementally doubling concentrations of capsaicin (0.9765-500 $\mu$mol/L). The dosimeter will deliver a puff of 20 $\mu$L per administration. Up to 10 concentrations of capsaicin could be tested by the volunteer to determine the concentration causing two and five coughs at screening (=baseline) and on Day 7 of each period.

Determination of tussive response to cough challenge:
When employing the single-breath method of capsaicin administration, the tussive response to each dose of aerosol is immediate and brief.

Subjects undergoing cough challenge should be specifically instructed not to attempt to suppress any coughs and not to talk immediately after inhalation of the tussive agent, since this may potentially suppress cough. It is recommended, for example, to give the following instruction to subjects: ''allow yourself to cough if you need to and as much as you need to''. Subjects should not be told that the induction of a specific number of coughs is the end-point of the study.

Therefore, only coughs occurring within 15s of capsaicin delivery should be counted. Coughs that occur beyond this time period may not be capsaicin-induced, but will nevertheless be counted.

Interpretation of cough challenge data:
For each test, the concentrations of capsaicin causing two (C2) and five coughs (C5) will be reported. The C2 and C5 can be obtained by determining the first administered concentration that results in two or more and five or more coughs; the number of coughs during the first 15s after administration for each capsaicin concentration. The number of coughs from 15s after to 1 minute after administration for each capsaicin concentration will also be counted.

## 12.2.6. Intraocular pressure measurement

In the PD part, on Day 8 at $t_{max}$, IOP will be measured by an ophthalmologist using an applanation tonometer.

## 12.2.7. Apomorphine challenge

In the PD part, apomorphine will be used in order to experimentally induce nausea and/or emesis and to assess a potential anti-emetic effect of BIA 10-2474. This apomorphine challenge will be used as an anti-emetic model on Day 10 at $t_{max}$.

Each subject will receive a single 50 µg/kg subcutaneous injection of apomorphine. Apomorphine will be administered around the $t_{max}$ of BIA 10-2474, as determined in the SAD part/MAD part.

The capacity of BIA 10-2474 to inhibit apomorphine-induced nausea and/or emesis will be evaluated by recording the occurrence of vomiting, the total number of retches and vomits, and the degree of nausea after having administered 50 µg/kg of apomorphine. Nausea, retches and/or vomiting are expected to occur within 10 minutes on average after the injection of apomorphine, with duration of approximately 5 to 45 minutes.

The emesis will be evaluated over 90 minutes after apomorphine injection as follows:
• Occurrence of vomiting : Yes/No
• Total number of vomits and retches
• Degree of nausea using a 100 mm VAS ranging from 0 (no nausea) to 100 (severe nausea). The volunteers will be asked to record the degree of nausea using a 100 mm VAS just before the apomorphine injection and at 10, 20, 30, 40, 50, 60, 70, 80, and 90 minutes after injection. During the emesis challenge test, subjects will be in separate rooms.

The following parameters will be derived and analysed: Maximum degree of nausea ($NS_{max}$), time of the maximum degree of nausea (NS $t_{max}$), area under the degree of nausea versus time curve [NS $AUC_{(0-90 mins)}$].

## 13. SAFETY ASSESSMENT

### 13.1. Physical Examination

In all study parts, physical examination will be performed at screening, at admission visit, at discharge and at follow-up visit.

Body weight and height are measured at screening visit in order to calculate the BMI (inclusion criteria #2).

Physical examination can also be performed throughout the study on medical indication at the discretion of the medical investigator.

The physical examinations will be performed by the Investigator or his representatives.

### 13.2. Neurological Examination

A complete neurological examination will be performed at screening in the four study parts, and at discharge in the PD part.

### 13.3. Vital Signs

### 13.3.1. Parameters

- Measured parameters: Supine and standing systolic blood pressure (SBP), diastolic blood pressure (DBP) and pulse rate, and body temperature.

### 13.3.2. Method of assessment

Qualified staff members will perform BP measurements. If possible, BP measurements will be taken from the same arm (opposite the arm that is used for blood sample collection) by an automated BP monitor using the oscillometric method (e.g., Dinamap®). In the case of an out-of-range value, measurements will be repeated immediately to confirm the change. Normal ranges for vital signs parameters used will be according to Biotrial standard operating manual (SOP).

Orthostatic vital signs (supine and standing BP and pulse) will be obtained:

- In the SAD part: at screening, D-2, D-1, D1, D2, D3, D4 at discharge, and at the Follow-up Visit.

- In the FI part: at screening, and for each period at D-1, D-2, D1, D2, D4 at discharge, and at the Follow-up Visit.

- In the MAD part: at screening, D-2, D-1, D1, D2, D10, D11, D12, D13 at discharge, and at the Follow-up visit.

- In the PD part: at screening, and for each period at D-1, D1, D2, D9, D10, D11, D12 at discharge, and at the Follow-up Visit.

Supine BP and pulse will be measured after the subject has been supine for at least 5 minutes. Standing BP and pulse will be measured after the subject has been standing for 2–3 minutes.

On D-1, vital signs will be obtained in triplicate at approximately 15 to 30 minute intervals. The subjects will be made to lie supine for at least 5 minutes before supine BP measurement and to stand for 2–3 minutes before the standing measurement. This process will be repeated 3 times in the same conditions each time. The average of the triplicate vital sign measurements will serve as baseline.

Tympanic body temperature will be measured:

- In the SAD part: at screening, D-2, D4/discharge, and at the Follow-up Visit.

- In the FI part: at screening, and for each period at D-2, D4/discharge, and at the Follow-up Visit.

- In the MAD part: at screening, D-2, D13/discharge, and at the Follow-up visit.

- In the PD part: at screening, and for each period at D-1, D12/discharge, and at the Follow-up Visit.

When vital signs are scheduled at the same time as blood draws, the blood draws will be obtained at the scheduled time point, and the vital signs will be obtained as close to the scheduled blood draw as possible. The timing of the assessments is summarised in Flow chart 1 for the SAD part, Flow chart 2 for the FI part, Flow chart 3 for the MAD part, and Flow chart 4 for the PD part.

### 13.4.  Standard 12-lead ECG

### 13.4.1. Parameters

- Measured parameters: HR, PR, QRS duration, QRS axis, QT;

- Derived parameters: two corrections of the QT interval will be investigated: Fridericia's correction (QTcF) and Bazett's correction (QTcB).

- Observations and comments on the quality of trace, on normality or abnormality.

### 13.4.2. Method of assessment

ECG recordings will be made using a Cardionics® ECG system.

12-lead ECG recordings will be performed:

- In the SAD part: at screening, D-2, D-1, D1, D2, D3, D4 at discharge, and at the Follow-up Visit.

- In the FI part: at screening, and for each period at D-1, D-2, D1, D2, D4 at discharge, and at the Follow-up Visit.

- In the MAD part: at screening, D-2, D-1, D1, D2, D10, D11, D12, D13 at discharge, and at the Follow-up visit.

- In the PD part: at screening, and for each period at D-1, D1, D2, D9, D10, D11, D12 at discharge, and at the Follow-up Visit.

The timing of the assessments summarised in Flow chart 1 for the SAD part, Flow chart 2 for the FI part, Flow chart 3 for the MAD part, and Flow chart 4 for the PD part. Triplicate ECGs will be obtained on D-1 at approximately 15 to 30 minute intervals. The average of the triplicate ECGs will serve as baseline.

The measurements will consist of 12-lead digital ECGs: D1, D2, D3, aVr, aVL, aVf, V1 to V6. Normal ranges for ECG parameters will be according to Biotrial SOP.

Subjects must rest in the supine position for at least 5 minutes before the ECG recording is started. The ECG may be recorded during the period of rest required before the measurements of supine BP and pulse. A qualified physician will review the ECGs promptly and any clinically important finding will be recorded on the appropriate CRF. The investigator is responsible for providing the interpretation of all ECGs.

### 13.5. Telemetry

### 13.5.1. Parameters

Cardiac telemetry is continuous monitoring of a patient's heart rate and rhythm.

### 13.5.2. Method of assessment

Telemetry will be used:

- In the SAD part: from pre-dose to 24h post-dose on D1 only

- In the MAD part: from pre-dose to 24h post-dose on D1 and from pre-dose to 24h post-dose on D10.

Telemetry system allows a remote monitoring of the cardiac rhythm of the subjects. This is a wireless device allowing subjects to move around freely in the clinical unit. A centralised, continuous and automatic evaluation of the ECG signal is carried out. Alerts are triggered as soon as an abnormal event occurs (arrhythmias). These alerts are reviewed by the investigator and considered for safety management of the subjects.

The system used at Biotrial is Cardiovision by Cardionics.

## 13.6.   Laboratory safety parameters

### 13.6.1. Serology, Drug Screen, Pregnancy Tests, Hormonology, and Risk Factors

Blood tests will be carried out to test for the presence of HIV-1 and 2 antibodies, HCV antibodies and HBs Ag.

Urinary screening will be carried out to test for amphetamines, barbiturates, benzodiazepines, cannabinoids, cocaine, and opiates.

Alcohol breath tests will be performed.

Serology will be carried out only at screening (for the four study parts).

Drug and alcohol screens will be carried out at screening and at each admission (D-2 for SAD, FI and MAD parts, and D-1 for PD part).

Female subjects of childbearing potential will be tested for pregnancy, in serum at screening and at the Follow-up Visit, and in urine at each admission.

FSH levels will be measured in post-menopausal female subjects only if less than12 months post last menstrual period.

### 13.6.2. Laboratory Safety

#### 13.6.2.1. Blood safety analysis

The following parameters will be determined:

- **Haematology:**

Red blood cell count, haemoglobin, haematocrit, white blood cell count with differential (neutrophils, lymphocytes, monocytes, eosinophils, basophils), platelets count.

- **Coagulation:**

Activated partial thromboplastin time (APTT), international normalized ratio (INR).

- **Biochemistry:**

Sodium, potassium, calcium, chloride, total and conjugated bilirubin, alanine aminotransferase (AST), aspartate aminotransferase (ALT), gamma-glutamyl transferase (GGT), alkaline phosphatases, total protein, albumin, urea, uric acid, bicarbonate, creatine phosphokinase (CPK), creatinine, glycaemia, lactate dehydrogenase (LDH).

#### 13.6.2.2. Urinalysis parameters

Determination of pH, protein, glucose, leukocytes, nitrites, ketones, and blood will be performed.

#### 13.6.2.3. Method of assessment

Clinical laboratory assessments and samples of urine are scheduled:

- In the SAD part: at screening, D-2, at discharge, and at the Follow-up Visit.
- In the FI part: at screening, and for each period at D-2 and at discharge, and at the Follow-up Visit.

- In the MAD part: at screening, D-2, D5 (predose), at discharge, and at the Follow-up Visit.

- In the PD part: at screening, and for each period at D-1, at discharge, and at the Follow-up Visit.

All clinically significant abnormal laboratory test values identified after IMP administration will be repeated until the values return to normal or baseline. If laboratory values do not return to normal or baseline within a reasonable period, the aetiology should be identified and the Sponsor notified.

The Safety urinalysis will involve semi-quantitative analysis (dipsticks): pH, protein, glucose, leukocytes, nitrites, ketones, blood.

### 13.6.2.4. Laboratory safety determinations

Laboratory tests will be performed for Biotrial Rennes by the Centre de Lutte contre le Cancer Eugène Marquis, Département de Biologie Clinique, Rue de la Bataille de Flandres-Dunkerque – CS44229 - 35062 Rennes Cedex.

### 13.7.   Adverse Events and Treatment Emergence

### 13.7.1. Definitions

- **Adverse Event**

An AE is any untoward medical occurrence in a patient or clinical investigation subject administered a medicinal product and which does not necessarily have a causal relationship with the treatment.

An AE can therefore be any unfavourable and unintended sign (including an abnormal laboratory finding, for example), symptom, or disease temporally associated with the use of a medicinal product, whether or not considered related to the medicinal product.

An AE includes, but is not limited to, the following:

- Any clinically significant event, or worsening of a pre-existing condition,

- An AE occurring from overdose of an IMP, whether accidental or intentional. Overdose is a dose greater than specified in the protocol,

- An AE occurring from abuse (e.g., use for nonclinical reasons) of an IMP,

- An AE that has been associated with the discontinuation of the use of an IMP.

Laboratory/ECG/vital signs abnormalities should not be documented as AEs unless they are considered clinically relevant, require treatment, fulfil any SAE criterion, or cause the subjects to change the study schedule.

In the case of laboratory/ECG abnormalities that are a sign of a medical condition, the condition should be reported as an AE, and not the sign.

Events occurring in subjects in the course of a clinical study during treatment-free periods or on treatment with placebo or a comparative medicine are also to be considered AEs.

- **Treatment Emergent Adverse Event and Repetition of Adverse Event**

A treatment-emergent AE is any AE that occurs after dosing, or that was present prior to dosing but is exacerbated after dosing.

An AE which occurs more than once in the same subject is a repetition and will only be counted once. A clinically relevant worsening of an AE (e.g., relevant change in severity, seriousness) must result in a new entry. The original entry remains unresolved and is given an end date reflecting the date of the worsening and a comment must be entered stating that the AE is continuing with a changed severity/seriousness (e.g., "continues as *event name* with *onset date* and *new severity/seriousness*"). The onset date of the new entry is also the date of worsening.

### 13.7.2. Serious adverse events or Serious Adverse Drug Reactions

- **General definitions:**

A SAE or Serious Adverse Drug Reaction (ADR) is any untoward medical occurrence that at any dose:

> 1. Results in death
>
> 2. Is life-threatening (see below)
>
> 3. Requires inpatient hospitalisation or prolongation of an existing hospitalisation (see below)
>
> 4. Results in a persistent or significant disability or incapacity (see below)
>
> 5. Is a congenital anomaly or birth defect

Additionally, important medical events may be considered SAEs when, based on appropriate medical judgment, they may jeopardize the subject and may require medical or surgical intervention to prevent one of the outcomes listed in this definition. Examples of such events include allergic bronchospasm requiring intensive treatment in an emergency room or at home, blood dyscrasias or convulsions that do not result in hospitalisation, or development of drug dependency or drug abuse.

**Life-threatening** refers to immediate risk of death as the event occurred. A life-threatening experience does not include an experience that, had it occurred in a more severe form, might have caused death, but that, as it actually occurred, did create an immediate risk of death. For example, hepatitis that resolved without evidence of hepatic failure would not be considered life-threatening, even though hepatitis of a more severe nature can be fatal. Similarly, an allergic reaction resulting in angioedema of the face would not be life-threatening, even though angioedema of the larynx, allergic bronchospasm, or anaphylaxis can be fatal.

**Hospitalisation** is official admission to a hospital. Hospitalisation or prolongation of a hospitalisation constitutes criteria for an AE to be serious; however, it is not itself considered a SAE. In the absence of an AE, a hospitalisation or prolongation of a hospitalisation should not be reported as an SAE. This is the case in the following situations:
- The hospitalisation or prolongation of hospitalisation is needed for a procedure required by the protocol.
- The hospitalisation or prolongation of hospitalisation is part of a routine procedure followed by the centre (e.g., stent removal after surgery). This should be recorded in the study file.

In addition, hospitalisation for a pre-existing condition that has not worsened does not constitute an SAE.

**Disability** is defined as a substantial disruption in a person's ability to conduct normal life functions.

If there is any doubt about whether the information constitutes an SAE, the information is treated as an SAE.

### Other Reportable Information

Certain information, although not considered an SAE, must be recorded, reported, and followed up as indicated for an SAE. This includes:

- Overdose of an investigational product as specified in this protocol with or without an AE.

- Inadvertent or accidental exposure with or without an AE.


### Expected and unexpected adverse events:

As this is a first-in-man study, no AEs are defined as expected.

### 13.7.3. Severity

The maximum intensity of an AE during a day should be graded according to the definitions below and recorded in details as indicated on the CRF. If the intensity of an AE changes over a number of days, then separate entries should be made having distinct onset dates.

Mild: AEs are usually transient, requiring no special treatment, and do not interfere with patient's daily activities.

Moderate: AEs typically introduce a low level of inconvenience or concern to the patient and may interfere with daily activities, but are usually ameliorated by simple therapeutic measures.

Severe: AEs interrupt a patient's usual daily activity and traditionally require systemic drug therapy or other treatment.

### 13.7.4. Causal relationship with trial medication

The relationship of an AE to the IMP is a clinical decision by the investigator based on all available information at the time of the completion of the CRF and is graded as follows:

1. **Not related:** a reaction for which sufficient information exists to indicate that the aetiology is unrelated to the study drug; the subject did not receive the study medication or the temporal sequence of the AE onset relative to administration of the study medication is not reasonable or the event is clearly related to other factors such as the subject's clinical state, therapeutic intervention or concomitant therapy.

2. **Unlikely:** a clinical event, including laboratory test abnormality, with a temporal relationship to drug administration which makes a causal relationship improbable and in which other drugs, chemicals, or underlying disease provide plausible explanations.

3. **Possible:** a clinical event, including laboratory test abnormality, with a reasonable time sequence to administration of the drug but which could also be explained by concurrent disease or other drugs or chemicals; information on drug withdrawals may be lacking are unclear.

4. **Probable:** a clinical event including laboratory test abnormality, with a reasonable time sequence to administration of the drug, unlikely to be attributed to concurrent disease or other drugs or chemicals and which follows a clinically reasonable response on withdrawal (de-challenge): re-challenge information is not required to fulfil this definition.

5. **Definite:** a reaction that follows a reasonable temporal sequence from administration of the drug, or in which the drug level has been established in body fluids or tissues, that follows a known or expected response pattern to the suspected drug, and that is confirmed by improvement on stopping or reducing the dosage of the drug, and reappearance of the reaction on repeated exposure (re-challenge).

### 13.7.5. Documentation and Treatment of Adverse Events by the Investigator

All AEs, including SAEs, occurring within the period of observation for the clinical study must be recorded.

The **period of observation** for the collection of AEs extends from the time when the subject gives Informed Consent until 10 to 14 days after the end of the treatment period. For all subjects, this period will be extended to follow-up on all on-going AEs after the end of the treatment period until all AEs are finally resolved or it is medically justifiable to stop further follow-up (e.g., a chronic condition has been reached).

There is no time limit on the collection of SAEs that are considered related to study drug. If the Investigator detects an SAE in a study subject after the end of the period of observation, and considers the event possibly related to prior study treatment or procedures, he must contact Bial's Head of Pharmacovigilance and Drug Safety Management to determine how the SAE should be documented and reported.

Bial's Head of Pharmacovigilance and Drug Safety Manager Contact details are:

The AEs must be documented as soon and as completely as possible on the "Adverse Events" pages in the CRF. Follow-up information must be entered as soon as available.

The following will also be specified:

- Other actions (none, medication required, tests required, hospitalisation required or prolonged, treatment unblinded, other-specify)

- Outcome and date of outcome according to the following definitions:
  - Recovered/resolved
  - Recovering/resolving
  - Not recovered/not resolved
  - Recovered with sequelae/resolved with sequelae
  - Fatal
  - Unknown
- Seriousness: yes or no (criteria for SAE see above)

Adverse events which occur during the study should be treated by established standards of care that will protect the life and health of the subjects. If such treatment constitutes a deviation from the protocol, the subjects should be withdrawn from the study and the reason must be documented in the CRF.

### 13.7.6. Reporting of Serious Adverse Events

All serious adverse events including other information reportable as SAEs and follow-up information must be reported to the Sponsor within 24h of awareness by faxing a completed serious adverse event form and confirming by phone or e-mail that the fax was received.

Suspected Unexpected Serious Adverse Reactions (SUSARs) are subject to expedited reporting. Biotrial, on behalf of the Sponsor, will ensure all required information is entered in an initial report submitted to the regulatory agency (ANSM) and Ethics Committee as soon as possible, but no later than 7 calendar days after first knowledge, followed by as complete a report as possible within 8 additional calendar days in case of fatal or life-threatening SUSARs, or 15 calendar days for other SUSARs that are not fatal or life-threatening.

### 13.7.7. Pregnancy

All initial reports of pregnancy in female subjects or partners of male subjects must be reported to the Sponsor by the study-site personnel within 24 hours of their knowledge of the event using the appropriate pregnancy notification form. Abnormal pregnancy outcomes (e.g., spontaneous abortion, fetal death, stillbirth, congenital anomalies, and ectopic pregnancy) are considered SAEs and must be reported using the Serious Adverse Event Form. Any subject who becomes pregnant during the study must be promptly withdrawn from the study and discontinue further study treatment.

Because the effect of the study drug on sperm is unknown, pregnancies in partners of male subjects included in the study will be reported by the study-site personnel within 24 hours of their knowledge of the event using the appropriate pregnancy notification form.

Follow-up information regarding the outcome of the pregnancy and any postnatal sequelae in the infant will be required.

# 14. DATA MANAGEMENT AND STATISTICS

## 14.1. Data entry and management

### 14.1.1. Data collection

All the results from evaluations conducted during the study will be recorded in an appropriate CRF for each subject.

Details of the procedure followed for filling in the CRF and making corrections are provided in Section 16.

All supportive documentation submitted to the Sponsor in addition to the CRF, such as laboratory or hospitalisation records, must be clearly identified with the study or protocol number, the study subject's number and initials; any personal information, including the study subject's name, must be removed or rendered illegible to preserve individual confidentiality.

All the documents must be archived for a minimum of 15 years.

### 14.1.2. Data coding:

Biotrial will ensure coding for subject AEs, concomitants medications and previous illnesses in compliance with the Medical Dictionary for regulatory activities (MedDRA) and the World Health Organisation Drug Dictionary (WHO-DD), using the most recent versions of MedDRA and WHO-DD available at the time of database set-up.

### 14.1.3. Data transfer

Biotrial will prepare the data validation document.

Biotrial will be responsible for data entry and their validation (according to the sponsor requirements). Data will be subject to double data entry.

Biotrial will organise a Data Review meeting before locking the database.

## 14.2. Statistical considerations

### 14.2.1. Sample size

Due to the exploratory nature of this investigation, there is no formal statistical hypothesis testing. The sample size is based on empirical considerations and on the literature [5; 6].

### 14.2.2. Statistical methods

Safety data will be analysed by Biostatistics Unit of BIOTRIAL using SAS® software version 9.3 or higher release (SAS Institute Inc., Cary, NC, USA).

Pharmacokinetic and pharmacodynamic data will be analysed by Biotrial using Phoenix® and SAS® software Version 9.3 or higher release (SAS Institute Inc. Cary NC USA).

No PK/PD correlation analysis will be done.

Descriptive statistics will be supplied according to the nature of the criteria:

- Quantitative variable: sample size, arithmetic mean, standard deviation (SD), median, minimum and maximum (with geometric mean and coefficient of variation (CV) for PK)

- Qualitative variable: sample size, absolute and relative frequencies per class

The analysis will be performed for each part and the tables, figures and listings will be edited for each part separately.

Data will be organised by treatment group with all the placebo-treated subjects pooled in a single group for the SAD and MAD parts.

## 14.2.3. Description of data sets

### 14.2.3.1. Definition of data sets

The following analysis data sets will be defined for each part separately.

For the SAD, MAD, FI and PD parts:

The Included set will be defined as all included subjects.

The Randomised set will be defined as all randomised subjects.

The Safety set will be defined as all included subjects having taken at least one dose of IMP.

For the SAD, MAD and FI parts:

The PK set will be defined as all randomised subjects having taken at least one dose of IMP without protocol deviation affecting PK evaluation and with available PK data.

The PD set will be defined as all randomised subjects having taken at least one dose of IMP without protocol deviations affecting PD evaluation and with available data for FAAH activity.

For the PD part:

The PD set will be defined as all randomised subjects having taken at least one dose of IMP without protocol deviations affecting PD evaluation and with available data for PD parameters.

The analysis sets will be validated during the data review meeting.

### 14.2.3.2. Description of the sets

A summary table with the description of the number of included subjects, number of randomised subjects, number of subjects who completed study, number of subjects who discontinued classified by reason of withdrawal, number of subjects in each analysis data set will be prepared. Corresponding individual listings will be prepared.

Listings with end of study status and visit dates will also be carried out by subject.

## 14.2.4. Demographic and baseline characteristics

The following analysis will be performed on the Randomised set.

The subjects' demographic characteristics and baseline characteristics will be summarized by treatment group/sequence and overall and listed by subject.

Tables by treatment group/sequence and overall with the number of subjects having at least one medical or surgical history and the corresponding listing by subject will be prepared.

Tables by treatment group/sequence and overall with the number of subjects having at least one previous treatment and the corresponding listing by subject will be prepared. The same table and listing will be prepared for concomitant treatments.

Details of drug dosing will be listed by subject.

## 14.2.5. Protocol deviations

A summary table of protocol deviations by treatment group/sequence and overall and the corresponding listing by subject will be generated.

## 14.2.6. Pharmacokinetic analysis

Single and multiple-dose PK parameters will be derived from the plasma concentration time and urinary excretion data.

A compartmental or non-compartmental PK method, as appropriate, will be used to analyse the plasma and urine concentrations of BIA 10-2474 and its metabolites.

Individual and mean plasma and urine concentrations at each sampling time point will be presented by listings and descriptive summary statistics for each dose group/food condition. Time profile plots of each dose group/food condition, arithmetic and logarithmic means ($\pm$SEM) at each time measurement will be generated for urine and plasma data.
All PK parameters will be presented by individual listings and summary statistics for each dose group/food condition. Box-plots will be performed by dose group/food condition for PK parameters.

For the SAD and MAD parts, the dose proportionality of PK plasma parameters $C_{max}$ and AUC will be evaluated using the Power model. The PK parameters will be log-transformed prior to this statistical analysis in order to use the linear mixed effects model that includes Dose as a fixed effect. Dose proportionality will be analysed by using the estimated slope parameter of the linear model and the associated 90% confidence interval that measures the degree of non-linear proportionality.

For the MAD part, the steady state will be also studied for each dose group using a one-way analysis of variance on factor Day after logarithmic transformation on plasma concentrations.

For the evaluation of the food interaction, an analysis of variance model appropriate for a 2-period, cross-over design with fixed terms for sequence, period, and treatment (i.e., food condition) and a random term for subject within sequence will be used to investigate the food interaction on the $C_{max}$ and AUC. Following log-transformation of the data, the 90% confidence intervals (90% CI) for the geometric mean ratio (GMR) between the food conditions will be calculated.
Moreover, $t_{max}$ will be compared between the food conditions using a Wilcoxon signed ranks test.

Additional details for statistical consideration for PK analysis will be defined in the Statistical Analysis Plan (SAP).

### 14.2.7. Pharmacodynamic analysis

#### 14.2.7.1. Criteria

The pharmacodynamics criteria are specified in Sections 4.5.3 and 12.1.

#### 14.2.7.2. Statistical methodology

Analysis of pharmacodynamics parameters will be performed on the PD set.

Additional details for statistical consideration for PD analysis will be defined in the SAP.
All values and calculated parameters will be listed.

### SAD\MAD\FI parts

*FAAH activity, AEA and related FAAs in SAD\MAD\FI parts:*

Raw data and changes from baseline* (percentage of inhibition for FAAH) will be described
by treatment group\food condition and measurement time.
Time profile plots of arithmetic means (+SEM) at each measurement time will be generated
by treatment group\food condition.

$E_{max}$, $T_{Emax}$ and AUEC (on percentage of inhibition for FAAH) will be summarised by
treatment group\food condition and Day (if applicable) using descriptive statistics.

* Baseline will be defined as Day -1 time-matched values.

For the SAD and MAD parts, an analysis of variance will be performed using log-
transformed data for $E_{max}$ and AUEC with treatment group as fixed effect. Geometric mean
ratios (GMR) (with associated confidence intervals) between each treatment group and
placebo group will be calculated.

Moreover, for the SAD and MAD parts, $t_{Emax}$ will be compared between each treatment group
and placebo group using a Mann-Withney Wilcoxon test.

To characterize the offset of the effect, the time needed to decrease by 50% the maximal
effect will be investigated for ethanolamides (AEA and related FAA).

No adjustment will be performed as all these analyses will be exploratory.
Box whisker plots will be generated for the comparison of $E_{max}$ and AUEC parameters
between treatment groups\food condition.

For FAAH activity and active treatment groups, plots of individual data between plasma
concentrations on X axis and percentage of inhibition (and raw data) on Y axis will be
produced separately for SAD and MAD (and also by day for MAD).

Relationships between inhibition of FAAH and ethanolamides (AEA and related FAA) will
be assessed in an exploratory manner.

*Psychometric scale in the SAD part:*

Raw data and changes from baseline (D1 predose) will be described by treatment group.
Total score will be analyzed using an analysis of variance with treatment group as fixed effect on the changes from baseline. Estimate of the difference (with associated CI) between each treatment group and placebo group will be calculated. No adjustment will be performed as this analysis will be exploratory.

## PD part

*Psychometric tests and scales*

All the parameters will be described by treatment group and measurement time.

For all parameters except the number of missed targets and number of false answers for DV and RVIP and the LMT parameters, the difference between the 2 groups will be analysed using an analysis of variance on change from baseline with treatment, period, sequence and day as fixed effects, treatment*day as interaction and subject within sequence as random effect. In case of significant treatment*day interaction, an analysis of variance for a 2-period, cross-over design will be performed at each day.

For LMT parameters, the difference between the 2 groups will be analysed using an analysis of covariance on raw data with treatment, period, sequence and day as fixed effects, baseline as covariate, treatment*day as interaction and subject within sequence as random effect. In case of significant treatment*day interaction, an analysis of covariance for a 2-period, cross-over design will be performed at each day.

*Pain model (cold pressor test)*

$CP_{tol}$, pain $VAS_{max}$, pain $VAS_{total}$ and the pain $AUC_{0-120s}$ will be described by treatment group.
The parameters will be compared at D6 between the 2 groups using an analysis of variance with fixed terms for sequence, period and treatment and a random term for subject within sequence. If necessary, data will be log-transformed.

*Cough challenge (capsaicin)*

Concentrations of capsaicin causing two (C2) and five coughs (C5) on the interval 0-15s will be described by treatment group and measurement time. Number of coughs on the interval 0-15s and 15-60s C2 and C5 on the interval 15s-60s will be also described.
C2 and C5 on the interval 0-15s will be compared at D7 between the 2 groups using an analysis of variance with fixed terms for sequence, period and treatment and a random term for subject within sequence. If necessary, data will be log-transformed.

*IOP measurement*

The intraocular pressure will be described by treatment group and measurement time.
IOP will be compared at D8 between the 2 groups using an analysis of variance with fixed terms for sequence, period and treatment and a random term for subject within sequence.

*Apomorphine challenge*

$NS_{max}$, NS $t_{max}$ and NS $AUC_{(0-90\ mins)}$ will be described by treatment group.

$NS_{max}$ and NS $AUC_{(0-90\ mins)}$ will be compared at D10 between the 2 groups using an analysis of variance with fixed terms for sequence, period and treatment and a random term for subject within sequence. If necessary, data will be log-transformed.

Moreover, NS $t_{max}$ will be compared between the 2 treatment groups using a Wilcoxon signed ranks test.

### 14.2.8. Safety analysis

#### 14.2.8.1. Criteria

- Adverse events

- Vital signs

- Standard 12-lead ECG

- Haematology, coagulation, biochemistry, urinalysis

- Physical examination

- Complete neurological examination (PD Part)

#### 14.2.8.2. Statistical methodology

Analysis of safety parameters will be performed on the Safety set.

The description will be performed:

- by treatment group for SAD and MAD parts,
- by food condition for measurements during the treatment periods and overall for measurements performed at screening and end-of-study visits for FI part,
- by treatment group for measurements during the treatment periods and overall for measurements performed at screening and end-of-study visits for PD part,

Vital signs, ECG parameters, (raw data and changes from baseline) will be described.

Laboratory data (haematology, biochemistry, coagulation and urinalysis) will be described.

In addition, vital signs, ECG and laboratory data could be compared to potentially clinically significant range to be specified in the SAP.

All these parameters will be listed by subject and measurement time. Data that is out of normal ranges will be flagged.

All AEs, SAEs and AEs leading to withdrawal will be listed by subject.

A TEAE is an event that occurs after IMP dosing or that was present prior to dosing but became exacerbated after dosing (during a treatment period for FI and PD parts).

Repetitions will only be counted once in summary tables. Repetitions are defined as follows:

If a given subject presents several AEs with same verbatim text during the same treatment period, only one event is defined, the others are considered repetitions or recurring episodes. The start time of the event will be the start time of the first occurrence, the end time will be the end time of the last episode. The intensity will be the highest recorded intensity for all episodes. The causality will be the highest likelihood recorded for all episodes.

AEs will be summarized by system organ class and preferred term in tables with:

- The number of subjects with at least one adverse event and number of AEs for each treatment group/food condition and overall,

- The number of subjects with at least one TEAEs and number of TEAEs for each treatment group/food condition.

Analyses taking into account intensity and drug relationship to treatment could be also carried out.

## 15. RIGHT OF ACCESS TO DATA AND SOURCE DOCUMENTS

### 15.1.  Monitoring

The investigator will allow the representative of the sponsor and the study Monitor:

- To inspect the site, the facilities and the material used for the study,

- To meet all members of the team involved in the study,

- To consult all the documents relevant to the study,

- To check that the CRFs have been correctly completed,

- To have direct access to source documents for comparison of data therein with the data in the CRFs,

- To check that AEs have been documented,

- To verify that the study is carried out in compliance with the protocol, GCP, and other relevant regulations.

This study will be monitored at regular intervals, by mutual agreement of the investigator and Monitor.

All information dealt with during these visits will be treated as strictly confidential.

The investigator will provide the sponsor with the following:

- Progress reports at regular intervals,

- Adequately completed CRFs.

### 15.2.  Audit- Inspection

The Investigator will be informed that an audit may be carried out, at the request of the sponsor, before, during or after the study.

The Investigator will be informed that the Regulatory Authorities may also carry out an inspection. In this case, the Investigator must inform the Sponsor as soon as he receives the notification of inspection.

The Investigator must allow the representatives of the Regulatory Authorities and persons responsible for the audit to:

Inspect the site, facilities and material used for the study,

Meet all members of his team involved in the study,

Have direct access to study data and source documents,

Consult all the documents relevant to the study.

## 16.  QUALITY CONTROL

The Investigator or the appointed persons agree to complete the subject's CRF sheets, at each investigation. Only the Investigator or appointed persons in his team may fill out or correct the CRFs. The CRFs will display the subject number corresponding to the order of inclusion in the study (4 digits) and the initials of the subject.

All corrections and alterations of data on the CRFs must be made by the Investigator or by the appointed persons in the following manner: strike through the datum to be corrected using a single line so that the original remains legible; correction fluid must never be used. The correction should be written to the side or above the original entry and must be initialled and dated by the person who makes the correction.

It is the responsibility of the monitor to make certain that the data are included in the CRFs is complete and accurate.

At the end of each study period, the investigator and the monitor must sign and date the CRF in order to attest respectively to:

- authenticity of the data collected in the CRF ,
- coherence between the data in the CRF and those in the source documents.

At the end of the study, the Investigator will keep a copy of the correctly completed CRFs for his own records and will organise the archiving of the original CRFs on behalf of the Sponsor.

The Investigator will keep a log of study volunteers screened for study participation and as appropriate, will indicate the reason individual study volunteers did not enter the study. The Investigator must submit to the Sponsor or its representatives a completed CRF for each subject who receives any IMP.

If computerised medical files are used, and if the computer system allows, no change made in the medical files by the Investigator should obscure the original information. The record must clearly indicate that a change was made and clearly provide a means to locate and read the prior information. The Investigator will save data at regular intervals.

The Investigator must guarantee the safety of the study data in the medical files by implementing security measures to prevent unauthorised access to the data and to the computer system.

## 17.  STUDY SUSPENSION, TERMINATION, AND COMPLETION

The Sponsor may suspend or terminate the study or any part of the study at any time for any reason.

If the Investigator suspends or terminates the study, the Investigator will promptly inform the Sponsor and the regulatory authorities and provide them with a detailed written explanation. The Investigator will return all test articles, test article containers, and other study materials to the Sponsor.

Upon study completion, the Investigator will provide the sponsor and Independent Review Board (IRB)/ Independent Ethics Committee (IEC) with final reports and summaries as required by regulations. For Investigational New Drug application (IND) studies, the Investigator must submit a written report to the Sponsor and IRB/IEC within 3 months after the completion or termination of the study.

## 18. ETHICS AND REGULATORY ASPECTS

### 18.1. Current texts

The study will be carried out in accordance with:

- The text of the Declaration of Helsinki adopted by the World Medical Assembly in June 1964, amended in Tokyo 1975, in Venice 1983, in Hong-Kong 1989, in Somerset West 1996 updated with a clarification note in Edinburgh 2000 and Washington 2002, revised in Tokyo 2004, Seoul 2008 and Fortaleza 2013.

- The ICH recommendations: Good Clinical Practice (E6), (CPMP/ICH/135/95), 2002.

- Directive 2001/20/EC translated in French law of the 9th August 2004 (n°2004-806) and the decree of 26th April 2006 (n°2006-477) relative to biomedical research and French law n°2002-303 of 4th March 2002 regarding subject's rights.

- French law n°78-17 of 6th January 1978 relative to Data processing, Data files and individual liberties, modified by law n°2004-801 of 6th August 2004.

- European directive 2005/28/CE dated 8 April 2005 (GCP) translated in French law by the Decision of 24 Nov 2006 fixing the GCP for biomedical research on drugs for human use.

- "Guideline on the Investigation Of Bioequivalence" published by the Committee for Medicinal Products for Human Use (CHMP)

- Note for Guidance on the Investigation of Bioavailability and Bioequivalence (CPMP/EWP/QWP/1401/98)

- Guideline on strategies to identify & mitigate risks for First-in-human clinical trial with Investigational Medicinal Products, CHMP 01/09/07.

### 18.2. Subject Information and Consent

An unconditional prerequisite for a subject's participation in the trial is his/her written informed consent. The subject's written informed consent to participate in the trial must be given before any trial-related activities are carried out. Nevertheless, if necessary and after documented agreement of the Sponsor, any measures, identical to those planned in the protocol for subject's screening, already performed within the timelines given by the protocol for the screening exams, could be used for the protocol in order to minimize the constraints of subjects. This procedures can only be performed after a Biotrial generic written informed consent already approved by Ethics Committee has been signed by the subject and the investigator.

Subjects will be verbally informed by an investigator of all pertinent aspects of the trial: the nature of the study, its aim, its possible risks and restrictions, its duration and the fee that they will receive. The protocol will be explained during a meeting prior to the study and each subject must be informed that participation in the study is voluntary and that he/she may withdraw from the study at any time. At this meeting, an information sheet will be given to each subject. The language used in doing so must be chosen so that the information can be fully and readily understood by lay persons.

The subject should carefully read before signing and dating the informed consent form. He/she should be allowed to ask all necessary questions to the investigator. The informed consent form must be signed and personally dated by both the subject and the investigator. A copy of the signed document should be given to the subject. A copy will be kept for 15 years by the investigator (the second copy given to the subject).

The completed "subject / patient screen log" will be signed by the investigator to attest that consent has been obtained from all subjects.

Whenever important new information becomes available that may be relevant to the subject's consent, the written subject information sheet and any other written information provided to subjects will be revised by the sponsor and be submitted again to the IEC/IRB for review and favourable opinion/authorisation. The agreed, revised information will be provided to each subject in the trial for signing and dating. The Investigator will explain the changes to the previous version.

### 18.3.   Submission to the authorities

#### 18.3.1. Ethics Committee opinion

It is the responsibility of the Sponsor to seek and obtain the favourable opinion of the CPP (Independent Ethics Committee). This activity is delegated to Biotrial.

The present biomedical trial will not be initiated until this favourable opinion is obtained.

#### 18.3.2. ANSM authorisation

It is the responsibility of the Sponsor to seek and obtain the ANSM (French Drug Agency) authorisation for conducting the present biomedical trial. This activity is delegated to Biotrial.

The present biomedical trial will not be initiated until the ANSM authorisation is received.

#### 18.3.3. Protocol Amendments

Any significant change (substantial modification) in the study requires a protocol amendment for authorisation or for information. Concerning a protocol amendment sent to ANSM and/or CPP for authorisation, an investigator must not make any changes to the study without regulatory authorities and sponsor approval except when necessary to eliminate apparent immediate hazards to the subjects. A protocol change intended to eliminate an apparent immediate hazard to subjects may be implemented immediately, but the change must then be documented in an amendment, reported to the regulatory authorities/IEC within 5 working days, and submitted in the required time frame. All protocol amendments must be reviewed and approved following the same process as the original protocol.

**18.4.  Regulatory requirements**

In compliance with French law approval as a site for biomedical research without direct individual therapeutic benefit was granted to ˙                          by the Minister for Health to Biotrial Rennes centre (site n°05001M).

## 19.  DATA PROCESSING AND ARCHIVING OF DOCUMENTS AND DATA RELATIVE TO THE RESARCH

After the study, the Investigator will keep all information relevant to the study for 15 years.

## 20.  CONFIDENTIALITY AND AGREEMENTS

**20.1.  Confidentiality**

Before starting the study, the Investigator must confirm receipt of adequate documentation from the Sponsor so as to be able to decide whether or not to perform the study.

All documents and information given to the Investigator by the Sponsor with respect to the study are strictly confidential.

The Investigator and his colleagues agree to use them only with the framework of this study, in order to carry out the protocol. This agreement is binding as long as the confidential information has not been disclosed to the public by the Sponsor.

The Investigator may use the technical protocol to obtain the informed consent of study subjects. It must not be disclosed to other parties without the written authorisation of the Sponsor.

The Investigator keeps a confidential subjects identification list for the study. The Investigator must maintain source documents for each subject in the study.

Data on subjects collected on CRFs during the study will be documented in an anonymous fashion. All information on CRFs must be traceable to these source documents.

**20.2.  Obligations of the Sponsor and contracting to CRO**

Sponsor will:

- Assure that the Contract Research Organisation (CRO) to which they delegate their tasks is fully qualified and that the study location and the logistical means are adapted to and available for his requirements.

- Supply the Investigator with the following:

  - an up-to-date IB,
  - information on the IMP,
  - the exclusion period during which the person cannot participate in another study,

- Supply the IMP and the documentation, take charge of supplementary costs for specific apparatuses and supplies and of general running costs incurred for the study,

- Immediately forward to the Investigator any information that is liable to have direct consequences on the study.
- Immediately examine with the Investigator any serious adverse event and take the required steps to guarantee the security of the study participants.

The Sponsor will contract Biotrial to:

- Contract an insurance policy for the present project and provide the sponsor and the Investigator with a copy of the certificate,
- Ensure that the study file was submitted to the CPP and that the committee has given its approval,
- Transmit to the ANSM and CPP all the information concerning any new discovery concerning the conduct of the study or the IMP,
- Submit the Clinical Trial Application (CTA) to the ANSM and obtain the approval for the present biomedical trial.
- Inform ANSM and CPP of any serious adverse event as soon as he becomes aware of the fact.
- Inform ANSM and CPP of premature termination of the study and indicate the reason(s),
- Send to ANSM within the legal time limit, any CPP decision further to extra information submitted,
- Designate the qualified people who participate in the clinical research and guarantee their training,
- Designate the appropriate people or Committees who undertake the management and the supervision of the study, data collection, data management and statistical analysis and writing of the study report.

## 21.  REPORT AND PUBLICATION

### 21.1.  Report:

The results of the study will be reported in a CSR. This report will be prepared by Biotrial according to existing Standard Operating Procedures (ICH Biotrial or Sponsor Clinical Report).

In compliance with the regulations, the final report will be produced within one year of completing the study and in agreement with the work order.

The final report will be provided to the investigator.

The CSR will be provided to the sponsor as Word and PDF files. Also, SAS transfer files of the data will be provided electronically. All data will be presented CTD compliant.

### 21.2.  Publication:

The Investigator will only use the information in the field of the study. The information cannot be used without sponsor's authorisation. Hence all or part of the information should only be divulged, submitted for publication or claim for industrial proprietary act with the written consent of Sponsor.

## 22. REFERENCES

1. BIA 10-2474 Investigator's Brochure. Edition number 2. 13 April 2015.

2. Dicpinigaiti PV, Rauf K. The Influence of Gender on Cough Reflex Sensitivity. Chest. 1998;113(5):1319-1321.

3. Fujimura M, Kasahara K, Kamio Y, Naruse M, Hashimoto T, Matsuda T. Female gender as a determinant of cough threshold to inhaled capsaicin. Eur Respir J. 1996 Aug;9(8):1624-6.

4. Stockhorst U, Enck P, Klosterhalfen S. Role of classical conditioning in learning gastrointestinal symptoms. World J Gastroenterol. 2007 Jul 7;13(25):3430-7

5. Bušen C, Holm S, Thomsen MS. Evaluation of the cohort size in phase I dose escalation trials based on laboratory data. J Clin Pharmacol. 2003 May;43(5):470-6.

6. Shein-Chung Chow. Controversial Statistical Issues in Clinical Trials. Boca Raton, Florida: Chapman & Hall/CRC. 2011.

7. Chait LD, Fischman MW, Schuster CR. 'Hangover' effects the morning after marijuana smoking. Drug Alcohol Depend. 1985 Jun;15(3):229-38.

8. Morice AH, Fontana GA, Belvisi MG, Birring SS, Chung KF, Dicpinigaitis PV, Kastelik JA, McGarvey LP, Smith JA, Tatar M, Widdicombe J; European Respiratory Society (ERS). ERS guidelines on the assessment of cough. Eur Respir J. 2007 Jun;29(6):1256-76.

Exhibit 9



# ANSM continues investigations into Bial clinical trial death

03-03-2016     COMMENTS (0)

Agence Nationale de Sécurité du Médicament et des Produits de Santé    BIA 10-2474    BIAL    Drug Trial    France    Neurological    Pharmaceutical    Research

France's National Agency for Medicines and Health Products Safety (ANSM) has set up a specialist committee as part of its ongoing investigations into the death of a clinical trial volunteer in January this year.

A French man in his 20s was left brain-dead from serious side effects after taking part in the trial of pain and mood disorder medication, BIA 10-2474, for Portuguese pharmaceutical company Bial.

Several other volunteers developed severe neurological problems during the Phase I clinical trial, which took place in Rennes.

French Health Minister, Marisol Touraine, said at the time it was "an accident of exceptional gravity … without precedent."

In a statement, the ANSM confirmed it has created a temporary specialist scientific committee (Comité Scientifique Spécialisé Temporaire – CSST) to bring together experts and clinicians in pharmacology and toxicology.

A spokesperson said the committee would aim to explore every possible explanation for the accident and would examine all relevant preclinical and clinical data.

The ANSM's investigations are running alongside those being carried out by the French judiciary, the General Inspectorate of Social Affairs and the Ministry for Health.

Inspections of the Biotrial research center at the University Hospital of Rennes, where the trial took place, are also ongoing, the statement concluded.

Exhibit 10

**Minutes of the Temporary Specialist Scientific Committee (TSSC) meeting on "FAAH (*Fatty Acid Amide Hydrolase*) Inhibitors" of 15 February 2016.**

Version dated 07 March 2016

TSSC members:
Bernard Bégaud, Marie Germaine Bousser, Pascal Cohen, Bertrand Diquet, Pierre Duprat, Walter Janssens, Michel Mallaret, Guy Mazué, Joëlle Micaleff, Claude Monneret, Jean Louis Montastruc and Laurent Venance.


**Foreword**

This TSSC was set up by the French National Agency for Medicines and Health Products Safety (ANSM), following the accident that occurred during the Phase 1 first-in-man clinical trial on the molecule BIA 10-2474 in Rennes, in January 2016. The scientific missions of the Group, were, on the basis of the available data and expertise of its members:
  - to better understand the mechanisms of action and potential toxicity of substances which, like BIA 10-2474, have a direct or indirect effect on the endocannabinoid system and, with that understanding,
  - put forward and list hypotheses to be able to explain the accident which occurred at Rennes,
  - to establish, where appropriate, general recommendations aiming to tighten safety during first-in-man Phase 1 trials.

The members of the TSSC, after having studied data from literature and the documents provided to them (BIA 10 2474 preclinical data, data on the trial conducted at Biotrial), met in a one-day plenary session on Monday 15 February 2016.


**Reminder on the endocannabinoid system**

BIA 10-2474, by the Bial pharmaceutical company (Portugal), is introduced as a "reversible" inhibitor of FAAH, an anandamide-degrading enzyme (hydrolase), one of the main mediators of what is known as the endocannabinoid system. This equivocally-named system (it is in fact a lot broader and more complex than cannabis derivative targets) exists in a large number of species (vertebrates and invertebrates, except for insects) and in mammals in particular. Knowledge is recent (the first receptor was identified by cloning in 1990) and as yet incomplete in several aspects.

There are **two types of receptors** (CB1 and CB2), transmembrane and G protein-coupled receptors (inhibiting adenylcyclase).
- CB1 is a highly ubiquitous presynaptic receptor found at the surface of several cell types (neurons, astrocytes, pericytes, endothelial cells) and in a large number of cerebral sites (basal ganglions, cerebellum, hippocampus, medulla oblongata, cortex, etc.). CB1 is one of the G protein-coupled receptors expressed at the highest level in the central nervous system, with the noteworthy exception of the brain stem.
CB1 is also found in peripheral organs (lungs, bowel, testicles, uterus, etc.).
The exogenous agonist specific to this receptor is tetrahydrocannabinol (THC).
- CB2 is mainly found in immune system cells (immunomodulator effects).

1

Eight endocannabinoids have been identified to date. They are bioactive lipids acting both as neurotransmitters and neuromodulators, produced "on demand", unlike conventional neurotransmitters which are released from storage vesicles. The three main lipids are:

- anandamide (AEA), isolated in 1992; its concentration in the brain is similar to that of dopamine or acetylcholine,
- 2-arachidonylglycerol (2-AG), arachidonic acid ester,
- 2-AG ether (arachidonic acid ether).

Like THC, anandamide has preferential affinity for the CB1 receptor and low affinity for the CB2 receptor. Conversely, 2-AG has high affinity for both receptor types and it can therefore be seen as the "real" endocannabinoid system mediator, whereas AEA, which has almost no effect on CB2, is able to interact with several other systems. Anandamide is therefore **little specific of the endocannabinoid system**. In effect:

- it is able to activate TRPV1 (*transient receptor potential vanilloid 1*) which are non-selective ion channels from the TRP channels group,
- it is a good agonist for PPAR (*peroxisome proliferator-activated receptor*) alpha and gamma, nuclear receptors involved in the energy metabolism and inflammation process,
- it interacts with NMDA (N-methyl D aspartate) glutamate receptors, both as stimulator by direct action and inhibitor acting indirectly *via* CB1,
- finally, like other endocannabinoids, it can lead to the activation of multiple transcription factors involved in apoptosis and neuroprotection phenomena by the MAP-kinase pathway, which is a highly promising research approach.

The effects of endocannabinoid system stimulation are similar to those induced by cannabis derivatives. Low to moderate concentrations induce behavioural responses combining stimulant and depressant effects, whereas at high doses, the effects are always of the depressant type. We therefore mainly see the following in animals:

- antinociception,
- hypothermia,
- hypolocomotion,
- catalepsy.

Working memory is affected without effect on reference memory. The effect on anxiety is biphasic: anxiolysis at low doses and anxiogenic at high doses.

After release by the postsynaptic compartment, AEA is usually degraded by FAAH (membrane hydrolase) which also partly degrades the 2-AG but also a fairly large number of other bioactive lipids.

Unlike in animals, there are two FAAH isoforms in human; prevalence of the low activity form is believed to be around 38% in the general population.

Where there is inhibition of FAAH activity, AEA concentrations increase, however an additional degradation pathway takes over: that of the cyclo-oxygenases. This leads to the formation of eicosanoids: leukotrienes and prostanoids (prostaglandins, thromboxanes, prostacyclins) with the ability to act on apoptosis and vasomotricity phenomena; the vasoconstrictor effect of 20-HETE (20-hydroxyeicosatetraeinoic acid) in the brain is, for example, well documented.

Points emphasised by the Group:

2

- among the "endocannabinoids", anandamide is that which it is believed the TSSC should focus on as part of its investigations,
- this biolipid acts on several other systems, some of which could be relevant to the question raised: vanilloid system receptors (TRPV1), PPAR alpha and gamma, NMDA glutamate receptors,
- anandamide is usually degraded by a hydrolase (FAAH), the activity of which is inhibited by BIA 10-2474. In the brain however there is a large number of other hydrolases (around 200), with more or less similar structures, the roles of which are far from being fully elucidated. The ability of BIA 10-2474 to bind to some of them and inhibit their action cannot be ruled out,
- FAAH inhibition leads to an increase in anandamide concentrations which is then catabolised by an additional pathway (cyclo-oxygenases); this gives rise to several compounds, some of which could have a harmful effect, especially on brain circulation,
- even massive stimulation of the endocannabinoid system per se, is not known, alone, to lead to significantly serious toxic effects. This strongly suggests that an *off-target* effect could explain the accident in Rennes.

**Molecule BIA 10-2474**

Bial would appear to have planned to develop BIA 10-2474 mainly as an analgesic. Examination of this molecule does not theoretically raise any specific questions. Its originality is relative as it could appear to be a "me-too" of several molecules previously developed as FAAH inhibitors such as PF-3845 by Pfizer and JNJ-42165279 by Janssen. They are heterocyclic compounds with pyridine, piperazine and pyridazine nuclei ... and especially a urea function, which is the site of a nucleophilic attack from the oxygen in the enzyme's serine 241. Item of interest: clinical development of several of these compounds was abandoned after Phase 2 clinical trials due to insufficient effectiveness (analgesic especially) without any specific toxicity being noted in humans or animals. From a structural viewpoint, BIA 10-2474 would effectively appear to be an irreversible inhibitor of FAAH (and not reversible as stated by the pharmaceutical company). To this effect, it is similar to the irreversible inhibitors already cited. The irreversible nature of the inhibition induced by the latter was clearly demonstrated in the covalent type bonding with the enzyme. Also, *reversible* FAAH inhibitors generally belong to other chemical compound classes.

An important difference with known inhibitors, in particular the compounds developed by Pfizer, concerns specificity for FAAH. It is, for example, extremely high for one of the Pfizer molecules, with a ratio of about 14,000 between the inhibitory concentrations ($IC_{50}$) for FAAH (7.2 nanomolar) compared to those inhibiting a panel of around twenty other hydrolases (100 micromolar). In the same way, Janssen & Janssen tested the selectivity of their JNJ-42165279 (for which, again, no toxicity has been seen in Phase 1) against 50 different enzymes.

The dossiers provided to date do not discuss the specificity of BIA 10-2474 for FAAH compared to other hydrolases. This has to be documented to be able to determine the plausibility of an off-target effect. Especially as the $IC_{50}$ of BIA 10-2474 measured in rats (1.1 to 1.7 micromolar, equivalent to around 200 times the Pfizer molecule) is that of a compound with a **relatively poor specificicity for the endocannabinoid FAAH**.

3

Another shortcoming concerns the potential toxicity of identified BIA 10-2474 metabolites. The imidazole cycle is a "leaving group" that can produce an isocyanate to which many brain proteins are likely to bind. The potential "intracerebral" metabolism is undoubtedly a more promising avenue for the observed toxicity than the peripheral molecule metabolism. The latter appears to be low although in the dossier submitted by Bial, a high metabolism is mentioned ("*extensive metabolization*"). During single-administration trials in humans (see further on), four metabolites were identified in plasma, two undetectable and two measured but with much lower concentrations than those of the mother molecule. These small quantities (<3%) which do not legally have to be characterised, do not theoretically plead in favour of toxicity via this pathway, unless we accept that one of metabolites, is extremely reactive and toxic at very low concentration levels.

---

Points emphasised by the Group:

- BIA 10-2474 is structurally similar to other existing FAAH inhibitors; development of several of them was interrupted in Phase 2 due to insufficient effectiveness, without any specific toxicity being observed in humans,
- the structural relatedness and analysis of its chemical structure would more so bring us to consider BIA 10 2474 as an irreversible and not reversible FAAH inhibitor,
- BIA 10-2474 would appear to be a lot less specific to FAAH than its predecessors, making binding to other cerebral enzymes plausible. This possibility, and as it has been done for other compounds, must absolutely be documented by Bial.

---

**Animal toxicology data**

---

*Opening remark*: interpreting animal toxicology data is always complex. Studies are conducted at doses which can be very high, incommensurate with the highest doses tested in humans. Therefore, highly varied toxicity symptoms, often aspecific, clinical or only visible after sacrifice (in macroscopy or microscopy), are observed in most animals. There is therefore a strong probability that elements appearing to indicate toxicity that we would look for later on are found within the data. To avoid this conventional interpretation bias, the TSSC closely examined the particularly extensive dossier of animal studies conducted, which must be looked at as a whole and in its context.

---

Preclinical studies seem to have been conducted according to currently approved standards (ICH recommendations especially) with a highly pure product (more than 99.9%), identical to that used for the manufacture of the capsules administered to the volunteers at the Biotrial centre.

The studies covered, which is little common and therefore surprising (this point should be clarified), four different species (rats, mice, dogs and monkeys) in two centres accredited by the European Medicines Agency (EMA) of sound reputation (Harlan Laboratories SA in Spain and AnaPath GmbH in Switzerland).

The toxicology data for BIA 10-2474 appeared to be complex to analyse and the TSSC declared it essential to have more detailed information on several important points, before its meeting of 24 March (see further on).

4

On the basis of the data that could be analysed to date, and generally, up to very high doses, we do not observe any specific toxicity, even if one of the most commonly observed toxic effects is that on spermatozoa.

The four BIA 10-2474 metabolites identified in plasma are likely to be those found in humans and apparently produced in very small quantities (around 1% of the parent product), and this in the four species. Therefore, specific toxicity studies for these metabolites were not legally compulsory and were not conducted.

We do not observe accumulation of the product or of its metabolites in repeated-dose studies (over 13 weeks).

The NOAEL (*No Observable Adverse Effect Level*) and NOEL (*No Observable Effect Level*) seem to have been correctly determined.

As in all toxicology protocols, the organs of the animals provided for in the protocol (40 organs) were systematically submitted for macroscopic and microscopic examination, without, at this stage of analysis of the case, noteworthy toxicity of a specific organ, *a fortiori* common to the four species studied, being observed. This also applies to both the central and peripheral nervous system, especially in primates.

However in rats and mice, cerebral damage, especially in the hippocampus with gliosis and inflammatory cell infiltration were observed in some animals treated at very high doses. This concerned one male and one female in the study on mice at 500 mg/Kg/24h over 4 weeks and one rat in the study at 150 mg/Kg/24h over 4 weeks (therefore, 650 and 195 times the highest dose, 50 mg, respectively, having been tested in repeated administration in the volunteers in Rennes). The damage, discussed by the Group given the context, appears to be common in rodents in such studies and does not in principle seem to be of the type to generate a signal. In the same way in primates and rats, cerebral damage and especially of the autonomic nervous system (Meissner's plexus in the bowel) was observed in some animals treated with a high dose.

In the group of dogs treated for 13 weeks, lung alterations clearly visible in macroscopy and confirmed in microscopy (bronchopneumonia/focal and multifocal acute alveolitis) were observed. These symptoms appear to be surprising due to their frequency. The toxicology report submitted by Bial links these lesions to bronchial inhalation of BIA 10-2474 powder. This hypothesis seemed little plausible to the TSSC experts. The relationship with the existence of high CB1 receptor density in the lungs, even if, without additional investigation, it cannot be ruled out, does not seem probable either; if only for the absence of similar symptoms in the other three species. Due to the symptoms, two dogs (one male and one female) from the high dose group had to be put down before the end of the study.

Various studies have been conducted in primates (*cynomolgus* or macaque).  No mortality was observed in the long-term study (13 weeks at 75 mg/Kg after dose-escalation by level). However, in other groups, one female died after dose escalation over 12 days (10, 25 and 50 mg/Kg/24h) followed by 9 days administration at 75 mg/Kg/24h (the dossier does not say anything specific about this animal; this point requires more detailed information).

In the same way, several primates had to be put down *for ethical reasons* during ascending dose studies to test tolerance to the product at very high doses: the two animals from group 1 on the fourth day of the final level at 250 mg/Kg, the two animals from group 2 (125 mg/Kg/24h) and one female from group 3 after three administrations at 60mg/Kg/24h, the other animals having survived to the end of escalation at 110 mg/Kg/24h. These premature deaths among primates occurred

however for very high repeated doses, equivalent to 325, 162 and 78 times the highest dose tested in Rennes in repeated administration (50 mg) respectively.

The animal studies dossier, although robust and in theory not generating any specific signals contraindicating in-human administration, raises some comments which led to more detailed information being requested of Bial:

- use of four different species (of which 2 rodents), is, for a case of this type (studies prior to first-in-man trials), unusual. A study in rats and primates would have been expected for a product with potential effect on the central nervous system,
- in dogs, the doses administered were reduced during the study (*down titration*) from 100 to 50 then to 20 mg/Kg,
- whereas BIA 10-2474 appeared to be developed as an analgesic, the analgesic activity of this molecule was apparently only demonstrated in two animal pharmacology tests, without comparison to a benchmark analgesic (gabapentin not being considered as such). This seems too basic to justify continuing development, *a fortiori* in humans (see the TSSC's recommendations at the end of the minutes).

---

Points emphasised by the Group:

- BIA 10-2474 toxicology studies were carried out properly in accordance with current standards (those of the ICH especially),
- no toxicity, especially neurological (central or peripheral) comparable to that observed in the accident in Rennes, appears to have been demonstrated in animals, despite the use of 4 different species and high doses administered over long periods,
- Bial should however provide clarification to the TSSC as to:
  - o the reasons for using four different species for the toxicology studies,
  - o the circumstances of death by bronchopulmonary disease in dogs,
  - o the circumstances of death during studies on primates at high doses,
  - o the results of any microscopic examinations of the brains of deceased primates,
  - o the reasons for down-titration in the 13-week study in dogs,
  - o the reasons for the apparent lack of preclinical pharmacology studies for confirming, before transfer to humans, the analgesic effect of BIA 10-2474, especially compared to benchmark analgesics.

---

**Clinical trial conducted in Rennes by Biotrial**

The Phase 1, monocentric, *First-in-Man* (FIM) trial planned to include 128 healthy male and female volunteers, age 18 to 55 years, and involved four parts:

- *single ascending dose* (SAD) study,
- *multiple ascending dose* (MAD) study,
- an open-label food interaction study, and
- a pharmacodynamics study (not done).

We see that dispersion of the ages of the volunteers recruited (18-55 years) is high, some being relatively elderly, compared to what is usually seen in Phase 1, first-in-man trials. The ages of the six subjects hospitalised at Rennes University Hospital ranged

from 27 to 49 years. Furthermore, several volunteers considered to have a risk factor for certain drug-related adverse effects were included. Among others, the risk factors included history of severe head injury (loss of consciousness) in one volunteer; a PR interval measured at over 240 milliseconds on several pre-dose electrocardiograms in another and blood pressure of over 140/90 mm Hg over 4 pre-dose readings.

The choice of the first dose administered was careful, 0.25 mg, equivalent to around 1/400th of the highest dose with no observable adverse effect level (NOAEL) in animals. The SAD part[1] involved 64 volunteers in 8 cohorts of 8 volunteers (6 receiving the active treatment and 2 the placebo) for the 8 dose levels tested (0.25 mg to 100mg); 48 subjects were therefore exposed to the active treatment. For each level, 2 subjects (1 *active treatment* and 1 placebo) were tested before administration to the other 6.

The MAD part provided for 6 cohorts of 8 volunteers (6 *active treatment* and 2 placebo), therefore 48 subjects. The 6 doses to be tested were: 2.5 mg; 5 mg; 10 mg; 20 mg; 50 mg and 100 mg. Each dose was to be administered for 10 consecutive days. The subjects in each cohort were to stay at the Biotrial centre for 15 days (and 14 nights). From the 10 mg dose, administration was based on the pharmacokinetic data measured at n-2 (i.e. that for the 10 mg cohort to start administration of 50 mg). As is the rule in Phase 1, the next dose level was used only if no toxic effects were observed in the volunteers from the previous level, following the monitoring committee's advice. As the MAD part was interrupted before cohort 6, 30 volunteers received the *active treatment* for this part of the trial.

The food interaction study covered 12 volunteers at the 40 mg dose.

90 subjects in total were therefore exposed to BIA 10-2474 during Phase 1, at highly variable doses.

The SAD part started on 9 July 2015 and ended (cohort 8: 100 mg) on 9 October.

The MAD part started on 6 October 2015. The penultimate cohort (cohort 5, 50 mg) began on 6 January 2016, therefore 19 days after the end of cohort 4 (20 mg). On the evening of day five (10 January) and therefore of the 5th administration (total dose of 250 mg), one of the 6 volunteers having received the *active treatment* was hospitalised in Rennes University Hospital in a serious condition. Biotrial did not initially consider the relationship between the acute symptoms presented by the subject and the molecule tested to be possible since the other 5 volunteers received their sixth dose the next morning, 11 January at 8 a.m. (total dose: 300 mg). The 5 volunteers receiving the active treatment, and not the 2 subjects receiving the placebo, were in turn hospitalised at Rennes University Hospital between 13 and 15 January, therefore between 2 and 4 days after the last administration. The trial appeared to have been effectively suspended on

---

[1] As a reminder, we recall the 2006 recommendations of the French Medicines Agency (AFSSaPS) for first-in-man trials (page 4):
*"In the same group*:
*• number of volunteers receiving the new active substance simultaneously. It is necessary, except otherwise justified with arguments, to limit the number of volunteers receiving the new active substance simultaneously, according to the risk factors identified.*
*• time between administration to one volunteer and administration to the next. A sufficiently long observation period should be provided for between administrations, especially depending on the product characteristics,*
*the data available (pharmacokinetic, pharmacodynamic) and on the risk factors identified,*
*• criteria for administration to the next volunteer,*
*• criteria for discontinuation of administration to volunteers not yet treated".*

the 11th since the administrations, which were to continue until the 15th, were discontinued on that date.

| Points emphasised by the Group: |
| --- |
| - according to current standards, it is a conventional Phase 1, first-in-man clinical trial protocol, conducted in a specialized centre of sound reputation, <br> - the protocol did not in principle include any elements or provisions likely to contraindicate or delay authorisation of the trial, <br> - three points should however be highlighted: |
|     o the trial was not immediately suspended whereas one of the volunteers had been hospitalised for a sudden-onset event, <br>     o it is regrettable that, as it is a trial on a molecule theoretically targeting the central nervous system, volunteer selection did not apparently take neuropsychological assessment (clinical interview with cognitive assessments and tests) into account, whereas the "somatic" explorations appeared to be exhaustive, <br>     o especially, the increase in the doses administered, although sometimes common practice in Phase 1, appears to be problematic as too sudden at the end of escalation, as the opposite would have been expected. For example, dose skipping between the MAD cohorts 4 and 5 corresponds to a ratio of 2.5 (20 to 50 mg) whereas the ratio is only 2 between cohorts 1 and 2 (2.5 to 5 mg). This very important point should be included in recommendations (see end of minutes). |

**Symptoms observed in the hospitalised volunteers**

All of the clinical, biological and radiological data available was analysed by the TSSC's doctors, and it was then summarized and made anonymous for presentation to the plenary group. For obvious reasons relating to subject protection and medical secrecy, this information will not be given in detail in this first report. Several important points deserve to be underlined however:

- the 6 volunteers (27 to 49 years) having received multiple doses of BIA 10-2474 50mg were hospitalised,
- the symptoms, of very rapid onset, **presented by 5 of the 6 volunteers**, although of varying severity, where of the same form, as much in clinical as in radiological terms, and only involved the central nervous system,
- brain imaging (MRI) showed damage of highly variable severity but also of the same form in terms of its characteristics, and essentially affecting the hippocampus and the pons,
- clinically, there was neither peripheral neurological symptoms, nor seizures, nor biological, metabolic or immunological anomalies,
- the entire picture, both clinical and radiological, was **therefore completely unusual**, with no relatedness to a known disease or toxicity.

**Detection of signs of toxicity in the other volunteers**

One of the most striking elements of the case is the absence of toxicity (adverse event of noteworthy intensity, *a fortiori* serious) in the other trial volunteers, some of which had received single-doses up to 100 mg or multiple doses of 10 times 20 mg, therefore a cumulative dose of 200 mg (NB: cumulative doses in the hospitalised volunteers ranged from 250 to 300 mg).

Among the 76 volunteers (except MAD cohorts) having received the active treatment,18 adverse events were observed, 11 of which (frequency: 14.5%) were cardiovascular (orthostatic hypotension, reflex tachycardia, PR or QT interval prolongation on the electrocardiogram, etc.), and there were cases of mild dizziness or headaches.

The observations were of the same type for the volunteers in the MAD cohorts, there being no events of noteworthy seriousness or severity, and cardiovascular symptoms were predominant. It should be noted that two volunteers from the 10 mg MAD cohort however presented, *on two occasions*, blurred vision and diplopia (one episode on the 2nd and 6th day for one volunteer and on the 3rd and 7th day for the other). Apparently, the investigator and the monitoring committee did not consider this symptom to be relevant, and it was not observed in the volunteers in the 20 mg cohort.

Since suspension of the trial, the 84 volunteers having taken BIA 10-2474 (aside from the six from cohort 5) have been contacted for a full clinical examination and MRI exploration. Among the 62 volunteers (74%) seen at the TSSC meeting (15 February 2016), no clinical or MRI anomalies have been detected.

| Points emphasised by the Group: |
| --- |
| - the symptoms seen in the volunteers other than those hospitalised, but exposed to BIA 10-2474 at highly variable doses, are non-specific and appear to be quantitatively and qualitatively similar to those seen in Phase 1 trials of this type, except for the fairly high frequency of cardiovascular symptoms (orthostatic hypotension and tachycardia),<br>- serious central nervous system symptoms exclusively, **only** appeared in the exposed volunteers from MAD cohort 5 (50 mg). |

**Pharmacokinetic data**

Generally, pharmacokinetic studies conducted in animals do not give rise to any specific remarks, even if as is usually the case, pharmacokinetics appear to become non-linear with the highest doses, at least in dogs.

The choice of the doses administered in Phase 1 would however deserve to be discussed. Indeed, considering the inhibitory concentration 50 ($IC_{50}$) of BIA 10-2474 and its pharmacokinetic characteristics in humans, complete FAAH inhibition should be achieved at doses lower than 5 mg (probably from 1.25 mg). Even if the primary objective of a Phase 1 study is to ensure good acceptability of a molecule for doses significantly higher than those considered to be therapeutic, this raises the question of the need to test an escalation up to 20 to 80 times the dose inhibiting FAAH, if this molecule is supposed to have an effect *via* this mechanism.

The pharmacokinetic studies during the SAD cohorts show that the elimination half-life is extended when doses administered become high; the areas under the curve (AUC), reflecting exposure, increase more rapidly than the doses increase. This, from a purely theoretical standpoint, could be explained by the acceleration in absorption beyond a certain threshold (of the barrier breach, facilitation of passage, transporter induction

9

type, etc.), or, a lot more likely, by saturation of elimination at between 40 and 100 mg, without it being possible to more accurately identify the threshold dose at which non-linearity begins.

During MAD studies, the same non-linearity is observed, the AUC increasing more rapidly than the doses from 20 mg. We especially see that:

- dispersion in the pharmacokinetic parameters among the volunteers is higher at 50 mg than at 20 mg,
- again for 50 mg, and unlike what is observed for 20 mg, residual BIA 10-2474 plasma concentrations continue to increase up to the fifth administration. The plasma concentration steady state was not therefore reached in cohort 5, unlike what was predicted by the elimination half-life values calculated for lower doses.
- as in SAD, non-linearity is likely as of 50 mg multiple doses.

The four metabolites identified in animals are expected to be the same in humans, two of them (2639 and 2445) reached measurable plasma concentrations remaining however very low (<3% of those of the parent product). Without direct administration of the metabolites themselves, it is difficult to determine their individual characteristics. However, it seems that the variability in the pharmacokinetic parameters is higher for these two metabolites than that observed in animals, with, for example, elimination half-life estimated to vary from 4 to 23 hours.

Variability also affects, but to a lesser extent, the pharmacokinetics of the molecule itself. This is commonly observed with drugs due to interindividual variations in metabolism, among other things. In the case of a Phase 1, first-in-man trial, this variability can become problematic if the dose calculations for the multiple doses (MAD) are based, as is the case here, on the means of the parameters measured in other individuals previously. By definition, this approach does not take extreme values into account, distribution of which can vary from one group to another, and which can lead to fairly significant prediction errors (see recommendations by the Group at the end of the minutes).

---

Points emphasised by the Group:

- extrapolation of animal data to humans suggests that complete inhibition of FAAH activity is achieved for doses a lot lower (20 to 80 times) than the maximum doses the protocol planned to test in humans,
- BIA 10-2474 pharmacokinetics become non-linear somewhere between 40 and 100 mg administered. They are also subject to noteworthy interindividual variability. Also, the kinetics of the two main, non-specifically explored metabolites, are possibly non-linear during administration of multiple doses of parent product higher than 40 mg,
- this explains why in the 50 mg MAD cohort, residual plasma concentrations were not all stabilised on day five of administration, unlike that which was predicted by the calculations pertaining to mean elimination half-life.

---

**Hypotheses to look into in an attempt to explain the accident in Rennes**

The TSSC's first conclusion concerns the astonishing and unprecedented nature of the accident in Rennes, as much in terms of:

- its seriousness (6 volunteers hospitalised, 1 death),
- the fact that the toxicology studies, although conducted on four animal species with doses up to 650 times the dose absorbed by the hospitalised volunteers, do not apparently show any lesions or picture likely to predict such toxicity,
- the very unusual nature of the clinical and radiological pictures which are like nothing potentially ever seen before,
- the fact that to date, no patent neurological or radiological signs of this type have been found in the other volunteers (some having absorbed up to 100 mg in a single dose or total dose of 200 mg over 10 days),
- finally, the fact that the accident occurred with a molecule similar to other compounds abandoned due to their insufficient effectiveness and for which no neurological or other toxicity had been observed.

Toxicity occurring in only one of the 14 cohorts of volunteers having received BIA-2474, can only in theory be explained by:

- an administration error or procedure specific to this cohort,
- a common feature among the six subjects having presented with signs of toxicity,
- an effect relating to the total BIA 10-2474 dose that the subjects received.

Exploration of the first hypothesis is not within the scope of the TSSC's missions but it seems that this explanation is little likely. For example, the product used for the toxicology studies was the same as that used in the capsules administered to all volunteer groups, and was later tested and revealed to be of the highest purity. The Group therefore mainly discussed the other two hypotheses.

*1. Hypothesis of a common feature among the volunteers in the fifth MAD cohort*

 Several possibilities were discussed:

1.1. Hypothesis of an interaction with other products
Cited regularly by the media, an interaction with medicinal products, foods (such as chocolate) or recreational substances (alcohol, narcotics including cannabis, etc.) could have occurred. The "medicinal products" hypothesis appears to be resolutely unlikely given Phase 1 good practices, and especially as the 6 subjects hospitalised would have to have taken one or several of the same medicinal products even though they were of different ages (27 to 49 years). The same theoretically applies for an interaction with food or consumption of chocolate by the volunteers. Chocolate only contains very small quantities of anandamide and hyperstimulation of the endocannabinoid system is not known to be able to produce symptoms of the type seen in Rennes (see further on). To date, there are no credible arguments in favour of narcotic consumption immediately before or during the stay at Biotrial. Besides the serious breach of Phase 1 good practices that it would represent, and due to the fact that once again all cohort 5 volunteers would have to have taken the same substance, this hypothesis comes up against two observations:

- blood narcotic (including cannabis) and alcohol tests and tests for other substances, whether medicinal products or not, are negative to date,

- the same argument applies to cannabis, namely that it seems to be accepted in neuroscience, that direct or indirect, even massive stimulation of endocannabinoid receptors, CB1 in particular, would not induce toxicity of the type seen in Rennes. Even if in certain subjects it can induce severe psychiatric effects (i.e. psychotic episode), neither cannabis, nor its main component tetrahydrocannabinol lead to acute toxic brain damage, even experimentally and at very high doses.

1.2. <u>Hypothesis of a specific genetic or metabolic characteristic or common pharmacological response among the subjects in the 5th MAD cohort</u>

There are several genetic factors, among others, likely to modulate individual response to administration of an FAAH inhibitor. For example, this enzyme has two isoforms with different activity; in the same way, the cytochrome P450 system is found at several levels, the activity of which can vary widely (by induction or inhibition) from one individual to another. As appealing as it may seem, this hypothesis clashes with statistics laws. For the FAAH example, if low activity isoform prevalence is 38% in the general population, the probability of finding it in 5 out of the 6 exposed cohort subjects is 0.0295 (a less than 3 in 100 chance) and 0.003 (3 in 1000 chance) in the six subjects exposed. The same applies to the probability of having included by accident a majority of rapid metaboliser subjects in a previous cohort, which could have biased the pharmacokinetic predictions for cohort 5.

*2. Hypotheses of a threshold effect relating to cumulative BIA 10-2474 dose*

Even if this second set of hypotheses appears a lot more likely, the potential mechanisms are especially numerous and some purely hypothetical or very little known. They may involve the molecule itself or a mediator such as anandamide.
Let's not forget, first of all:
- the highly unusual nature of this dose-dependent toxicity, which was not observed in animals even at very high doses, theoretically with no portent signs in the volunteers having been exposed to lower doses of a compound similar to molecules having previously been seen to be little effective, without specific toxicity. It happened "*as if something gave way or swung suddenly at a specific dose or concentration threshold which is typical of an on-off effect*". This threshold effect could be encouraged by the fact that BIA 10-2474 pharmacokinetics become non-linear above 40 mg,
- that it is almost certainly an *off-target* effect due to (i) the fact that complete and prolonged (8 hours) FAAH inhibition is achieved for BIA 10-2474 doses of 1.25 to 5 mg, (ii) that this molecule appears to be little specific for FAAH, and, especially, (iii) that stimulation of endocannabinoid receptors by anandamide cannot theoretically induce toxicity of this type.

Several hypotheses possibly explaining such a human-specific **on-off/off-target effect**, were discussed during the TSSC meeting:

2.1. <u>Inhibition of other cerebral enzymes by BIA 10-2474</u>

This is one of the TSSC's preferred avenues. Bial's molecule is in fact significantly less FAAH-specific than molecules developed to date, and its binding to other, i.e. off-target, cerebral hydrolases or enzymes is therefore plausible, especially when concentrations of

BIA 10-2474 or its metabolites increase. Let's not forget that BIA 10-2474 was administered to the volunteers in MAD cohort 5 at a dose (50 mg) 10 to 40 times higher than that supposedly inducing complete FAAH inhibition. The TSSC therefore asked to receive additional information on:
- the affinity of BIA 10-2474 for other cerebral enzymes,
- the geographic distribution of these enzymes in the brain, and
- the consequences, if they are known, of inhibition of their activity.

2.2. Toxicity from a BIA 10-2474 metabolite

Bial's molecule (which has a leaving imidazole group) could produce a toxic isocyanate that is able to bind to many brain proteins and induce widespread lesions. This hypothesis is very interesting to look into, even if, like the previous hypothesis, it comes up against the absence of central nervous system toxicity observed in animals.
Toxicity from one of the 4 peripherally-circulating metabolites (plasma) in humans and animals could also be envisaged. Their specific activity and toxicity have not been tested by Bial, however these metabolites are produced in very small quantities (<3% of BIA 10-2474 circulating concentration) even if pharmacokinetic variability is higher in humans. It is also possible that these peripherally-produced metabolites are of the hydrophilic type and therefore have difficulty crossing the blood-brain barrier, unless we assume there is a specific carrier and/or efflux pump inhibition during the rise in circulating concentrations from repeated doses.

2.3. Suspected anandamide-related toxic effects

FAAH activity blockade leads, at least temporarily, to an increase in intracerebral anandamide concentrations, which has several possible consequences:
- 2.3.1. *Binding to other receptors*
  Anandamide is a mediator, the ubiquity of which largely exceeds the endocannabinoid system. It is able, especially when its concentrations increase, to interact with several types of receptors (at least TRPV1, PPAR and NMDA) and with the MAP-kinase pathway, having possible consequences on apoptosis and neuroprotection. Some of these mechanisms involve ion channels which may help explain the sudden threshold effect. This avenue is currently being explored by the TSSC's experts.

- 2.3.2. *Toxicity from anandamide degradation products*
  In the event of FAAH inhibition, anandamide can be degraded by the cyclo-oxygenases pathway, giving rise to various compounds (leukotrienes and prostanoids) some of which have known effects on cerebral vasomotricity, which may be compatible with some of the lesions observed in the cohort 5 volunteers. This avenue is also being explored by the TSSC.

In its meeting on 24 March, additional data will be studied by the TSSC, mainly concerning points 2.1, 2.2 and 2.3.
The plausibility of hypotheses 2.3.1 and 2.3.2 is however challenged by the fact that (i) this effect has not been observed with other apparently more specific inhibitors of FAAH and (ii) complete and lasting FAAH inhibition, and therefore, theoretically, the rise in intracerebral anandamide concentrations, is achieved from the lowest BIA 10-2474 doses tested by MAD, for which no toxic effect has been observed.

13

**Recommendations that the TSSC would like to see put to French and international authorities**

In the TSSC's opinion, the seriousness of the accident in Rennes warrants that legislation and good practices governing first-in-man trials move forward to become clearer and tighter on a certain number of points. More comprehensive recommendations, that the TSSC would like to see applied at international level, will be put forward at the TSSC meeting on 24 March 2016. Several of them can already be listed:

-   Firstly, demonstration of pharmacological activity, comparative whenever possible, should be a requirement in the future before in-human administration or even before continuing toxicology studies can be envisaged. Preclinical pharmacology studies should be conducted as early as possible, on an adequate dose range (dose-effect curves) and should be designed so as to be reasonably predictive of real-life, future therapeutic efficacy.
-   A neuropsychological assessment with clinical interview and cognitive tests should be a compulsory part of assessment during volunteer screening and inclusion in a Phase 1 trial for drugs with "central nervous system" tropism.
-   Detailed and well-supported arguments for the choice of maximum dose to be tested in volunteers with respect to the presumed effective dose should be provided. For example, in this case, it appears unjustified to plan to test a dose (100 mg) 80 times higher than that presumed to induce complete and prolonged FAAH inhibition (claimed mechanism of action of the drug tested).
-   A large-scale consensus process should cover Phase 1 dose-escalation strategies to establish recommendations for more reasonable and careful practices than those applied, for example, in the case of BIA 10-2474. Dose skipping, which is highly paradoxical, was observed between cohorts 4 and 5, and therefore in the risk area, and was more substantial than for the first apparently risk-free levels (i.e.: a ratio of 2.5 between 20 and 50 mg compared to 2 between 1.25 and 2.5 mg).
-   Pharmacokinetic parameter variability and extremes, and not only the mean, should be taken into account for setting the next dose level.

Exhibit 11

# EMA Will Assess ANSM Review of Botched Clinical Trial in France

Posted 19 January 2016

By Zachary Brennan (/SearchRegFocus.aspx?name=Zachary Brennan)



EU authorities could end up revising clinical trial guidelines depending on the outcome of French regulators' investigation into Biotrial's halted Phase I trial that has resulted in the death of one volunteer and the hospitalizations of five others.

"The French authorities have opened an investigation including verification that the clinical trial has been carried out according to standards," European Medicines Agency (EMA) spokeswoman Rebecca Harding told *Focus*. "EU authorities will look carefully at the findings to determine if further measures are needed to protect health of clinical trial participants. Until EU authorities have the full picture, it is not possible to say whether any revisions to EU guidelines are required."

The comments come as France's National Agency for Medicines and Health Products Safety (ANSM) launched an investigation (http://www.raps.org/Regulatory-Focus/News/2016/01/15/23905/France%E2%80%99s-ANSM-Investigating-Trial-Halted-After-Five-Patients-Hospitalized-One-Brain-Dead/) into the trial after it was halted. ANSM has not responded to a request for comment on the details of its investigation.

The first-in-human trial of Bial's FAAH (fatty acid amide hydrolase) inhibitor, known as BIA 10-2474, involved 128 healthy volunteers, 90 of whom received different doses of the drug. The six subjects who were hospitalized received higher doses of the drug than the others, and the first subject became ill on 10 January. One day later, contract research organization Biotrial halted the study.

Catherine Hill, an expert in clinical-trial design and a former member of the scientific advisory board of ANSM, told Nature (http://www.nature.com/news/scientists-in-the-dark-after-french-clinical-trial-proves-fatal-1.19189): "The French authorities have not been very rapid nor transparent in their response."

One of the hospitalized patients has since been discharged, according to Nature, which also notes that the four others are in serious but stable condition.

ANSM Statement (http://social-sante.gouv.fr/IMG/pdf/16_01_15_-_intervention_mt_-_accident_grave_rennes.pdf) (French)

Rennes, France Hospital Statement (http://www.chu-

rennes.fr/sections/autres_professionnel/relations_presse/dossiers_et_communig/du_16_au_20_mars_les/downlo
_CP_CHU_de_Rennes_-_Point_de_situation_n3.pdf?nocache=1453127883.87) (French)

Case 1:1-ev-02199-JEB Document 1-5 Filed 1/24/11 Page 197 of 365

---

Share this article:

**Categories:** Clinical (/SearchRegFocus.aspx?catid=444), Crisis management (/SearchRegFocus.aspx?
catid=445), Ethics (/SearchRegFocus.aspx?catid=449), Government affairs (/SearchRegFocus.aspx?catid=450),
Project management (/SearchRegFocus.aspx?catid=458), Research and development (/SearchRegFocus.aspx?
catid=459), News (/SearchRegFocus.aspx?catid=471), Europe (/SearchRegFocus.aspx?catid=511), EMA
(/SearchRegFocus.aspx?catid=531), EC (/SearchRegFocus.aspx?catid=532)

**Tags:** ANSM (/SearchRegFocus.aspx?tag=ANSM), Biotrial (/SearchRegFocus.aspx?tag=Biotrial), EMA
(/SearchRegFocus.aspx?tag=EMA), Bial (/SearchRegFocus.aspx?tag=Bial), clinical trial in France
(/SearchRegFocus.aspx?tag=clinical trial in France)

---

**You must be logged in to leave a comment (/Vlogin.aspx?
returnURL=http://www.raps.org/regulatoryDetail.aspx?id=23925)**

Related Links ▾

European Regulatory Roundup: EMA Proposes Major Changes to Risk Management (3 March 2016) (/Regulatory-
Focus/News/2016/03/03/24465/European-Regulatory-Roundup-EMA-Proposes-Major-Changes-to-Risk-Management-3-
March-2016/)

Regulatory Recon: FDA Struggles With ANDA Backlog; Trump Calls for Reimportation of Cheap Drugs (3 March 2016)
(/Regulatory-Focus/News/2016/03/03/24464/Regulatory-Recon-FDA-Struggles-With-ANDA-Backlog-Trump-Calls-for-
Reimportation-of-Cheap-Drugs-3-March-2016/)

Genetically Engineered Mosquitoes to Aid Zika Response? FDA Plans to Release More Info (/Regulatory-
Focus/News/2016/03/02/24460/Genetically-Engineered-Mosquitoes-to-Aid-Zika-Response-FDA-Plans-to-Release-More-
Info/)

Korean Device Firm Denies FDA Inspection (/Regulatory-Focus/News/2016/03/02/24458/Korean-Device-Firm-Denies-FDA-
Inspection/)



MATHEMATICS:
The Essentials for All
Regulatory Professionals

READ HERE

GRACE COLLEGE
OrthoWor

Exhibit 12

General Pharmacy





# TGN1412: From Discovery to Disaster

## Attarwala H

*Department of Pharmaceutical Sciences, School of Pharmacy, Northeastern University, Boston, MA, USA*

***Address for correspondence:*** *Mr. Husain Attarwala; E-mail: attarwala.h@husky.neu.edu*

**ABSTRACT**

After a drug is confirmed as safe and efficacious in preclinical studies, it is tested in healthy human volunteers for first in man trials. In 2006, a phase I clinical study was conducted for a CD28 superagonist antibody TGN1412 in six human volunteers. After very first infusion of a dose 500 times smaller than that found safe in animal studies, all six human volunteers faced life-threatening conditions involving multiorgan failure for which they were moved to intensive care unit. After this particular incident, a lot was changed over how first in man trials are approved by regulatory authorities and the way clinical trials are conducted. This review primarily deals with preclinical studies conducted by TeGenero, results of which encouraged them to test the antibody on human subjects, reasons why this drug failed in human trial and aftermath of this drug trial. In addition, another drug—Fialuridine which failed in phase 2 clinical trial leading to death of five human subjects is briefly reviewed.

**Key words:** Clinical trials, Fialuridine, TGN1412

**DOI:** 10.4103/0975-1483.66810

## INTRODUCTION

CD28 superagonist antibodies can cause activation and proliferation of regulatory T cells regardless of signal received by T-cell receptor. Regulatory CD4+CD25+ T cells play an important role in prevention of autoimmune diseases.[1] Activation of regulatory T cells by antigens is controlled by co-stimulatory signal from antigen presenting cells, mainly dendritic cells (DC) where antigen is presented by MHC complex of DC to T cells via T-cell receptor. This along with co-stimulation of CD28 receptor by CD80 or CD86 ligand on DC is required for T-cell activation.[2] *In vitro* it was possible to stimulate T cells by the use of combination of antibodies against T-cell receptor and CD28 receptor. Monoclonal anti-CD28 antibody such as TGN1412 was capable of activating T cells by binding to CD28 receptor irrespective of T-cell receptor activation and hence it was termed as a CD28 superagonist.

Superagonistic activity of these antibodies was shown to be as a result of their binding to C"D loop of CD28 receptor in contrast to other CD28 antibodies which bind to a site close to binding site of natural ligands. Since activation of regulatory T cells can be useful for the treatment of a variety of autoimmune diseases and cancer, they were investigated for their therapeutic potential in different animal models for their superagonist activity.[3] One such antibody TGN1412 by TeGenero underwent rigorous preclinical investigation prior to its approval for clinical trials. TGN1412 could cause *ex vivo* expansion of T cells in the absence of additional stimuli from T-cell receptor. In preclinical studies, well-tolerated expansion of T cells was observed without any measurable proinflammatory reaction. Moreover, TGN1412 also demonstrated its therapeutic potential for use in autoimmune disease because of its capability of activating regulatory T cells. Thus, depending upon the condition of the immune system

TGN1412 was thought to be useful for disease related to low numbers of activated T such as B-cell lymphoma or for treatment of autoimmune diseases such as rheumatoid arthritis. When this antibody was tested in humans, it was immediately withdrawn from phase 1 clinical trials and volunteers had to be taken to intensive care unit 8 h after drug infusion due to multiorgan failure.[4]

## DEVELOPMENT OF TGN1412

After identification of CD28 antibodies capable of activating T cells along with signal from T-cell receptors, studies were conducted to evaluate T-cell activation potential of these CD28 antibodies. Large number of mouse hybridomas were isolated and investigated for functional activity through CD28. It was found that one category of these antibodies was capable of activating T cells irrespective of signal received from T-cell receptor. They were named as CD28 superagonists. These antibodies did not differ in antibody class or the binding avidity for the CD28 receptor but differed in the epitope-binding site. Conventional CD28 antibody-binding site was at the top of CD28 molecule where the natural CD28 ligands bind, while the CD28 superagonist required an intact CD28 C"D loop for its binding.[2] Toward further development of this class of antibodies, TeGenero started with screening of several mouse monoclonal CD28 superagonist antibodies. From these studies, TGN1412, a genetically engineered humanized anti-CD28 antibody was produced by transferring complement-determining regions from variable regions of heavy and light chains of monoclonal anti-mouse CD28 antibody 5.11A1 into human heavy and light chain variable antibody construct. Huminized heavy and light variable regions were then combined with IgG4γ and ϰ chain coding human gene. A mouse antibody used in humans may have toxicity problems related to immunogenicity and problems related to effective functioning of antibody. To avoid these problems, the above humanized antibody TGN1412 was constructed.[2]

## *IN VITRO* EVALUATIONS OF TGN1412 IN HUMAN AND NON-HUMAN CELLS

Specificity of TGN1412 to CD28 was evaluated by flow cytometry and Biacore analysis. These assays showed specificity of TGN1412 for CD28 receptor and that TGN1412 did not cross react with other closely related molecular targets such as Cytotoxic T-lymphocyte-antigen-4 and inducible co-stimulator. *In vitro* studies for cross reactivity of TGN1412 with CD28 expressed on T cells of rodents and non-human primates revealed that

TGN1412 had low-binding affinity for rodent CD 28 whereas the same was high in case of T cells from for CD 28 to T cells derived from cynomolgus monkey and rhesus monkey. Determination of sequence homology of C"D loop of CD28 of humans and rhesus revealed difference of one amino acid while that in marmoset monkey revealed difference of two out of six amino acids. In case of rodents, the C"D loop sequence homology with humans was very low. When incubated with different subsets of T cells obtained from healthy donars, only TGN1412 but not conventional CD28 antibody was able to cause rapid proliferation of T cells in the absence of stimuli from T-cell receptor. These results showed that TGN1412 had superagonistic activity for T cells obtained from healthy donars and that they could specifically react with CD28 receptor having sequence homology with human CD28 receptor.[2]

## *IN VIVO* STUDIES

Prior to use of TGN1412 different antibody variants were used for preclinical studies. All these studies demonstrated that these superagonist are safe and efficacious (Investigation brochure, 2005). These encouraging results demonstrated high possibility for the use of this superagonist for the treatment of different T-cell deficiency syndromes like auto-immune diseases and B-cell lymphoma. To further evaluate its efficacy, humanized antibody as described above was engineered from 5.11A1 mouse human CD28 antibody. Selection of proper non-human primate model was an important issue for testing further safety and efficacy of this antibody. Toward this end, cynomolgus and rhesus monkeys were chosen because the CD28 receptor in these species and humans have similar affinity for TGN1412[5] because of 100% sequence homology of extracellular domain of CD28 receptor.[5] Moreover, Fc receptors and their motifs responsible for signal transduction in these species are highly conserved in human species hence similar antibody affinities and response can be expected. On the basis of this hypothesis, it was decided that results obtained from pharmacokinetic and pharmacodynamic studies in these closely related species would most closely predict fate of drug response when tested in humans. A repeat dose study for toxicokinetic evaluation of TGN1412 was conducted. In this study, doses ranging from 5 to 50 mg/kg were administered. Plasma half-life of TGN1412 was found to be 8 h which was as expected for a large protein molecule like an antibody. Despite four increasing repeated doses of TGN1412 resulting in four plasma peaks concentrations of TGN1412, only one peak for increase in T-cell number

*Attarwala. J Young Pharm. 2010;2(3): 332-336*

was observed. This was because extent of expansion of T cells by TGN1412 is highly dependent on availability of T cells and saturation kinetics of CD28 co-stimulator receptor. After these studies, toxicological studies using rhesus and cynomolgus monkeys were conducted. Rodent species were not considered appropriate because of difference in binding affinities of TGN1412 at the C"D loop of CD28 receptor. A repeat dose pilot study was conducted in cynomolgus and rhesus monkey. In this study, an increasing dose of TGN1412 starting from 5 to 50 mg/mL was administered. Dose as high as 50 mg/mL was well tolerated and no adverse reactions such as systemic immune system disregulation or hypersensitive reactions were observed. In addition, no signs of toxicity were observed in any of the physiological systems including cardiovascular system, respiratory system, or central nervous system. On the basis of these results, no observed drug effect level was considered to be 50 mg/kg. For additional toxicity studies, rat anti-CD28 antibody jj316 or TGN1112 (IgI variant of TGN1412) were used for toxicological studies in relevant species. Expected pharmacodynamic effect of TGN1412, that is elevation in levels of CD4+ and CD8+ was observed after 13 days of initial dosing. Levels of IL-2, IL-6, and IL-5 were moderately increased in serum in animals treated with TGN1412. However, from these studies there was no indication or sign of any clinical manifestations of first dose cytokine release syndrome in any of the CD28 superagonist antibody-treated animals since elevation of cytokine levels was observed only for a week at 5 mg/kg dose of TGN1412. In addition, there was no signal from any of the animals treated with any dose of superagonist indicating symptoms of anaphylactic shock or development of autoimmune disease, or systemic immune suppression. In addition to these studies, tissue cross-reactivity studies were performed where distribution of lymphocytes was observed by lymphocyte staining. These studies revealed a consistent tissue staining in lymphoid tissue as expected demonstrating target-tissue specificity of CD28 superagonist. In addition, studies for immunogenicity of TGN1412 were performed on primate model. Anti-TGN1412 antibody titers were observed in all animals, which were thought to be as a consequence of the humanized antibody being used in primate model.[1–5] Hence, TGN1412 proved to be safe and efficacious and passed a variety of conventional preclinical safety tests such as *in vitro* tests on human white blood cells and preclinical tests in non-human primates which bagged TeGenero approvals from UK and German regulatory authorities for first in man phase 1 trial for this new therapeutic agent with an unusual mode of action.[6]

## CLINICAL DEVELOPMENT OF TGN1412

After getting approval from regulatory authorities, phase 1 trials were conducted. The main aim was to establish safe human dose which can be further be used for subsequent drug trials. For this purpose, it was decided to conduct the trials on healthy human volunteers because disease free subjects have comparable CD28 receptors as in case of rhematioid arthritis or B-cell lymphoma. Also, immunological safety was expected to be more in healthy subjects compared to those with pre-existing disease. In addition, healthy subjects would not only exclude effects of other medications administered to diseased patients, but also exclude the effects of functional activation or dysfunctionalization of T cells as a result of prior diseased condition.[2]

## DOSE CALCULATION

Since TGN1412 showed specificity toward CD28 receptor expressed on human and non-human primate T cells, safe dose calculated from preclinical studies in non-human primate model was considered of suitable relevance for calculation of first in human dose. Various tests for expected pharmacological activity of TGN1412 and unexpected toxicological effects of TGN1412 were conducted in non-human primates cynomolgus and rhesus monkeys. These tests demonstrated a dose of 50 mg/kg administered for four consecutive weeks to be safe [21] On the basis of the repeat dose toxicity studies in cynomolgus monkeys, no observed adverse effectt level (NOAEL) was considered to be 50 mg/kg per week for not less than four consecutive weeks. Considering FDA guidelines, "Minimal Anticipated Biological Effect Level" (MABEL) approach and the Safety Criteria for the safe first dose, a dose of 0.1 mg/kg was decided to be administered to healthy volunteers in a double-blind randomized placebo-controlled phase I clinical trial conducted.

## THE FIRST DOSE DISASTER

After collection of this large amount of preclinical data, when TGN1412 was administered to six healthy human volunteers in phase 1 clinical trial conducted by Paraxel for TeGenero at Northwick hospital in London, UK, minutes after the first infusion of humanized CD28 superagonist TGN1412, all patients started suffering from severe adverse reaction resulting from rapid release of cytokines by activated T cells.[7] Table 1 lists some of the important lessons from TGN1412 trial failure.

TGN1412

**Table 1: Summary of learning points from the TGN1412 phase I study**

| TGN1412 study problem | Detail | Learning Point |
|---|---|---|
| Interpretation of preclinical (primate) studies | Low-level cytokine release in primate studies should have promoted more caution | Minor but potentially important effects in preclinical studies should raise caution in crossing the species barrier |
| Use of human *in vitro* studies | Insufficient *in-vitro* human studies were performed | *In vitro* studies on human material as close as possible to the target tissue can be important. |
| Choice of starting dose | Subtle difference between primate and human target ligand may explain marked difference in potency – the calculation of an initial dose based on a fraction of predicted 'no adverse effect level' proved dangerously wrong | Prediction of risk and dose range from animal studies may prove unreliable: extra caution with wider margins of safety are required with 'potentially risky modes of action' |
| Dosing interval between subjects | No 'proper interval' allowing for the observation of possible side effects was left between the dosing of one subject and the next | In first-in-man studies, investigators should expect the unexpected |
| Preparation for adverse events | Preparation for possible adverse events (cytokine storm) was inadequate – investigators did not expect it, recognize it or treat early. | Where there is a known theoretical risk, investigators should plan for its potential occurrence |

Adapted from Dayan and Wraith[8]

After this unexpected outcome of the trial United Kingdom's Medicines and Healthcare Products Regulatory Agency (MHRA) initiated an investigation on the trial procedures and ethics. They did not find any flaw in trial procedure or in manufacture of drug. They mentioned that the severe reactions were as a result of unexpected biological effect of the drug.[9] Deficiencies they found in the drug trail were inadequate maintenance medical records, physician with inappropriate qualification, inadequacy in ensuring insurance protection of the sponsor, and failure in arranging early medical coverage.[10] In addition, there was no citation mentioned in the investigation brochure supporting the 100% homology of CD28 receptor between primate species used for preclinical trial and humans. Later, it was reviewed by Hansen and Leslie[11] that differences of up to 4% existed in the amino-acid sequences of the C"D loop of CD28 receptor in rhesus and cynomolgus with that of humans. This raises doubts on whether trial met the criteria on scientific validity of preclinical data.[10] Later, *British Journal of Medicine* and other journals requested for a more critical trial inquiry independent of the authorities who approved the trial. Toward this end, expert scientific group under Professor Gordon Duff was formed which further investigated the biological and ethical concerns which may have resulted in the disastrous aftermath.[12] Just after few minutes of drug infusion, all six human volunteers started suffering severe cytokine release syndrome leading to sever inflammation.[13] Similar effects were observed in small number of patients treated with rituximab, muromonab-CD3, and alemtuzumab antibodies.[13] Even the investigation brochure had in its text mentioned caution about possibility of cytokine release syndrome. Despite of knowing these facts infusion of TGN1412 given to all six volunteers within a short span of time was a serious concern in conduct of the trial.

Moreover, when the last volunteer was to be infused, the first volunteer had already started showing adverse effects. Despite of this observation, sixth volunteer was still infused with the drug.[4] Moreover, the place where trial was conducted was not a hospital but a privately leased unit by Paraxel, which delayed the quick diagnosis and treatment of affected volunteers.[4,10] In addition, the preclinical test did not include a test for allergy. This was important because CD28 is also expressed by the cells responsible for allergy and the fact that the adverse reactions were immediate, relates to the release of preformed cytokines in granules of allergy-mediating immune cells. Inclusion of an allergy test in preclinical studies might have predicted the massive cytokine release.[14]

In an another clinical trial conducted by National Institute of Health for the drug Fialuridine, a thymidine analog having antiviral activity against Hepatitis B virus showed adverse reactions in phase 2 clinical trials leading to death of five human volunteers due to severe hepatic toxicity and lactic acidosis.[15] Before conducting human trials, Fialuridine was tested on different animals including mice, rat, dog, monkeys, and woodchucks. These studies demonstrated that doses hundred times higher than that administered to humans did not induce any toxic reactions. Moreover, animal models showed bone marrow and heart toxicity with no signs of mitochondrial injury.[16] None of the preclinical toxicity studies on laboratory animals could predict the toxic outcomes observed in phase II studies. Even a pilot study on 43 patients treated for 2 and 4 weeks duration with Fialuridine did not reveal any signs of hepatic toxicity on initial examination.[17] During 13th week of phase II studies, one of the patients suddenly developed hepatic toxicity and lactic acidosis. At this point, trial was stopped for all other patients. Even after discontinuation of Fialuridine

*Attarwala. J Young Pharm. 2010;2(3): 332-336*

administration, seven other patients showed signs of severe hepatic toxicity five of which could not survive and other two could survive only after liver transplantation.[17] It was reported by Richardson *et al.*[18] that Fialuridine accumulates in genomic DNA in liver and also other tissues after chronic oral drug administration. Accumulation of Fialuridine in genomic DNA specifically in liver may be responsible for its toxic effects due to production of defective mitochondrial DNA resulting in high levels of lactic acid and deposition of fat in mitochondrial microvesicles.[19] Fialuridine can get incorporated into cellular and mitochondrial nacent DNA which may result in inhibition of DNA synthesis or synthesis of abnormal DNA.[17,18] This unexpected tragedy has focused attention of researchers on possibility of a new type of delayed toxic effect due to mitochondrial injury.[19] Later after these disastrous trial outcomes, woodchucks with Hepatitis B virus infection were used for evaluation of hepatotoxicity. The main aim of this study was to develop a suitable animal model, which can predict clinical toxicity in humans by preclinical studies prior to use of nucleoside analogs in clinical trials. Initial 8-week treatment showed lowering in serum levels of Hepatitis B virus but later after from 12th week onward woodchucks began to loose weight and began to show mitochondrial injury.[20] Since no such chronic administration studies were carried out prior to Fialuridine clinical trial, observed chronic toxicity effects remained unpredicted by preclinical studies. Now for all preclinical studies involving nucleoside analogs for HBV treatment, a woodchuck model is used for evaluation of mitochondrial toxicity.[16]

## CONCLUSION

Drugs showing safety and efficacy in preclinical animal models may show very different pharmacological properties when administered to humans. Development of proper preclinical models which can efficiently predict drug behavior in humans is very essential prior to testing a drug in a human subject. First in man, human trials of potent biological molecules should include initial testing on very less number of human volunteers before administration of drug to a greater number of human volunteers. The above-mentioned incidents especially the TeGenero incident was an alarming call for the researchers and also for the trial approving regulatory authorities on toxicity-related unpredictability of new drugs in human subjects especially for biological with a novel mechanism of action like TGN1412. Though there is always a risk involved with clinical trials, these risks can be potentially reduced if more scientific research toward development of

animal models closely mimicking drug behavior in humans can be developed.

## REFERENCES

1. Masteller EL, Warner MR, Tang Q, Tarbell KV, McDevitt H, Bluestone JA. Expansion of functional endogenous antigen-specific CD4+CD25+ regulatory T cells from nonobese diabetic mice. J Immunol 2005;175:3053-9.
2. Hunig T. Manipulation of regulatory T-cell number and function with CD28-specific monoclonal antibodies. Adv Immunol 2007;95:111-48.
3. Lühder F, Huang Y, Dennehy KM, Guntermann C, Müller I, Winkler E, *et al.* Topological requirements and signaling properties of T cell-activating, anti-CD28 antibody superagonists. J Exp Med 2003;197:955-66.
4. Suntharalingam G, Perry MR, Ward S, Brett SJ, Castello-Cortes A, Brunner MD, *et al.* Cytokine storm in a phase 1 trial of the anti-CD28 monoclonal antibody TGN1412. N Engl J Med 2006;355:1018-28.
5. Hanke T. Lessons from TGN1412. Lancet 2006;368:1569-70.
6. Stebbings R, Poole S, Thorpe R. Safety of biologics, lessons learnt from TGN1412. Curr Opin Biotechnol 2009;20:673-7.
7. Schraven B, Kalinke U. CD28 superagonists: What makes the difference in humans? Immunity 2008;28:591-5.
8. Dayan CM, Wraith DC. Preparing for first-in-man studies: The challenges for translational immunology post-TGN1412. Clin Exp Immunol 2008;151:231-4.
9. Horvath CJ, Milton MN. The TeGenero incident and the Duff report conclusions: A series of unfortunate events or an avoidable event? Toxicol Pathol 2009;37:372-83.
10. Shamoo A, Woeckner E. Ethical flaws in the TeGenero trial. Am J Bioeth 2007;7:90-2.
11. Hansen S, Leslie RG. TGN1412: Scrutinizing preclinical trials of antibody-based medicines. Nature 2006;441:282.
12. Goodyear MD. Further lessons from the TGN1412 tragedy. BMJ 2006;333:270-1.
13. Tuma RS. Phase I antibody risks, trial safety examined. J Natl Cancer Inst 2006;98:956-8.
14. Weis JH. Allergy test might have avoided drug-trial disaster. Nature 2006;441:150.
15. Honkoop P, Scholte HR, de Man RA, Schalm SW. Mitochondrial injury. Lessons from the fialuridine trial. Drug Saf 1997;17:1-7.
16. Gallin JI. Principles and practice of clinical research. San Diego, CA: Academic Press. xv; 2002. p. 490.
17. McKenzie R, Fried MW, Sallie R, Conjeevaram H, Di Bisceglie AM, Park Y, *et al.* Hepatic failure and lactic acidosis due to fialuridine (FIAU), an investigational nucleoside analogue for chronic hepatitis B. N Engl J Med 1995;333:1099-105.
18. Richardson FC, Engelhardt JA, Bowsher RR. Fialuridine accumulates in DNA of dogs, monkeys, and rats following long-term oral administration. Proc Natl Acad Sci U S A 1994;91:12003-7.
19. Swartz MN. Mitochondrial toxicity--new adverse drug effects. N Engl J Med 1995;333:1146-8.
20. Lewis W, Griniuviene B, Tankersley KO, Levine ES, Montione R, Engelman L, *et al.* Depletion of mitochondrial DNA, destruction of mitochondria, and accumulation of lipid droplets result from fialuridine treatment in woodchucks (Marmota monax). Lab Invest 1997;76:77-87.
21. Department of Health. Expert Scientific Group on phase one clinical trials: a consultation, 8th June, 2010. http://www.dh.gov.uk/en/Publicationsandstatistics/Publications/PublicationsPolicyAndGuidance/DH_063117 [last accessed 2010 Jun 8].

**Source of Support:** Nil, **Conflict of Interest:** None declared.

Exhibit 13

# EXPERT SCIENTIFIC GROUP ON

# PHASE ONE CLINICAL TRIALS

# FINAL REPORT

3O[th] November 2006

Published by TSO (The Stationery Office) and available from:

**Online**
**www.tsoshop.co.uk**

**Mail,Telephone, Fax & E-mail**
TSO
PO Box 29, Norwich, NR3 1GN
Telephone orders/General enquiries: 0870 600 5522
Fax orders: 0870 600 5533
E-mail: customer.services@tso.co.uk
Textphone 0870 240 3701

**TSO Shops**
123 Kingsway, London,WC2B 6PQ
020 7242 6393 Fax 020 7242 6394
16 Arthur Street, Belfast BT1 4GD
028 9023 8451 Fax 028 9023 5401
71 Lothian Road, Edinburgh EH3 9AZ
0870 606 5566 Fax 0870 606 5588

**TSO@Blackwell and other Accredited Agents**

© Crown Copyright 2006

All rights reserved.

Applications for reproduction should be made in writing to
the Copyright Unit, Her Majesty's Stationery Office,
St Clements House, 2-16 Colegate, Norwich NR3 1BQ.

First published 2006

ISBN-10  0 11 703722 2

ISBN-13  978 0 11 703722 9

Printed in the United Kingdom for The Stationery Office
5476378 C4 12/06

Contents

|  |  |  | Pages |
|---|---|---|---|
| 1. | Executive Summary | | 1 |
| 2. | Introduction | | 13 |
| 3. | Background to the TGN1412 incident as at July 2006. | | 18 |
| | Prepared by the Secretariat to the ESG | | |
| | A  Pre-clinical development of TGN1412 | | |
| | B  Transition to Clinical Development of TGN1412 | | 24 |
| | C  Phase One Clinical Trial and Adverse Events at Northwick Park Hospital | | 30 |
| | D  MHRA GCP, GMP and GLP Investigations | | 37 |
| 4. | Paper published in the New England Journal of Medicine | | 44 |
| 5. | NIBSC Special Cytokine Study and Follow Up Studies | | 56 |
| 6. | Summary of Stakeholder Consultations | | 68 |
| 7. | Predicting Hazards in Pre-clinical to Clinical Transition | | 75 |
| 8. | Risk Reduction and Risk Management | | 83 |
| 9. | Scope and Summary of the Recommendations | | 97 |
| 10. | Appendices | | |
| | 10.1  Meetings, Papers and Minutes of the ESG | A | 1 - 216 |
| | 10.2  List of invited stakeholders & stakeholder consultations | B | 1 - 3 |
| | 10.3  Stakeholder Meetings Minutes and Presentations | C | 1 - 70 |
| | 10.4  Stakeholder Written Submissions | D | 1 – 83 |
| | 10.5  Comments on Interim Report | E | 1 - 131 |
| | 10.6  List of Invited Observers | F | 1 |
| | 10.7  Observers Submissions | G | 1 - 2 |
| | 10.8  History of Phase One Clinical Trials in the UK | H | 1 - 2 |
| | 10.9  Membership of the Expert Scientific Group | I | 1 - 2 |
| | 10.10 Secretariat and Professional Supporting Staff | J | 1 |
| | 10.11 Table of Results for Laboratory Analysis | K | 1 - 3 |
| 11. | Glossary | L | 1 - 7 |

# 1. Executive Summary

## Background

The Expert Scientific Group (ESG) was set up following the very serious adverse reactions that occurred in the first-in-man clinical trial of TGN412 in March 2006. The trial was performed in a private clinical research unit at Northwick Park Hospital in London.   TGN1412 is a monoclonal antibody that was being developed as a medicine to treat leukaemia and autoimmune diseases such as rheumatoid arthritis.

In the clinical trial, six healthy male volunteers experienced severe systemic adverse reactions soon after receiving TGN1412 intravenously.   All six volunteers developed a cytokine release syndrome with multi-organ failure and required intensive treatment and supportive measures that were provided by the Intensive Therapy Unit (ITU) at Northwick Park Hospital.

Previously, first-in-man clinical trials had a very good safety record and, as far as we can determine, the TGN1412 trial outcome, where all recipients experienced such a severe and similar adverse reaction, is unprecedented.

Following these events at Northwick Park Hospital, the ESG was set up by the Secretary of State for Health, with the following terms of reference:

## Terms of Reference

1. To consider what may be necessary in the transition from pre-clinical to first-in-man phase one studies, and in the design of these trials, with specific reference to:

   - Biological molecules with novel mechanisms of action;
   - New agents with a highly species-specific action;
   - New drugs directed towards immune system targets.

2. To provide advice in the form of a report to the Secretary of State for Health for the future authorisation of such trials with an interim report to be provided within three months

The ESG was asked to seek the views of major stakeholders before compiling its report.

Stakeholders raised several areas of concern that were not within our terms of reference.   These included topics such as the process of informed consent and clarity of information, communication between clinical investigators and clinical trial subjects before and during a trial, insurance cover, the role of Research Ethics Committees, and clinical follow-up of trial subjects who had experienced an adverse

reaction.   Although beyond our remit, we considered these wider concerns to be extremely important, and recommend that they should be taken up as a high priority.


## Aims of the ESG

The aims of the ESG were to review what could be learned from the TGN1412 trial, and to make recommendations to increase the safety of future first-in-man trials of the types of medicines described in our terms of reference.

We were asked to make an interim report in three months and to seek stakeholder opinions in formulating our recommendations.    Following the publication of our interim report on July 26th 2006, we received some further 38 written and verbal submissions from stakeholders, including four of the trial volunteers and their representatives, the Northwick Park physicians, patient representatives, individuals, national and international public sector institutions, the biotechnology and pharmaceutical industries and contract research organisations.    The ESG has considered the stakeholder written submissions and verbal presentations, and has taken them into account in developing the final recommendations.

At the time of our interim report, some results were awaited from independent laboratory tests carried out by the National Institute for Biological Standards and Control (NIBSC) to clarify the toxicity seen in the TGN1412 trial.   These results were received in November 2006 and were studied closely.   The new experimental results may provide potential answers to scientific questions surrounding the adverse reactions to TGN1412 in the clinical trial, and why similar reactions were not detected in pre-clinical testing in animals.   These results have been incorporated as a summary section in our report.


## Approach to the Problem

The need for better and safer medicines is clear, as is the fact that the first human exposure to a new medicine will always carry some risk, even if extremely small.  Our aim has been to optimise the safety of future first-in-man trials of the types of medicines within our remit without stifling innovation or raising unnecessary barriers to the development of useful new medicines.

The ESG has met 10 times, has held 5 stakeholder meetings and has considered a total of 52 written and 25 verbal submissions from stakeholders.

We reviewed the pre-clinical development of TGN1412, the results from MHRA investigations and the likely causes of the unpredicted severe toxicity at the dose given in the trial.  Our conclusion is that the pre-clinical development studies that were performed with TGN1412 did not predict a safe dose for use in humans, even though current regulatory requirements were met.

The dose of TGN1412 given to the human volunteers induced a rapid and large release of cytokines, which are small protein molecules that transmit signals between

immune cells and tissue cells.  Cytokines are biologically potent, and their production is normally highly controlled.  A rapid and large release of cytokines causing fever, low blood pressure and organ failure has been called a 'cytokine release syndrome', or 'cytokine storm'.  This occurred in the trial volunteers but it did not occur in the cynomolgus monkey, the animal model chosen for studies to calculate the dose for the first human exposure to TGN1412.  At a dose that was numerically 500 times larger than that given to human volunteers, cynomolgus monkeys did not develop a cytokine release syndrome.

We went on to identify factors relevant to risk assessment and risk management in first-in-man trials of new medicines as described in our remit.  We use the word 'agent' to describe a chemical or biological compound being developed as a potential medicine for human use.

## Scope of the Recommendations

### What kind of clinical trial?

The recommendations are intended to apply to "first-in-man" clinical trials, and not to phase one trials in general (which might include trials of agents with an established record of safety in humans).  Special caution is needed during first human exposures to higher risk agents at doses with the potential to cause a pharmacological effect.

However, added caution should also be taken when administering a medicine with the potential for high risk to a distinct new population, be they healthy volunteers or patients.  Preparation of guidance on first-in-man studies should give consideration to the applicability of the concepts developed to transitions from one population group to another.

The ICH E8 guideline 'General Considerations for Clinical Trials (CPMP/ICH/291/95)   (http://www.emea.europa.eu/pdfs/human/ich/029195en.pdf) provides general guidance on clinical trials and contains, in section 3, an internationally agreed description of phase one trials and a good overview of the development phases of medicines from discovery to market.

### What kind of agent?

Our remit covers three categories of medicines that may have a higher potential for risk of harm to volunteers during the first human exposures, or where risk may be more difficult to evaluate in pre-clinical development.  The categories are:

- Biological molecules with novel mechanisms of action;
- New agents with a high degree of species-specificity;
- New agents with immune system targets.

3

We intend our recommendations to apply to agents in any one of these three categories unless a careful assessment of the nature of the agent, the physiological role of the target molecules, and the intended recipients, supports a low risk of harm in first human exposures.

We do not suggest that all agents that fall into one of the three categories listed above necessarily pose a high risk on first human exposures, but that a thorough assessment of risk should be made and a clear scientific case provided when risk of harm is assessed as being low.

For example a conventional vaccine, although aimed at stimulating an immune response, may not pose a high risk, or a new agent similar to one with an established safety record in humans , and aimed at a known target where the pharmacology can be predicted with confidence, may not pose a high risk.

We have discussed in this report factors that should raise the level of caution for first human exposures to new agents. These include:

- any agent whose effects might cause severe physiological disturbance to vital body  systems;
- agonistic or stimulatory actions;
- novel agents and novel mechanisms of action where there is no prior experience;
- species-specificity of an agent making pre-clinical risk-assessment in animal models difficult or impossible;
- the potency of an agent, eg compared with a natural ligand;
- multifunctional agents, eg bivalent antibodies, FcR binding domains;
- cell-associated targets;
- targets that by-pass normal control mechanisms;
- immune system targets;
- targets in systems with the potential for large biological amplification *in vivo*.

A thorough assessment of risk should always be carried out before first-in-man trials. The risk assessment should be clearly described in the trial documents and be fully examined by the regulator.  When there is significant doubt, higher risk should always be assumed.  (See Section 7 of the Report.)

## The Recommendations

The safety, rights and well-being of subjects, both patients and healthy volunteers, must always be the primary concerns in clinical trials.   We have made 22 recommendations that we believe will increase the safety of volunteers in future clinical trials involving the first human exposures to agents with higher potential risks, as categorised in our terms of reference and discussed in Section 8 of our report.

They cover:

- Pre-clinical and early clinical development;
- The process of preparation and review of clinical trial applications, and early access to advice for both regulators and sponsors;
- Determining and administering the initial doses in man;
- The clinical environment for first-in-man studies**;**
- Developing the skills and training to meet future needs.

There is focus on sharing of information relevant to safety, the calculation and administration of first doses, and regulatory access to independent specialist opinion in the appraisal of trial applications for the first human exposures to new medicines of the types described in our remit where there is higher potential risk.

The rationale for each recommendation, and explanations of our intentions, are summarised in *Section 7, "Predicting Hazards in Pre-clinical to Clinical Transition", and Section 8, "Risk Reduction and Risk Management"*.  The recommendations should be considered in the context of these Sections.

Our recommendations are offered to the UK authorities and sponsors of first-in-man trials in the UK, but we believe it is important that agreement is sought at EU and international level, to ensure that equal protection is afforded to clinical trial participants worldwide.

## Acknowledgement

We are especially grateful to the four trial volunteers who visited the ESG and gave us valuable personal accounts of their experiences.

We would also like to thank all of the stakeholders for the many thoughtful and constructive comments that they provided in written and verbal submissions to the ESG.

We also thank the secretariat and technical support teams whose hard work in preparing background papers, arranging meetings, taking minutes and liaising with national and international stakeholders has been greatly appreciated.

## Summary of Recommendations

### Pre-clinical and early clinical development

1. Decisions on the strategy for pre-clinical development of a new medicine and the experimental approaches used to assemble information relevant to the safety of first-in-man clinical trials must be science-based, made and justified case-by-case by individuals with appropriate training.

The pre-clinical development of new medicines is addressed by internationally agreed guidelines, in particular ICH S6 Pre-clinical Safety Evaluation of Biotechnology-Derived Products, and ICH M3 (R1) Non-Clinical Safety Studies for the Conduct of Human Clinical Trials for Pharmaceuticals (see further reading below).

Regulators should consider the applicability of this guidance to high-risk medicines and in particular their first use in man. The development of more specific guidance in the present context should be proposed. This might best be achieved by initial guidance at the EU level, and using that as a platform for proposals at international level.

2. The regulatory process for first-in-man trials of higher risk agents and advanced medicinal products based on innovative technologies should be subject to regular review.

With present advances in biology, biological chemistry, informatics and biotechnology, we can expect the identification of many new therapeutic targets and the development of innovative medicines to fill unmet clinical needs. It is important that the regulation of medicines is science-based and that the regulatory process keeps pace with, and is appropriate for, the science and technology that will give rise to tomorrow's medicines.

3. Developers of medicines, research funding bodies and regulatory authorities should expedite the collection of information from unpublished pre-clinical studies relevant to the safety of human exposure. As a first step this should focus on pre-clinical reports of results that signal potential danger to humans with the use of a higher risk medicine or group of medicines. This should provide a platform for information sharing between regulators at EU and international level, e.g. in the form of a confidential database. The submission of such data to a database by the investigators is strongly encouraged.

In the interests of safety, we believe that the ultimate goal should be an open access database, and the feasibility of this needs to be explored. However, to avoid the risk of delay in sharing safety-critical information, reports from studies that would otherwise not be in the public domain could initially be stored in a secure database accessible only to regulators worldwide, with frequent review of the reason for delaying open access.

4.  Regulatory authorities should consider ways to expedite the sharing of safety information on phase one clinical trials between regulators within the EU and worldwide.  This should certainly include information on first-in-man experience with higher risk medicines.  Trials with negative safety outcomes should be included.   This database might be widened to include products that may not currently be perceived as high risk, or trials conducted later in development, that suggest a strong warning for first-in-man use of similar products.

In the EU, this collection and sharing of information could be based on the model of the existing clinical trial database EudraCT (for first-in-man trials since 2004) and the EudraVigilance database for 'Suspected Unexpected Serious Adverse Reactions (SUSARs)' – (see below).   Relevant information from first-in-man trials prior to 2004 could be submitted on a voluntary basis. This would ensure access to relevant safety information by national regulators.

This will require dialogue with the pharmaceutical industry on which study reports should be made available and when they should be posted, but should be achievable since industry is already committed to disclosure of clinical trial results on medicines already on the market, and encourages sponsors to post results of development failures where there may be important safety implications. The regulators should explore the feasibility of open access to this data.

SUSARs are Suspected Unexpected Serious Adverse Reactions.  They are unexpected because their nature or severity is not consistent with the applicable product information (e.g. investigator's brochure for an unauthorised investigational product or summary of product characteristics for an authorized product), they are reactions because there is a causal relationship with the product, and they are serious, as described below

Article 2(o) of Directive 2001/20/EC gives the definition of serious adverse reaction: "any untoward medical occurrence or effect that at any dose results in death, is life-threatening, requires hospitalisation or prolongation of existing hospitalisation, results in persistent or significant disability or incapacity, or is a congenital anomaly or birth defect."
For all other important medical outcomes not on this list, professional medical and scientific judgement should be exercised when deciding the need to report.

**The process of preparation and review of clinical trial applications, and early access to advice for both regulators and sponsors**

5.  More communication is strongly recommended between developers and the regulator at an earlier stage before an application is filed, especially for higher risk agents, to ensure that there is time for an appropriate consideration of any safety concerns without introducing undue delay to product development.   Ways to increase communication between the regulator and research ethics committees should also be considered.

For first-in-man clinical trials of new agents that fall into the higher risk categories described in our remit, pre-submission meetings between sponsors and regulators, to

identify potential concerns, would be useful to both parties, and are strongly recommended.  If developers elect not to have pre-submission discussion with the regulator, they should be asked to inform the regulator six weeks in advance of an intended application for a first-in-man clinical trial of a higher risk medicine.  This would give the regulator adequate time to consider the need for external expert advice and to identify appropriate experts (see next recommendation).   Advance warning would reduce the possibility of prolonging the assessment process.

6.   For appraisal of applications for trials of higher risk agents, as defined by the nature of the agent, its degree of novelty, its intended pharmacological target, and its intended recipient, the regulator should have access to additional opinion from independent, specialist experts with research knowledge of their fields.

7.   An Expert Advisory Group (EAG) of the Commission on Human Medicines, or a similar body, might undertake this role with a core membership of appropriate experts and the ability to co-opt additional expertise as the need dictates.

8.   Consideration should be given to introducing some flexibility in the time-scale of clinical trial appraisal in exceptional cases of unusual complexity.

We emphasise "exceptional cases of unusual complexity"; there is no intention to introduce unjustified delay in the regulatory process in the development of new medicines.  The European Clinical Trials Directive (article 6, paragraph 7) (Directive 2001/20/EC, below) already allows for time extension in the appraisal of gene therapy, somatic cell therapy and products containing genetically modified organisms.  This might be a model for other highly innovative medicines that bring new science into therapeutics.

**Determining and administering the initial doses in man**

9.   Special consideration should be given to new agents for which the primary pharmacological action, for the proposed therapeutic effect, cannot be demonstrated in an animal model.  The underpinning case for dose selection in any trial of this kind should include a clear rationale for the proposed mechanism of action and also for the safety and efficacy of the substance in its intended clinical use.

10. A broader approach to dose calculation, beyond reliance on 'No Observable Effect Level' or 'No Observable Adverse Effect Level' in animal studies, should be taken.  The calculation of starting dose should utilise all relevant information.  Factors to be taken into account include the novelty of the agent, its biological potency and its mechanism of action, the degree of species-specificity of the agent, the dose-response curves of biological effects in human and animal cells, dose-response data from *in vivo* animal studies, pharmacokinetic and

pharmacodynamic modelling, the calculation of target occupancy versus concentration and the calculated exposure of targets or target cells in humans *in vivo*.

The 'Minimal Anticipated Biological Effect Level' (MABEL) approach is one good model for achieving this. (See BIA/ABPI report and stakeholder submission.)

11. If different methods give different estimates of a safe dose in humans, the lowest value should be taken as the starting point in first-in-man trials and a margin of safety introduced in calculation of the actual starting doses in man.

12. When it is likely that pre-clinical information, for any reason, may be a poor guide to human responses *in vivo*, the starting doses in first-in-man trials should be calculated to err on the side of caution. Further dose increases should proceed with caution since the initial dose may have been particularly low and there may be a steep dose-response curve.

13. Careful consideration should be given to the route and the rate of administration of the first doses in first-in-man trials, with careful monitoring for an adverse or exaggerated response.

For example, in the case of first human exposure to a higher risk agent given intravenously, a slow infusion over several hours may be more appropriate than a slow bolus over several minutes. This would allow monitoring for an adverse response and stopping the infusion if clinically indicated.

14. The trial design, including number of subjects, decisions on starting doses and the dose escalation regime, should be made on a case-by-case basis, and should be scientifically and statistically justifiable, taking account of all relevant information.
(See stakeholder submission from The Royal Statistical Society)

15. New agents in first-in-man trials should be administered sequentially to subjects with an appropriate period of observation between dosing of individual subjects. The interval of observation between sequential dosing of subjects should be related to the kind of adverse reactions that might be anticipated based on the nature of the agent, its target and the recipient, as well as the potential pharmaco- and toxicokinetics and pharmaco- toxicodynamics of the agent.

There should be a suitable interval between doses to different individuals as well as between doses to the same individual, and both should be justified on the basis of available evidence.

9

16. A similar period of monitoring should occur between sequential dosing of the subjects during dose escalation. *(as above)*

17. The decision whether to conduct a first-in-man trial in healthy volunteers or in volunteer patients should be carefully considered and fully justified, taking into account all factors relevant to the safety of the subjects and the value of the scientific information that is likely to be obtained.

In general, there is no anticipated benefit to a patient in a first-in-man trial of a new medicine.   Therefore, risk to benefit assessment is not usually a major factor in deciding whether such trials should be performed in volunteer patients or in healthy subjects.

In the field of cancer medicine there may be exceptions since patients who experience a beneficial response to a trial agent are often able to continue treatment with it.   In this case the balance of risk and benefit may become a factor in deciding that patients are more appropriate subjects of a clinical trial, especially patients that have not responded to available therapies and when the trial medicine has predictable cellular toxicity (which may, in fact, be its intended pharmacological effect).

However, the paramount factors should always be the rights, safety, and well-being of the volunteers, whether patients or healthy individuals, and the value of what can be learned from the clinical trial.

**The clinical environment for first-in-man studies**

18. Principal Investigators who are responsible for the care of subjects in first-in-man trials should always be appropriately qualified, and satisfy themselves that they know enough about the agent, its target and mechanism of action to be in a position to make informed clinical judgements.

    The development of a national professional accreditation system for Principal Investigators conducting first-in-man clinical trials should be strongly encouraged.

19. In first-in-man studies where there is a predictable risk of certain types of severe adverse reaction, a treatment strategy should be considered beforehand.   This should include the availability of specific antidotes where they exist and a clear plan of supportive treatment, including the pre-arranged contingency availability of ITU facilities.

20. First-in-man studies of higher risk medicines should always be conducted in an appropriate clinical environment supervised by staff with appropriate levels of training and expertise, with immediate access to facilities for the treatment and stabilisation of individuals in an acute emergency, and with pre-arranged contingency availability of ITU facilities in reasonable proximity.

10

There should always be an adequate staffing level in first-in-man studies and adequate 24-hour cover when volunteers are kept in overnight.

All clinical sites conducting such trials should have standard operating procedures for emergency situations, and staff should maintain expertise in implementing these procedures through regular drills.  Trial subjects should always be clearly informed about what to do if they experience symptoms of an adverse reaction during or after a clinical trial.

**Developing expertise**

21. The availability of 'hands-on' experience in the planning and conduct of clinical trials should be widened.  For example postgraduate training programmes could have within them a secondment period to commercial organisations or a training period in specialist centres within the NHS and Universities (see next recommendation).

The need to train a new generation of doctors in the skills needed for the assessment of safety and efficacy of medicines was highlighted in the UK's Academy of Medical Sciences 2005 report "Safer Medicines".  Similar needs were identified in "Sustaining the skills pipeline in the pharmaceutical and biopharmaceutical industries", a recent report of a study by the ABPI.

This will need co-operation between higher education funding bodies and institutions, the NHS and industry.  Given that major stakeholders agree on the need to fill this skills gap with a new generation of Clinical Pharmacologists, Toxicologists and related professionals, it should be possible to address it, and we encourage this in the interests of the safety of future first-in-man clinical trials.

22. The feasibility of developing specialist centres for phase one clinical trials of higher risk agents and advanced medicinal products should be explored.

The development of a national inspection and accreditation system for clinical centres that undertake first-in-man studies of higher risk agents should be encouraged.  The accreditation should be open to all centres that fulfil defined criteria, in both the public and private sectors.

## Further reading

'Cytokine Storm in a Phase 1 Trial of the Anti-CD28 Monoclonal Antibody TGN1412'
G. Suntharalingam, M. Perry, S. Ward, S. Brett,  A. Castello-Cortes, M. Brunner, and N. Panoskaltsis.
N Engl J Med.  2006, 355:1018-1028.

The European Clinical Trials Directive 2001/20/EC
(http://ec.europa.eu/enterprise/pharmaceuticals/eudralex/vol-1/dir_2001_20/dir_2001_20_en.pdf)

EudraLex Volume 10 –Clinical Trials
(http://ec.europa.eu/enterprise/pharmaceuticals/eudralex/homev10.htm)

European Union Guidelines -
http://www.emea.europa.eu/htms/human/humanguidelines/background.htm

ICH E8 - General Considerations for Clinical Trials (CPMP/ICH/291/95)
(http://www.emea.europa.eu/pdfs/human/ich/029195en.pdf)

ICH S6 Pre-clinical Safety Evaluation of Biotechnology-Derived Products (CPMP/ICH/302/95)
(http://www.emea.europa.eu/pdfs/human/ich/030295en.pdf)

ICH M3 (R1) Non-Clinical Safety Studies for the Conduct of Human Clinical Trials for Pharmaceuticals (CPMP/ICH/286/95).
(http://www.emea.europa.eu/pdfs/human/ich/028695en.pdf).

ICH International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use (ICH) http://www.ich.org/cache/compo/276-254-1.html

Academy of Medical Sciences 2005 report "Safer Medicines"
(http://www.acmedsci.ac.uk/p102.html).


"Sustaining the skills pipeline in the pharmaceutical and biopharmaceutical industries", ABPI. (http://www.abpi.org.uk/Details.asp?ProductID=285).

## 2.    Introduction

**Adverse events in Phase One Clinical Trial at Northwick Park Hospital**

On March 13, 2006, six healthy male volunteers received TeGenero's TGN1412 drug and two received a placebo in a phase one, first-in-man, clinical trial run by Parexel, a contract research organisation.  The Parexel unit was in rented space on the Northwick Park Hospital site in London. TGN1412 is a monoclonal antibody that was being developed as a new medicine for the treatment of B cell leukaemia and autoimmune diseases.  Within hours of receiving TGN1412, all six volunteers were admitted to the intensive care unit at Northwick Park Hospital with a very severe systemic inflammatory reaction that progressed to multi-organ failure.

**Formation of Expert Scientific Group (ESG)**

The ESG was established in April 2006 by the Secretary of State for Health following the tragic events at Northwick Park Hospital during the clinical trial of TGN1412.

## Terms of Reference of ESG

Following the clinical trial of TGN1412 the Secretary of State for Health appointed the ESG with the following remit:

1.      To consider what may be necessary in the transition from pre-clinical to first-in-man phase one studies, and in the design of these trials, with specific reference to:

   • Biological molecules with novel mechanisms of action;
   • New agents with a highly species-specific action;
   • New drugs directed towards immune system targets.

2.      To provide advice in the form of a report to the Secretary of State for Health for the future authorisation of such trials with an interim report to be provided within three months

The ESG was asked to seek the opinions of major stakeholders before formulating its recommendations.

The ESG comprised 17 individuals with backgrounds in science, clinical medicine, pharmacology, toxicology, immunology, bio-ethics, clinical trials, medicines development and medicines regulation.  There were also two lay members making 19 in all.  The ESG had observers in attendance from the Medicines Regulatory Authorities of Japan, USA and the EU, and from the Department of Health, the Department of Trade & Industry and the Gene Therapy Advisory Committee.

**Aims of ESG, ways of working and meetings schedule**

With the types of agent described in the terms of reference, the aim was to optimise the safety of first-in-man clinical trials without creating unnecessary barriers to the development of useful new medicines.

After an assessment of the events in the TGN1412 trial, the ESG liaised with the National Institute for Biological Standards and Control (NIBSC) to perform independently some of the key experiments that had been undertaken by TeGenero in the pre-clinical development of TGN1412, and to perform further investigations of the biological properties of TGN1412.

With the outcome of the TGN1412 clinical trial in mind, and what was known about the TGN1412 monoclonal antibody, the ESG considered factors that may be generally important for the recognition of *a priori* risk in phase one trials.

The ESG identified and discussed properties of TGN14 that may confer risk, and that could be generalised to other agents in first-in-man clinical trials, such as:

- Species-specificity of action creating challenges for pre-clinical development;

- Agonistic activity on targets within a biological amplification cascade;

- Immune system targets;

- Cell surface targets that activated signalling pathways

- Multifunctional molecules, eg antibodies with potential to activate FcR-bearing cells as well as primary target cells;

- Potency:

  - Increased affinity, occupation or signalling effect on target receptor compared with a natural ligand (e.g. "superagonist antibody");
  - Prolonged exposure to target via normal (e.g. antibodies) or altered pharmacokinetics (e.g. pegylation);
  - Multivalency, allowing cross-linking of target molecules.

These and other factors related to the nature of the agent and the physiological function of its targets were considered in detail with an attempt to understand what could be generalised to allow recognition of higher risk agents in the categories described in our terms of reference.

Risk reduction and risk management questions related to different aspects of the transition from pre-clinical to clinical development of a new medicine, with a focus on the first human exposures, were then explored in detail.  Examples of the questions discussed included:

**Pre-clinical**

- How to validate the predictive value of animal models?
- Are there methods to optimise the predictive value of *in vitro* experiments on human cells / tissues?
- What is the feasibility and value of developing shared databases on experience with animal model responses to new investigational agents, or classes of agents? Could such a database be contributed to, and accessible by, international regulatory agencies, pharmaceutical and biotechnology industries, academic researchers, research ethics committees?
- Development of *in silico* modelling; how useful is it now, or when might it be in the future?

**Clinical**

- Adequate safety margin of dose; is NOAEL or NOEL in an animal model a valid starting point for newer types of medicines and is the safety margin in humans sufficiently large taking into account all relevant information?
- Is sequential administration of high-risk agents essential in first-in-man trials? How long to wait before administration to second and subsequent recipients?
- How important is the route and rate of administration with a new agent, especially one that has a novel mechanism of action?
- How to choose the first recipient?  How to ensure informed consent?
- When and how to escalate the dose?
- Are there differences in risk/benefit ratio between healthy volunteers and patients, even in phase one trials?  Is there a clear rationale for first-in-man trials to involve healthy volunteers or volunteer patients?  Is this a case-by-case question?
- What should be the clinical environment of phase one trials?
- Importance of adequate staff, expertise and training?
- Should there be more training opportunities to acquire relevant skills?
- Do first-in-man trials of higher risk agents need to be performed on hospital sites?
- The ready availability of resuscitation and ITU facilities?
- The anticipation of major adverse reactions, and type of reaction?
- Availability of specific therapies for potential ADRs where a risk is identifiable?
- Is there enough disclosure of data to the principal investigator to allow informed clinical judgements?
- Should there be specialist units for first-in-man trials of higher risk or very innovative agents?
- Is there enough sharing of information from previous clinical trial experiences?
- Could clinical trial safety databases be open access?

**Regulatory**

- Should there be a review of higher risk 'first-in-man' CTA applications by independent experts; eg an Expert Advisory Group of CHM and/or co-option of highly specialised experts when needed?
- Can higher risk agents be defined in a pragmatic way?
- How could this be done within the time scales that apply (during the processing of the application or before the application is submitted)?

- Should the time scales be extended, or the clock able to be stopped?

## Meetings and key dates (2006)

23rd May        ESG meeting.
                    Background papers from secretariat on development of
                    TGN1412 , and adverse reactions in the clinical trial.
                    MHRA Investigation Reports
                    Clinical Reports from Northwick Park ITU physicians

31st May        ESG meeting.
                    Mechanism(s) of the adverse reactions
                    Identification of risk factors
                    Identification of high-risk agents

2nd June        ESG meeting.
                    Risk reduction strategies

14th June       ESG meeting.
                    Risk reduction strategies (continued)
                    Views of stakeholders

15th June       Sub-group meeting with stakeholders

16th June       Sub-group meeting with stakeholders

19th June       Sub-group meeting with stakeholders

20th June       Sub-group meeting with stakeholders

27th June       ESG meeting.
                    Assessment of stakeholder views on TGN 1412 trial

11th July       ESG meeting with stakeholders.
                    Stakeholders views, interim recommendations

20th July       Interim Report to web as consultation document.
Following publication of the interim report as a consultation document, further
stakeholder presentations and written submissions were invited in September, October
and November 2006.  Further meetings were held as follows:

12th Sept       ESG meeting with stakeholders

24th Oct        ESG meeting with stakeholders

13th Nov        ESG meeting with stakeholders

16

14th Nov     Sub-group meeting with stakeholders, including four of the clinical trial volunteers and their representatives.

15th Nov     ESG meeting
NIBSC results
Discussion on stakeholders' views
Final recommendations

30th Nov     Final Report to Ministers

All stakeholders' comments were considered in detail by the ESG before submission of its final report and recommendations.

## 3.   Background to the TGN1412 incident as at July 2006. Prepared by the Secretariat to the ESG

### A      Pre-clinical Development of TGN1412

**Role of CD28 in Immune System**

CD28 is a co-stimulatory receptor expressed on the cell surface of CD4 T lymphocytes (T cells) and on a large fraction of CD8 T cells.  It efficiently co-stimulates resting T cells in combination with a signal from the T cell antigen receptor (TCR)[1].  The CD28 receptor promotes the development of $T_H1$ and $T_H2$ cells.  $T_H1$ and $T_H2$ cells are helper T cells that aid activation of the responses of white blood cells.  $T_H1$ cells promote 'cellular immunity' in host defence and are also involved in reactions such as transplant rejection. $T_H2$ cells promote 'humoural immunity' by helping B lymphocytes (B cells) to proliferate and secrete antibodies.

Activation of the CD28 signalling pathway in nature requires simultaneous triggering of the TCR by antigen and of CD28 by its physiological membrane-bound ligands B7-1 (CD80) or B7-2 (CD86).  *In vitro*, this process can be mimicked by using a combination of antibodies with specificity for the TCR and CD28.  The agonistic anti-CD28 monoclonal antibody TGN1412 bypasses the requirement for TCR signalling and activates human T cells irrespective of their TCR specificity.  This property led to the use of the term 'superagonist'.

The finding that early TCR signals are not required for T-cell expansion mediated by agonistic anti-CD28 antibodies was shown for human and rat T cells[2, 3] – see Figure 1.

It was further shown that agonistic anti-CD28 monoclonal antibodies such as TGN1412, bind exclusively to the laterally exposed C''D loop of the immunoglobulin-like extracellular domain of CD28 whereas conventional, co-stimulatory antibodies recognise an epitope close to the binding site for the natural ligands, and that this specificity closely correlates with the agonistic activity of anti-CD28 antibodies[3].  Most recently, the critical involvement of the C''D loop for binding of agonistic anti-CD28 monoclonal antibodies has also been confirmed by X-ray crystallographic analyses[4].



Figure 1: Activation of human T cells in the absence of TCR stimulation TGN1412 bypasses the requirement for TCR signalling triggering and activates human T cells in the absence of TCR stimulation . In T cells, TCR triggering alone leads to anergy and apoptosis.  Conventional anti-CD28 antibodies are not capable of inducing cellular T cell response. Concomitant triggering *via* anti-TCR and anti-CD28 antibodies leads to proliferation and secretion of pro-inflammatory cytokines *in-vitro*, but not *in vivo*. In contrast, TGN1412 induces profound *in vitro* T cell proliferation and well-tolerated *in vivo* expansion of T cells.

The TGN1412 humanised monoclonal antibody

TGN1412 is an agonistic anti-CD28 monoclonal antibody, developed as a therapeutic agent for various diseases in which T cells are involved in the pathogenesis of chronic inflammation or haematological malignancies such as leukaemia.  The antibody is a recombinant humanised monoclonal antibody that specifically binds CD28 present on T cells.  TGN1412 was genetically engineered by transfer of the complementarity determining regions (CDRs) from heavy and light chain variable region sequences of a monoclonal mouse anti-humanCD28 antibody into human heavy and light chain variable region frameworks.  Humanised variable regions were subsequently recombined with a human gene coding for the IgG4γ chain and with a human gene coding for a κ chain, respectively.  The human constant domain and variable domain framework structures were expected to confer decreased immunogenicity and an optimum of antibody effector functioning within the human immune system.

The TGN1412 molecule consists of two light chains of ~24 kDa (214 amino acids) and two heavy chains of ~51 kDa (447 amino acids). The protein is expressed in CHO cells and has a molecular mass of ~148 kDa. The TGN1412 drug product is a buffered, isotonic, non-preserved concentrate for solution for infusion. In the clinical material the concentration of the drug substance was 10 mg·ml$^{-1}$, filled in 40 ml vials.  The container was a 50 ml injection vial.

The rationale for development of TGN1412 for haematological malignancies was based on its capability to reconstitute a collapsed T cell compartment (*e.g.* in B-CLL).  In *ex vivo* experiments conducted with primary blood samples from a broad spectrum of B-CLL patients, it could be demonstrated that TGN1412 induced both polyclonal T-cell

expansion and activation. TGN1412 bypasses the requirement for TCR triggering and activates T cells irrespective of their TCR specificity.  This novel mode of T cell activation has been termed "agonistic" or "superagonistic".  Both terms are used synonymously throughout the literature cited.

Furthermore, TGN1412 was shown indirectly to improve deficient antigen presentation by BCLL cells.  The postulated immunomodulatory (anti-inflammatory) properties of TGN1412 were related to its feature of activating and expanding regulatory T lymphocytes and inducing anti-inflammatory cytokines.  Agonistic anti- CD28 treatment was demonstrated to be effective in animal models of autoimmune diseases including animal models of rheumatoid arthritis, rat experimental autoimmune neuritis (EAN)[5] and rat experimental autoimmune encephalomyelitis (EAE)[6].

**Toxicology Report**

***In vitro* development using animal and human cells**

Specificity of TGN1412 for human CD28 was shown in various assay systems, including flow cytometry and Biacore analyses. TGN1412 did not cross-react with the closely related receptors Cytotoxic T-Lymphocyte- Antigen-4 (CTLA-4) and Inducible Costimulator (ICOS).

The topological requirements of agonistic anti-CD28 antibodies have been investigated in detail by epitope mapping using chimeric CD28 molecules[3].  It has been shown that agonistic antibodies specific for rat or human CD28 bind exclusively to the laterally exposed C''D loop of the immunoglobulin-like domain of CD28 whereas conventional, co-stimulatory antibodies recognise an epitope close to the binding site for the natural CD80/CD86 ligands.  Moreover, mouse CD28 molecules engineered to express human C''D loop sequences activated T cells without TCR ligation when cross-linked by agonistic anti-human CD28 antibodies, showing that agonistic function is causally related to the C''D loop.  More recently, the critical involvement of the C''D loop for binding of agonistic anti-CD28 monoclonal antibodies has also been confirmed by X-ray crystallographic analyses.  Therefore, based on shared specificity-function relations, the agonistic anti-rat CD28 monoclonal antibody JJ316 and the anti-human CD28 agonists 5.11.A1, TGN1112 and TGN1412 were considered as true orthologues.

Studies were conducted with TGN1412 and TGN1112 to demonstrate cross-reactions with CD28 expressed on T cells from rodents and non-human primates such as Macaca mulatta (rhesus monkey), Macaca fascicularis (cynomolgus monkey) and Callithrix jacchus (marmoset monkey) in order to support the rationale for the selection of an appropriate species for safety and toxicology studies.

TGN1412 was reactive with human, cynomolgus and rhesus monkey T cells in a pattern characteristic for CD28.  Binding to T cells from marmosets could not be demonstrated.

In addition, an amino acid sequence homology analysis of the C''D loop of CD28 from different species was performed.  Whereas the C''D loop sequences of human and cynomolgus monkey are identical and differ in one amino acid from rhesus CD28, the

marmoset C''D differs in 2 out of 6 amino acids. The rodent C''D loop has very low homology with the human CD28 C''D loop.

The T cell activating capacity of TGN1412 was established in *in vitro* proliferation assays using total peripheral blood mononuclear cells (PBMC) as well as purified T lymphocytes and highly purified T cell subsets such as CD4+ and CD8+ T cells, naïve CD4+CD45RA+ and memory CD4+CD45R0+ cells or conventional CD4+CD25- as well as regulatory CD4+CD25 high T cells from healthy donors.  Co-incubation of PBMC with soluble TGN1412 resulted in polyclonal T cell proliferation and secretion of T cell specific cytokines.  The degree of TGN1412-induced proliferation varied among different blood donors, while conventional, co-stimulatory human-specific anti-CD28 antibodies were generally unable to induce substantial cellular proliferation.  TGN1412 was, therefore, considered to be unique in its ability to deliver mitogenic signals via CD28 without co-engagement of the TCR.

### *In vivo* development in animal models

.A longitudinal study to assess the tolerability and T cell activating efficacy of TGN1412 and the IgGl variant TGN1112 was conducted in rhesus monkeys. TGN1112 was able to activate and expand T cells in vivo.  Importantly, administration of agonistic anti-CD28 monoclonal antibodies to Macaca mulatta did not mediate a substantial change in systemic cytokine (IL-5, IL-6, IL-10, IFN$\gamma$) serum concentrations and had no long-term (up to day 155) side-effects.

It was observed that TGN1412 had a significantly weaker pharmacological activity in rhesus monkeys than TGN1112. This was explained by the different affinities and/or FcR-binding properties of the two antibody formats.

The T cell activating properties of TGN1412 were determined in studies conducted in cynomolgus monkeys. Flow cytometry results revealed a substantial expansion of CD4+ and CD8+ T cells that showed a clear peak at around day 15 post infusion.  The transientT cell expansion was paralleled by cellular activation as measured by CD69 and CD25.

### Pharmacokinetics and Toxicokinetics of TGN1412

Due to the well-known pathways of protein degradation, conventional absorption, distribution, metabolism and excretion studies were not performed with TGN1412.

Differences in the kinetics of surrogate agonistic anti-CD28 antibodies (JJ316 and TGN1112) were found when comparing the results in the rat model of adjuvant arthritis and in the rhesus monkey.  They appeared to be at least partly reconciled in the kinetics of in vivo T cell expansion induced by JJ316 and TGN1112.  This difference was expected, as it mirrors the general diversity of rodents and non-human primates.

Therefore, toxicokinetic characteristics of TGN1412, as determined in cynomolgus monkeys were assumed to be most predictive for human pharmacokinetics.

21

Toxicokinetic evaluation during the repeat-dose toxicity study in cynomolgus monkeys showed that TGN1412 serum concentration *versus* time profiles were generally consistent with intravenous (*iv*) injection of the drug. A terminal elimination half life of ~ 8 days after the first injection of 5 mg·kg$^{-1}$ was estimated for TGN1412, consistent with the relatively slow elimination of a large biological molecule such as an antibody.

In one animal, relatively low serum concentrations of TGN1412 were observed, which was attributed to the presence of anti-TGN1412 antibodies. No consistent sex-related differences were apparent in any of the toxicokinetic parameters reported for TGN1412.

Systemic exposure to TGN1412 increased by up to around 20-fold as dose increased from 5 to 50 mg·kg$^{-1}$. In addition, there was evidence for increased mean terminal half-life of TGN1412 as dose increased.

Since TGN1412 does not act directly on malignant tissues, pharmacodynamic effects were not expected to be solely correlated to plasma/ serum concentrations of the active substance, but rather to be dependent on the effect on T cell subsets in the peripheral blood and lymphoid tissues. In this respect, it is important to note that although four peak serum levels were observed following four weekly doses of TGN1412 only one peak of T cell expansion (around day 15) was observed. The lack of repetitive T cell expansion may be due to modulation availability of the CD28 antigen, availability of the TGN1412 target structure, functional unresponsiveness of T cells and/or limitation of T cell expansion by homeostatic mechanisms.

**Nonclinical Safety Studies**

Since the TGN1412 epitope on the CD28 extracellular domain is restricted to humans and non -human primates, cynomolgus and rhesus monkeys were considered to be the most relevant species for safety and toxicology studies to assess any potential toxicity of TGN1412 administration to humans.
The nonclinical toxicology program included studies of repeat-dose toxicity, local tolerance and immuno-histochemical investigation of cross reactivity with human and cynomolgus monkey tissues. These studies were conducted in compliance with Good Laboratory Practices (GLP). The *IV* route of administration was selected to accord with the intended application in clinical trials.

The results of these studies showed that TGN1412 was well tolerated in cynomolgus monkeys at doses up to 50 mg·kg$^{-1}$·week$^{-1}$ for four consecutive weeks. No TGN1412-related signs of toxicity, hypersensitivity or systemic immune system deviation were observed in these studies. No adverse effects on the major physiological systems (cardiovascular system, respiratory system and central nervous system) were observed.

Therefore, 50 mg·kg$^{-1}$ was considered to be the no-observed-adverse-effect level (NOAEL).

Reproduction and developmental toxicity studies were not performed. Histopathology of reproductive tract tissues was, however, performed as part of the 28-day toxicity study in cynomolgus monkeys. No treatment-related changes were observed.

Due to the biological nature of TGN1412, the standard battery of genotoxicity testing was considered to be inappropriate and was therefore not performed.

Local reactions at the injection sites of treated cynomolgus monkeys were considered not to be related to treatment with TGN1412 but to the administration procedure.  In a local tolerance study conducted in rabbits, *IV*, perivenous, or intra-arterial routes of TGN1412 administration were well tolerated and did not produce clinically significant irritation

The immunotoxicity of TGN1412 was assessed as part of the standard toxicology studies and in non-GLP pharmacology studies.  For additional studies, an agonistic antibody with specificity for rat CD28 (JJ316) or an IgGI variant of TGN1412 (TGN1112) was used. Administration of TGN1412 or TGNI 112 to non-human primates led to a transient increase in CD4+ and CD8+ T cell numbers between day 13 and 17 after dosing.  This was an expected pharmacodynamic effect of TGN1412. Moderate elevations of IL-2, IL-5 and IL-6 serum levels were observed upon TGN1412 treatment in individual animals, however, no clinical signs of a first-dose cytokine release syndrome (CRS) were observed.  Moreover, there was no evidence for an anaphylactic reaction, induction of autoimmune disease and/or unintended systemic immuno-suppression in animals treated with any dose of agonistic anti-CD28 monoclonal antibodies.

In the tissue cross reactivity study, the distribution of lymphocyte staining was consistent with the expected distribution of T cells within lymphoid tissue (target antigen specificity).  Additional specific staining considered to represent astrocyte staining was seen in central nervous tissues of both human and cynomolgus monkey donors. However, CNS tissue cross reactivity was not associated with CNS related adverse clinical symptoms/toxicology findings in cynomolgus monkeys.  Intracytoplasmic staining was recorded in the cervix of cynomolgus donors and in cytotrophoblast cells in the placenta of humans.  This intracytoplasmic staining was not regarded as being of clinical importance as exposure of cytoplasmic antigens appeared to be a result of tissue sectioning.  The fact that no treatment-related histopathological findings were reported for the reproductive tract of cynomolgus monkeys from the 28-day toxicology study underlined this assumption.

## References

1.      Riley J. and June C.  The CD28 family: a T cell rheostat for therapeutic control of T cell activation. Blood, 2005; 105: 13 to 21.

2.      Dennehy K.M., Kerstan A., Bischof A., Park J. H., Na S. Y., and Hunig, T. Mitogenic signals through CD28 activate the protein kinase Ctheta-NF-kappaB pathway in primary peripheral T cells. Int. Immunol., 2003; 15: 655 to 663.

3.      Luhder F., Huang Y., Dennehy K., Guntermann C., *et al.*  Topological requirements and signaling properties of T cell-activating, anti-CD28 antibody superagonists. J. Exp. Med., 2003; 197: 955 to 966.

4.      Evans E., Esnouf R., Manso-Sancho R., Gilbert R., *et al.*  Crystal structure of a soluble CD28-Fab complex. Nature Immunol., 2005; 6: 271 to 279.

5.      Schmidt J., Elflein K., Stienekemeier M., Rodriguez-Palmero M., *et al.*
        Treatment and prevention of experimental autoimmune neuritis with
        superagonistic CD28-specific monoclonal antibodies. J. Neuroirnmunol., 2003;
        140: 143 to 152.

6.      Beyersdorf N., Gaupp S., Balbach K., Schmidt J., *et al.*  Selective targeting of
        regulatory T cells with CD28 superagonists allows effective therapy of
        experimental autoimmune encephalomyelitis.  J Exp. Med., 2005; 202: 445 to
        455.

**B      Transition to Clinical Development of TGN1412**

**Use of Human Volunteers**

Based on the proposed TGN1412 mode-of-action and on its demonstrated pre-clinical
safety in non-human primates, the company considered that an analysis of its
immunological safety and pharmacodynamic effects in immunocompetent humans
justified the selection of healthy subjects as the target population for a TGN1412 first-in-
man trial.

In particular, the company believed that a study in healthy subjects yielding valuable
information on TGN1412 safety and pharmacology was warranted prior to studies in
patients because:

i.      the target antigen CD28 is expressed comparably in healthy subjects and in
        rheumatoid arthritis (RA) and B-cell chronic lymphocytic leukaemia (B-CLL)
        patients, respectively, implying that safety, pharmacokinetic (PK) and
        pharmacodynamic (PD) data could be at least partially transferred to B-CLL
        and/or RA patients

ii.     immunological safety of TGN1412 was considered most likely in healthy
        subjects, since no adverse effects had been observed in healthy animals in
        multiple pre-clinical studies, including non-human primates.  Immunological
        adverse effects could not be completely excluded in subjects with an existing
        immuno-pathogenic predisposition

iii.    interpretation of safety and pharmacology data in healthy subjects would not be
        compromised by pre-activation or dysfunction of T cells or by a pre-existing
        imbalance of effector/memory and regulatory T cells or other components of the
        haematopoietic compartment.

iv.     healthy subjects, as outlined in the study protocol, would represent a rather
        homogenous population, avoiding the impact of confounding factors such as
        pre/co-medication and/or disease activity on the interpretation of TGN1412 safety
        and pharmacology.

**Dose calculation**

Since the specificity of TGN1412 was apparently restricted to CD28 expressed on T cells from humans and nonhuman primates, safety and toxicology studies in non-human primates (cynomolgus and rhesus monkeys) were considered as the most relevant studies to assess a potential toxicity of TGN1412 administration to humans. To determine potential adverse effects related to TGN1412 mode-of-action as well as unintended toxicity, a number of safety and efficacy studies with TGN1412 in non-human primates were conducted using single dose and multiple-dose regimens. The results of these studies showed that TGN1412 was well tolerated at doses up to 50 mg·kg$^{-1}$·week$^{-1}$ for at least 4 consecutive weeks.

Calculation of the phase I trial starting dose was primarily based on the No Observed Adverse Effect Level (NOAEL) in the repeated dose toxicity study in cynomolgus monkeys and the procedure described in the draft USA Food and Drug Administration (FDA) guideline "Estimating the Safe Starting Dose in Clinical Trials for Therapeutics in Adult Healthy Volunteers"[1]. The NOAEL was considered 50 mg·kg$^{-1}$.

Using the FDA guidance, an allometric correction factor of 3.1 was applied for the cynomolgus monkey NOAEL in order to calculate the "human equivalent dose" (HED) of 16 mg·kg$^{-1}$. When the default safety factor of 10 was then applied, the maximum recommended starting dose (MRSD) was estimated to be 1.6 mg·kg$^{-1}$. The company then applied an additional safety margin and proposed a starting dose of 0.1 mg·kg$^{-1}$.

The dose range in the proposed phase I trial was considered to ensure both maximum patient safety due to the conservative safety factors of 160 and also to enable investigation of basic PD/PK characteristics of TGN1412, relevant for future clinical trials to be conducted in patient populations.

Using a "Minimal Anticipated Biological Effect Level" (MABEL) Approach

Pharmacological activity of TGN1412 and its surrogate had been observed in rhesus and cynomolgus monkeys at between 2.5 and 25 mg·kg$^{-1}$. A no observed effect level (NOEL) of <0.3 mg·kg$^{-1}$ was derived from pre-clinical studies conducted in healthy and arthritic (adjuvant arthritis) rats using the rat CD28 specific homologous antibody JJ316. Optimal pharmacological responses were achieved between 1 and 5 mg·kg$^{-1}$. Therefore, the Minimal Anticipated Biological Effect Level (MABEL) dose could be considered to be between 0.3 and 1 mg·kg$^{-1}$. If the MABEL was considered to be 0.5 mg·kg$^{-1}$ and using the Safety Criteria outlined in the CPMP Position Paper on Non-Clinical Safety Studies to Support Clinical Trials with a Single Microdose[2], the safe starting dose would have been calculated to be 0.005 mg·kg$^{-1}$ or 5 μg·kg$^{-1}$.

**Examples of starting dose calculation for two products which were "first-in-man" in healthy volunteers as a comparison with TGN1412.**

*Product 1*

**MABEL**

The maximal inhibition determined in vitro in human plasma is ~40% at a concentration of 0.2ug/ml. No change in the degree of inhibition was observed at concentrations of 2ug/ml or 20ug/ml. The concentration resulting in 20% inhibition was calculated to be 0.01ug/ml. Using a plasma volume of 50ml/kg, this translates into a dose of 0.5ug/kg. From toxicokinetic studies in the monkey, a 5mg/kg bolus dose resulted in a peak plasma concentration of 189ug/ml. The maximum concentration anticipated with a 0.5ug/kg dose is 0.0189ug/ml.

Starting dose 0.5ug/kg

**Human Equivalent Dose**

1/10 of the HED based upon the NOAEL in the most sensitive species is normally accepted as a maximum safe starting dose in healthy volunteers. An additional safety factor up to 10 should be added if NOAEL has not been defined.

The calculation is as follows

Observed adverse effect dose in the monkey: 5 mg/kg

Corresponding Human Equivalent Dose (HED): 1.6 mg/kg

1/10 of the HED: 0.16 mg/kg

Additional safety factor of 10: 0.016 mg/kg

Starting dose 16ug/kg

**Microdose**

The dose calculated to yield a pharmacological effect is 0.5mg/kg. The term microdose is defined as less than 1/100[th] the dose calculated to yield a pharmacological effect. This is 5ug/kg

Starting dose 5ug/kg

*Product 2*

**MABEL**

The compound showed no differences in affinity or potency when compared to its rodent homologue in vitro. Both molecules were efficacious in a rodent model of disease. The

26

minimum effective dose of the test compound was 0.3mg/kg. This corresponds to a plasma level of 0.04mg/ml in the rodent. Using a plasma volume of 50ml/kg, this translates into a dose of 2mg/kg.

Starting dose 2mg/kg

**Human Equivalent Dose**

1/10 of the HED based upon the NOAEL in the most sensitive species is normally accepted as a maximum safe starting dose in healthy volunteers. An additional safety factor up to 10 should be added if NOAEL has not been defined.

The calculation is as follows
      NOAEL in both rat and monkey is 500 mg/kg

      Corresponding Human Equivalent Dose (HED): 81 mg/kg (rat)

                                      162mg/kg (monkey)

      1/10 of the HED: 8.1 mg/kg

Starting dose 8mg/kg

**Microdose**

The dose calculated to yield a pharmacological effect is 5mg/kg. The term microdose is defined as less than 1/100[th] the dose calculated to yield a pharmacological effect.  This is 50ug/kg

Starting dose 50ug/kg

**Calculated receptor occupancy of TGN1412**

**Example of Receptor Occupancy versus local concentration**

| | | |
|---|---|---|
| Dissociation constant | 1.88E-9 (M) | **Kd of TGN1412** |
| Molecular weight (Da) | 150,000 | **Molecular weight of TGN1412** |
| Volume of distribution (mL/kg) | 57 | |

| Dose (mg/kg) | Plasma conc (M) | Receptor Occupancy (%) |
|---|---|---|
| 0.0001 | 1.17E-11 | 0.6% |
| 0.001 | 1.17E-10 | 5.9% |
| 0.01 | 1.17E-09 | 38.4% |
| 0.1 | 1.17E-08 | 86.2% |
| 1 | 1.17E-07 | 98.4% |
| 10 | 1.17E-06 | 99.8% |



28

## Receptor Occupancy for TGN1412 as calculated by the ABPI/BIA Taskforce

### TGN1412: an example

The amount of mAb bound to its target can be estimated from the simple relationship as outlined in the joint ABPI/BIA, where:
mAb (A) + ligand (B) is in equilibrium with mAB-ligand complex (C) The binding affinity (Kd) is represented by [A][B]/[C] and mAbs are selected for high affinity i.e. they favour the binding to target ligand.

*In vivo*, the concentration of both mAb and the target ligand will change with time. However, as an initial estimate, the amount (or percentage) of mAb bound to the target in circulating blood can be estimated by assuming:
i) no turnover (elimination) of the target ligand (CD28 receptor)
ii) no loss of mAb to distribution and clearance
iii) instantaneous equilibrium in the binding reaction.

Whilst these assumptions are not a true representation of the *in-vivo* situation, they do give an estimate of the likely binding to available target in the first few hours immediately after dosing.

Dose TGN1412 0.1 mg/kg
Body weight 70 kg
Molecular weight TGN1412 150000
Blood volume 5L and plasma volume 2.5
T lymphocyte count at baseline (before dosing) = $1.3 \times 10^9$ cells per L blood
CD28 receptors per Tcell 150000 (Bryl et al 2001; 167 (6): 3231-3238)
Kd 1.88 nM (TeGenero, information in public domain)
Total TGN1412 concentration (A + C) in plasma immediately post-dosing 18.7 nM
Total ligand (CD28) concentration (B + C) exposed to plasma at baseline 0.648 nM, assuming B + C = $1.3 \times 10^9$ x 150,000 (receptors/cell)/$N_A$ x $10^9$
Drug-ligand concentration (C) immediately post-dosing 0.587 nM
Percentage CD28 receptors occupied by TGN1412 90.6%

Clearly, this initial dose is expected to give a very high occupancy of CD28 receptors immediately post-dosing and is likely to achieve the maximum pharmacological effect. It is not uncommon that a very small dose of mAb (below the clinically recommended dose) will give a maximum pharmacological effect, albeit for a short duration of time. The duration of effect being largely governed by the dose of mAb and the rate of turnover of the target ligand. For a receptor agonist, such as TGN1412, this level of receptor occupancy should be viewed in light of that achieved in pre-clinical pharmacology studies and the relative potency between animals and man. This information is not in the public domain.

### Some simplifying general principles

A precise estimate of initial ligand binding requires an estimate of the target concentration. In some situations this may prove difficult, for example where the ligand is in tissue or the volume is variable (e.g., synovial fluid). Where the concentration of

29

ligand is reasonably expected to be much lower than antibody, i.e., A >> B, for monoclonal antibodies, fractional ligand occupancy (Ro) is approximately given by:

Ro = 1/(1 + Kd[nM] / (187[nM/mg/kg] x Dose[mg/kg])

The relatively low variability in monoclonal antibody distribution means that the factor of 187 is generic to large proteins (MWT in excess of say 100kDA). As a guide, starting doses in mg/kg of **Kd[nM]/200**, will have initial ligand occupancy of about **50%**. For an antibody falling under the terms of reference of the ESG, such as TGN1412, lower initial occupancy is desirable. Initial levels of receptor occupancy should be justified by the applicant in the IMPD application. For example, using this approach, a dose of 0.001 mg/kg TGN1412 would give a projected receptor occupancy in the range 5-10%.

## References

1.    Estimating the Safe Starting Dose in Clinical Trials for Therapeutics in Adult Healthy Volunteers. U.S. Department of Health and Human Services Food and Drug Administration, Centre for Drug Evaluation and Research (CDER), Centre for Biologics Evaluation and Research (CBER), December 2002

2.    CPMP Position Paper on Non-Clinical Safety Studies to Support Clinical Trials with a Single Microdose. CPMP/SWP/2599/02. January 2003

## C    Phase One Clinical Trial and Adverse Events at Northwick Park Hospital

### Introduction

TGN1412, a CD28 superagonist was scheduled to be tested in 'First in man' trial at the Parexel Clinical Pharmacology Research Unit (CPRU) located within leased space at Northwick Park hospital in North London. The Parexel CPRU was the contract Research organisation that undertook responsibility for conduct of the trial of TGN1412. TGN1412 or analogues had been tested in pre-clinical studies in the following species; Rats (JJ316), rabbits, rhesus and cynomolgus monkeys (TGN 1112 and TGN 1412). TGN 1112 is an IgG1 variant of TGN 1412.

### 5.1    Design of Trial

The proposed trial was a phase-I, single centre, double blind randomised, placebo controlled escalating dose group study to asses the safety, pharmacokinetics, pharmacodynamics and immunogenicity of single doses of TGN1412 administered intravenously to healthy volunteers.

The primary objectives were to assess the safety and tolerability of ascending single doses of TGN1412 in separate cohorts and to assess pharmacokinetics. The

secondary objectives included assessment of effect of TGN1412 on lymphocyte subsets, cytokine profiles and anti-TGN1412 antibody generation after single doses of TGN1412.

The subjects were scheduled to be admitted to the CPRU on day 1 and retained at the unit until day-3.  Vital signs were to be measured 05, 1, 2, 4, 8 and 12 hours after start of infusion.  Further recordings (ambulatory) were planned at specified intervals up to 43 days.

The proposed dosing range was 0.1, 0.5, 2.0, and 5.0mg/kg BW intravenously or placebo.

**5.2   Trial Protocol**

*Inclusion & Exclusion Criteria; (Protocol defined).*

A predefined set of criteria were used to select appropriate volunteers;

Inclusion Criteria:

- 18-40 year old healthy males
- Body-mass index 18-28 kg/m$^2$
- In good health based on medical history, examination, ECG and laboratory parameters.
- Normal CRP at screening and day (-1) to exclude inflammatory processes
- Able to give informed consent.

Exclusion Criteria;

A variety of exclusion criteria were applicable, notable of which were;

- Any infection or inflammation (based on CRP)
- Enlarged lymph nodes
- History of major systemic disorder (cardio-respiratory, neurological …etc)
- History of multiple drug allergies or any clinical allergic disease
- AIDS, hepatitis (B or C),
- Subjects receiving an investigational drug in the previous-4 months, or vaccines
- Subjects who received a previous dose level(TGN 1412) in this study
- Alcohol or substance abuse, mental incapacity, participation in strenuous exercise in the previous 4 days, high BP, low heart rate etc.

**Measures provided in the Protocol to minimise risks**

The protocol listed the following potential adverse events and the general and specific treatments were planned in the event of such an occurrence;

| Event | General measures | Specific measures |
|---|---|---|
| Anaphylaxis | Airway/circulation support/ vasoconstrictors | Corticosteroids /Beta- agonists / antihistamines |
| Immunogenicity /Autoimmunity | Avoid further exposure | Steroids/ antihistamines if required. |
| General cutaneous reactions | Antihistamines, analgesics, | Corticosteroids if necessary |
| Cytokine release syndrome | General supportive measures | Corticosteroids and other appropriate clinical measures. |
| serious adverse events | General supportive measures | System specific measures.  Stop trial if a number of serious ADRs were reported. |
| Immunosuppression (massive induction of anti-inflammatory cytokines        &        / regulatory  T cells) | Appropriate counter measures | Antibiotics for infection etc.. |

**Reasons for stopping subjects in the trial:**

Subject withdrawal;

- o   Withdrawal of consent
- o   Intolerable adverse event
- o   An intercurrent illness or procedural complication
- o   Entry into study in violation of protocol or protocol violation during the study
- o   Investigator opinion on best medical interests of the subject
- o   Availability of new data that raised concerns about safety of drug

Premature termination of the trial;

- o   Number and severity of adverse events justify discontinuation ( in the opinion of investigator and sponsor)
- o   New data becoming available that raise concerns about safety of the drug

**5.3    Adverse Events:**

Report obtained from SUSARs.

The first screening was 22nd February 2006. The first day of dosing was 13th March 2006.

32

Eight subjects aged 19-34 (mean 26 years) were recruited.   All had normal haematological and biochemical parameters pre-dosing.

Predose parameters

| Subjects ➲ | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Urea (mmol/L) | 6.0 | 3.6 | 4.6 | 4.3 | 5.8 | 4.9 |
| Creatinine (umol/L) | 89 | 82 | 79 | 74 | 81 | 78 |
| Neutrophils [x $10^9$/L] | 2.32 | 1.73 | 2.54 | 3.69 | 5.14 | 2.16 |
| Lymphocytes [x $10^9$/L] | 1.47 | 1.63 | 2.28 | 1.69 | 2.59 | 2.03 |
| CRP (units) | <5 | <5 | <5 | <5 | <5 | <5 |
| ALT | 23 | 22 | 32 | 25 | 36 | 25 |

Doses Administered and times
All subjects were dosed between 8-9 AM on the 13th Mar 2006 at ~10minute intervals. Six received active agent and two received placebo.

| | Subjects ⇒ | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|---|
| Body weight (Kg) | | 84.3 | 68.9 | 88.5 | 82.4 | 72.1 | 81.8 |
| Dosing | | | | | | | |
| TGN1412 | | 8.4 mg | 6.8 mg | 8.8 mg | 8.24 mg | 7.2 mg | 8.2mg |
| Dosing time | | 08:00 | 08:20 | 08:30 | 08:40 | 08:50 | 09:00 |

*Symptoms and timing*

A number of symptoms were reported by the subjects fairly soon after administration of the investigational agent (drug/ placebo).

- In 5 of 6 subjects, headache was reported between 50-90 minutes.
- All reported lumbar myalgia.
- Rigors were reported between 58-120minutes in 4 subjects.
- Elevated temperatures >38°C were noted between 2.5 to 6.5 hrs

- Hypotension was noted between 3.5 to 4.6 hrs after administration
- Tachycardia noted at 2.5 to 4.6 hrs

Other symptoms reported include nausea, vomiting, dyspneoa and bowel disturbances. A number of subjects subsequently reported feeling extremely ill and unable to recall events in specific order (reported as amnesia).

*Initial treatment*

All subjects received intravenous fluids [4 to 8 l overall; (colloids 1.5 to 4.0 l) and crystalloids 1-4 l).   All subjects also received vasoconstrictors (metaraminol 1mg), analgesics (including paracetamol and codeine orally).

Corticosteroid (hydrocortisone 100mg) was administered to all subjects between 4 to 6 hours of onset of symptoms.

*Transfer to Critical care*

All 6 symptomatic subjects were transferred to the Critical Care Unit at Northwick Park hospital between 12 and 16 hours after dosing in view of the continued deterioration in clinical status.

On transfer to critical care unit, the following were the predominant and common features; dyspnoea and tachypnoea in 5 of the 6, respiratory fatigue in 4 of the 6, bilateral radiological pulmonary infiltrates in all, increased blood urea, significant base deficit, and features consistent with disseminated intravascular coagulation [elevated fibrin degradation products (FDP), low fibrinogen and altered prothrombin time].   There was general lymphopenia (values ranging between 0.04 to 0.07 x$10^9$/L in the ITU) compared to pre-dose (baseline 1.47 to 2.59 x $10^9$/L) and this persisted for several days.

*Treatment in Critical care*

- Ventilation:

All subjects (patients) needed assisted ventilation: 4 of the 6 non-intubated patients received continuous positive pressure ventilation (CPAP) for durations of 4 -82 hours. Intermittent positive pressure ventilation (IPPV) was utilised in two subjects (12 -18 hours post dose).  These two subjects needed IPPV.

- Veno-venous filtration:

Continuous veno-venous filtration (CVVHDF) was utilised in all subjects for varied durations (44 hours to 158 hours) in the ITU setting.  Two subjects had oliguria/anuria.

- Steroids /Immunosuppressants;

A second dose of Hydrocortisone (100mg each dose, and 200mg total) was administered after the initial dose and this was followed by 3 doses of methylpredinisolone 1.0 gramme IV to all subjects, the first at 16 hours with subsequent doses at 40 and 64 hours post TGN412 dosing.  Three doses of Dacluzimab (an immunosuppressant monoclonal antibody to prevent T lymphocyte proliferation), 1mg/kg were administered to each subject.  Low dose steroids were continued after the above for a range of 21-33 days.

Other clinical events

Atrial fibrillation and peripheral limb ischaemia were seen in two subjects. ;
Generalised desquamation (prolonged in 3 subjects), muscle weakness, myalgia, and hyperalgesia occurred.   Other neurological phenomena were also noted including headache, inability to concentrate, impaired ability to recall and peripheral numbness.

Complications/ other events

Three of the six subjects acquired infections while in hospital (Klebsiella, Candida, Staphlococcus aureus infection of foot wounds.   Two others had viral reactivation (oronasal herpes and herpetic lesions elsewhere) and these responded to appropriate treatments (antibiotics and high dose acyclovir).

Clinical Follow-up

In all 6 subjects the duration of pyrexia (temp >38 C) varied between 14 hours to 36 hours. At the start of ITU/ICU admission, all subjects needed plasma volume expanders, vasoconstrictors, and veno-venous haemofiltration of duration (44-158 hours). The Intensive therapy unit stay was prolonged in 3 subjects.

**Interpretation of clinical events triggered by TGN**

The events that followed administration of TGN1412 were similar to those observed with another agent, OKT3 antibody. OKT3 when administered to humans and in some animals caused a cytokine storm, releasing various inflammatory cytokines from luymphocytes/monocytes and other cells.

The events in the 6 subjects who received TGN 1412 followed a similar clinical picture with generalised symptoms (myalgia, headache, hypotension & tachycardia). These progressed as described above with changes in cytokines and lymphocyte subsets.

**Cytokine release**

Estimation of cytokines was part of the protocol of assessing the response to TGN1412. The cytokine results were obtained from different laboratories. The data from one private organisation is shown summarised here. The data from the immunology and haematology labs of Northwick Park Hospital are provided as non-numerical figures in the appendix. The values from the sponsor company (TeGenero) are not available at this point in time.

The following cytokines were assayed; TNFα, INFγ, IL-2, IL-4, IL-6 and IL10.

Cytokine table

|  | PREDOSE | 1 HOUR | 4 HOURS | DAY 2 | DAY 3 00:10 | DAY 3 11:50 | DAY 4 | DAY 5 | DAY 6 am |
|---|---|---|---|---|---|---|---|---|---|
| Mean TNFalpha; | <2.8 | 1943 | > 5000 | 836 | 107 | 136 | <2.8 | <2.8 | 3.00 |
| Mean IFN g | <7.1 | 99 | > 5000 | 4730 | 1366 | 270 | 89 | 43 | 27 |
| MeanIL-10 | <2.8 | 76 | 2158 | 1771 | 272 | 69 | 19 | 10 | 8 |
| Mean-IL-6 | < 3.0 | 29 | 1330 | 1204 | 96 | 475 | 466 | 95 | 43 |
| Mean-IL4 | <2.6 | 9 | 1205 | 13 | 24 | 3 | 3 | 3 | 3 |
| Mean-IL2 | 4.70 | 57 | 3317 | 137 | 14. | 9 | 4 | 3. | 4 |

*The table only shows mean values rounded to the closest integer. This is only to provide a schematic representation of changes in Cytokine values. The symbols (<) and (>) indicates values below and above the assay limits and hence are not exact values.*

All cytokines increased significantly on days 1 and 2. Very large increases ( >500-1000 fold) were seen in TNF and Interferon gamma and especially at 4 hours and day 2. Interestingly, TNF rose sharply in all subjects within 1 hour of TGN 1412 administration. A downward trend was seen in all cytokines by day 3 after administration.



The values from the Immunology laboratory of Northwick Park Hospital are not shown here.


**Lymphocyte subsets;**

All subjects demonstrated lymphopenia after administration of TGN1412.   The comparisons of lymphocyte levels throughout the course are shown in the table.

| Blood level (units) | Predose (range)* | T=8 hours (range)* | CTU normal range | T=16 hours (range)** | ICU normal range |
|---|---|---|---|---|---|
| Lymphocytes (x10$^9$/L) | 1.86 (1.47 - 2.59) | 0.06 (0.05 – 0.09) | 1.5 – 4.0 | 0.04 (0.03 - 0.07) | 1.10 – 4.80 |

Individual T –lymphocyte values varied to a greater extent.   In all subjects after TGN 1412 there was a significant drop in CD3+, CD4+ CD8+ cells.  The recovery also varied, with CD3+ cells leading the recovery followed by CD4+ and then CD8+. The CD8+ cells showed the slowest and the lower magnitude of recovery.

OUTCOMES;

**Sequelae**

All subjects have been followed by a clinician for 3 months after the event.  All have residual limitations especially of loss of memory, inability to concentrate and headaches. One subject has dry gangrene of the toes and fingers that still require remedial measures. One subject has recurrent apthous ulcerations.

Further data are awaited on the haemodynamic stability, immunological profile and antibody screen in these individuals.

**D**　　**MHRA GCP, GMP and GLP Investigations**

**Introduction**

This section covers the investigations carried out by the Medicines and Healthcare products Regulatory Agency (MHRA) regarding the Serious Adverse Events experienced during the 'first time into man study of the monoclonal antibody TGN1412.  It summarises the inspections performed by the MHRA and other European authorities and the testing performed on samples following the incident. The objective of this investigation was to determine whether there were any errors in the conduct of this trial which might have caused the serious adverse events.

**Background**

Parexel (a contract research organisation) was contracted by the sponsor, TeGenero AG, to conduct an entry into human study of the monoclonal antibody TGN1412.  Eight healthy male volunteers were recruited and dosed by Parexel Clinical Pharmacology Research Unit (CPRU) on 13th March 2006.  On the same day Serious Adverse Events (SAEs) were reported in 6 of the 8 subjects. According to Parexel CPRU, the subjects experienced "Cytokine Release Syndrome", which was reported as "Life-Threatening".  The drug codes were broken by Parexel, this confirmed that the 6 subjects who experienced SAEs received active drug and the two subjects who did not experience adverse events received placebo.

**Study Design**

A Phase I, single-centre, double-blind, randomised, placebo-controlled, single escalating-dose study. Four single doses: 0.1, 0.5, 2.0 and 5.0 mg/kg to be administered in 4 groups of 8. A total of 32 subjects were planned.

First date of screening: 22nd February 2006
First day of dosing: 13th March 2006

Key organisations involved in the trial

| Role | Name | Location |
|---|---|---|
| Sponsor | TeGenero AG | Wurzburg, Germany |
| Manufacturer | Boehringer Ingelheim | Germany |
| GLP Studies | [Redacted under FOIA Section 38] | [Redacted under FOIA Section 38] |
| Contract Research Organisation / Phase I Clinical Pharmacology Unit | Parexel | Northwick Park Hospital, Harrow, UK |

37

**Triggered Inspections of Facilities**

Following the incident triggered inspections were performed at the various facilities.

| Facility | Inspection Type | Date of Inspection |
|---|---|---|
| TeGenero AG, Germany | GCP | 17th of March 2006 |
| Parexel, Northwick Park Hospital, Harrow, UK | GCP | 16th, 17th and 27th March 2006 |
| Parexel | GMP | 14th and 16th March 2006 |
| [Redacted under FOIA Section 38] | GLP | 20th-21st March 2006 |
| Boehringer Ingelheim, Germany | GMP | 22nd – 24th of March 2006 |

**Inspection Findings**

**GCP Inspection of TeGenero AG**

The inspection focussed upon the pre-clinical work performed by TeGenero prior to the first in human study.  All work performed had been provided to regulatory authorities, as required by the clinical trials application process.  No irregularities were found during the inspection.

**GCP Inspection of Parexel**

During the inspection the following areas were inspected; Parexel Clinical Pharmacology Research Unit (CPRU) Clinic, recruitment offices, reception, areas used to store the infusion pumps, office where blind break envelopes were stored, the sample laboratory and sample storage area.  In addition, the Clinbase® electronic clinical trials database was viewed.

The inspectors reported that there were no findings which were believed to be likely to have contributed to the Serious Adverse Events experienced by the trial subjects who received the study drug.

## Protocol Adherence

As a result of the GCP inspection a number of discrepancies were identified:

**Documentation procedures were not adhered to**

It is incumbent upon clinical pharmacology research units to keep appropriate records as laid out in protocol procedures.  Parexel failed to complete the full medical background of a trial subject in writing.  One Principal Investigator did not update the medical history file in writing following a verbal consultation with one of the volunteers.

**Employment procedural errors**

There was no contract in existence for the bank screening physician at the time they were employed - one was subsequently issued.
Parexel's Principal Investigator failed to authorise, in their log, the full work remit for the bank screening physician at the start of their employment.
Having interviewed the bank screening physician as part of their inspection, MHRA Inspectors were not satisfied that the individual had adequate training and experience for their role.

**Insurance issues**

Parexel had a duty to review TeGenero's insurance policy to ensure that one was in place and that there were no exclusion categories within it that might impact upon their volunteers, in this study. They failed to do this although no such exclusions were subsequently found.

The placebo volunteers – non adherence to the unblinding procedure;

The placebo volunteers were permitted to leave the trial before appropriate checks were undertaken to confirm that they were the two subjects that had received the placebo.

**Contracts**

There was no contract in place between TeGenero and Parexel at the start of the trial – one was subsequently issued and there was only a draft contract in existence between Parexel and private laboratory they had engaged.

**Medical Cover**

There was no formal system in place to provide 24 hour medical cover.

**Parexel GMP Inspection**

The scope of the inspection included a review of the facilities, equipment, quality systems, documentation and records associated with the storage, preparation and release of TGN1412 and placebo at the unit.

No deficiencies were raised during the inspection.

[Redacted under FOIA Section 38] GLP Inspection

The purpose of the inspection was to determine that a pivotal toxicology study performed to support the progression of TGN1412-HV into human was conducted in accordance with the principles of GLP.

The study audited was –

[Redacted under FOIA Section 38] Study: "4 week intravenous toxicity study in cynomolgus monkeys with a 6 week observation period".

Additionally two validation studies and a dose-ranging study were reviewed.

The inspector concluded that the study had been performed in accordance with the principles of GLP and that the results presented in the final report appeared to accurately reflect the raw data.  No critical or major deficiencies were identified.

It appears highly unlikely that any of these deficiencies contributed to the condition of the volunteers who participated in the Phase I clinical trial at Parexel CPRU, Northwick Park Hospital.

**TGN1412 Product analysis Testing**

Following the incident a series of tests were performed by independent laboratories to determine if the products met the batch release specification and additional tests were performed to aid the investigation into the incident.  The testing spans the batch used in the toxicology studies (80 litre batch) and the batch used for the subjects (2000 litre batch).

**Overview**

Following the serious adverse event at the Parexel CPRU samples of the product and the placebo, administered to the trial subjects, had been secured by nursing staff and were seized by the Metropolitan Police investigation team.  Staff from the National Institute for Biological Standardisation Control (NIBSC) transported the samples under controlled temperature conditions to NIBSC laboratories at Potters Bar, where they were transferred to temperature monitored refrigerators.

The manufacturer of the product Boehringer-Ingelheim in Germany (BI) provided reference materials and detailed analytical methodology to perform the required analysis. By virtue of their role as the UK Official Medicines Control Laboratory NIBSC were selected by MHRA to perform most of the analyses required on the product.  However, tests, which NIBSC could not perform were carried out at three other laboratories. [Redacted under FOIA Section 38] Laboratories performed a rabbit pyrogen test, a sterility test and a total viable count.  The Forensic Chemistry Centre (Cincinnati Ohio USA), US Food and Drug Administration (FDA) performed a toxicological screening test.  The MHRA laboratory at Teddington developed and validated a suitable method to assay both the protein and acetate in the diluted samples administered to the trial subjects.

MHRA staff produced a testing protocol, based upon the release tests and specifications from the product manufacturer.  The test protocol aimed to indicate any differences between the initial 80 Litre batch produced by BI, that was used in the toxicological study, and the full-scale production batch used for the clinical trial.

**Samples available for testing**

The following test materials were obtained from the CPRU at Northwick Park.:-

Refrigerated (2 - 8°C) Samples of Investigational Medicinal Product (IMP)
TGN1412 Lot No. E5646LO004
Refrigerated (2 - 8°C) Samples of placebo acetate buffer Lot No. 5653LO01

The following reference/retained sample materials were provided by BI Germany:-

Frozen reference samples Ref Std DS/1. These materials were combined from
manufacturing runs 90695 and 90710. This was the material produced from the
80L batches used in the toxicity study.

Frozen reference samples Ref Std DS/2. These materials were produced from
manufacturing run 100301-01. This was the reference for material Lot 5646LO004

Additionally, NIBSC are storing further samples, as yet un-analysed, of clinical
materials and samples seized by the Metropolitan Police from The Doctors'
Laboratory.

NIBSC is also storing the actual diluted samples of TGN1412 and placebo as
administered to the trial subjects.

## Testing Protocol

The following testing protocol was agreed by the MHRA investigation team, in
conjunction with the analysts at NIBSC.  The protocol was based upon the company
batch release specification.  However, for the SDS-PAGE and size exclusion
chromatography prior to the receipt of the company methods, NIBSC performed an
analysis using in-house methods.  These tests were designed to confirm that the
Investigational Medicinal Product (IMP) Lot No E5646LO004 administered to the trial
subjects complied with the manufacturers' release specification and was equivalent to the
pilot scale batch (Run 90695/90710) used in the original pre-clinical toxicity study.

**Company release specification tests.**

Assay by UV spectrophotometry:-  To confirm the concentration of total protein
present in the  IMP batch and that the product  was free from insoluble
aggregates.

Endotoxins by LAL gel clot:-.  To confirm the absence of endotoxins and
pyrogenic material.

SDS-PAGE and Isoelectric focussing:-.  To confirm that the product was
consistent with the proteins expected to be found with a Human monoclonal
antibody (MAb) and demonstrate that there was no adverse production of either
dimers or half molecules.

41

Size Exclusion High Performance Liquid Chromatography:-.  To confirm that the principal peak in the chromatograms obtained was consistent with those produced by a protein of the expected molecular weight and that the content of dimers in the IMP was consistent with both the specification and the chromatographic profile obtained from the pilot batches.

BIAcore (Cell Binding) Assay:-.  To confirm that the product contains a protein that binds to the CD28 construct used.

Total Viable Count and Sterility:-.  To confirm that neither the placebo nor the IMP were contaminated with micro-organisms.

Non-Company release specification tests.

Rabbit Pyrogen Test:- To confirm that product did not contain pyrogenic material. Performance of the test also required that the product was injected into another animal species. (Performed by a commercial contract research laboratory).

Abnormal Toxicity Test (British Pharmacopoeia):- . The test was performed to confirm that IMP TGN1412 did not contain unexpected toxic contaminants and the MAb was not toxic to the test species.

Toxicity Screen.  The test was performed using various screening techniques by the FDA's Forensic Chemistry Centre (FCC). The tests were based upon those routinely performed by FCC to assure the safety and non-contamination of foodstuffs in the USA. The results of the test would provide the final assurance that the IMP TGN1412 was not contaminated by any unexpected organic or inorganic toxic materials.


**Results Obtained**

All the results obtained by all methods performed confirmed that TGN1412, as administered to the trial subjects, fully complied with the release specification.

Scientists from NIBSC advised that any minor differences detected between the results obtained with Batch E5646LO04 as administered and those obtained with reference material DS 01 (pilot scale production) or reference material DS 02 (Lot No E5646LO04 were of no significance.

The results of the analysis performed are presented in Table 1 in Appendix K.


**Conclusions**

The investigation indicated that the adverse incident did not involve errors in the manufacture of TGN1412 or in its formulation, dilution or administration to trial participants.  It was therefore concluded that an unpredicted biological action of the drug in humans was the most likely cause of the adverse reactions in the trial participants.

The Expert Scientific Group wishes to emphasis that the residual syringe samples of the material which was administered to the trial subjects have not yet been analysed for content and potential contamination and that, accordingly, the conclusions expressed with respect to the formulation, dilution and administration to trial participants, must be viewed as preliminary, until the results of analyses have been obtained.  They also wish to point out that the provisional conclusions above were drawn based on analyses of TGN1412 from the same batch that had been administered to the subjects and handled and diluted according to the trial protocol and in an identical fashion as deduced from the GCP records.  It is deemed highly unlikely that only the material given to the six affected trial subjects and not that given to the two subjects who received placebo, would have been subject to any form of contamination.  Therefore the provisional conclusion remains reasonable.

**4.    CYTOKINE STORM IN A PHASE ONE TRIAL OF THE ANTI-CD28 MONOCLONAL ANTIBODY TGN1412**


PERMISSION HAS BEEN GRANTED BY THE AUTHORS, THE EDITORS OF THE NEW ENGLAND JOURNAL OF MEDICINE AND THE MASSACHUSETTS MEDICAL SOCIETY FOR REPRODUCTION OF THIS ARTICLE.


THE ARTICLE WAS WRITTEN BY THE NORTHWICK PARK HOSPITAL PHYSICIANS WHO TREATED THE CLINICAL TRIAL VOLUNTEERS AT NORTHWICK PARK HOSPITAL.

The NEW ENGLAND JOURNAL of MEDICINE

---

BRIEF REPORT

# Cytokine Storm in a Phase 1 Trial of the Anti-CD28 Monoclonal Antibody TGN1412

Ganesh Suntharalingam, F.R.C.A., Meghan R. Perry, M.R.C.P.,
Stephen Ward, F.R.C.A., Stephen J. Brett, M.D., Andrew Castello-Cortes, F.R.C.A.,
Michael D. Brunner, F.R.C.A., and Nicki Panoskaltsis, M.D., Ph.D.

---

SUMMARY

Six healthy young male volunteers at a contract research organization were enrolled in the first phase 1 clinical trial of TGN1412, a novel superagonist anti-CD28 monoclonal antibody that directly stimulates T cells. Within 90 minutes after receiving a single intravenous dose of the drug, all six volunteers had a systemic inflammatory response characterized by a rapid induction of proinflammatory cytokines and accompanied by headache, myalgias, nausea, diarrhea, erythema, vasodilatation, and hypotension. Within 12 to 16 hours after infusion, they became critically ill, with pulmonary infiltrates and lung injury, renal failure, and disseminated intravascular coagulation. Severe and unexpected depletion of lymphocytes and monocytes occurred within 24 hours after infusion. All six patients were transferred to the care of the authors at an intensive care unit at a public hospital, where they received intensive cardiopulmonary support (including dialysis), high-dose methylprednisolone, and an anti–interleukin-2 receptor antagonist antibody. Prolonged cardiovascular shock and acute respiratory distress syndrome developed in two patients, who required intensive organ support for 8 and 16 days. Despite evidence of the multiple cytokine-release syndrome, all six patients survived. Documentation of the clinical course occurring over the 30 days after infusion offers insight into the systemic inflammatory response syndrome in the absence of contaminating pathogens, endotoxin, or underlying disease.

From the Department of Intensive Care Medicine, Northwick Park and St. Mark's Hospital (G.S., M.R.P., S.W., A.C.-C., M.D.B.); the Department of Intensive Care Medicine, Hammersmith Hospital (S.J.B.); and the Department of Haematology, Imperial College London, Northwick Park and St. Mark's Campus (N.P.) — all in London. Address reprint requests to Dr. Suntharalingam at Rm. 4J007, Department of Intensive Care Medicine, or to Dr. Panoskaltsis at the Department of Hematology — both at Northwick Park and St. Mark's Hospital, Watford Rd., Harrow, London, HA1 3UJ, United Kingdom; or at ganesh.suntharalingam@nwh-nhs.uk or n.panoskaltsis@imperial.ac.uk.

This article was published at www.nejm.org on August 14, 2006.

N Engl J Med 2006;355.
Copyright © 2006 Massachusetts Medical Society.

ON MARCH 13, 2006, EIGHT HEALTHY MALE VOLUNTEERS PARTICIPATED in a double-blind, randomized, placebo-controlled phase 1 study of the safety of TGN1412 (TeGenero), a novel monoclonal antibody. The study drug is a recombinantly expressed, humanized superagonist anti-CD28 monoclonal antibody of the IgG4κ subclass that stimulates and expands T cells independently of the ligation of the T-cell receptor.[1] In contrast to other antibodies in clinical use or in clinical trials, TGN1412 directly stimulates the immune response in vivo. In preclinical models, the stimulation of CD28 with TGN1412 (or with murine-antibody counterparts) preferentially activated and expanded type 2 helper T cells[2] and, in particular, CD4+CD25+ regulatory T cells, resulting in transient lymphocytosis with no detectable toxic or proinflammatory effects.[3,4]

On the day of the trial, six of the eight volunteers received TGN1412 and two received placebo. Subsequently, the six volunteers in the treatment group, who had multiorgan failure with an unknown mechanism and an unpredictable severity, were all admitted to the on-site critical care unit at Northwick Park and

Downloaded from www.nejm.org at MHRA-INFO CTR on August 14, 2006 .
Copyright © 2006 Massachusetts Medical Society. All rights reserved.

BRIEF REPORT

St. Mark's Hospital, a National Health Service (NHS) hospital in London. We detail the clinical and pathological findings during the first 30 days after the infusion.

## METHODS

### TRIAL CONDUCT

TeGenero sponsored the trial of the monoclonal antibody TGN1412, which was manufactured by Boehringer Ingelheim. The trial was conducted by Parexel International, a contract research organization that operates an independent clinical trials unit in leased space on the premises of Northwick Park and St. Mark's Hospital.

The authors of this report are a group of NHS clinicians who assumed clinical responsibility for the secondary care of these patients after they were transferred to the NHS (between 12 hours [one patient] and 16 hours [five patients] after infusion). The authors have no contractual or operational relationship with either Parexel International or TeGenero.

### PATIENTS AND SOURCES OF DATA

All six patients provided written informed consent to the NHS for the publication of data obtained during clinical case management. Clinical data obtained before admission to the NHS, and selected laboratory data obtained before the complications were observed, are reproduced here with permission from TeGenero. The trial was suspended owing to the serious adverse events, and no further tests were performed for research purposes. There was full disclosure of drug information, scientific data, and trial documentation by TeGenero and Parexel International, in order to assist in clinical management decisions at the time of the incident.

### CYTOKINE AND CELL SUBGROUP DETERMINATIONS

Data on subgroups of cytokines and lymphocytes were subsequently collected for clinical purposes during the course of the illnesses. For details on the cytokine assays and the cell subgroups, see the Supplementary Appendix (available with the full text of this article at www.nejm.org).

## RESULTS

All six patients who received the trial drug were male, with a median age of 29.5 years (range, 19 to 34) (Table 1). None had a notable medical history, and all were clinically well during the 2 weeks before the study; baseline laboratory values were normal (Table 2). Beginning at 8 a.m. on day 1, each volunteer received an intravenous infusion, 10 minutes apart, of either the study drug or placebo. Each infusion lasted 3 to 6 minutes. The six volunteers in the treatment group each received 0.1 mg of TGN1412 per kilogram of body weight, infused at a rate of 2 mg per minute; the remaining two volunteers received a similar volume of saline.

### INITIAL RESPONSE AFTER INFUSION OF TGN1412

A series of adverse effects began in the treatment group after infusion, starting with the onset of severe headache in five patients after a median of 60 minutes (range, 50 to 90), accompanied by lumbar myalgia in all six patients after a median of 77 minutes (range, 57 to 95) (Fig. 1). Subsequently, during this early phase, the patients were restless and had varying degrees of nausea, vomiting, bowel urgency, or diarrhea (Table 1). Five subjects had short amnestic episodes associated with severe pyrexia, restlessness, or both. All patients had a systemic inflammatory response that included erythema and peripheral vasodilatation (the timing of which was undocumented), with recorded rigors in four patients at a median of 59 minutes (range, 58 to 120) after infusion. Hypotension (defined by a decline in systolic blood pressure of 20 mm Hg or more) developed in all patients a median of 240 minutes (range, 210 to 280) after infusion, accompanied by tachycardia, with maximal heart rates of 110 to 145 beats per minute. All patients received intravenous lactated Ringer's solution during this time. Body temperatures of 39.5 to 40.0°C were recorded a median of 280 minutes (range, 240 to 390) after infusion. At 300 minutes after infusion, Patient 1 had signs of respiratory failure, with tachypnea and a partial pressure of arterial oxygen ($PaO_2$) of 52 mm Hg while breathing ambient air; the $PaO_2$ increased with the addition of supplemental oxygen. Chest radiography revealed pulmonary infiltrates; these findings were not consistent with the expected response of a fit young man to the infusion of less than 4 liters of fluid at this stage. There was no clinical evidence of bronchospasm or laryngeal edema.

All patients were initially empirically treated

N ENGL J MED   10.1056/NEJMoa063842

2

Downloaded from www.nejm.org at MHRA-INFO CTR on August 14, 2006 .
Copyright © 2006 Massachusetts Medical Society. All rights reserved.

The NEW ENGLAND JOURNAL of MEDICINE

**Table 1. Data for All Six Affected Patients on Transfer to the Intensive Care Unit (ICU).***

| Characteristic | Patient No. | | | | | |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| Age (yr) | 24 | 34 | 31 | 19 | 28 | 20 |
| Weight (kg) | 68.9 | 84.3 | 81.8 | 72.1 | 88.5 | 82.4 |
| TGN1412 dose (mg) | 6.8 | 8.4 | 8.2 | 7.2 | 8.8 | 8.2 |
| Transfer to critical care (hr after dose) | 15.5 | 16.0 | 16.0 | 16.0 | 16.0 | 12.0 |
| APACHE II score on transfer† | 8 | 10 | 11 | 18 | 20 | 18 |
| Bilateral pulmonary infiltrates‡ | + | ++ | ++ | ++ | ++ | +++ |
| Duration of abnormalities on chest radiography (days) | 7 | 6 | 8 | >5 | 6 | 7 |
| Hemodynamics on transfer | | | | | | |
| Blood pressure (mm Hg) | 120/50 | 124/79 | 107/42 | 98/40 | 95/40 | 80/64 |
| Heart rate (beats/min) | 125 | 103 | 116 | 120 | 105 | 140 |
| LVEF on echocardiogram (%) | 50–55 | 70 | 60 | 50–55 | 60 | 55 |
| PaO$_2$:FiO$_2$ | 395.5 | 195.6 | 329.5 | 321.3 | 201.8§ | 84.0§ |
| Base deficit (mmol/liter) | −5.1 | −6.5 | −5.6 | −5.8 | −10.3 | −8.2 |
| Lactate (mmol/liter)¶ | 3.1 | 4.5 | 5.7 | 6.0 | 5.9 | 4.2 |
| Urinary output (ml/hr) | 20 | 30 | 30 | 45 | 30 | 0 |
| Treatment | | | | | | |
| Days spent in ICU | 4 | 7 | 7 | 5 | 11 | 21 |
| Days receiving corticosteroids (including tapering) | 21 | 21 | 21 | 21 | 24 | 33 |
| Epiphenomena | | | | | | |
| Generalized desquamation‖ | + | ++ | + | + | ++++ | +++ |
| Muscle weakness‡ | + | ++ | + | + | ++ | ++ |
| Late myalgia | Calf | Calf and hip adductors | Calf | — | Calf | — |
| Neurologic findings | Headaches and hyperalgesia | Hyperalgesia | Hyperalgesia and numbness | Headaches | Headaches and numbness | — |

* LVEF denotes left ventricular ejection fraction, PaO$_2$ partial pressure of arterial oxygen, and FiO$_2$ fraction of inspired oxygen.
† Acute Physiology and Chronic Health Evaluation (APACHE) II scores range from 0 to 71, with higher values indicating more severe illness.
‡ Plus signs represent the degree of infiltrates or of muscle weakness.
§ The patient was on assisted mechanical ventilation.
¶ The normal range for lactate is 0.5 to 2.2 mmol per liter.
‖ One plus symbol represents one episode of generalized desquamation, two represent two episodes, and three and four represent increasingly prolonged generalized desquamation.

in the independent clinical trials unit. A dose of 200 mg of hydrocortisone was administered intravenously in divided doses (with the initial 100-mg bolus a median of 331 minutes [range, 315 to 346] after infusion), in addition to 10 mg of chlorpheniramine intravenously, 1 g of acetaminophen intravenously, 4 to 8 mg of ondansetron intravenously, and 0.5 to 3.0 mg of metataminol intravenously (in divided doses, titrated to effect). Blood samples were analyzed 8 hours after infusion at an off-site private laboratory (according to the study protocol) and therefore were not avail-

able as the situation evolved; the results were abnormal (Table 2).

SUBSEQUENT EVENTS

After an initial recovery, Patient 6 became hypotensive (blood pressure, 65/40 mm Hg), and 12 hours after infusion, he had metabolic acidosis and marked respiratory distress with hypoxemia that was refractory to treatment with supplemental oxygen. He underwent intubation and mechanical ventilation, after which he was admitted to the intensive care unit (ICU) at Northwick Park

3

Downloaded from www.nejm.org at MHRA-INFO CTR on August 14, 2006 .
Copyright © 2006 Massachusetts Medical Society. All rights reserved.

BRIEF REPORT

| Blood Level of Constituent | Independent Clinical Trials Unit | | | Intensive Care Unit | |
|---|---|---|---|---|---|
| | Before Infusion | 8 Hours after Infusion | Normal Range | 16 Hours after Infusion | Normal Range |
| Creatinine (μmol/liter) | | | | | |
| Median | 80 | 128 | — | 163 | — |
| Range | 74–89 | 106–195 | 66–112 | 125–325 | 62–115 |
| Urea (mmol/liter) | | | | | |
| Median | 4.8 | 6.4 | — | 9.3 | — |
| Range | 3.6–6.0 | 6.1–7.6 | 1.7–8.3 | 7.3–7.7 | 3.2–7.4 |
| Uric acid (μmol/liter) | | | | | |
| Median | 330 | 418.5 | — | 404 | — |
| Range | 309–426 | 339–465 | 266–474 | 251–590 | 210–420 |
| Alanine aminotransferase (IU/liter) | | | | | |
| Median | 25 | 21 | — | 32 | — |
| Range | 22–36 | 15–191 | 10–50 | 18–161 | 0–55 |
| Hemoglobin (g/dl) | | | | | |
| Median | 15.4 | 11.7 | — | 12.7 | — |
| Range | 15.1–15.9 | 11.0–14.1 | 13.0–17.0 | 10.3–15.6 | 13.0–17.5 |
| Neutrophils (×10⁻³/mm³) | | | | | |
| Median | 2.43 | 2.31 | — | 6.50 | — |
| Range | 1.73–5.14 | 1.99–4.95 | 2.00–7.50 | 5.09–11.14 | 1.80–7.70 |
| Monocytes (×10⁻³/mm³) | | | | | |
| Median | 0.26 | 0.03 | — | 0.03 | — |
| Range | 0.08–0.59 | 0.01–0.15 | 0.20–1.00 | 0.01–0.05 | 0.20–0.80 |
| Lymphocytes (×10⁻³/mm³) | | | | | |
| Median | 1.86 | 0.06 | — | 0.04 | — |
| Range | 1.47–2.59 | 0.05–0.09 | 1.50–4.00 | 0.03–0.07 | 1.10–4.80 |
| Platelets (×10⁻³/mm³) | | | | | |
| Median | 222 | 98 | — | 132 | — |
| Range | 164–261 | 51–144 | 150–400 | 69–169 | 140–450 |
| Prothrombin time (sec) | | | | | |
| Median | 11.2 | 14.2 | — | 26.2 | — |
| Range | 10.5–11.7 | 13.1–19.5 | 10.0–12.0 | 19.5–33.2 | 11.5–16.0 |
| Activated partial-thromboplastin time (sec) | | | | | |
| Median | NA | NA | — | 43.5 | — |
| Range | | | | 40.1–61.9 | 26.0–38.0 |
| Fibrinogen (g/liter) | | | | | |
| Median | NA | 1.47 | — | 1.69 | — |
| Range | | 0.66–1.75 | 1.50–4.00 | 0.99–1.98 | 2.00–4.50 |
| D-dimer (ng/ml) | | | | | |
| Median | NA | NA | — | 1784 | — |
| Range | | | | 1350–4535 | 0–250 |

**Table 2. Median Results of Blood Tests for the Six Patients before Infusion and 8 and 16 Hours after Infusion of TGN1412.***

* To convert values for creatinine to milligrams per deciliter, divide by 88.4. To convert values for urea to milligrams per deciliter, divide by 0.357. NA denotes not available.

N ENGL J MED   10.1056/NEJMoa063842

4

Downloaded from www.nejm.org at MHRA-INFO CTR on August 14, 2006 .
Copyright © 2006 Massachusetts Medical Society. All rights reserved.

48

The NEW ENGLAND JOURNAL of MEDICINE



**Figure 1. Summary Timeline of the Main Events after Infusion of TGN1412.**

The course is divided into four phases: cytokine storm, reactive, recovery, and steady state. ALT denotes alanine aminotransferase. Dashed lines represent the responses of Patients 5 and 6 (who were the most seriously ill).

and St. Mark's Hospital. He had severely abnormal hemodynamics, coagulation, and pulmonary function, with a $PaO_2$ of 84 mm Hg while breathing 100% oxygen (ratio of $PaO_2$ to the fraction of inspired oxygen, 84) (Table 1).[8] Because there was concern that all patients would follow a similar course of rapid deterioration, all remaining patients were transferred to NHS ICU facilities 16 hours after infusion.

**FURTHER TREATMENT**

Between 16 and 20 hours after infusion of TGN1412, the patients had further signs of respiratory deterioration: all six had signs of tachypnea, use of accessory muscles, inability to complete spoken sentences, and bilateral pulmonary infiltrates on chest radiography (Fig. 2A and 2B), and two had symptoms of dyspnea. There was also evidence of substantial renal impairment and disseminated intravascular coagulation, as indicated by an elevated prothrombin time, low fibrinogen level, high level of D-dimers, and decreased platelet counts in all six patients (Table 2). All patients had severe lymphopenia and monocytopenia, with sparing of neutrophils. Blood smears showed toxic granulation with Döhle's bodies and a dysplastic appearance of the neutrophils, with pseudo–Pelger–Huët anomaly (Fig. 2C and 2D).

There was no clinical evidence of primary cardiogenic shock, nor was there bronchospasm, laryngeal edema, or cutaneous signs indicating anaphylaxis. There were no overt or focal neurologic symptoms or signs that suggested neurogenic vasodilatory shock. All electrocardiograms and echocardiograms were normal (Table 1), and there was no clinical indication for lumbar puncture or electroencephalography.

All patients received empirical treatment with 1 g of methylprednisolone sodium succinate intravenously a median of 16 hours (range, 15.5 to 17) after infusion with TGN1412, with subsequent doses 40 hours and 64 hours after. Because of the expected effects of TGN1412 on T cells, all patients were empirically treated daily for 3 days with an anti–interleukin-2 receptor antagonist antibody, daclizumab (Roche), beginning a median of 25.5 hours (range, 23.5 to 28.0) after infusion. This treatment was stopped after 3 days

5

Downloaded from www.nejm.org at MHRA-INFO CTR on August 14, 2006 .
Copyright © 2006 Massachusetts Medical Society. All rights reserved.

49



**Figure 2. Representative Chest Radiographs (Panels A and B) and Blood Smears (Panels C and D) of the Six Affected Patients.**

All anteroposterior chest radiographs were similar in appearance, with interstitial infiltrates first noted 5 to 16 hours after infusion of TGN1412 (Panels A and B). The blood films did not show red-cell fragmentation but did show dysplastic changes in the neutrophils, including pseudo–Pelger–Huët anomaly (arrows, Panels C and D; May–Grünwald–Giemsa stain), which was first noted within 24 hours after TGN1412 infusion. Although toxic granulation, vacuoles, and Döhle's bodies were initially observed, later blood smears showed neutrophils that were hypogranular.

in the absence of TGN1412-induced lymphocytosis. In addition, potential activation of a histaminergic response was treated with 50 mg of intravenous ranitidine every 8 hours and 10 mg of intravenous chlorpheniramine maleate every 8 hours (continued from earlier doses).

**SUPPORTIVE MANAGEMENT**

Patients 1 through 4 received continuous positive airway pressure of 10 cm $H_2O$ by means of a tight-fitting face mask. Patients 5 and 6 underwent mechanical ventilation, with tidal volumes limited to 6 to 8 ml per kilogram of dry body weight and

positive end-expiratory pressure maintained at 15 to 20 cm $H_2O$. All six patients had oliguria, metabolic acidosis, and increasing creatinine levels; they therefore received renal support by means of continuous venovenous hemodiafiltration with the use of a standard polyacrylonitrile membrane (Gambro Hospal U.K.) within 36 hours after their exposure to TGN1412. Dialysate rates were set to 1 liter per hour and were subsequently increased to 4 liters per hour.

All patients required the replacement of blood components by means of the infusion of fresh-frozen plasma and cryoprecipitate to correct co-

Downloaded from www.nejm.org at MHRA-INFO CTR on August 14, 2006 .
Copyright © 2006 Massachusetts Medical Society. All rights reserved.

50



agulopathy. Owing to their severe lymphopenia, the patients were treated according to a protocol of infusions of irradiated red cells and platelets, as required, to prevent possible graft-versus-host disease.

CLINICAL PROGRESSION

Patients 1, 2, 3, and 4 continued to have intermittent fever, myalgia, and diffuse erythematous flushing for 48 hours, at which point their clinical symptoms and signs diminished markedly. Immunomodulatory treatment in these four patients was reduced to a tapering dose of intravenous hydrocortisone followed by oral prednisolone (total duration of corticosteroid treatment in each case, 21 days). Continuous venovenous hemodiafiltration was stopped after a median of 28 hours (range, 22 to 35), and continuous positive airway pressure was stopped after 4 hours in Patient 1 and after a median of 77 hours (range,

7

N ENGL J MED   10.1056/NEJMoa063842

Downloaded from www.nejm.org at MHRA-INFO CTR on August 14, 2006 .
Copyright © 2006 Massachusetts Medical Society. All rights reserved.

51



**Figure 3. Summary of Laboratory Results for the Six Patients during the First 30 Days (Panels A and B) and the First 5 Days (Panel C) after Infusion of TGN1412.**

Panel A shows that C-reactive protein and serum creatinine levels increased rapidly during the first 48 hours after infusion, with a concomitant decline in the platelet count starting within the first 8 hours and persisting for at least 5 days. Alanine aminotransferase levels increased slowly, starting within the first 48 hours, and peaked between 10 and 25 days after infusion, when the patients had recovered from the acute illness. Panel B shows that levels of CD3+, CD4+, and CD8+ T-cell subgroups were undetectable within the first 24 hours after infusion, followed by a first peak at day 5 and a second peak at day 15, with a leveling off to near-preinfusion levels by day 30. Monocyte numbers also fell in the short term but increased to above the normal range 10 to 16 days after infusion. Neutrophil counts were relatively constant immediately after infusion and then increased, as expected, with increasing stress and corticosteroid use. Panel C shows that, during the first 4 hours after infusion, the first cytokine to increase substantially was TNF-α (2.8 pg per milliliter at 0 hour, 1760.1 at 1 hour, and 46¹5.9 at 4 hours), followed by interferon-γ (7.1 pg per milliliter at 0 hour, 43.9 at 1 hour, and ≥5000 at 4 hours) and interleukin-10, 8, 6, 4, 2, 1β, and 12p70. All data are medians. I bars represent interquartile ranges. Dashed lines represent the upper limit of the normal reference range (where only one dashed line is shown) or both the upper and lower limits. Time points with single values were excluded. To convert values for creatinine to milligrams per deciliter, divide by 88.4.

57 to 82) in Patients 2, 3, and 4 (Fig. 4A and 4B through 7A and 7B in the Supplementary Appendix). Patient 2 was also successfully treated for presumed nosocomial *Klebsiella pneumoniae* bacteremia, isolated on day 6 after TGN1412 infusion.

Patients 5 and 6 had a more complex course, as detailed in the Supplementary Appendix. Although both patients initially had diminished erythema and fever 48 hours after infusion, they subsequently had recurrent fever, increased peripheral vascular permeability, and episodes of diffuse erythematous flushing lasting several days. Both patients required intubation and mechanical ventilation. Peripheral ischemia was observed in a glove-and-stocking distribution in Patient 6. It fluctuated over time, independently of the changing vasopressor dose. Most of the peripheral ischemia slowly resolved, except in patch-

Downloaded from www.nejm.org at MHRA-INFO CTR on August 14, 2006 .
Copyright © 2006 Massachusetts Medical Society. All rights reserved.

*The* NEW ENGLAND JOURNAL *of* MEDICINE

es of necrosis on the fingers of both hands and all the toes.

Over the next 30 days, all patients had generalized desquamation (most marked in Patients 5 and 6) and muscle weakness on discharge from the ICU. Five patients had late myalgia, headache after the discontinuation of corticosteroids, difficulties with concentration, and short-term difficulties in finding words (particularly names). Three patients had delayed hyperalgesia, and two had peripheral numbness. None had documented lymphadenopathy or splenomegaly while in the ICU or after discharge.

### HEMATOLOGIC AND IMMUNOLOGIC PROGRESSION

The laboratory values for the six patients are summarized in Figure 3; data on the clinical course of each patient are provided in the Supplementary Appendix. Severe thrombocytopenia was observed, initially accompanying disseminated intravascular coagulation but persisting even after the other clotting values normalized (Fig. 3A, and Fig. 4A and 4B through 9A and 9B in the Supplementary Appendix). All patients had mild normocytic anemia that persisted beyond discharge from the ICU, followed by a slow recovery. Neutrophil numbers initially were preserved and then increased in response to corticosteroids (Fig. 3B), but they were dysplastic in appearance (Fig. 2C and 2D), a feature that eventually resolved. By contrast, marked lymphopenia and monocytopenia were noted in all patients 8 hours after TGN1412 infusion (Table 2).

Lymphocyte numbers were too low to allow for the measurement of cell subgroups 1 day after infusion. Subsequent blood tests showed increasing levels of CD4+ and CD8+ T cells (Fig. 3 through 9 in the Supplementary Appendix), CD19+ B cells, and CD16+ presumed natural killer cells, starting 48 hours after infusion. In Patients 1, 2, 3, and 4, who recovered the most rapidly, T-cell recovery occurred in a CD4+:CD8+ ratio of 1:1, with a temporary rise to levels just above normal in two patients (Fig. 4D and 7D in the Supplementary Appendix). Patients 5 and 6, the two who were most severely ill, had a slower recovery, with lower overall numbers of T cells (Fig. 8 and 9 in the Supplementary Appendix) and a CD4+:CD8+ ratio of 2:1.

The lymphocyte and monocyte nadirs in each patient occurred within 24 hours after TGN1412 infusion, overlapping with the cytokine storm

(Fig. 3B, and Fig. 4C through 9C in the Supplementary Appendix). A dramatic increase in the level of tumor necrosis factor $\alpha$ (TNF-$\alpha$) was observed in all patients within an hour after TGN1412 infusion, followed by elevations in the level of interleukin-2, 6, and 10 and interferon-$\gamma$ within the first 4 hours after infusion (Fig. 3C, and Fig. 4C through 9C and 10 in the Supplementary Appendix). This cytokine release resolved after the first doses of hydrocortisone and methylprednisolone, and in Patients 1, 2, 3, and 4 the values normalized within 2 days. By contrast, in Patients 5 and 6, the cytokine storm was prolonged by 1 to 2 days; discrete elevations in the interleukin-6 and interleukin-4 levels, out of proportion to those noted in the other patients, were observed.

### DISCUSSION

The intravenous infusion of TGN1412 in healthy persons produced a sudden and rapid release of proinflammatory cytokines. These unexpected clinical data provide insight into the natural course of the cytokine storm and the systemic inflammatory response syndrome (SIRS) in the absence of contaminating organic factors. Regulatory authorities, who tested TGN1412 from the same batch as the infused drug, found no errors in its manufacture, formulation, or administration and found no contamination with endotoxin, pyrogen, or microbiologic or other agents.[6] This type of cytokine release had not been observed in the preclinical studies of TGN1412, and it is currently unclear whether the severe effects of this type of cytokine release in vivo in humans is caused by the direct ligation of CD28 on T cells or by the ligation and activation of other cell types, leading to the release of preformed TNF-$\alpha$, which then triggers the remainder of the cascade. The Secretary of State for Health has convened an expert scientific group to study the events of the clinical trial in greater detail.[6]

Clinically, the most striking phenomenon in the cohort was the stereotypical response to the study drug in all six patients and in all organ systems affected (albeit to varying degrees) (Table 3). All six patients initially had clinical signs that fit the criteria for SIRS.[8] Subsequently, the most prominent clinical feature was the early appearance of respiratory distress and pulmonary infiltrates, accompanied by renal impairment and

9

Downloaded from www.nejm.org at MHRA-INFO CTR on August 14, 2006 .
Copyright © 2006 Massachusetts Medical Society. All rights reserved.

53

BRIEF REPORT

profound disseminated intravascular coagulation. This pattern of organ impairment may be consistent with a generalized multiorgan response to inflammation or critical illness.[9,40] However, the rapid onset and concordance of the lung injury among patients seemed unusual, and in the presence of high cytokine (especially interferon-$\gamma$ and TNF-$\alpha$) levels, these features may be consistent with immune-mediated injury that is specific to the lung.[41,42]

Alveolar macrophages in humans are normally inefficient in the costimulation of T cells through the CD28 pathway[43]; thus, our data suggest that anti-CD28 agonists in vivo may be able to potentiate immune activation and therefore lung injury. Neither cytokine storm nor lung injury was observed in the preclinical studies of TGN1412. This probably indicates that the presence of high levels of proinflammatory cytokines is a requirement for the pulmonary compromise, regardless of whether CD28 is ligated in the lung. In contrast to the pulmonary compromise that eventually ensues in SIRS, the more rapid onset of lung injury in our patients may have been due to the combination of the direct effects of the antibody and cytokines on lung tissue.

Equally striking was the consistent pattern of immunologic effects and recovery in all six patients. In particular, the severe lymphopenia observed in these patients was unexpected; a temporary lymphocytosis had been observed in preclinical studies of TGN1412 in animals.[3,9,14] This unanticipated lymphopenia in humans may have reflected cell death or the migration of cells to other tissues such as lymph nodes, although lymphadenopathy was not detected. Lymphopenia has been observed as part of the cytokine storm induced by other monoclonal antibodies.[15-17] However, the low cell numbers observed in these studies were anticipated, given the mechanism of action and the antilymphocyte specificity of the infused antibodies. Sepsis in humans may also induce lymphopenia that is selective for B cells and CD4+ T cells over the course of several days.[18] In contrast, the onset of lymphopenia within 8 hours after infusion of TGN1412, and the involvement of all mononuclear cells (CD4+ and CD8+ T cells and monocytes), may suggest that the depletion of cells in our patients was a response to the infused T-cell agonist drug rather than to the cytokine storm alone.

The clinical progression after infusion of

TGN1412 can be separated into four phases (Fig. 1). Phase 1 began within an hour after infusion, continued through days 1 and 2 (and day 3, in Patients 5 and 6), and consisted of the cytokine storm, involving the rapid induction of type 1 and type 2 cytokines (to varying degrees) and severe lymphopenia and monocytopenia. Phase 2, the reactive phase, occurred from day 1 through day 3 (or days 1 through 8 in Patients 5 and 6, who were the most seriously ill); it consisted of renal failure, disseminated intravascular coagulation, pulmonary infiltrates, and respiratory failure. Phases 1 and 2 overlapped; phase 2 was not necessarily directly caused by the events in phase 1. The recovery phase, phase 3, occurred between day 3 and day 15 (or between day 5 and day 20, for the patients who were the sickest) and was

**Table 3. Common Features after Infusion of TGN1412.**

| System | Feature |
|---|---|
| Cardiovascular | Capillary leak |
| | Hemodynamic instability |
| | Lactic acidemia |
| Renal | Early acute renal impairment |
| | Urinary sediment |
| |    10–100 White cells |
| |    <10 Red cells |
| | Granular casts (two patients) |
| Pulmonary | Acute pulmonary changes (six patients) |
| | Met criteria for acute lung injury (two patients)* |
| | Met criteria for acute respiratory distress syndrome (one patient)* |
| Hematologic and immunologic | Cytokine storm (TNF-$\alpha$; interferon-$\gamma$; interleukin-10, 6, 2) |
| | Increased C-reactive protein level and erythrocyte sedimentation rate |
| | Lymphopenia |
| | Monocytopenia |
| | Thrombocytopenia |
| | Disseminated intravascular coagulation |
| | Normochromic, normocytic anemia |
| | Dysplastic neutrophils but preserved numbers |
| Hepatic | Increased alanine aminotransferase and alkaline phosphatase levels |
| Integumentary | Diffuse erythema |
| | Late desquamation |
| Neurologic | Delirium |
| | Partial amnesia |
| | Paresthesia or localized numbness |
| | Difficulty concentrating (late) |
| | Headaches (early and late) |
| Autonomic, gastrointestinal, or both | Bowel urgency or diarrhea |
| | Nausea or vomiting |
| Musculoskeletal | Myalgia in lower back (early) and calves (late) |

* Criteria are from the American–European Consensus Conference on ARDS.[7]

N ENGL J MED   10.1056/NEJMoa063842

10

Downloaded from www.nejm.org at MHRA-INFO CTR on August 14, 2006 .
Copyright © 2006 Massachusetts Medical Society. All rights reserved.

characterized by the recovery of renal and pulmonary function. This recovery was reflected in thrombocytosis and increases in alanine aminotransferase and monocyte and lymphocyte levels (mostly in a 1:1 ratio of CD4+:CD8+ T cells). The last phase, phase 4, can be described as a plateau or steady-state phase. It began 15 days after infusion (or 20 days after in Patients 5 and 6) and consisted of normalization of the measured variables. As compared with reactions to the infusion of other immunomodulatory agents (such as anti-CD20,[15] anti-CD3,[16] and anti-CD52 monoclonal antibodies[17]), the response to TGN1412 initially had similar kinetics, including the rapid increase in the levels of first TNF-α and then interferon-γ and interleukin-6, followed by cardiovascular instability, and disseminated intravascular coagulation. However, from phase 2 onward, features unique to the response to TGN1412 were apparent — including early acute lung injury, diffuse

erythema with late desquamation, neurologic sequelae, and post-illness myalgias (Table 3).

These events occurred during the first dosing interval in a phase 1 drug trial of a humanized immunomodulatory monoclonal antibody involving healthy subjects. The events provide insight into an immune-mediated cytokine storm leading to multiorgan failure in the absence of infection, contamination with endotoxin, or underlying disease. The TGN1412 variant of the syndrome had some features that set it apart from a typical cytokine storm, most notably early acute lung injury and marked lymphopenia.

No potential conflict of interest relevant to this article was reported.

We are indebted to the NHS staff members involved in the care of the patients on the day of the event and after, for their skill and dedication and for overcoming the unprecedented clinical and logistic challenges that the event presented; and especially to the six patients for consenting to the publication of their clinical data in order to inform ongoing discussion and debate.

REFERENCES

1. Lukder F, Huang Y, Dennehy KM, et al. Topological requirements and signaling properties of T cell-activating, anti-CD28 antibody superagonists. J Exp Med 2003;197:955-66.
2. Rodríguez-Palmero M, Hara T, Thumbs A, Hunig T. Triggering of T cell proliferation through CD28 induces GATA-3 and promotes T helper type 2 differentiation in vitro and in vivo. Eur J Immunol 1999; 29:3914-24.
3. Beyersdorf N, Gaupp S, Balbach K, et al. Selective targeting of regulatory T cells with CD28 superagonists allows effective therapy of experimental autoimmune encephalomyelitis. J Exp Med 2005;202:445-55.
4. TGN1412 investigator's brochure. Wurzburg, Germany: TeGenero Immunotherapeutics, 2005. (Accessed July 27, 2006, at http://www.mhra.gov.uk/home/idcplg? IdcService=GET_FILE&dDocName= CON2023518&RevisionSelection Method=LatestReleased.)
5. Offner PJ, Moore EE. Lung injury severity scoring in the era of lung protective mechanical ventilation: the PaO2/FiO2 ratio. J Trauma 2003;55:285-9.
6. Investigations into adverse incidents during clinical trials of TGN1412. London: Medicines and Healthcare products Regulatory Agency (MHRA), 2006. (Accessed July 27, 2006, at http://www.mhra.gov.uk/ home/idcplg?IdcService=GET_FILE&dDoc

Name=CON2023821&RevisionSelection Method=LatestReleased.)
7. Bernard GR, Artigas A, Brigham KL, et al. The American-European Consensus Conference on ARDS. Definitions, mechanisms, relevant outcomes, and clinical trial coordination. Am J Respir Crit Care Med 1994;149(3 Pt 1):818-24.
8. American College of Chest Physicians/Society of Critical Care Medicine Consensus Conference: definitions for sepsis and organ failure and guidelines for the use of innovative therapies in sepsis. Crit Care Med 1992;20:864-74.
9. Hudson LD, Milberg JA, Anardi D, Maunder RJ. Clinical risks for development of the acute respiratory distress syndrome. Am J Respir Crit Care Med 1995; 151:293-301.
10. Iriver PG, Kleinknecht DJ, Loirat P, Landais PJ. Acute renal failure in intensive care units — causes, outcome, and prognostic factors of hospital mortality: a prospective, multicenter study. Crit Care Med 1996;24:192-8.
11. Theron M, Huang KJ, Chen YW, Liu CC, Lei HY. A probable role for IFN-gamma in the development of a lung immunopathology in SARS. Cytokine 2005;32:30-8.
12. Gon Y, Wood MR, Kiosses WB, et al. S1P3 receptor-induced reorganization of epithelial tight junctions compromises lung barrier integrity and is potentiated

by TNF. Proc Natl Acad Sci U S A 2005; 102:9270-5.
13. Chelen CJ, Fang Y, Freeman GJ, et al. Human alveolar macrophages present antigens ineffectively due to defective expression of B7 costimulatory cell surface molecules. J Clin Invest 1995;95:1415-21.
14. Hunig T, Dennehy K. CD28 superagonists: mode of action and therapeutic potential. Immunol Lett 2005;100:21-8.
15. Winkler U, Jensen M, Manzke O, Schulz H, Diehl V, Engert A. Cytokine-release syndrome in patients with B-cell chronic lymphocytic leukemia and high lymphocyte counts after treatment with an anti-CD20 monoclonal antibody (rituximab, IDEC-C2E8). Blood 1999;94:2217-24.
16. Gaston RS, Deierhoi MH, Patterson T, et al. OKT3 first-dose reaction: association with T cell subsets and cytokine release. Kidney Int 1991;39:141-8.
17. Wing MG, Moreau T, Greenwood J, et al. Mechanism of first-dose cytokine-release syndrome by CAMPATH 1-H: involvement of CD16 (FcgammaRIII) and CD11a/CD18 (LFA-1) on NK cells. J Clin Invest 1996;98: 2819-26.
18. Hotchkiss RS, Tinsley KW, Swanson PE, et al. Sepsis-induced apoptosis causes progressive profound depletion of B and CD4+ T lymphocytes in humans. J Immunol 2001;166:6952-63.
Copyright © 2006 Massachusetts Medical Society.

Downloaded from www.nejm.org at MHRA-INFO CTR on August 14, 2006 .
Copyright © 2006 Massachusetts Medical Society. All rights reserved.

55

# 5.     NIBSC Special Cytokine Study and Follow Up Studies

## Initial cell-based testing of TGN1412

### Background

Following the Serious Adverse Events that occurred in all six recipients of the stimulatory CD28 Monoclonal antibody (Mab) TGN1412 during its clinical trial at Northwick Park on 13 03 06, an initial phase of analysis was carried out which showed that the drug complied with its specification and appeared to be of clinical grade.  Much of this evaluation was carried out at NIBSC and is now complete.

Following discussions with the MHRA, the chairman of ESG and in-house consideration, a second phase of the investigation was begun at NIBSC to investigate the mechanisms underlying the pathological responses and to gain additional information about the biological activities of this molecule.  Adverse reactions to TGN1412 began soon after its injection and continued for a period of weeks.  The initial responses of fever, pain, and organ failure due to hypotension were consistent with responses to bacterial endotoxin even though the drug was not found to be contaminated with endotoxin in the bacterial endotoxins (Limulus) test.  Also, the drug passed a "classical" rabbit pyrogen test, which is used to detect both endotoxin and "non-endotoxin" pyrogenic contaminants, but it is relatively insensitive compared with in vitro tests (1) and there are examples of the rabbit pyrogen test failing to detect contaminants that subsequently caused adverse reactions in man (*2,3*).

For some years an alternative "non-Pharmacopoeial" test for pro-inflammatory and pyrogenic contaminants has been applied to certain products associated with adverse reactions in man but which were negative in the bacterial endotoxins test or the rabbit pyrogen test or both (*1, 2, 3,4*).  The alternative test is variously described as an "*in vitro* pyrogen test*", "monocyte activation test" or "cytokine release test".  In this procedure, human peripheral blood monocytes, which respond to contaminants by releasing pro-inflammatory cytokine proteins, are incubated with the drug being tested and one or more cytokines in the cell-conditioned medium are quantified.  The monocytes are usually stimulated either as the mononuclear cell fraction or as diluted whole blood and the cytokine readouts are tumour necrosis factor alpha (TNF$\alpha$), interleukin-1$\beta$ (IL-1$\beta$) and interleukin-6 (IL-6) (*5,6*).

Since the initial phase of the adverse reactions to TGN1412 suggested the release of pro-inflammatory cytokines (e.g. TNF$\alpha$, IL-1$\beta$ and IL-6) it was decided to assess TGN1412 for cytokine releasing activity in two "cytokine release tests": one utilising peripheral blood mononuclear cells (PBMC) purified from human peripheral blood and one utilising diluted human peripheral blood.  In all experiments the blood was freshly drawn from healthy volunteers (NIBSC staff).  The procedure using PBMC was chosen because this system (with IL-6 as readout) gained regulatory significance when it was FDA-approved in 2002 for use at a pharmaceutical company as an end product release test; also, the procedure is used (with FDA-approval) for in process testing and has been used to good effect in detecting a non-endotoxin pyrogen (bacterial peptidoglycan) that was causing adverse drug reactions to a licensed product (*4*).  The test system using diluted whole

blood was chosen because this test system includes the neutrophils, platelets and red cells that are lost when the mononuclear cells are purified.  Unlike the PBMC-based test, tests using whole blood have been validated only for testing for endotoxin, though such tests do have a capability to detect "non-endotoxin" contaminants (*8,9*)

When testing for contaminants in cytokine-release tests, usually it is a requirement that the drug under test does not have intrinsic cytokine-releasing activity (*7*) but in the case of TGN1412, the severity and duration of the adverse drug reactions suggested that the drug might have intrinsic pro-inflammatory activity, especially as TGN1412 was negative in the bacterial endotoxins test and the rabbit pyrogen test.  So, in the present study, the cytokine release test is being used to detect responses that could be due to either contaminants or an unwanted biological activity or both.

In addition to the cytokine release testing, experiments were begun to investigate effects on lymphocyte proliferation mediated by TGN1412 as this could be implicit in the phenomena observed in the six volunteers at Northwick Park.


**Methods**


**Tests using the peripheral blood mononuclear cell fraction, PBMC**

The PBMC cytokine release test applied at NIBSC is a method that has been harmonised with tests in use in the pharmaceutical industry (*7*).  PBMC are isolated, by density-gradient centrifugation, from human heparinised peripheral blood that is not more than four hours old.  The test preparation is cultured with 0.5 to 2.0 million PBMC/ml in culture medium and the donor's own plasma.  The culture is carried out, using aseptic technique and reagents and consumables that are sterile and pyrogen-free, at $37\pm1°C$, in $5\%$ $CO_2$ in humidified air for 16 to 24 h.  The cytokine responses to the test preparation are compared, in validated ELISAs, with responses to standard endotoxin and appropriate positive controls, in this case the CD3-stimulating monoclonal antibody UCHT-1 and the lectin phytohaemagglutinin (PHA).  Readouts were: IL-6, TNFα, IL-8, Tissue Factor (TF), IL-2, interferon gamma (IFNγ)

(Not all readouts were measured in all tests).  Two experiments were carried out using PBMC: in each experiment PBMC from four independent donors were tested.


**Tests using diluted whole blood**

Human heparinised peripheral blood (20% final concentration) that is not more than four hours old is cultured with the test preparation.  Aseptic technique and reagents and consumables that are sterile and pyrogen-free are used.  The blood culture is carried out at $37\pm1°C$, in $5\%$ $CO_2$ in humidified air for 16 to 24 h.  The cytokine responses to the test preparation are compared, in validated ELISAs, with responses to standard endotoxin and appropriate positive controls, in this case the CD3-stimulating monoclonal antibody UCHT-1 and the lectin phytohaemagglutinin (PHA).  Readouts were: IL-6, TNFα, IL-8, Tissue Factor (TF), IL-2, interferon gamma (IFNγ).  (Not all readouts were measured in all tests).  Four experiments were carried out using diluted whole blood: in each experiment blood from four independent donors was tested.

**Rationale for doses of TGN1412 tested in cytokine release tests**

TGN 1412 was injected into volunteers at 0.1 mg/kg and into monkeys at the much higher dose of 50 mg/kg, i.e. 500x the human dose.

When given as 0.1 mg/kg. Average male = 70 kg, and has approximately 5 litres of blood.  Drug dissolves in plasma which is approximately 60 % of total blood volume and so effective dilution volume is 3 litres.

0.1 mg/kg x 70 kg = 7 mg TGN 1412 per 3 litres plasma
$$= \text{approx 2 mg/litre plasma}$$
$$= \text{approx 2 } \mu\text{g/ml plasma}$$

Dose given to monkeys = 50 mg/kg = 500x more than that given in man.  The larger dose is equivalent to approx 1000 μg/ml.

So, TGN 1412 was tested in cytokine release tests at 1000, 500, 250, 125, 62.5, 31.25, 16, 8, 4 and 2 μg/ml final concentration.

**Tests for cell proliferation**

Interaction of TGN1412 with CD28 is reported to induce a proliferative stimulatory signal.  To investigate this, cell proliferation was assessed using a flow cytometry based assay that utilised "wet" and "dry" coating of Abs.  Proliferation stimulated by TGN1412 wet coated at 10 μg/ml and in some wells air dried (giving 1 and 10 μg per well) was assessed in 96 well plates.  The mitogens PHA (10 μg/ml) and anti-CD3 monoclonal antibody UCHT-1 coated at 10 μg/ml and in some wells air dried (giving 1 μg per well) were employed as positive controls.  Briefly, isolated human PBMC were pulsed with the fluorescent membrane dye PKH26, washed and plated in triplicate at 1 x $10^6$ PBMC per ml.  After 72 h, PBMC were counterstained with anti-human CD4 FITC and anti-human CD8 APC conjugates, washed and fixed with 2% v/v paraformaldehyde.  Triplicates were pooled for acquisition of 30,000 lymphocytes using a Becton Dickinson FACSCalibur flow cytometer.  Lymphocytes undergoing proliferation divide their cell membrane between the daughter cells resulting in a halving of fluorescent dye and a reduction in fluorescent intensity compared with parent and resting cells.  This appears as bands of cells with reducing PKH26 fluorescence on the flow cytometer.  Using cell cycle analysis software the reduction in fluorescent intensity of proliferating cells was used to calculate precursor frequencies.  The CD4/CD8 ratio of proliferating cells was analysed using Cell Quest software.  The methodology has been described previously (*10,11*).

**Results**

TGN1412 (2 to 1000 μg/ml) incubated with PBMC (1 m cells/ml) for 16-24h did not stimulate the production of IL-6, TNFα, IL-8 or Tissue Factor (TF).  Results for IL-6 and TNFα are shown in the two figures immediately below.





Similarly, TGN1412 (2 to 1000 μg/ml) incubated with diluted whole blood (20% v/v) for 16-24h did not stimulate the production of IL-6, TNFα, IL-8 or IFNγ (data not shown). In subsequent experiments with whole blood, the incubation time was increased to 48 or 72 h and IL-2 and IFNγ were the chosen readouts. In some of these experiments the TGN1412 tested was taken from a second vial and the Biacore binding assay was repeated on the TGN from this second vial to confirm that the TGN1412 had not lost any of its capability to bind to CD28. The Biacore results for the TGN1412 from the second vial were very similar to those obtained in the initial evaluation, confirming that the

59

TGN1412 had retained its biological activity. TGN1412 (8 to 1000 µg/ml) incubated with diluted whole blood (20% v/v) for 48 or 72 h did not stimulate the production of IL-2 or IFNγ. In contrast, the positive controls of the CD3 MAb UCHT-1 (0.5 to 10 µg/ml) and PHA (2.5 to 20 µg/ml) stimulated the release of IFNγ, and PHA (2.5 to 20 µg/ml) stimulated the release of IL-2. The IFNγ responses were somewhat variable, i.e. donor-dependent, but in any given experiment most donors responded, though for some donors, UCHT-1 was a more effective stimulus than PHA and for some donors PHA was a more effective stimulus than UCHT-1. However, the striking observation was that TGN1412 was ineffective when simply incubated with whole blood or PBMC. The two figures immediately below illustrate this finding.





60

The lack of effect of TGN1412 in the above experiments contrasts with its effectiveness in an initial experiment to investigate its effects on lymphocyte proliferation: see the figure below. In this experiment, TGN1412 was "wet coated" or "dry-coated" onto the walls of the 96-well plate. When "dry-coated", but not "wet coated", at 1 μg/well, TGN1412 stimulated cell proliferation, though it was less effective when "dry coated" at 10 μg/well. The level of stimulation with TGN1412 (1 μg/well) was similar to that seen with UCHT-1 and PHA. Although the results of this experiment are still being analyzed, further proliferation experiments are already planned, as are further cytokine release tests in which TGN1412 is "dry-coated" onto the wells of 96-well plates, since this appears to be a more effective way of presenting the drug to cells.



Flow cytometric analysis of lymphocyte proliferation following stimulation with 1ug per well of TGN1412 for 72hours.

**Conclusions from initial experiments and suggestions for further experiments**

Simply adding TGN1412 to PBMC or diluted blood does not stimulate the release of a "cytokine storm" or stimulate lymphocyte proliferation. This suggests that the dramatic adverse effects experienced by the volunteers at Northwick Park cannot be explained by a rapid induction of cytokines resulting from simple ligation of CD28. "Dry coating" TGN1412 onto the walls of the wells of 96-well plates would appear to be a more effective methodology, possibly due to cross-linking.

Adding TGN1412 to the wells of plates coated with an antibody against human IgG4 Fc should be investigated. Additionally, experiments that address a possible role for sCD28 in human and cynomolgus macaque (cyno) blood, the effects of TGN1412 on responses to other stimuli, e.g. endotoxin, and the effects of TGN1412 on endothelium and endothelium + PBMC might provide valuable information about TGN1412. Flow cytometry to assess intracellular cytokines and *in vivo* cyno experiments to repeat the toxicology at the dose injected in man, the 500x larger dose tested in cynos and an intermediate dose or doses would also be very informative.

61

## Follow up cell-based testing of TGN1412

### Background

Analysis of TGN1412 from unopened bottles and syringes recovered from Northwick Park Hospital was completed in October 2006 (please see report of Robin Thorpe to MHRA) and showed that the drug complied with its specification and appeared to be of clinical grade.  Following discussions with the MHRA, the chairman of ESG and in-house consideration, a second phase of the investigation was begun at NIBSC in an attempt to learn something of the mechanisms underlying the pathological responses and to gain additional information about the biological activities of this molecule.  An interim report (10 07 06) of the cell-based testing of TGN1412 has been presented to the ESG. Since that time, further cell-based testing of TGN1412 has been carried out at NIBSC and the results of this work are summarised below.   While much has been learned, particularly concerning the most effective way to present TGN1412 to cells *in vitro*, it should be noted that the work is still ongoing and some of the results require confirmation.

### Methods

*In vitro* experiments.  Cytokine release studies using peripheral blood mononuclear cells (PBMC) and tests for lymphocyte activation and proliferation using flow cytometry were carried out as described in the interim report of 10 07 06 except that TGN1412 was presented to human or Cynomolgus macaque PBMC in a number of different protocols:

(1) As an aqueous solution
(2) Wet coated directly onto the walls of the wells of 96-well plates
(3) Dry coated directly onto the walls of the wells of 96-well plates
(4) As an aqueous solution, in the presence of a monolayer of cells derived from human endothelium (HUVEC(JR))
(5) As an aqueous solution, in combination with aqueous anti-human Fc antibody
(6) Wet coated onto an anti-human Fc antibody that had itself been dry coated onto the walls of the wells of 96-well plates

Cytokine release studies at 16-24 h were confined to protocols (1)–(4) because all anti-human Fc antibodies tested were positive for bacterial endotoxin, which is a potent stimulus for the release of pro-inflammatory cytokines, and tests for lymphocyte activation and proliferation remain to be carried out on lymphocytes taken from the co-cultures with human endothelial cells.

As previously, appropriate positive and negative controls were included: CD3-stimulating monoclonal antibody UCHT-1, the lectin phytohaemagglutinin (PHA) and an isotype matched (IgG4) human monoclonal antibody of irrelevant specificity, i.e. not anti–CD28.

Additional studies to measure the expression of T lymphocyte activation markers after a 3-day stimulation with TGN1412 and intracellular cytokine staining for interleukin-2 (IL-2) and interferon gamma (IFNγ) after a 6-hour stimulation with TGN1412 have now been performed.

*In vivo* experiments.  These were carried out in 12 Cynomolgus macaques, two of which were injected intravenously with TGN1412 buffer (control) and two of which were injected intravenously with each of the following doses of TGN1412: 0.1, 0.5, 5.0 and 50 mg/kg, using TGN1412 from a freshly opened vial of the drug.  Additionally, two animals were injected with 0.1 mg/kg of TGN1412 taken from syringe #5, which was recovered from Northwick Park.  TGN1412 was administered as a slow intravenous injection that mimicked the rate of administration in the Northwick Park trial as closely as was practicable.  The rationale for the choice of these doses of these materials is as follows: 0.1 mg/kg was the dose administered to the six volunteers at Northwick Park and 5.0 and 50 mg/kg were the doses injected in Cynomolgus macaques in the pre-clinical safety testing reported by TeGenero; 0.5 mg/kg was chosen to fill in the dose–response curve between 0.1 and 5.0 mg/kg and syringe #5 contained an aliquot of TGN1412 associated with the most severe adverse events.

TGN1412 was administered to Cynomolgus macaques under anaesthesia.  Anaesthesia was maintained for 2 hours after administration of TGN1412 to allow monitoring of blood pressure, heart rate and core body temperature at hourly intervals.  Blood samples we taken at these times for haematology, biochemistry and liver function tests, cytokine release measurements and pharmacokinetics.  This allowed for detailed monitoring of any immediate adverse reactions.  Twenty-four hours after administration of TGN1412, macaques were anaesthetized for a peripheral lymph node biopsy to look for changes in lymphoid tissue lymphocytes and to take blood samples for haematology, biochemistry and liver function tests, cytokine release measurements and pharmacokinetics.  A further blood sample was taken at day 3 or 4 for haematology, cytokine release measurements and pharmacokinetics.  Macaques were terminated on day 7, blood samples taken for testing and tissues for histopathology.

**Results**

**Cytokine release studies.**

TGN1412 (2.0–1000 µg/ml = 0.25–125 µg/well) added in aqueous phase to PBMC (200,000 cells/well) did not stimulate the release of tumour necrosis factor alpha (TNF), interleukin-6 (IL-6) and IL-8.  Similarly, TGN1412 wet coated onto the walls of wells (1 µg/well) was not a stimulus for pro-inflammatory cytokine release from PBMC (125,000 cells/well).  In contrast, TGN1412 (1.0 and 10 µg/well, but not 0.1 µg/well) dry coated onto the walls of wells in which PBMC (125.000 cells/well) were cultured for 16-24h stimulated the production of TNF, IL-6 and IL-8.  The magnitude of the cytokine responses was in the ratio IL-8>TNF>IL-6.  TGN1412 (0.1, 1.0 and 10 µg/ml) added in aqueous phase to a co-culture of PBMC (50,000 or 125,000 cells/well) and human endothelial cells (a monolayer of 15,000 or 68,000 cells/well) and cultured for 16-24h stimulated the production of TNF, IL-6 and IL-8.  The magnitude of the cytokine responses was in the ratio IL-8>TNF=IL-6.

**Tests for lymphocyte activation and proliferation.**

**Proliferation studies**

Human PBMC pulsed with the fluorescent membrane dye PKH26 were assessed by flow cytometry for their proliferative response to TGN1412 at doses ranging from 0.5ug/ml to

1000ug/ml.   TGN1412 in aqueous phase, wet coated onto plates or cross-linked in aqueous phase with an anti-human FC antibody did not produce any significant proliferative response.   Only TGN1412 immobilised by dry coating onto plates or captured in aqueous phase by anti-human Fc antibody dried onto plates, followed by washing, resulted in significant lymphocyte proliferation in experiments in which PBMC were incubated for 3 days with an immobilised isotype control antibody or TGN1412. Phenotypic analysis of proliferating lymphocytes identified CD4+ lymphocytes as the principle responding lymphocyte population.   Analysis of the proliferation data showed that all of the CD4+ cells were committed to dividing, there eventually being no resting CD4+ cells remaining.   The level of proliferation induced by immobilised TGN1412 was profound and equivalent to the response observed with mitogens used as positive controls in this assay.   Even greater proliferative responses were achieved with anti-human Fc antibody captured TGN1412, suggesting that the responses measured with dried on TGN1412 may be an underestimation of the magnitude of the response.   Stimulation of lymphocytes with TGN1412 was accompanied by up regulation of the activation marker CD25 by proliferating cells.

Proliferative responses were quantified as precursor frequencies per $10^6$ lymphocytes. Measurement of proliferative responses to TGN1412 with this assay identified the optimal dose response as between 2 and 10 µg/ml.   With higher doses of 100 or 1000µg/ml, equivalent to the doses tested in Cynomolgus macaques, either a low or no proliferative response was observed.   In contrast, with 2µg/ml, equivalent to the human dose administered at Northwick Park, a strong polyclonal proliferative response was observed.

Following a 3-day stimulation with TGN1412, lymphocytes washed and transferred to fresh plates without TGN1412 continued to proliferate for a further 3 days.

**Intracellular cytokine staining**

Human PBMC stimulated with immobilised TGN1412 for 6 hours in the presence of a secretion inhibitor were assayed for IL-2 and IFNγ.   Stimulation with immobilised TGN1412 for 6 hours resulted in significant production of IL-2 by CD4 positive lymphocytes compared with controls.

The level of IL-2 positive lymphocytes was equivalent to the response seen with mitogens used as strong positive controls in this assay.   Staining for intracellular IFNγ on CD4 positive lymphocytes was observed following stimulation with immobilised TGN1412.   However, the response was much smaller than that observed with mitogen which activates CD8 positive lymphocytes to produce far more IFNγ than CD4 positive lymphocytes.   The dose–response of immobilised TGN1412 for intracellular cytokine staining matched the dose–response of proliferative responses.   Even higher levels of IL-2 positive lymphocytes were obtained with anti-Fc antibody captured TGN1412, suggesting that the responses measured with dried on TGN1412 may be an underestimation of the magnitude of the response achievable with TGN1412.

The intracellular cytokine staining responses for IL-2 and IFNγ matched the ELISA data for supernatants from 3 day cultures stimulated with TGN1412.   That is high levels of IL-2 and low levels of IFNγ in response to TGN1412 at small but not large doses.

**Data from Cynomolgus macaques**

At all doses of TGN1412 administered to Cynomolgus macaques no gross adverse reaction was observed in terms of general health, blood pressure, heart rate, temperature, haematology, biochemistry or liver function.  Further analysis, tests and histopathology are ongoing.  There was no adverse reaction associated with administration of syringe material at the human dose.

In initial *in vitro* assays, in which PBMC from Cynomolgus macaques were stimulated with immobilised TGN1412, cells did not undergo a proliferative response.  Early indications are that Cynomolgus macaque PBMC are activated by TGN1412 but do not undergo proliferation.  However, when exogenous human IL-2 was added to cultures of Cynomolgus macaque PBMC stimulated with immobilised TGN1412 then a strong proliferative response was observed.  No proliferative response was observed following the addition of human IL-2 alone to Cynomolgus macaque PBMC cultures.

Summary of *in vitro* activation and proliferation responses of human and Cynomolgus macaque lymphocytes to immobilised TGN1412

|  | TGN1412 evoked activation | TGN1412 evoked proliferation | IL-2 evoked activation | IL-2 evoked proliferation | TGN1412+IL-2 evoked activation | TGN1412+IL-2 evoked proliferation |
|---|---|---|---|---|---|---|
| Human PBMC | ++++ | ++++ | – | – | Could not be tested* | Could not be tested* |
| Macaque PBMC | ++ | – | – | – | +++ | +++ |

*: TGN1412 stimulates activation, IL-2 secretion and proliferation when given alone.

**Conclusions**

TGN1412 is here shown to have the capability to evoke cytokine release and lymphocyte proliferation *only* when presented to cells in the effective manner identified in these studies.  When immobilised by drying onto plates, binding to endothelial cells or captured by immobilised anti-Fc antibody, TGN1412 stimulated the release of cytokines, including TNF, IL-2, IL-6, IL-8, and IFNγ, and profound proliferation of human CD4+ lymphocytes in *in vitro* assays.  TGN1412 did not induce cytokine release or proliferative responses when presented in aqueous phase or when cross-linked in aqueous phase.  The data from these *in vitro* assays suggests that the dose of TGN1412 given to volunteers in the Northwick Park trial was close to the maximum immunostimulatory dose.  In contrast to man, Cynomolgus macaques given TGN1412 at any of the doses tested did not experience any gross adverse reactions and Cynomolgus macaque lymphocytes did not proliferate when stimulated with immobilised TGN1412 unless IL-2 was added to cultures.

**Further studies**

Experiments are underway to determine whether or not pulsed TGN1412, i.e. added to a monolayer of endothelial cells with unbound TGN1412 then washed away before addition of PBMC, is a more effective stimulus for cytokine release.  This could be the

case since unbound TGN1412 would be expected to compete with the bound TGN1412 and so serve as a competitive antagonist of the bound TGN1412 at CD28 receptors. Also, experiments are underway with co-cultures of human PBMC and human MRC5 fibroblasts to determine whether or not a monolayer of cells other than endothelial cells can be used to bind TGN1412 to render it biologically active *in vitro*. These experiments will then be repeated with Cynomolgus macaque PBMC substituted for human PBMC as far as is practicable given the small volumes of Cynomolgus macaque blood that is available for such studies. Additionally, TGN1412–stimulated inflammatory cytokine release from human diluted whole blood and Cynomolgus macaque diluted whole blood will be compared.

## References

1. Duff, G.W. and Atkins E. (1982) The detection of endotoxin by in vitro production of endogenous pyrogen: comparison with Limulus Lysate Gelation. J. Immunol Methods 52: 323-331, 1982

2. Dinarello, C.A., O'Connor, J.V., LoPreste, G., Swift, R.L. (1984). Human leukocyte pyrogen test for detection of pyrogenic material in growth hormone produced by recombinant Escherichia coli. J. Clin. Microbiol, 20, 323-9. 1984

3. Poole, S., Thorpe, R., Meager, A., Hubbard, A.R., Gearing, A.J.H. (1988) Detection of pyrogen by cytokine release. Lancet, 8577, 130.

4. Martis L et al. Aseptic peritonitis due to peptidoglycan contamination of pharmacopoeia standard dialysis solution. Lancet, 2005, 365(9459): 588-94.

5. Poole, S., Gaines Das, R.E. (2001) Towards a 'human pyrogen test'. J Parenteral Sci. 6(2), 63-4.

6. Poole, S., Mistry, Y, Ball, C., Gaines Das, R.E., Opie, L.P., Tucker, G., Patel, M. (2003) A rapid 'one-plate' in vitro test for pyrogens. J Immunol Methods, 274, 209-20.

7. Gaines Das RE, Brugger P, Patel M, Mistry Y, Poole S. Monocyte activation test for pro-inflammatory and pyrogenic contaminants of parenteral drugs: test design and data analysis. J Immunol Methods, 2004, 288(1-2): 165-77.

8. Nakagawa, Y., Maeda, H., Murai, T. (2002) Evaluation of the *in vitro* pyrogen test system based on proinflammatory cytokine release from human monocytes: comparison with a human whole blood culture test system and with the rabbit pyrogen test. Clin Diagn Lab Immunol, 9, 588-97.

9. Hoffmann et al. International validation of novel pyrogen tests based on human monocytoid cells. J Immunol Methods, 2005, 298:161-73.

10. Givan AL, Fisher JL, Waugh M, Ernstoff MS, Wallace PK. A flow cytometric method to estimate the precursor frequencies of cells proliferating in response to specific antigens. J Immunol Methods. 1999 Nov 19;230(1-2):99-112.

11.   Wade-Evans AM, Stott J, Hanke T, Stebbings R, Berry N, Lines J, Sangster R, Silvera P, Walker B, MacManus S, Davis G, Cowie J, Arnold C, Hull R, Almond N. Specific proliferative T cell responses and antibodies elicited by vaccination with simian immunodeficiency virus Nef do not confer protection against virus challenge. AIDS Res Hum Retroviruses. 2001 Nov 1;17(16):1517-26.

## 6.    Summary of Stakeholder Consultation

**Stakeholder Oral Presentations to the Expert Scientific Group**

A wide range of stakeholders identified by the Chairman were invited to submit oral or written views concerning the incident.
The following stakeholders made oral presentations to the Chair and representatives of the Expert Scientific Group.

**Stakeholders**

Dr. Brian Gennery, Director of the Clinical Research Centre, University of Surrey,
Professor Patrick Vallance, Academy of Medical Sciences,
The Association of the British Pharmaceutical Industry (ABPI) and the BioIndustry Association (BIA), represented by Sir Colin Dollery, Dr. David Chiswell, Dr. Richard Peck, Dr. Peter Lloyd, Dr. Richard Barker and Ms Aisling Burnard,
Professor Terry Hamblin, Professor Martin Gore and Dr. Monica Preuss, representing the Gene Therapy Advisory Committee (GTAC),
Dr. Sally Burtles, representing Cancer Research UK,
Dr Malcolm Boyce, Chairman of the Association for Human Pharmacology in the Pharmaceutical Industry (AHPPI),
Dr. J. S. de Bono, Institute of Cancer Research
Professor Peter Weissberg, British Heart Foundation,
Professor Mark Feldmann, Head, Kennedy Institute of Rheumatology Division, Imperial College,
Dr Liz Allen, Chair, Contract Clinical Research Association,
Professor Robert Hawkins, Cancer Research UK professor of Medical Oncology, Christie Hospital, Manchester.

**Expert Scientific Group Representatives**

Professor Gordon Duff (Chair), Professor Robert Lechler, Sir Leszek Borysiewicz, Dr Stephen Inglis, Ms Vivienne Parry, Professor Mark Walport, Professor Alex Markham., Professor Neva Haites, Professor Andrew McMichael, Sir Bob Hepple, Professor Munir Piromohamed, Professor Johannes Löwer, Professor Lars Klareskog, Professor Kevin Park, Professor Herman Waldmann.

**Opening remarks by the Chairman to the stakeholders**

The stakeholders were welcomed by the Chair who thanked them for meeting with Members of the Expert Scientific Group.  He explained that the ESG was independent of the MHRA and CHM and would seek to identify generally applicable factors that conferred a high degree of risk to new pharmacological agents.  It would then attempt to codify these risk factors in order to make recommendations on how to optimise the safety of first-in-man clinical trials without creating unnecessary barriers to the development of useful new medicines.  Part of this process would be to take the opinions of a wide range of stakeholders from the academic, industrial and public arenas; hence, the reason for "stakeholder consultation" meetings.

68

The Chair explained that all papers and proceedings were confidential until the report of the ESG was published when all information, excepting material withheld under Section 38 of the FOIA, would enter the public domain.

**Dr. Brian Gennery, Director of the Clinical Research Centre, University of Surrey.**

Dr Gennery has a long history of responsibility for Phase I clinical trials and intimated that the Clinical Research Centre at the University of Surrey carried out a lot of studies for industry. He stated that the TGN 1412 incident prompted him to contact the Expert Scientific Group with his views regarding the quality and quantity of data provided by sponsors to clinical units.
The presentation was on the information needs in early stage clinical trials and although the information he presented to the ESG was not directly related to the TGN 1412 incident, it was relevant to the wider safety of subjects in early phase clinical development.
The presentation covered general principles, chemistry and pharmacy of trial products, pre-clinical biology and safety testing, adequacy of clinical data and the importance of the investigator's brochure.

**Professor Patrick Vallance, Academy of Medical Sciences.**

Professor Vallance chaired the Academy of Medical Sciences Working Group set up following the TGN 1412 incident. The Academy had previously provided the Expert Scientific Group on Phase One Clinical Trials with a position paper on testing antibody therapies which was the subject of his presentation.  He recognised that the Academy did not have access to information not in the public domain, but that the conclusions reached by the Working Group were generally valid as best practice principles for this type of therapy.
The presentation covered the predictive value of pre-clinical data, prediction of the starting dose, considerations of the clinical site and identification of risk factors.
The predictive value of pre-clinical testing included the importance of proportionate effects in animal and human *in vitro* and *in vivo* data and the importance of parallel comparisons of drug effects in human and animal cells *in vitro* in judging the predictive value of the animal model.

**The Association of the British Pharmaceutical Industry (ABPI) and the BioIndustry Association (BIA), represented by Sir Colin Dollery, Dr. David Chiswell, Dr. Richard Peck, Dr. Peter Lloyd, Dr. Richard Barker and Ms Aisling Burnard.**

Dr Chiswell introduced the group and explained that the ABPI/BIA team were representing a single taskforce of approximately 20 experts, co-chaired by Sir Colin Dollery and himself, who were studying the lessons from the TGN1412 incident.   He stated that a forensic inquiry into TGN 1412 had not been carried out as not all of the information was in the public domain, rather a "best practice" guide would be presented for future studies.
It was stressed that the current review procedures and regulations relating to early phase clinical development had proved to be most effective and had made such studies very safe.  The TGN 1412 incident should be viewed as wholly exceptional and any new recommendations should not lead to a check list approach being adopted.

69

The APBI/BIA presentation covered the mechanism of action and disposition of biological agents, animal models used and their predictability, the translation of pre-clinical data into the clinical situation, the conduct of the trial itself, manufacturing and control of biologicals, protocol and regulatory review and education and training of scientists and physicians with regard to safety assessment.

**Professor Terry Hamblin, Professor Martin Gore and Dr. Monica Preuss, representing the Gene Therapy Advisory Committee (GTAC).**

Professor Gore has a long experience of protocol review and has been following development of monoclonal antibodies for several years.  Professor Hamblin has a long history of immunotherapy and had been treating patients with antibodies since 1974.   He presented unpublished data regarding a study he had carried out in a single patient subject in 1994 using a tri-specific anti-CD3/CD2/CD28 antibody.
The presentation covered two main areas, first dosing in man, healthy volunteers versus patients and the first in man study of a tri-specific anti-CD3/CD2/CD28 antibody which was performed in 1994.  The effects of this antibody had parallels with the effects of TGN1412.

**Dr. Sally Burtles, representing Cancer Research UK,**

Dr Sally Burtles  has responsibility for early phase clinical trials and pre-clinical development at Cancer Research UK and informed the ESG that Cancer Research UK was very active in bringing new cancer treatments into man.  Dr Burtles described the CRUK portfolio of projects and it was noted that 9 were biological products, some of which fell into the Expert Scientific Group's terms of reference
Her presentation was on the translation from pre-clinical studies to first in man trials and the design of these trials.   The areas covered were general experience, expertise and experience, minimising the use of animals, independent peer review of studies and data, oncology drug development, risk-benefit analysis, transition into man and safety considerations.
.
**Dr Malcolm Boyce, Chairman of the Association for Human Pharmacology in the Pharmaceutical Industry (AHPPI),**

Dr Boyce is the Clinical Director of a phase I trials unit with an interest in clinical pharmacology.  He is also Chairman of the Association for Human Pharmacology in the Pharmaceutical Industry (AHPPI).  AHPPI was founded in 1988 and has 162 members with representation from most of the big pharmaceutical companies and contract research organisations (including Parexel). The main purpose of AHPPI was to provide continuing education in clinical pharmacology to its members.
Dr Boyce delivered a presentation entitled "First administrations of a new drug substance to humans".
The presentation covered Phase I units in the UK,  trial sponsor, types of trial, biological versus small molecules, pre-trial considerations, staff training, dialogue amongst concerned parties, past safety in phase I trials, healthy subjects versus patients, choice of dose and study design, review and assessment.

**Dr. J. S. de Bono, Institute of Cancer Research**

His presentation was entitled "Phase one trials and cancer" and covered what were considered key issues, a review of cancer phase I trials, antibody therapeutics, antibody phase I trials, minimising risk – maximising benefit and volunteer studies for cancer drugs.
He stressed that, for cancer studies, that different reasons existed for using healthy volunteer or cancer patients and that the chance of benefit with novel therapeutics had increased in recent years. Antibody therapeutics has been deemed a major success in cancer therapy which had led to significant therapeutic advances.

**Professor Peter Weissberg, British Heart Foundation**

Professor Weissberg informed the ESG that the British Heart Foundation (BHF) supported a wide range of research, including clinical trials; they did not, however, commission research.  He said that the BHF position was that patient safety was the first priority and it supported decreasing potential risks to subjects in phase I clinical trials. He considered that it was important to learn as quickly as possible from any adverse events that occurred during a clinical trial and suggested that trial data on adverse events should be submitted to a central point (e.g. the regulatory authority) that would then promulgate the information to relevant parties.

**Professor Mark Feldman FRS (Head, Kennedy Institute of Rheumatology, Imperial College London)**

Professor Feldman delivered a presentation entitled "Trial Design for Species Specific Molecules".  The Kennedy Institute's experience of developing and using an anti-TNFα monoclonal antibody in rheumatoid arthritis and their approach to risk reduction were described  Professor Feldman completed his presentation by discussing methods to improve the testing of new species specific therapeutics including extensive *in vitro* analysis and the use of transgenic mice.

**Dr Liz Allen (Chair, Contract Clinical Research Association)**

Dr Allen was joined by Dr B Holt and delivered a presentation entitled "Considerations of Phase I Studies with Biologics and NCEs with Novel Targets".
Members were informed that the Contract Clinical Research Association (CCRA) was a trade organisation with 28 members, 9 of which were involved in phase I studies.
The CCRA considered that in the pre-clinical review of biologics and NCEs with specific targets, safety considerations were paramount and special consideration should be given to the mechanism of action and potential consequences of target effects and to the predictability and homology of animal models.
It was stated that safety of phase I clinical trials in the UK was very good and that the TGN 1412 experience was unprecedented. Data was provided showing that from 1992 to 2000 a serious adverse event had occurred in 171 subjects out of 81,471 (0.21%).

71

**Professor Robert Hawkins (Cancer Research UK Professor of Medical Oncology, Christie Hospital, Manchester)**

Professor Hawkins delivered a presentation entitled "Clinical Development of Cancer Immunotherapies" in which he related his experiences working with cancer vaccines, targeted super-antigens and gene modified T-cells.

*Full details of the oral presentations and associated discussions are presented in the complete minute of the meetings in Appendix C.*

## Stakeholder Written Submissions to the Expert Scientific Group

The following stakeholders provided written submissions.

ABPI / BIA, Joint Report of the Early Stage Clinical Trial Taskforce,
Faculty of Pharmaceutical Medicine of the Royal Colleges of Physicians
Nuffield Council on Bioethics (Professor Sandy Thomas, Director,)
Professor Sir Ravinder Maini, Kennedy Institute of Rheumatology, ICL
Dr Camilo Colaco, ImmunoBiology Ltd, Cambridge
National Cancer Research Institute, Consumer Liaison Group (Mr Roger Wilson (Chair)
The Royal Society (Professor David Read FRS , Biological Secretary and Vice President)
Dr Lynda Wright, Executive Director, The Organisation for Professionals in Regulatory Affairs
Kate Webb, Senior Policy Adviser, Which.
The Royal Statistical Society, Professor Tim Holt,
Focus on Alternatives, Dr Gill Langley,
J Robinson Associates,
Datamonitor, Press release.

### ABPI / BIA, Joint Report of the Early Stage Clinical Trial Taskforce

A full report was submitted which covered the background to the incident, mechanisms of action and biological activity, selection of species/animal models for safety evaluation, translation of pre-clinical data to the clinic, clinical trials conduct, manufacturing, protocol and regulatory review and  education and training.  Findings and recommendations on these areas were discussed and points to consider for first time in man studies with novel biopharmaceuticals were put forward.

### Faculty of Pharmaceutical Medicine of the Royal Colleges of Physicians

This paper focussed on the areas of review of information prior to clinical trials, the clinical procedures adopted in trials, the responsibilities of sponsors and reviewers and the training and competence of staff involved in clinical trials.

**Nuffield Council on Bioethics (Professor Sandy Thomas, Director,)**

This paper investigated the issues of informed consent and the inducements offered to trial participants and also covered the validity of research involving animals and replacements for their use in research.

**Professor Sir Ravinder Maini, Kennedy Institute of Rheumatology, ICL**

The comments provided in this document include the ability of animal models to predict toxic effects, the capacity to recognise toxic effects and the need to react swiftly and appropriately.  It also states that first time in man studies should be undertaken by clinicians who understand the biology of the target and the expected response.

**Dr Camilo Colaco, ImmunoBiology Ltd, Cambridge**

This was represented as an article published in the May 5th issue of The Scientist and the recommendation of the author is to develop a mechanism whereby external expert review panels can liaise with the MHRA to provide timely relevant and confidential expert input.

**National Cancer Research Institute, Consumer Liaison Group (Mr Roger Wilson (Chair)**

The issues addressed in this submission covered the consent process, animal research, Standard Operating Procedures, participant selection, simultaneous dosing and the analysis of data generated in previous studies.

**The Royal Society (Professor David Read FRS, Biological Secretary and Vice President)**

This paper focussed on three specific areas, biological molecules with novel mechanisms of action and new agents with a highly species specific action, new drugs directed towards immune targets and the validity of pre-clinical testing using animals.

**Dr Lynda Wright, Executive Director, The Organisation for Professionals in Regulatory Affairs (TOPRA)**

TOPRA's response included a background to the organisation and an outline of what it considered it can contribute to clinical trials and the wider area of education.

**Kate Webb, Senior Policy Adviser, Which.**

The Which response document was presented under the headings of general comments, clinical trial protocol, management of the trial, regulating the trial and conclusions and recommendations.

73

**The Royal Statistical Society, Professor Tim Holt,**

 The Society established a working party to review statistical design considerations for 'first in man' studies with particular reference to monoclonal antibodies and the wider class of new biologicals and biotechnologies.

**Focus on Alternatives, Dr Gill Langley,**

The written submission included sections on the perceived systemic weakness of animal tests, an approach to safer clinical studies and the need for a new paradigm and associated conclusions.

**J Robinson Associates,**

Did not give permission for publication in the report.

**Datamonitor, Press release.**

Independent commentary on Biologics driving growth in the pharmaceutical sector.

*Full details of the written submissions and associated documents are presented in Appendices C and D*

## 7.     Predicting Hazards in Pre-clinical to Clinical Transition

### Background

The TGN1412 trial had been approved by two European Regulatory Agencies and a local research ethics committee, yet all of the recipients of the antibody experienced unpredicted and very severe adverse reactions shortly after dosing.  The results of further laboratory tests are awaited, but so far there is no evidence that the serious adverse effects seen were caused by anything other than an 'on-target' effect of the antibody triggering a cytokine release syndrome in the trial volunteers.

As far as we can determine, such a serious adverse reaction in all recipients of a trial agent, as occurred with TGN1412, was unprecedented.  It highlighted an urgent need to review the safety of first-in-man trials of novel agents, and to examine how risks in medicines development are currently assessed and minimised by sponsors, investigators and regulators.

TGN1412 had undergone pre-clinical testing according to current regulatory requirements, but a safe starting dose for the first trial in humans had not been predicted from the pre-clinical studies.  Several of the laboratory tests that were performed in the pre-clinical development phase of TGN1412 were repeated by the National Institute for Biological Standards and Control (NIBSC), and similar results were obtained.

It is important to note, however, that further tests performed at NIBSC showed that it was possible to create conditions *in vitro* that resulted in TGN1412-induced release of cytokines and T cell proliferation in human blood cells. Immobilisation of the antibody by dry-coating it onto a plastic surface, or using an immobilised second antibody, or exposing human blood cells to TGN1412 in the presence of an endothelial cell monolayer resulted in cytokine release and/or T cell proliferation.

Notably, similar stimulatory effects on the proliferation of T cells from cynomolgus monkeys have not, so far, been reproduced *in vitro*, and cynomolgus monkeys showed no adverse reaction when given TGN1412 over a wide dose range *in vivo*.

These studies add information on the potential mechanism of the adverse reaction, and why pre-clinical tests performed in human and animal cells, and in animal models, failed to predict the human response to the starting dose of TGN1412 given in the trial.  The more recent results from work done at NIBSC, if confirmed and developed, may well point the way to different methods that should be included in pre-clinical testing in the future, particularly for agonistic (stimulatory) antibodies with cell surface targets.

The aim of the ESG has been to define what can be learned from the TGN1412 experience and to consider how far the findings can be generalised to increase the safety of human volunteers in future first-in-man trials of higher risk new agents.  Within our terms of reference, we examined whether and how hazards might be recognised in the nature of the agent, its pharmacological target and its intended recipients.

We concluded that there are identifiable hazards inherent in the nature of some new agents and in the molecular targets at which they are aimed. The recognition of these hazards is especially important for the safety of first-in-man clinical trials. The conclusions below summarise ESG discussions and take account of both written and verbal submissions received from stakeholders.

Toxicity of a new agent in a first-in-man trial may be seen early, occurring soon after administration, or late, occurring some time afterwards. The ESG focused on serious acute toxicity that occurs early, or immediately, and may often be life-threatening.  The need to monitor for evidence of late toxicity, and the duration of monitoring, are questions best addressed case-by-case, taking into account the type of agent, its pharmacological targets and its half-life *in vivo*.

We have not attempted to quantify or rank risk in any formal way, we use the term "higher risk agents" to mean those that fall within our terms of reference where risk factors can be recognised.

Many of our recommendations refer to decisions affecting the safety and value of first-in-man trials that we believe must be made on a case-by-case basis and be scientifically justifiable.  By this we mean that developers should provide justifications for case-by-case decisions and that the regulator should assess the justifications, taking into account the safety of trial volunteers and the information that will be gained.

The recommendations are intended to apply to first human exposures of higher risk agents within the terms of reference but some recommendations may apply to phase one trials in general.

## Inherent Hazards of Certain Types of New Medicines

### Species-specificity of action

Some medicines, especially biological medicines such as recombinant cytokines or polypeptide hormones designed to have affinity for human cellular receptors, and monoclonal antibodies selected against a human target antigen, may show a high level of species-specificity.

In general, agents aimed very specifically at human molecular targets may show much reduced activity in other species such as in mice, rats and rabbits, but have some activity in non-human primates where molecular structures are closer to those in humans.

As well as differences in molecular affinity for the target molecule, other factors can affect the biological response in a test animal, both quantitatively and qualitatively, compared with the response in the human.  For example, there may be a different tissue distribution of the molecular target, different cellular consequences of target binding, different cellular regulatory mechanisms, different metabolic pathways, or different compensatory responses to an initial physiological perturbation.

With new agents where there is evidence of species-specificity of action from *in vitro* studies with human cells compared with cells from a test species, the value of the *in vivo* response of the test species will be significantly reduced in terms of predicting the *in vivo* human response.

This problem may be more likely to arise with biological medicines, although an agent of any type, including small chemical molecules, if highly specific for a human target, may show species-specificity of action.

In practice this means that pre-clinical animal studies with relatively species-specific agents:

- may not reproduce the intended pharmacological effect in humans;

- may give misleading pharmacokinetic and pharmacodynamic results;

- may not reflect 'on-target' toxicity.

In addition, large human-compatible biological molecules are likely to cause immune responses in other species, and animal studies may not predict the effects of repeat dosing of such agents because of their immunogenicity.

Species-specificity of an agent does not imply that there is always an increased risk in first-in-man trials, but it makes pre-clinical evaluation of the risk in animal experiments much more difficult, and sometimes perhaps impossible. Therefore, a highly cautious approach is needed.

It should also be noted that similar responses in human and animal cells *in vitro* is not necessarily a guarantee that the *in vivo* responses will be similar.

Animal studies taking due regard of the three 'Rs', (refinement, reduction and replacement of animals in testing) remain necessary for many aspects of pre-clinical development of novel agents including testing of 'off-target' and 'on-target' toxicity and understanding the fundamental biology relevant to a new medicine and its target molecules in the human. Most, if not all, new medicines arise from biological insights gained from well-designed animal studies. The key point we want to make is the importance of deciding what can be learned from animal studies in the pre-clinical development of a new medicine, and what limitations there might be when it comes to predicting the response, and dose-response relationship, in humans.

**Novel agents and mechanisms of action**

The risks of unpredictable adverse reactions in first-in-man clinical trials are, in general, greater with agents that have very novel mechanisms of action since there will be no prior experience to guide pre-clinical development and the transition to clinical development.

If there is also species-specificity, the prediction of *in vivo* responses in the human, from *in vitro* studies with human cells or tissues, assumes a central importance.

77

Novel agents and novel mechanisms of action may encompass the physical nature of the agent, the target at which it is aimed, and the anticipated biological response(s).  All of these factors may be affected by the *in vivo* environment, for example, enzymatic and non-enzymatic modification of the agent, the *in vivo* distribution of the agent and its duration at sites of action, the extent and cellular distribution of the target, unpredicted downstream events including amplification by cellular or biochemical pathways that were not present in the *in vitro* models studied, and the effects of compensatory homeostatic mechanisms.

## Agonistic mechanism of action

Many new agents are designed to act through cellular receptors that have not been used previously as therapeutic targets.  Receptors on the surface of cells specifically recognise extracellular molecules generally known as ligands.  Ligand-receptor interaction leads to a cellular response, often transmitted to the cell nucleus by a biochemical signalling pathway.  In many cases the response in the nucleus is a change in the regulation of gene activity.  Some receptors, eg those for steroid hormones, are located within the cell itself and therefore have no signalling pathway from the cell surface.

New agents that target cellular receptors may either mimic the effect of the natural ligand, or may occupy the receptor without causing a cellular response but preventing the natural ligand from interacting with the receptor.  At receptor level, the former is described as a receptor agonist, the latter as a receptor antagonist.

Medicines can have agonistic or antagonistic actions on receptors that suppress cellular activity as well as receptors that stimulate cell activity.  Thus receptor agonists and antagonists can either stimulate or suppress cells depending upon the physiological role of the receptor with which they interact.

TGN1412 was designed as a super-agonist for the CD28 receptor on T lymphocytes, which is a co-stimulatory receptor in normal physiology, leading to activation of the T cell with both an increased production of cytokines and an increased rate of cellular proliferation.

In general, agents that have agonistic actions leading to cellular activation and proliferation may be associated with more risk, especially if their target is within a biological amplification cascade (see below).

## Potency

New agents may be engineered to have a more potent effect than the natural ligands they are designed to simulate.

For example, this might be achieved by:

- higher affinity for a receptor, or greater receptor occupancy compared with the natural ligand;

- greater signalling effect on the target receptor compared with the natural ligand;

- multiple valency that allows cross-linking of more than one target receptor.

The effects of some agents may also be exaggerated by pharmacokinetic properties that result in an increased exposure of target cells to the agent compared with the natural ligand.

TGN1412 was designed to interact with a different part of the CD28 molecule than the natural ligands for this receptor, resulting in direct stimulation of cellular signalling without requiring a co-stimulus from the T cell antigen receptor, as occurs in nature. It therefore has a novel mode of action.

TGN1412 by-passed the normal control mechanism that requires antigen stimulation to activate an immune response by expanding only those clones of T cells that carry an appropriate antigen receptor and, instead, stimulated many T cell clones independently of their antigen specificity.

TGN1412 is a high molecular weight monoclonal antibody that does not pass through the kidney, giving it a long half-life in the body that is measured in weeks.  Being an antibody, TGN1412 was difficult to remove from the body once injected.  It would have entered the immunoglobulin pool containing many antibodies necessary for defence against infections.

**Multifunctional molecules**

Antibodies are a good example of multifunctional molecules.  They are complex proteins with a high degree of specificity to recognise three-dimensional molecular structures. While their natural function is to recognise microbial pathogens and contribute to their elimination, the molecular recognition properties of antibodies can be exploited in the development of new drugs that will recognise specific molecular targets.

If the target is a soluble mediator, the antibody may bind to it and neutralise its effects, as is the case with antibodies to TNF used in the treatment of rheumatoid arthritis.  If the target is a cell surface receptor, an antibody can either block it as an antagonist, or stimulate it as an agonist.  The binding of certain types of antibody to a cell can also lead to cell death through activation of cytotoxic proteins (complement) and other mechanisms.

Since antibodies have two antigen-recognising arms, it is theoretically possible that one antibody could bind to two cell surface receptors and greatly increase the signalling response in the cell.  There is also the possibility that an antibody to a cellular receptor could bind to receptors that had been cleaved or released from the cell membrane, forming a soluble immune complex.  The functional consequence of this cannot be predicted without experimental studies.  However, where differences in receptor shedding between the human and a test species occurs, the results from animal testing may not be a

good guide to the responses in human, even when the binding affinity of the antibody for the target is similar.

A major part of an antibody, distinct from the antigen recognition regions, can also have important biological effects by engaging cellular receptors on a range of different cell types. This part of an antibody is called the Fc portion and its cell surface receptors are called Fc receptors. By engaging a cell surface receptor via its antigen recognising part, and engaging Fc receptors on different cells via its Fc part, an antibody can act as a bridge, bringing different cells into close contact with the potential for additional cellular activation of both cross-linked cell types. Although Fc receptors for IgG4, the particular antibody type of TGN1412, are thought to be rare, such cross-linking activity of TGN1412 *in vivo* cannot be excluded on current evidence.

## Inherent Hazards of Certain Types of Pharmacological Target

In general, a high level of caution is needed in the first human exposures to any agent whose effects might cause severe physiological disturbance to vital body systems.

### Immune system targets

The immune system recognises microbes and abnormal cells and generates clones of lymphocytes to remove them. Initial activation of the immune system triggers a self-amplifying cascade of lymphocyte proliferation and release of soluble mediators to produce an immune response.

Normally the response is limited to a small number of lymphocyte clones determined by the specificity of their antigen receptor through which the initial activation is signalled.

The effects of pharmacological agents that act on the earlier phases of the immune response may be greatly amplified *in vivo* by activation of the immune cascade.

The potential for over-stimulation of the immune system is increased when the agent is an agonist targeted at activating receptors on lymphocytes, and when the antigen receptor is by-passed allowing polyclonal lymphocyte activation to occur. Similar considerations may apply to antagonists that act within regulatory pathways that turn off an immune response.

### Other targets with potential for biological amplification

Factors were identified above as hazards with agents aimed at the immune system, but there may be inherent risk in pharmacological stimulation of other self-amplifying cascade systems such as the inflammatory response and the thrombosis-haemostasis pathways.

### Summary of risk factors

The ESG concluded that it is not possible to make a fully comprehensive list of all possible risk factors related to investigational agents and their targets, because of the

80

inherent scientific uncertainties associated with innovative medicines.  The assessment of
risk or hazard must therefore be a science-based exercise performed case-by-case.

There are, however, certain factors that clearly may confer higher risk in pre-clinical to
clinical transition.  These include:

- any agent whose effects might cause severe physiological disturbance to vital body
  systems;
- agonistic or stimulatory actions;
- novel agents and novel mechanisms of action where there is no prior experience;
- species-specificity of an agent making pre-clinical risk-assessment difficult or
  impossible;
- the potency of an agent, eg compared with a natural ligand;
- multifunctional agents, eg bivalent antibodies, FcR binding domains;
- cell-associated targets;
- targets that by-pass normal control mechanisms;
- immune system targets;
- targets in systems with the potential for large biological amplification *in vivo*.

In addition to these identifiable factors that should be taken into account in the risk-
assessment of an agent in a first-in-man clinical trial, other factors, some of which may
become more significant in the future, need to be considered.  Examples include:

- Agents with a target that is not present in animal models;

- Combination products e.g retroviral vectors in gene therapy (even if the components
  have been used in humans before, the new combination may generate new risks);

- 'Bio-similars' that are significantly different from the innovator product, for example,
  in post-translational modifications;

- Vaccines with novel adjuvants, especially those that direct antigen to signalling
  molecules on the surface of immunocytes, or are designed to stimulate pro-
  inflammatory cytokine production from lymphocytes or antigen presenting cells;

- Major changes to the route of administration, posology, or formulation of an agent.

Our terms of reference list three categories of agent that may be considered *a priori* to
pose increased risk of harm in first human exposures, or where pre-clinical assessment of
risk may be more difficult.  The categories are:

- Biological molecules with novel mechanisms of action.
- New agents with a high degree of species-specificity.
- New agents with immune system targets.

81

While our recommendations for caution are aimed at medicines in any one of these three categories, we recognise that exceptions may be made when the potential for harm in first human exposures can be assessed as low, based on a careful scientific evaluation of risk.

Although some of the examples of risk factors mentioned above may be more likely with biological agents, they may also apply to small molecule agents.  The descriptions given of factors that may increase risk in first-in-man trials, and where increased caution is indicated, are not intended to form a complete or comprehensive list, and are merely given as examples.

Clearly the more potential risk factors that are applicable to an agent and its pharmacological targets, the higher the risk in transition from pre-clinical to clinical development and the more caution is required, especially when species-specificity is a factor.

## 8.    Risk Reduction and Risk Management

### Overall Aim of the ESG

The aim has been to review and generalise what can be learned from the TGN 1412 trial, when a safe starting dose in humans was not predicted from the pre-clinical studies that were done.  We considered how to optimise the safety of future 'first-in-man' trials without inhibiting innovation or creating unnecessary barriers to the development of useful new medicines.

The recommendations were formulated bearing in mind the ESG's terms of reference and the general features identified as potentially increasing risk.  Although we have not attempted to quantify or rank risk in any formal way, we use the term "higher risk agents" to mean those that fall within our terms of reference where there are factors that may indicate a higher risk of harm to volunteers in first-in-man clinical trials.

Many of our recommendations refer to decisions affecting the safety and value of first-in-man trials that we believe should be made on a case-by-case basis and be scientifically justified.  By this we mean that developers should provide clear justifications for such decisions and the regulator should assess the justifications, taking into account the safety of trial volunteers and the information that will be gained from the trial.

The views outlined on increasing the safety of first-in-man trials with higher risk agents are summary conclusions from ESG discussions taking account of all written and verbal comments received from stakeholders before and after the publication of our interim report on 26th July 2006.

### Background

The current guidelines for pre-clinical development and first-in-man studies evolved from decades of experience with low molecular weight chemicals, and have been adapted to apply to previous types of biological medicines, mainly altered or natural biological products such as vaccines and products purified from human and animal sources.  They served well with previous types of medicines, and phase one trials, before the TGN1412 trial, had a good safety record.  However, many of the newer medicines, like TGN1412, are innovative products of advanced biotechnology that may require a different approach.

The first generation of biotechnology agents, including therapeutic monoclonal antibodies, recombinant cytokines, interferons and hormones achieved real clinical advances and large benefits to patients in the therapeutic areas of cancer, autoimmunity, inflammatory diseases and many other debilitating non-malignant diseases.  We may expect, and hope, to see a large increase in these new medicines in the future and other novel biological medicines, such as those based on nucleic acids, for the treatment and prevention of disease.

The degrees of specificity and potency that can be engineered into such agents compared with simpler chemical entities create difficult challenges in pre-clinical and clinical

development.  It is now apparent that the pre-clinical development of such agents cannot rely on methods that served well with smaller chemical medicines or previous generations of biological medicines.

There are many potential classes of new agents, and the inherent risks may be quite different in each class although some generalisations are possible.  With heterogeneity of risk, there is unlikely to be any single, major risk reduction technique or approach that will be sufficient to optimise the safety of first-in-man trials of all types of higher risk agent.

The ESG concluded that the integration of information from many sources, in an iterative process, offers the best approach to optimising the safety of volunteers in first-in-man trials of certain types of new biological medicines.  Similar considerations will apply to species-specific small molecule agents when the detection of 'on-target' toxicity in animal studies may be unreliable. This may also apply to unanticipated "off-target" toxicity, which may reveal new biology.

A multi-level approach to risk reduction and risk management applied to all aspects of medicines development should be the norm, and although operational distinctions are made between different stages of development, such as pre-clinical and clinical phases, an integrated overview of the entire process should be maintained, and refined as new information accumulates.

**Pre-clinical**

The decision to begin development of a new medicine should be based on the identification of an unmet clinical need and a sound scientific rationale for therapeutic benefit.  In general, the higher the potential risk associated with the type of agent and its pharmacological target, the greater the importance of the underpinning scientific and clinical rationale for its development.

Important information can be learned about the intended pharmacological response of a new medicine, and its potential for adverse reactions, from studies in animal models.  However, the predictive value of the animal model for responses in humans needs to be understood, especially when there is known or suspected species-specificity of effect arising from the nature of the medicine or its target molecule(s) *in vivo*.

For highly novel agents, it is essential that there is a discussion between regulatory scientists and independent scientists in the relevant research field, to evaluate the full spectrum of biological effects of the new class of agent.  Decisions on what can usefully be learned from whole animal studies and from *in vitro* experimentation using human and animal tissues must be science-based in the light of the value of the information obtained with different technologies and its relevance to human subjects *in vivo*.

For example:

   o  Using cells and tissues *in vitro* to assess comparability in man and in animal model species of the binding affinity for target molecule(s).

84

o Assessing the comparability of measurable cellular or tissue responses to receptor occupancy in terms of morphological or biochemical changes, including pre-specified responses as well as cellular changes that may be detected by screening procedures such as RNA or protein profiles. The aim is to test similarity of biological responses in man and model species. Both qualitative and quantitative comparisons should be made.

o In some cases where a new agent is highly species-specific, particularly with biological medicines such as antibodies or cytokines, it may be valuable to test biological responses in appropriate animal models using species-homologous counterparts of the human agent. This can increase the understanding of the physiological role of the target but cannot necessarily predict the response in humans.

o There may also be value in using genetically modified animal cells, tissues or whole animal models, or cellular chimeras, to evaluate responses to human-specific agents.

o The correlation between responses to a new agent in animal and human cells or tissues, and the relation between *in vitro* and *in vivo* animal responses may allow, by iteration, a progressive refinement of the ability to predict the human response *in vivo*.

o The design of the trial should be guided by appropriate statistical methods that maximise the information value of the trial and minimise the exposure to risk of the trial subjects. It may be possible to develop new statistical methods or computer modelling to optimise the predictive value of pre-clinical information for first-in-man trials in humans. Statisticians involved in the design of first-in-man clinical trials should be fully informed of all relevant factors from the pre-clinical development phase that may affect the safety of trial subjects, and the aims to be achieved in terms of new information gained.

Ultimately, the strategy for pre-clinical development of a new medicine, and the experimental approaches used to assemble information that optimises the safety of first-in-man trials are science-based decisions that must be made case-by-case by competent and appropriately trained investigators. .

Rigid adherence to guidelines developed from experience with existing medicines may carry the risk of creating a false sense of security when dealing with new classes of medicines and there may be over-reliance on methods that are not appropriate in specific cases.

- Decisions on the strategy for pre-clinical development of a new medicine and the experimental approaches used to assemble information relevant to the safety of first-in-man clinical trials must be science-based, made and justified case-by-case by individuals with appropriate training.

85

The pre-clinical development of new medicines is addressed by internationally agreed guidelines, in particular ICH S6 and M3 (M 3 (R1) Non-Clinical Safety Studies for the Conduct of Human Clinical Trials for Pharmaceuticals CPMP/ICH/286/95, S 6 Pre-clinical Safety Evaluation of Biotechnology-Derived Products CPMP/ICH/302/95).

Regulators should consider the applicability of this guidance to high-risk medicines and in particular their first use in man.  Developing more explicit guidance on these should be considered.  This might best be achieved by initial guidance at the EU level, and using that as a platform for proposals at ICH level.

The recent results from experiments performed at NIBSC suggest that different and informative approaches can be taken in *in vitro* studies that might be more predictive of *in vivo* responses.  With higher risk agents, the pre-clinical development programme should ensure a sound understanding of the biological activity, and potency, of the agent.

- The regulatory process for first-in-man trials of higher risk agents and advanced medicinal products based on innovative technologies should be subject to regular review.

With present advances in biology, biological chemistry, informatics and biotechnology, we can expect the identification of many new therapeutic targets and the development of innovative medicines to fill unmet clinical needs.  It is important that the regulation of medicines is science-based and that the regulatory process keeps pace with, and is appropriate for, the science and technology that will give rise to tomorrow's medicines.

## Sharing of information

### Pre-clinical studies

It would seem essential to attempt the collection of unpublished pre-clinical information relevant to the safety of human subjects in first-in-man trials to inform the planning of future trials with similar agents.  A UK or European database could be linked with others in different countries to form a global database. There is some indication that the pharmaceutical and biotechnology industries and research funding bodies would be willing to explore the sharing of information in this way, and researchers from other sectors, such as academic centres and research institutions might also contribute.

- Developers of medicines, research funding bodies and regulatory authorities should expedite the collection of information from unpublished pre-clinical studies relevant to the safety of human exposure.  As a first step this should focus on pre-clinical reports of results that signal potential danger to humans with the use of a higher risk medicine or group of medicines.  This could provide a platform for information sharing between regulators at EU and international level, e.g. in the form of a confidential database.  The submission of such data to a database by the investigators is strongly encouraged.

We believe that the ultimate goal should be an open access database, and the feasibility of this needs to be explored.  To avoid the risk of delay in sharing safety-critical information, reports from studies that would otherwise not be in the public domain could initially be stored in a secure database accessible only to regulators worldwide, with frequent review of the reason for delaying open access.

**Phase one trials**

Before the implementation in 2004 of the European Clinical Trials Directive, there was no necessity in the UK for investigators to apply to the regulator for authorisation to conduct a phase one trial in healthy volunteers where there was no potential for therapeutic benefit to the volunteer.  A similar situation may have existed in some other European countries and elsewhere.

It is not known how many first-in-man trials were conducted in the UK before 2004, or what the outcomes were.  Useful information gained during previous studies of an agent is not always in the public domain and accessible to others who are undertaking a trial of the same, or a similar agent.

The ESG heard a specific example during a stakeholder consultation where information from a phase one trial of an anti-lymphocyte antibody with reactivity against three targets, including the target of TGN1412, and relevant to safety in humans, was never published.

There may be several reasons for non-publication of the outcome of clinical trials, including negative results that are less likely to be accepted for publication in a scientific journal, issues of commercial confidentiality, or the abandonment of the project in the early stages of development.

Both the developers of new medicines and the regulatory authorities should consider ways of encouraging and expediting the collection of past information from first-in-man clinical trials, and future information as it becomes available, onto a database. The feasibility of open access to this information should be explored. Access to the database would be helpful to Research Ethics Committees, for example.

- Regulatory authorities should consider ways to expedite the sharing of safety information on first-in-man clinical trials between regulators within the EU and worldwide.  This should certainly include information on first-in-man experience with higher risk medicines.  Trials with negative safety outcomes should be included. This database might be widened to include products that may not currently be perceived as high risk, or trials conducted later in development, that suggest a strong warning for first-in-man use of similar products.

In the EU, this collection and sharing of information could be based on the model of the existing clinical trial database EudraCT (for first-in-man trials since 2004) and the EudraVigilance database for 'Suspected Unexpected Serious Adverse Reactions

(SUSARs)'.   Relevant information from first-in-man trials prior to 2004 could be submitted on a voluntary basis. This would ensure access to relevant safety information by national regulators.

Since 2004 in the UK there has been a requirement for Suspected Unexpected Serious Adverse Reactions (SUSARs) within phase one trials to be reported to the regulator.  The same applies to all countries of the EU and similar arrangements exist in other countries. It is the intention within Europe to share this information between regulators but we suggest that this should include the sharing of information between regulators worldwide. The feasibility of open access to this data should also be explored.

**Transition from pre-clinical to clinical development**

Calculation of the starting dose in a first-in-man trial is a central factor affecting the safety of the subjects in the trial.  Pre-clinical studies with TGN1412 did not predict a safe starting dose for human trials, and all the evidence available so far indicates that too high a dose was given.  The guidelines for dose calculation that have worked well in the past for small molecule drugs may not be universally applicable to large molecule biological medicines, especially when species-specificity of action makes it difficult, or impossible, to predict a safe human dose from studies in animals.

Conventionally, with small molecule drugs, a low dose that has no effect in animals, (No Observable Effect Level, NOEL) or no adverse effects (No Observable Adverse Effect Level, NOAEL) could be established as a starting point, and then a dose reduction with a high margin of safety calculated as the starting dose in first-in-man trials.  In general, the more species-specific an agent is, the less reliable will be information from animal studies as a guide to the starting dose in humans.

To overcome this, a wider approach to dose calculation, based on all relevant information should be undertaken.  For example, this might include taking account of the novelty of the agent and its mechanism of action, the degree of species-specificity of the agent, the dose-response curves of biological effects in human and animal cells and dose-response data from relevant *in vivo* animal studies.

With receptor ligands it is also important to measure or calculate receptor occupancy versus concentration and the extent of exposure of targets and target cells *in vivo*.  In general, doses for first human exposure, even when the relationship between receptor occupancy and biological response is not known, should be calculated to provide concentrations at targets that would give rise to low receptor occupancy.

It was suggested in a stakeholder submission that the starting dose in first-in-man trials of biological medicines should be the dose required to reach the bottom end of a dose response curve in man.  This could be estimated from human receptor occupancy and cellular dose-response studies, combined with information from qualified animal models and experience with similar agents.  This would give a 'Minimum Anticipated Biological Effect Level' (MABEL) below which the starting dose should be set.  The ESG thought that this was a very useful approach to calculating a safe dose in first-in-man trials.

88

This use of information from both physico-chemical and biological studies combined with prior knowledge of similar agents is likely to increase the safety of first-in-man trials with higher risk agents, and could be enhanced with better access to results from previous pre-clinical and phase one studies with similar agents.

The overall opinion of the ESG was that when it is likely that pre-clinical information, for any reason, may be a poor guide to human responses *in vivo,* the starting dose should be calculated to err on the side of caution.

There is a point of view that giving a dose that is much too low to provide any useful information would call into question the ethics of a trial.  However, the opinion of the ESG was that since it may be difficult *a priori* to predict a dose that is too low to be useful, a very low starting dose in the context of an appropriate dose escalation regime would increase the safety of first-in-man trials without creating a serious logistical barrier.

The view that higher risk agents should be given at specified low dose levels, for example in the microgram or nanogram range ('microdosing', 'nanodosing') may have value as a general guideline.  But there may be instances of highly potent agents where such specified levels could still be too high for safety in first-in-man trials and the ESG felt that, although these guides were useful to focus care on dose calculation, a 'rule of thumb' was less valuable than a thorough case-by-case evaluation of all relevant information.

It has also been pointed out in stakeholder comments that a very small sub-pharmacological dose, while decreasing risk to the recipient, does not necessarily reduce the risk when pharmacological dose levels are reached during dose escalation.  This may be especially true with agents where there is a very steep dose-response curve in humans *in vivo*.

- Special consideration should be given to new agents for which the primary pharmacological action for the proposed therapeutic effect cannot be demonstrated in an animal model.  The underpinning case for dose selection in any trial of this kind should include a clear rationale for the proposed mechanism of action and also for the safety and efficacy of the substance in its intended clinical use.

- A broader approach to dose calculation, beyond reliance on 'No Observable Effect Level' or 'No Observable Adverse Effect Level' in animal studies, should be taken. The calculation of starting dose should utilise all relevant information.  Factors to be taken into account include the novelty of the agent, its biological potency and its mechanism of action, the degree of species-specificity of the agent, the dose-response curves of biological effects in human and animal cells, dose-response data from *in vivo* animal studies, pharmacokinetic and pharmacodynamic modelling, the calculation of target occupancy versus concentration and the calculated exposure of targets or target cells in humans *in vivo*.

  The 'Minimal Anticipated Biological Effect Level' (MABEL) approach is one good model for achieving this.
  (See ABPI/BIA report and stakeholder submission.)

- If different methods give different estimates of a safe dose in humans, the lowest value should be taken as the starting point in first-in-man trials and a margin of safety introduced in calculation of the actual starting doses in man.

- When it is likely that pre-clinical information, for any reason, may be a poor guide to human responses *in vivo*, the starting doses in first-in-man trials should be calculated to err on the side of caution.  Further dose increases should proceed with caution since the initial dose will have been particularly low and there may be a steep dose-response curve.

- Careful consideration should be given to the route and the rate of administration of the first doses in first-in-man trials, with careful monitoring for an exaggerated response.

For example, in the case of first human exposure to a higher risk agent given intravenously, a slow infusion over several hours may be more appropriate than a slow bolus over several minutes.  This would allow monitoring for an adverse response and stopping the infusion if clinically indicated.

The trial design, and decisions on the number of subjects, starting doses and the dose escalation regime should be based on detailed evaluation of predicted and possible risks related to the nature of the agent, its target *in vivo* and the intended recipients.  As with many of the questions surrounding pre-clinical to clinical transition of new, higher risk agents, ultimately these are science-based decisions that must be made carefully case-by-case, and should be justifiable, based on all relevant information.

- The trial design, including decisions on the number of subjects, starting doses and the dose escalation regime, should be made on a case-by-case basis, and should be scientifically and statistically justifiable, taking account of all relevant information.

(See stakeholder submission from The Royal Statistical Society).

**Sequential dosing of trial subjects**

In general, new agents in first-in-man trials should be administered sequentially to human subjects with an appropriate interval between dosing of subjects to limit the number of people that may be affected by a severe adverse reaction.  The intervals of observation between administration to the first, second and subsequent subjects should be determined by the kind of adverse reaction that might be anticipated based on the nature of the agent, its target, and the intended recipient.

Although there will be no available pharmacokinetic data in the human, some prediction of pharmacokinetics may be possible from animal studies, for example with large biological molecules that will not be filtered in the kidneys.

For first-in-man trials of a higher risk agent, a guideline minimum observation period after administration to the first subject was discussed by the ESG, but it was acknowledged that the period of observation between dosing the first and subsequent subjects must take into account factors related to the agent used, its target, the recipients, and the range of possible adverse reactions.

The monitoring period between dosing of different subjects should be decided case-by-case.  Protocols exist for the progressive escalation of dosing in phase one trials related to periods of monitoring for adverse reactions.  A longer monitoring period of the first recipient of an escalated dose would also increase safety.

- New agents in first-in-man trials should be administered sequentially to subjects with an appropriate period of observation between dosing of individual subjects.  The interval of observation between sequential dosing of subjects should be related to the kind of adverse reactions that might be anticipated based on the nature of the agent, its target and the recipient, as well as the potential pharmacokinetic and pharmaco/toxico-dynamics of the agent.  There should be a suitable interval between doses to different individuals as well as between doses to the same individual, and both should be justified on the basis of available evidence.

- A similar period of monitoring should occur between sequential dosing of the subjects during dose escalation. *(as above)*

**Choice of subjects for first-in-man phase one trials**

The aim of a phase one trial is not to assess the therapeutic benefit of a new agent and subjects are not expected to derive any benefit.  In general, the decision to perform phase one trials in either volunteer healthy subjects or volunteer patients should be made on a case-by-case basis.

Several factors must be considered, such as the risks inherent in the type of agent under test and its molecular target, the presence of the target in healthy subjects and patients, the value of the information that may be obtained in healthy subjects or in patients, and how far the information may be generalised.

In the cancer field there is a history of conducting clinical trials with cytotoxic agents with high potential for toxic effects.  The practice has usually been to perform first-in-man trials in volunteer patients, which ensures that the intended drug target is present, and toxicity arising from both 'on-target' and 'off-target' effects would be detectable.

Although there is no anticipated therapeutic benefit to the subjects in a phase one trial, patient volunteers may be more appropriate subjects than healthy volunteers on the basis of a 'risk to benefit' assessment in the case of higher risk agents targeted at serious diseases where all existing therapeutic options for the patient have been exhausted.  This assumes that should a patient derive any benefit in a first-in-man clinical trial, the trial medicine could be made available for continued treatment after the trial.

91

There may be circumstances, however, where healthy volunteers are more appropriate subjects in a phase one clinical trial.  For example where concurrent medication in patients would cause difficulties in the interpretation of results.

- The decision whether to conduct a first-in-man trial in healthy volunteers or in volunteer patients should be carefully considered and fully justified, taking into account all factors relevant to the safety of the subjects and the value of the scientific information that is likely to be obtained.

The paramount factors should always be the safety, rights and well-being of the volunteers, whether patients or healthy individuals, and the value of what can be learned from the clinical trial.

**Clinical aspects and environment of first-in-man trials**

The Principal Investigator (PI) must be appropriately qualified to undertake and supervise the trial. The PI should be satisfied that full information has been made available about the nature of the agent being tested, the details of pre-clinical development relevant to safety in humans and the rationale of the trial design and protocol.  If there is doubt, the PI should seek further information.  The methods used to calculate the starting dose and the scientific rationale behind the dose escalation strategy should also be made available to the PI.  Principal Investigators should always satisfy themselves that they are in a position to make informed clinical judgements.

In cases where there is a predictable risk of a certain type of severe adverse reaction occurring in humans, a treatment strategy should be considered beforehand.  This should include the availability of specific antidotes where they exist and a clear plan of supportive treatment including the availability of ITU facilities.

First-in-man trials should be conducted in appropriate clinical environments supervised by staff with appropriate levels of training and expertise and an understanding of the trial agent, its target and mechanism of action.  There must be immediate access to facilities for the treatment of medical emergencies (such as cardiac emergencies, anaphylaxis, cytokine release syndrome, convulsions, hypotension), facilities for stabilising individuals in an acute emergency and ready availability of ITU facilities.

- Principal Investigators who are responsible for the care of subjects in first-in-man trials should always be appropriately qualified and satisfy themselves that they know enough about the agent, its target and mechanism of action to be in a position to make informed clinical judgements.

The development of a national professional accreditation system for Principal Investigators conducting first-in-man clinical trials should be encouraged.

- In first-in-man studies where there is a predictable risk of certain types of severe adverse reaction, a treatment strategy should be considered beforehand.  This should include the availability of specific antidotes where they exist and a clear plan of supportive treatment including pre-arranged contingency availability of ITU facilities.

- First-in-man studies of higher risk medicines should always be conducted in an appropriate clinical environment supervised by staff with appropriate levels of training and expertise with immediate access to facilities for the treatment and stabilisation of individuals in an acute emergency and with pre-arranged contingency availability of ITU facilities.

There should always be an adequate staffing level in first-in-man studies and adequate 24-hour cover when volunteers are kept in overnight.  All clinical sites conducting such trials should have standard operating procedures for emergency situations, and staff should maintain expertise in implementing these procedures through regular drills.  Trial subjects should always be clearly informed about what to do if they experience symptoms of an adverse reaction during or after a clinical trial.

**Regulatory considerations**

Regulation of medicines, including the conduct and safety of clinical trials, should be based on the science underpinning medicines development.  In recent years, advances in molecular biology and biotechnology have produced new classes of potent and clinically valuable medicines.   As the pace of development in biosciences increases, major advances can take place over comparatively short time periods and this is likely to continue well into the future.  It is therefore essential that a wide range of expertise in emerging areas of science should be available to the regulator.

**Regulatory access to independent advice**

Professional scientific and medical assessors should be supported by external experts who are in touch with the research front in their fields to ensure that regulatory decisions are based on state-of-the-art science.

The regulator should be able to call upon such support for assessing first-in-man phase one clinical trial applications when the requirement is recognised, eg with applications for trials of higher risk agents as defined by factors discussed previously such as the nature of the agent, its degree of novelty, its intended pharmacological target and the intended recipients.

It would be possible to develop the existing scientific advisory structure to make highly specialised expertise available to regulators.  For example, an Expert Advisory Group (EAG) of the Commission on Human Medicines might undertake this role, with the appointment of a core membership of relevant experts and the ability to co-opt additional experts as the need dictates.

93

At present, the regulations for appraisal of applications for clinical trial authorisations create a potential logistical difficulty in seeking outside opinion because a strict time limit is imposed on the process.  The advantage of a standing EAG is that good communications with the regulator can be established and responses could be provided on a short timescale.

The logistical problem should be significantly reduced if more communication can be encouraged between developers and the regulator at an earlier stage, before an application is filed, especially for a higher risk agent.  This would also enable the regulator to access external expert opinion at an earlier time, if necessary.
Increased opportunity for communication between the regulator and research ethics committees on applications for trials of higher risk medicines would also contribute to the overall safety environment.

While it is against the interests of patients to introduce unnecessary delays in medicines development through a slower regulatory process, consideration should be given to introducing some flexibility in the time-scale of clinical trial appraisal in exceptional cases of unusual complexity.

- More communication is strongly recommended between medicines developers and the regulator at an earlier stage before an application is filed, especially for higher risk agents, to ensure that there is time for an appropriate consideration of any safety concerns without introducing undue delay in product development.  Ways to increase communication between the regulator and research ethics committees should also be considered.

- For appraisal of applications for first-in-man trials of higher risk agents, as defined by the nature of the agent, its degree of novelty, its intended pharmacological target, and its intended recipient, the regulator should have access to additional opinion from independent, specialist experts with research knowledge of their fields.

- An Expert Advisory Group (EAG) of the Commission on Human Medicines, or a similar body, might undertake this role with a core membership of appropriate experts and the ability to co-opt additional experts as the need dictates.

- Consideration should be given to introducing some flexibility in the time-scale of clinical trial appraisal in exceptional cases of unusual complexity.

## Future needs

### Skills and training

Many first-in-man phase one trials in the UK, possibly the majority, are currently performed in commercial Clinical Research Organisations (CROs) unrelated to NHS hospitals and universities.

This means that UK Schools of Medicine, Nursing, Dentistry and Pharmacy, as well as the NHS, have decreasing opportunities to develop and teach the skills needed by the next generation of phase one clinical trial specialists. This has negative implications for the future of phase one clinical trials in the UK, and for clinical trials in general. The situation may be similar in other countries.

Provision for 'hands-on' experience in the planning and conduct of clinical trials could be increased if academic and NHS institutions created links with commercial CROs. University or NHS postgraduate training programmes could incorporate placement periods within CROs. Another way to retain and develop clinical trial skills within the NHS and universities might be to encourage the formation within them of specialist centres for phase one trials (see below).

The need to train a new generation of doctors in the skills needed for the assessment of safety and efficacy of medicines was highlighted in the UK's Academy of Medical Sciences 2005 report "Safer Medicines" (http://www.acmedsci.ac.uk/p102.html). Similar needs were identified in "Sustaining the skills pipeline in the pharmaceutical and biopharmaceutical industries", a recent report of a study by the ABPI. (http://www.abpi.org.uk/Details.asp?ProductID=285).

This will need co-operation between higher education funding bodies and institutions, the NHS and industry. Given that major stakeholders agree on the need to fill this skills gap with a new generation of Clinical Pharmacologists and related professionals, it should be possible to address it, and we encourage this in the interests of the safety of future first-in-man clinical trials.

- The availability of 'hands-on' experience in the planning and conduct of clinical trials should be widened, for example by secondment periods to commercial organisations within postgraduate training programmes, or the development of specialist centres within the NHS and Universities (see next recommendation).

As the science underpinning innovative medicines becomes increasingly sophisticated we may anticipate ever more advanced medicinal products in the future. For example, such products might be aimed very specifically at signalling pathways or sequences of nucleic acids, and may incorporate genetic elements, cellular elements and advanced physical or biological delivery systems.

Such innovative products, known as Advanced Therapy Medicinal Products in the EU, are considered to have great potential for therapeutic benefit in diseases where there is current clinical need. But the promise of more effective medicines carries the possibility, or likelihood, of unpredictable risk. When innovative products enter first-in-man trials, it is important that the skills needed to anticipate and recognise these risks are developed in parallel. The feasibility of developing specialist centres within universities and the NHS for phase one clinical trials of higher risk and advanced medicinal products should be explored.

- The feasibility of developing specialist centres for Phase One clinical trials of higher risk agents and advanced medicinal products should be explored.

The development of a national inspection and accreditation system for clinical centres conducting first-in-man studies of higher risk agents should be encouraged.  Although we have highlighted universities and the NHS, the accreditation should be open to all centres in both the public and private sectors that fulfil defined criteria.  This would enhance the training opportunities and the skill base.

# 9.    Scope and Summary of the Recommendations

The aim of the ESG has been to define what can be learned from the TGN1412 trial and to consider how far the findings can be generalised to optimise the safety of volunteers in future trials of higher risk new medicines within the ESG's terms of reference.    In this report we have made 22 recommendations that we believe will optimise the safety of future first-in-man phase one clinical trials without creating unjustifiable barriers to the development of useful new medicines.

We have considered pre-clinical, clinical and regulatory aspects of phase one trials where safety may be increased, both now and with a view to the future.    The recommendations are made with first-in-man trials of higher risk agents in mind, as defined by the nature of the agent, its mode of action, its pharmacological target and its intended recipients, but some of the recommendations may have applicability to phase one trials in general.

Our recommendations are intended to supplement current regulatory guidelines and refine their applicability to newer types of agents where a higher risk of toxicity in first-in-man trials may be recognised.

Several of our recommendations relate to decisions that we believe are more safely made on a case-by-case basis during pre-clinical development and clinical transition. We recommend that such decisions should be justified, and by that we mean that the medicines developer should provide the justification which should be carefully assessed by the regulator, calling on independent expert advice when it is needed.

## Scope of the Recommendations

### What kind of clinical trial?

The recommendations are intended to apply to "first-in-man" clinical trials, and not to phase one trials in general (which might include trials of agents with an established record of safety in humans).   Special caution is needed during first human exposures to higher risk agents at doses with the potential to cause a pharmacological effect.

However, added caution should also be taken when administering a medicine with the potential for high risk to a distinct new population, be they healthy volunteers or patients.  Preparation of guidance on first-in-man studies should give consideration to the applicability of the concepts developed to transitions from one population group to another.

The ICH E8 guideline 'General Considerations for Clinical Trials (CPMP/ICH/291/95)  (http://www.emea.europa.eu/pdfs/human/ich/029195en.pdf) provides general guidance on clinical trials and contains, in section 3, an internationally agreed description of phase one trials and a good overview of the development phases of medicines from discovery to market.

**What kind of agent?**

Our remit covers three categories of medicines that may have a higher potential for risk of harm to volunteers during the first human exposures, or where risk may be more difficult to evaluate in pre-clinical development.  The categories are:

- Biological molecules with novel mechanisms of action;
- New agents with a high degree of species-specificity;
- New agents with immune system targets.

We intend our recommendations to apply to agents in any one of these three categories unless a careful assessment of the nature of the agent, the physiological role of the target molecules, and the intended recipients, supports a low risk of harm in first human exposures.

We do not suggest that all agents that fall into one of the three categories listed above necessarily pose a high risk on first human exposures, but that a thorough assessment of risk should be made and a clear scientific case provided when risk of harm is assessed as being low.

For example a conventional vaccine, although aimed at stimulating an immune response, may not pose a high risk, or a new agent similar to one with an established safety record in humans, and aimed at a known target where the pharmacology can be predicted with confidence, may not pose a high risk.

We have discussed in this report factors that should raise the level of caution for first human exposures to new agents.  These include:

- any agent whose effects might cause severe physiological disturbance to vital body systems;
- agonistic or stimulatory actions;
- novel agents and novel mechanisms of action where there is no prior experience;
- species-specificity of an agent making pre-clinical risk-assessment in animal models difficult or impossible;
- the potency of an agent, eg compared with a natural ligand;
- multifunctional agents, eg bivalent antibodies, FcR binding domains;
- cell-associated targets;
- targets that by-pass normal control mechanisms;
- immune system targets;
- targets in systems with the potential for large biological amplification *in vivo*.

A thorough assessment of risk should always be carried out before first-in-man trials.  The risk assessment should be clearly described in the trial documents and be fully examined by the regulator.  When there is significant doubt, higher risk should always be assumed.  (See Section 7 of the Report.).

98

**Summary of the Recommendations**

The safety, rights and well-being of subjects, both patients and healthy volunteers, must always be the primary concerns in clinical trials.  We have made 22 recommendations that we believe will increase the safety of volunteers in future clinical trials involving the first human exposures to agents with higher potential risks, as categorised in our terms of reference and discussed in Section 8 of our report. They cover:

- Pre-clinical and early clinical development;
- The process of preparation and review of clinical trial applications, and early access to advice for both regulators and sponsors;
- Determining and administering the initial doses in man;
- The clinical environment for first-in-man studies;
- Developing the skills and training to meet future needs.

There is focus on sharing of information relevant to safety, the calculation and administration of first doses, and regulatory access to independent specialist opinion in the appraisal of trial applications for the first human exposures to new medicines of the types described in our remit where there is higher potential risk.

The rationale for each recommendation, and explanations of our intentions, are summarised in *Section 8, "Predicting Hazards in Pre-clinical to Clinical Transition", and Section 9, "Risk Reduction and Risk Management"*.  The recommendations should be considered in the context of these Sections.

Stakeholders raised several areas of concern that were not within our remit.  These included topics such as the process of informed consent and clarity of information, communication between clinical investigators and clinical trial subjects before and during a trial, insurance cover, the role of Research Ethics Committees, and clinical follow-up of trial subjects who had experienced an adverse reaction.  Although beyond our remit, we believe these wider concerns are all extremely important, and recommend that they are taken up as a high priority and considered in detail.

Our recommendations are offered to the UK authorities and sponsors of first-in-man trials in the UK, but we believe it is important that agreement is sought at EU and international level, to ensure that equal protection is afforded to clinical trial participants worldwide.

# Final Recommendations

## Pre-clinical and early clinical development:

1. Decisions on the strategy for pre-clinical development of a new medicine and the experimental approaches used to assemble information relevant to the safety of first-in-man clinical trials must be science-based, made and justified case-by-case by individuals with appropriate training.

The pre-clinical development of new medicines is addressed by internationally agreed guidelines, in particular ICH S6 Pre-clinical Safety Evaluation of Biotechnology-Derived Products, and ICH M3 (R1) Non-Clinical Safety Studies for the Conduct of Human Clinical Trials for Pharmaceuticals (see further reading below).

Regulators should consider the applicability of this guidance to high-risk medicines and in particular their first use in man.  The development of more specific guidance in the present context should be proposed.  This might best be achieved by initial guidance at the EU level, and using that as a platform for proposals at international level.

2.  The regulatory process for first-in-man trials of higher risk agents and advanced medicinal products based on innovative technologies should be subject to regular review.

With present advances in biology, biological chemistry, informatics and biotechnology, we can expect the identification of many new therapeutic targets and the development of innovative medicines to fill unmet clinical needs.  It is important that the regulation of medicines is science-based and that the regulatory process keeps pace with, and is appropriate for, the science and technology that will give rise to tomorrow's medicines.

3.  Developers of medicines, research funding bodies and regulatory authorities should expedite the collection of information from unpublished pre-clinical studies relevant to the safety of human exposure.  As a first step this should focus on pre-clinical reports of results that signal potential danger to humans with the use of a higher risk medicine or group of medicines.  This should provide a platform for information sharing between regulators at EU and international level, e.g. in the form of a confidential database.  The submission of such data to a database by the investigators is strongly encouraged.

In the interests of safety, we believe that the ultimate goal should be an open access database, and the feasibility of this needs to be explored.  However, to avoid the risk of delay in sharing safety-critical information, reports from studies that would otherwise not be in the public domain could initially be stored in a secure database accessible only to regulators worldwide, with frequent review of the reason for delaying open access.

4.  Regulatory authorities should consider ways to expedite the sharing of safety information on phase one clinical trials between regulators within the EU and worldwide.  This should certainly include information on first-in-man experience with higher risk medicines.  Trials with negative safety outcomes should be included.  This database might be widened to include products that may not currently be perceived as high risk, or trials conducted later in development, that suggest a strong warning for first-in-man use of similar products.

100

In the EU, this collection and sharing of information could be based on the model of the existing clinical trial database EudraCT (for first-in-man trials since 2004) and the EudraVigilance database for 'Suspected Unexpected Serious Adverse Reactions (SUSARs)' – (see below).   Relevant information from first-in-man trials prior to 2004 could be submitted on a voluntary basis. This would ensure access to relevant safety information by national regulators.

This will require dialogue with the pharmaceutical industry on which study reports should be made available and when they should be posted, but should be achievable since industry is already committed to disclosure of clinical trial results on medicines already on the market, and encourages sponsors to post results of development failures where there may be important safety implications.   The regulators should explore the feasibility of open access to this data.

SUSARs are Suspected Unexpected Serious Adverse Reactions.  They are unexpected because their nature or severity is not consistent with the applicable product information (e.g. investigator's brochure for an unauthorised investigational product or summary of product characteristics for an authorized product), they are reactions because there is a causal relationship with the product, and they are serious, as described below:

Article 2(o) of Directive 2001/20/EC gives the definition of serious adverse reaction: "any untoward medical occurrence or effect that at any dose results in death, is life-threatening, requires hospitalisation or prolongation of existing hospitalisation, results in persistent or significant disability or incapacity, or is a congenital anomaly or birth defect."
For all other important medical outcomes not on this list, professional medical and scientific judgement should be exercised when deciding the need to report.

## The process of preparation and review of clinical trial applications, and early access to advice for both regulators and sponsors

5.   More communication is strongly recommended between developers and the regulator at an earlier stage before an application is filed, especially for higher risk agents, to ensure that there is time for an appropriate consideration of any safety concerns without introducing undue delay to product development.   Ways to increase communication between the regulator and research ethics committees should also be considered.

For first-in-man clinical trials of new agents that fall into the higher risk categories described in our remit, pre-submission meetings between sponsors and regulators, to identify potential concerns, would be useful to both parties, and are strongly recommended.  If developers elect not to have pre-submission discussion with the regulator, they should be asked to inform the regulator six weeks in advance of an intended application for a first-in-man clinical trial of a higher risk medicine.  This would give the regulator adequate time to consider the need for external expert advice and to identify appropriate experts (see next recommendation).  Advance warning would reduce the possibility of prolonging the assessment process.

101

6.  For appraisal of applications for trials of higher risk agents, as defined by the nature of the agent, its degree of novelty, its intended pharmacological target, and its intended recipient, the regulator should have access to additional opinion from independent, specialist experts with research knowledge of their fields.

7.  An Expert Advisory Group (EAG) of the Commission on Human Medicines, or a similar body, might undertake this role with a core membership of appropriate experts and the ability to co-opt additional expertise as the need dictates.

8.  Consideration should be given to introducing some flexibility in the time-scale of clinical trial appraisal in exceptional cases of unusual complexity.

We emphasise "exceptional cases of unusual complexity"; there is no intention to introduce unjustified delay in the regulatory process in the development of new medicines.  The European Clinical Trials Directive (article 6, paragraph 7) (Directive 2001/20/EC, below) already allows for time extension in the appraisal of gene therapy, somatic cell therapy and products containing genetically modified organisms.  This might be a model for other highly innovative medicines that bring new science into therapeutics.

## Determining and administering the initial doses in man:

9.  Special consideration should be given to new agents for which the primary pharmacological action, for the proposed therapeutic effect, cannot be demonstrated in an animal model.  The underpinning case for dose selection in any trial of this kind should include a clear rationale for the proposed mechanism of action and also for the safety and efficacy of the substance in its intended clinical use.

10. A broader approach to dose calculation, beyond reliance on 'No Observable Effect Level' or 'No Observable Adverse Effect Level' in animal studies, should be taken.  The calculation of starting dose should utilise all relevant information.  Factors to be taken into account include the novelty of the agent, its biological potency and its mechanism of action, the degree of species-specificity of the agent, the dose-response curves of biological effects in human and animal cells, dose-response data from *in vivo* animal studies, pharmacokinetic and pharmacodynamic modelling, the calculation of target occupancy versus concentration and the calculated exposure of targets or target cells in humans *in vivo*.

The 'Minimal Anticipated Biological Effect Level' (MABEL) approach is one good model for achieving this. (See BIA/ABPI report and stakeholder submission.)

102

11. If different methods give different estimates of a safe dose in humans, the lowest value should be taken as the starting point in first-in-man trials and a margin of safety introduced in calculation of the actual starting doses in man.

12. When it is likely that pre-clinical information, for any reason, may be a poor guide to human responses *in vivo*, the starting doses in first-in-man trials should be calculated to err on the side of caution.  Further dose increases should proceed with caution since the initial dose may have been particularly low and there may be a steep dose-response curve.

13. Careful consideration should be given to the route and the rate of administration of the first doses in first-in-man trials, with careful monitoring for an adverse or exaggerated response.

For example, in the case of first human exposure to a higher risk agent given intravenously, a slow infusion over several hours may be more appropriate than a slow bolus over several minutes.  This would allow monitoring for an adverse response and stopping the infusion if clinically indicated.

14. The trial design, including number of subjects, decisions on starting doses and the dose escalation regime, should be made on a case-by-case basis, and should be scientifically and statistically justifiable, taking account of all relevant information.
(See stakeholder submission from The Royal Statistical Society)

15. New agents in first-in-man trials should be administered sequentially to subjects with an appropriate period of observation between dosing of individual subjects. The interval of observation between sequential dosing of subjects should be related to the kind of adverse reactions that might be anticipated based on the nature of the agent, its target and the recipient, as well as the potential pharmaco- and toxicokinetics and pharmaco- toxicodynamics of the agent.

There should be a suitable interval between doses to different individuals as well as between doses to the same individual, and both should be justified on the basis of available evidence.

16. A similar period of monitoring should occur between sequential dosing of the subjects during dose escalation. *(as above)*

17. The decision whether to conduct a first-in-man trial in healthy volunteers or in volunteer patients should be carefully considered and fully justified, taking into

103

account all factors relevant to the safety of the subjects and the value of the scientific information that is likely to be obtained.

In general, there is no anticipated benefit to a patient in a first-in-man trial of a new medicine.  Therefore, risk to benefit assessment is not usually a major factor in deciding whether such trials should be performed in volunteer patients or in healthy subjects.

In the field of cancer medicine there may be exceptions since patients who experience a beneficial response to a trial agent are often able to continue treatment with it.  In this case the balance of risk and benefit may become a factor in deciding that patients are more appropriate subjects of a clinical trial, especially patients that have not responded to available therapies and when the trial medicine has predictable cellular toxicity (which may, in fact, be its intended pharmacological effect).

However, the paramount factors should always be the rights, safety, and well-being of the volunteers, whether patients or healthy individuals, and the value of what can be learned from the clinical trial.

## The clinical environment for first-in-man studies

18. Principal Investigators who are responsible for the care of subjects in first-in-man trials should always be appropriately qualified, and satisfy themselves that they know enough about the agent, its target and mechanism of action to be in a position to make informed clinical judgements.

    The development of a national professional accreditation system for Principal Investigators conducting first-in-man clinical trials should be strongly encouraged.

19. In first-in-man studies where there is a predictable risk of certain types of severe adverse reaction, a treatment strategy should be considered beforehand.  This should include the availability of specific antidotes where they exist and a clear plan of supportive treatment, including the pre-arranged contingency availability of ITU facilities.

20. First-in-man studies of higher risk medicines should always be conducted in an appropriate clinical environment supervised by staff with appropriate levels of training and expertise, with immediate access to facilities for the treatment and stabilisation of individuals in an acute emergency, and with pre-arranged contingency availability of ITU facilities in reasonable proximity.

There should always be an adequate staffing level in first-in-man studies and adequate 24-hour cover when volunteers are kept in overnight.

All clinical sites conducting such trials should have standard operating procedures for emergency situations, and staff should maintain expertise in implementing these procedures through regular drills.  Trial subjects should always be clearly informed about what to do if they experience symptoms of an adverse reaction during or after a clinical trial.

## Developing expertise

21. The availability of 'hands-on' experience in the planning and conduct of clinical trials should be widened.  For example postgraduate training programmes could have within them a secondment period to commercial organisations or a training period in specialist centres within the NHS and Universities (see next recommendation).

The need to train a new generation of doctors in the skills needed for the assessment of safety and efficacy of medicines was highlighted in the UK's Academy of Medical Sciences 2005 report "Safer Medicines".  Similar needs were identified in "Sustaining the skills pipeline in the pharmaceutical and biopharmaceutical industries", a recent report of a study by the ABPI.

This will need co-operation between higher education funding bodies and institutions, the NHS and industry.  Given that major stakeholders agree on the need to fill this skills gap with a new generation of Clinical Pharmacologists and related professionals, it should be possible to address it, and we encourage this in the interests of the safety of future first-in-man clinical trials.

22. The feasibility of developing specialist centres for phase one clinical trials of higher risk agents and advanced medicinal products should be explored.

The development of a national inspection and accreditation system for clinical centres that undertake first-in-man studies of higher risk agents should be encouraged.  The accreditation should be open to all centres that fulfil defined criteria, in both the public and private sectors.

## Further reading

'Cytokine Storm in a Phase 1 Trial of the Anti-CD28 Monoclonal Antibody TGN1412'
G. Suntharalingam, M. Perry, S. Ward, S. Brett,  A. Castello-Cortes, M. Brunner, and N. Panoskaltsis.
N Engl J Med.  2006, 355:1018-1028.

The European Clinical Trials Directive 2001/20/EC
(http://ec.europa.eu/enterprise/pharmaceuticals/eudralex/vol-1/dir_2001_20/dir_2001_20_en.pdf)

EudraLex Volume 10 –Clinical Trials
(http://ec.europa.eu/enterprise/pharmaceuticals/eudralex/homev10.htm)

European Union Guidelines -
http://www.emea.europa.eu/htms/human/humanguidelines/background.htm

ICH E8 - General Considerations for Clinical Trials (CPMP/ICH/291/95)
(http://www.emea.europa.eu/pdfs/human/ich/029195en.pdf)

ICH S6 Pre-clinical Safety Evaluation of Biotechnology-Derived Products
(CPMP/ICH/302/95)
(http://www.emea.europa.eu/pdfs/human/ich/030295en.pdf)

ICH M3 (R1) Non-Clinical Safety Studies for the Conduct of Human Clinical Trials for Pharmaceuticals (CPMP/ICH/286/95).
(http://www.emea.europa.eu/pdfs/human/ich/028695en.pdf).

ICH International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use (ICH) http://www.ich.org/cache/compo/276-254-1.html

Academy of Medical Sciences 2005 report "Safer Medicines"
(http://www.acmedsci.ac.uk/p102.html).


"Sustaining the skills pipeline in the pharmaceutical and biopharmaceutical industries",
ABPI. (http://www.abpi.org.uk/Details.asp?ProductID=285).

Exhibit 14



Ø Ø Ø
FAQ | Register Now | Sign In
Go

HOME | PHYSICAL SCIENCES | EARTH SCIENCES | LIFE SCIENCES | MEDICINE | SOCIAL SCIENCES | CULTURE | VIDEO | CONTRIBUTORS

HOME > CULTURE > TECHNOLOGY > NEWS ARTICLES

SCIENTIFIC BLOGGING
SCIENCE 2.0

# Blood Test Predicts Cytokine Storm Drug Reaction In Humans

By News Staff | March 9th 2015 02:17 PM | Print | E-mail | Track Comments

RSS Share / Save Tweet Like

SCIENTIFIC BLOGGING
SCIENCE 2.0
News Staff
Search This Blog

A new test that uses combinations of cells from a single donor's blood can predict whether a new drug will cause a severe immune reaction in humans.

The test could avert disasters like the 2006 trial of the drug TGN1412, which led to six healthy young men being admitted to intensive care with multiple organ failure. The volunteers receiving TGN1412 experienced a catastrophic inflammatory reaction called a cytokine storm, a particular worry for new biological therapies, or "biologics" which use biological material such as antibodies. Many blockbuster drugs such as the cancer drugs Herceptin and Avastin are biologics, as are around a third of medicines in the pharmaceutical pipeline. Because these medicines are specific to humans, they can cause severe reactions that don't materialize in animal studies, so tests on human cells are essential.

However, cytokine storm side effects are hard to predict with tests were just one cell type is used, since they depend on interactions between blood cells and endothelial cells, which form the lining of blood vessels. But because endothelial cells are deep within the body, they are normally only grown from tissue removed in surgery or post mortem, or from umbilical vessels after birth.

Because of this, current tests use endothelial cells taken from vessels of one donor, and white blood cells from a different donor. When cells from two different donors are used, one may have an immune reaction to the other, meaning the system is already primed for inflammation before the drug is added. This can result in the test falsely showing a severe immune reaction to a drug that is safe.

Researchers at Imperial College London got around this problem by isolating stem cells from the blood of a volunteer, and using them to grow endothelial cells in a dish. They then took white blood cells which they added to the donor's own endothelial cells to recreate the unique conditions found in their blood vessels. When TGN1412 was added to the test tube, the mixture of cells released a cytokine storm, as would happen inside the body.

The new method is better as it only requires blood from one donor and doesn't mix cells from different people, with the advantage of making a more reliable test.

Professor Jane Mitchell, from the National Heart and Lung Institute at Imperial College London, who led the study, said: "As biological therapies become more mainstream, it's more likely that drugs being tested on humans for the first time will have unexpected and potentially catastrophic effects. We've used adult stem cell technology to develop a laboratory test that could prevent another disaster like the TGN1412 trial.

"Drug companies have the technical capacity to start using this test now, but we're working on developing an off-the-shelf kit which will make it easy to use on a large scale."

KNOW SCIENCE AND WANT TO WRITE?

Register Now To Get Your Own Column!

Top Articles | New Comments | Events

1. Happiness Can Break Your Heart Too
2. Why Strong Artificial Intelligences Need Protection From Us - Not Us From Them
3. New, Less Toxic Therapy For Stage-4 Breast Cancer
4. Superman Can Start Worrying -- We've Got The Formula For (almost) Kryptonite!
5. Can You Suggest A Second Earth Apart From Mars?
6. E-Cigarette Formaldehyde Exposure Well Below WHO Quality Guidelines
7. Drug Combination Slows Breast Cancer Spread

ACSH American Council on Science and Health Science. Not Hype.

Extreme Happiness Can Kill You
Energy Drinks and the Heart: Not a Healthy Coupling
When the '5-Second Rule' Works (and When it Doesn't)
'Female Viagra' RIP: No Libido & No Libi-Dough
Here's Why Your Fingers and Toes Are Always Cold
Online Diet Programs Unlikely to Meet Standards, Study Finds

more

Fad Friday: Daith Pierci...

AdChoices

Dr Daniel Reed, the first author on the study, said: "A further benefit of this new technology is that personalised therapies can be tested to see how safe and effective they will be for an individual."

The Imperial researchers have collaborated with the National Institute for Biological Standards and Control to validate the test and are now working with the clinical trials company Quintiles to develop the technology further. The research is published in the FASEB Journal.

Citation: D.M. Reed et al. 'An autologous endothelial cell:PBMC assay that detects cytokine storm responses to biologics.' FASEB Journal, 2015. doi:10.1096/fj.14-268144

---

**News Articles**

**MORE ARTICLES**

- Most Teens Who Misuse Prescription Stimulants Say They Use Other People's Medication
- Why Do Chimpanzees Throw Stones At Trees?
- Modified Protein Reverses Cirrhosis In Lab Rats

All Articles

**ABOUT**

News Releases From All Over The World, Right To You...

View Profile

---

**RELATED ARTICLES ON SCIENCE 2.0**

Tissue Engineering Advance – Human Blood Vessels Grown In Mice From Adult Progenitor Cells
Aging Astronauts: Space Life Accelerates Oxidative Stress
Fixing 'leaky' Blood Vessels To Combat Severe Respiratory Ailments
No Hablo Cytokines: Cell–To–Cell Communication By Amino Acids
'Engineered' Blood Vessels From Adult Stem Cells Function Like Native Tissue

**YOU MAY ALSO LIKE**

Sponsored Links by Taboola



Brilliant Mortgage Payoff Method Has Banks On Edge
Comparisons.org



The 4 stages before a Heart Attack. Are you at risk?
VitaPulse Supplement



Testosterone Trick Leaves Wives Speechless
Test X180 Supplement



The Most Horrible News Broadcast Slip Ups Ever
My Daily Viral



The Cameraman Decided To Just Keep Recording
UberHavoc



Homeowners in for a Pleasant Surprise in 2016
Rate Marketplace Quotes



3 Billionaires Say: Something Big Coming Soon In U.S.A
Stansberry Research



10 Online Dating Sites That Really Work
Top 10 Online Dating Sites



SCIENCE CODEX

The BMJ Editor unpicks row over Hunt's use of seven–day NHS data
Alzheimer's disease: Early biomarker defined
Research shows efficacy of steroid use in late preterm delivery
New maps reduce threats to whales, dolphins
Accepting a job below one's skill level can adversely affect future employment prospects

more

Exhibit 15

*The FASEB Journal* • Research Communication

# An autologous endothelial cell:peripheral blood mononuclear cell assay that detects cytokine storm responses to biologics

Daniel M. Reed,* Koralia E. Paschalaki,[†] Richard D. Starke,[†] Nura A. Mohamed,*[,‡] Giles Sharp,[§] Bernard Fox,[§] David Eastwood,[§] Adrian Bristow,[§] Christina Ball,[§] Sandrine Vessillier,[§] Trevor T. Hansel,[¶] Susan J. Thorpe,[§] Anna M. Randi,[†] Richard Stebbings,[‖] and Jane A. Mitchell*[,1]

*Department of Cardiothoracic Pharmacology, Vascular Biology Section, National Heart and Lung Institute, and [†]Vascular Sciences, National Heart and Lung Institute, Hammersmith Hospital, Imperial College London, London, United Kingdom; [‡]Qatar Foundation Research and Development Division, Doha, Qatar; [§]National Institute for Biological Standards and Control, Potters Bar, United Kingdom; [¶]Imperial Clinical Respiratory Research Unit, St. Mary's Hospital, London, United Kingdom; and [‖]Medimmune, Cambridge, United Kingdom

**ABSTRACT** There is an urgent unmet need for human tissue bioassays to predict cytokine storm responses to biologics. Current bioassays that detect cytokine storm responses *in vitro* rely on endothelial cells, usually from umbilical veins or cell lines, cocultured with freshly isolated peripheral blood mononuclear cells (PBMCs) from healthy adult volunteers. These assays therefore comprise cells from 2 separate donors and carry the disadvantage of mismatched tissues and lack the advantage of personalized medicine. Current assays also do not fully delineate mild (such as Campath) and severe (such as TGN1412) cytokine storm-inducing drugs. Here, we report a novel bioassay where endothelial cells grown from stem cells in the peripheral blood (blood outgrowth endothelial cells) and PBMCs from the same donor can be used to create an autologous coculture bioassay that responds by releasing a plethora of cytokines to authentic TGN1412 but only modestly to Campath and not to control antibodies such as Herceptin, Avastin, and Arzerra. This assay performed better than the traditional mixed donor assay in terms of cytokine release to TGN1412 and, thus, we suggest provides significant advancement and a definitive system by which biologics can be tested and paves the way for personalized medicine.—Reed, D. M., Paschalaki, K. E., Starke, R. D., Mohamed, N. A., Sharp, G., Fox, B., Eastwood, D., Bristow, A., Ball, C., Vessillier, S., Hansel, T. T., Thorpe, S. J., Randi, A. M., Stebbings, R., Mitchell, J. A. An autologous endothelial cell:peripheral blood mononuclear cell assay that detects cytokine storm responses to biologics. *FASEB J.* 29, 2595–2602 (2015). www.fasebj.org

*Key Words:* stem cells · TGN1412 · coculture · personalized medicine

BIOLOGIC THERAPIES, WHICH include antibodies and stem cells, are increasingly important for the treatment of human disease. In line with this, the idea of tailoring therapies on a patient-by-patient basis in order to provide personalized medicine is now a key consideration in drug development. Importantly, because these medicines are human specific, biologic therapies require the use of human tissue-based bioassays for measures of efficacy and safety. Of particular concern is the assessment of biologic drugs to cause cytokine release that could result in precipitation of the so-called cytokine release syndrome, also described as cytokine release response, cytokine storm, cytokine cascade, or hypercytokinemia. Cytokine storm is a potentially fatal immune reaction associated with the clinical symptoms of severe inflammation and highly elevated levels of various proinflammatory cytokines.

In 2006, a clinical study held at Northwick Park Hospital to test the monoclonal antibody (mAb), anti-CD28 superagonist, TGN1412, resulted in all 6 healthy male volunteers suffering a profound cytokine storm response (1). This was despite the drug passing all preclinical safety testing, including tests on human-isolated T lymphocytes (2). Thus, TGN1412 defined an urgent unmet need for improved bioassays to detect cytokine storm-inducing drugs (3, 4). We now know that TGN1412 does not activate T lymphocytes or peripheral blood mononuclear cells (PBMCs) to release cytokines when it is added in aqueous

---

Abbreviations: BOEC, blood outgrowth endothelial cell; EGFR2, epidermal growth factor receptor 2; FBS, fetal bovine serum; FCS, fetal calf serum; GM-CSF, granulocyte-macrophage colony-stimulating factor; mAb, monoclonal antibody; NIBSC, National Institute for Biologic Standards and Control; PBMC, peripheral blood mononuclear cell; RPMI, Roswell Park Memorial Institute; VE, vascular endothelial

[1] Correspondence: Head of Vascular Biology and Head of Cardiothoracic Pharmacology, National Heart and Lung Institute, Institute of Cardiovascular Medicine & Science, Dovehouse St., Imperial College, London SW3 6LY, United Kingdom. E-mail: j.a.mitchell@imperial.ac.uk
doi: 10.1096/fj.14-268144
This article includes supplemental data. Please visit *http://www.fasebj.org* to obtain this information.

phase, unless there is an endothelial cell interface present (2, 5). This can be mimicked when TGN1412 is immobilized by nonspecific binding to a solid-phase platform such as plastic (5, 6). TGN1412-like mAbs also activate cytokine release from undiluted human whole blood, although the sensitivity of this assay is relatively low (7, 8).

Human endothelial cell:PBMC coculture assays have an advantage over assays with immobilized antibodies because they more accurately mimic the *in vivo* environment (5). However, this type of assay routinely relies on cell components from 2 separate donors, resulting in tissue mismatch responses, including those driven by heterologous major histocompatibility complex reactions (9). The use of these assays that comprise endothelial cells from 1 donor (usually from umbilical veins) and PBMCs from another (usually from healthy male volunteers) has raised concerns in the biologics industry where the potential for certain drugs to cause cytokine storm is now a requirement for preclinical safety testing (10). Clearly, the best type of cytokine storm assay would be one where endothelial cells and PBMCs are isolated from the same donor.

Up until now, same-donor endothelial cell:PBMC coculture has not been possible due to difficulties in isolating and growing endothelial cells from vessels of living donors. Adult stem cell technology allows for a range of cells, including endothelial cells, to be grown *in vitro* from blood progenitors. Here, we have utilized this technology to grow endothelial cells from progenitors in the PBMC fraction of human blood [so-called blood outgrowth endothelial cells (BOECs) (11)]. Using BOECs as the endothelial interface, we have constructed and validated a novel cytokine storm assay using PBMCs from the same donors.

## MATERIALS AND METHODS

### Media and solutions

Lonza-EGM2 medium was prepared by addition of Lonza-EGM2 SingleQuot supplements and growth factors to Lonza-EBM2 basal medium (Lonza, Walkersville, MD, USA). The supplier's information states that the following are included, although no concentrations are given: human epidermal growth factor, gentamicin-amphotericin-B 100, R3-IGF-1, ascorbic acid, vascular endothelial growth factor, human fibroblast growth factor-B, heparin, and hydrocortisone. The medium was prepared according to the supplier's instructions except that, for BOEC isolation and maintenance, the recommended 2% (v/v) fetal bovine serum (FBS) supplied with the kit was replaced and increased to 10% (v/v) using FBS from Hyclone (catalog number HYC-001-330Y; Thermo Fisher, Loughborough, United Kingdom). Type 1 rat tail collagen solution (catalog number 5423; BD Biosciences, Medford, MA, USA) was prepared in 0.02 N glacial acetic acid according to the manufacturer's instructions, at a concentration of $50 \mu g/ml$ and used to precoat surfaces used for BOEC isolation and maintenance. Coating was achieved by adding $5.2 \mu g/cm^2$ collagen solution and incubating at $37°C$, $5\% \ CO_2$ for 1 hour prior to washing 3 times with PBS.

Roswell Park Memorial Institute (RPMI) 1640 medium (Sigma-Aldrich, Nottingham, United Kingdom), which was used in all assays, was supplemented with $2 \ mM$ L-glutamine, 100 U/ml penicillin, 0.1 mg/ml streptomycin, and nonessential amino acids (Life Technologies, Paisley, United Kingdom). Male human AB serum was purchased from Biosera UK (catalog number HU 490-100ml; LabTech, Uckfield, United Kingdom) and, unless otherwise stated, was used as the serum supplement in all assays.

Unless otherwise stated, all cells were cultured in a humidified incubator at $37°C$ with $5\%$ (v/v) $CO_2$.

### BOEC culture and characterization

BOECs were isolated as described previously (12–14) and in accordance with published protocols (11). Blood (48 ml) was collected into tubes with Ficoll (15), from healthy volunteers at the Royal Brompton Hospital or the National Institute for Biologic Standards and Control (NIBSC; Potters Bar, United Kingdom). Tubes were centrifuged at 1600 $g$ for 30 minutes at room temperature with maximum acceleration and brake settings to obtain PBMCs within 1 hour of blood collection. Tubes were then inverted 8 times and within 1 hour, contents were then carefully pooled into a 50 ml Falcon tube (BD Biosciences), and 10% Hyclone FBS/PBS (v/v) was added to give a final volume of 50 ml. Cells were then centrifuged at 520 $g$ for 10 minutes with maximal acceleration and intermediate brake settings. The supernatant was discarded, and pellets were resuspended in 10 ml of 10% Hyclone FBS/PBS (v/v) solution. This process was repeated a further 2 times giving 3 washes in total. After the final wash, cells were resuspended in an appropriate volume (4–12 ml) of Lonza-EGM2 with 10% (v/v) FBS and distributed across collagen (5.2 $\mu g/ml$; BD Biosciences) precoated wells of a 6-well plate (Nunc, Roskilde, Denmark) at a density of $3 \times 10^7$ cells per well. After 24 hours, medium was carefully removed, cells were washed with Lonza-EGM2 with 10% (v/v) FBS, and 4 ml of fresh Lonza-EGM2 with 10% (v/v) FBS was added to each well. This process was repeated at 24, 72, and 96 hours and then every 48 hours without washing thereafter until colonies appeared. Colonies of endothelial cells typically emerged between days 7 and 12. Once colonies emerged, they were allowed to expand. Colonies were removed by trypsin (TrypLE 1×; Life Technologies) digest using 2 ml trypsin per well. Trypsin was neutralized with 4 ml Lonza-EGM2 with 10% (v/v) FBS, and the 6 ml cell per trypsin mix was collected in a 50 ml Falcon tube and centrifuged at 190 $g$ for 5 minutes at room temperature with maximal acceleration and intermediate brake settings. Cells were then plated and expanded and maintained on 25 and 75 $cm^2$ culture flasks (Nunc) precoated with collagen as described above. BOECs were used in experiments between passage 2 and passage 8.

Endothelial cell cultures were examined by light microscopy for cobblestone morphology. Images were captured using a light microscope at ×10 magnification with a Nikon VR ISO3200 camera attachment (Tokyo, Japan). BOECs were also stained for the endothelial cell marker vascular endothelial (VE)-cadherin. In these experiments, BOEC monolayers were fixed for 10 minutes in 4% (w/v) paraformaldehyde and permeabilized for 10 minutes using 0.2% (v/v) Triton X-100 (Sigma-Aldrich) at room temperature. Nonspecific binding was blocked using 4% FBS (v/v) in PBS for 1 hour at room temperature. Monolayers were then incubated for 1 hour with primary antibodies for VE-cadherin (goat anti-human; Santa Cruz Technology, Heidelberg, Germany), and after washing 3 times with PBS, with secondary antibodies conjugated to an Alexa Fluor dye (donkey anti-goat 594; Santa Cruz Biotechnology). All incubations with antibodies were carried out at room temperature. Cell nuclei were stained with the nuclear dye DAPI (10 $\mu g/ml$; Sigma-Aldrich), and images were captured using a Cellomics ArrayScan VTi HCS (Thermo Fisher) at ×10 magnification.

### HUVECs

HUVECs were isolated from healthy human umbilical cords kindly donated by the Maternity Unit at the Royal Oldham Hospital (Oldham, United Kingdom). HUVECs were isolated as

| PBMC: Day1 | BOEC outgrowth: Day 11 | BOEC (25cm² flask) | VE-cadherin |
|---|---|---|---|



**Figure 1.** Endothelial cells derived from human blood (BOECs). BOECs emerged from PBMCs between day 7 and 12 (day 11 shown). Cells were subsequently expanded in cell culture flasks and had cobblestone morphology. BOECs expressed VE-cadherin [nuclei are stained with DAPI (10 $\mu$g/ml)].

described previously (5). Briefly, cords were collected in sterile jars containing 1× HBSS supplemented with 20 mM 4-(2-hydroxyethyl)-1-piperazine ethane sulfonic acid buffer, 0.08% sodium bicarbonate, 0.05 mg/ml gentamycin, 50 U/ml penicillin, and 0.05 mg/ml streptomycin. The umbilical veins were flushed aseptically several times with PBS prior to incubation with 0.1% (w/v) collagenase (Roche Products Limited, Welwyn Garden City, United Kingdom) for 20 minutes while wrapped in cling film. Endothelial cells were collected by massaging the cord, flushing the vein with warm PBS, and centrifuging the cell suspension at 400 × $g$ for 10 minutes at room temperature prior to transfer to 25 cm² flasks in Lonza-EGM2 medium containing 10% (v/v) fetal calf serum (FCS). After overnight culture, HUVECs were then washed twice with warm PBS prior to further incubation in 20% (v/v) spent medium and fresh Lonza-EGM2 containing 10% (v/v) FCS. HUVECs from different cords were cultured separately and, after 2–3 days, were maintained in Lonza-EGM2 containing 2% (v/v) FCS as supplied by Lonza. Primary HUVECs were used in experiments between passage 2 and passage 8.

## Coculture assays

The day before the assay, 100 $\mu$l BOECs or HUVECs in RPMI medium containing 10% (v/v) human AB serum were plated into 96-well plates (30,000 cells per well; Nunc) and allowed to adhere overnight. On the day of the assay, donors of BOECs were recalled, blood was collected into heparin or sodium citrate, and PBMCs were isolated by density gradient centrifugation according to standard protocols (5). For the endothelial cell alone controls, medium was replaced with RPMI containing 2% (v/v) human AB serum. For the PBMC alone controls, cells were plated in RPMI containing 2% (v/v) human AB serum. For the cocultures, supernatants were aspirated from the endothelial cell monolayers, and PBMCs were added to the wells in RPMI containing 2% (v/v) human AB serum. For a subset of experiments designed to test the utility of FBS as a serum supplement, the assay was conducted as above but using 10% (v/v) FBS in place of the human AB serum.

Antibodies or isotype controls were then added (1 $\mu$g/well in a reaction volume of 200–250 $\mu$l) to monocultures or coculture wells for 24 hours before supernatants were collected and stored at −80°C until cytokines were measured using specific ELISA or MSD multiplex ELISA (Meso Scale Discovery, Rockville, MD, USA). In some experiments, cell proliferation was measured as described briefly below.

## Therapeutic antibodies

Antibodies were selected based on their ability to cause severe [TGN1412 (1)] or mild cytokine storm [Campath (alumtuzumab)

(16)] in humans. Noncytokine storm-causing therapeutic antibodies [Herceptin (trastuzumab), Avastin (bevacizumab) (17), and Arzerra (ofatumumab) (18)] were included as negative controls. The classifications of "non," "mild," and "severe" cytokine storm-causing antibodies are not official definitions, but rather, they are commonly used in the field to simply group therapeutic antibodies based on their clinical responses. Specifically, drugs that do not routinely cause increases in multiple cytokines when administered to patients are commonly referred to as noncytokine storm causing, those that cause detectable, but clinically manageable, increases in multiple cytokines coupled with physical symptoms in some patients are commonly referred to as mild cytokine storm producing, whereas those, like TGN1412, that cause increases in multiple cytokines, with life-threatening clinical symptoms that are not always manageable in some patients, are referred to as severe cytokine storm causing.

## Measurement of proliferation

Proliferation was assessed as described previously (2). Briefly, where proliferative studies were conducted, 50 $\mu$l of the original medium was supplemented with 50 $\mu$l of medium containing [³H] thymidine (Amersham Biosciences UK Limited, Little Chalfont, United Kingdom) at 0.5 $\mu$Ci/well for 18–19 hours. Cells were then harvested using a Micro-96 Cell Harvester (Molecular Devices, Wokingham, United Kingdom) onto glass fiber filtermats (PerkinElmer, Cambridge, United Kingdom). Tritiated thymidine incorporation was determined using a 1450 Microbeta Scintillation Counter (PerkinElmer).

## Measurement of cytokine release by ELISA

CXCL8 was measured by specific ELISA using an R&D Systems' Duoset ELISA platform (catalog number D208L; Abingdon, United Kingdom), according to the manufacturer's instructions, or using an in-house assay developed at NIBSC (6). Additional cytokines (IL-2, TNF-$\alpha$, IFN-$\gamma$, and IL-6) were measured using an in-house cytokine-specific ELISA standardized using World Health Organization International Standards or Reference Reagents (NIBSC) as described previously (6).

In some experiments, a full range of cytokines including granulocyte-macrophage colony-stimulating factor (GM-CSF), IL-10, and IL-13 as well as CXCL8, IL-2, IL-6, TNF-$\alpha$, and IFN-$\gamma$ was measured using an MSD 9-Plex Ultra-Sensitive Assay (Meso Scale Discovery). The immunoassay was carried out according to the manufacturer's instructions. Plates were read using an MSC Sector Imager 2400 and analyzed using MSD Discovery Workbench software.

TABLE 1. *Donor characteristics from which BOECs and PBMCs were isolated*

| Donor | Sex | Time to BOEC emergence (d) | CFU/50 ml blood |
|---|---|---|---|
| 1 | Male | 12 | 2 |
| 2 | Male | 11 | 4 |
| 3 | Female | 7 | 1 |
| 4 | Male | 11 | 1 |
| 5 | Male | 10 | 1 |
| 6 | Female | 10 | 2 |

CFU, colony-forming unit.

## RESULTS

As shown previously (19, 20), endothelial cells grown out from human blood (BOECs) of healthy volunteers had typical endothelial cell morphology and expressed VE-cadherin (**Fig. 1** and **Table 1**). In our study, BOECs emerged from PBMCs between day 7 and 12 (Fig. 1 and Table 1).

For a same-donor endothelial cell:PBMC bioassay to be useful, clearly, it should show cytokine release to TGN1412. In order to validate our same-donor BOEC:PBMC cocultures as a predictive cytokine storm assay and to compare responses with current coculture formats, we compared our same-donor BOEC:PBMC bioassay with cocultures using HUVECs as an endothelial cell interface.

Cocultures of HUVECs:PBMCs or same-donor BOECs: PBMCs responded to authentic TGN1412 and a remanu-factured synthetic TGN1412 IgG4 analog, NIB(28SA)-G4 (21), to release a range of "cytokine syndrome" cytokines (CXCL8, IL-6, IL-2, and TNF-$\alpha$) and to stimulate cell proliferation (**Fig. 2** and **Table 2**). TGN1412 and NIB (28SA)-G4 are both engineered humanized antibodies of IgG4 subclass. ANC28 is a fully murine antibody that also acts as an anti-CD28 superagonist and thereby mimics the effects of TGN1412 in human tissue bioassays (22). In line with this, ANC28 similarly activated cocultures of either PBMCs:HUVECs or PBMCs:BOECs to release a range of cytokines and to stimulate cell proliferation (Fig. 2 and **Table 3**). However, unlike TGN1412, ANC28 also activated monocultures of PBMCs to release cytokines and to pro-liferate, as similarly found with an anti-CD3 mAb (23), and so in monoculture assays is not an ideal analog of TGN1412. In addition to CXCL8, IL-6, IL-2, and TNF-$\alpha$, TGN1412 also activated same-donor BOECs:PBMCs or HUVECs:PBMCs to release IFN-$\gamma$, GM-CSF, and IL-10 (**Fig. 3** and Table 2). It should be noted that endothelial cell: PBMC cocultures did not respond to TGN1412 when hu-man AB serum was replaced with 10% FBS (Supplemental Fig. S1). Although this study is not powered to assess the effect of donor sex differences, we found that cells from either male or female donors respond similarly to thera-peutic antibodies.

In order to assess the predictive advantage of using same-donor endothelial cell:PBMC bioassays over using the conventional mixed-donor HUVEC:PBMC assays, we cal-culated assay readouts based on a fold change format to identify the relative signal-to-noise ratio for each readout induced by TGN1412 (Fig. 3). When comparing both assays, where cytokines and proliferation induced by TGN1412 were measured as fold change compared with an IgG4 isotype control, BOEC cocultures proved superior to HUVEC cocultures with statistically significant benefit shown for IFN-$\gamma$, TNF-$\alpha$, IL-10, GM-CSF, CXCL8, and proliferation.



**Figure 2.** Responses of HUVEC (*A–E*) and BOEC (*F–J*) coculture assays to cytokine storm-causing drugs. BOECs, HUVECs, or PBMCs were cultured in monoculture or in cocultures and incubated for 24 hours with isotype controls (IgG1 and IgG4) or the anti-CD28 superagonists [TGN1412, NIB(28SA)-G4, or ANC28] (all 1 $\mu$g/well). CXCL8 (*A* and *F*), IL-6 (*B* and *G*), IL-2 (*C* and *H*), TNF-$\alpha$ (*D* and *I*), and proliferation (measured as counts per minute; CPM) (*E* and *J*) were measured as readouts. Data are the mean ± SEM (*n* = 9–12 from 3 PBMC donors). Statistical significance was determined by 1-way ANOVA followed by Bonferroni posttest to compare ANC28 to IgG1 and TGN1412 and NIB(28SA)-G4 to IgG4. *$P < 0.05$.

TABLE 2. *Absolute cytokine levels released and proliferation responses to TGN1412 and an IgG4 control antibody in cocultures of BOECs or HUVECs with PBMCs*

| Anylate (pg/ml) | IFN-$\gamma$ | IL-2 | TNF-$\alpha$ | IL-10 | GM-CSF | IL-6 | CXCL8 | Proliferation |
|---|---|---|---|---|---|---|---|---|
| HUVEC:PBMC IgG4 | 12.72 ± 3.0 | 2.3 ± 0.6 | 31.7 ± 9.1 | 6.0 ± 2.1 | 13.1 ± 6.3 | 777.9 ± 305.1 | 6883.7 ± 2728.1 | 16297.0 ± 1481.3 |
| HUVEC:PBMC TGN1412 | 60.9 ± 3.1* | 110.9 ± 15.1* | 298.9 ± 11.7* | 82.2 ± 5.6* | 147.0 ± 20.6* | 4410.9 ± 509.1* | 21932.5 ± 2197.1* | 20670.58 ± 1708.5* |
| BOEC:PBMC IgG4 | 8.2 ± 2.0 | 1.0 ± 0.0 | 10.3 ± 3.1 | 4.0 ± 1.4 | 8.4 ± 3.3 | 201.7 ± 36.3 | 1405.5 ± 341.9 | 5000.6 ± 860.3 |
| BOEC:PBMC TGN1412 | 94.5 ± 11.0* | 105.9 ± 12.9* | 497.6 ± 40.8* | 73.7 ± 3.2* | 361.3 ± 60.4* | 3510.6 ± 590.9* | 19316.7 ± 1338.1* | 34169.4 ± 1998.6* |

Data are the mean ± SEM ($n$ = 10–24 from 3 PBMC donors). Where anylates were below the level of detection, the nominal value for the limit of detection (1.00 for IL-2) was attributed to the sample. Statistical significance between IgG4- and TGN1412-treated cocultures was carried out by multiple $t$ tests on individual readouts (*$P$ < 0.05).

After establishing proof-of-concept studies using TGN1412, we next sought to determine how our same-donor BOEC:PBMC bioassay might delineate between severe, mild and noncytokine storm-causing therapeutic antibodies. For this part of the study, we used the anti-CD52 mAb Campath, which causes mild cytokine storm in some patients (16), and Avastin (anti-VEGF), Arzerra (anti-CD20), and Herceptin [anti-EGFR2 (epidermal growth factor receptor 2)], which do not cause cytokine release in the majority of patients (17). As above (Fig. 2), the anti-CD28 superagonist ANC28 released high levels of cytokines, whereas Campath released only moderate levels, and Avastin (anti-VEGF), Arzerra (anti-CD20), and Herceptin (anti-EGFR2) released insignificant levels of cytokines (Table 3). These observations confirm that our same-donor BOEC:PBMC bioassay is not only an effective detecting system for profound cytokine storm responses but also appropriately delineates between responses to therapeutic antibodies that have been used in the clinic.

## DISCUSSION

Here, we report a novel bioassay using human cells that readily detects cytokine storm responses and delineates between therapeutic antibodies that cause severe and mild/rare infusion events. Our assay has been made possible because of advancements in the field of stem cell biology whereby endothelial cells can be grown routinely out of the blood of human volunteers. Our assay not only detects TGN1412, without problems of false-positive responses to control antibodies, but also clearly performs better than the industry standard coculture assay that uses HUVECs and PBMCs from different donors, presumably because we remove the confounding factor of tissue mismatch.

Following recent discussion by leaders in the field of cytokine storm assays (10), it is accepted that there are no clear and consistent precepts for the range of cytokine storm assays currently used by the pharmaceutical industry. Since the advent of TGN1412, the unifying gold standard for these assays has been detection of cytokine release by anti-CD28 superagonists but without a predefined criteria for 1) minimum unit, relative (fold) increase, and identity of cytokines released that constitute an adequate mimic of cytokine release syndrome; 2) profile of control antibodies that do not generally activate cytokine release; 3) physiologic conditions that best model the human *in vivo* situation; and 4) assessment in tissue from specific target patient groups relevant to the particular biologic drug to be tested (personalized medicine). With this in mind, it is increasingly accepted that research focus should turn to translatability of these assays and their utility as formats to detect cytokine storm in new drugs with unknown potential toxicity. Each of these points will be discussed below.

### Minimum unit, relative (fold) increase, and identity of cytokines released that constitute an adequate mimic of cytokine release syndrome

Despite no clear benchmarks, it is accepted that a "cytokine storm response" has been detected in a given bioassay

TABLE 3. *Ability of same-donor BOEC:PBMC cocultures to delineate severe, mild, and noncytokine storm-causing biologics*

| Anylate (pg/ml) | IFN-γ | IL-2 | TNF-α | IL-10 | IL-6 | CXCL8 | IL-13 |
|---|---|---|---|---|---|---|---|
| ANC28 | 695.7 ± 134.9* | 864.1 ± 159.1* | 405.4 ± 65.6* | 554.0 ± 186.3* | 5563.4 ± 1250.0* | 16655.8 ± 380.0* | 180.8 ± 41.1* |
| Campath | 7.43 ± 2.8 | 9.6 ± 2.2 | 75.3 ± 16.2 | 12.7 ± 3.1 | 574.6 ± 355.4 | 9276.1 ± 2093.3* | 30.7 ± 8.5 |
| Avastin | 0.78 ± 0.0 | 1.6 ± 0.3 | 31.8 ± 15.0 | 4.7 ± 1.8 | 201.9 ± 92.2 | 2962.1 ± 1095.3 | 13.0 ± 7.5 |
| Arzerra | 0.78 ± 0.0 | 1.6 ± 0.3 | 12.0 ± 4.9 | 1.8 ± 0.8 | 134.4 ± 23.9 | 2283.1 ± 720.1 | 4.6 ± 0.8 |
| Herceptin | 0.78 ± 0.0 | 2.0 ± 0.5 | 19.7 ± 7.6 | 2.3 ± 0.8 | 154.9 ± 44.1 | 2576.0 ± 881.9 | 4.3 ± 0.8 |
| Medium | 0.78 ± 0.0 | 3.3 ± 0.5 | 18.8 ± 4.7 | 10.07 ± 1.1 | 114.7 ± 5.0 | 1793.5 ± 382.4 | 5.6 ± 1.1 |

BOEC:PBMC cocultures were incubated for 24 hours with medium alone, Herceptin (noncytokine storm causing), Arzerra (noncytokine storm causing), Avastin (noncytokine storm causing), Campath (mild/none cytokine storm causing), or the anti-CD28 superagonist ANC28 (severe cytokine storm causing) (all 1 μg/well). Data are the mean ± SEM (n = 6 from 3 PBMC donors). Where anylates were below the level of detection, the nominal value for the limit of detection (0.78 for IFN-γ) was attributed to the sample. Statistical significance for the effect of each drug on individual cytokines was determined by 1-way ANOVA followed by Dunnett's multiple comparison test *vs.* medium only (*$P < 0.05$).

when "significant" increases in cardinal proinflammatory cytokines are seen. These generally include those found in the plasma of patients administered the TGN1412 drug in the 2006 trial (1). In generic form (not specifically related to TGN1412), these would include, as a minimum unit, CXCL8, IL-6, IFN-γ, TNF-α, or IL-1. In addition to detecting adequately proinflammatory cytokines as readouts of cytokine toxicity, any bioassay for a given biologic drug should also detect the desired therapeutic response. In the case of TGN1412, an anti-CD28 superagonist with the predefined downstream target of activation of T cells for the treatment of cancer and autoimmune disease, readouts of IL-2 release and proliferation of T cells would seem to be an essential requirement of a successful TGN1412 bioassay for efficacy. Although on the face of it, this point seems obvious, it should not be overlooked. This is because whereas not necessarily predicted to do so, the desired therapeutic effect of a drug may lead to or exacerbate activation of unforeseen cytokine pathways. In the case of our same-donor BOEC:PBMC bioassay, each of these considerations is met.

## Profile of control antibodies that do not generally activate cytokine release

As with traditional *in vitro* toxicity screens, when designing new *in vitro* bioassays to detect the potential of a new drug to cause a cytokine storm response, it is critical that false positives be avoided. Assays that show cytokine release to control antibodies used safely in the majority of patients have the inherent danger of inaccurately flagging a drug as dangerous that could be safe and have important clinical potential. Some of the current *in vitro* bioassays designed specifically to detect cytokine responses to TGN1412 show increased cytokine release for cardinal readouts such as CXCL8 and IL-6 to control antibodies such as Avastin (24). Again, as above, our same-donor assay detects lower (in the case of Campath) or insignificant levels of cytokines in response to control biologic drugs used safely in the clinic.

## Physiologic conditions that best model the human *in vivo* situation and assessment in tissue from specific target patient groups relevant to the particular biologic drug to be tested (personalized medicine)

We suggest that it is for these points, physiologic conditions that best model the human *in vivo* situation and assessment in tissue from specific target patient groups relevant to the particular biologic drug to be tested (personalized medicine), that our same-donor BOEC:PBMC assay has a clear and unique advantage over current industry standard formats. Some current bioassay systems designed to detect cytokine storm responses rely on the use of PBMCs being added to microtitre plates that are dry or wet coated with antibody (2, 24). Although PBMC monoculture assays detect *in vivo* toxicity responses, unlike endothelial cell coculture assays (2), they are inherently artificial with the potential disadvantage of not mimicking the combination of endothelial cells

**Figure 3.** Comparison of TGN1412-induced responses of BOECs and HUVECs in coculture with PBMCs. Data are presented as fold change (TGN1412/IgG4) of cytokine release or proliferation in response to TGN1412 compared to IgG4 isotype control. BOECs (open bars) or HUVECs (filled bars) were cocultured with PBMCs and incubated with IgG4 (1 μg/well) or TGN1412 (1 μg/well) for 24 hours. Data are the mean ± SEM (n = 12–24 from 3 PBMC donors). Statistical significance between BOEC vs. HUVEC cocultures was carried out by multiple *t* tests on individual readouts. *$P < 0.05$.



and leukocytes present *in vivo*. Whole-blood assays that also detect a cytokine response to TGN1412-like drugs (7) have the advantage of being somewhat more physiologic and easy to perform but lack the sensitivity of immobilized antibody assays (7, 25). Combining PBMCs with an endothelial interface may be considered to better mimic the *in vivo* situation and constitutes a bioassay format that detects cytokine release to TGN1412, but as mentioned above, has previously relied on endothelial cells and PBMCs from different donors. Our observation that substitution of human with bovine serum results in the loss of TGN1412 sensing raises an important point. Because TGN1412 caused cytokine storm exclusively in humans, it seems logical that either human serum elements are essential and/or serum constituents from other species interfere with TGN1412 signaling in human cell cocultures *in vitro*. Our BOEC:PBMC bioassay fulfills the goal of a more physiologic platform by using cells from the same donor. Clearly, because we can grow cells from blood progenitors, this assay is easily performed in tissue from specific patient groups and thereby fulfills the increasing requirement for a personalized medicine approach to testing drugs for efficacy as well as toxicity.

## Summary and future applications

As acknowledged by recent discussions between experts in the field, there are still significant gaps in our knowledge of how *in vitro* cytokine assay data translate to the clinic. This raises the question of how much we should focus on studying TGN1412 and its associated mechanism *versus* using and developing assays that will allow preclinical data to be translated fully to the clinic and that will adequately detect "unknowns" without false-positive responses. We suggest that the assay we describe here using endothelial cells and PBMCs from the same donor in coculture represents a significant advancement in this area with clear translational potential for personalized medicine in biotherapeutic design and safety assessment. However, this assay relies on specialized cell culture techniques and relatively lengthy preculture steps. The translational potential of this assay will also require rigorous testing. The challenge now is to establish how this assay prototype can be scaled up for standardized high-throughput use by industry. Finally, whereas current bioassays to detect cytokine storm response have utilized whole blood, or leukocytes with or without endothelial cells, it is acknowledged that other specialized cells may, in some circumstances, contribute to cytokine storm responses *in vivo*. With future advancements in adult stem cell biology, we suggest that where stromal cell types may be required to compliment *in vitro* bioassays systems, the concept of same-donor assays will be entirely possible.            FJ

The authors gratefully acknowledge Drs. Graham Clarke and Margaret Rainer (Quintiles Drug Research Unit, London, United Kingdom) for helpful discussions. The authors also acknowledge Ms. Stefania Mataragka, Ms. Hime Gashaw, and Mr. Neil Galloway-Phillips for technical support. The authors thank the staff and patients at the Maternity Unit at the Royal Oldham Hospital (Oldham, United Kingdom) for donating umbilical cords, and donors of blood for blood outgrowth endothelial cell and peripheral blood mononuclear cell preparations. This work was funded by the Medical Research Council and a Wellcome Trust Programme Grant (0852551Z108/Z to J.A.M.). D.M.R. and J.A.M. are associated with the following patent filed in Europe: WO2014147216. J.A.M. has previously received consultancy fees from Roche Limited (West Sussex, United Kingdom).

## REFERENCES

1. Suntharalingam, G., Perry, M. R., Ward, S., Brett, S. J., Castello-Cortes, A., Brunner, M. D., and Panoskaltsis, N. (2006) Cytokine storm in a phase 1 trial of the anti-CD28 monoclonal antibody TGN1412. *N. Engl. J. Med.* **355**, 1018–1028
2. Stebbings, R., Findlay, L., Edwards, C., Eastwood, D., Bird, C., North, D., Mistry, Y., Dilger, P., Liefooghe, E., Cludts, I., Fox, B., Tarrant, G., Robinson, J., Meager, T., Dolman, C., Thorpe, S. J., Bristow, A., Wadhwa, M., Thorpe, R., and Poole, S. (2007) "Cytokine storm" in the phase I trial of monoclonal antibody TGN1412: better understanding the causes to improve preclinical testing of immunotherapeutics. *J. Immunol.* **179**, 3325–3331
3. Stebbings, R., Eastwood, D., Poole, S., and Thorpe, R. (2013) After TGN1412: recent developments in cytokine release assays. *J. Immunotoxicol.* **10**, 75–82
4. Hünig, T. (2012) The storm has cleared: lessons from the CD28 superagonist TGN1412 trial. *Nat. Rev. Immunol.* **12**, 317–318
5. Findlay, L., Sharp, G., Fox, B., Ball, C., Robinson, C. J., Bird, C., Stebbings, R., Eastwood, D., Wadhwa, M., Poole, S., Thorpe, R., and Thorpe, S. J. (2011) Endothelial cells co-stimulate peripheral blood mononuclear cell responses to monoclonal antibody TGN1412 in culture. *Cytokine* **55**, 141–151
6. Findlay, L., Eastwood, D., Stebbings, R., Sharp, G., Mistry, Y., Ball, C., Hood, J., Thorpe, R., and Poole, S. (2010) Improved in vitro methods to predict the in vivo toxicity in man of therapeutic monoclonal antibodies including TGN1412. *J. Immunol. Methods* **352**, 1–12
7. Bailey, L., Moreno, L., Manigold, T., Krasniqi, S., Kropshofer, H., Hinton, H., Singer, T., Suter, L., Hansel, T. T., and Mitchell, J. A. (2013) A simple whole blood bioassay detects cytokine responses to anti-CD28SA and anti-CD52 antibodies. *J. Pharmacol. Toxicol. Methods* **68**, 231–239
8. Wolf, B., Morgan, H., Krieg, J., Gani, Z., Milicov, A., Warncke, M., Brennan, F., Jones, S., Sims, J., and Kiessling, A. (2012) A whole blood in vitro cytokine release assay with aqueous monoclonal antibody presentation for the prediction of therapeutic protein induced cytokine release syndrome in humans. *Cytokine* **60**, 828–837
9. Huang, E. H., Morgan, C. J., Sedmak, D. D., Ferguson, R. M., and Orosz, C. G. (1994) Alloantigenicity of human endothelial cells. IV. Derivation, characterization, and utilization of gonadal vein endothelia to control endothelial alloantigenicity during lymphocyte-endothelial interactions. *Transplantation* **57**, 703–711
10. Finco, D., Grimaldi, C., Fort, M., Walker, M., Kiessling, A., Wolf, B., Salcedo, T., Faggioni, R., Schneider, A., Ibraghimov, A., Scesney, S., Serna, D., Prell, R., Stebbings, R., and Narayanan, P. K. (2014) Cytokine release assays: current practices and future directions. *Cytokine* **66**, 143–155
11. Martin-Ramirez, J., Hofman, M., van den Biggelaar, M., Hebbel, R. P., and Voorberg, J. (2012) Establishment of outgrowth endothelial cells from peripheral blood. *Nat. Protoc.* **7**, 1709–1715
12. Reed, D. M., Foldes, G., Gatheral, T., Paschalaki, K. E., Lendvai, Z., Bagyura, Z., Nemeth, T., Skopal, J., Merkely, B., Telcian, A. G., Gogsadze, L., Edwards, M. R., Gough, P. J., Bertin, J., Johnston, S. L., Harding, S. E., and Mitchell, J. A. (2014) Pathogen sensing pathways in human embryonic stem cell derived-endothelial cells: role of NOD1 receptors. *PLoS One* **9**, e91119
13. Starke, R. D., Ferraro, F., Paschalaki, K. E., Dryden, N. H., McKinnon, T. A., Sutton, R. E., Payne, E. M., Haskard, D. O., Hughes, A. D., Cutler, D. F., Laffan, M. A., and Randi, A. M. (2011) Endothelial von Willebrand factor regulates angiogenesis. *Blood* **117**, 1071–1080
14. Starke, R. D., Paschalaki, K. E., Dyer, C. E., Harrison-Lavoie, K. J., Cutler, J. A., McKinnon, T. A., Millar, C. M., Cutler, D. F., Laffan, M. A., and Randi, A. M. (2013) Cellular and molecular basis of von Willebrand disease: studies on blood outgrowth endothelial cells. *Blood* **121**, 2773–2784

15. Thill, M., Strunnikova, N. V., Berna, M. J., Gordiyenko, N., Schmid, K., Cousins, S. W., Thompson, D. J., and Csaky, K. G. (2008) Late outgrowth endothelial progenitor cells in patients with age-related macular degeneration. *Invest. Ophthalmol. Vis. Sci.* **49**, 2696–2708

16. Wing, M. G., Moreau, T., Greenwood, J., Smith, R. M., Hale, G., Isaacs, J., Waldmann, H., Lachmann, P. J., and Compston, A. (1996) Mechanism of first-dose cytokine-release syndrome by CAMPATH 1-H: involvement of CD16 (FcgammaRIII) and CD11a/CD18 (LFA-1) on NK cells. *J. Clin. Invest.* **98**, 2819–2826

17. Chung, C. H. (2008) Managing premedications and the risk for reactions to infusional monoclonal antibody therapy. *Oncologist* **13**, 725–732

18. Czuczman, M. S., Fayad, L., Delwail, V., Cartron, G., Jacobsen, E., Kuliczkowski, K., Link, B. K., Pinter-Brown, L., Radford, J., Hellmann, A., Gallop-Evans, E., DiRienzo, C. G., Goldstein, N., Gupta, I., Jewell, R. C., Lin, T. S., Lisby, S., Schultz, M., Russell, C. A., and Hagenbeek, A.; 405 Study Investigators. (2012) Ofatumumab monotherapy in rituximab-refractory follicular lymphoma: results from a multicenter study. *Blood* **119**, 3698–3704

19. Paschalaki, K. E., Starke, R. D., Hu, Y., Mercado, N., Margariti, A., Gorgoulis, V. G., Randi, A. M., and Barnes, P. J. (2013) Dysfunction of endothelial progenitor cells from smokers and chronic obstructive pulmonary disease patients due to increased DNA damage and senescence. *Stem Cells* **31**, 2813–2826

20. Reed, D. M., Foldes, G., Kirkby, N. S., Ahmetaj-Shala, B., Mataragka, S., Mohamed, N. A., Francis, C., Gara, E., Harding, S. E., and Mitchell, J. A. (2014) Morphology and vasoactive hormone profiles from endothelial cells derived from stem of different sources. *Biochem. Biophys. Res. Commun.* 455, 172–177

21. Ball, C., Fox, B., Hufton, S., Sharp, G., Poole, S., Stebbings, R., Eastwood, D., Findlay, L., Parren, P. W., Thorpe, R., Bristow, A., and Thorpe, S. J. (2012) Antibody C region influences TGN1412-like functional activity in vitro. *J. Immunol.* **189**, 5831–5840

22. Waibler, Z., Sender, L. Y., Merten, C., Hartig, R., Kliche, S., Gunzer, M., Reichardt, P., Kalinke, U., and Schraven, B. (2008) Signaling signatures and functional properties of anti-human CD28 superagonistic antibodies. *PLoS One* **3**, e1708

23. Eastwood, D., Bird, C., Dilger, P., Hockley, J., Findlay, L., Poole, S., Thorpe, S. J., Wadhwa, M., Thorpe, R., and Stebbings, R. (2013) Severity of the TGN1412 trial disaster cytokine storm correlated with IL-2 release. *Br. J. Clin. Pharmacol.* **76**, 299–315

24. Findlay, L., Eastwood, D., Ball, C., Robinson, C. J., Bird, C., Wadhwa, M., Thorpe, S. J., Thorpe, R., Stebbings, R., and Poole, S. (2011) Comparison of novel methods for predicting the risk of pro-inflammatory clinical infusion reactions during monoclonal antibody therapy. *J. Immunol. Methods* **371**, 134–142

25. Thorpe, S. J., Stebbings, R., Findlay, L., Eastwood, D., Poole, S., and Thorpe, R. (2013) How predictive are in vitro assays for cytokine release syndrome in vivo? A comparison of methods reveals worrying differences in sensitivity and frequency of response. *Cytokine* **64**, 471–472

*Received for publication December 3, 2014.*
*Accepted for publication February 13, 2015.*

Exhibit 16

BMJ 2015;350:h1831 doi: 10.1136/bmj.h1831 (Published 2 April 2015)     Page 1 of 1





# NEWS

# Experimental drug that injured UK volunteers resumes in human trials

Owen Dyer

Montreal

A phase II trial of an experimental drug that made headlines nine years ago when it caused horrific injuries to volunteers in a London trial is about to begin in Russia to evaluate it as a potential treatment for rheumatoid arthritis.

The drug, known as TGN1412, attained brief worldwide notoriety when six paid volunteers, all young men, were admitted to hospital for intensive care soon after being given what was believed to be a minute dose by a contract research organisation in Northwick Park Hospital, London.[1] The men experienced a cytokine storm, an extreme autoimmune reaction leading to multiple organ failure. One lost his fingertips and toes to necrosis. Another was described by hospital staff as looking like "the elephant man" after his head ballooned. All had lasting injuries.

But the drug is set for a "potentially triumphant return," an editorial in the *British Journal of Clinical Pharmacology* has argued. "TGN1412 was a chilling example," wrote an editor, Adam Cohen, of how "a sophisticated product could be destroyed by inadequate development."[2]

The injured men were compensated after a legal battle, and the drug's developer, TeGenero, founded by researchers from the University of Würzburg, Bavaria, went bankrupt. But the disastrous trial continued to be studied at Würzburg and in the United Kingdom.

In late 2006, before investigators could establish what had gone wrong, the commercial rights to TGN1412 were acquired by a Russian investor. The drug was renamed TAB08 and was developed further by the Russian biotechnology company TheraMAB.

Soon after, researchers at Würzburg and in Britain gained new insights into the drug's effects on T cells. The drug's developers had hoped that it would preferentially activate regulatory T cells, suppressing autoimmune inflammation. They had initially tested it on cynomolgus monkeys (a species of macaque), in whose T cells the drug's target CD28 receptor closely resembles the human version. Their starting dose in the human trial had been just 0.2% of the final dose tested on the monkeys.

But they overlooked subtle differences in the human immune system that cause other, pro-inflammatory immune cells to also carry CD28 receptors accessible to the drug. The error was compounded by TeGenero's failure to calculate a starting dose on the basis of receptor occupancy. Normally, when potential agonists are tested on important body systems, the initial dose is calculated so that a maximum of 10% of available receptors might potentially be occupied. When this calculation was belatedly made after the event, it showed that the dose used had been enough to occupy 90% of all CD28 receptors in the human body.

This knowledge led Russian researchers to begin a phase I trial with a dose 0.1% of that given in London, then to titrate upwards. At 5% of the London dose, they concluded, regulatory but not inflammatory T cells were activated.[3] A phase II trial will begin this June in Russia, TheraMAB's chief executive, Dmitry Tyrsin, told Reuters, and the company is seeking approval to extend the trial to the United States later this year. Trials in patients with lupus and psoriasis are also planned.

"This is good news for the whole industry," Tyrsin said. "It shows that if you plan preclinical development in the right step-wise way, then you can safely develop potentially risky drugs."

1   Mayor S. Severe adverse reactions prompt call for trial design changes. *BMJ* 2006;332:683.
2   Kenter MJH, Cohen AF. The return of the prodigal son and the extraordinary development route of antibody TGN1412: lessons for drug development and clinical pharmacology. *Br J Clin Pharm* 2015;79:545-7.
3   Tabares P, Berr S, Römer PS, et al. Human regulatory T cells are selectively activated by low-dose application of the CD28 superagonist TGN1412/TAB08. *Eur J Immunol* 2014;44:1225-36.

Cite this as: *BMJ* 2015;350:h1831

© BMJ Publishing Group Ltd 2015

Exhibit 17

# THE WALL STREET JOURNAL.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.

http://www.wsj.com/articles/zafgen-says-another-patient-dies-in-beloranib-study-1449059965

BUSINESS

# Zafgen Says a Second Patient Died in Beloranib Study

FDA had placed beloranib on partial clinical hold in October following first patient's death

By **ANNE STEELE**

Updated Dec. 2, 2015 9:20 a.m. ET

Zafgen Inc. said Wednesday that a second patient died during a continuing study of a rare genetic disorder, two months after U.S. regulators temporarily halted part of its clinical trial to investigate circumstances surrounding the previous death.

Shares plunged 56% to $6.95 in premarket trading.

The biopharmaceutical company said it learned Tuesday that a patient being treated with beloranib for Prader-Willi syndrome was diagnosed with bilateral pulmonary emboli—blood clots to the lung—and died.

The patient was receiving the drug during the open-label extension portion of the late-stage trial, which hadn't been halted.

Prader-Willi syndrome is a genetic disorder that results in life-threatening obesity because of unrelenting hunger. There is no cure for the disease, which affects one in 12,000 to 15,000 people, according to the Prader-Willi Syndrome Association.

In October, Zafgen disclosed that a patient had died during the beloranib study. The U.S. Food and Drug Administration placed beloranib on partial clinical hold because of the thromboembolic events—blood clots that move after forming and block other vessels—in other trials of beloranib and the unknown nature of that death.

A company spokeswoman said Tuesday the previous death was still under investigation. She also said the randomized portion of the trial, which was halted by the FDA, was closed by Zafgen. She said Zafgen felt a sufficient number of patients had completed the randomized portion in two separate trials of beloranib to assess the efficacy of the drug. Patients from that portion who chose to could be screened and move to the open-label portion.

On Tuesday, Chief Executive Thomas Hughes said Zafgen is in talks with the FDA while determining next steps for the program.

"Our thoughts are with the patient and their family at this time," he said. "Patient safety remains our top priority, and we are investigating the circumstances around this event."

The company reiterated its expectation for "top-line results" of the randomized portion of the clinical trial in the first quarter of 2016.

**Write to** Anne Steele at Anne.Steele@wsj.com

Copyright 2014 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

Exhibit 18





## Business

# FDA halts trial of cancer drug by Seattle's CTI BioPharma after patients die

  

Originally published February 10, 2016 at 7:30 am *Updated February 11, 2016 at 6:13 am*



The Seattle Times on Facebook ✕

James Bianco, CEO of CTI BioPharma, photographed at the company's Seattle headquarters. (Steve

Ringman/The Seattle Times)





**The Food and Drug Administration has shut down Seattle-based CTI BioPharma's clinical trial of a blood cancer drug after patients died from "intracranial hemorrhage, cardiac failure and cardiac arrest."**

By Rachel Lerman 🐦
*Seattle Times technology reporter*

The Food and Drug Administration has shut down Seattle-based CTI BioPharma's clinical trial of a cancer-drug candidate after patients died of cardiac arrest and

bleeding inside the skull.

CTI BioPharma, which was previously known as Cell Therapeutics, started testing the drug called pacritinib in December 2013 as a treatment for myelofibrosis, a blood cancer, and other cancers.



The FDA initially put a partial hold on the Phase 3 clinical trial last week, requiring CTI to halt new patient enrollment. The company announced late Tuesday the FDA had put the trial on full clinical hold after patients died from "intracranial hemorrhage, cardiac failure and cardiac arrest."

All patients on pacritinib must stop the drug, and no new patients can be added to the trial, the company said in a news release.

## Most Read Stories


Seattle priest, a known pedophile, was moved parish to parish

The Seattle Times editorial board recommends John Kasich, Bernie Sanders

Bernie Sanders puts 20 staffers in state, opens Seattle office

Gym owner: 'Appropriate' to call cops on Kam Chancellor

 For Tulalip 22-year-old, a life gone haywire after Oregon standoff

Unlimited Digital Access. $1 for 4 weeks.

CTI gave no details on the number of deaths associated with the clinical trial. Spokeswoman Monique Greer said Wednesday that an earlier Phase 3 trial had 327 patients and the current one had more than 300 patients.

She said the company, which has withdrawn the new-drug application under which it was conducting the clinical trial to gain marketing approval for pacritinib, was "not in a position to make any public statements regarding next steps at this time" because it is still working with the FDA.

CTI was the subject of a 2013 Seattle Times investigation about its first commercial drug, Trisenox. The company was sued by the U.S. Department of Justice in 2010 for illegally promoting the drug for unapproved uses. CTI eventually paid the federal government $10.5 million to settle the suit.

The company noted in its 2014 annual report that the first Phase 3 trial of pacritinib has "positive top-line results" and the FDA had fast-tracked the second part of the phase 3 trial, which was to target patients with intermediate and high-risk myelofibrosis.

Drug trials often fail during Phase 3 trials, but it is generally not because of multiple deaths, said David Gortler, a former FDA senior medical officer and a drug-safety expert at consulting group FormerFDA.com.

"Patient deaths are a rare occurrence, generally speaking, within clinical trials," Gortler said. " ... Even one death is cause enough to shut down a clinical trial."



www.koreanair.com

Convenient and direct aisle access from every seat — Excellence in Flight KOREAN AIR

Any kind of severe effect during a trial must be reported to the FDA, Gortler said, and companies usually shut down trials themselves after deaths occur.

The company's statement said the FDA's Monday letter cited interim results from the clinical trial that "show a detrimental effect on survival." The clinical trial was comparing pacritinib to "the best available" current treatment for patients with myelofibrosis.

Kevin Noonan, a biotechnology patent lawyer with McDonnell Boehnen Hulbert & Berghoff in Chicago and a former molecular biologist, said Phase 3 trials are the culminating stage of testing for the drug.

"Many, many compounds can get through the first couple phases, then fail in Phase 3."

He compared the process to safety testing a car — you want to drive it as fast as you can because you want to make sure you have tested every aspect.

Entering a new phase is like turning a blind corner, he said.



4 Stages to a Heart Attack

4 Signs

The Cardiac Killer

He noted that the FDA errs on the side of safety by placing blame on the drug for the death, though occasionally the cause turns out to be something else.

Shares of CTI BioPharma fell 40 percent to 30 cents on Wednesday. Combined with a sharp plunge Tuesday on the earlier news of the partial clinical hold, the stock is down about 75 percent this week.

James Bianco remains at the helm of the company founded in 1991.

During a quarter century, it has raised and spent more than $2 billion, according to its latest quarterly report in November. In December, it raised about $50 million more.

But at its current share price, CTI BioPharma's total market capitalization is only about $92 million.

*Rachel Lerman: rlerman@seattletimes.com; on Twitter@rachelerman.*

Exhibit 19

nature.com    Sitemap                                                    Log In    Register

News & Comment        News blog Archive        Post

Previous post                                              Next post
**Another Alzheimer's antibody drug fails**        **Court upholds federal funding of**
**large trials**                                   **embryonic stem cell research**

NEWS BLOG

# Hepatitis C drug trial halted after patient death

24 Aug 2012 | 21:02 GMT | Posted by Kat Lougheed | Category: Biology & Biotechnology, Health and medicine

Bristol-Myers Squibb has halted development of a potential hepatitis C drug after nine participants in a clinical trial of the therapy were hospitalized and one died (see press release).

Hepatitis C (HCV) is a chronic viral infection transmitted via blood and, occasionally, other bodily fluids. In a large proportion of cases, patients develop chronic liver disease, which can remain symptomless for decades. Cirrhosis and cancer occur in a number of cases, leading to a 1–5% death rate. The US Centers for Disease Control estimates that approximately 3.2 million people in the United States are living with chronic HCV infection, making a new and improved HCV drug a potentially very profitable investment.

Bristol-Myers Squibb (BMS), based in New York, acquired the rights to the drug BMS-986094 (formerly known as INX-189) when it bought Inhibitex, based in Alpharetta, Georgia, for US$2.5 billion in January (see 'Pharma giants buy up hepatitis C hopefuls'). The drug works by inhibiting a polymerase enzyme called NS5B, which is essential for viral replication. It was being tested in a phase II clinical trial until 1 August, when BMS announced that they had voluntarily suspended the research (see press release). It has since been revealed that this was owing to suspected heart and kidney toxicity effects, although the company cautioned that a causal link between the drug and adverse effects has not been proven. Two trial participants remain in hospital (reported in the *New York Times*). Abandoning the drug amounts to writing off about $1.8 billion of what BMS paid for Inhibitex. After the news of the safety crisis broke, shares in BMS fell, reducing its market value by billions (see FierceBiotech).

This is a major blow for BMS, which had been hoping to capitalize on the multibillion-dollar market for a new HCV treatment. The company is just one of the competitors in a hot field that has seen some big acquisitions in recent years. In February, Gilead Sciences, based in Foster City, California, bought out Pharmasset, of Princeton, New Jersey, for $11 billion to take control of their hepatitis drug candidate (see *Nature Biotechnology*'s news story — subscription required). In the same month, Enanta Pharmaceuticals, based in Watertown, Massachusetts, secured a hepatitis C drug-development deal with Novartis, based in Basel, Switzerland, with a $34-million up-front payment and another $440 million if the drug reaches required goals, plus a double-digit percentage of worldwide sales (see

Xconomy). Roche, also based in Basel, bought Anadys Pharmaceuticals, based in San Diego, California, for $230 million in October 2011, after eyeing a hepatitis C drug in its pipeline (see *Nature*). These acquisitions had led to the share prices of other HCV drug developers to rise in anticipation of a buyout (see InvestorPlace).

For many years, the only available treatment for HCV was a combination of interferon-α and ribavirin. The interferon acted to boost the patient's immune system, while ribavirin inhibited virus replication. A modified version of interferon-α, pegylated-interferon-α, which remains in patients' bodies for longer, was introduced in 2001. But the treatment had severe side effects, including anaemia, severe depression and flu-like symptoms, and was not effective in all patients. Last year, two new drugs, boceprevir and telaprevir, were approved by the US Food and Drug Administration (FDA). Both of these drugs target HCV's NS3-4A protease, which the virus needs to generate functional proteins. Both drugs, however, do have side effects. Because they are taken in combination with interferon-α and ribavirin to prevent the emergence of resistance, the side effects of the original treatment regimen are still a problem. Telaprevir was recently relabelled to take into account its potential for causing cardiac arrhythmias (FDA update) and boceprevir has been found to interact with HIV protease inhibitors, so co-administration is not recommended (FDA update).

Pharmaceutical companies are trying to find new drugs that are more effective and have fewer side effects. In addition to protease inhibitors, other potential drugs (including BMS-986094) act on the NS5B RNA polymerase enzyme, preventing amplification of viral RNA. Another class of drugs aim to stop viruses penetrating the host's cells (see 'New drug targets raise hopes for hepatitis C cure').

Idenix Pharmaceuticals, based in Cambridge, Massachusetts, had a drug in trial that acted with a mechanism similar to that of BMS-986094. That trial has now been put on partial hold by the FDA as a result of the BMS trial failure (see press release). Shares in Idenix tumbled after the news was released (see FierceBiotech and *Business Week*). There may still be hope for other NS5B inhibitors in the pipeline, as not all of them share the same mechanism of action as BMS-986094. Gilead has an NS5B inhibitor in phase III trials, and Vertex, also based in Cambridge, is working on a similar drug.

CORRECTION: An earlier version of this post incorrectly implied that Vertex and Gilead HCV drugs are being investigated by the FDA, when both companies have stated that they have not been contacted by the FDA (see *Business Week*).

Previous post
**Another Alzheimer's antibody drug fails large trials**

Next post
**Court upholds federal funding of embryonic stem cell research**

## Comments

Comments are closed.

Exhibit 20

www.medscape.com

# After Patient's Death, Study Shows HCV Drug Cardiotoxic in 14 of 34 Treated Patients

Michael O'Riordan  |  September 24, 2014

DURHAM, NC – The development of **BMS-986094** (Bristol-Myers Squibb), a nucleotide-polymerase inhibitor for the treatment of chronic hepatitis C (HCV) infection, was terminated back in August 2012, but a new retrospective review analyzing adverse events provides an in-depth look at the cardiotoxicity associated with the investigational agent.

The findings may have profound implications for other drugs in late-stage testing or others approved for use. Investigators say understanding the mechanisms of cardiac dysfunction and its relevance to other agents will require more study.

Development of BMS-986094 was stopped after a 25-year-old male treated with 200-mg dose experienced rapidly progressive heart failure and died. The patient had been hospitalized with shortness of breath and was found to have a left ventricular ejection fraction (LVEF) <10%.

Now, as part of a retrospective review of the phase 2 study that included the index death, researchers report that 14 of 34 patients treated with BMS-986094 had some evidence of cardiac dysfunction.

The review was published online September 24, 2014 in *Hepatology*.

In total, six patients had severe LV dysfunction (LVEF <30%) and eight had moderate LV dysfunction (LVEF 30%-50%) in one or more evaluations in the six months following drug discontinuation.

"These are blockbuster drugs that all the pharmaceutical companies are trying to develop," lead investigator **Dr Tariq Ahmad** (Duke University Medical Center, Durham, NC) told **heartwire** . "If it weren't for the index case, it is possible that we might not have picked up on the cardiotoxicity."

BMS-986094 is a direct-acting antiviral (DAA) agent and some drugs in this class have received breakthrough-therapy status by the US **Food and Drug Administration** (FDA). **Sofosbuvir** (Solvadi, Gilead), which grabbed headlines for its $1000-per-pill price tag, is also a nucleotide-polymerase inhibitor. Given the massive potential in HCV therapeutics, Bristol-Myers Squibb paid $2.5 billion to buy Inhibitex, the company that began development on the drug that was to become BMS-986094.

Following the death of the 25-year-old patient, the FDA requested an official analysis of all patients who had been treated with BMS-986094. The company reached out to the Duke Clinical Research Institute to help with a clinical analysis of all exposed patients. Ahmad praised Bristol-Myers Squibb because it surrendered all clinical data it had on treated patients, "which is something that's unprecedented for a pharmaceutical company, because it's a major development area for them."

**Exposure to BMS-986094**

Of the 20 patients who received 200 mg of BMS-986094, four had severe systolic dysfunction and seven had moderate dysfunction. For the nine patients who received the 100-mg dose, two developed severe systolic dysfunction and one had moderate impairment. No patients treated with the 50-mg dose developed systolic dysfunction. Patients with cardiac dysfunction were treated with the drug longer, but drug duration in this early-stage trial ranged only from one to six

weeks.

"There were quite a few people who developed [reduced systolic function] once we started looking for it," said Ahmad. "A lot of these patients didn't have any symptoms. When we did an ultrasound of their heart, they had fairly profound cardiac dysfunction, but when we looked at some of the other things we think about with heart failure, like troponin or [brain natriuretic peptide] BNP levels, they weren't too abnormal."

The researchers also analyzed the ECGs of patients with evidence of LV dysfunction and identified three main abnormalities: ST depressions, T-wave inversions, or loss of T-wave amplitude.

"The ECGs showed some abnormalities, but these are things you'd pick up after the fact," said Ahmad. "If you showed me an ECG with some T-wave or ST changes, I might not make that much of it, but in hindsight, when we looked at these people with very low ejection fractions, they did have some abnormalities. But it was nothing that would jump out [at you]."

BMS-986094 also had an adverse impact on the kidney, with most of the patients having increases in serum creatinine levels regardless of the degree of systolic dysfunction. The patient who died developed acute renal failure, while another required temporary hemodialysis. The serum creatinine levels of all patients improved once the drug was stopped.

**Adverse Signs Diminished When Drug Stopped**

Overall, four of the six patients with severe LV systolic dysfunction had improved LVEFs after drug discontinuation, as did six of the eight individuals with moderate dysfunction. Of the 14 patients with impaired cardiac function, the last available measurement of LVEF in seven individuals was >50%.

The researchers included **Dr Jeffrey Saffitz** (Beth Israel Deaconess Medical Center, Boston, MA), a world expert in cardiac pathology, and he analyzed the explanted heart of the patient who died. There was an elongation and thinning of the ventricular cells, but limited necrosis and an insufficient amount of myocarditis to have caused ventricular dysfunction. As of now, nobody knows why BMS-986094 caused heart failure.

To **heartwire** , Ahmad said their review also showed that patients who appear to be most at risk for developing systolic dysfunction were individuals with cardiovascular disease risk factors, such as hypertension or diabetes. These are the type of patients who are excluded from clinical trials and who would be at risk when the drugs get used in the general population of HCV patients. Also, HCV trials are smaller than cardiology studies, so it's possible the adverse cardiac effects of other nucleotide-polymerase inhibitors might simply be undetected at this point, said Ahmad.

Ahmad said the findings are important, particularly for their inability to use traditional methods to gauge myocardial dysfunction, other than an ultrasound, because of how widespread the incidence of HCV is and how many patients could potentially be treated with these drugs. "If it hadn't been for the unfortunate case of that gentleman dying, some of these patients might be walking around with ejection fractions of 20%, and nobody would know it," he said.

References

1. Ahmad T, Yin P, Saffitz J, et al. Cardiac dysfunction associated with a nucleotide polymerase inhibitor for treatment of hepatitis C. *Hepatology* 2014; DOI:10.1002/hep.27488. Abstract

Heartwire from Medscape © 2014 Medscape, LLC

Exhibit 21

Downloaded from http://bmjopen.bmj.com/ on March 17, 2016 - Published by group.bmj.com

Open Access Research



# Haphazard reporting of deaths in clinical trials: a review of cases of ClinicalTrials.gov records and matched publications–a cross-sectional study

Amy Earley,[1] Joseph Lau,[2] Katrin Uhlig[1,3]

To cite: Earley A, Lau J, Uhlig, K. Haphazard reporting of deaths in clinical trials: a review of cases of ClinicalTrials.gov records and matched publications–a cross-sectional study. BMJ Open 2013;3:e001963. doi:10.1136/bmjopen-2012-001963

► Prepublication history and additional material for this paper are available online. To view these files please visit the journal online (http://dx.doi.org/10.1136/bmjopen-2012-001963).

Received 15 August 2012
Revised 4 December 2012
Accepted 11 December 2012

This final article is available for use under the terms of the Creative Commons Attribution Non-Commercial 2.0 Licence; see http://bmjopen.bmj.com

¹Center for Clinical Evidence Synthesis, Institute for Clinical Research and Health Policy Studies, Tufts Medical Center, Tufts University School of Medicine, Boston, MA, USA
²Center for Evidence-based Medicine, Public Health Program, Alpert Medical School, Brown University, Providence, RI, USA
³Division of Nephrology, Department of Medicine, Tufts Medical Center, Boston, MA, USA

Correspondence to
Dr Katrin Uhlig;
kuhlig@tuftsmedicalcenter.org

## ABSTRACT

**Context:** A participant death is a serious event in a clinical trial and needs to be unambiguously and publicly reported.

**Objective:** To examine (1) how often and how numbers of deaths are reported in ClinicalTrials.gov records; (2) how often total deaths can be determined per arm within a ClinicalTrials.gov results record and its corresponding publication and (3) whether counts may be discordant.

**Design:** Registry-based study of clinical trial results reporting.

**Setting:** ClinicalTrials.gov results database searched in July 2011 and matched PubMed publications.

**Selection criteria:** A random sample of ClinicalTrials.gov results records. Detailed review of records with a single corresponding publication.

**Main outcome measure:** ClinicalTrials.gov records reporting number of deaths under participant flow, primary or secondary outcome or serious adverse events. Consistency in reporting of number of deaths between ClinicalTrials.gov records and corresponding publications.

**Results:** In 500 randomly selected ClinicalTrials.gov records, only 123 records (25%) reported a number for deaths. Reporting of deaths across data modules for participant flow, primary or secondary outcomes and serious adverse events was variable. In a sample of 27 pairs of ClinicalTrials.gov records with number of deaths and corresponding publications, total deaths per arm could only be determined in 56% (15/27 pairs) but were discordant in 19% (5/27). In 27 pairs of ClinicalTrials.gov records without any information on number of deaths, 48% (13/27) were discordant since the publications reported absence of deaths in 33% (9/27) and positive death numbers in 15% (4/27).

**Conclusions:** Deaths are variably reported in ClinicalTrials.gov records. A reliable total number of deaths per arm cannot always be determined with certainty or can be discordant with number reported in corresponding trial publications. This highlights a need for unambiguous and complete reporting of the number of deaths in trial registries and publications.

## ARTICLE SUMMARY

### Article focus
■ We hypothesised that the lack of clear expectations for reporting all deaths in clinical trials give rise to discrepancies in the number of deaths reported across reports of a trial.

### Key message
■ There is a lack of clarity, consistency and agreement in reporting of deaths in clinical trials which highlights the need for unambiguous templates to standardise reporting of total number of deaths per arm in ClinicalTrials.gov records and more explicit reporting guidelines for peer-reviewed publications.

### Strengths and limitations of this study
■ Our findings indicate a need for explicit expectations for reporting of all deaths.
■ We suggest amendments to reporting formats such as: number of participants who started per arm, total number of deaths from any cause per arm and the time point of last ascertainment to prompt study investigators to sum up all deaths across participant loss, primary or secondary outcomes and serious adverse events.
■ We examined only a small number of matched cases which may not be generalisable. Nevertheless, even these small samples illustrate ambiguity within records and inconsistencies across reports of the same trial.
■ We used only data available in the publicly available reports and only counted actual number of deaths and not alternate information on death, such as percents or survival analyses, as exact back calculations are not always possible.
■ We followed operational rules to determine total deaths per arm within a report. These operational rules were not overly stringent and more rigid expectations would have resulted in fewer reports with the data amenable for detailed analysis.

Downloaded from http://bmjopen.bmj.com/ on March 17, 2016 - Published by group.bmj.com

# Haphazard reporting of deaths in clinical trials

## INTRODUCTION

The death of a clinical trial subject is a serious event that needs to be publicly disclosed. Incomplete reporting of deaths may overemphasise health benefits when benefits and harms of medical interventions are summarised.[1] [2] For unambiguous reporting, all deaths have to be reported for each trial arm and the absence of deaths must be explicitly stated if none were known to have occurred.

Formal reporting expectations for public disclosure of deaths in clinical trials are complex. During a trial, the USA Food and Drug Administration (FDA) expects a sponsor of an investigational new drug to submit annual reports that include a list of subjects who died during participation in the investigation, with the cause of death for each subject.[3] This means all deaths must be reported to the FDA, regardless of cause.

Sponsors of investigational new drugs also need to promptly report to the FDA and trial investigators serious unexpected events if they are suspected adverse reactions, meaning that there is a 'reasonable possibility' that the drug caused it.[4] [5] Further, the FDA regulations specify that the sponsor report 'an aggregate analysis of specific events observed in a clinical trial … that indicates those events occur more frequently in the drug treatment group than in a concurrent or historical control group'[6] suggesting that the events may be caused by the drug.[5]

After trial completion, trial registries such as ClinicalTrials.gov provide web-based public records of trial results of federally and privately funded trials.[7] Results reporting in ClinicalTrials.gov is mandated by the USA FDA Amendments Act which requires the reporting of summary results for certain studies within 1 year of completing data collection for the prespecified primary outcome.[7–9] These are phase II-IV interventional studies of FDA approved drugs, biological products and devices with at last one US site ongoing after 2007.[7–9] Based on this Act, the results data bank of the ClinicalTrials.gov registry shall include 'a table of anticipated and unanticipated serious adverse events grouped by organ system with number and frequency in each arms of the trial'.[10] The ClinicalTrials.gov data element definitions define adverse events as 'unfavorable changes in health …, that occur in trial participants during the clinical trial or within a specified period following the trial' and under serious adverse events include 'adverse events that result in death'.[11] This reporting of deaths as a serious adverse event is currently the only requirement for reporting of deaths in ClinicalTrials.gov and requires a judgment about the possibility of a causal association. However, causality assessment for a non-specific event such as death may be a challenge.[12]

The peer-reviewed publication of clinical trials is guided by CONSORT.[13] The main reporting CONSORT guideline does not specify a need to report all deaths; however, the extension for reporting of adverse events states that 'Authors should always report deaths in each study group during a trial, regardless of whether death is an end point and regardless of whether attribution to a specific cause is possible'.[14]

We hypothesised that the complex reporting expectations for death give rise to discordance in deaths documented across reports of a trial. We first examined how number of deaths from any cause was reported in ClinicalTrials.gov records. We then attempted to determine the total deaths per arm in a ClinicalTrials.gov results record and in the corresponding publication. Finally, we conducted a detailed review of cases with discrepancies in death numbers to identify possible explanations.

## METHODS

The ClinicalTrials.gov team provided us with a database of results records indexed in ClinicalTrials.gov (search date July 12, 2011). The database contained all records of phase II, III or IV interventional trials with results entered between 9 September 2009 and 14 June 2011. In 500 randomly selected records, we examined the record for reporting of any number of deaths. This entailed review of three of the four scientific data modules, that is, participant flow, primary and secondary outcomes and serious adverse events, but not baseline characteristics. Online supplementary appendix 2 shows screenshots for the three pertinent modules from a sample ClinicalTrials.gov record. We considered deaths only when a zero or a positive number for death was reported in any module, that is, we did not derive death numbers from information on deaths reported as percentages, rates, risks or survival curves. In the 123 records that reported some number of death, we examined in which module deaths were reported. Deaths from serious adverse events would presumably be a reason for not completing a trial and qualify to be listed as such in the participant flow module. We examined how many records reported number of deaths only in the serious adverse events module without reporting any deaths as a reason for discontinuation.

Among the 500 records, we also identified studies with an outcome measure description that implied ascertainment of death, including overall survival, time to mortality, all cause deaths, disease-specific deaths, composite outcomes including death and serious adverse events including deaths. In this subset, we examined how often actual numbers of deaths were reported as part of the primary or secondary outcome module when the outcome suggested that deaths were collected.

We then compared death reporting between ClinicalTrials.gov results records and corresponding publications. To select a sample of pairs, we used 2 criteria (1) ClinicalTrials.gov records had to provide only a single PubMed Identifier matching a publication describing trial results to avoid the need for reconciliation across several publications and (2) publications

Earley A, Lau J, Uhlig, K. BMJ Open 2013;3:e001963. doi:10.1136/bmjopen-2012-001963

Downloaded from http://bmjopen.bmj.com/ on March 17, 2016 - Published by group.bmj.com

had to be electronically accessible through our library. Based on these two criteria, we retrieved 27 publications matching the ClinicalTrials.gov records that reported death numbers. We sampled another 27 pairs of publications and ClinicalTrials.gov records where the record did not report death numbers.

For each record or publication, we attempted to determine the total deaths per arm and the numbers randomised or analysed per arm based on the data available in the record and publication, without contacting authors. This required assumptions when reconciling number of deaths across the three pertinent modules in the ClinicalTrials.gov record. For the publications, we searched the sections of the article corresponding to the modules. We used the following operational rules for decision-making:

▶ If a report did not provide any direct information on number of deaths, no counts were implied.
▶ If a number of deaths was reported in only one module in the ClinicalTrials.gov record or the corresponding sections in the publication, that is, either in participant flow, primary or secondary outcome or adverse events, this was determined to be the total number of deaths.
▶ Otherwise, as a default, the highest unambiguous number of deaths in one module was taken as the total number of deaths.

Online supplementary appendix 3 shows an example of a record where the total number of deaths could not be determined with certainty based on these rules. When the number of deaths could be determined for both the ClinicalTrials.gov record and the corresponding publication following the rules, we compared the numbers between the record and the publication. A pair was discordant either when the total number of deaths was not the same, or when the ClinicalTrials.gov record did not include any information on death numbers, yet the publication mentioned a presence or absence of deaths. Discordant cases were reviewed in more detail. We extracted the denominators for number of deaths from information on number started, randomised or analysed. We further captured information on duration of follow-up and looked for possible reasons for differences in the number of deaths.

## RESULTS

### Reporting of crude number of deaths in ClinicalTrials.gov results records

In July 2011, there were 1981 records with results in ClinicalTrials.gov and 500 records were randomly chosen for further analysis (see online supplementary appendix figure 1). These included 123 records (25%) which reported a number of deaths in at least one module. Deaths were variably reported across the three modules of participant flow, primary or secondary outcome and serious adverse events (figure 1). Sixty-four per cent of the records reported death



**Figure 1**   Reporting of number of deaths by data module in 123 ClinicalTrials.gov records.

numbers only in one of the modules, 32% in two modules and 4% in all of them. Approximately one-fifth (27/123) of the records reported number of deaths only in the module for the serious adverse events, that is, there were no deaths reported in the participant flow as a reason for not completing the trial. One-fifth (24/123) reported deaths in both of these modules.

Out of the 500 records, we identified 97 with a primary or secondary outcome measure definition that implied ascertainment of deaths. Of the 97, there were 32 (33%) that reported a crude number of deaths in the primary or secondary outcome module, with or without a result for death in another metric for death, such as percentage, rate and risk estimate. The 65 records that did not report crude number of deaths in the primary or secondary outcome module nonetheless still reported number of deaths under participant flow or serious adverse events.

### Reporting of information on death, determination of total number of deaths per arm and congruency in matched pairs

We examined congruence of reporting of number of deaths across pairs of ClinicalTrials.gov records and corresponding trial publications. Figure 2 tabulates whether there was any information on number of deaths in a trial report, and if so, whether total number of deaths could be determined per arm following simple rules, and finally whether the total numbers per arm were concordant or discordant across pairs. We examined 27 pairs where the ClinicalTrials.gov record contained some information on number of deaths and 27 pairs where the ClinicalTrial.gov record did not contain any information on death numbers.

Of the 27 pairs with number of deaths reported in the ClinicalTrials.gov record, there were 15 (55%) in which the total number of deaths per arm could be determined in both reports (figure 2A). The number of deaths were concordant between the ClinicalTrials.gov record and the publication in 10 pairs (37%), but discordant in five (19%). In the remaining 12 (44%), concordance could not be assessed because the total number of deaths per arm could not be determined

Earley A, Lau J, Uhlig, K. *BMJ Open* 2013;**3**:e001963. doi:10.1136/bmjopen-2012-001963

Downloaded from http://bmjopen.bmj.com/ on March 17, 2016 - Published by group.bmj.com

# Haphazard reporting of deaths in clinical trials

**Figure 2**  Consistency of death in matched pairs in (A) those with number of deaths in ClinicalTrials.gov and (B) those without any information on death numbers in ClinicalTrials.gov.



unambiguously for the record and the publication. The five discordant pairs are shown in detail in table 1.

In the 27 pairs where the ClinicalTrials.gov record did not contain any information on death numbers, 14 (52%) pairs were concordant regarding the absence of information on deaths, that is, the trial publications also did not contain any death numbers (figure 2B). However, 13 (48%) publications contained information on number of deaths. In nine studies (33%), the published study affirmatively reported 'no deaths' and in four studies, the published report mentioned positive number of deaths (figure 2B). These four cases are shown in table 2. For example in Case 9, the ClinicalTrials.gov record did not contain any information on number of

deaths; but the publication reported one death under serious adverse events (table 2).

## Review of cases with discordant counts

Tables 1 and 2 show the detailed review of the cases with discordant counts. For each case, the crude number of deaths for each module or reporting location for the ClinicalTrials.gov record and the corresponding publication are shown, as well as the total number of deaths per arm that was determined following our operational rules. The summary contains comments and interpretation of the discrepancies.

In several cases, information on duration of follow-up or the time point of last assessment was not exact or

Earley A, Lau J, Uhlig, K. *BMJ Open* 2013;**3**:e001963. doi:10.1136/bmjopen-2012-001963

Downloaded from http://bmjopen.bmj.com/ on March 17, 2016 - Published by group.bmj.com

Earley A, Lau J, Uhlig. K. *BMJ Open* 2013;3:e001963. doi:10.1136/bmjopen-2012-001963

**Table 1**   Cases with number of deaths in ClinicalTrials.gov record that are discordant with the corresponding publication

| Population | Was death a specified outcome* Define | Reporting module or location | ClinicalTrials.gov record Deaths/Randomised | | Publication Deaths/Randomised | |
|---|---|---|---|---|---|---|
| | | | Arm 1 | Arm 2 | Arm 1 | Arm 2 |
| **Case 1** | | | | | | |
| Lung cancer | Yes Survival is a secondary outcome | | Follow up: While on study drug+30 d after last dose (estimated 4 mo) | | Follow up: From random assignment until first day of progression or until death | |
| | | Flow | -/52 | -/51 | 4/52 | 2/51 |
| | | Outcome | -/52 | -/51 | – | – |
| | | SAE | 1/52 | 0/51 | 1/52 | 2/51 |
| | | **Total** | >1/52 | >0/51 | >4/52 | >2/51 |
| Summary | Both CT.gov record [NCT00085839] and the publication [PMID18281658] reported hazards ratios for survival and mean survival in months, but not the number of deaths for the outcome. Both reported deaths under serious adverse events, but counts differed between record and report. In addition the publication reported deaths in the flow diagram, while the record did not. The total number of deaths is discrepant between record and publication; however, neither is likely to represent the total number of deaths that occurred during the study. | | | | | |
| **Case 2** | | | | | | |
| Multiple myeloma | No | | Follow up: Up to 18 mo | | Follow up: Enrolled 2/06-12/06, analysis through 8/2007 | |
| | | Flow | 1/53 | 1/43 | 1/53 | 1/43 |
| | | Outcome | -/53 | -/41 | – | – |
| | | SAE | -/53 | -/42 | 4/53 | 1/42 |
| | | **Total** | 1/53 | 1/43 | 4/53 | 1/43 |
| Summary | Both CT.gov record [NCT00259740] and publication [PMID19714603] reported 1 death per arm in the participant flow. The total number of deaths is discrepant between record and publication, however, since the publication also reported 5 deaths under SAE. | | | | | |
| **Case 3** | | | | | | |
| Refractory prostate cancer | Yes Survival is the primary outcome | Flow | Follow up: Analyzed through 9/2009 -/377 | -/378 | Follow up: Analyzed through 9/2009 -/377 | -/378 |
| | | Outcome | -/377 | -/378 | 279/377 | 234/378 |
| | | SAE | 0/371 sudden death | 1/371 sudden death | 275/371 | 227/371 |
| | | **Total** | >0/377 | >1/371 | 279/377 | 234/378 |
| Summary | The CT.gov record [NCT00417079] reported hazards ratios for survival as well as survival in months, but not the total number of deaths per arm for this outcome. The publication [PMID20888992] reported a large number of deaths per arms for the outcome of survival (as) and also a large number of deaths under SAE. The numerators and denominators differed slightly based on intention to treat analyses or per protocol analyses. The CT.gov record reported only one death under SAE; although based on the survival analysis, it appeared likely that the total number of deaths in the study was higher. The total number of deaths is discrepant between record and report. | | | | | |

Continued

**Haphazard reporting of deaths in clinical trials**

Downloaded from http://bmjopen.bmj.com/ on March 17, 2016 - Published by group.bmj.com

Haphazard reporting of deaths in clinical trials

Earley A, Lau J, Uhlig K. *BMJ Open* 2013;3:e001963. doi:10.1136/bmjopen-2012-001963

**Table 1** Continued

| Population | Was death a specified outcome* Define | Reporting module or location | ClinicalTrials.gov record Deaths/Randomised | | Publication Deaths/Randomised | |
|---|---|---|---|---|---|---|
| | | | Arm 1 | Arm 2 | Arm 1 | Arm 2 |
| **Case 4** | | | | | | |
| Chronic Obstructive Pulmonary Disease | Yes Death is a secondary outcome | | Follow up: 52 wk | | Follow up: 52 wk | |
| | | Flow | -/772 | -/796 | -/772 | -/796 |
| | | Outcome | -/25 | -/25 | 25/772 | 25/796 |
| | | SAE | 1/778 sudden death; 0/778 death | 3/790 sudden death; 2/790 death | -/778 | -/790 |
| | | **Total** | 25/772 | 25/796 | 25/772 | 25/796 |
| Summary | The CT.gov record [NCT00297115] reported 25 per arm as number analyzed in the outcome module and defined the number analyzed as the number died. Further, the CT.gov record reports deaths under SAE using two different death definitions ('sudden death' and 'death'), while the publication [PMID19716960] does not report any. Assuming that the deaths reported under SAE in the record are included in those reported for the outcome of death, the total number of deaths is consistent across record and publication. The publication describes 2 trials of similar design with two separate NCT number, but only the results corresponding to the trial in the index CT.gov record were compared. | | | | | |
| **Case 5** | | | | | | |
| Prostate cancer | Yes Death is a secondary outcome | | Follow up: From start of therapy up to 30 d after last dose | | Follow up: Duration of therapy+30 d | |
| | | Flow | -/48 | -/47 | – | -/47 |
| | | Outcome | 2/48 | 2/47 | – | -/47 |
| | | SAE | | -/95 | 2/47 | |
| | | **Total** | 2/48 | 2/47 | – | 2/47 |
| Summary | The CT.gov record [NCT00385580] reported results for 2 arms. The publication presents only results for Arm 2. The CT.gov report shows 2 deaths in the outcome module, but none under SAE. The publication [PMID19920114] shows 2 deaths under SAE. The number of deaths reported for this arm was consistent between record and publication. | | | | | |

*In the ClinicalTrials.gov record.
Data collection in ClinicalTrials.gov on Feb 14 2012.
Abbreviations: CT.gov, ClinicalTrials.gov; D/C, discontinuation; NCT, National Clinical Trial (number); SAE, serious adverse events; – (dash), not reported.

Downloaded from http://bmjopen.bmj.com/ on March 17, 2016 - Published by group.bmj.com

Earley A, Lau J, Uhlig K. *BMJ Open* 2013;**3**:e001963. doi:10.1136/bmjopen-2012-001963

Haphazard reporting of deaths in clinical trials

**Table 2**   Cases without any information on death numbers in ClinicalTrials.gov record but reports of number of deaths in the corresponding publication

| Population | Was death a specified outcome* Define | Reporting module or location | ClinicalTrials.gov record Deaths/Randomised | | | | Publication Deaths/Randomised | |
|---|---|---|---|---|---|---|---|---|
| | | | Arm 1 | | | Arm 2 | Arm 1 | Arm 2 |
| **Case 6** Influenza vaccine in elderly | No | | Follow up: 6 mo | | | | Follow up: 6 mo | |
| | | Flow | -/857 | -/848 | -/870 | -/1262 | -/2575 | -/1262 |
| | | Outcome | – | – | – | – | | |
| | | SAE | -/855 | – | -/870 | -/1260 | 16/2573 | 7/1260 |
| | | **Total** | | -/2575 | | -/1262 | 16/2575 | 7/1262 |
| Summary | The CT.gov record [NCT00391053] did not report deaths counts across 4 arms. The publication [PMID19508159] described 23 deaths under SAE for 2 arms, collapsing arms 1–3 into one. | | | | | | | |
| **Case 7** Amyotrophic lateral sclerosis | No | | Follow up: 9 mo | | | | Follow up: 10 mo | |
| | | Flow | -/75 | | | -/75 | 3/75 | 5/75 |
| | | Outcome | -/75 | | | -/75 | – | – |
| | | SAE | -/75 | | | -/75 | 3/75 | 5/75 |
| | | **Total** | -/75 | | | -/75 | 3/75 | 5/75 |
| Summary | The CT.gov record [NCT00243932] did not report death counts. The publication [PMID19743457] describes 8 deaths under participant flow as well as under SAE, which are presumably the same. | | | | | | | |
| **Case 8** Diabetes Mellitus Type 2 | No | | Follow up: 26 wk | | | | Follow up: 26 wk | |
| | | Flow | -/239 | | | -/241 | -/239 | -/241 |
| | | Outcome | – | | | – | – | – |
| | | SAE | -/231 | | | -/238 | 0/231 | 1/238 |
| | | **Total** | -/239 | | | -/241 | 0/239 | 1/241 |
| Summary | The CT.gov record [NCT00469092] did not report death counts. The publication [PMID19821654] describes one death under SAE as a 'treatment emergent death'. It also reported 2 deaths during the run-in period that were not included in the participant flow. | | | | | | | |
| **Case 9** Metastatic penile cancer | No (in record); Y (in publication) Overall survival was a reported outcome, unclear whether primary or secondary | | Follow up: 'Timeframe 9 y and 6 mo' | | | | Follow up: Duration of enrollment 4/2000 through 9/2008 (max FU up to 7 y 5 mo) | |
| | | Flow | -/30 | | | | -/30 | |
| | | Outcome | -/30 | | | | 20/30 | |
| | | SAE | -/30 | | | | – | |
| | | **Total** | -/30 | | | | 20/30 | |
| Summary | The CT.gov record [NCT00512096] did not include death counts even though "overall survival" was a pre-specified outcome. The publication [PMID20625118] reported 20 deaths for this outcome. | | | | | | | |

*In the ClinicalTrials.gov.record.
Data collection in ClinicalTrials.gov on Feb 14 2012.
CT.gov, ClinicalTrials.gov; D/C, discontinuation; FU, follow up; NCT, National Clinical Trial (number); SAE, serious adverse events; – (dash), not reported.

Downloaded from http://bmjopen.bmj.com/ on March 17, 2016 - Published by group.bmj.com

# Haphazard reporting of deaths in clinical trials

varied across the reports. Comparison of the number of deaths required reconciliation across reports with discordant numbers of arms (Cases 5 and 6) or discordant number of studies (Case 4). For example, in Case 5, the ClinicalTrials.gov record included two arms treated with different drug doses, while the publication reported results only for one of the arms. The number of deaths for this single arm was consistent across the ClinicalTrials.gov record and the publication. In the other cases with the same number of arms, the inference or certainty about the number of deaths within each arm differed. In addition to discordant counts, problems were lack of provision of crude death numbers even when death was an outcome of interest (Cases 1 and 3), imprecision in data entry (Case 4), reporting of deaths under serious adverse events without specification as to whether they were counted as part of the death outcome (Case 4) or the participant flow (Case 7). In most cases, the publication included a slightly higher crude number of deaths. Large discrepancies were noted in cases where the record did not report counts for an outcome that included death, while the report did (Cases 3 and 9).

## DISCUSSION

Our study highlights a failure of consistent and clear reporting of number of deaths in clinical trials. Only 25% of ClinicalTrials.gov results records provided some number of deaths, with great variation and overlap in the reporting across the three data modules for participant flow, primary or secondary outcomes or serious adverse events. While we expected records reporting death as a serious adverse event to also list death as a reason for discontinuation from the trial in participant flow, a fifth of the records with death numbers reported deaths only under serious adverse events. Among ClinicalTrials.gov records with a definition for a primary or secondary outcome that implies ascertainment of death, only a third provided crude number of deaths in the data module for the primary or secondary outcome. This heterogeneous reporting and the uncertainty of whether deaths are reported in a redundant or exclusive manner across data modules, poses problems for reconciling deaths within a trial report.

Total number of deaths per arm could not always be determined unambiguously in the ClinicalTrials.gov results records or the corresponding publication. In the small sample where total deaths could be determined in both reports for the same trial, we identified examples where the number of deaths was discordant, highlighting lack of coherence and completeness. There were no clear patterns to explain the discrepancies. Finding a slightly higher crude number of deaths in publications than in ClinicalTrial.gov records suggests that number of deaths in the ClinicalTrials.gov records are not complete.

Our findings of haphazard reporting of deaths in clinical trials indicate a need for explicit expectations in reporting of all deaths regardless of whether they are

considered to be a serious adverse event or not. We suggest that reporting formats for aggregate clinical trial results need to be amended to provide the following information: number of individuals who started per arm, number of deaths from any cause per arm and the time point of last ascertainment. This should prompt study investigators to sum up all deaths across participant flow, primary or secondary outcomes and serious adverse events. Information on mean duration of follow-up is also needed to allow calculation of rates. Given their prominent role supported by the legal regulations, clinical trials registries can spearhead uniform and consistent reporting of important trial outcomes, such as deaths. Similarly editors and sponsors must educate trialists to better meet the need for uniform reporting of all deaths.[13 15]

Our study has several limitations. We examined only a small number of matched cases which may not be generalisable. Nevertheless, even these small samples illustrate ambiguity within records and inconsistencies across reports of the same trial. Also, we used only data available in these reports to determine the total number of deaths per arm. It is possible that individual patient data available to the trial investigators would allow more studies to provide unambiguous number of deaths. However, this information is not publicly available and clinicians and policy makers rely on publicly accessible trial results reported in ClinicalTrials.gov records and in journal publications. Further, we only gave credit to number of deaths and not to alternate information on death, such as per cents or survival analyses, as exact back calculations are not always possible. Finally, we followed operational rules to determine total deaths per arm within a report. These operational rules were not overly stringent and more rigid expectations would have resulted in fewer reports with the data amenable for detailed analysis.

Our findings have to be viewed in context. Only 22% of studies report their results in ClinicalTrials.gov within 1 year of completion[16] and fewer than half of studies funded by the National Institutes of Health publish their results in a Medline indexed journal within 30 months of trial completion.[17] Thus, our matched pairs are drawn from a minority of trials that have been compliant with both expectations: publication of results in ClinicalTrials.gov and publication in a peer-reviewed journal.

Full reporting of all deaths enables more accurate assessment of risks and benefits associated with treatments. Assessment of patient safety relies on capturing signals, even when they are non-specific.[18 19] Small differences in numbers of death may bias results and distort estimates across studies. From an ethical perspective, it is desirable that trials ascertain and report all deaths regardless of whether they appear to be related to study conduct or intervention, are unforeseen or non-specific. Even with clear instructions and prompts for trials to report deaths, however, there may be remaining uncertainty depending on the rigour of ascertainment

Earley A, Lau J, Uhlig, K. BMJ Open 2013;3:e001963. doi:10.1136/bmjopen-2012-001963

Downloaded from http://bmjopen.bmj.com/ on March 17, 2016 - Published by group.bmj.com

or surveillance and the selection of trial outcomes. Further, crude numbers are not the only format for reporting deaths in a trial. Time to event reporting may be more meaningful, but may introduce uncertainty about how censoring and deaths are handled. While both approaches to presenting information on deaths may be necessary and complementary, our study suggests that some improvement can be made with simple means of standardised reporting formats.

In summary, our study shows lack of clarity, consistency and agreement in reporting of deaths in clinical trials. This highlights the need for unambiguous templates to standardise reporting of total number of deaths per arm in ClinicalTrials.gov records and more stringent reporting guidelines for peer-reviewed publications.

**Contributors** KU, AE and JL conceived the idea of the study and were responsible for the design of the study. AE and KU were responsible for the acquisition of the data, for undertaking the data analysis and produced the tables and graphs. JL provided critical input into the data analysis and the interpretation of the results. The initial draft of the manuscript was prepared by KU and AE and then circulated repeatedly among all authors for critical revision.

**Funding** This project was funded under Contract No. HHSA 290 2007-10055-I, entitled 'Evidence-based Protocol for Reviewing ClinicalTrials. gov Results Database,' from the Agency for Healthcare Research and Quality, U.S. Department of Health and Human Services. The authors of this report are responsible for its content. Statements in the report should not be construed as endorsement by the Agency for Healthcare Research and Quality or the U.S. Department of Health and Human Services.

**Competing interests** None.

**Provenance and peer review** Not commissioned; externally peer reviewed.

**Data sharing statement** There are no additional data available.

## REFERENCES

1. Chou R, Helfand M. Challenges in systematic reviews that assess treatment harms. *Ann Intern Med* 2005;142(12 Pt 2):1090–9.
2. Ioannidis JP, Lau J. Completeness of safety reporting in randomized trials: an evaluation of 7 medical areas. *JAMA* 2001;285:437–43.
3. Food and Drug Administration. Code of Federal Regulations Title 21. 21 CFR 312.33(b)(3)—Annual Reports. 2012. Ref Type: Bill/Resolution
4. Food and Drug Administration. Investigational new drug safety reporting requirements for human drug and biological products and safety reporting requirements for bioavailability and bioequivalence studies in humans. Final rule. *Fed Regist* 2010;75:59935–63.
5. Sherman RB, Woodcock J, Norden J, et al. New FDA regulation to improve safety reporting in clinical trials. *N Engl J Med* 2011;365:3–5.
6. Food and Drug Administration. Code of Federal Regulations Title 21. 21 CFR 312.32(c)(1)(i)(C)-IND safety reporting. 2012. Ref Type: Bill/Resolution
7. Zarin DA, Tse T, Williams RJ, et al. The ClinicalTrials.gov results database—update and key issues. *N Engl J Med* 2011;364:852–60.
8. Food and Drug Administration Amendments Act. U.S. Public Law 110–85. 2012. Ref Type: Bill/Resolution
9. Tse T, Williams RJ, Zarin DA. Reporting 'basic results' in ClinicalTrials.gov. *Chest* 2009;136:295–303.
10. Food and Drug Administration Amendments Act. U.S. Public Law 110–95. 2007. Ref Type: Bill/Resolution
11. ClinicalTrials.gov. ClinicalTrials.gov 'Basic Results' Data Element Definitions. 2012. http://prsinfo.clinicaltrials.gov/results_definitions.html#AdverseEvents (accessed 26 Jun 2012). Ref Type: Online Source
12. Cato A. Premarketing adverse drug experiences: data management procedures. Unexpected death occurring early in clinical trials. *Drug Inf J* 1987;21:3–7.
13. Schulz KF, Altman DG, Moher D. CONSORT 2010 statement: updated guidelines for reporting parallel group randomized trials. *Ann Intern Med* 2010;152:726–32.
14. Ioannidis JP, Evans SJ, Gotzsche PC, et al. Better reporting of harms in randomized trials: an extension of the CONSORT statement. *Ann Intern Med* 2004;141:781–8.
15. Mansi BA, Clark J, David FS, et al. Ten recommendations for closing the credibility gap in reporting industry-sponsored clinical research: a joint journal and pharmaceutical industry perspective. *Mayo Clin Proc* 2012;87:424–9.
16. Prayle AP, Hurley MN, Smyth AR. Compliance with mandatory reporting of clinical trial results on ClinicalTrials.gov: cross sectional study. *BMJ* 2012;344:d7373.
17. Ross JS, Tse T, Zarin DA, et al. Publication of NIH funded trials registered in ClinicalTrials.gov: cross sectional analysis. *BMJ* 2012;344:d7292.
18. Drazen JM. COX-2 inhibitors—a lesson in unexpected problems. *N Engl J Med* 2005;352:1131–2.
19. Nissen SE, Wolski K. Rosiglitazone revisited: an updated meta-analysis of risk for myocardial infarction and cardiovascular mortality. *Arch Intern Med* 2010;170:1191–201.

Downloaded from http://bmjopen.bmj.com/ on March 17, 2016 - Published by group.bmj.com



# Haphazard reporting of deaths in clinical trials: a review of cases of ClinicalTrials.gov records and matched publications−a cross-sectional study

Amy Earley, Joseph Lau and Katrin Uhlig,

*BMJ Open* 2013 3:
doi: 10.1136/bmjopen-2012-001963

---

Updated information and services can be found at:
**http://bmjopen.bmj.com/content/3/1/e001963**

---

*These include:*

| | |
|---|---|
| **Supplementary Material** | Supplementary material can be found at: **http://bmjopen.bmj.com/content/suppl/2013/01/18/bmjopen-2012-001963.DC1.html** |
| **References** | This article cites 14 articles, 0 of which you can access for free at: **http://bmjopen.bmj.com/content/3/1/e001963#BIBL** |
| **Open Access** | This is an open-access article distributed under the terms of the Creative Commons Attribution Non-commercial License, which permits use, distribution, and reproduction in any medium, provided the original work is properly cited, the use is non commercial and is otherwise in compliance with the license. See: http://creativecommons.org/licenses/by-nc/2.0/ and http://creativecommons.org/licenses/by-nc/2.0/legalcode. |
| **Email alerting service** | Receive free email alerts when new articles cite this article. Sign up in the box at the top right corner of the online article. |

---

| | |
|---|---|
| **Topic Collections** | Articles on similar topics can be found in the following collections<br><br>Evidence based practice (462)<br>Medical publishing and peer review (44) |

---

## Notes

---

To request permissions go to:
**http://group.bmj.com/group/rights-licensing/permissions**

To order reprints go to:
**http://journals.bmj.com/cgi/reprintform**

To subscribe to BMJ go to:
**http://group.bmj.com/subscribe/**

Exhibit 22

Skip to content

# STAT

Law ignored, patients at risk

Politics
Law ignored, patients at risk

- Twitter
- Facebook
- LinkedIn
- Email
- Print



Alex Hogan/STAT

By Charles Piller @cpiller

December 13, 2015

- Twitter
- Facebook
- LinkedIn
- Email
- Print

Stanford University, Memorial Sloan Kettering Cancer Center, and other prestigious medical research institutions have flagrantly violated a federal law requiring public reporting of study results, depriving patients and doctors of complete data to gauge the safety and benefits of treatments, a STAT investigation has found.

The violations have left gaping holes in a federal database used by millions of patients, their relatives, and medical professionals, often to compare the effectiveness and side effects of treatments for deadly diseases such as advanced breast cancer.

The worst offenders included four of the top 10 recipients of federal medical research funding from the National Institutes of Health: Stanford, the University of Pennsylvania, the University of Pittsburgh, and the University of California, San Diego. All disclosed research results late or not at all at least 95 percent of the time since reporting became mandatory in 2008.

## Failure to Report: A STAT investigation

**What we found:** Most research institutions — including leading universities and hospitals in addition to drug companies — routinely break a law that requires them to report the results of human studies of new treatments to the federal government's ClinicalTrials.gov database.

**Read: Law ignored, patients at risk**

**Interactive: Explore the performance of top research institutions in academia, industry, and government.**

**Read more: How we did the project.**

**Have you participated in a clinical trial? Take our survey.**

Drug companies have long been castigated by lawmakers and advocacy groups for a lack of openness on research, and the investigation shows just how far individual firms have gone to skirt the disclosure law. But while the industry generally performed poorly, major medical schools, teaching hospitals, and nonprofit groups did worse overall — many of them far worse.

The federal government has the power to impose fines on institutions that fail to disclose trial results, or suspend their research funding. It could have collected a whopping $25 billion from drug companies alone in the past seven years. But it has not levied a single fine.

The STAT investigation is the first detailed review of how well individual research institutions have complied with the law.



**Read More**

Special Report: Popular heart surgery carried hidden danger

The legislation was intended to ensure that findings from human testing of drugs and medical devices were quickly made public through the NIH website ClinicalTrials.gov. Its passage was driven by concerns that the pharma industry was hiding negative results to make treatments look better — claims that had been dramatically raised in a major lawsuit alleging that the manufacturer of the antidepressant Paxil concealed data that the drug caused suicidal thoughts among teens.

"GlaxoSmithKline was misstating the downside risks. We then asked the question, how can they get away with this?" Eliot Spitzer, who filed the 2004 suit when he was New York attorney general, said in an interview.

The STAT analysis shows that "someone at NIH is not picking up the phone to enforce the obligation to report," Spitzer said. "Where NIH has the leverage through its funding to require disclosure, it's a pretty easy pressure point."

NIH Director Dr. Francis Collins acknowledged in a statement that the findings are "very troubling."

## Clinical trial reporting lapses visualized

STAT examined data reporting for all institutions – federal agencies, universities, hospitals, nonprofits, and corporations – required to report results to ClinicalTrials.gov for at least 20 human experiments since 2008. This visualization shows the first comparative analysis of their performance. Among the groups, just two companies provided trial results within the legal deadline more than half the time. Most – including the National Institutes of Health, which oversees the reporting system – violated the law the vast majority of the time.

### Percentage of clinical trials by entity that have late or no results:





Data visualization: NATALIA BRONSHTEIN

Sources: ClinicalTrials.gov data downloaded Sept. 10, 2015; STAT reporting

Doctors rely on robust reporting of data to see how effectively a drug or device performs and to understand the frequency of side effects such as suicidal thinking — crucial information for making treatment recommendations. Researchers depend on prior results to plan future studies and to try to ensure the safety of volunteers who participate in trials.

Yet academic scientists have failed to disclose most results on time — within a year of a study being completed or terminated.

In interviews, researchers, university administrators, and hospital executives said they are not intentionally undermining the law. They said that they are simply too busy and lack administrative funding, and that they disclose some clinical trial results in medical journals and at conferences. Some experts voiced concerns that the researchers might also face pressure from corporate sponsors to delay reports — whether negative or positive — for commercial reasons.

## Not much to boast about

A number of trials languishing on researchers' "to do" piles involve life-and-death problems.

Memorial Sloan Kettering failed to report data for two trials of the experimental anticancer drug ganetespib, made by Synta Pharmaceuticals. The results of tests involving breast and colorectal cancer patients showed serious adverse effects in 13 of 37 volunteers. They included heart, liver, and blood disorders, bowel and colon obstructions, and one death.



The New York City hospital said it delayed its reporting so that it could complete related medical journal articles. It rushed to submit the results to ClinicalTrials.gov only after being contacted by STAT — more than two years late for one of the studies.

Collette M. Houston, who directs clinical research operations for Memorial Sloan Kettering, said she believes the researchers did immediately report adverse events to Synta and the Food and Drug Administration. But a hospital spokesperson said records needed to verify if that happened were no longer accessible.

Houston said that Synta, which paid for the research, normally would alert investigators on other ongoing trials of the same drug about adverse events, so they would learn of the possible added risks to patients despite Memorial Sloan Kettering's failure to report to ClinicalTrials.gov.

In another case, delayed reporting denied doctors timely information on treating breast cancer. In 2009, the nonprofit Hoosier Cancer Research Network terminated a study of Avastin in 18 patients with metastatic breast cancer. The drug didn't help and caused trial volunteers serious harm — including hypertension, gastrointestinal toxicity, sensory problems, and pain. But the Indianapolis-based network, which runs trials under contract for drug companies, did not report the results as required the following year — though doctors nationwide were debating whether it was advisable to treat breast cancer patients with Avastin.

In 2011, the FDA revoked its approval of Avastin for breast cancer after determining that it was ineffective for that use and posed life-threatening risks. The Hoosier Network researchers finally published the data in a medical journal in 2013. They have yet to post results on ClinicalTrials.gov — nearly six years after the legal deadline.

The lead investigator, Dr. Kathy Miller of Indiana University School of Medicine, blamed "short staffing" for the reporting delay. "Getting that uploaded was not a big priority," she said, adding that she had never heard of anyone using ClinicalTrials.gov to examine trial results. She insisted that her study "didn't have anything to add to that national debate" about Avastin's safety and efficacy.

STAT identified about 9,000 trials in ClinicalTrials.gov subject to the law's disclosure requirements. The analysis focused on the 98 universities, nonprofits, and corporations that served as sponsors or collaborators on at least 20 such trials between 2008 and Sept. 10 of this year.

None of the organizations has much to boast about. Only two entities — drug companies Eli Lilly and AbbVie — complied with reporting requirements more than half the time, a sign of how uniformly the research community flouts the law.



Results from academic institutions arrived late or not at all 90 percent of the time, compared with 74 percent for industry. More than one-fourth of companies did better than all the universities and nonprofits.

The FDA, which regulates prescription drugs, is empowered to levy fines of up to $10,000 a day per trial for late reporting to ClinicalTrials.gov. In theory, it could have collected $25 billion from drug companies since 2008 — enough to underwrite the agency's annual budget five times over. But neither FDA nor NIH, the biggest single source of medical research funds in the United States, has ever penalized an institution or researcher for failing to post data.

Even the agency's own staff scientists have violated the reporting law three-quarters of the time.

Collins said NIH research shows reporting rates by both industry and academia have improved over the past several years due to greater awareness, and NIH's own scientists are now reporting their results about 90 percent of the time. "Of course I would like to see all of these rates reach 100 percent," Collins said.

Data from ClinicalTrials.gov reviewed by STAT show NIH scientists' reporting of results within the legal deadline peaked at 38 percent in 2013. Counting results reported late, NIH staff performance reached 90 percent for studies due in 2012 but has dropped since then.





**Read More**

FDA official took name off papers

Beginning next spring, after further refinement of ClinicalTrials.gov rules, NIH and FDA will have "a firmer basis for taking enforcement actions," Collins said. If an NIH grantee fails to meet reporting deadlines, their funding can be terminated, he said.

The agency's staff scientists, he added, "will be required to follow the law and NIH policy, and there will be consequences … for failing to do so."

### 'Too busy to follow the law'

University researchers and administrators cited a lack of time as one of the reasons they miss reporting deadlines. Lisa Lapin, a top communications official at Stanford, said via email that many faculty members find the process for entering results "above and beyond" their capacity, "given multiple existing constraints on their time" and no funding for additional staff.

Stanford supplied data to ClinicalTrials.gov for 26 of 82 trials for which results were due — far below the performance by most other top universities or companies. Professors supplied data on time for only four studies.

Dr. Harry Greenberg, senior associate dean for research at Stanford, said his institution was determined to improve.

"We will solve it, and we'll solve it the best way possible," through steps that include providing support for faculty members to enter trial data, he said.

NIH estimates that it takes, on average, about 40 hours to submit trial results, and many drug and medical device makers have dedicated staff to post data to ClinicalTrials.gov. Eli Lilly has seven full-time employees for the task.

But Collins and advocates for transparency said time demands are no excuse for noncompliance. "There is no ethical justification for ignoring the law," said Jennifer Miller, a New York University medical ethicist. "It's not OK to say, 'I'm too busy to follow the law.'"



## Filling information gaps

Six organizations — Memorial Sloan Kettering, the University of Kansas, JDRF (formerly the Juvenile Diabetes Research Foundation), the University of Pittsburgh, the University of Cincinnati, and New York University — broke the law on 100 percent of their studies — reporting results late or not at all.

Dr. Paul Sabbatini, a research executive at Memorial Sloan Kettering, said that as an efficiency measure, his organization previously tried to complete work on scholarly publications in tandem with reporting ClinicalTrials.gov results. "We thought and hoped that we could keep that process bundled," he said, but preparing journal articles and getting them published often takes years. The hospital will now post to ClinicalTrials.gov independently.

Several organizations argued that publishing in peer-reviewed medical journals is the highest form of disclosure of study results and should be sufficient, or that there should be a way to simply copy journal data into ClinicalTrials.gov.

Critics say such views reflect the primacy of scholarly articles for academic career advancement more than any inherent superiority over ClinicalTrials.gov.

A 2013 analysis in the journal PLOS Medicine compared 202 published studies against results in ClinicalTrials.gov for the same research. The NIH registry proved far more complete, especially for reporting adverse events — signs that a therapy might be going badly wrong.



**Read More**

Experts to presidential candidates: Take a stand on clinical trials

Journals often reject papers about small studies or trials stopped early for a range of reasons, such as a drug causing worrisome side effects. They publish relatively few negative results, although failed tests can be as important as positive findings for guiding treatment. ClinicalTrials.gov tries to fill these critical information gaps and serve as a timely and comprehensive registry.

The website is open to the public, unlike many journals that charge a substantial fee. And the site requires data to be entered in a consistent way that allows easier comparisons of benefits or side effects across many studies.

It also lets experts check whether researchers have cherry-picked results, which can mislead doctors and patients.

Preliminary work by The Compare Project, at the Centre for Evidence-Based Medicine at the University of Oxford, suggests that shifts away from outcome measures designated before the start of a clinical trial to results selected at the study's conclusion are common. The group recently examined reports in leading journals on 44 trials and found that overall, 213 original measures went unreported, while 225 new measures were added.

## Withheld data spurred action

Congress passed a law requiring registration of clinical trials in 1997, and the ClinicalTrials.gov database was created in 2000 for this purpose. At first it was little used.

NYU's Miller traces the origins of stronger reporting requirements to Spitzer's Paxil suit.

GlaxoSmithKline disputed the charges but settled out of court. This past September, the medical journal BMJ reanalyzed clinical trial data gathered by the company in 2001 and recently shared with independent scientists. Its findings showed Paxil to be no more effective in teens than a placebo, and linked the drug to increased suicide attempts.



Scenarios similar to the Paxil case have been repeated many times since with other drugs.

In the wake of the bird flu scare a decade ago, governments stockpiled billions of dollars worth of the antiviral drug Tamiflu, thought to be a lifesaver. The Lancet reported last year, however, that previously undisclosed trial data showed that Tamiflu "did not necessarily reduce hospital admissions and pulmonary complications in patients with pandemic influenza."

Another notorious case involved an experimental arthritis drug, TeGenero's TGN1412, tested on six men in London in 2006. All immediately fell gravely ill. One suffered heart failure, blood poisoning, and the loss of his fingers and toes in a reaction that resembled gangrene. A close variant of the drug had been found potentially dangerous years earlier, but the results had never been published.

In response to Spitzer's suit, GlaxoSmithKline agreed to share much more data with the public. The move prodded competitors and lawmakers to do better.

Then in 2007, a new US law broadened trial registration requirements and added mandates for disclosing summary data, adverse events, and participants' demographic information on ClinicalTrials.gov.

"Mandatory posting of clinical trial information would help prevent companies from withholding clinically important information about their products," Senator Charles Grassley, an Iowa Republican and a leading proponent of the law, said at the time. "To do less would deny the American people safer drugs when they reach into their medicine cabinets."

## High hopes not realized

The popularity of ClinicalTrials.gov shows progress on lawmakers' goal of a better-informed public. The site logs 207 million monthly page views and 65,000 unique daily visitors. An NIH survey suggested that 8 in 10 are patients and their family members or friends, and medical professionals and researchers. With a $5 million budget, the program's staff of 38, operating at NIH in Bethesda, Md., reviews trial designs and results, provides services, conducts research, and sets policy.

Yet, the lofty hopes for the website have never been realized. More than 200,000 trials are registered on ClinicalTrials.gov, but many drug or device studies are exempted from reporting results, including most trials that have no US test site, those involving nutritional supplements, and early safety trials.

Study sponsors can also request permission to delay reporting on experimental drugs not yet approved by the FDA, and have done so on more than 4,300 occasions.

The many exceptions mean that virtually all research organizations — even the most conscientious — have posted results for just a small fraction of their registered trials.

AbbVie, one of the most legally compliant pharmaceutical companies, was involved in 459 registered trials. Just 25 of those required the reporting of results by law. Even for that small number, AbbVie achieved its relatively good reporting record not from exceptional efforts on public disclosure, but by diligently applying for filing extensions.

Biogen delivered results late or not at all 97 percent of the time, the worst record among pharma companies. It said that many of its studies were not covered by the reporting law, and that it had extension requests pending or planned for others — accounting for the poor performance. But STAT did not count trials exempted from the law, nor those that NIH listed as having applied for extensions.



**Read More**

Drug makers need to disclose more clinical trial data, study says

The reporting of results on ClinicalTrials.gov, poor by any reasonable standard, is worse than it appears, some researchers say.

In part, that's because there is no easy way to tell whether companies or universities are registering all of their applicable trials, and there is no comprehensive policing mechanism. A research organization that appears conscientious in reporting results might be hiding some trials.

NYU's Miller studied drugs from major companies approved by the FDA in 2012. In a recent article in the medical journal BMJ Open, she and her coauthors showed that trials subject to the legal requirements often were not registered, and results not provided — even when the firms gave the data confidentially to the FDA during the approval process.

Miller found that results from only about two-thirds of studies used to justify FDA approvals were posted to ClinicalTrials.gov or published elsewhere.

Reporting lapses betray research volunteers who assume personal risks based on the promise that they are contributing to public health, said Kathy Hudson, an NIH deputy director who helps to guide the agency's clinical trial policies. "If no one ever knows about the knowledge gained from a study," she said in an interview, "then we have not been true to our word."

Draconian consequences — including FDA and NIH penalties — might prove necessary to improve the distorted evidence base of clinical medicine, said Dr. Ben Goldacre, a fellow at the University of Oxford and cofounder of The Compare Project and Alltrials.net, which advocates for disclosure of clinical research.

As a young doctor, Goldacre broke his leg in a fall while running to treat a cardiac arrest patient. "Nobody has ever broken a leg running down a corridor to try to fix the problem of publication bias," he said. "That's because of a failure of empathy."

*Illustrations: Alex Hogan/STAT; Photos: Memorial Sloan Kettering, AP, NIH, Jun Seita/Creative Commons, Getty Images*

Charles Piller can be reached at charles.piller@statnews.com
Follow Charles on Twitter @cpiller

- Twitter
- Facebook
- LinkedIn
- Email
- Print